Nos. 21-1123, -1125

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

VIASAT, INC.,

*Appellant,*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee,*

SPACE EXPLORATION HOLDINGS, LLC,

*Movant-Intervenor.*

On Appeal from the Federal Communications Commission
IBFS File No. SAT-MOD-20200417-00037

**APPENDIX IN SUPPORT OF VIASAT'S MOTION
TO STAY PENDING JUDICIAL REVIEW**

OF COUNSEL:

John P. Janka
Jarrett S. Taubman
VIASAT, INC.
901 K Street NW, Suite 400
Washington, DC 20001

Colin L. Ward
VIASAT, INC.
6155 El Camino Real
Carlsbad, CA 92009

June 2, 2021

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

David J. Zimmer
Gerard J. Cedrone
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

*Counsel for Viasat, Inc.*

# TABLE OF CONTENTS

**Page**

Declaration of William M. Jay.............................................................................A001

Ex. A:  Federal Communication Commission's Order and Authorization
and Order on Reconsideration (adopted Apr.  23, 2021 and
released Apr. 27, 2021)....................................................................A010

Ex. B:  Excerpts of the Application for Modification of Authorization for
SpaceX NGSO Satellite System, Attachment A (filed Apr. 17,
2020). ...............................................................................................A068

Ex. C:  Letter from David Goldman, Director of Satellite Policy, Space
Exploration Technologies Corp., to Marlene H. Dortch, Sec'y,
FCC (dated Sept. 14, 2020) ............................................................A071

Ex. D:  Petition Pursuant to Section 1.1307(c) of Viasat, Inc. (dated Dec.
22, 2020). .........................................................................................A081

Ex. E:  Excerpts of Ex. 12 to the Viasat NEPA Petition (Martin Ross et
al., *Limits on the Space Launch Market Related to Stratospheric
Ozone Depletion*, 7 Astropolitics 50 (2009))...................................A116

Ex. F:  Excerpts of Ex. 14 to the Viasat NEPA Petition (Martin N. Ross
& Patti M. Sheaffer, *Radiative Forcing Caused by Rocket Engine
Emissions*, 2 Earth's Future 177 (2014)). ........................................A120

Ex. G:  Ex. 15 to the Viasat NEPA Petition (Lee Organski et al.,
Aerospace Corp., *Environmental Impacts of Satellites from
Launch to Deorbit and the Green New Deal for the Space
Enterprise* (presented Dec. 2020))...................................................A123

Ex. H:  Ex. 18 to the Viasat NEPA Petition (Luc H. Riesbeck et al.,
Aerospace Corp., *The Future of the Night Sky: Light Pollution
from Satellites* (2020)). ....................................................................A125

Ex. I:  Ex. 19 to the Viasat NEPA Petition (Constance Walker et al.,
*Impact of Satellite Constellations on Optical Astronomy and
Recommendations Toward Mitigation* (2020))..................................A143

i

Ex. J:    Excerpts of Ex. 20 to the Viasat NEPA Petition (Constance Walker et al., *Appendices to "Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigation"* (2020)) ..........................................................A166

Ex. K:    Ex. 21 to the Viasat NEPA Petition (Fabio Falchi et al., *Limiting the Impact of Light Pollution on Human Health, Environment and Stellar Visibility*, 10 J. Env't Mgmt. 2714 (2011))....................A170

Ex. L:    Ex. 22 to the Viasat NEPA Petition (Ron Chepesiuk, *Missing the Dark: Health Effects of Light Pollution*, 117 Env't Health Persp. A20 (2009))......................................................................................A195

Ex. M:    Ex. 23 to the Viasat NEPA Petition (Rebecca Bell et al., *Dark Nature: Exploring Potential Benefits of Nocturnal Nature-Based Interaction for Human and Environmental Health*, 5 Eur. J. Ecopsychology 1 (2014))..................................................................A204

Ex. N:    Ex. 24 to the Viasat NEPA Petition (Stefano Gallozzi et al., *Concerns About Ground Based Astronomical Observations: A Step To Safeguard the Astronomical Sky* (2020))............................A222

Ex. O:    Ex. 30 to the Viasat NEPA Petition (Marit Undseth et al., *Space Sustainability: The Economics of Space Debris in Perspective* (2020))................................................................................................A239

Ex. P:    Opposition of Space Exploration Holdings, LLC to Petition Pursuant to Section 1.1307(c) of Viasat, Inc. (dated Jan. 6, 2021) ..A242

Ex. Q:    Letter from Amy R. Mehlman, Vice President, U.S. Gov't Affairs & Policy, Viasat, Inc., & Jarrett S. Taubman, Assoc. Gen. Counsel, Gov't & Regulatory Affairs, Viasat, Inc. to Marlene H. Dortch, Sec'y, FCC (dated Jan. 15, 2021)........................................A274

Ex. R:    Reply of Viasat, Inc., in Support of its Petition Pursuant to Section 1.1307(c) (dated Jan. 19, 2021) ..........................................A301

Ex. S:    Ex. 12 to the Viasat NEPA Reply (Anthony Mallama, *The Brightness of VisorSat-Design Starlink Satellites* (Jan. 2, 2021))....A349

Ex. T:   Excerpts of Ex. 13 to the Viasat NEPA Reply (Constance Walker et al., *Dark and Quiet Skies for Science and Society: Report and Recommendations* (2020)) ................................................................ A373

Ex. U:   Ex. 14 to the Viasat NEPA Reply (Int'l Dark Sky Ass'n Comments — Comment from Charles Lee Mudd Jr. and Ruskin Hartley, Exec. Dir., Int'l Dark Sky Ass'n, to Mary B. Neumayr, Chairman, CEQ, Docket No. CEQ-2019-0003 (Mar. 9, 2020)) ....... A378

Ex. V:   Letter from SpaceX to FCC (dated Apr. 2, 2021) .......................... A392

Ex. W:   Letter from Viasat to FCC (dated Apr. 16, 2021) .......................... A396

Ex. X:   Letter from Dr. Andy Lawrence to Marlene H. Dortch, Sec'y, FCC (dated Apr. 21, 2021) ............................................................. A402

Ex. Y:   Attachment A: Technical Information to Supplement Schedule S (filed Nov. 8, 2018), in *Matter of Space Exploration Holdings, LLC, Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, IBFS File No. SAT-MOD-20181108-00083. .............................................................................. A406

Ex. Z:   Int'l Astronomical Union, *IAU Statement on Satellite Constellations* (June 3, 2019), as downloaded from http://www.iau.org/news/announcements/detail/ann19035 .............. A413

Ex. AA:  Royal Astronomical Soc'y, *RAS Statement on Starlink Satellite Constellation* (June 7, 2019), as downloaded from http://ras.ac.uk /news-and-press/news/ras-statement-starlink-satellite-constellation. .................................................................................... A417

Ex. BB:  Am. Astronomical Soc'y, *AAS Issues Position Statement on Satellite Constellations* (June 10, 2019), as downloaded from https://aas.org/press/aas-issues-position-statement-satellite-constellations ...................................................................................... A422

Ex. CC:  Excerpts of the *Final Environmental Assessment and Finding of No Significant Impact for SpaceX Falcon Launches at Kennedy Space Center and Cape Canaveral Air Force Station*, Federal Aviation Administration (July 2020), as downloaded from https:// www.faa.gov/space/environmental/nepa_docs/media/SpaceX _Falcon_Program_ Final_EA_and_FONSI.pdf .............................. A427

Ex. DD: Dr. Jonathan McDowell, *Space Report*, No. 785 (Nov. 5, 2020), as downloaded from https://planet4589.org/space/jsr/back/news .785.txt ........................................................................................... A433

Ex. EE:  Martin N. Ross & Leonard David, *Space Pollution*, Sci. Am. (Nov. 6, 2020), as downloaded from https://www .scientificamerican.com/article/an-underappreciated-danger-of- the-new-space-age-global-air-pollution ........................................... A438

Ex. FF:  Aaron Boley & Michael Byers, *Satellite mega-constellations create risks in Low Earth Orbit, the atmosphere and on Earth*, Scientific Reports 11, 10642 (2021), as downloaded from https://www.nature.com/articles/s41598-021-89909-7.pdf ............. A443

Ex. GG: M. Kocifaj et al., *The Proliferation of Space Objects Is a Rapidly Increasing Source of Artificial Night Sky Brightness* 5 (2021) ........ A452

Ex. HH: Trevor Mogg, *Elon Musk Reveals When Starlink Internet Service Will Likely Exit Beta*, Digital Trends (Apr. 16, 2021), as downloaded from https://www.digitaltrends.com/news/elon-musk -reveals-when-starlink-internet-will-likely-exit-beta ....................... A459

Ex. II:  Kate Duffy, *Here are the 7 big space companies in the race to build a global satellite-internet network*, Business Insider (Apr. 17, 2021), as downloaded from https://www.businessinsider.com /spacex-starlink-amazon-oneweb-companies-compete-satellite- internet-2021-4#canadas-telesat-7 .................................................. A466

Declaration of Mark Dankberg ......................................................................... A478

Nos. 21-1123, -1125

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

VIASAT, INC.,

*Appellant,*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee,*

SPACE EXPLORATION HOLDINGS, LLC,

*Movant-Intervenor.*

On Appeal from the Federal Communications Commission
IBFS File No. SAT-MOD-20200417-00037

**DECLARATION OF WILLIAM M. JAY**

I, William M. Jay, hereby declare as follows:

1.      I am a partner at the law firm of Goodwin Procter LLP, a member in good standing of the bar of the District of Columbia, and counsel for Viasat, Inc.  I submit this declaration in support of Viasat's Motion to Stay Pending Judicial Review in the above-captioned case, in order to authenticate and provide to the Court certain documents cited and referenced in Viasat's motion.

2.      For ease of reference, this declaration refers to the agency action on

review in this Court—*i.e.*, *Matter of Space Exploration Holdings, LLC, Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, IBFS File No. SAT-MOD-20200417-00037—as the "proceedings below." For any excerpted documents that were entered in the proceedings below, the complete versions are available on the FCC docket for the underlying agency proceedings, https://bit.ly/3fJ8d9W.

3.      Attached as **Exhibit A** is a true and correct copy of the Federal Communication Commission's Order and Authorization and Order on Reconsideration (adopted Apr. 23, 2021 and released Apr. 27, 2021), as entered in the proceedings below.

4.      Attached as **Exhibit B** is a true and correct copy of excerpts of the Application for Modification of Authorization for SpaceX NGSO Satellite System, Attachment A (filed Apr. 17, 2020), as entered in the proceedings below.

5.      Attached as **Exhibit C** is a true and correct copy of the Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Sec'y, FCC (dated Sept. 14, 2020), as entered in the proceedings below.

6.      Attached as **Exhibit D** is a true and correct copy of the Petition Pursuant to Section 1.1307(c) of Viasat, Inc. (dated Dec. 22, 2020), as entered in the

proceedings below (hereinafter, for ease of reference, the "Viasat NEPA Petition").

7.      Attached as **Exhibit E** is a true and correct copy of excerpts of Exhibit 12 to the Viasat NEPA Petition (Martin Ross et al., *Limits on the Space Launch Market Related to Stratospheric Ozone Depletion*, 7 Astropolitics 50 (2009)), as entered in the proceedings below.

8.      Attached as **Exhibit F** is a true and correct copy of excerpts of Exhibit 14 to the Viasat NEPA Petition (Martin N. Ross & Patti M. Sheaffer, *Radiative Forcing Caused by Rocket Engine Emissions*, 2 Earth's Future 177 (2014)), as entered in the proceedings below.

9.      Attached as **Exhibit G** is a true and correct copy of Exhibit 15 to the Viasat NEPA Petition (Lee Organski et al., Aerospace Corp., *Environmental Impacts of Satellites from Launch to Deorbit and the Green New Deal for the Space Enterprise* (presented Dec. 2020)), as entered in the proceedings below.

10.     Attached as **Exhibit H** is a true and correct copy of Exhibit 18 to the Viasat NEPA Petition (Luc H. Riesbeck et al., Aerospace Corp., *The Future of the Night Sky: Light Pollution from Satellites* (2020)), as entered in the proceedings below.

11.     Attached as **Exhibit I** is a true and correct copy of Exhibit 19 to the Viasat NEPA Petition (Constance Walker et al., *Impact of Satellite Constellations*

*on Optical Astronomy and Recommendations Toward Mitigation* (2020)), as entered in the proceedings below.

12.     Attached as **Exhibit J** is a true and correct copy of excerpts of Exhibit 20 to the Viasat NEPA Petition (Constance Walker et al., *Appendices to "Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigation"* (2020)), as entered in the proceedings below.

13.     Attached as **Exhibit K** is a true and correct copy of Exhibit 21 to the Viasat NEPA Petition (Fabio Falchi et al., *Limiting the Impact of Light Pollution on Human Health, Environment and Stellar Visibility*, 10 J. Env't Mgmt. 2714 (2011)), as entered in the proceedings below.

14.     Attached as **Exhibit L** is a true and correct copy of Exhibit 22 to the Viasat NEPA Petition (Ron Chepesiuk, *Missing the Dark: Health Effects of Light Pollution*, 117 Env't Health Persp. A20 (2009)), as entered in the proceedings below.

15.     Attached as **Exhibit M** is a true and correct copy of Exhibit 23 to the Viasat NEPA Petition (Rebecca Bell et al., *Dark Nature: Exploring Potential Benefits of Nocturnal Nature-Based Interaction for Human and Environmental Health*, 5 Eur. J. Ecopsychology 1 (2014)), as entered in the proceedings below.

16.     Attached as **Exhibit N** is a true and correct copy of Exhibit 24 to the Viasat NEPA Petition (Stefano Gallozzi et al., *Concerns About Ground Based*

*Astronomical Observations: A Step To Safeguard the Astronomical Sky* (2020)), as entered in the proceedings below.

17.    Attached as **Exhibit O** is a true and correct copy of Exhibit 30 to the Viasat NEPA Petition (Marit Undseth et al., *Space Sustainability: The Economics of Space Debris in Perspective* (2020)), as entered in the proceedings below.

18.    Attached as **Exhibit P** is a true and correct copy of the Opposition of Space Exploration Holdings, LLC to Petition Pursuant to Section 1.1307(c) of Viasat, Inc. (dated Jan. 6, 2021), as filed in the proceedings below.

19.    Attached as **Exhibit Q** is a true and correct copy of the Letter from Amy R. Mehlman, Vice President, U.S. Gov't Affairs & Policy, Viasat, Inc., & Jarrett S. Taubman, Assoc. Gen. Counsel, Gov't & Regulatory Affairs, Viasat, Inc. to Marlene H. Dortch, Sec'y, FCC (dated Jan. 15, 2021), as entered in the proceedings below.

20.    Attached as **Exhibit R** is a true and correct copy of the Reply of Viasat, Inc., in Support of its Petition Pursuant to Section 1.1307(c) (dated Jan. 19, 2021), as entered in the proceedings below (hereinafter, for ease of reference, the "Viasat NEPA Reply").

21.    Attached as **Exhibit S** is a true and correct copy of Exhibit 12 to the Viasat NEPA Reply (Anthony Mallama, *The Brightness of VisorSat-Design Starlink*

*Satellites* (Jan. 2, 2021)), as entered in the proceedings below.

22.    Attached as **Exhibit T** is a true and correct copy of excerpts of Exhibit 13 to the Viasat NEPA Reply (Constance Walker et al., *Dark and Quiet Skies for Science and Society: Report and Recommendations* (2020)), as entered in the proceedings below.

23.    Attached as **Exhibit U** is a true and correct copy of Exhibit 14 to the Viasat NEPA Reply (Int'l Dark Sky Ass'n Comments — Comment from Charles Lee Mudd Jr. and Ruskin Hartley, Exec. Dir., Int'l Dark Sky Ass'n, to Mary B. Neumayr, Chairman, CEQ, Docket No. CEQ-2019-0003 (Mar. 9, 2020)), as entered in the proceedings below.

24.    Attached as **Exhibit V** is a true and correct copy of the Letter from SpaceX to FCC (dated Apr. 2, 2021) as entered in the proceedings below.

25.    Attached as **Exhibit W** is a true and correct copy of the Letter from Viasat to FCC (dated Apr. 16, 2021) as entered in the proceedings below.

26.    Attached as **Exhibit X** is a true and correct copy of the Letter from Dr. Andy Lawrence to Marlene H. Dortch, Sec'y, FCC (dated Apr. 21, 2021), as entered in the proceedings below.

27.    Attached as **Exhibit Y** is a true and correct copy of Attachment A: Technical Information to Supplement Schedule S (filed Nov. 8, 2018), in *Matter of*

*Space Exploration Holdings, LLC, Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, IBFS File No. SAT-MOD-20181108-00083.

28.    Attached as **Exhibit Z** is a true and correct copy of Int'l Astronomical Union, *IAU Statement on Satellite Constellations* (June 3, 2019), as downloaded from http://www.iau.org/news/announcements/detail/ann19035/.

29.    Attached as **Exhibit AA** is a true and correct copy of Royal Astronomical Soc'y, *RAS Statement on Starlink Satellite Constellation* (June 7, 2019), as downloaded from http://ras.ac.uk/news-and-press/news/ras-statement-starlink-satellite-constellation.

30.    Attached as **Exhibit BB** is a true and correct copy of Am. Astronomical Soc'y, *AAS Issues Position Statement on Satellite Constellations* (June 10, 2019), as downloaded from https://aas.org/press/aas-issues-position-statement-satellite-constellations.

31.    Attached as **Exhibit CC** is a true and correct copy of excerpts of the *Final Environmental Assessment and Finding of No Significant Impact for SpaceX Falcon Launches at Kennedy Space Center and Cape Canaveral Air Force Station*, Federal Aviation Administration (July 2020), as downloaded from https://www.faa.gov/space/environmental/nepa_docs/media/SpaceX_Falcon_Program_Final_EA_and_FONSI.pdf.

32.    Attached as **Exhibit DD** is a true and correct copy of Dr. Jonathan McDowell, *Space Report*, No. 785 (Nov. 5, 2020), as downloaded from https://planet4589.org/space/jsr/back/news.785.txt.

33.    Attached as **Exhibit EE** is a true and correct copy of Martin N. Ross & Leonard David, *Space Pollution*, Sci. Am. (Nov. 6, 2020), as downloaded from https://www.scientificamerican.com/article/an-underappreciated-danger-of-the-new-space-age-global-air-pollution.

34.    Attached as **Exhibit FF** is a true and correct copy of Aaron Boley & Michael Byers, *Satellite mega-constellations create risks in Low Earth Orbit, the atmosphere and on Earth*, Scientific Reports 11, 10642 (2021), as downloaded from https://www.nature.com/articles/s41598-021-89909-7.pdf.

35.    Attached as **Exhibit GG** is a true and correct copy of M. Kocifaj et al., *The Proliferation of Space Objects Is a Rapidly Increasing Source of Artificial Night Sky Brightness* 5 (2021).

36.    Attached as **Exhibit HH** is a true and correct copy of Trevor Mogg, *Elon Musk Reveals When Starlink Internet Service Will Likely Exit Beta*, Digital Trends (Apr. 16, 2021), as downloaded from https://www.digitaltrends.com/news/elon-musk-reveals-when-starlink-internet-will-likely-exit-beta.

37.    Attached as **Exhibit II** is a true and correct copy of Kate Duffy, *Here*

*are the 7 big space companies in the race to build a global satellite-internet network*,

Business Insider (Apr. 17, 2021), as downloaded from https://www.businessinsider

.com/spacex-starlink-amazon-oneweb-companies-compete-satellite-internet-2021-

4#canadas-telesat-7.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2021                    /s/ *William M. Jay*
                                            William M. Jay

# EXHIBIT A

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| Space Exploration Holdings, LLC | **)** | IBFS File No. SAT-MOD-20200417-00037 |
| | **)** | |
| Request for Modification of the Authorization | **)** | |
| for the SpaceX NGSO Satellite System | **)** | Call Signs S2983 and S3018 |


**ORDER AND AUTHORIZATION AND ORDER ON RECONSIDERATION**


**Adopted: April 23, 2021**             **Released: April 27, 2021**

By the Commission:

**TABLE OF CONTENTS**

Heading             Paragraph #

I. INTRODUCTION ............................................................................................................................... 1
II. BACKGROUND ................................................................................................................................ 2
III. DISCUSSION .................................................................................................................................... 7
     A. Public Interest Determination ....................................................................................................... 8
     B. Radiofrequency Interference ....................................................................................................... 14
         1. Interference to Other NGSO Systems and Processing Round Placement ............................. 15
             a. Modifications and the Significant Interference Standard ................................................ 16
             b. Analysis of Overall NGSO Interference Environment .................................................... 19
         2. Interference into GSO Systems ............................................................................................. 32
         3. Compatibility with Terrestrial 5G and the 12 GHz Rulemaking ........................................... 48
         4. Protection of Ka-Band Terrestrial Systems .......................................................................... 52
     C. Orbital Debris .............................................................................................................................. 53
     D. Authority for LEOP and Payload Testing Operations ................................................................. 69
     E. The National Environmental Policy Act and Other Matters ........................................................ 72
         1. Background and Legal Framework ........................................................................................ 72
         2. Potential Effect on Earth's Atmosphere from Satellite Launch and Reentry ......................... 80
         3. Satellite Debris Surviving Reentry ....................................................................................... 84
         4. Potential Impact on the Night Sky and Astronomy ............................................................... 86
         5. Satellite Collisions in Space ................................................................................................. 89
         6. Radiofrequency Emissions ................................................................................................... 90
     F. Other Matters ............................................................................................................................... 93
     G. Petition for Reconsideration of Partial Grant .............................................................................. 94
IV. CONCLUSION AND ORDERING CLAUSES .................................................................................. 96

## I.     INTRODUCTION

1.      In this Order and Authorization and Order on Reconsideration (Order), we grant subject to the conditions set forth herein the application[1] of Space Exploration Holdings, LLC (SpaceX) for modification of its license for a non-geostationary orbit (NGSO) fixed-satellite service (FSS) constellation using Ku- and Ka-band spectrum.[2]  Specifically, we modify the license by reducing the number of satellites from 4,409 to 4,408; modifying the primary operational altitude specified for 2,814 satellites, to change it from the 1,100-1,300 km range to the 540-570 km range; modifying the minimum earth station elevation angle for both user beams and gateway beams,[3] and by including in the license authority to conduct launch and early orbit phase (LEOP) operations and payload testing during orbit-raising and deorbit of its satellites, consistent with parameters described in the application and related materials.  We further conclude that this modification does not create significant interference problems that would warrant treatment of SpaceX's system as if it were filed in a later processing round.[4]  We deny petitions to deny or defer of Viasat, Inc. (Viasat), SES Americom, Inc. and O3B Limited (SES/O3b), Kepler Communications, Inc. (Kepler), and Kuiper Systems LLC. (Kuiper); the "Opposition and Motions for Consultation with Affected Agencies, for Disclosure, for Certification of Suitably Comprehensive Insurance Coverage, for Certification of Indemnity, and to Suspend or Revoke Licenses" of The Balance Group; and the "Petition Pursuant to Section 1.1307" of Viasat.[5]  We also dismiss the request of DISH Network LLC. (DISH) for production of evidence.[6]  Furthermore, we deny Viasat's Petition for Reconsideration of our previous partial grant of this application for ten satellites.[7]  Our action will allow SpaceX to implement safety-focused changes to the deployment of its satellite constellation to deliver

---

[1] See Space *Exploration Holdings, LLC, Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, IBFS File No. SAT−MOD−20200417−00037, filed April 17, 2020 (SpaceX Third Modification Application).

[2] *See Space Exploration Holdings, LLC, Application for Approval for Orbital Deployment and Operating Authority for the SpaceX NGSO Satellite System*, Memorandum Opinion, Order and Authorization, 33 FCC Rcd 3391 (2018) (*SpaceX Authorization*).

[3] Specifically, SpaceX is authorized to operate with earth station elevation angles as low as 25 degrees for user terminals and gateways, and for gateways in the polar regions it is authorized to operate with earth station elevation angles as low as five degrees.

[4] SpaceX's authorization was granted pursuant to the Commission's processing round procedures.  See *SpaceX Authorization*, 33 FCC Rcd at 3392-93, para. 3.  SpaceX's original application was considered as part of the Ku/Ka-band processing round that closed on November 15, 2016.  *See id.*; *OneWeb Petition Accepted for Filing, IBFS File No. SAT-LOI-20160428-00041; Cut-Off Established for Additional NGSO-Like Satellite Applications or Petitions for Operations in the 10.7-12.7 GHz, 14.0-14.5 GHz, 17.8-18.6 GHz, 18.8-19.3 GHz, 27.5-28.35 GHz, 28.35-29.1 GHz, and 29.5-30.0 GHz Bands*, Public Notice, 31 FCC Rcd 7666 (IB 2016)  (*2016 Processing Round Public Notice*).  SpaceX's original application was also considered as part of a processing round addressing additional frequency bands that closed on July 26, 2017.  *See SpaceX Authorization,* 33 FCC Rcd at 3392, para. 3; *Applications Accepted for Filing; Cut-off Established for Additional NGSO-like Satellite Applications or Petitions for Operations in the 12.75-13.25 GHz, 13.85-14.0 GHz, 18.6-18.8 GHz, 19.3-20.2 GHz, and 29.1-29.5 GHz Bands*, Public Notice, DA 17-524 (IB rel. May 26, 2017) (*2017 Processing Round Public Notice*).

[5] See Opposition and Motions of The Balance Group (filed May 26, 2020), as amended by Errata of The Balance Group (filed May 27, 2020) (The Balance Group Opposition); Petition to Deny or Defer of Viasat, Inc. (filed Jul. 13, 2020) (Viasat Petition); Petition to Deny or Defer of SES Americom, Inc. and O3b Limited (filed Jul. 13, 2020) (SES/O3b Petition); Petition to Deny of Kepler Communications, Inc. (filed Jul. 13, 2020) (Kepler Opposition); Petition to Deny and Comments of Kuiper Systems, LLC (filed Jul. 13, 2020) (Kuiper Opposition); Petition Pursuant to Section 1.1307 of Viasat, Inc. (filed Dec. 19, 2020) (Viasat NEPA Petition).

[6] *See* Letter from Trey Hanbury, Counsel, DISH Network, LLC., to Marlene H. Dortch, Secretary, FCC (filed Sept. 25) (DISH September 25 Letter Requesting Order of Production of Evidence).

[7] Petition for Reconsideration of Viasat, Inc. (filed Feb. 8, 2021) (Viasat Recon Petition).

broadband service throughout the United States, including to those who live in areas underserved or unserved by terrestrial systems.

## II.   BACKGROUND

2.      On March 28, 2018, the Commission granted SpaceX authority to deploy and operate an NGSO satellite system comprising 4,425 satellites operating in the Ku- and Ka-bands for provision of FSS.[8]  SpaceX was authorized to operate in the 10.7-12.7 GHz, 13.85-14.5 GHz, 17.8-18.6 GHz, 18.8-19.3 GHz, 27.5-29.1 GHz, and 29.5-30 GHz frequency bands.[9]  The Commission conditioned the grant of SpaceX's application on, among other things, approval of an updated description of the orbital debris mitigation plans for the system.[10]  In addition, SpaceX's authorization was conditioned to bring its license into conformance with any future Commission rulemakings.[11]

3.      On April 26, 2019, the International Bureau (Bureau), granted SpaceX's request to modify its initial authorization to: (1) reduce the number of satellites in the constellation from 4,425 to 4,409; (2) operate 1,584 satellites previously authorized to operate at an altitude of 1,150 km at the lower altitude of 550 km; and (3) make related changes to the operations of the satellites in this new lower shell of the constellation.[12]  On December 19, 2019, the Bureau granted SpaceX's second modification request to allow it to increase the number of orbital planes authorized for operations of SpaceX's satellites at the 550 kilometer (km) orbital shell, to reduce the number of satellites in each orbital plane, and to reconfigure existing satellites in its constellation accordingly.[13]  The Bureau assessed each of the modification requests in accordance with its *Teledesic Order* precedent,[14] and in both instances found that grant of the modification was in the public interest, and would not materially change the interference environment.[15]  Therefore, in neither of these instances did the Bureau conclude that SpaceX's system needed to be considered as part of a later processing round.

4.      On April 17, 2020, SpaceX filed the instant application, the Third Modification Application.  Pursuant to the Third Modification Application, SpaceX's constellation would consist of the 1,584 satellites previously authorized in the First and Second Modification Orders operating at 550 km, with an inclination of 53 degrees, in 72 orbital planes with 22 satellites per plane; an additional 1,584 satellites operating at 540 km, with an inclination of 53.2 degrees, in 72 orbital planes with 22 satellites

---

[8] *SpaceX Authorization*, 33 FCC Rcd at 3391, para.1.

[9] *See id.* at 3392, para. 2.

[10] *See id.* at 3398, 3406, paras. 15, 40.p.

[11] *See id.* at 3406, para. 40.r.

[12] *See Space Exploration Holdings, LLC, Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, Order and Authorization, 34 FCC Rcd 2526 (IB 2019) (*SpaceX First Modification Order*).  *See* Petition for Reconsideration and Petition to Condition of WorldVu Satellites Limited, IBFS File Nos. SAT-MOD-20181108-00083, SES-LIC-20190402-00425 through -00427, SES-LIC-20190402-00450, -00451, and -00454 (filed May 28, 2019) and SES-AMD-20190410-00520 through 00525 (filed May 31, 2019) (OneWeb Petition for Reconsideration); *see also* Letter from Nickolas G. Spina, Counsel to Kepler Communications, Inc., to Marlene H. Dortch, Secretary, FCC, IBFS File Nos. SAT-MOD-20181108-00083, SAT-MOD-20190830-00087, and SAT-STA-20190924-00098, at 1-2, 5-13 (filed Oct. 15, 2019).  OneWeb's petition for reconsideration was granted in part and denied in part, and Kepler's filing was dismissed.  *See Space Exploration Holdings, LLC, Request for Modification of the Authorization of the SpaceX NGSO System*, Memorandum Opinion and Order, 35 FCC Rcd 5649 (IB, rel. June 4, 2020).

[13] *See Space Exploration Holdings, LLC, Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, Order and Authorization, 34 FCC 12307 (IB 2019) (SpaceX Second Modification Order).

[14] *See Teledesic LLC*, Order and Authorization, 14 FCC Rcd 2261 (IB 1999) (*Teledesic Order*).

[15] *See SpaceX First Modification Order,* 34 FCC Rcd at 2530, 2536, paras. 9, 27.

per plane; 720 satellites operating at 570 km, with an inclination of 70 degrees, in 36 orbital planes with 20 satellites per plane; 348 satellites operating at 560 km, with an inclination of 97.6 degrees, in 6 orbital planes with 58 satellites per plane; and 172 satellites also operating at 560 km, with an inclination of 97.6 degrees, in 4 orbital planes with 43 satellites per plane.[16]  The various altitudes specified are the "center" altitude, with operations occurring with a range of 30 km around that altitude.[17]  SpaceX does not seek any modification to the Ku- and Ka-band frequencies currently specified in its license.[18]  SpaceX also requests authority to conduct LEOP operations and payload testing during orbit-raising and telemetry, tracking, and command (TT&C) communications during de-orbit of its satellites.[19]

5.        On June 12, 2020, the SpaceX Third Modification Application was accepted for filing.[20]  Nearly 200 pleadings have been submitted into the International Bureau Filing System (IBFS) regarding this modification application.[21]   During the public notice period,[22] Viasat and SES/O3B submitted petitions to deny or defer; Kepler and Kuiper submitted pleadings titled "petitions to deny," which we will consider informal objections because they lack an affidavit required by our rules;[23] and The Balance Group submitted an Opposition and Motions for Consultation with Affected Agencies, for Disclosure, for Certification of Suitably Comprehensive Insurance Coverage, for Certification of Indemnity, and to Suspend or Revoke Licenses.[24]  Spire Global, Inc. (Spire), WorldVu Satellites Limited (OneWeb), and AT&T Services, Inc. (AT&T) filed comments.[25]  RS Access, LLC (RS Access), DISH, Astroscale U.S. Inc. (Astroscale), the Computer & Communications Industry Association (CCIA) and INCOMPAS, and Go Long Wireless, LTD., Cass Cable TV, Inc., Story Communications, LLC., and Vision Broadband, LLC. (the MVDDS Licensees) filed letters.[26]  SpaceX responded in a consolidated opposition,[27] and also

---

[16] *See* SpaceX Third Modification Application, Narrative at 4.

[17] The exceptions to this altitude range are for satellites at the upper range of SpaceX's selected altitudes, operating with a nominal altitude of 560 km or 570 km.  Consistent with the discussion below, those satellites would be required to operate below 580 km, and thus would have an altitude range of +20 km/-30 km and +10 km/-30 km, respectively.

[18] *See* SpaceX Third Modification Application, Frequency Bands Requested at 1.

[19] *See Id.*, Narrative at 4; 47 CFR §§ 25.282, 25.283.

[20] *See* Policy Branch Information, Space Stations Accepted for Filing, Public Notice, Report No SAT-01472 (IB Sat. Div. Jun. 12, 2020).

[21] *See generally* IBFS File No. SAT-MOD-20200417-00037.

[22] *See* 47 CFR §§ 25.151, 25.154.

[23] 47 CFR § 25.154(a)(4), (b)(1).

[24] See Viasat Petition; SES/O3B Petition; Kepler Opposition; Kuiper Opposition; The Balance Group Opposition; Viasat NEPA Petition.

[25] *See* Comments of Spire Global, Inc. (filed Jul. 13, 2020) (Spire Comments); Comments of WorldVu Satellites Limited, Debtor-in-Possession (filed Jul. 13, 2020) (OneWeb Comments); Comments of AT&T Services, Inc. (filed Jul. 13, 2020) (AT&T Comments).

[26] *See* Letter from V. Noah Campbell, RS Access, LLC, to Marlene H. Dortch, Secretary, FCC (filed Jun. 11, 2020) (RS Access Letter); Letter from Jeffrey Blum, Executive Vice President External and Legislative Affairs, DISH Network, LLC., to Marlene H. Dortch, Secretary, FCC (filed Jun. 16, 2020) (DISH Letter); Letter from Charity Weeden, Vice President Global Space Policy, Astroscale U.S. Inc., to Marlene H. Dortch, Secretary, FCC (filed Jun. 30, 2020) (Astroscale Letter); Letter from Vann Bentley, Policy Counsel, Computer & Communications Industry Association, to Marlene H. Dortch, Secretary, FCC (filed Jul. 13, 2020) (CCIA/INCOMPAS Letter); Letter from Bruce E. Fox, Go Long Wireless, to Marlene H. Dortch, Secretary, FCC (filed Aug. 14, 2020) (MVDDS Licensees Letter).

submitted specific responses to DISH,[28] Viasat,[29] Hughes,[30] RS Access,[31] Kuiper,[32] SES/O3B,[33] and the Balance Group.[34] Astroscale, Viasat, AT&T, Kuiper, Kepler, OneWeb, SES/O3b, and the American

(Continued from previous page) ————————————

[27] *See* Consolidated Opposition and Response of Space Exploration Holdings, LLC. (filed Jul. 27, 2020) (SpaceX Consolidated Opposition); Opposition of Space Exploration Holdings LLC to Petition Pursuant to Section 1.1307(c) of Viasat, Inc. (filed Jan. 6, 2021) (SpaceX Opposition to Viasat NEPA Petition).

[28] *See* DISH Letter; Letter from David Goldman, Director Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Jun 29, 2020) (SpaceX June 29 Response to DISH); Letter from Jeffrey Blum, Executive Vice President External and Legislative Affairs, DISH Network, LLC., to Marlene H. Dortch, Secretary, FCC (filed Jul. 14, 2020) (DISH July 14Response to SpaceX); Letter from Irene Rodriguez, DISH Network LLC., to Marlene H. Dortch, Secretary, FCC (filed Aug. 6, 2020) (DISH August 6 Response to SpaceX); DISH September 25 Letter Requesting Order of Production of Evidence; Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Oct. 1, 2020) (SpaceX October 1 Response to DISH); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Oct. 15, 2020) (SpaceX October 15 EPFD Notice); Ex Parte Presentation of DISH Network, LLC (filed Dec. 31, 2020) (DISH December 31 Ex Parte); Ex Parte Presentation of DISH Network LLC (filed Jan. 5, 2021) (DISH January 5 Ex Parte); Ex Parte Presentation of DISH Network LLC (filed Jan. 11, 2021) (DISH January 11 Ex Parte); Ex Parte Presentation DISH Network LLC. (filed Feb. 10, 2021) (DISH February 10 Ex Parte); Letter from Jeffrey Blum, Executive Vice President External and Legislative Affairs, DISH Network, LLC, to Marlene H. Dortch, Secretary, FCC (filed Feb. 15, 2021) (DISH February 15 Letter); Request for Protective Order of DISH Network LLC (filed Feb. 23, 2021) (DISH Request for Protective Order); Ex Parte Presentation of DISH Network LLC. (filed Feb. 24, 2021) (DISH February 24 Ex Parte); Letter from David Goldman, Director Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Feb. 25, 2021) (SpaceX February 25 2021 Response to DISH); Letter from Jeffrey Blum, Executive Vice President External and Legislative Affairs, DISH Network, LLC., to Marlene H. Dortch, Secretary, FCC (filed Mar. 4, 2021) (DISH March 4 Response to SpaceX); Ex Parte Presentation of DISH Network LLC (filed Mar. 8, 2021) (DISH March 8 Ex Parte); Ex Parte Presentation of DISH Network LLC (filed March. 9, 2021) (DISH March 9 Ex Parte); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed March 9, 2021) (SpaceX March 9 Response to DISH); Letter from Jeffrey Blum, Executive Vice President External and Legislative Affairs, DISH Network, LLC, to Marlene H. Dortch, Secretary, FCC (filed Mar. 17, 2021) (DISH March 17 Response to SpaceX); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed March 18, 2021) (SpaceX March 18 Response to DISH); Ex Parte Presentation of DISH Network LLC. (filed Mar. 22, 2021) (DISH March 22 2021 Ex Parte); Letter from Jeffrey Blum, Vice President, External and Legislative Affairs, DISH Network LLC, to Marlene H. Dortch, Secretary, FCC (filed Mar. 24, 2021) (DISH March 24 Response to SpaceX); Letter from Jeffrey Blum, Vice President, External and Legislative Affairs, DISH Network LLC., to Marlene H. Dortch, Secretary, FCC (filed Mar. 25, 2021) (DISH March 25 Letter); Letter from Jeffrey Blum, Executive Vice President, External and Legislative Affairs, DISH Network LLC., to Marlene H. Dortch, Secretary, FCC (filed Apr. 6, 2021) (DISH April 6 Letter); Ex Parte Presentation of DISH Network LLC. (filed Apr. 14, 2021) (DISH April 14 Ex Parte); Letter from Jeffrey Blum, Executive Vice President, External and Legislative Affairs, DISH Network LLC., to Marlene H. Dortch, Secretary, FCC (filed Apr. 19, 2021) (DISH April 19 Letter); Ex Parte Presentation of DISH Network LLC (filed Apr. 22, 2021) (DISH April 22 Ex Parte); Letter from, Pantelis Michalopoulos, Counsel, DISH Network LLC., to Marlene H. Dortch, Secretary, FCC (filed Apr. 23, 2021) (DISH April 23 12 GHz Letter); Letter from Jeffrey Blum, Executive Vice President, External and Legislative Affairs, DISH Network LLC., to Marlene H. Dortch, Secretary, FCC (filed Apr. 23, 2021) (DISH April 23 EPFD Letter).

[29] *See* Letter from Christopher J. Murphy, Associate General Counsel, Viasat, to Jose P. Albuquerque, Chief, Satellite Division (filed Jun. 8, 2020) (Viasat June 8 Letter); Letter from Christopher J. Murphy, Associate General Counsel, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Jun. 24, 2020) (Viasat June 24 Response to SpaceX); Letter from Christopher J. Murphy, Associate General Counsel, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Jul. 2, 2020) (Viasat July 2 Response to SpaceX); Letter from Christopher J. Murphy, Associate General Counsel, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Jul. 20, 2020) (Viasat July 20 response to SpaceX);  Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Sept. 17, 2020) (Viasat September 17 Letter); Ex Parte Presentation of Viasat, Inc. (filed Sept. 23, 2020) (Viasat September 23 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC  (filed Sept.

(continued….)

(Continued from previous page)

25, 2020) (Viasat September 25 Response to SpaceX); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Oct. 5, 2020) (Viasat October 5 Response to SpaceX); Ex Parte Presentation of Viasat, Inc. (filed Oct. 29, 2020) (Viasat October 29 Ex Parte); Ex Parte Presentation of Viasat, Inc. (filed Nov. 19, 2020) (Viasat November 19 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Dec. 8, 2020) (Viasat December 8 Letter); Ex Parte Presentation of Viasat, Inc. (filed Dec. 21, 2020) (Viasat December 21 ex Parte); Letter from David Goldman, Director Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Dec. 30, 2020) (SpaceX December 30 Response to Viasat); Ex Parte Presentation of Viasat, Inc. (filed Jan. 7, 2021) (Viasat January 7 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Jan. 15, 2021) (Viasat January 15 Letter); Letter from David Goldman, Director of Satellite Policy, Space Explorations Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Feb. 4, 2021) (SpaceX NEPA Response); Ex Parte Presentation of Viasat Inc. (filed Feb. 8, 2021) (Viasat February 8Ex Parte); Ex Parte Presentation of Viasat, Inc. (filed Feb. 12, 2021) (Viasat February 12 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Feb. 18, 2021) (Viasat February 18 Response to SpaceX); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Jessica Rosenworcel, Acting Chairwoman, Brendan Carr, Commissioner, Geoffrey Starks, Commissioner, and Nathan Simington, Commissioner, FCC (filed Feb. 22, 2021) (Viasat February 22 Letter); Letter from David Goldman, Director of Satellite Policy, Space Explorations Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Mar. 2, 2021) (SpaceX March 2 Response to Viasat); Letter from David Goldman, Director of Satellite Policy, Space Explorations Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Mar. 11, 2021) (SpaceX March 11 Response to Viasat); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Mar. 16, 2021) (Viasat March 16 Letter); Ex Parte Presentation of Viasat Inc. (filed Mar. 23, 2021) (Viasat March 23 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Mar. 26, 2021) (Viasat March 26 Letter); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc. to Marlene H. Dortch, Secretary, FCC (filed Apr. 5, 2021) (Viasat April 5 Letter); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc. to Marlene H. Dortch, Secretary, FC C(filed Apr. 12, 2021) (Viasat April 12 Conditions Letter); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc. to Marlene H. Dortch, Secretary, FCC (filed Apr. 12, 2021) (Viasat April 12 LEO Letter); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc. to Marlene H. Dortch, Secretary, FC C(filed Apr. 12, 2021) (Viasat April 12 Collision Risk Letter); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc. to Marlene H. Dortch, Secretary, FC C(filed Apr. 12, 2021 )(Viasat April 12 Look Angles Letter); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc. to Marlene H. Dortch, Secretary, FC C(filed Apr. 12, 2021 )(Viasat April 12 Failure Rates Letter); Ex Parte Presentation of Viasat Inc. (filed Apr. 13, 2021) (Viasat April 13 Ex Parte); Ex Parte Presentation of Viasat Inc. (filed Apr. 14, 2021) (Viasat April 14 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, to Marlene H. Dortch, Secretary, FCC (filed Apr. 16, 2021) (Viasat April 16 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, to Marlene H. Dortch, Secretary, FCC (filed Apr. 19, 2021) (Viasat April 19 Letter); Ex Parte Presentation of Viasat Inc. (filed Apr. 21, 2021) (Viasat April 21 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, to Marlene H. Dortch, Secretary, FCC (filed Apr. 21, 2021 Viasat April) 21 Letter); Ex Parte Presentation of Viasat, Inc. (filed Apr. 22, 2021) (Viasat April 22 Ex Parte); Ex Parte Presentation of Viasat, Inc. (filed Apr. 26, 2021) (Viasat April 26 Ex Parte).

[30] *See* Letter from Jennifer A. Manner, Senior Vice President Regulatory Affairs, Hughes Network Systems, LLC, to Marlene H. Dortch, Secretary, FCC (filed September 21, 2020) (Hughes September 21 Ex Parte); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Sept. 29, 2020) (SpaceX September 29 Response to GSO Operators); Letter from Jennifer A. Manner, Senior Vice President Regulatory Affairs, Hughes Network Systems, LLC, to Marlene H. Dortch, Secretary, FCC (filed Feb. 5, 2021) (Hughes February 5 Letter); Ex Parte Presentation of Hughes Network Systems, LLC (filed Mar. 5, 2021) (Hughes March 5 Ex Parte); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Mar. 11, 2021) (SpaceX March 11 Response to Hughes); Letter from Jennifer Manner, Senior Vice President Regulatory Affairs, Hughes Network Systems, to Marlene H. Dortch, Secretary, FCC (filed Apr. 5, 2021) (Hughes April 5 Letter); Letter from Jennifer A. Manner, Senior Vice President Regulatory Affairs, Hughes Network Systems, LLC, to Marlene H. Dortch, Secretary, FCC

(continued….)

(Continued from previous page)

(filed Apr. 12, 2021) (Hughes April 12 Letter); Ex Parte Presentation of Hughes Network Systems, LLC. (filed Apr. 20, 2021) (Hughes April 20 Ex Parte); Ex Parte Presentation of Hughes Network Systems, LLC. (filed Apr. 21, 2021) (Hughes April 21 Carr Ex Parte); Ex Parte Presentation of Hughes Network Systems, LLC. (filed Apr. 21, 2021) (Hughes April 21 Simington Ex Parte).

[31] *See* RS Access Letter; Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Jul. 10, 2020) (SpaceX July 10 Response to RS Access); Ex Parte Presentation of RS Access, LLC (filed Feb. 8, 2021) (RS Access February 8 Ex Parte); Ex Parte Presentation of RS Access, LLC (filed Feb. 19, 2021) (RS Access February 19 Ex Parte); Ex Parte Presentation of RS Access LLC (filed Feb. 26, 2021) (RS Access February 26 Ex Parte); Ex Parte Presentation of RS Access LLC (filed Mar. 15, 2021) (RS Access March 15 Ex Parte); Ex Parte Presentation of RS Access LLC. (filed Apr. 9, 2021) (RS Access April 9 Ex Parte); Ex Parte Presentation of RS Access LLC. (filed Apr. 23, 2021) (RS Access April 23 Ex Parte).

[32] *See* Ex Parte Presentation of Kuiper Systems, LLC (filed May 1, 2020) (Kuiper May 1 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed May 22, 2020) (Kuiper May 22 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Jun. 1, 2020) (Kuiper June 1 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Aug. 18, 2020) (Kuiper August 18 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Sept. 2, 2020) (Kuiper September 2 Ex Parte); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Sept. 3, 2020) (SpaceX September 3 Response to Kuiper); Ex Parte Presentation of Kuiper Systems, LLC (filed Sept. 17, 2020) (Kuiper September 17 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Sept. 24, 2020) (Kuiper September 24 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Sept. 30, 2020) (Kuiper September 30 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Oct. 6, 2020) (Kuiper October 6 Ex Parte); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Oct. 9, 2020) (SpaceX October 9 Response to Kuiper); Ex Parte Presentation of Kuiper Systems, LLC (filed Oct. 9, 2020) (Kuiper October 9 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Oct. 19, 2020) (Kuiper October 15 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Oct. 19, 2020) (Kuiper October 16 Ex Parte); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Oct. 29, 2020) (SpaceX October 29 Response to Kuiper); Letter from Mariah Dodsen Shuman, Counsel, Kuiper Systems, LLC, to Marlene H. Dortch, Secretary, FCC (filed Nov. 6, 2020) (Kuiper November 6 Response to SpaceX); Ex Parte Presentation of Kuiper Systems, LLC (filed Nov. 17, 2020) (Kuiper November 17 Ex Parte); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Nov. 17, 2020) (SpaceX November 17 Letter); Letter from Mariah Dodson Shuman, Counsel, Kuiper Systems, LLC to Marlene H. Dortch, Secretary, FCC (filed Nov. 20, 2020) (Kuiper November 20 Letter); Ex Parte Presentation of Kuiper Systems, LLC (filed Nov. 24, 2020) (Kuiper November 24 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Dec. 3, 2020) (Kuiper December 3 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Dec. 23, 2020) (Kuiper December 23 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Feb. 4, 2021) (Kuiper February 4 Ex Parte); Letter from Mariah Dodson-Shuman, Counsel, Kuiper Systems, LLC, to Marlene H. Dortch, Secretary, FCC (filed Feb. 4, 2021) (Kuiper February 4 Letter); Ex Parte Presentation of Kuiper Systems, LLC (filed Feb. 11, 2021) (Kuiper February 11 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC (filed Feb. 22, 2021) (Kuiper February 22 Ex Parte); Ex Parte Presentation of Kuiper Systems LLC (filed Feb. 25, 2021) (Kuiper February 25 Ex Parte); Letter from David Goldman, Director Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Feb. 25, 2021) (SpaceX February 25 Response to Kuiper); Ex Parte Presentation of Kuiper Systems LLC (filed Mar. 16, 2021) (Kuiper March 16 Ex Parte); Ex Parte Presentation of Kuiper Systems, LLC. (filed Mar. 23, 2021) (Kuiper March 23 Ex Parte); Letter from Mariah Dodson Shuman, Counsel, Kuiper Systems LLC, to Marlene H. Dortch, Secretary, FCC (filed Mar. 31, 2021) (Kuiper March 31 Letter); Ex Parte Presentation of Kuiper Systems, LLC (filed Apr. 5, 2021) (Kuiper April 5 Ex Parte); Letter from Mariah Dodson Shuman, Counsel, Kuiper Systems LLC., to Marlene H. Dortch, Secretary, FCC (filed Apr. 7, 2021) (Kuiper April 7 Letter); Ex Parte Presentation of Kuiper Systems LLC (filed Apr. 14, 2021) (Kuiper April 14 Ex Parte); Ex Parte Presentation of Kuiper Systems LLC. (filed Apr. 15, 2021) (Kuiper April 15 Ex Parte); Ex Parte Presentation of Kuiper Systems LLC (filed Apr. 19, 2021) (Kuiper April 19 Ex Parte).

[33] *See* Ex Parte Presentation of SES Americom, Inc. and O3b Limited (filed Sept. 10, 2020) (SES/O3b September 10 Ex Parte); Ex Parte Presentation of SES Americom, Inc. (filed Oct. 13, 2020) (SES October 13 Ex Parte); Letter from Suzanne Malloy, Vice President Regulatory Affairs, SES Americom and O3b Limited, to Marlene H. Dortch,

(continued….)

7

Astronomical Society also filed Reply comments.[35]  A significant number of *ex parte* presentations and additional letters were also filed in response to this application outside of the public notice period.[36]

(Continued from previous page) ──────────────────────

Secretary, FCC (filed Oct. 21, 2020) (SES/O3b October 21 Letter); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Nov. 13, 2020) (SpaceX November 13 Response to SES/O3b); Ex Parte Presentation of SES Americom and O3b Limited (filed Nov. 23, 2020) (SES/O3b November 17 Ex Parte); Ex Parte Presentation of SES Americom and O3b Limited (filed Nov. 23, 2020) (SES/O3b November 23 Ex Parte); Letter from Suzanne Malloy, Vice President Regulatory Affairs, O3b Limited, to Marlene H. Dortch, Secretary, FCC (filed Jan. 29, 2021) (SES/O3b January 29 Letter); Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Feb. 22, 2021) (SpaceX February 22 Response to SES/O3b); Ex Parte Presentation of SES/O3b(filed Feb. 26, 2021) (SES/O3b February 26 Ex Parte); Letter from Suzanne Malloy, Vice President Regulatory Affairs, O3B Limited, to Marlene H. Dortch, Secretary, FCC (filed Mar. 22, 2021) (SES/O3b March 22 Letter); Ex Parte Presentation of SES Americom Inc. and O3b Limited (filed Mar. 23, 2021) (SES/O3b March 23 Ex Parte); Ex Parte Presentation of SES Americom Inc. and O3b Limited (filed Mar. 30, 2021) (SES/O3b March 30 Ex Parte); Ex Parte Presentation of SES Americom Inc. and O3b Limited (filed Apr. 6, 2021) (SES/O3b April 6 Ex Parte); Letter from Suzanne Malloy, Vice President Regulatory Affairs, SES Americom Inc. and O3b Limited, to Marlene H. Dortch, Secretary, FCC (filed Apr. 21, 2021) (SES/O3b April 21 Letter); Ex Parte Presentation of SES Americom Inc. and O3B Limited (filed Apr. 23, 2021) (SES/O3b April 23 Ex Parte).

[34] *See* The Balance Group Opposition; Reply of Space Exploration Holdings, LLC (filed June 8, 2020) (SpaceX June 8 Reply To The Balance Group); Reply of the Balance Group (filed Jun. 16, 2020) (The Balance Group June 16 Reply to SpaceX).

[35] *See* Letter from Charity Weeden, Vice President Global Space Policy, Astroscale U.S., Inc., to Marlene H. Dortch, Secretary, FCC (filed Aug. 6, 2020) (Astroscale Reply); Reply of WorldVu Satellites Limited, Debtor-in-possession (filed Aug. 7, 2020) (OneWeb Reply); Reply of Kuiper Systems, LLC (filed Aug. 7, 2020) (Kuiper Reply); Reply of Viasat, Inc. (filed Aug. 7, 2020) (Viasat Reply); Reply of AT&T Services, Inc. (filed Aug. 7, 2020) (AT&T Reply); Reply of SES Americom, Inc. and O3b Limited (filed Aug. 7, 2020) (SES/O3b Reply); Reply of Kepler Communications, Inc. (filed Aug. 7, 2020) (Kepler Reply); Reply of the American Astronomical Society (filed Jan. 7, 2021) (American Astronomical Society Reply); Reply of Viasat, Inc. in Support of Petition Pursuant to Section 1.1307 (filed Jan. 19, 2021) (Viasat NEPA Reply).

[36] *See* Ex Parte Presentation of Space Exploration Holdings, LLC (filed May 6, 2020) (SpaceX May 6 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Jun. 3, 2020) (SpaceX June 3 Ex Parte); SpaceX June 18 Ex Parte; Ex Parte Presentation of Space Exploration Holdings, LLC (filed Jul. 31, 2020) (SpaceX July 31 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Sept. 3, 2020) (SpaceX September 3 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Sept. 14, 2020) (SpaceX September 14 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Sept. 18, 2020) (SpaceX September 18 Ex Parte); Letter from Dr. Jonathan McDowell, Harvard and Smithsonian Center for Astrophysics, to Marlene H. Dortch, Secretary, FCC (filed Sept. 21, 2020) (McDowell Letter); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Sept. 23, 2020) (SpaceX September 23 Ex Parte); Letter from Amy R. Mehlman, Vice President U.S. Government Affairs and Policy, Viasat, Inc., to Marlene H. Dortch, Secretary, FCC (filed Sept. 24, 2020) (Viasat Response to McDowell Letter); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Oct. 5, 2020) (SpaceX October 5 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Oct. 15, 2020) (SpaceX October 15 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Oct. 20, 2020) (SpaceX October 20 Ex Parte); Letter from Sean Williams, Director of Government Affairs, Pacific Dataport, Inc., to Marlene H. Dortch, Secretary, FCC (filed Nov. 25, 2020) (Pacific Dataport Letter); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Dec. 4, 2020) (SpaceX December 4 Ex Parte); Letter from Jacob Calderwood to Marlene H. Dortch, Secretary, FCC (filed Dec. 5, 2020) (Jacob Calderwood December 5 Letter); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Dec. 7, 2020) (SpaceX December 7 Ex Parte); Ex Parte Presentation of Space exploration Holdings, LLC (filed Dec. 9, 2020) (SpaceX December 9 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Dec. 15, 2020) (SpaceX December 15 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Dec. 21, 2020) (SpaceX December 21 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Dec. 28, 2020) (SpaceX December 28 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Jan. 5, 2021) (SpaceX January 5 Ex Parte);  Ex Parte Presentation of Space Exploration Holdings, LLC (filed Jan. 19, 2021) (SpaceX January 19 Ex Parte); Ex Parte

(continued….)

6.    On November 17, 2020, SpaceX submitted a letter requesting the Bureau expedite grant of the Third Modification Application, through a partial grant if necessary, in order to facilitate deployment of Starlink satellites into sun synchronous polar orbits at 560 km.[37]  On January 8, 2021, the Bureau granted SpaceX authority, with conditions, to deploy ten satellites into orbit with an altitude of 560 km and inclination of 97.6 degrees, which enabled SpaceX to take advantage of an upcoming launch opportunity.  The Bureau deferred a number of other issues raised on the record to a future order addressing the entire modification request, and we address those issues in this order.[38]  Additionally,

Presentation of Space Exploration Holdings, LLC (filed Jan. 22, 2021) (SpaceX January 22 Ex Parte); Letter from Joel M. Thomas, to Marlene H. Dortch, Secretary, FCC (filed Jan. 26, 2021) (Joel Thomas Letter); Letter from John Wallace, Alaska Technologies, to Marlene H. Dortch, Secretary, FCC (filed Jan. 26, 2021) (Alaska Technologies Letter); Letter from Jonah Koonce to Marlene H. Dortch, Secretary, FCC (filed Jan. 27, 2021) (Jonah Koonce Letter); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Feb. 1, 2020) (SpaceX February 1 Ex Parte); Ex Parte Presentation of WorldVu Satellites Limited (filed Feb. 10, 2021) (OneWeb February 10 Ex Parte); Ex Parte Presentation of World Vu Satellites Limited, (filed Feb. 17, 2021) (OneWeb February 17 Ex Parte); Letter from Jacob Calderwood to Marlene H. Dortch, Secretary, FCC (filed Feb. 19, 2021) (Jacob Calderwood February 19 Letter); Ex Parte Presentation of Space Exploration Holdings LLC (SpaceX February 22 Ex Parte); Letter from Roberta Townsend Vennel, Kodiac Archipelago Rural Regional Leadership Forum, to Jessica Rosenworcel, Acting Chairwoman, FCC (filed Feb. 24, 2021) (Kodiac Archipelago Letter); Ex Parte Presentation of WorldVu Satellites Limited, (filed Feb. 25, 2021) (OneWeb February 25 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Mar. 1, 2021) (SpaceX March 1 Ex Parte); Ex Parte Presentation of SpaceX Exploration Holdings LLC (filed Mar. 4, 2021) (SpaceX March 4 Ex Parte); Letter from Vernon Samson to Marlene H. Dortch, Secretary, FCC (filed Mar. 6, 2021) (Vernon Samson Letter); SpaceX March 8 Ex Parte; Letter from David Goldman, Director of Satellite Policy, Space Exploration Technologies Corp., to Marlene H. Dortch, Secretary, FCC (filed Mar. 9, 2021) (SpaceX March 9 Letter); Ex Parte Presentation of WorldVu Satellites Limited (filed March 10, 2021) (OneWeb March 10 Ex Parte); Letter from Brian D. Weimer, Counsel, WorldVu Satelites Limited, to Marlene H. Dortch, Secretary, FCC (filed Mar. 15, 2021) (OneWeb March 15 Letter); Ex Parte Presentation of Space Exploration Holdings, LLC (filed Mar. 16, 2021) (SpaceX March 16 Ex Parte); Letter from Michael P. Williams, Sr., Chief, Akiak IRA Council, to Jessica Rosenworcel, Acting Chairwoman, FCC (filed Mar. 19, 2021) (Akiak Native Community Letter); Ex Parte Presentation of WorldVu Satellites Limited (filed Mar. 29, 2021) (OneWeb March 29 Ex Parte); Ex Parte Presentation of WorldVu Satellites Limited (filed Apr. 1, 2021) (OneWeb April 1 Ex Parte); Ex Parte Presentation of Space Exploration Holdings, LLC. (filed Apr. 2, 2021) (SpaceX April 2 Ex Parte); Ex Parte Presentation of WorldVu Satellites Limited (filed Apr. 12, 2021) (OneWeb April 12 Ex Parte); Ex Parte Presentation of WorldVu Satellites Limited (filed Apr. 14, 2021) (OneWeb April 14 Ex Parte); Letter from Nickolas G. Spina, Kepler Communications, Inc., to Marlene H. Dortch, Secretary, FCC (filed Apr. 16, 2021) (Kepler April 16 Letter); Ex Parte Presentation of Space Exploration Holdings, LLC (filed April 20, 2021) (SpaceX April 20 Ex Parte); Letter from Professor Andrew Lawrence to Marlene H. Dortch, Secretary, FCC (filed Apr. 21, 2021) (Andrew Lawrence Letter); Letter from Brian D. Weimer, Counsel, WorldVu Satellites Limited, to Marlene H. Dortch, Secretary, FCC (filed Apr. 21, 2021) (OneWeb April 21 Letter); Letter from Carey Halnier to Marlene H. Dortch, Secretary, FCC (filed Apr. 26, 2021) (Carey Halnier Letter).

[37] *See* SpaceX November 17 Letter at 2-3 (specifying six orbital planes with 58 satellites in each, at 560 km altitude).  Several letters were filed responding specifically to SpaceX's requesting partial expedited grant.  *See* Viasat November 19 Ex Parte; Viasat December 8 Letter; SES/O3b November 23 Ex Parte; Kuiper November 24 Ex Parte; Kuiper December 3 Ex Parte; Kuiper December 23 Ex Parte; Kepler December 4 Letter; Pacific Dataport Letter; SpaceX December 4 Ex Parte; SpaceX December 7 Ex Parte; SpaceX December 9 Ex Parte; SpaceX December 15 Ex Parte; SpaceX December 21 Ex Parte; SpaceX January 5 Ex Parte; Jacob Calderwood December 5 Letter.

[38] *See Space Exploration Holdings, LLC, Request for Modification of the SpaceX NGSO System*, Order and Authorization, DA 21-34, 2021 WL 118618 (IB, granted in part and deferred in part Jan. 8, 2021) (*SpaceX Third Modification Ten-Satellite Grant)*.  In this partial grant the Bureau also granted SpaceX's request for waiver of certain requirements in the Schedule S form.  *Id.* at paras. 16-17.

Viasat has filed a petition for reconsideration of this partial grant.[39]

## III.    DISCUSSION

7.    After review of the record, we conclude that grant of the SpaceX Third Modification Application will serve the public interest, subject to the requirements and conditions specified herein. Below, we address the various outstanding issues raised by commenters on SpaceX's application. Where appropriate, and consistent with prior authorizations for SpaceX's system, we defer matters of general applicability to ongoing or potential future rulemakings.

### A.    Public Interest Determination

8.    Section 25.117 of the Commission's rules governs the modification of space station licenses and provides generally that modifications of space station authorizations will be granted except under certain circumstances.[40]  One of these exceptions is when "granting the modification request would not serve the public interest, convenience, and necessity."[41]  In interpreting this provision, the Bureau has stated that, "[i]f the proposed modification does not present any significant interference problems and is otherwise consistent with Commission policies, it is generally granted."[42]  Therefore we consider whether the request will serve the public interest, convenience, and necessity.

9.    SpaceX argues grant of its modification is in the public interest, as it is reducing its satellites' altitude to improve space safety, reducing its power flux density (PFD) emissions to improve the interference environment, and lowering its elevation angles to improve the customer experience.[43]  Additionally, several individuals, businesses, and organizations from Alaska submitted letters in the docket urging the Bureau to act on the SpaceX modification to allow SpaceX to begin deployment of its Starlink service in Alaska.[44]  These filings discuss the scarcity of reliable internet service, the extreme expense of the internet service that is available, the difficulties of maintaining that service, and the effect this has on Alaska communities.[45]  They argue the Starlink service will finally bring ubiquitous internet connectivity within reach for these areas.[46]

10.    Viasat, Hughes, and Kuiper challenge SpaceX's claims.  Viasat and Hughes argue that SpaceX's claims of the public interest benefits of its system are unsubstantiated and should not rely on them as justification for grant of the SpaceX Third Modification Application.[47]  Viasat argues that SpaceX has not provided analysis demonstrating how the latency has changed by reducing the satellites'

---

[39] *See* Viasat Recon Petition; *see also* Opposition to Petition or Reconsideration of Space Exploration Holdings, LLC, filed Feb. 23, 2021 (SpaceX Recon Opposition); Reply of Viasat in Support of Petition for Reconsideration (filed Mar. 5, 2021) (Viasat Recon Reply).

[40] 47 CFR § 25.117.

[41] 47 CFR §25.117(d)(2)(ii).

[42] *SpaceX First Modification Order*, at para. 9 (quoting *Teledesic Order*, 14 FCC Rcd at 2264, para. 5).

[43] *See* SpaceX September 3 Ex Parte at 1; SpaceX September 18 Ex Parte at 1.

[44] *See* Jacob Calderwood December 5 Letter; Jacob Calderwood February 19 Letter; Alaska Technologies Letter; Joel Thomas Letter; Jonah Koonce Letter; Kodiak Archipelago Letter; Vernon Samson Letter; Akiak Native Community Letter; Carey Halnier Letter.

[45] *See* Jacob Calderwood December 5 Letter; Jacob Calderwood February 19 Letter; Alaska Technologies Letter; Joel Thomas Letter; Jonah Koonce Letter; Kodiak Archipelago Letter; Vernon Samson Letter; Akiak Native Community Letter; Carey Halnier Letter.

[46] *See* Jacob Calderwood December 5 Letter; Jacob Calderwood February 19 Letter; Alaska Technologies Letter; Joel Thomas Letter; Jonah Koonce Letter; Kodiak Archipelago Letter; Vernon Samson Letter; Akiak Native Community Letter; Carey Halnier Letter.

[47] *See* Viasat Petition at 47-48; Viasat Reply at 42-45; Hughes September 21 Ex Parte at 1.

operating altitude, and therefore this assertion by SpaceX does not justify the modification.[48]  Viasat also argues that SpaceX's system, as currently authorized, can provide service worldwide, including to polar regions, as it is authorized for 1,225 satellites in high-inclination (greater than 70 degree) orbits, and therefore SpaceX's claim that the modification will allow it to increase its service areas is untrue.[49]

11.    Viasat and Kuiper further challenge SpaceX's claim that the Third Modification Application will improve space safety.  Viasat argues, for example, that satellites from other systems will have to transit through the more densely-populated orbits where SpaceX satellites would operate.[50]  Kuiper similarly argues that while there may be public interest benefits to reducing SpaceX's satellite altitude for the constellations located at its original altitude, these benefits are negated by the harm to the public interest caused by placing 2,824 more satellites in the 540-570 km orbital shell, which it views as already congested.[51]

12.    As described in more detail below, we conclude that grant of the SpaceX Third Modification Application is in the public interest.  Based on our review, we agree with SpaceX that the modification will improve the experience for users of the SpaceX service, including in often-underserved polar regions.  We conclude that the lower elevation angle of its earth station antennas and lower altitude of its satellites enables a better user experience by improving speeds and latency.[52]  Additionally, a number of the satellites being deployed pursuant to this modification are satellites orbiting at high inclinations, which are uniquely able to provide improved service to higher latitude regions.[53]  As noted below, deployment to a lower altitude guarantees removal of satellites from orbit within a relatively short period of time, and consequently has beneficial effects with respect to orbital debris mitigation.  We also note that this decision is taken under the existing satellite precedent and licensing framework and does not address, and is not intended to resolve, any additional issues or concerns that may arise related to the Rural Digital Opportunity Fund program.[54]

13.    Grant of the SpaceX Ku- and Ka-band NGSO system, as modified, will improve service to remote and underserved areas, including polar regions, and will facilitate the deployment of the Starlink system overall.  We conclude that operations at the lower altitude will have beneficial effects with respect to orbital debris mitigation.  We also find that SpaceX's modification will not present significant interference problems, as assessed under Commission precedent.  We address these issues in more detail below.

## B.    Radiofrequency Interference

14.    Commenters raised concerns regarding the effect SpaceX's system, as modified, would have on other NGSO systems, geostationary orbit (GSO) satellite systems, and multichannel Video Distribution Data systems (MVDDS) operations.

### 1.    Interference to Other NGSO Systems and Processing Round Placement

15.    SES/O3b, Kuiper, Viasat, Kepler, OneWeb, and DISH all claim that the SpaceX Third

---

[48] *See* Viasat Petition at 47.  Viasat further argues that SpaceX has not demonstrated the latency and download speeds that it claims.  *See* Viasat September 17 Ex Parte at 2-4; Hughes September 21 Ex Parte at 1; Viasat September 25 Ex Parte at 1-2; Viasat October 5 Response to SpaceX at 2-6.

[49] *See* Viasat Petition at 47-48.

[50] *See id.* at 48.

[51] *See* Kuiper Opposition at 10-11.

[52] *See* SpaceX September 3 Ex Parte at 1; SpaceX September 18 Ex Parte at 1.

[53] *See* SpaceX Third Modification Application, Narrative at II, 3- 4 (specifying 520 satellites will operate in orbits that will serve polar regions).

[54] *See e.g.* Viasat April 26 Ex Parte Letter.

Modification is a complete redesign of SpaceX's authorized system that will substantially increase interference into other systems. They argue that, consistent with the Bureau's precedent, specifically the Bureau's decision in the *Teledesic Order*,[55] SpaceX's modified system should not be treated as if authorized in the Commission's Ku-/Ka-band processing rounds that closed in November 2016 (the 2016 Processing Round)[56] and July 2017 (the 2017 Processing Round)[57] but instead should be considered as part of the Ku-/Ka-band processing round that closed in May 2020 (the 2020 Processing Round).[58] These operators argue that the processing round framework is designed to promote regulatory certainty, and therefore allowing operators like SpaceX to modify their systems so substantially and still remain part of their original processing round–in SpaceX's case the 2016 Processing Round–will destroy that certainty.[59] SpaceX argues that, unlike for amendments, there is no distinction between major and minor modifications in the Commission's rules, and the relevant precedent under the *Teledesic Order* is to consider the requested modification's impact on the overall interference environment, and not whether the modification creates new interference geometries.[60] SpaceX claims that its system, far from increasing interference into other systems, will in fact improve the overall interference environment.[61] SpaceX further argues that forcing its system to become part of the 2020 Processing Round would be counter to the public interest and would effectively preclude operators from modifying their systems, exactly what the *Teledesic Order* sought to prevent.[62]

### a.    Modifications and the Significant Interference Standard

16.    As noted, our rule governing the modification of space station licenses states that "applications for modifications of space station authorizations will be granted," unless one of several enumerated exceptions applies, none of which are potentially relevant here except for the provision

---

[55] *See generally Teledesic Order*.

[56] *See 2016 Processing Round Public Notice*.

[57] *See 2017 Processing Round Public Notice.*

[58] *See Cut-off Established for Additional NGSO FSS Applications or Petitions for Operations in the 10.7-12.7 GHz, 12.75-13.25 GHz, 13.85-14.5 GHz, 17.7-18.6 GHz, 18.8-20.2 GHz, and 27.5-30 GHz Band*, Public Notice, Report No. SPB-279, DA 20-325 (Mar. 24, 2020). *See* SES/O3b Petition at 15; SES/O3b Reply at 11, 17; SES/O3b October 13 Ex Parte at 2; SES/O3b November 17 Ex Parte, Attachment 1 at 1; SES/O3b January 29 Letter at 1, 2, 9-11; SES/O3b February 26 Ex Parte at 1, Attachment B at 1, 4; SES/O3b March 22 Letter; SES/O3b March 23 Ex Parte; SES/O3b April 21 Letter at 1-2; Kuiper Opposition at 28-29; Kuiper Reply at 11-14; Kuiper August 18 Ex Parte at 1, 2; Kuiper September 2 Ex Parte at 2; Kuiper September 17 Ex Parte at 2; Kuiper September 24 Ex Parte at 1; Kuiper September 30 Ex Parte at 2; Kuiper October 6 Ex Parte at 2; Kuiper October 9 Ex Parte at 1, 3-5; Kuiper October 15 Ex Parte at 2; Kuiper October 16 Ex Parte at 1, 3-5; Kuiper November 6 Response to SpaceX at 2; Kuiper February 4 Letter at 5-10; Kuiper February 4 Ex Parte at 1, 3, 5; Kuiper February 11 Ex Parte at 1, 3, 5; Kuiper February 22 Ex Parte at 1, 3, 5; Kuiper February 25 Ex Parte at 1, 3, 5; Kuiper March 16 Ex Parte at 1, 3, 5; Kuiper March 23 Ex Parte; Viasat Petition at 44, 48-49; Viasat Reply at 30-32; Viasat February 8 Ex Parte at 3; Viasat February 12 Ex Parte at 3; Kepler Opposition at 2, 11; Kepler Reply at 23-24; OneWeb Comments at 8-9; OneWeb February 10 Ex Parte at 2-3, 5; OneWeb February 17 Ex Parte at 5-7; OneWeb February 25 Ex Parte at 5; OneWeb March 10 Ex Parte at 5; OneWeb March 15 Letter at 1-2, 10-11; OneWeb April 12 Ex Parte at 5; DISH February 15 Letter at 7-8.

[59] *See, e.g.*, SES October 13 Ex Parte at 2; SES/O3B November 17 Ex Parte, Attachment 1 at 1; SES/O3B January 29 Letter at 2, 9-11; Kuiper Opposition at 29-30; Kuiper Reply at 11-14; Kuiper August 18 Ex Parte at 2; Kuiper September 2 Ex Parte at 2; Kuiper October 6 Ex Parte at 2; Kuiper October 9 Ex Parte at 1, 3; Kuiper November 6 Response to SpaceX at 3; Kuiper February 4 Letter at 1-4.

[60] *See* SpaceX February 22 Response to SES/O3B at 1-2; SpaceX March 9 Letter at 1-3.

[61] *See* SpaceX February 22 Ex Parte at 2; SpaceX March 1 Ex Parte at 1; SpaceX March 8 Ex Parte at 1.

[62] *See* SpaceX September 3 Response to Kuiper at 3; SpaceX October 9 Response to Kuiper at 1, 2-3; SpaceX January 19 Ex Parte, Attachment B at 2.

stating that the modification will not be granted if it "would not serve the public interest, convenience, and necessity."[63]  In the context of applications to modify authorized NGSO systems that were originally subject to modified processing round procedures, the Bureau has interpreted this provision, including in its *Teledesic Order*, to include the following determination: "[i]f the proposed modification does not present any significant interference problems and is otherwise consistent with Commission policies, it is generally granted[,]" but if the modification "presents significant interference problems, [the Bureau] would treat the modification as a newly filed application and would consider the modification application in a subsequent satellite processing round."[64]  While we are not bound by this Bureau-level precedent in considering the instant decision, we conclude that this focus on the public interest in avoiding significant radiofrequency interference is consistent with the purpose of the Commission's processing round procedure, which is designed to establish the interference environment in which participants in the processing round could reasonably anticipate they would be entitled to operate their systems.[65]  Under the Bureau's decision in the *Teledesic Order*, if a modification would "present significant interference problems," grant of the modification would not be in the public interest, and that the application should instead be treated as a newly-filed application for processing round purposes.[66]  The Bureau has affirmed this standard in several applications, including its grant of SpaceX's first modification application for its Ku- and Ka-band authorized system (*SpaceX First Modification Order*).[67]  We apply the same standard in this Commission-level decision, for the reasons set forth in the *Teledesic Order*.[68]

17.    The question of treating SpaceX's modification as a "newly filed application" for processing round purposes is relevant to SpaceX's status vis-à-vis other NGSO FSS systems in the same frequency bands.  In connection with grant of certain NGSO FSS systems pursuant to processing round procedures, the Commission has adopted rules for sharing spectrum as between systems in the same processing round.[69]  NGSO FSS space station applications granted with a condition to abide by these sharing rules must coordinate with each other in good faith with respect to the use of commonly

---

[63] 47 CFR § 25.117(d)(2)(ii).  None of the other exceptions in Section 25.117(d)(2) appear to be relevant, and none have been raised in connection with SpaceX's modification request.

[64] *Teledesic Order*, 14 FCC Rcd at 2264, para. 5.

[65] *See Update to Parts 2 and 25 Concerning Non-Geostationary, Fixed-Satellite Service Systems and Related Matters*, Report and Order and Further Notice of Proposed Rulemaking, 32 FCC Rcd. 7809, 7829, para. 61 (2017) (*NGSO FSS Report and Order*) ("The purpose of the recent processing rounds was to establish a sharing environment among NGSO systems, to provide a measure of certainty in lieu of adopting an open-ended requirement to accommodate all future applicants.").

[66] *Teledesic Order*, 14 FCC Rcd at 2264, para. 5.

[67] *See e.g., SpaceX First Modification Order*, 34 FCC Rcd at 2529, para. 9.

[68] Two petitions for rulemaking have been filed that raise issues related to modification of NGSO systems and the *Teledesic Order* standard, but we have not made any decisions regarding these petitions, and at this time, find no reason to depart from the existing Bureau-level precedent.  On April 30, 2020, SpaceX filed a petition for rulemaking to revise and clarify the Commission's spectrum sharing rules for NGSO FSS systems.  SpaceX Petition for Rulemaking, Revision of Section 25.261 of the Commission's Rules to Increase Certainty in Spectrum Sharing Obligations Among Non-Geostationary Orbit Fixed-Satellite Service Systems, RM-11855 (filed Apr. 30, 2020).  SpaceX proposes that the Commission codify protection rights for NGSO FSS systems from those systems authorized through a later processing round, and clarify or revise the spectrum selection priority among NGSO FSS systems authorized through the same processing round.  *See id.*  On July 9, 2020, Kuiper filed a petition for rulemaking to specify types of modifications to an authorized NGSO FSS system which would presumptively be considered in a later processing round.  Kuiper Petition for Rulemaking, Modernization of Section 25.117 of the Commission's Rules for Modifications of NGSO FSS Systems in the New Space Age, RM-11861 (filed July 9, 2020).

[69] 47 CFR § 25.261; *see generally NGSO FSS Report and Order*, 32 FCC Rcd 7809.

authorized frequencies.[70]  If a coordination agreement is not in place between two or more NGSO FSS satellite systems, a default spectrum-splitting procedure applies.[71]  These rules apply as between NGSO systems authorized in the same processing round.  When it updated these procedures in 2017, the Commission explained that it would limit the default spectrum-splitting procedure to qualified applicants in a processing round, and that treatment of later applicants with respect to systems approved in a prior processing round would be on a case-by-case basis.[72]  In this case, as part of a later processing round, the Commission authorized Kuiper to deploy an NGSO FSS system, and Kuiper is required to coordinate to prevent harmful interference to operational systems licensed or granted U.S. market access in previous NGSO FSS processing rounds.[73]  In the event that Kuiper is not able to reach a coordination agreement with operators authorized in previous processing rounds, Kuiper must submit a showing for approval demonstrating that its operations will not cause harmful interference to any operational system licensed or granted U.S. market access in these earlier processing rounds.[74]  The question of whether SpaceX's NGSO system, as modified, is treated as part of the 2016/2017 or 2020 processing round will affect how SpaceX's system is conditioned with respect to coordination and spectrum vis-à-vis those systems authorized in the 2016/2017 Processing Rounds as well as Kuiper and any other systems authorized as part of the 2020 Processing Round.

18.    Our rules do not differentiate between minor or major modifications, and there is no provision requiring a "major" modification to be moved to a future processing round.[75]  As commenters have recognized, in the grant of SpaceX's first modification, the Bureau found that SpaceX's modification would not significantly worsen the interference environment because the reduction in the number of satellites meant "the number of spatial configurations that have the potential for generating interference between SpaceX and any other NGSO FSS system in the same processing round is expected to remain approximately unchanged."[76]  While SpaceX's Third Modification will also slightly reduce the number of satellites in the Starlink constellation, from 4,409 to 4,408, our review of the interference analyses provided by SpaceX and other operators demonstrates that the SpaceX Third Modification will contain spatial configurations and potential for generating new interference events into other NGSO FSS systems.  However, the *Teledesic Order* inquiry does not end there – the existence of new spatial configurations and new potential interference events does not automatically require placing SpaceX in the 2020 Processing Round.  SpaceX is correct to note that the appropriate standard under the *Teledesic Order* is to consider the modification's effect on the overall interference environment.  In the case of the *Teledesic Order*, the Bureau considered a modification that involved a reduction in the number of satellites and an increase in the altitude of those satellites, among other changes.[77]  The Bureau concluded that the increased operating altitude for the satellites would tend to worsen the interference environment by increasing the number of satellites visible in the sky, but the reduction in the number of satellites would tend to decrease the interference the system caused.[78]  The Bureau determined that the decrease in interference caused by the reduction in satellites sufficiently offset the increased interference caused by

---

[70] 47 CFR § 25.261(b).

[71] 47 CFR § 25.261(c).

[72] *NGSO FSS Report and Order*, 32 FCC Rcd at 7829, para. 61.

[73] *Id.* at 8334, para. 34.

[74] *Id.* at 8341, para. 50.

[75] *See* 47 CFR § 25.117.  *See also Teledesic Order*, 14 FCC Rcd at 2266-67, para. 12 (noting that the Commission generally takes a flexible approach when considering modifications to space station licenses, and has not promulgated a rule distinguishing between minor or major modifications to space station licenses).

[76] *See SpaceX First Modification Order*, 34 FCC Rcd at 2530, para. 9.

[77] *See Teledesic Order*, at 2262, para. 3.

[78] *See* SpaceX March 9 Letter at 3.

the increase in operating altitude, and therefore Teledesic's proposed modification would not worsen the overall interference environment.[79]  For the reasons discussed below, we find that, similar to the *Teledesic Order* determination, the SpaceX Third Modification will not present significant interference problems, since potential increased interference in some instances would be offset by diminished interference overall, and we grant the modification without need to treat the modification as a newly filed application. We will continue to consider SpaceX's Ku- and Ka-band system, as modified, part of the 2016/2017 Processing Rounds.

      **b.**      **Analysis of Overall NGSO Interference Environment**

    19.    *Question of "Significant Interference Problems."*  In support of its modification, SpaceX notes that it is requesting to slightly reduce the overall number of satellites in its system, that fewer satellites would be visible from any point in the United States, and that because the satellites would be operating at lower altitudes, they will be able to transmit and receive at lower effective isotropic radiated power (EIRP).[80]  SpaceX states that to maintain coverage with the satellites at the lower altitudes, SpaceX would use a minimum elevation angle as low as 25 degrees for user beams, and that SpaceX will generally observe the same 25 degree minimum elevation angle for gateway beams,[81] except for satellites operating at higher inclinations, which would observe a minimum elevation angle of five degrees for gateways located above 62 degrees latitude.[82]  As part of its  application, SpaceX provided an analysis of the proposed modification's effect on downlink and uplink interference, stating that it had evaluated the effect on the interference environment using characteristics of three NGSO systems that had been authorized – OneWeb for Ku-band and Telesat and O3b for Ka-band.[83]

    20.    A number of parties disagree with SpaceX's analysis with respect to the interference environment.  SES/O3b, Kuiper, Viasat, Kepler, OneWeb, and RS Access argue that grant of the SpaceX Third Modification Application will increase the number of in-line interference events because of its proposed lower elevation angles and doubling of the number of satellites communicating with each gateway earth station simultaneously.[84]  SES/O3b and Kuiper also argue SpaceX's redesigned antennas and wider beam footprints would worsen the interference environment and eliminate earth station separation as an interference mitigation technique.[85]  OneWeb and Kepler request specific conditions

---

[79] *See Teledesic Order*, at 2267, para. 13; SpaceX March 9 Letter at 3.

[80] SpaceX Third Modification Application, Narrative at 8-9.  *See also* SpaceX October 29 Response to Kuiper at 2; SpaceX November 6 Response to SES/O3B at 2; SpaceX January 19 Ex Parte at 1; SpaceX January 22 Ex Parte at 1; SpaceX February 1 Ex Parte at 1.

[81] SpaceX Third Modification Application, Technical Attach at 4.

[82] *Id.* at 7.

[83] *See id., Annex* 1, A1-1.

[84] *See* SES/O3b Petition at 6-9; SES/O3B Reply at 4-10; SES October 13 Ex Parte at 2; SES/O3b October 21 Letter at 1-3; SES/O3b November 17 Ex Parte, Attachment 1 at 2; SES/O3b January 29 Letter at 2, 3-6; SES/O3b February 26 Ex Parte, Attachment B at 2-3; Kuiper Opposition at 13-15, 17-20; Kuiper Reply at 15-16; Kuiper August 18 Ex Parte at 2; Kuiper September 2 Ex Parte at 2; Kuiper September 24 Ex Parte at 1, 6-9; Kuiper October 6 Ex Parte at 2; Kuiper October 9 Ex Parte at  4-9; Kuiper October 16 Ex Parte at 4-9; Kuiper November 17 Ex Parte at 1-2, 5, Slide 4-6, 14-15, 17; Kuiper November 20 Letter at 1-2, Slides 1-2; Kuiper February 4 Ex Parte at 1, 4; Kuiper February 11 Ex Parte at 1, 4; Kuiper February 22 Ex Parte at 1, 4; Kuiper February 25 Ex Parte at 1, 4; Kuiper March 16 Ex Parte at 1, 4; Viasat July 2 Response to SpaceX at 1; Viasat February 8 Ex Parte at 30; Viasat February 12 Ex Parte at 30; Kepler Opposition at 3, 5, 6; OneWeb Comments at 8-9; OneWeb February 10 Ex Parte at 3-5; OneWeb February 17 Ex Parte, Attachment at 5-7; OneWeb February 25 Ex Parte at 3-5; RS Access Letter at 4.

[85] *See* SES/O3b Petition at 9-10; SES/O3b Reply at 11-16; SES/O3b October 21 Letter at 2; SES/O3b January 29 Letter at 2, 7-9; SES/O3b February 26 Ex Parte, Attachment B at 2-3; Kuiper Opposition at 23-26; Kuiper Reply at 15-24; Kuiper August 18 Ex Parte at 2; Kuiper September 2 Ex Parte at 2; Kuiper September 24 Ex Parte at 6-9; Kuiper October 9 Ex Parte at 6-9; Kuiper October 16 Ex Parte at 6-9; Kuiper November 17 Ex Parte at 1-2; Kuiper

                                                                   (continued....)

requiring SpaceX to select satellites to avoid in-line interference events between itself and the OneWeb and Kepler systems, respectively.[86] SpaceX argues the number of satellites communicating with earth stations simultaneously is irrelevant; rather the issue according to SpaceX is how many satellites are in view at any given time, because operators will not know which satellites are actively communicating and so will have to take all satellites in view into account when conducting coordination.[87] SpaceX admits that taken on its own, operating with a lower elevation angle would tend to increase in-line events, as more satellites would be "visible" from the perspective of a particular earth station location, but SpaceX argues that reducing its satellites' operating altitude will actually reduce the number of satellites "visible", and more than offsets the increase in geometric in-line events caused by the reduction in elevation angle.[88] Specifically, SpaceX acknowledges there would be more potential interference events as a result of operations at the lower elevation angles between 25 and 40 degrees, but posits there will also be significantly fewer interference events at the most optimal angles higher than 40 degrees, offsetting any new events resulting from the lower elevation angles.[89] Furthermore, according to SpaceX, its ability to reduce power flux density (PFD) emissions from the satellites at the reduced satellite operational altitude will also improve the interference environment.[90] For the Ku-band downlinks, SpaceX states that even with the lower satellite altitudes, it will still maintain the same PFD at the Earth's surface in the Ku-band, resulting from a decrease in PFD levels at the satellites.[91] For the Ka-band downlinks, SpaceX states that it will reduce PFD levels by 7 dB.[92] SpaceX argues its beam footprints will be smaller because of the modification, not larger as SES/O3b and Kuiper suggest.[93] SpaceX believes that gateway earth station separation is still a viable interference mitigation technique and is prepared to coordinate with other operators.[94] While the modification will generate new interference events, SpaceX argues that, taken

---

(Continued from previous page) ———————————————

November 17 Ex Parte at 2-3, Slides 8-9; Kuiper November 20 Letter at 1-2; Kuiper February 4 Ex Parte at 1, 7; Kuiper February 11 Ex Parte at 1, 7; Kuiper February 22 Ex Parte at 1, 7; Kuiper February 25 Ex Parte at 1; Kuiper March 16 Ex Parte at 1, 7; OneWeb Comments at 11, 13-14; OneWeb March 15 Letter at 7-10.

[86] *See* OneWeb April 12 Ex Parte, Attachment at 6; OneWeb April 14 Ex Parte at 2; Kepler April 16 Letter at 2-3.

[87] *See* SpaceX October 29 Ex Parte at 5; SpaceX January 19 Ex Parte at 6; SpaceX February 25 Response to Kuiper at 10-11. SpaceX argues that in the absence of an agreement to share detailed beam pointing information as between two NGSO operators, i.e., when the default spectrum splitting procedure applies, *see* 47 CFR § 25.261, an NGSO operator cannot know which satellites are active or not, and therefore an operator must assume that every satellite of another NGSO system that is in view could potentially cause or experience inline interference. *See, e.g.*, SpaceX February 25 Response to Kuiper

[88] *See* SpaceX September 3 Ex Parte, Attachment A; SpaceX September 18 Ex Parte, Attachment A; SpaceX October 29 Response to Kuiper at 2-9; SpaceX November 6 Response to SES/O3b at 2; SpaceX November 13 Response to SES/O3b at 5-6; SpaceX January 19 Ex Parte at 4, 5; SpaceX February 22 Response to SES/O3b at 2-3, 10; SpaceX February 25 Response to Kuiper at 6-10.

[89] *See* SpaceX February 22 Response to SES/O3b at 2, 4-5; SpaceX February 25 Response to Kuiper at 8-9.

[90] *See* SpaceX February 22 Response to SES/O3b at 5-6, 10; SpaceX February 25 Response to Kuiper at 11-14.

[91] SpaceX Consolidated Opposition at 32.

[92] *Id.*

[93] *See* SpaceX September 3 Ex Parte, Attachment A; SpaceX September 18 Ex Parte, Attachment A; SpaceX October 29 Response to Kuiper at 5; SpaceX November 13 Response to SES/O3b at 2-5, 7-9; SpaceX January 19 Ex Parte at 5-6, 9; SpaceX February 22 Response to SES/O3b at 5-30; SpaceX February 25 Response to Kuiper at 11-16, 28-32.

[94] *See* SpaceX October 29 Response to Kuiper at 2, 8-10; SpaceX November 13 Response to SES/O3b at 5; SpaceX January 19 Ex Parte at 7; SpaceX February 22 Response to SES/O3b at 11-13. For example, with respect to the O3b system, SpaceX argues that because of the reduced PFD, the SpaceX downlink beam PFD footprint will become smaller as a result of the modification. *See, e.g.*, SpaceX February 22 Response to SES/O3b at 10-11. SpaceX further argues that O3b's operations, rather than SpaceX's modification, would be the limiting factor in the success

(continued….)

together, the changes proposed will in fact improve the overall interference environment.[95]

21.        With respect to the issues raised by the other NGSO operators, including SES/O3b, Viasat, OneWeb, and Kuiper, we agree that grant of the SpaceX Third Modification Application would result in new interference to other NGSO systems in certain areas where previously interference did not exist.  In applying the Bureau's decision in the *Teledesic Order*, however, we conclude that grant of the SpaceX modification would not create "any significant interference problems."  Specifically, after analyzing the technical arguments in the record, we conclude that the lower altitude of the satellites will in fact result in fewer satellites in view, and therefore will result in fewer in-line interference events with respect to other NGSO operators,[96] even if the number of active satellites in view of a particular earth station is increased.  We observe that by lowering the earth station elevation angle, more of the sky is visible from the perspective of the earth station, and as a result more satellites may be visible.[97]  However, when the satellite altitude is lowered, the satellites will need to be closer to the earth station in order to be within view, and therefore lowering the altitude of the satellites helps to offset the fact that additional satellites may be visible due to the lower elevation angles, in turn offsetting the potential increase in in-line interference events.[98]  We also conclude that the reduced satellite PFD at the satellites enabled by operating the satellites at lower altitudes will help to offset the potential for increased interference.[99]  Consistent with our conclusion that the number of in-line events overall will not increase, we decline to adopt any conditions requiring SpaceX to prevent in-line interference events with OneWeb, Kepler, or any other individual operator.  We conclude that the modification will not create any significant interference problems to other systems or significantly increase interference potential to future systems. In connection with this finding, we also address some additional arguments specific to certain NGSO operators below.

22.        SpaceX and Kuiper debate in a series of filings what demonstrations SpaceX must provide with respect to the changes in the interference environment for the Kuiper system.[100]  SpaceX argues that Kuiper is attempting to force first processing round licensees like SpaceX to protect later processing round licensees like Kuiper, when in fact Commission rules and conditions on Kuiper's authorization clearly require Kuiper to protect SpaceX from interference.[101]  Kuiper argues SpaceX's

(Continued from previous page) ───────────────

of earth station separation as an interference mitigation technique.  *Id.* at 12-14.  We encourage operators to coordinate to resolve interference concerns.

[95] *See* SpaceX Consolidated Opposition at 20, 26-29; SpaceX October 29 Response to Kuiper at 2-4; SpaceX November 13 Response to SES/O3b at 8-10; SpaceX January 19 Ex Parte at 1, Attachment B at 4-5; SpaceX January 22 Ex Parte at 1, Attachment A at 6-7; SpaceX February 1 Ex Parte at 1, Attachment A at 4-5; SpaceX February 22 Ex Parte at 2; SpaceX February 22 Response to SES/O3b at 10; SpaceX February 25 Response to Kuiper at 10, 21-25.

[96] We do note, however, that Kepler's system presents slightly different issues, and those are addressed below.

[97] *See* SpaceX February 22 Response to SES/O3b at 2-5, 10; SpaceX February 25 Response to Kuiper at 5-10.

[98] *See* SpaceX February 22 Response to SES/O3b at 2-5, 10; SpaceX February 25 Response to Kuiper at 5-10.

[99] *See* SpaceX February 22 Response to SES/O3b at 5-6, 10; SpaceX February 25 Response to Kuiper at 11-14.

[100] *See* SpaceX Consolidated Opposition at 21-22; SpaceX September 3 Response to Kuiper at 1, 2; SpaceX October 9 Response to Kuiper at 1-4; SpaceX October 29 Response to Kuiper at 1; SpaceX December 21 Ex Parte at 1; SpaceX January 19 Ex Parte at 1, Attachment B at 2; SpaceX January 22 Ex Parte at 1, Attachment A at 2; SpaceX February 1 Ex Parte at 1, Attachment A at 2; SpaceX February 22 Ex Parte at 2; SpaceX February 25 Response to Kuiper at 1-5; SpaceX April 2 Ex Parte at 4.

[101] *See Kuiper Systems, LLC, Application for Authority to Deploy and Operate a Ka-band Non-Geostationary Satellite Orbit System*, 35 FCC Rcd 8324, 8341, para. 50 (2020) ( "We fully anticipate that all parties will negotiate in good faith, and Kuiper will be able to reach a coordination agreement with operators authorized in previous processing rounds.  In the event this does not happen, Kuiper must make a showing demonstrating to the

(continued….)

interpretation conflicts with precedent in the *Teledesic Order*, which states that a modification will be evaluated with respect to all pending and licensed NGSO constellations using the same spectrum.[102] We agree with Kuiper that, consistent with the *Teledesic Order*, we must take into consideration Kuiper's system when evaluating SpaceX's proposed modification. In the *Teledesic Order*, the Bureau stated that it would evaluate the proposed modification and potential for significant interference with respect to all NGSO FSS applications, including those in a later processing round, and consistent with our application of the *Teledesic Order* rationale to this modification we take this same approach.[103] However, consistent with the discussion above regarding the overall effect on the interference environment, we conclude that, taking into consideration the overall interference environment, the requested modification will not create any significant interference problems with Kuiper, as a later processing round system.

23.    *Kepler's Arguments Regarding In-line Events.* Kepler raises a slightly different concern. Kepler states that the restructuring of orbital planes in the SpaceX constellation has concentrated more satellites in northern regions, which is a key service area for Kepler's operations.[104] Kepler's satellites operate in high-inclination sun-synchronous orbits, and SpaceX now proposes to place 520 satellites into orbits closely aligned with Kepler's, both in altitude and inclination,[105] and Kepler's analysis finds that SpaceX's modification would increase the number of in-line interference events.[106] Kepler argues that the sample victim systems SpaceX used in its initial interference analysis - OneWeb, Telesat, and O3b - are not representative of Kepler's system and did not take into account the effect of the restructuring of its orbital planes or its decreased minimum elevation angle.[107] Kepler's user terminals operate with a minimum elevation angle of 10 degrees, while OneWeb's operate with a minimum elevation angle of 40 degrees, so Kepler argues that it is more sensitive to SpaceX's modified minimum elevation angle.[108] Kepler conducted its own analysis of the interference environment, taking all these factors into account and using the same assumptions SpaceX used in its analysis, and Kepler concludes that the third SpaceX modification would significantly worsen the interference environment with respect to Kepler's system.[109] Kepler found that even if it used minimum elevation angles of 40 degrees, the increase in interference would be notable, but at its actual minimum elevation angle of 10 degrees, the increase in interference is substantial, and the interference worsened at higher latitudes.[110]

24.    SpaceX responds that any arguable increase in the number or duration of in-line events on Kepler's uplinks is irrelevant as a practical matter, since the interference caused by Kepler to SpaceX's uplinks even under SpaceX's existing authorization will require the two systems to split shared spectrum at all times in the absence of a coordination agreement, with or without the requested SpaceX

---

(Continued from previous page) ————————————
Commission that its operations will not cause harmful interference to any operational system licensed or granted U.S. market access in the July 2016 Processing RndRound and the May 2017 Processing Round.").

[102] *See* Kuiper September 24 Ex Parte at 4; Kuiper October 9 Ex Parte at 4; Kuiper October 16 Ex Parte at 4.

[103] *Teledesic Order* at 2265, 2272, para. 7, 23.

[104] *See* Kepler Opposition at 3.

[105] A small number of these SpaceX satellites have already been deployed, pursuant to the Bureau's partial grant of the modification related to deployment of ten satellites in January 2021. *See SpaceX Third Modification Ten-Satellite Grant.*

[106] *See* Kepler Opposition at 3-7.

[107] *Id.* at 5-6.

[108] *See id.* at 6.

[109] *See id.* at 7-11.

[110] *See id.* at 9-11.

modification.[111]  SpaceX also provided analysis of simulations it conducted to assess interference between the Kepler and SpaceX systems.[112]  Kepler argues that SpaceX did not deny its modification would generate increased interference into Kepler's system.[113]  Kepler alleges that its system will trigger the band-splitting mechanism 2.1% of the time, not 100% of the time as SpaceX claims.[114]  On the other hand, Kepler argues that SpaceX's modification will cause the band-splitting mechanism to be triggered 46.1% of the time, more than two thousand times higher than what would otherwise be triggered by Kepler's system.[115]  Kepler also argues that interference does not occur everywhere, and if Kepler's uplinks trigger the band-splitting mechanism, that does not automatically mean the band-splitting mechanism is triggered in the downlink direction.[116]  SpaceX again argues that the separation angles are in fact driven by interference from Kepler into the SpaceX uplink, so the modification causes no significant change to the interference environment for Kepler.[117]  We note first that the band-splitting mechanism would only be triggered in the absence of coordination, and on this point, Kepler agrees with SpaceX that an optimal solution will ultimately come out of specific coordination agreements between operators.[118]  Kepler's concern appears to be that it would not experience the same effect to its system as SpaceX in the event of band-splitting, because SpaceX has so many more satellites.[119]  Since, as discussed below, SpaceX has agreed to accept additional uplink interference from Kepler that results from this modification, which appears to be the primary issue from Kepler's perspective, and that a number of the concerns Kepler raises regarding band-splitting would only be present in the absence of a coordination agreement, we conclude that the modification does not create any significant interference problems with Kepler.

25.    *Gateways.*  OneWeb argues that an additional outcome of SpaceX's proposal to lower the operational altitude of 2,824 satellites from 1,100-1,330 km to 540-570 km is that it will significantly increase the number of SpaceX gateway sites in the United States in order to provide the same level of service.[120]  According to OneWeb, this will increase the probability of a SpaceX gateway earth station being collocated, or nearly collocated, with other NGSO operators' gateway earth stations, thereby "materially worsening" the NGSO interference environment in the Ka-band.  OneWeb argues that in fact SpaceX is deliberately collocating its gateway earth stations with those of OneWeb to cause coordination between the operators to fail.[121]  We note that typically in issuing a space station grant we do not limit the number of gateway earth stations that can be deployed and did not limit the number of gateways in our prior SpaceX grants.  Therefore, there would be nothing to prevent SpaceX from deploying a similar number of gateways to communicate with satellites in its previously requested orbits.  We observe that the number of gateway earth stations used by any system would naturally grow for any system as the

---

[111] SpaceX Consolidated Opposition at 23-24, 26-27.  SpaceX argues that the interference Kepler's earth stations would cause to SpaceX uplinks exceeds the 6 percent $\Delta T/T$ in-line event trigger (in this case -12.2 dB interference-to-noise ratio) for spectrum splitting under section 25.261 at all times.  *Id.* at 23; *see* 47 CFR § 25.261(c).  *See also* SpaceX Consolidated Opposition, Appendix A at A-6.

[112] *See* SpaceX Consolidated Opposition, Appendix A at A-3.

[113] *See* Kepler Reply at 6.

[114] *See id.* at 6-11.

[115] *See id.* at 10-11.

[116] *See id.* at 14-15; *see also* OneWeb Reply at 15-18.

[117] *See* SpaceX January 19 Ex Parte Attach., at 12..

[118] *See* Kepler Opposition at 2.

[119] *See, e.g.*, *id. at* 6.

[120] OneWeb Reply at 13.

[121] *See* OneWeb April 12 Ex Parte, Attachment at 7.

system expands, and OneWeb was not entitled to expect that SpaceX would be operating with a certain number of gateway earth stations.  Moreover, operations with additional gateway earth stations can provide more frequency reuse and capacity.

26.     *Parabolic Antennas.*  In more recent pleadings, OneWeb and Kuiper raise additional concerns that SpaceX has clandestinely redesigned certain satellite antennas from phased-array antennas to a more "parabolic-like" antenna technology to communicate with gateways and/or has incorrectly represented antenna patterns in its technical analyses related to the third modification.[122]  OneWeb argues the change in antenna materially affects the PFD levels produced on the ground.[123]  OneWeb states that the PFD is lower close to the center of the beam because of SpaceX's reduction in PFD emissions, but it increases with distance away from the center at all elevation angles, and could be as much as nine dB higher.[124]  Kuiper argues that in providing a comparison of the interference environment, SpaceX has incorrectly used the antenna pattern associated with its Third Modification Application in its comparative analysis of the pre-modification and post-third modification interference environments.[125]  SpaceX confirms that it is using parabolic antennas for Ka-band gateway transmissions, but argues this upgrade was not clandestine and that it has complied and will continue to comply with all Commission rules, including applicable PFD and EPFD limits.[126]  The antenna pattern SpaceX used in its Third Modification Application is the antenna pattern recommended by the International Telecommunication Union (ITU) for low-earth orbit systems, which SpaceX states more accurately reflects SpaceX's hardware, but is still "conservative relative to measured antenna patterns."[127]  SpaceX argues the impact of the redesigned antenna on the interference environment is negligible.[128]  Kuiper responds to SpaceX's explanation by objecting to the fact that SpaceX has confirmed it is already operating with redesigned antennas prior to receiving authorization for its modified antenna specifications.[129]  Kuiper argues that contrary to SpaceX's assertion, its redesigned antennas will have far more than a negligible impact on the interference environment– specifically, Kuiper submitted diagrams of the interference patterns which it says "speak for themselves."[130]

27.     First, we decline to address in this SpaceX Third Modification the arguments regarding the extent to which SpaceX is currently authorized to operate using parabolic antennas for Ka-band gateway transmissions.  Questions as to whether SpaceX is not in compliance with this current authorization present concerns that go beyond the scope of this SpaceX Third Modification Application.  Second, we conclude that the use of parabolic antennas SpaceX plans on satellites that are authorized by this Third Modification will not cause any significant interference problems.  SpaceX states that it has included the antenna beam patterns for the parabolic antenna as part of its filings and analyses since it filed the modification.[131]  Thus, we have relied on those technical specifications as part of the above analysis where we find that there will not be any significant interference issues.  We see no reason to

---

[122] *See* OneWeb March 15 Letter at 2-5; OneWeb April 12 Ex Parte, Attachment at 4; Kuiper February 4 Ex Parte at 1; Kuiper February 11 Ex Parte at 1; Kuiper February 22 Ex Parte at 1; Kuiper February 25 Ex Parte at 1; Kuiper March 16 Ex Parte at 10.

[123] *See* OneWeb March 15 Letter at 5-7; OneWeb April 12 Ex Parte, Attachment at 4.

[124] *See* OneWeb March 15 Letter at 6-7

[125] Kuiper March 16 Ex Parte at 10.

[126] *See* SpaceX April 2 Ex Parte at 3-4.

[127] SpaceX April 2 Ex Parte at 3.

[128] *See id. at* 3.

[129] *See* Kuiper April 7 Letter at 1.

[130] *See id.*

[131] *See* SpaceX April 2 Ex Parte at 3.

revisit this analysis since the technical specifications have not changed. Therefore, we conclude that the communications with a parabolic, rather than phased array antenna, will not cause any significant interference problems.

28.    Viasat urges us to condition this grant to require SpaceX to share detailed information on its system's operating parameters, including "the number of beams on each satellite, the number of channels per beam, the number of co-frequency reuses, as well as satellite and earth station masks (especially with regard to sidelobes)."[132] Viasat argues that SpaceX does not have authority or technical ability to utilize all "look angles" simultaneously and that this information is essential to providing a baseline of operating parameters to allow others to design systems in the future.[133] Viasat further requests that if SpaceX does not share this information, that the Commission exclude replacement authority from this modification.[134] We decline to adopt Viasat's open-ended information sharing condition, as we already have a process in place for NGSO satellite applicants to provide information on the record with respect to their proposed systems, including detailed technical information required under the Commission's rules. In addition, there is a process under the rules for applicants to amend applications and licensed systems to request modification. Viasat has not provided a compelling reason to deviate from our well-established satellite application, amendment, and modification rules, or those related to authority for deployment and operation of technically-identical replacement satellites. Viasat's argument also appears to overly broadly interpret a statement by SpaceX on the effect of the modification on the overall interference environment.[135] Kuiper requests that we condition this grant to require SpaceX to share beam pointing information – in other words, which satellites are pointing at a particular earth station and the frequencies being used at a particular moment in time.[136] Kuiper states that this will assist with the coordination process.[137] We similarly decline to adopt Kuiper's specific suggested condition. We note, however, that on an ongoing basis under the Commission's good faith coordination requirement, SpaceX and all other NGSO operators already have an obligation – at the appropriate time - to facilitate the mutual exchange of data on an ongoing basis to ensure operational compatibility and to identify potential interference events in advance.[138]

29.    *Increased Interference to SpaceX.* A number of parties argue that grant of the SpaceX Third Modification would increase SpaceX's susceptibility to interference from other NGSO systems.[139]

---

[132] Viasat April 12 Conditions Letter, Attachment at 1; Viasat April 13 Ex Parte, Attachment at 1; Viasat April 14 Ex Parte, Attachment at 1; *See* also Viasat April 12 Look Angle Letter.

[133] *See* Viasat April 12 Conditions Letter, Attachment at 2; Viasat April 13 Ex Parte, Attachment at 2; Viasat April 14 Ex Parte, Attachment at 2; Viasat April 12 Look Angle Letter.

[134] *See* Viasat April 19 Letter at 5.

[135] *See* Viasat April 26 Ex Parte Presentation at 9 (interpreting SpaceX's statement about considering satellites in view for purposes of comparing numbers of potential in-line interference events as meaning that SpaceX claims to "own" the entire field of view).

[136] *See* Kuiper April 15 Ex Parte.

[137] *See id*.

[138] *See NGSO FSS Order*, 32 FCC Rcd at 7825, para. 48; *see also Kuiper Order*, 35 FCC Rcd at 8341, para. 49.

[139] *See* SES/O3b Petition at 11-14; Kuiper Opposition at 21-23; OneWeb Comments at 8-9; OneWeb March 15 Letter at 9. These parties argue that SpaceX's proposed reduction in elevation angles, while maintaining the sensitivity of its space stations, will leave SpaceX's Ku- and Ka-band satellite receivers open to interference, especially if earth station separation is used. *See* SES/O3b Petition at 11-14; SES/O3b January 29 Letter at 9-10; OneWeb Comments at 16-19, 20-25; Kuiper Opposition at 21-23; Kuiper November 17 Ex Parte at 5, slides 10, 12-13; Kuiper November 20 Letter at 1-2, slides 1-2. OneWeb also argues that the proposed reduction in SpaceX's PFD emission would leave its Ka-band earth station gateways more susceptible of interference. OneWeb Comments at 16-19, 20-25;

SES/O3b and OneWeb express concern that this increased susceptibility of SpaceX's systems will carry significant operational costs, and OneWeb requests the Bureau condition any grant of this application on SpaceX being required to accept any increased interference caused by its modification.[140]  After analyzing its susceptibility to interference, SpaceX says it is willing to accept any additional interference from other NGSO systems authorized in the 2016 Processing Round resulting from this modification compared to its current authorization.[141]  Kuiper argued that SpaceX had not acquiesced to a condition requiring it to accept increased interference from Kuiper.[142]  SpaceX has since agreed to accept interference from the Kuiper system as well with respect to its Ka-band uplinks, where operating SpaceX's satellites at lower altitudes will potentially make SpaceX more susceptible to interference.[143]

30.    We conclude that there is the potential for increased interference to SpaceX's system as a result of the modification, but since SpaceX has agreed to accept the additional interference, and will accept this grant subject to such potential additional interference, as conditioned, we also conclude that the potential for additional interference into the SpaceX system does not weigh against grant of the modification in this instance.  Any alteration to the interference environment resulting from increased SpaceX susceptibility to interference is mitigated by the fact that SpaceX is willing to accept the additional interference, including from the Kuiper system, to the extent that the modification has increased interference into SpaceX's system.

31.    We note that OneWeb challenges whether SpaceX is in fact able to accept additional interference resulting from its Third Modification.  OneWeb calculated with the proposed modification SpaceX could experience ten to thirteen dB in increased interference and notes that it does not understand how SpaceX, or any NGSO operator, could accept that much more interference.[144]  OneWeb also argues that with respect to inter-operator coordination, coordination conditions and operational limitations agreed to by SpaceX and another NGSO operator concerning the currently authorized SpaceX system would be fundamentally different from the conditions arising from the coordination of a "more interference-sensitive environment."[145]  At this time, we decline to second-guess SpaceX's statement that it is able to accept any additional interference resulting from the modification–OneWeb's arguments appear to be speculative on this point–and SpaceX would be in the best position to know whether it is able to operate its system with potentially increased interference, consistent with the conditions in this modification grant.  Thus, absent evidence that SpaceX cannot accept additional interference resulting from this modification, we find that a condition requiring SpaceX to accept such interference is sufficient in this case.

## 2.    Interference into GSO Systems

32.    SpaceX certifies that, as required by the Commission's rules,[146] its NGSO constellation, as modified, will comply with the applicable Ku- and Ka-band equivalent power flux-density (EPFD)

---

[140] *See* SES/O3b Petition at 11-14; OneWeb Comments at 16, 19-20; OneWeb Reply at 18-22.

[141] *See* SpaceX Consolidated Opposition at 20-25; SpaceX January 19 Ex Parte at 2, 8; SpaceX March 9 Letter at 3.

[142] *See* Kuiper September 24 Ex Parte at 5; Kuiper October 9 Ex Parte at 7.

[143] *See* SpaceX April 15 Letter at 9 (noting that SpaceX agrees to accept interference from the Kuiper system with respect to its Ka-band uplinks, where operating SpaceX's satellites at lower altitudes will potentially make SpaceX more susceptible to interference).  SpaceX argues that the baseline level of interference has not been established from Kuiper into SpaceX's system – and we condition this grant such that a baseline can be established.  *See id.*

[144] *See* OneWeb March 15 Letter at 9-10.

[145] *Id.*

[146] 47 CFR § 25.146.

limits set forth in Article 22 of the ITU Radio Regulations.[147]  In the *First SpaceX Modification*, the Bureau granted SpaceX's request for waiver of the requirement to receive a "favorable" or "qualified favorable" finding from the ITU with respect to compliance with the applicable EPFD limits prior to commencing operations.[148]  The Bureau retained the requirement, however, that SpaceX receive the "favorable" or "qualified favorable" finding from the ITU, and in the case of an unfavorable finding, adjust its operations to satisfy the ITU requirements.[149]

    33.     *General Concerns Regarding Compliance with EPFD Limits.*  In connection with the SpaceX Third Modification Application, several parties raise concerns with SpaceX's ITU filings and its compliance with EPFD limits generally.[150]  Viasat and Hughes assert that it is unclear from the Third Modification Application if SpaceX is basing its EPFD certification on the "single entry" value of its constellation as a whole or if it is aggregating the "single entry" values of each of the several individual NGSO ITU filings for Starlink.[151]  Viasat argues that aggregating single entry EPFD values from the separate ITU filings for Starlink would mean SpaceX was claiming single-entry status from two or more SpaceX-controlled ITU filings for the same NGSO system and would constitute an impermissible attempt to emit more power than the ITU and Commission's rules permit.[152]  Similarly, Kepler and Hughes request that SpaceX indicate which of its ITU filings represent the third modification application.[153]  According to Viasat, even assuming the parts of SpaceX's system covered by different ITU filings operated cooperatively to prevent interference, the system as a whole would exceed the ITU's EPFD limits.[154]  Viasat, Hughes, and Kepler request that SpaceX provide more information on its ITU filings, including the masks for each ITU filing associated with this application, as well as further technical demonstrations that it will comply with applicable EPFD limits.[155]  Hughes also requests the Commission condition grant of this modification such that SpaceX must obtain a "favorable" or "qualified favorable" finding from the ITU, and "the finding must explicitly indicate that the joint effect of multiple ITU filings related to [SpaceX's] constellation was taken into account when verifying compliance with applicable EPFD limits."[156]  Furthermore, Hughes requests the Commission require SpaceX to identify all ITU

---

[147] SpaceX Third Modification Application, Technical Attach. at 15 (citing 47 CFR § 25.146(a)(2)); *see, e.g.*, SpaceX June 29 Response to DISH at 2.

[148] *First SpaceX Modification*, 34 FCC Rcd at 2536.

[149] *Id.*

[150] *See, e.g.*, Viasat Petition at 37-43; Kepler Reply at 24-25.  Viasat and Kepler appear to raise these issues generally with respect to SpaceX's compliance with applicable ITU RR Article 22 EPFD limits, across a variety of frequency bands.

[151] *See* Viasat Petition at 40; Viasat December 21 Ex Parte at 9; Viasat January 7 Ex Parte at 9; Viasat February 8 Ex Parte at 30; Viasat February 12 Ex Parte at 30; Hughes April 12 Letter at 3.  Viasat also cites SpaceX's request for special temporary authority in June 2020, in which SpaceX requests authority to use higher power limits to more easily acquire its satellites at the lower altitudes to which they are initially deployed and states it will comply with EPFD limits only most of the time, as evidence that SpaceX will not comply with EPFD limits when operating its constellation under this third modification.  *See* Viasat Petition at 38-39 (citing Space Exploration Holdings, LLC., Request for Special Temporary Authority, IBFS File No. SAT-STA-20200610-00071, Narrative at 1-2 (filed June 10, 2020)).  SpaceX has clarified that it does not seek authority in this modification to operate with higher power for certain communications during orbit-raising, and this issue is discussed in further detail below.  *See* SpaceX Consolidated Opposition at 33, n.98; SpaceX April 2 Ex Parte at 4.

[152] *See* Viasat Petition at 40-41; Viasat February 8 Ex Parte at 30; Viasat February 12 Ex Parte at 30; Hughes April 12 Letter at 3.

[153] *See* Kepler Reply at 34-35; Hughes April 12 Letter at 3.

[154] *See* Viasat Petition at 41-43; *see also* Hughes April 12 Letter at 3.

[155] *See* Viasat Petition at 44; Kepler Reply at 24-25; Hughes April 12 Letter at 3.

[156] *See* Hughes April 12 Letter at 2.

filings associated with its satellite constellation and confirm that the EPFD filings provided to Hughes and other operators reflects SpaceX's complete system prior to any grant of its third modification application.[157]

34.    SpaceX states that it has conducted its EPFD analysis based on procedures and software approved by the ITU, and has every incentive to ensure that this analysis has been performed properly because if the ITU were to determine that SpaceX's system would exceed the applicable EPFD limits, SpaceX would have to revise its operations to come into compliance with those limits.[158]  The Commission has incorporated by reference ITU EPFD limits into its rules, including for the Ku- and Ka-band and, as noted, requires that NGSO FSS licensees and grantees communicate a "favorable" or "qualified favorable" finding by the ITU Radiocommunication Bureau regarding compliance with applicable ITU EPFD limits.[159]  Given the condition in SpaceX's license, as modified, requiring that SpaceX receive the "favorable" or "qualified favorable" finding from the ITU, and in the case of an unfavorable finding, adjust its operations to satisfy the ITU requirements,[160] we agree that SpaceX has "every incentive" to ensure that its EPFD analysis has been performed properly – and we also conclude that the ITU is in the best position to determine whether SpaceX appropriately relied on multiple ITU filings in its analysis.  Therefore, we do not see the need to further address the parties' claims with respect to aggregation of "single entry" values from separate ITU filings, or to condition the grant as Hughes requests.

35.    *EPFD Limits Applicable to the 12.2-12.7 GHz Frequency Band.*  DISH and AT&T express concern that SpaceX's system, as modified, would exceed ITU and Commission EPFD limits specifically into Ku-band direct broadcast satellite (DBS) receivers in the 12.2-12.7 GHz band.[161]  To protect DBS operators, AT&T argues, the Bureau should not permit SpaceX to commence operations under this proposed third modification until it has obtained the "favorable" or "qualified favorable" finding from the ITU.[162]  AT&T also requests the Bureau condition any grant of SpaceX's third modification to require SpaceX to remedy interference into DBS systems immediately upon notification of such interference.[163]  Finally, AT&T requests the Bureau consider SpaceX's modification in the context of aggregate EPFD limits, including applications for NGSO licenses and modifications recently filed in the 2020 Processing Round, and condition any further modification of SpaceX's license on SpaceX "demonstrating how it has 'cooperated' with other U.S. licensees and market access grantees to determine if the aggregate limit has been met."[164]

36.    In response to these assertions, SpaceX reiterates that it has certified that it will comply

---

[157] *See id.*

[158] SpaceX Consolidated Opposition at 33. SpaceX also notes in its consolidated opposition that it has provided Viasat the EPFD data files.  *Id.*

[159] 47 CFR § 25.146(c).

[160] *First SpaceX Modification Order*, 34 FCC Rcd at 2536, para. 28.

[161] *See* DISH Letter at 1; DISH July 14 Response to SpaceX at 3-5; DISH February 10 Ex Parte at 1; AT&T Comments at 3.

[162] *See* AT&T Comments at 3-6 (citing 47 CFR § 25.146(c)); AT&T Reply at 1-4.  As noted, the Commission had conditioned SpaceX's original authorization on SpaceX receiving a "favorable" or "qualified favorable" finding from the ITU with respect to compliance with applicable ITU RR Article 22 limits prior to commencing operations, but subsequently this condition was modified in the First SpaceX Modification, to permit SpaceX to commence operations prior to this finding, provided that SpaceX adjust its operations to satisfy the ITU requirements in the event that it does not receive a "favorable" or "qualified favorable" finding.  *First SpaceX Modification*, 34 FCC Rcd at 2536, para. 28.

[163] *See* AT&T Comments at 3, 6; AT&T Reply at 6-7.

[164] *See* AT&T Comments at 3, 6-7.

with EPFD limits to protect DBS services,[165] that it has used approved ITU software and methodologies to conduct its EPFD analysis and presented its results in its application[166] and that AT&T's request regarding protection of DBS incumbents against any increase in interference is "inconsistent with the international accord holding that operating within the EPFD limits provides sufficient protection to GSO systems."[167]

37.    DISH further argues that SpaceX has failed to demonstrate its EPFD emissions will not exceed what a standard DBS antenna can tolerate.[168]  On September 25, 2020, DISH filed a letter requesting the Bureau require SpaceX to produce its EPFD analysis for DISH's examination with no limitations on the type of analysis DISH may perform with that data,[169] and SpaceX provided DISH with its EPFD data.[170]  Following this exchange, DISH states that it has reviewed SpaceX's EPFD data and submits a technical study allegedly showing that SpaceX's proposed modification would exceed applicable EPFD limits in the 12.2-12.7 GHz band and cause harm to DBS customers in the United States.[171]  DISH argues that SpaceX's EPFD analysis has utilized the incorrect assumption that the value of "Nco," a factor used in ITU EPFD analysis to represent the number of co-frequency, co-polarization satellite beams transmitting to a given point on the Earth's surface simultaneously, is one, which according to DISH means that only one satellite beam will transmit to a given spot on the Earth's surface at a time.[172]  DISH speculates that SpaceX will transmit between two and ten, if not more, co-frequency beams in the 12.2-12.7 GHz band, and therefore an Nco value of four or six is more appropriate.[173]  SpaceX states that its use of an Nco value of one is not merely an input for its EPFD analysis, but reflects the way SpaceX in fact has operated its system and the method by which it will continue to operate its system in the future.[174]  SpaceX also states that it entirely avoids communications with its satellites when they are near the geostationary arc, specifically to avoid causing interference to systems like DISH's.[175]  DISH further argues that if the SpaceX modification is granted, it should not include the 12 GHz band.[176]

38.    DISH also submits an analysis which, according to DISH, demonstrates that even with an

---

[165] *See* SpaceX June 29 Response to DISH at 1-2.

[166] *See id. at* 2.

[167] SpaceX Consolidated Opposition at 32.

[168] *See* DISH Letter at 1, 5; DISH July 14 Response to SpaceX at 3, 5; DISH December 31 Ex Parte at 2; DISH January 5 Ex Parte at 2.

[169] *See* DISH September 25 Letter Requesting Order of Production of Evidence at 1-2, 6-7.

[170] *See* SpaceX October 15 EPFD Notice.  The Bureau had not taken any action on DISH's request at that point.

[171] *See* DISH February 15 Letter at 1; DISH February 24 Ex Parte at 1-2; DISH March 8 Ex Parte at 2; DISH March 9 Ex Parte at 2; DISH March 17 Response to SpaceX at 1, 2.

[172] *See, e.g.*, DISH February 15 Ex Parte at 2, 3, Attachment at 4-5; DISH March 8 Ex Parte at 2; DISH March 9 Ex Parte at 2; DISH March 17 Response to SpaceX at 1, 2, 6; DISH April 14 Ex Parte at 1-2.

[173] *See* DISH February 15 Letter at 2, 4, 5, Attachment at 4-5; 14-15, 20; DISH March 8 Ex Parte at 2; DISH March 9 Ex Parte at 2.  In support of this assertion, DISH points to several aspects of SpaceX's proposed service - including that one satellite beam would allow for 200-300 Mbps speeds, and that SpaceX promises ten Gbps speeds for every user.  See DISH March 4 Response to SpaceX at 3-4.  DISH provided a variety of additional technical arguments on this point regarding SpaceX's Nco value.

[174] *See* SpaceX March 16 Ex Parte at 2 (stating that Nco=1 for Ku-band operations is not just an analytical input for analysis but actually reflects the way SpaceX operates its system); SpaceX March 18 Response to DISH at 1; SpaceX April 2 Ex Parte at 1-2.

[175] *See* SpaceX February 25 Response to DISH at 2; SpaceX March 9 Response to DISH at 1-2).

[176] *See* DISH March 8 Ex Parte at 2; DISH March 9 Ex Parte at 2; DISH March 17 Response to SpaceX at 1, 2-3; DISH April 14 Ex Parte at 4.

Nco value of one, SpaceX's system will exceed the EPFD limits in the 12.2-12.7 GHz band across the United States.[177] SpaceX argues that the methodology DISH uses in this analysis to show SpaceX will exceed the EPFD limits with an Nco value of one is not ITU-approved.[178] DISH further argues that SpaceX does not address how it will meet demand with only one co-frequency satellite beam, and it is concerned, along with Viasat, that when SpaceX is forced to choose between complying with the EPFD limits and meeting demand under its obligations as a winner in the Rural Digital Opportunity Fund auction, SpaceX will choose to violate the EPFD limits.[179] If SpaceX can indeed meet demand with a Nco value of one, DISH argues this demonstrates SpaceX's need for the 12.2-12.7 GHz band is attenuated compared with the vast amount of spectrum it is also authorized to use.[180] DISH argues the Commission should deny the modification, or else grant it with specific conditions requiring it to: (1) "not use more than one satellite beam from any of its satellites in the same frequency in the same or overlapping areas at a time;" (2) be "subject to any findings the Commission may make about the method for determining EPFD limits compliance and the operational requirements for avoiding interference into DBS systems consistent with international footnote R.R. 5.487A;" and (3) "submit under an appropriate protective order sufficient information about its operations to permit DBS licensees to assess compliance with the condition."[181]

39.    A certification of compliance with EPFD limits is what is required by our rules, and we are satisfied with SpaceX's certification that it will not violate ITU EPFD limits relevant to the 12.2-12.7 GHz band. We find that SpaceX has addressed DISH's inquiry regarding whether an Nco value of one is reflective of the way that SpaceX operates its system, and condition this grant accordingly. As noted, DISH asks us to condition SpaceX's grant to require that SpaceX "not use more than one satellite beam from any of its satellites in the same frequency in the same or overlapping areas at a time."[182] SpaceX has stated on the record that an Nco value of one, as an input value for how many co-frequency simultaneously transmitting satellites will service a given point on Earth, actually reflects the way it operates its system.[183] SpaceX has also agreed to the condition proposed by DISH that SpaceX not use more than one satellite beam from any of its satellites in the same frequency in the same or overlapping areas at a time.[184] We condition this grant accordingly.

---

[177] See DISH March 17 Response to SpaceX at 2, 4; DISH March 24 Response to SpaceX; DISH March 25 Letter; DISH April 6 Letter at 1; DISH April 14 Ex Parte at 2, 3; See also DISH April 23 EPFD Letter (submitting an additional study in which DISH states that based on its own analysis, SpaceX would not meet the EPFD limits even with a "nominal" Nco of 1).

[178] See SpaceX March 18 Response to DISH at 1-2. DISH argues its analysis is based on real-world information, which the Commission has found is preferable to simulations, and use of ITU software is not mandated by the international Radio Regulations—it is only a recommendation. See DISH April 14 Ex Parte at 2-3.

[179] See DISH April 6 Letter at 2; DISH April 14 Ex Parte at 2, 3; see also Viasat April 5 Letter; Viasat April 12 Letter at 1; Viasat April 26 Ex Parte.

[180] See DISH April 6 Letter at 3.

[181] See DISH April 6 Letter at 3-4; DISH April 14 Ex Parte at 4. DISH also requests that the Commission add to the SpaceX license conditions a requirement that SpaceX must "cease operations as a result of any future Commission actions on related matters, including the pending rulemaking proceeding regarding the 12.2-12.7 GHz band,[] SpaceX's Petition for designation as an eligible telecommunications carrier,[] and SpaceX's application for modification of its blanket earth station license to permit operation of earth stations in motion ("ESIMs")." Id. at 4. We address the arguments regarding the Commission's pending 12 GHz NPRM below, and the basis for the other portions of this condition, which reference the Commission's Rural Digital Opportunity Fund auction and a pending earth station application, are not clear from DISH's filing. Id.

[182] DISH April 6 Letter at 3-4.

[183] See, e.g., SpaceX March 18 Response to DISH.

[184] SpaceX April 15 Letter at 4.

40.     Having addressed the input parameters for the ITU EPFD analysis, we refer to section 25.146 of the Commission's rules, which incorporates findings by the ITU Radiocommunication Bureau regarding compliance with ITU EPFD limits.[185]  Contrary to DISH's assertion, we will not depart from the Commission's determination as a general matter in the *NGSO FSS Report and Order* that applicants may certify their compliance with ITU EPFD limits.[186]  The Commission concluded that it could rely on ITU Radiocommunication Bureau review as a technical matter, including requiring applicants to use the ITU-approved validation software to assess compliance with EPFD limits.[187]  Although DISH alleges that SpaceX cannot meet the EPFD limits even using the input of an Nco of one based on its own analysis, the relevant analysis under the Commission's rules is analysis using ITU-approved software.  For these reasons we also reject DISH's proposed condition that SpaceX be "subject to any findings the Commission may make about the method for determining EPFD limit compliance and the operational requirements for avoiding interference into DBS systems consistent with international footnote R.R. 5.487A."[188]  DISH essentially asks us to condition SpaceX's grant explicitly on the possibility that the Commission may reconsider or revise the Commission's decision in the *NGSO FSS Report and Order*, which we decline to do at this time.  In the event that we were to revise our applicable rules, we find that the more general condition language in SpaceX's license, included as part of this modification as well, is sufficient.  Similarly, DISH's request that we require SpaceX to "submit under an appropriate protective order sufficient information about its operations to permit DBS licensees to assess compliance with the condition" would be at odds with the Commission's determination in the *NGSO FSS Report and Order*, reflected in section 25.146(c) of the Commission's rules, that applicants must submit the input data files used for the ITU validation software, and that an ITU determination of "favorable" or "qualified favorable" is sufficient for the Commission to assess compliance with EPFD limits.[189]

41.     We further see no reason to revoke our previously-granted waiver of section 25.146(c), and accordingly, we will continue to condition this grant consistent with the prior modifications to require SpaceX to provide the underlying data for its EPFD analysis to any interested party.  We similarly decline AT&T's requested condition on this grant to require SpaceX to "demonstrate" how it has coordinated with other systems to assess whether the aggregate EPFD limits have been met.[190]  SpaceX's license is already conditioned to require such coordination, and it is not clear how some type of demonstration of coordination would be assessed by the Commission or otherwise add to the existing requirement.  Additionally, we decline to condition this grant of modification to require that if any DBS operator notify SpaceX that its system is causing actual interference in excess of the certified limit, SpaceX should be required to immediately remedy the interference.  We find this is unnecessary given the existing condition that SpaceX's operations in the 12.2-12.7 GHz band are authorized only up to the equivalent power flux-density requirements of Article 22 of the ITU Radio Regulations, as well as Resolution 76 (Rev. WRC-15) of the ITU Radio Regulations.

42.     Finally, as SpaceX has provided its EPFD input data files to DISH, we dismiss DISH's request for production of evidence as moot.[191]

43.     *EPFD Limits Applicable to the 19.7-20.2 GHz Frequency Band.*  SES/O3b and Hughes

---

[185] 47 CFR § 25.146(c).

[186] *See NGSO FSS Report and Order*, 32 FCC Rcd at 7822, para. 41.

[187] *Id.*

[188] The Table of Frequency Allocations includes footnote 5.487A, which states, among other things, that NGSO systems in the FSS in the 12.2-12.7 GHz band "shall be operated in such a way that any unacceptable interference that may occur during their operation shall be rapidly eliminated."  *See* 47 CFR § 2.106, footnote 5.487A.

[189] *NGSO FSS R&O*, 32 FCC Rcd at 7822, para. 41; 47 CFR § 25.146.

[190] *See* AT&T Reply Comments at 7.

[191] *See* DISH Letter Requesting Order of Production of Evidence at 1.

also raise concerns regarding compliance with EPFD limits in the Ka-band, in particular, with respect to the 19.7-20.2 GHz band.[192]  SES/O3b and Hughes argue that SpaceX used an Nco of one when conducting its EPFD analysis, but the SpaceX modification states that up to eight satellites will be communicating with an earth station at any one time, similar to DISH's concerns, raising questions as to whether SpaceX will in fact comply with applicable EPFD limits in this band.[193]  {[

]}  SpaceX explains that its Nco value for its satellites in the 17.8-18.6 GHz band was for the modification granted in 2019 and is eight for the current modification, reflecting its proposed change in operations, but it is using an Nco of one in the 19.7-20.2 GHz band because the EPFD limits are more stringent, requiring SpaceX to limit the number of satellites communicating with an earth station simultaneously in that band to one.[198]  SpaceX agrees operating four or eight satellites simultaneously in the 19.7-20.2 GHz band would violate the EPFD limits, and does not propose to operate its gateways with more than one satellite at a time using a given frequency in the 19.7-20.2 GHz band.[199]  Hughes nevertheless contends SpaceX has not shown it will comply with EPFD limits in the 19.7-20.2 GHz band and requests that we to require that SpaceX "may not use more than one satellite beam for satellite transmissions on the same frequency to the same or overlapping areas at a time."[200]  SpaceX agrees to this condition,[201] and we adopt it here.  Hughes also requests that we subject SpaceX to any findings the Commission may make about the method for determining EPFD limit compliance and the operating requirements for avoiding unacceptable interference into GSO FSS systems.[202]  For the same reasons as discussed in connection with DISH's proposed conditions above, we decline to condition SpaceX's grant on a change in our rules regarding EPFD limit compliance, as Hughes requests.[203]

44.    *Potential for Additional Interference to GSO Systems.*  Apart from the questions of Nco and EPFD limits, SES/O3b and DISH argue that SpaceX's application would increase interference into

---

[192] *See* SES/O3b Petition at 15-17; Hughes March 5 Ex Parte; Hughes April 12 Letter.

[193] *See* SES/O3b Petition at 16; SES October 13 Ex Parte at 3; SES/O3b October 21 Letter at 2-3; SES/O3b November 17 Ex Parte, Attachment 1 at 3; Hughes March 5 Ex Parte at 1, 2.

[194] *See* Hughes February 5 Letter at 1.

[195] *See id. at* 1-2.

[196] *See id. at* 1, Attachment A.

[197] *See id.* at 2, Attachment A.

[198] *See* SpaceX November 13 Response to SES/O3b at 1-2; SpaceX March 11 Response to Hughes at 1.

[199] *See* SpaceX March 11 Response to Hughes at 1, 2.

[200] *See* Hughes April 12 Letter at 1-2.

[201] SpaceX April 15 Letter at 5.

[202] Hughes April 12 Letter at 1-2.

[203] We also decline to include in the conditions Hughes' suggested language to specify SpaceX secondary operations in the 19.7-20.2 GHz band with respect to GSO FSS, since we have not included this specific language in prior SpaceX authorization conditions.  *See* Hughes April 12 Letter at 1.

GSO satellite systems. SES/O3b argues that the increased scan angles proposed for SpaceX's satellites would create large grating lobes that, in addition to potentially impacting earth stations serving the O3b NGSO network, could cause interference into earth stations serving SES's GSO satellites.[204] SpaceX responds that the phased array antennas used on its satellites have been specifically designed with small enough spacing between antenna elements to operate at the highest frequency and largest scan angle proposed by SpaceX in its modification application, without producing grating lobes that would direct Ka-band energy in unexpected directions and potentially affect earth stations communicating with GSO satellites.[205] Although SES/O3b challenges this assessment in its reply comments, it appears in later filings to focus instead on the mainlobe size as a source of interference effects.[206] In general, SpaceX states that the modified constellation will have the same sidelobe levels as the previously authorized constellation, and ultimately SES/O3b appears to agree with this assessment.[207] Given that lack of any evidence on this point in the record, we have no reason to doubt SpaceX's assertion that its phased array antennas are designed not to produce excessive grating lobes.

45.      SES/O3b also claims that SpaceX has modified the GSO avoidance angle in its modification to 18 degrees, while SpaceX previously specified a GSO avoidance angle of 22 degrees.[208] SpaceX admits that it has adjusted its GSO avoidance angle, but consistent with its original authorization, states that it has done so within the EPFD limits.[209] SpaceX observes that the Commission did not require any specific GSO avoidance angle as part of its original authorization.[210] We conclude that so long as SpaceX is in compliance with EPFD limits, SpaceX may operate with a GSO avoidance angle of 18 degrees.

46.      As to the remainder of the arguments regarding interference to GSOs, we note that the analysis is similar to that of our analysis above related to NGSO systems, including with respect to the O3b NGSO constellation, which would have similar geometries to GSO satellites for purposes of the interference analysis. SES/O3b also observes that SpaceX stated it would reduce its PFD emissions to account for the greater Nco of eight in the 17.8-18.6 GHz band, but SES/O3b argues that the decrease in PFD emissions has no impact on the factor that is actually driving the increased risk of interference – SpaceX's decision to lower its earth station elevation angles.[211] SpaceX suggests that taken together, its reduced altitude, lower elevation angles, and reduced PFD emissions will result in no increased interference into GSO systems and argues that SES/O3b is not analyzing the effects of all these proposals together.[212] Given the similarities in analysis as between the interference environment for GSO and NGSO satellites in this particular context, we reference the analysis in our discussion above, and find that the reduction in SpaceX's earth station antenna elevation angles, which would, without other mitigating proposals, tend to increase interference, is offset by the proposed reduction in altitude of SpaceX's satellites and the decreased PFD emissions.

47.      DISH also argues that lowering the altitude of all of the SpaceX satellites and increasing the number of orbital planes in which they operate will have the effect of tightening a net of satellites

---

[204] See SES/O3b Petition at 15-16; SES/O3b Reply at 17-19.

[205] SpaceX Consolidated Opposition at 32.

[206] See, e.g., SES/O3b October 21 Letter at 2.

[207] Id.

[208] See id.

[209] See SpaceX September 3 Ex Parte, Attachment A; SpaceX September 18 Ex Parte, Attachment A; SpaceX November 13 Response to SES/O3b at 2-3; SpaceX January 19 Ex Parte, Attachment B at 3.

[210] SpaceX November 13 Letter at 2-3.

[211] See SES/O3b October 21 Letter at 3.

[212] See SpaceX January 19 Ex Parte, Attachment B at 9.

around the Earth, placing more SpaceX satellites in between DBS GSO satellites and the Earth's surface and increasing the power levels of the constellation.[213]  SpaceX clarified that, contrary to DISH's claim that lowering the elevation of SpaceX's satellites will tighten the net of satellites around the Earth and result in more SpaceX satellites between DBS satellites and earth stations, SpaceX's reduction in altitude will actually result in fewer satellites being visible to its earth stations at any one time, and so to the extent that one considers a satellite in view from a given location to be "in between" that location and a GSO satellite, the modification therefore has the opposite effect to what DISH predicts.[214]  We find that given the lower altitude of the SpaceX satellites following the modification, from the perspective of a GSO earth station, there should be a wider separation angle from the inline event on average, and any inline event would be for a shorter time period, as the SpaceX satellite would appear to be moving faster as viewed on the ground than when at a higher orbital altitude.  Therefore, we find that the SpaceX Third Modification will not increase interference into GSO satellite systems.

### 3.    Compatibility with Terrestrial 5G and the 12 GHz Rulemaking

48.    RS Access, CCIA and INCOMPAS, DISH, and the MVDDS Licensees argue that grant of the application would hinder the Commission's ability to authorize 5G services in the 12 GHz band.[215]  Several parties argue that while sharing might be possible between MVDDS operators and the SpaceX system as currently authorized, sharing would become impossible between terrestrial 5G services and SpaceX's constellation, as modified, particularly because of SpaceX's proposed lower elevation angles and its proposed doubling of the number of satellites interacting with each gateway earth station.[216]  RS Access, CCIA and INCOMPAS, and the MVDDS Licensees argue that SpaceX already has access to 14,050 megahertz of spectrum—the 12.2-12.7 GHz band is only 3.6% of that spectrum—and that SpaceX has been on notice about the potential for a rulemaking on the 12.2-12.7 GHz band.  They further argue that the Commission is able to grant SpaceX's modification while preserving the 12.2-12.7 GHz band for terrestrial 5G.[217]  RS Access therefore requests the Bureau exclude the 12.2-12.7 GHz band from SpaceX's license, or else require SpaceX to operate at elevation angles of 40 degrees in the 12.2-12.7 GHz band.[218]  Alternatively, now that the *12 GHz NPRM* has been published, RS Access requests the Bureau delay action on SpaceX's application until the 12 GHz rulemaking is complete.[219]

---

[213] *See* DISH Letter at 4; DISH December 31 Ex Parte at 2; DISH January 5 Ex Parte at 2.

[214] *See* SpaceX June 29 Response to DISH at 3-4.  In response to DISH, SpaceX also notes that the majority of the satellites in view above the horizon from any site in the United States would not be located in the direction of the equatorial GSO arc, and that SpaceX and other NGSO FSS operators typically observe an exclusion zone around the GSO arc in which their satellites will not operate. *Id.* at 4, n.12.

[215] *See* RS Access Letter at 1-2, 4-6 (citing Petition for MVDDS 5G Coalition for Rulemaking, RM-11768 (filed Apr. 26, 2016)); RS Access February 8 Ex Parte at 1; RS Access February 19 Ex Parte, Attachment at 2-3; RS Access February 26 Ex Parte at 1; RS Access March 15 Ex Parte, Exhibit B at 2-4; CCIA/INCOMPAS Letter at 1; DISH July 14 Reply to SpaceX at 1, 5-6; DISH December 31 ex Parte at 1; DISH January 5 Ex Parte at 1; DISH January 11 Ex Parte at 1; DISH March 8 Ex Parte at 1-2; DISH March 9 Ex Parte at 1; MVDDS Licensees Letter at 1, 5.  *See also Expanding Flexible Use of the 12.2-12.7 GHz Band*, Notice of Proposed Rulemaking, FCC 21-13 (2021) (*12 GHz NPRM*); MVDDS Licensees Letter at 1.

[216] *See* RS Access Letter at 3-6; RS Access February 8 Ex Parte, Attachment A at 1-3; RS Access February 11 Ex Parte, Attachment A at 1-3; RS Access February 26 Ex Parte, Attachment A at 1-3; RS Access March 15 Ex Parte, Exhibit B at 3.

[217] RS Access Letter at 2, 3, 8; RS Access February 8 Ex Parte, Attachment A at 1-4; RS Access February 11 Ex Parte, Attachment A at 1-3; RS Access February 26 Ex Parte, Attachment A at 1-3; RS Access March 15 Ex Parte, Exhibit B at 2-4; CCIA/INCOMPAS Letter at 2; MVDDS Licensees Letter at 3-5.

[218] *See* RS Access Letter at 5-6; RS Access April 9 Ex Parte at 1; RS Access April 23 Ex Parte at 2-3.

[219] See RS Access February 8 Ex Parte at 1; RS Access February 26 Ex Parte at 1; RS Access March 15 Ex Parte, Exhibit B at 3-4.

49. SpaceX argues that these commenters' claims to the 12.2-12.7 GHz band for terrestrial 5G services are speculative, that it is a crucial band for SpaceX's service, and that its authorization is already subject to a condition requiring it to comply with all future Commission rulemakings, should the Commission act on the MVDDS rulemaking petition.[220] SpaceX also argues that technical analysis in the record shows that sharing between terrestrial 5G and the SpaceX system as currently authorized would also be impossible, and so the modification is immaterial to that discussion.[221] RS Access argues that when these studies were filed in the record, NGSO FSS systems were envisioned to utilize Earth station antennas with elevation angles so low they would cover the entire sky, from horizon to horizon, but the "mega-constellations" being developed can use much higher elevation angles because satellites are always in view overhead, and this blocks interference from terrestrial systems in the same band.[222] According to RS Access, therefore, SpaceX's reduction in elevation would render sharing much more difficult.[223]

50. We recently released the *12 GHz NPRM*, which assesses the potential for terrestrial 5G use of the band.[224] We decline to prejudge any aspects of the 12 GHz rulemaking proceeding by either commenting on the ability of terrestrial and satellite operators to share spectrum in the frequency band more generally, or by denying the requested modification that would include authorization to use the 12.2-12.7 GHz band. We also decline to delay action on this modification until the 12 GHz rulemaking is concluded. As with prior grants, we condition this grant, subject to any modification necessary to bring it into conformance with future actions in Commission rulemakings, including but not limited to the 12 GHz proceeding, which is expressly referenced in the ordering clauses below.[225] Therefore, SpaceX proceeds at its own risk.

51. With respect to DISH's recent letter requesting a Protective Order "to propound certain additional questions to the NGSO system proponents,"[226] we decline to grant DISH's request in the context of this application proceeding. DISH presents its request as one connected to the *12 GHz NPRM*,[227] rather than specific issues related to the SpaceX Third Modification Application.[228] For

---

[220] *See* SpaceX Consolidated Opposition at 34-35; SpaceX July 10 Response to RS Access at 2, 4; SpaceX December 21 Ex Parte at 1, 2; SpaceX December 28 Ex Parte at 2.

[221] *See* SpaceX Consolidated Opposition at 34-35; SpaceX July 10 Response to RS Access at 2-3 (citing Letter from Allison Minea, DISH Network LLC and South.com LLC, to Marlene H. Dortch, Secretary, FCC, RM-11768, at 3 (dated Dec. 2, 2019)); Reply Comments of the MVDDS 5G Coalition, RM-11768, Appendix A at 3 (dated Jun. 23, 2016); Comments of the MVDDS 5G Coalition, RM-11768, Attachment I at 2 (dated Jun. 8, 2016); SpaceX January 19 Ex Parte, Attachment B at 10; SpaceX January 22 Ex Parte, Attachment A at 11; SpaceX March 1 Ex Parte at 2; SpaceX March 8 Ex Parte at .

[222] *See* RS Access February 8 Ex Parte, Attachment A at 1-2; RS Access February 11 Ex Parte, Attachment A at 1-2; RS Access February 26 Ex Parte, Attachment A at 1-2; RS Access March 15 Ex Parte, Exhibit B at 2-3. DISH also indicated that advances in technology over the last five years have made sharing between NGSO FSS and MVDDS systems feasible. *See* DISH March 17 Response to SpaceX at 5.

[223] *See* RS Access February 8 Ex Parte, Attachment A at 1-2; RS Access February 11 Ex Parte, Attachment A at 1-2; RS Access February 26 Ex Parte, Attachment A at 1-2; RS Access March 15 Ex Parte, Exhibit B at 2-3.

[224] *See Expanding Flexible Use of the 12.2-12.7 GHz Band*, Notice of Proposed Rulemaking, FCC 21-13 (2021) (*12 GHz NPRM*).

[225] *See infra* para. 97.w; *SpaceX Authorization*, 33 FCC Rcd at 3399, 3401-02 para. 17 ("we note that, as with the *OneWeb Order*, *Telesat Canada Order*, and *Space Norway Order*, grant of the SpaceX application will not prejudge any decision, including a contrary action in any future rulemaking proceeding."), nn.65, 88 (2018). *See also SpaceX Third Modification Ten-Satellite Grant* at *3, para. 9 n. 27.

[226] DISH February 23 Request for Protective Order at 1; *see also* DISH April 23 12 GHz Letter (filing in this proceeding arguments more generally related to the 12 GHz proceeding).

[227] *See* 12 GHz NPRM.

example, DISH states that it is listing "questions and information requests that DISH believes the Commission would find highly probative to the issues teed up for evaluation in the 12 GHz rulemaking,"[229]  In its request, DISH states that SpaceX has not claimed that the information requested by DISH would be "irrelevant or unhelpful to the Commission in its... review of SpaceX's proposed modification[,]" but provides no rationale or argument as to why this information would be relevant to review of the SpaceX Third Modification Application.[230]  We decline to make any determination on DISH's request to the extent that it is relevant to the *12 GHz NPRM* more generally, but we deny DISH's request in the context of processing this modification application.

### 4.    Protection of Ka-Band Terrestrial Systems

52.    In accordance with the conditions on its original authorization, SpaceX submitted a showing demonstrating that it will protect terrestrial fixed stations in the Ka-band with the characteristics described in recommendation ITU-R SF.1483.[231]  SpaceX askes the Bureau to determine that it has satisfied the condition on its original authorization.[232]  OneWeb states it has analyzed SpaceX's showing and agrees SpaceX will be able to protect terrestrial fixed stations in the Ka-band, and supports SpaceX's request that the Bureau find SpaceX has satisfied this condition.[233]  We agree SpaceX's showing demonstrates it will protect terrestrial fixed stations in the Ka-band and find SpaceX has satisfied this condition.

### C.    Orbital Debris

53.    SpaceX's original authorization for its Ku- and Ka-band system was conditioned upon Commission approval of an updated description of the orbital debris mitigation plans for its system.[234]  As part of SpaceX's first modification application, SpaceX submitted an updated description and analysis of its orbital debris mitigation plans.[235]  In the *SpaceX First Modification Order* the Bureau concluded that the orbital debris mitigation plan was sufficient with regard to the 1,584 satellites in SpaceX's constellation that it was requesting to operate at 550 km, as part of its modification request.[236]  SpaceX's plan concerning avoiding collisions with large objects (both active satellites and debris) involved three main elements, recognizing that such risks can be reduced by maneuvering to avoid predicted collisions and by removing objects from orbit after their mission is complete.  First, SpaceX indicated that its satellites would have propulsion and would be maneuverable.[237]  Second, SpaceX indicated that it would take steps to reduce collision risk for satellites that reach the end of their mission by lowering the altitude

---

(Continued from previous page) ————————————————————

[228] RS Access also asks that we condition this grant on receipt of information about SpaceX's antenna performance specifications, to help operators better understand coexistence opportunities between NGSO FSS and 5G in the 12.2-12.7 GHz band.  RS Access April 23 Ex Parte at 2.  We decline to condition this grant as requested by RS Access since similarly this request appears more related to issues that are part of the 12 GHz proceeding.

[229] DISH February 23 Request for Protective Order at 2.

[230] *Id*.

[231] *See* SpaceX Third Modification Application, Technical Attachment at 17; SpaceX Authorization at para. 35.

[232] *See* SpaceX Third Modification Application, Technical Attachment at 17; SpaceX Authorization at para. 35.

[233] *See* OneWeb Comments at 2-3.

[234] *SpaceX Authorization*, 33 FCC Rcd at 3398, 3407, paras. 15, 40p.

[235] *SpaceX First Modification Order*, 34 FCC Rcd at 2532, para. 18.

[236]  *Id. at* 2536, 2538, paras. 26, 32p.  This determination was also based on information provided by SpaceX concerning measures it had taken to reduce to zero the calculated casualty risk from satellite debris that survives re-entry into the Earth's atmosphere. Id. at 2535-2536, n.1.  That information is equally applicable to the spacecraft proposed for deployment pursuant to this modification.

[237] SpaceX First Modification Application, Technical Attachment at 39.

of the satellites in order to hasten atmospheric re-entry, and by continuing active collision avoidance for as long as possible during the disposal phase.[238]  Third,  as a result of the reduction in altitude to the 550 km range, even if not maneuverable SpaceX satellites would, due to higher atmospheric drag at that altitude, comply with the so-called "25 year rule" that a satellite operating in Low Earth Orbit should be removed from orbit within no more than 25 years after the conclusion of its mission.[239]  SpaceX also indicated it would deploy satellites to an initial altitude of approximately 350 km in order to ensure that any satellites that are not able to maneuver upon deployment are in a low orbit from which "passive" atmospheric re-entry can be expected within months.[240]  SpaceX relies on the same considerations in this modification for altitudes ranging from 540 km to 570 km.[241]  In response to SpaceX's modification application, a number of parties expressed concerns about the orbital debris mitigation information SpaceX provided in its application and the consequences of grant of SpaceX's third modification on space safety and the orbital debris environment.[242]

54.      *Framework for Analysis.*  In several respects, the concerns raised relate to the scale of the over-all constellation deployment, taking into account the 1,594 satellites already authorized for deployment and the 2,814 satellites for which SpaceX seeks a modified altitude, particularly with respect to collision risk and potential operational effects on other systems.  Because our decisions concerning prior modifications did not address such concerns, we address them here.  In addition, although we agree with SpaceX that specification of a lower altitude provides for operations that present considerably lower risk than at the higher altitude, all other things being equal,[243] we do not ascribe any public interest weight to reduction in risk relative to a constellation configuration that was only conditionally authorized, in particular one conditionally authorized subject to further review on precisely the issues addressed here. Instead, our review is guided by an assessment of the constellation configuration for which SpaceX seeks authorization, based on available factual information and taking into consideration relevant research and debris mitigation considerations identified for large constellations in relevant research and sources such as the U.S. Government Orbital Debris Mitigation Standard Practices (ODMSP).[244]  We believe this approach is preferable in that it evaluates the proposed operations based on objective benchmarks, rather than through a comparison with an earlier proposed system.

55.      The ODMSP contains a provision specifically focused on large constellations (100 or more operational spacecraft cumulative).  The ODMSP provision on large constellations focuses primarily on disposal of spacecraft at the end of their mission, and identifies immediate removal from orbit as the preferred method for disposal, with another option being delayed re-entry utilizing atmospheric drag to remove the satellite from orbit as soon as practicable, but in any event within 25

---

[238] Id. at 39-40.

[239] *See* U.S. Government Orbital Debris Mitigation Standard Practices, November 2019 Update, at p. 5, Section 4.-1.b.  Available at:
https://orbitaldebris.jsc.nasa.gov/library/usg_orbital_debris_mitigation_standard_practices_november_2019.pdf
(ODMSP).  SpaceX submitted information indicating that its satellites can be expected to re-enter passively from that range in approximately five years.  First Modification Application, Technical Attachment at 39-40.

[240] *See* Space*X February 22 Ex Parte at 1-2.*

[241] SpaceX Third Modification Application, Narrative at 2.

[242] *See e.g.,* Viasat Petition, Kuiper Opposition, Kepler Opposition, Spire Comments; SES/O3B Petition; OneWeb Comments; Astroscale Letter; Kuiper May 1 Ex Parte; Viasat June 8 Letter.

[243] This observation is also amply supported by modeling studies of large constellations. *See, e.g.,* J.-C. Liou, et al. "NASA ODPO's Large Constellation Study", Orbital Debris Quarterly News, Vol. 22 (3), pp. 4-7, 2018; Hugh G. Lewis, *"Evaluation of debris mitigation options for a large constellation"* First International Orbital Debris Conference (Houston, 2019), available at:
https://www.hou.usra.edu/meetings/orbitaldebris2019/orbital2019paper/pdf/6069.pdf

[244] *See generally* ODMSP.

years. While the ODMSP specifies an acceptable probability of successful postmission disposal for a single spacecraft as 0.9, the ODMSP identify the need for additional measures for spacecraft in a large constellation. "Each spacecraft in a large constellation should have a probability of successful postmission disposal at a level greater than 0.9 with a goal of 0.99 or better." The ODMSP also provides that the "successful postmission disposal threshold," should be based on factors such as mass, collision probability, orbital location, and other relevant parameters.

56.     As discussed in greater detail below, we conclude that SpaceX's updated orbital debris mitigation plan is sufficient, subject to certain conditions to provide for ongoing review and potential revision of license terms, including suspension of deployment if necessary, if targets for reliable operation and disposal are not met. This grant is also subject to the outcome of the Commission's orbital debris proceeding[245] and any other relevant rulemakings. We discuss first the question of collision risk.

57.     With respect to collision risk, we focus on three specific areas in which parties raise concerns about SpaceX's debris mitigation plans. First, a number of parties express concerns about SpaceX's plans to reduce collision risk by using a collision avoidance process in which SpaceX continuously assesses the trajectories of Starlink satellites and executes collision avoidance maneuvers when needed. This is accomplished through "autonomous" processes in which computers on individual satellites calculate the need for a maneuver based on their own position readings as well as data received from the ground, and execute the maneuver using a pre-programmed routine in the event a maneuver is needed. These parties express skepticism about the effectiveness of this approach. Second, parties raise concerns about the reliability of Starlink spacecraft, noting that failed spacecraft will not be maneuverable and cannot avoid collisions, and given the large number of spacecraft planned for deployment, even a relatively low failure rate could present significant collision risk. Finally, several parties focus on the difficulties and risks of having more than one large constellation operate within an altitude "shell" or altitude range. We address each of these issues in turn.

58.     *Maneuverability.* In prior cases, including in the SpaceX first modification, there has been an approach of assuming collision risk to be zero or near zero for spacecraft that have a maneuver capability and a process for identifying the need for and executing collision avoidance maneuvers, unless there is evidence that the assumption is not warranted.[246] This approach follows a similar assumption made for purposes of assessing collision risk in NASA's Debris Assessment Software, which is intended to provide a generalized assessment of collision risk based on the spatial density of objects in the regions of space where a spacecraft will orbit. SpaceX states that it intends to conduct active maneuvers to avoid collisions with both debris and other spacecraft throughout the life of its satellites, including through the deorbit phase until the spacecraft can no longer be controlled due to atmospheric turbulence, and states that because of its system's capabilities, the assumption of zero or near zero risk is warranted. Viasat and Kepler argue there was not enough information on the maneuverability of SpaceX's satellites.[247] Astroscale, Viasat, Kepler, and OneWeb also argue that satellites with propulsion should not be considered to have zero or near-zero collision risk, as propulsion cannot reduce collision risk to zero, and residual risk across a large constellation such as SpaceX's could be significant.[248] We recognize, as

---

[245] A number of the issues related to large constellation collision risk, for example, are a subject of the Commission's FNPRM in the ongoing orbital debris proceeding, IB Docket 18-313. *See, e.g.*, *Orbital Debris R&O and FNPRM*, 35 FCC Rcd at 4226-31, para. 155-163.

[246] *Orbital Debris Report and Order & FNPRM*, 35 FCC Rcd at 4171-4172.

[247] *See* Kepler Opposition at 13; Viasat Petition at 20. Viasat also argues that SpaceX has not shown that its hall-effect thrusters can withstand the increased resistance caused by atmospheric drag at the proposed lower operational altitude. *See* Viasat Petition at 47. We observe that at this point SpaceX has deployed and maneuvered a significant number of satellites at lower orbital altitudes.

[248] *See* Astroscale Letter at 2-4; Viasat Petition at 13, 18-19; Viasat Reply at 22-24; Kepler Opposition at 12-13; OneWeb Comments at 5-6; OneWeb Reply at 8-9; see also Kepler April 16 Letter at 2 (requesting the Commission require SpaceX to be responsible for all conjunction avoidance maneuvers with respect to Kepler's satellites).

several parties note, that spacecraft collision avoidance maneuvers cannot reduce risk to zero.  There will be some residual risk.  In response to Bureau inquiries about the levels of such risk, SpaceX stated that for each conjunction event, it will take mitigating action to reduce  probability of collision (PC) when PC is greater than 1E$^{-05}$ (one in one hundred thousand),[249] and by that action reduce PC to 1E$^{-06}$ (one in a million) or less.[250]  When analyzing conjunction risk, SpaceX also assumes a ten meter "hard body radius" for its satellites.  This hard body radius approach in and of itself substantially increases the assumed area occupied by the spacecraft, since it assumes that an object is the size of a sphere defined by the object's largest dimension.  In addition, the assumed 10-meter radius is substantially larger than the satellites' actual dimensions.  The inherent conservatism in this approach suggests a residual risk from each conjunction lower than 1E$^{-06}$, perhaps by one or more orders of magnitude depending on specific details of the conjunction.  SpaceX also provides propagated ephemeris data three times a day to the 18th Space control Squadron and screens for potential intra-constellation collisions every hour.[251]  While it might be possible to assess the cumulative total for residual risk not mitigated by maneuvers based on the number of conjunctions, with the number of conjunctions for the Starlink network comparatively higher than for smaller constellations at the same altitude, the range in which this risk level falls appears to be sufficiently low to justify treating it as zero.  Furthermore, there is the distinct possibility that this form of residual risk is in some or many cases an artifact of the methods used for assigning probability values, which include some assumptions concerning distribution, rather than a realistic risk.  However, given the unprecedented scale of SpaceX's operations, we believe this is an area that warrants continued monitoring, and will therefore condition this grant on SpaceX reporting, on a semi-annual basis, several indicators for this risk, including the number of collision avoidance maneuvers undertaken by its satellites.

59.      With respect to the concerns expressed by some parties about the effectiveness of SpaceX's collision avoidance process and the information SpaceX has provided about it,[252] none of the parties raise specific or particularized concerns that warrant additional inquiry at this time.  It appears that the questions raised are primarily ones that could be addressed through good faith coordination among the operators, and we urge resort to such discussions.[253]

60.      *Collision Risk and Satellite Reliability*.  Spacecraft that are not capable of maneuvering generally have little or no capability to avoid collisions, and several parties express concern that, absent very high reliability, at levels above those currently in evidence, the number of SpaceX satellites that fail in a way that makes them un-maneuverable will be high, and with that the consequent collision risk will also be high.[254]  Viasat also raises a broader concern that SpaceX is employing a deployment strategy focusing more on disposability than reliability.[255]

---

[249] *See* SpaceX March 16 Ex Parte at 1.

[250] *See id*.  SpaceX also identifies 1E-04 as a more typical industry threshold for action.

[251] *See id.* at 2.

[252] SES/O3b, Kuiper, Viasat, OneWeb, and Astroscale express concern about the lack of information on SpaceX's autonomous collision avoidance system and the impact of that lack of information on other operators' ability to physically coordinate operations with SpaceX. *See* SES/O3B Petition at 17; SES/O3B Reply at 20, 22; SES October 13 Ex Parte at 4; SES/O3B November 17 Ex Parte, Attachment 1 at 3; Kuiper Petition at 4; Kuiper Reply at 9; Viasat Reply at 25; OneWeb Reply at 9-10; OneWeb February 10 ex Parte at 6; OneWeb February 25 Ex Parte at 6; Astroscale Letter at 4.

[253] See "NASA, SpaceX Sign Joint Spaceflight Safety Agreement" NASA New Release 21-011 (March 18, 2021), available at:  https://www.nasa.gov/press-release/nasa-spacex-sign-joint-spaceflight-safety-agreement.

[254] *See* Astroscale Letter at 7-8; Viasat Petition at 13-14, 21-22; Kuiper Petition at 2-4; OneWeb Comments at 7.

[255] *See* Viasat Petition at 22-23, 29-32 (citing https://www.reddit.com/r/spacex/comments/gxb7j1/we_are_the_spacex_software_team_ask_us_anything/); Viasat

(continued….)

61.     SpaceX's satellite failure rate is a matter of significant contention in the record.[256]  The primary point of contention for the most part does not appear to be the underlying data, but instead the interpretation of its significance.  As a manifestation of this, the parties appear to be utilizing different definitions of what constitutes a failure, based on different insights as to the relevance of particular types of satellite failures.  For example, and as SpaceX correctly notes, viewed in light of the "25 year rule" limitation on maximum orbital lifetime for satellites in Low Earth Orbit identified in the ODMSP, the Starlink satellites are by definition successful, because even if they fail to operate, they will re-enter the Earth's atmosphere  within approximately 5 years.[257]  Bearing in mind that the ODMSP identifies the need for special, individualized assessments of large constellations, and in particular given that SpaceX has adopted a strategy of accelerating removal of spacecraft from orbit by lowering the spacecraft orbit to speed re-entry, an alternative definition of a satellite failure would be any failure that results in SpaceX being unable to execute this shortened re-entry period.  Recognizing that satellite failures typically occur with higher frequency immediately post-launch, SpaceX is also following a strategy of deploying almost all of its spacecraft into a low orbit in the 350 km range or below,[258] so that any spacecraft that do not have the capability to maneuver or perform their mission re-enter the atmosphere within a short period of time, essentially as soon as or faster than satellites that complete their mission and are retired.  Thus, an alternative definition, and one that several parties support,[259] is that a failed satellite is one that loses the capability to maneuver at a higher altitude, as this identifies satellites that present collision risks that are anomalous.  For ease of reference, we refer to this type of failure as a "disposal failure."  Finally, several parties appear to define satellite failures as any scenario that results in a satellite not performing its mission over a longer-term period.[260]  This definition for failure rates includes satellites that present very low risk for debris mitigation purposes because disposal, while it may occur sooner than expected, is virtually indistinguishable from a "nominal" disposal.  However, the rate at which this scenario occurs can have some relevance in assessing the over-all number of satellites that an operator must launch in order to fill out and maintain its constellation.  Moreover, each satellite that does not operate for its full planned mission lifetime must be replaced with another satellite that carries its own failure risk, including for failure of the maneuver capability at the primary mission altitude.  For ease of reference, we refer to this scenario as "early mission termination."

62.     SpaceX provided data to show that, as of April 2, 2021, and excluding the first 60 proto-type Starlink satellites launched (referred to as v0.9), its current system (satellites designated as v1.0), has a disposal failure rate of approximately 1.45% (20 of 1383 satellites) and an early mission termination rate of approximately 3.1% (43 of 1383 satellites, i.e., the 20 disposal failures, plus 7 satellites "screened"

(Continued from previous page) ──────────────

Reply at 9-15; Viasat September 17 Ex Parte at 1-2; Viasat December 21 Ex Parte at 3; Viasat January 7 Ex Parte at 3; Viasat February 8 Ex Parte at 5, 15; Viasat February 12 Ex Parte at 5, 15.

[256] *See*, *e.g.*, Viasat Petition at 13-15, 21; OneWeb Comments at 5-7; Viasat January 7 Ex Parte; Viasat February 8 Ex Parte; Viasat February 12 Ex Parte at 16-21. *See also* McDowell *Letter*; Viasat Response to *McDowell Letter*; Viasat October 5 Response to SpaceX.

[257] *See* SpaceX Consolidated Opposition at 3-4, SpaceX September 29 Response to GSO Operators at 3, SpaceX March 2 Response to Viasat at 1, 3-6.

[258] SpaceX indicates that the majority of Starlink satellites are deployed by launches dedicated only for SpaceX satellites, with typical deployment orbits "at 265 x 285 km or 208 x 366 km."  SpaceX April 2 Ex Parte at 3.  One launch to date has involved deployment of ten satellites at an altitude close to the 550 km altitude range for the main Starlink mission as part of a "ride share" launch in which the vast majority of satellites deployed were for other operators.

[259] *See* McDowell Letter.

[260] Viasat Response to McDowell Letter: ViaSat April 12 Ex Parte.

at low altitude immediately post-launch, and 16 additional satellites deorbited early).[261]  Taking into account the 60 v0.9 satellites, and treating the 10 that remain in orbit as of April 9, 2021 as disposal failures,[262] the disposal failure rate is 2.16%.  All of the v0.9 satellites were prototypes that are being deorbited well before the stated 5-7 year nominal mission lifetime for Starlink satellites,[263] so for purposes of calculating early mission termination rates all would count, which yields an early mission termination rate of 7.4% for the constellation as a whole.  SpaceX argues that it has identified and corrected the root cause for satellites in the disposal failure category, improved its manufacturing process and updated the software on on-orbit satellites to address causes of loss of maneuverability.[264]  Among several data points provided in the record, SpaceX states that as of mid-February 2021, 720 of the last 723 satellites it launched were maneuverable above injection altitude.[265]

63.     Satellites that have a disposal failure will present a collision risk for as long as they remain on orbit.  A number of parties submit information based on calculations derived from NASA's Debris Assessment Software, which includes a tool for quantifying a single satellite's risk of collision during its orbital lifetime or 100 years, whichever is shorter.  Based on the single satellite risk for a satellite in the disposal failure category, and the rate of disposal failure, a relatively simple calculation can estimate the risk from disposal failure for the constellation as a whole.  The information in the record indicates a single satellite risk that can be approximated as .0001,[266] and a targeted mission lifetime for each satellite of between 5 and 7 years.[267]  Over a fifteen year license term, and assuming replenishment on a five year cycle, there would be the initial launch plus two replenishment cycles for the 4,408 satellites, for a total of 13,224 satellites, while a seven year replenishment cycle would yield a number consistent with a SpaceX estimate of fewer than 10,000 satellites launched during the license term.[268]  These figures do not account for early mission termination, and assuming that rate is 10%, i.e., somewhat higher than the rate to date, yields an upper end estimate for the range of number of satellites to be launched of 15,000 satellites, rounding up from 14,546 (13,224 satellites plus ten percent, 1,322).  At the currently observed disposal failure rate of approximately 1.5% for the v1.0 satellites, this implies 150

---

[261] SpaceX April 2 Ex Parte at 2. Viasat argues SpaceX's calculated failure rate of 1.45% is misleading because it does not take into account satellites that failed or were screened and deliberately deorbited at injection altitude and also does not include the 60 V0.9 satellites, all of which should be included in a calculation of SpaceX's failure rate. *See* Viasat April 12 Failure Rate Letter at 2-4, 5-6. Viasat also faults SpaceX for not including information on its lifetime failure rate, which Viasat expects will increase because of manufacturing flaws and aggressive design choices. *Id.* at 4-5. SpaceX did however include data on the number of satellites failed or screened at injection orbit, *see* SpaceX April 2 Ex Parte at 2, and we have taken these satellites into consideration, along with the 60 v0.9 Starlink satellites in conducting our analysis.

[262] This information is based on review of catalog entries for Starlink satellites accessed via the n2yo.com web site, on April 13, 2021.

[263] SpaceX May15 Response at 5 (spacecraft designed for 5 year mission lifetime); SpaceX April 2 Ex Parte at 1 and Attachment B at 2 (7 year satellite life estimated); SpaceX March 16 Ex Parte (first tranche of satellites fully demised or in the process of de-orbiting).

[264] *See* SpaceX February 22 Ex Parte at 1, SpaceX April 2 Ex Parte at 2.

[265] *See* SpaceX February 22 Ex Parte at 1; SpaceX March 16 Ex Parte at 2; *see also* SpaceX September 29 Response to GSO Operators at 3 (no satellite failures in the last 233 satellites launched); SpaceX October 5 Ex Parte, at 1, Exhibit 2 (no failures in the last 300 satellites launched).

[266] SpaceX July 7 Letter.  SpaceX provided several figures for this risk, based on alternative scenarios that might be applicable to its satellites.  The .0001 figure assumes a tumbling configuration for the satellite, which would in all circumstances be achievable, and a collision risk figure that at the higher end for the range of altitudes in which Starlink satellites will operate.

[267] SpaceX May 15 Response at 5; SpaceX April 2 Ex Parte at 1 (7 years).

[268] SpaceX April 2 Ex Parte at 1.

satellites for 10,000 satellites launched, and 225 satellites for 15,000 satellites launched, with a corresponding cumulative collision risk of .015 (one in 66.7) for 10,000 satellites launched and .0225 (one in 44.5) for 15,000 satellites.  At a 1% disposal failure rate, there would be 100 satellites failed for 10,000 launched, and 150 for 15,000 launched, with a corresponding cumulative collision risk of .01 (1 in 100) and .015 (1 in 66.7) respectively.  At a 0.5% disposal failure rate, there would be 50 satellites failed for 10,000 launched, and 75 for 15,000 launched, with a corresponding cumulative collision risk of .005 (1 in 200) and .0075 (1 in 133.3).

64.     While this analysis necessarily involves estimates, it illustrates that it will be important for SpaceX to maintain a high disposal reliability rate for its satellites in order to limit collision risk.  Although the trend is at this point promising, the data covers only the early stages of constellation deployment.  Typical spacecraft failure curves tend to show high failure rates at the earliest and latest stages of satellite operations.  Given that high reliability will be important in maintaining low risk levels, we believe, as suggested by several commenters, that continued monitoring of constellation reliability will be necessary.[269]  We will require semi-annual reporting concerning the number of satellites launched and disposal reliability.  In addition, and as a method of continuing monitoring, we will require on a going forward basis from the information provided in SpaceX's April 2 Ex Parte that if at any time the number of satellites that have experienced a disposal failure reaches three per year, SpaceX will be required to report that fact.  The three-satellite reporting threshold corresponds roughly to the expected annual number of satellites that would exhibit a disposal failure, based on the 50 satellites for which disposal failures could be expected from a 0.5% disposal failure rate for 10,000 satellites.  In the event disposal failure rates exceed the reporting threshold, the Commission will consider whether additional license conditions or limitations on deployment and operation may be necessary, taking into account any materials submitted by SpaceX to address corrective measures.

65.     *Co-Existence of NGSO Systems in LEO.*  A number of parties that plan to operate satellites in Low Earth Orbit, particularly in orbits that are in the same altitude range or adjacent to the altitude range in which SpaceX will operate, raise concerns about the operations of more than one constellation in the same orbital region.[270]  Some of these operator's identify constraints and limitations on their own ability to avoid collisions, and one asks that responsibility for conducting collision avoidance maneuvers be assigned to SpaceX.[271]  The information provided in this proceeding establishes that SpaceX is taking necessary actions to avoid collisions through the use of conjunction screening and satellite maneuvers, as well as deployment strategies and management of spacecraft operations.  With respect to the request that we include a condition specifying "responsibility" for collision avoidance, we decline to do so, as this might suggest an absence of responsibility for other operators.  We expect all operators to engage in and complete good-faith coordination of physical operations, and with respect to SpaceX, its authorization is already conditioned accordingly.

66.     Several parties proposing to operate constellations raise concerns about overlapping orbital "shells" based on SpaceX's request to operate within plus or minus 30 km of its specified "nominal" satellite altitudes.[272]  SpaceX states that the 30 kilometer "tolerance" is considerably larger

---

[269] Viasat Petition at 35; Astroscale Letter at 8; Astroscale Reply at 4.

[270] *See* Spire Comments at 1-2; SES/O3b Petition at 17-18; Kepler Opposition at 12-13; Kuiper Opposition at 4-10; Kuiper May 1 Ex Parte at 2; OneWeb Comments at 3-4; Viasat Petition at 10-11; Viasat December 21 Ex Parte at 7, 10; Viasat February 8 Ex Parte at 12; Viasat February 12 Ex Parte at 12.  *See also* RS Access Letter at 4 (expressing concerns about increased probability of collision).

[271] *See* Kepler Reply at 31-32, 28-30; Spire Comments at 2.

[272] *See* SES/O3b Petition at 17-18; Kuiper Opposition at 4-11; Kuiper Reply at 4-8; Kuiper May 1 Ex Parte at 2; Kuiper August 18 Ex Parte at 1-2; Kuiper September 2 Ex Parte at 2; Kuiper September 17 Ex Parte at 1-2; Kuiper September 24 Ex Parte at 3; Kuiper September 30 Ex Parte at 1-2; Kuiper October 6 Ex Parte at 2; Kuiper October 9 Ex Parte at 1, 3; Kuiper October 15 Ex Parte at 2; Kuiper October 16 Ex Parte at 1, 3; *see also* SpaceX September 3 Response to Kuiper at 2; SpaceX September 14 Ex Parte, Attachment 2; SpaceX October 9 Response to Kuiper at 5;

(continued….)

than what is required for typical operations, but provides leeway for maneuvers involving more than typical station-keeping.[273] Viasat specifically requests the Commission condition any grant of SpaceX's modification on requiring it to maintain an orbital tolerance of 2.5 km or less, to facilitate sharing of the 510-600 km orbital environment with other operators.[274] With respect to the upper altitude limits for Starlink operations, we conditioned the Ten-Satellite Partial Grant to require SpaceX to maintain its orbital tolerance such that its satellites will fly below 580 km at all times.[275] Kuiper requests we continue to apply that condition to SpaceX's constellation going forward,[276] and we will do so. As a practical matter, this will mean that SpaceX satellites in the upper altitude ranges must abide by a smaller orbital tolerance – 10 km or less for the planned operational orbit at 570 km altitude, and 20 km or less for the satellites at 560 km – in order to stay below 580 km at all times. This condition will also limit any risk of Starlink satellites failing at higher altitudes where longer orbital decay times and marginally greater collision risk would be expected. Viasat worries that our approach will effectively split the 510-640 km orbital environment between SpaceX and Kuiper and preclude others from operating in this region,[277] but nothing in our grant will prevent physical sharing of low-earth orbit. With respect to Starlink satellites at the lower range of specified nominal altitude ranges, the information provided by the one operator raising a specific concern did not indicate the orbital tolerance of its own operations, but instead indicated a nominal altitude at 507 km, three kilometers below the lowest nominal Starlink altitude.[278] We are unable to resolve this issue based on the limited information provided, and in any event the record does not indicate that at this stage there have been any meaningful efforts on the part of the operators to coordinate physical operations. Under the circumstances, we decline to include a specific condition concerning this matter. We also decline to condition this grant to restrict SpaceX's orbital tolerance to the extent Viasat suggests, as it is unclear in the absence of a particular operational scenario whether maintaining the satellites within a smaller or larger operational volume is preferable for purposes of limiting risk.

67.    *Accidental Explosions.* The Balance Group and Kepler also express concern that SpaceX has not demonstrated its satellites have no credible failure mode for accidental explosions. SpaceX addressed this issue in its original application for authorization.[279] These commenters do not suggest and we find no reason why SpaceX's satellites would be more prone to accidental explosions now than at the time of SpaceX's original authorization. In any event, given the reporting conditions adopted, we anticipate that any unexpected events involving accidental explosions would be identified, as these events can be expected to impact disposal failure rates. If necessary, and as with disposal failures more generally, corrective action can be taken if warranted by the facts.

68.    *Other matters.* SpaceX's original authorization and first and second modifications were conditioned on SpaceX submitting, and the Bureau approving, a modification containing an updated orbital debris mitigation plan. SpaceX requests in this application that we find it has satisfied this

(Continued from previous page) ───────────────────

SpaceX November 17 Letter at 2; SpaceX December 4 Ex Parte at 4; SpaceX January 19 Ex Parte, Attachment B at 2.

[273] SpaceX Consolidated Opposition at 10.

[274] See Viasat April 12 Conditions Letter, Attachment at 1,2; Viasat April 13 Ex Parte, Attachment at 1, 2; Viasat April 14 Ex Parte, Attachment at 1, 2; Viasat April 12 LEO Letter at 2.

[275] *See* Ten-Satellite Partial Grant at Paras. 12, 19S.

[276] *See* Kuiper February 4 Ex Parte at 1, 3; Kuiper February 4 Letter at 1, 2; Kuiper February 11 Ex Parte at 1, 3; Kuiper February 22 Ex Parte at 1, 3; Kuiper February 25 Ex Parte at 1, 3; Kuiper March 16 Ex Parte at 1, 3.

[277] *See* Viasat April 12 LEO Letter.

[278] *See* SES/O3b Petition at 17-18.

[279] *See* Space *Exploration Holdings, LLC, Application for Approval for Orbital Deployment and Operating Authority for the SpaceX NGSO Satellite System*, IBFS File No. SAT-LOA-20161115-00118, Technical Information at 51-52 (filed Nov. 15, 2016).

condition.  For the reasons set forth above, we find SpaceX has satisfied this condition and we will remove it from this authorization.

### D.    Authority for LEOP and Payload Testing Operations

69.    SpaceX requests authority to conduct LEOP operations and payload testing during orbit-raising as well as TT&C operations during deorbit of its satellites.  SpaceX has been conducting these operations through a series of 180-day Special Temporary Authority (STA) grants, which allow SpaceX to conduct LEOP operations and payload testing for all satellites previously launched and those to be launched during the six-month period covered by the STA.[280]  SpaceX argues grant of this request would be in the public interest because it would relieve the Bureau of the burden of processing a continuous stream of STA requests,[281] and that it has been conducting LEOP operations and testing for over a year without complaint from other operators.[282]  Viasat expresses concern with the broad authority SpaceX requests in its modification application to conduct testing of its satellites' Ku- and Ka-band payloads,[283] noting SpaceX's statement that it will likely be engaged in orbit-raising and deorbit maneuvers on an ongoing basis.[284]  Viasat alleges that SpaceX has not defined "harmful interference" in its proposal to conduct these operations on an unprotected, non-harmful interference basis, and Viasat argues that SpaceX has provided insufficient technical analysis to show that its testing operations can be conducted on a non-interference basis with respect to GSO satellites, NGSO systems, and terrestrial fixed services.[285]

70.    We agree with SpaceX that granting it authority for these transition phase operations is in the public interest.  SpaceX's practice of testing its satellites at injection altitude, before orbit-raising, allows it to de-orbit any non-functional satellites in a matter of days or weeks, helping to ensure that non-maneuverable satellites do not reach operational orbit.  Additionally, given that SpaceX has been conducting these operations on an ongoing basis for over a year pursuant to STA, we conclude that granting SpaceX authority to conduct these operations pursuant to this modification and consistent with

---

[280] *See, e.g.*, Space Exploration Holdings, LLC., Request for Special Temporary Authority, Grant Stamp, IBFS File No. SAT-STA-20190405-00023 (granted May 9, 2019) (granting a 60-day STA to SpaceX for LEOP operations and testing for its first tranche of Starlink satellites) and extensions: IBFS file Nos. SAT-STA-20190717-00063 (granted Jul. 25, 2019), SAT-STA-20190815-00075 (granted Sept. 4, 2019), SAT-STA-20190917-00095 (granted Sept. 25, 2019), SAT-STA-20191018-00118 (granted Oct. 24, 2019), SAT-STA-20191118-00134 (granted Dec. 5, 2019), SAT-STA-20191220-00151 (granted Jan. 2, 2020); Space Exploration Holdings, LLC., Request for Special Temporary Authority, Grant Stamp, IBFS File No. SAT-STA-20190924-00098 (granted Nov. 7, 2019) (granting SpaceX a 60-day STA for LEOP operations and testing for its second tranche of Starlink satellites) and extensions: IBFS file nos. SAT-STA-20200103-00005 (granted Jan. 30, 2020), SAT-STA-20200207-00014 (granted Feb. 10, 2020); Space Exploration Holdings, LLC., Request for Special Temporary Authority, Grant Stamp, IBFS file no. SAT-STA-20191231-00155 (granted-in-part and deferred in part Jan. 2, 2020, granted-in-full Jan 17, 2020); Space Exploration Holdings, LLC., Request for Special Temporary Authority, Grant Stamp, IBFS File No. SAT-STA-20191230-00156 (granted March 19, 2020) (authorizing SpaceX to conduct LEOP operations and testing for all Starlink satellites both previously launched and to be launched during the 180-day period of the STA).

[281] *See* SpaceX Consolidated Opposition at 35-36.

[282] *See id. at* 36.

[283] *See* Viasat Petition at 39.

[284] *See id.* (quoting SpaceX Third Modification Application, Attachment 1, at 4).

[285] *See id. at* 39-40.  Viasat states, for example, that SpaceX has not shown that Ku- and Ka-band emissions can be made on a non-interference basis, and has not provided any EPFD analysis or masks to show that testing can be conducted on a non-interference basis with GSOs, or any interference-to-noise (I/N) analysis showing that testing can be conducted without increasing interference to other NGSO systems, or any analysis showing that testing would not cause additional interference to terrestrial fixed services.  *Id.* at 40.  Viasat alleges that given the size and complexity of the system, the "complete mitigation" of interference is hard to imagine.  *Id.*

the rules for GSO satellites, would lessen the burden on Commission resources to process STAs. As to Viasat's concerns regarding the technical aspects of SpaceX's non-interference operations, we have already addressed interference concerns in connection with SpaceX's STA requests. Specifically, we have conditioned SpaceX's STAs on SpaceX providing the input data files for its EPFD analysis to any requesting operator, as well as operating on a non-interference, unprotected basis. [286] Given that SpaceX has been conducting these operations since 2019 without issue, we conclude that granting SpaceX authority for these types of operations under this modification, with the same conditions, will sufficiently ensure that other operators do not encounter harmful interference resulting from these operations. Consistent with our grants of STA to date, we limit SpaceX's power levels to those requested in this modification, rather than those requested in its two most recent STA applications.[287]

71.     In connection with orbit raising and de-orbit, Spire requests that SpaceX bear full responsibility for active collision-avoidance during orbit-raising and deorbit operations.[288] In connection with orbit-raising and deorbit of its satellites, we expect that SpaceX will undertake the necessary actions to perform collision avoidance. However, this does not remove the responsibility of other operators to assess collision risk upon receipt of a space situational awareness conjunction warning, and mitigate the risk, if necessary.[289]

### E.     The National Environmental Policy Act and Other Matters

#### 1.     Background and Legal Framework

72.     The Commission implements the provisions of the National Environmental Policy Act of 1969 (NEPA)[290] in Part 1, Subpart I of the Commission's rules.[291] The Commission's rules provide that, except for a specifically enumerated list of conditions that expressly require the preparation of an environmental assessment (EA), other Commission actions "are deemed individually and cumulatively to have no significant effect on the quality of the human environment and are categorically excluded[.]"[292] Under the Commission's rules, the Commission has delegated to its licensees and applicants both the initial assessment of whether a deployment is categorically excluded from further environmental review and the preparation of an EA when required.[293] Applicants must determine whether a proposed action falls under one of the specified categories in the FCC's rules that would require an EA.[294] Given that the categories set forth in section 1.1307(a) and (b) of the FCC's rules largely focus on environmental effects

---

[286] *See*, *e.g.*, Space Exploration Holdings, LLC, Request for Special Temporary Authority, Grant Stamp, IBFS File No. SAT-STA-20190924-00098, Condition 5, Basis for Grant at 3-4 (granted Nov. 7, 2019)

[287] *See* Space Exploration Holdings, LLC., Request for Special Temporary Authority, IBFS File No. SAT-STA-20200610-00071 (filed Jun. 10, 2020); Space Exploration Holdings, LLC., Request for Special Temporary Authority, IBFS File No. SAT-STA-20201218-00147 (filed Dec. 18, 2020.) Both of these STA requests were for authority for 180 days to continue orbit raising Starlink satellites both those previously launched and those to be launched during the 180-day period and to use a higher power of 21 dBm to assist in Earth station acquisition of the satellites. SpaceX has clarified that it is not requesting this higher power in this modification. *See* SpaceX April 2 Letter at 4.

[288] *See* Spire Comments at 3.

[289] *See Orbital Debris R&O and FNPRM*, 33 FCC Rcd at 4256, Appendix A – Final Rules (adopting an application requirement that space station operators make a certification regarding reviewing conjunction warnings, assessing collision risk, and mitigating the collision risk if necessary).

[290] National Environmental Policy Act of 1969, as amended, 42 U.S.C. §§ 4321-4335 (NEPA).

[291] 47 CFR §1.1301.

[292] 47 CFR § 1.1306(a).

[293] *See* 47 CFR § 1.1301, *et seq.*

[294] *See* 47 CFR §§ 1.1306, 1.1307(a), (b).

at the earth's surface, space stations generally have not triggered these categories and therefore have been categorically excluded from review.

73.    The Commission's rules also state that even if an action is otherwise categorically excluded, an interested person who alleges that the action will have a significant environmental impact shall submit "a written petition setting forth in detail the reasons justifying or circumstances necessitating environmental consideration in the decision-making process." [295]  Under that provision, the Bureau responsible for the particular action "shall review the petition and consider the environmental concerns that have been raised" and if the Bureau "determines that the action may have a significant environmental impact," the Bureau will require the applicant to prepare an EA which will serve as the basis for the determination to proceed with or terminate environmental processing.[296]  The Commission has not typically received petitions raising environmental concerns regarding the licensing of space stations.

74.    In response to SpaceX's Third Modification Application, two parties, The Balance Group and Viasat, have raised objections related to the NEPA.[297]  In May 2020, The Balance Group submitted an Opposition to the SpaceX modification application alleging, among a number of other issues, that a NEPA analysis was required.[298]  In December 2020, Viasat filed a "Petition Pursuant to Section 1.1307(c) requesting that the Commission require either an Environmental Assessment (EA) or an Environmental Impact Statement (EIS) before acting on SpaceX's application."[299]  Viasat explained that it was filing this new Petition as a supplement to a Petition to Deny the modification application it filed in July 2020 as a result of other commenters submitting into the record research, studies, and filings that "raised serious environmental concerns relevant to SpaceX's proposed modification."[300]

75.    Consistent with our NEPA framework, we consider the claims raised by The Balance Group and Viasat under section 1.1307(c) of our rules to determine whether the filings have satisfied the requirement to provide "in detail the reasons justifying or circumstances necessitating environmental consideration in the decision-making process" and if so, whether the action may have a significant environmental impact and require preparation of an EA.[301]  We conclude, based on the record before us, that the issues raised in the filings do not warrant preparation of an EA.

76.    Taken together, the parties argue that the SpaceX Third Modification implicates five major categories of impacts related to the environment that should be reviewed under NEPA: the impact of launching and deorbiting large numbers of satellites on the composition of the Earth's atmosphere and global climate change, the risk of SpaceX's satellites surviving reentry and causing damage inside Earth's atmosphere, the increased "light pollution" caused by the modified SpaceX constellation, impact on the safety and sustainability of the orbital environment, and the impact of the satellites' radiofrequency emissions.[302]  Viasat argues that relying on the Commission's categorical exclusions in this instance would violate the requirements of NEPA; endanger the environmental, aesthetic, health, safety, and economic interests NEPA seeks to protect; and harm the public interest.[303]  According to Viasat, there is

---

[295] 47 CFR § 1.1307(c).

[296] *Id.*  Additionally, if the Bureau responsible for processing a particular action, otherwise categorically excluded, determines that the proposal may have a significant environmental impact, the Bureau, on its own motion, shall require the applicant to submit an EA.  47 CFR § 1.1307(d).

[297] *See, e.g.*, Viasat NEPA Petition; The Balance Group Opposition at 13.

[298] The Balance Group Opposition at 13.

[299] *See generally* Viasat NEPA Petition.

[300] *Id.* at i.

[301] 47 CFR § 1.1307(c).

[302] *See* Viasat NEPA Petition at ii, 4; Viasat March 16 Letter at 1-4; The Balance Group Opposition at 13, 16, 24.

[303] *See* Viasat NEPA Petition at 4.

no need to demonstrate "extraordinary circumstances" to justify NEPA review, as SpaceX alleges, because NEPA review is required if an action may have a significant environmental impact, and, even if extraordinary circumstances are required, SpaceX is seeking to launch more satellites than have ever been launched before, which is clearly an extraordinary circumstance.[304] SpaceX argues, on the other hand, that because the Commission's rules categorically exclude from review all actions not enumerated in section 1.1307 of the rules, and because Viasat did not allege that this action falls under an enumerated category for which an EA is required, Viasat must demonstrate that extraordinary circumstances exist to require deviating from established categorical exclusions.[305]

77.      As a threshold matter, we note that it is not clear that all of the issues raised by these parties are within the scope of NEPA or related to our action in approving SpaceX's Third Modification application.[306] We further observe that several of the issues presented to the Commission raise novel questions about the scope of NEPA, including whether NEPA covers sunlight as a source of "light pollution" when reflecting on a surface that is in space. We note that NEPA is a procedural statute intended to ensure that Federal agencies consider the environmental impacts of their actions in the decision-making process.[307] We find that we do not need to evaluate and determine whether NEPA applies to the novel issues raised by Viasat and The Balance Group in order to act on SpaceX's application. Instead, for purposes of our analysis, and out of an abundance of caution, we will assume that NEPA may apply and consider the concerns raised in the record before us under the standard set forth in section 1.1307(c) of our rules. As explained in detail below, based on the record, we do not find that there is a need for SpaceX to prepare an EA on the issues raised in the record.[308] In certain instances, we also discuss how the Commission's responsibilities under the Communications Act, separate from the Commission's responsibilities under NEPA, address the concerns raised by Viasat and The Balance Group.

78.      *Scope of NEPA with respect to "Commission Action.*"  In addition to disputes on whether our actions in this proceeding trigger an EA, Viasat and SpaceX disagree on how to determine what Commission action or actions should be subject to any NEPA analysis in this proceeding. The parties disagree on whether all of the satellites that SpaceX has "proposed launching,"[309] including every satellite that was a subject to the Commission's previous authorizations or any satellite application that is new, on file currently, and pending with the Commission, must be taken into consideration in a NEPA analysis.[310]

---

[304] *See* Viasat NEPA Reply at 13, 17-19; Viasat February 18 Response to SpaceX at 7-8 (quoting CEQ rules at 40 CFR § 1501.4(b)).

[305] See SpaceX Opposition to Viasat NEPA Petition at 6-7 (citing 47 C.F.R. §§ 1.1306, 1.1307); SpaceX NEPA Response at 6 (citing 47 CFR §§ 1.1306, 1.1307(a)-(b)).

[306] SpaceX, for example, argues that Congress did not intend that NEPA be applied in space. SpaceX March 11 Ex Parte at 1 (citing 42 U.S.C. § 4321; *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983)); *see also* SpaceX April 2 Ex Parte at 5 (arguing that NEPA does not apply to outer space generally or to SpaceX's safety upgrade specifically).

[307] The Supreme Court has made clear that NEPA is a procedural statute that does not mandate particular results; "[r]ather, NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *See* Pub. Citizen, 541 U.S. at 756–57 (citing Methow Valley, 490 U.S. at 349–50); Vt. Yankee, 435 U.S. at 558 ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural."). *See also* https://www.govinfo.gov/content/pkg/FR-2020-07-16/pdf/2020-15179.pdf.

[308] 47 CFR § 1.1307(c). We decline to reach the issue, disputed by the parties, of whether there must be "extraordinary circumstances" shown to override the categorical exclusion. Instead, we consider this matter under the framework outlined in Section 1.1307(c) of our rules. *Id.*

[309] *See* Viasat NEPA Petition at 12. We note that although the Commission authorizes deployment and operation of space stations, the FAA is the agency authorized to issue launch licenses.

[310] *See, e.g.*, Viasat NEPA Petition at 12-13; SpaceX Opposition to Viasat NEPA Petition at 10-11.

43

Specifically, Viasat argues that the SpaceX Third Modification Application cannot be considered "in isolation" because SpaceX has authorization for about 12,000 satellites already and has also requested authorization for a second generation constellation of 30,000 satellites.[311] Viasat argues that NEPA requires connected actions, actions that are interdependent parts of a larger action and depend on the larger action for their justification, to be examined together.[312] Viasat claims that the SpaceX constellation is interconnected under the CEQ regulations because "these satellites would be operated by the same party (SpaceX), support the provision of the same broadband services, contribute to the same pool of available capacity to support those services, and utilize common network infrastructure."[313] SpaceX argues, on the other hand, that the Commission need not consider its existing authorization for a separate NGSO satellite system that would operate in the V-band, or its pending application for a new NGSO constellation, in the context of our review of the Third Modification application.[314] Our action on this modification request will not affect SpaceX's V-band authorization, which is separately conditioned on the Commission granting a modification of that space station grant to include a final orbital debris mitigation plan.[315] Moreover, we are not taking action through this modification on the separate request by SpaceX for authorization of a separate NGSO system.[316] We do not speculate how we may act with respect to those potential future actions, but rather, consistent with section 1.1307(c), consider whether the "particular action" at issue, the instant modification request, should be subject to an EA.[317]

79.    SpaceX also argues that its existing authorization for its Ku- and Ka-band system establishes the baseline for considering the potential environmental impact of its third modification.[318] Viasat argues, on the other hand, that at present SpaceX is not permitted to deploy its 2,814 satellites because of a condition on its authorization requiring approval of a modification with an updated orbital debris showing.[319] According to Viasat, the question is not whether the SpaceX modification will improve the environmental effects of its constellation from its original authorization, but whether deployment of these satellites, plus replacements, will have a significant environmental impact.[320] We agree with Viasat that, absent Commission action on the instant modification, SpaceX would not be fully authorized to deploy the remainder of the satellites in its Ku-/Ka-band constellation not addressed by previous modification requests.[321] We therefore do not use as a baseline the deployment of a sub-set of

---

[311] Viasat states that the 4,408 satellites addressed in this authorization are just the initial phase of a larger constellation that will contain 42,000 satellites, meaning SpaceX will be launching and deorbiting over 100,000 satellites over the next fifteen years.  See Viasat NEPA Petition at 12-13; Viasat NEPA Reply at 5, 10-11, 13-15; Viasat February 18 Response to SpaceX at 8-12.

[312] See Viasat NEPA Reply at 10 (citing 40 CFR § 1501.9(e)(1)); Viasat February 18 Response to SpaceX at 8-12.

[313] *See* Viasat February 18 Response to SpaceX at 10.

[314] SpaceX Opposition to Viasat's NEPA Petition at 10; *see Space Exploration Holdings, LLC, Application for Approval for Orbital Deployment and Operating Authority for the SpaceX V-band NGSO Satellite System*, Memorandum Opinion, Order and Authorization, 33 FCC Rcd 11434 (2018) (*SpaceX V-band Authorization*); Space Exploration Holdings Application for Approval for Orbital Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System, IBFS File No. SAT-LOA-20200526-00055 (filed May 26, 2020).

[315] *See SpaceX V-band Authorization*, 33 FCC Rcd at 11440-41, 11447, paras. 16, 32.o.

[316] This application, which seeks authorization of a SpaceX "Gen2" NGSO satellite system that would operate in the fixed-satellite service using Ku-, Ka-, and E-band frequencies, has not yet been accepted for filing.  *See* IBFS File No. SAT-LOA-20200526-00055.

[317] 47 CFR § 1.1307(c).

[318] *See* SpaceX Opposition to Viasat's NEPA Petition at 10; SpaceX March 11 Response to Viasat at 1-2.

[319] *See* Viasat NEPA Reply at 5-8; Viasat February 18 Response to SpaceX at 3-4.

[320] *See* Viasat NEPA Reply at I,-I, 5-9; Viasat February 18 Response to SpaceX at 3-5.

[321] This includes replacement satellites deployed over the course of the 15-year license term.

44

SpaceX's satellites at the previously anticipated higher orbital altitude, but instead consider the concerns raised by Viasat and The Balance Group in the context of the deployment of the remainder of the SpaceX satellites addressed in the instant modification, as detailed in the paragraphs below.

## 2.     Potential Effect on Earth's Atmosphere from Satellite Launch and Reentry

80.      Viasat raises a number of arguments regarding environmental risks that may be posed by thousands of satellites being launched and then reentering the atmosphere over a short period of time.[322] In particular, Viasat argues that the launch and reentry of so many satellites could release dangerous chemical compounds into the atmosphere that could deplete the ozone layer.[323] According to Viasat, the number of satellite launches required by the proposed modification will affect the chemical composition of the atmosphere because rockets emit ozone-depleting chemicals.[324] Furthermore, Viasat alleges, when satellites constructed from aluminum, like the Starlink satellites, burn up in the atmosphere, the aluminum becomes alumina, which also contributes to global climate change.[325] Viasat argues that NEPA requires the Commission to conduct further research on the effects of alumina, along with other complex chemical compounds possibly emitted into the atmosphere upon satellite reentry.[326] SpaceX argues generally that its modification request will have no impact on the number of launches or deorbiting satellites planned for its constellation and that its launches as well as its satellites burning up in the atmosphere upon reentry will have no significant effect on the atmospheric environment.[327] With respect to chemical material released from re-entering satellites, SpaceX and Viasat disagree about the amount of alumina that SpaceX's satellites could produce in the atmosphere.[328]

81.      As to the effect on the atmosphere from satellite launches, SpaceX states that the Federal Aviation Administration (FAA) and NASA found "No Significant Impact" for SpaceX Falcon Launches, including in the FAA's July 2020 Environmental Assessment which undertook an evaluation of SpaceX's proposed increase in launch and reentry rates, including for launches scheduled through 2025.[329] SpaceX

---

[322] Consistent with some of its arguments raised in the context of orbital debris mitigation, Viasat accuses SpaceX of selecting a strategy of satellite disposability and replaceability over reliability and safety. *See* Viasat NEPA Petition at II, 4, 8, 9-13, 15-16; Viasat NEPA Reply at 20-21; Viasat February 8 Ex Parte at 6, 21; Viasat February 8 Ex Parte at 32-34; Viasat February 12 Ex Parte at 6, 21, 32-34. Viasat argues this accelerated deorbit will increase the number of satellites being launched and deorbited, so that SpaceX will have to launch a greater number of satellites over the 15-year license period to maintain its constellation. *See* Viasat NEPA Petition at II, 4, 8, 9-13, 15-16; Viasat NEPA Reply at 20-21; Viasat February 8 Ex Parte at 32-34; Viasat February 12 Ex Parte at 32-34.

[323] *See* Viasat NEPA Petition at II, 4, 8, 9-13, 15-16; Viasat NEPA Reply at 20-21; Viasat February 8 Ex Parte at 32-34; Viasat February 12 Ex Parte at 32-34; Viasat April 16 Letter at 6.

[324] *See* Viasat NEPA Petition at 10-11 (citing Martin Ross et al., Limits on the Space Launch Market Related to Stratospheric Ozone Depletion, 7 Astropolitics 50, 52 (2009); Viasat NEPA Reply at 20-22; Viasat February 8 Ex Parte at 32-34; Viasat February 12 Ex Parte at 32-34.

[325] *See* Viasat NEPA Petition at 11-12 (citing Martin N. Ross & Patti M. Sheaffer, *Radiation Forcing Caused by Rocket Engine Emissions,* 2 Earth's Future 177, 193 (2014)); Viasat NEPA Reply at 20-22; Viasat February 8 Ex Parte at 32-34; Viasat February 12 Ex Parte at 32-34.

[326] See Viasat NEPA Petition at 12-13 (citing Martin N. Ross & Leonard David, *An Underappreciated Danger of the New Space Age: Global Air Pollution*, Sci. Am. (Nov. 6, 2020), http://www.scientificamerican.com/article/an-underappreciated-danger-of-the- new-space-age-global-air-pollution/); Viasat February 8 Ex Parte at 32-34; Viasat February 12 Ex Parte at 32-34.

[327] *See* SpaceX Opposition to Viasat's NEPA Petition at I, IV-V, 2, 18-20; SpaceX March 11 Response to Viasat at 2; SpaceX April 2 Ex Parte.

[328] SpaceX April 2 Ex Parte at 5; Viasat April 16 Letter at 7.

[329] SpaceX April 2 Ex Parte at 5-6, Attach. at 5 (citing FAA's "Final Environmental Assessment and Finding of No Significant Impact for SpaceX Falcon Launches at Kennedy Space Center and Cape Canaveral Air Force Station", July 2020,

(continued….)

further argues that an assessment of launch operations at Kennedy Space Center indicates that the SpaceX Falcon 9 launch vehicle does not emit any aluminum oxide whatsoever.[330]

82.    As discussed above, the fact that the SpaceX Third Modification is not equivalent to a request for initial authorization for 2,814 satellites does not preclude an examination of whether the SpaceX deployment may have a significant environmental impact under NEPA.  Therefore, we are not persuaded by SpaceX's argument that the modification will not affect the chemicals entering the atmosphere either as part of launch or satellite reentry.  We do not, however, find at this time that the record supports requiring SpaceX to prepare an EA.  First, with respect to launch activities, the FAA has prepared its own EA on the SpaceX launches, and pursuant to our rules,[331] no additional consideration of potential impacts associated with those launches is required.[332]  With respect to materials accumulating in the atmosphere as a result of satellite reentry, we find that the allegations Viasat makes in its petition are insufficient for us to determine that additional environmental consideration is necessary under our rules or that granting the SpaceX modification application may have a significant environmental impact on the atmosphere or ozone layer.  Additionally, we find that Viasat's arguments regarding "unknowns about other complex chemical compounds" are too vague to warrant further consideration under section 1.1307(c) of our rules.[333]

83.    Distinct from the NEPA issues, we also note that, in the context of our orbital debris proceeding, the Commission found that for NGSO satellites, leaving a satellite in orbit as debris at the end of that satellite's lifetime is generally associated with increased risk to future space operations.[334]  Where satellites are disposed of by atmospheric re-entry, but some materials do not burn up when reentering the

---

(Continued from previous page)
https://www.faa.gov/space/environmental/nepa_docs/media/SpaceX_Falcon_Program_Final_EA_and_FONSI.pdf;
"Final Environmental Assessment for Space Exploration Technologies Operations Area on Kennedy Space Center",
Oct. 2018, https://netspublic.grc.nasa.gov/main/FINAL_%20SpaceX_EA_Roberts%20Rd_10-2-18.pdf; NASA
NEPA Finding, Dec. 2018
https://netspublic.grc.nasa.gov/main/FONSI%20for%20EA%20for%20Space%20Exploration%20Technologies%20
Opersations%20Area%20KSC--originalsigned.pdf ).

[330] SpaceX April 2 Ex Parte at 6.

[331] See 47 CFR § 1.1311(e) ("An EA need not be submitted to the Commission if another agency of the Federal
Government has assumed responsibility for determining whether [ ] the facilities in question will have a significant
effect on the quality of the human environment….").

[332] https://www.faa.gov/space/licenses/.  See also 51 U.S.C. § 50901 et seq. (providing that the Secretary of
Transportation is to oversee and coordinate the conduct of commercial launch and reentry operations, issue permits
and commercial licenses and transfer commercial licenses authorizing those operations, and protect the public health
and safety, safety of property, and national security and foreign policy interests of the United States); 14 CFR §
415.53 (stating that the FAA does not review "payloads" that are subject to regulation by the FCC or the Department
of Commerce, National Oceanic and Atmospheric Administration (NOAA); or owned or operated by the U.S.
Government)

[333] While we construe these arguments generously for purposes of NEPA analysis, our rules do require that the
petition must set forth "in detail the reasons justifying or circumstances necessitating environmental consideration in
the decision-making process."  47 CFR § 1.1307(c).

[334] See supra paras. 53-68 (orbital debris discussion); Orbital Debris R&O and FNPRM, 35 FCC Rcd at 4198, para.
87 ("Spacecraft that are unable to complete post-mission disposal, particularly when left at higher altitudes where
they may persist indefinitely, will contribute to increased congestion in the space environment over the long-term
and increase risks to future space operations").

atmosphere, surviving debris can cause harm to human life and property on Earth.[335]  As discussed in greater detail above, SpaceX has demonstrated compliance with the orbital debris rules.[336]

### 3.    Satellite Debris Surviving Reentry

84.    We next address Viasat's arguments regarding satellite debris that survives atmospheric reentry.  Viasat states that "as a general matter" 10 to 40% of a satellite's mass does not burn up on reentry and could reach the Earth's surface.[337]  While this statement may be true in discussing satellite design generally, the record establishes it is not accurate for SpaceX's satellites.  Viasat alleges that the reentry of the SpaceX Starlink satellites risks surviving debris potentially injuring humans, damaging buildings or aircraft, polluting the landscape, or causing fires in the wilderness.[338]  We point out that the Commission already evaluates risk of human casualty from debris surviving re-entry as part of its analysis of an applicant's orbital debris mitigation plans.  This analysis typically takes into consideration factors identified using an assessment software developed by NASA and used for evaluating NASA missions.  Those factors include the materials composition of the satellite (i.e., what materials are likely to survive reentry), as well as the impacting kinetic energy with which any surviving materials would reach the Earth's surface, among other things.[339]  In connection with its orbital debris mitigation demonstration, SpaceX states that its satellites will be fully demisable.  In this context, that means that the calculated risk of human casualty from materials reaching the Earth's surface is roughly zero.  Viasat argues the Commission cannot take SpaceX's assertion of demiseability at face value and must conduct a "hard look" under NEPA.[340]  SpaceX replies that it has designed its satellites to be fully demisable upon reentry and that this is not merely an assertion, as Viasat claims, since SpaceX has validated its conclusion with a Commission-mandated analysis using software purpose-built by NASA.[341]

85.    SpaceX's statement that its satellites are designed to demise upon reentry into Earth's atmosphere is sufficiently supported by the record before us.  In its First Modification application, SpaceX submitted technical information concerning the demisability of its satellites, which the Bureau addressed.  Because the Bureau previously assessed the casualty risk associated with the SpaceX satellites and there is no material difference between those satellites and the ones under consideration here, we find that Viasat's general assertions do not provide a justification for further environmental review of this issue.  We also find that Viasat's general assertions about potential effects to aircraft provide insufficient detail to justify environmental consideration of this issue through an EA.

### 4.    Potential Impact on the Night Sky and Astronomy

86.    We address Viasat's arguments that light pollution caused by large satellite constellations

---

[335] See infra paras. 84-85; see also, e.g., https://www.unoosa.org/pdf/publications/st_space_49E.pdf.

[336] See 47 CFR § 25.111(d)(14); Mitigation of Orbital Debris in the New Space Age, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 4156 (2020) (Orbital Debris Order and FNPRM).

[337] Viasat NEPA Petition at 13.

[338] See id. at 13-16; Viasat NEPA Reply at 26-27; Viasat February 8 Ex Parte at 32-34; Viasat February 12 Ex Parte at 32-34.

[339] See, e.g., Orbital Debris R&O & FNPRM, 35 FCC Rcd 4156, 4212, para. 117 (adopting the 15 joule metric into the Commission's rules).

[340] See Viasat NEPA Petition at 15-16 (citing William M. Wiltshire, Counsel, Space Exploration Holdings, LLC., to Jose P. Albuquerque, Chief, Satellite Division, IBFS File No. SAT-MOD-20181108-00083, at 3 (filed Mar. 13, 2019)); Viasat NEPA Reply at 26-27; Viasat February 8 Ex Parte at 21, 32-34; Viasat February 12 Ex Parte at 21, 32-34.

[341] See SpaceX Opposition to Viasat's NEPA Petition at V, 20-21; SpaceX January 22 Ex Parte, Attachment A at 4; SpaceX March 11 Response to Viasat at 2.

will have aesthetic, scientific, cultural, social, and health effects.[342]  The Balance Group also argues that the Commission must perform a review under NEPA to assess the light pollution effects the Starlink system will have on humans, flora, fauna, and animal migration.[343]  Viasat notes that light pollution from satellite constellations like Starlink can affect casual stargazers, astrophotographers, and professional astronomers alike,[344] that the night sky also has religious and cultural significant meaning for many groups, and that light pollution is also known to cause health problems.[345]  According to Viasat, the sheer number of satellites in the Starlink constellation, coupled with their operating altitude, will cause those satellites to have a serious impact on astronomy and stargazing.[346]  SpaceX responds that it has been working with astronomers and that its modification will in fact lessen the effect its constellation will have on the night sky.[347]  SpaceX argues that lowering the altitude of the SpaceX satellites to below 600 km will significantly reduce the amount of time those satellites reflect sunlight during the night, thereby lessening their impact on astronomy.[348]  Additionally, SpaceX states that it has been taking measures to darken its satellites, including testing an experimental darkening treatment on one satellite, launching satellites with visors to protect reflective surfaces from the sun's glare, and devising methods to keep satellites oriented to reduce reflectivity.[349]  According to SpaceX, these methods are making satellites "all but invisible" to the naked eye, thereby mitigating Viasat's concerns about aesthetic effects, for example.[350]  SpaceX describes this as an iterative process, as a technical challenge, and states that it has been working in close collaboration with the astronomy community.[351]  Finally, SpaceX notes that it makes detailed tracking information available to astronomers so they can avoid its satellites.[352]  On the

---

[342] *See* Viasat NEPA Petition at 16; Viasat NEPA Reply at 27-30, 33; Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35.

[343] *See* The Balance Group Opposition at 10-14.

[344] *See* Viasat NEPA Petition at 16-18; Viasat NEPA Reply at 27-30; Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35.

[345] Viasat states that various scientific and astronomy organizations have expressed concerns about light pollution caused by large satellite constellations like Starlink.  *See, e.g.*, Viasat NEPA Petition at 18-19 (citing Fabio Falchi et al., *Limiting the Impact of Light Pollution on Human Health, Environment and Stellar Visibility*, 10 J. Env't Mgmt. 2714 (2011); Ron Chepesiuk, *Missing the Dark: Health Effects of Light Pollution*, 117 Env't Health Persps. 20 (2009); Viasat NEPA Reply at 27-30; Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35. Viasat cites to a report warning astronomers to expect significant light pollution interference from satellites in the Starlink constellation orbiting below 614 km.  See Viasat NEPA Petition at 19 (citing Constance Walker et al., *Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigation*, at 3 (2020)); *see also* Viasat NEPA Reply at 27-30; Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35.

[346] *See* Viasat NEPA Petition at 19-20; Viasat NEPA Reply at 27-30; Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35.

[347] *See* SpaceX Opposition to Viasat's NEPA Petition at I, III, 2, 11-14.

[348] *See id.* at I, III, 12-13, 14.  SpaceX points out that the very report Viasat cites in support of its claims recommends operators of Large NGSO constellations fly their satellites at altitudes below 600 km for this reason. See *id.* at III, 12-13, 14 (citing Constance Walker et al., *Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigation,* at 3 (2020)).

[349] *See id.* at 11.

[350] *See id. at* 11, 14-15.

[351] *See* SpaceX April 2 Ex Parte at 4.  SpaceX notes that it has established in conjunction with members of the astronomy community – a target of 7th apparent magnitude for an acceptable brightness impact.  *Id.*, Attach at 3. SpaceX states that while it has not achieved this ultimate 7th apparent magnitude value goal yet, it has made significant progress toward this goal, diminishing the average brightness of its satellites from 4.99 apparent magnitude to 6.48 apparent magnitude.  The higher apparent magnitude values represent objects appearing dimmer.

[352] See SpaceX Opposition to Viasat NEPA Petition at 11.

whole, SpaceX argues, its modification will make its satellites less visible both to astronomers and to the general public.  In a separate filing, the American Astronomical Society agrees satellites at lower altitudes are preferable to satellites at higher altitudes.[353]  According to the American Astronomical Society, by reducing the altitude of its satellites, along with other measures to lower the apparent brightness of its satellites, SpaceX is in fact mitigating the effects of its constellation on visual astronomy.[354]  Viasat argues that even if light pollution can be mitigated at lower altitudes, the modification would give SpaceX authority to deploy nearly 3,000 satellites into low-earth orbit that it currently does not have authority to deploy, and the increase in the number of satellites will undoubtedly increase the concerns with respect to light pollution, especially because satellites appear brighter at lower altitudes during astronomical twilight.[355]  Viasat argues that fewer satellites in the sky is a better mitigation technique for light pollution than a lower altitude.[356]  And, Viasat alleges that SpaceX's attempts to mitigate light pollution, such as its satellite darkening treatment, have been unsuccessful.[357]

87.    After considering the record and claims by Viasat and The Balance Group, we conclude that the issues raised do not justify the need for an EA.  With respect to Viasat and The Balance Group's arguments related to possible effects to astronomy, we note that we have a robust record on these issues, including from the American Astronomical Society,[358] and find that the record does not support the need to prepare an EA.  We take note of SpaceX's representation that it has diminished the average brightness of its satellites from a 4.99 apparent magnitude to a 6.48 apparent magnitude and made commitments to the astronomy community regarding further reduction in the visibility of its satellites.  We also take note of SpaceX's representation that its efforts to reduce satellite reflectivity not only would benefit communities of astronomers, but also will, reduce brightness of the Starlink satellites to a naked eye observer.[359]  We recognize that while SpaceX is still testing some of these solutions, SpaceX must continue its efforts to fulfill its commitments to the astronomy community.  Although we do not find that the record before us merits preparation of an EA under NEPA, we conclude that it nonetheless would serve the public interest under the Communications Act for SpaceX to ensure that it does not unduly burden astronomy and other research endeavors.[360]  Accordingly, we will continue to monitor this situation and SpaceX's efforts to achieve its commitments in this record.  With respect to other claims related to potential impact on the night sky, including alleged impacts to human health, flora, fauna, and animal migration, we find that the Viasat and the Balance Group have failed to set forth in detail reasons justifying or circumstances necessitating environmental consideration of these issues.[361]

88.    Viasat also argues SpaceX has not addressed the impact its satellites would have on radioastronomy, and thus the constellation will cause environmental impacts by hampering scientific

---

[353] See American Astronomical Society Reply at 1 (citing Constance Walker et al., *Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigation*, at 3 (2020)) (stating that satellites orbiting at or below 600 km do appear brighter than satellites at higher altitudes, but they are in sunlight for less of the night, which is "one of the leading benefits to science.")

[354] See id. at 1.

[355] See Viasat NEPA Reply at 27-30; 32-35; Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35.

[356] See Viasat NEPA Reply at 27-30; Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35.

[357] See Viasat NEPA Reply at 33-34; Viasat February 8 Ex Parte at 32, 34-35; Viasat February 12 Ex Parte at 32, 34-35; Viasat April 16 Letter at 4-5.

[358] See generally American Astronomical Society Reply.

[359] SpaceX April 2 Ex Parte at 4.

[360] See, e.g., 42 U.S.C. § 4332 (directing federal agencies to "interpret[ ] and administer[ ]" their organic statutes "in accordance" with NEPA's environmental protection policies).

[361] See 47 CFR § 1.1307(c).

advancements.[362]  The Balance Group notes that SpaceX has not provided peer-reviewed studies and written declarations from impacted federal, state, international, and independent astronomy facilities to show there will not be damage to those facilities caused by the SpaceX constellation as currently authorized and as modified.[363]  SpaceX notes in its reply to The Balance Group that the Commission has adopted several footnotes to the United States Table of Frequency Allocations to protect the radio astronomy service, many of these footnotes developed by the ITU.[364]  Compliance with the requirement to protect the radio astronomy service is a condition for all space station authorizations utilizing the relevant spectrum bands.[365]  SpaceX states that it completed coordination over a year ago to ensure protection of the radio astronomy service.[366]  As to the Radio Astronomy Service, SpaceX is correct that its authorization is conditioned to require it to protect the Radio Astronomy Service, and SpaceX did complete coordination to ensure that protection.  Neither Viasat nor The Balance Group have provided a basis to call into question the validity of that coordination or SpaceX's ability to protect the Radio Astronomy Service, and have not raised environmental concerns with respect to this issue that would warrant requiring preparation of an EA.

### 5.    Satellite Collisions in Space

89.    We next address Viasat's argument that increasing the density of satellites in the 540-570 km orbital shell will increase the risk of collisions and thus increase the amount of orbital debris, potentially making this area of space unviable, as discussed above.[367]  Viasat argues that orbital debris considerations fall under the ambit of NEPA because it affects the human environment by (1) causing severe ecological harm to the near-Earth orbital environment, the ecosystem in question, because orbital debris interferes with humanity's ability to explore and develop space and (2) orbital debris may cause severe economic harm by increasing the probability of damage to existing satellites and other space vehicles.[368]  SpaceX argues in response, that among other things, the Commission already has an orbital debris mitigation regime to review satellite applications, and environmental review of orbital debris under NEPA would be unnecessary and redundant.[369]  Viasat alleges that reviewing an applicant's orbital debris mitigation plan does not discharge its duties under NEPA.[370]  Without deciding whether such alleged impacts in space are even within the scope of NEPA (which applies to effects on the quality of the human environment), we find that Viasat's arguments about these issues have failed to set forth in detail reasons justifying or circumstances necessitating environmental consideration of these issues under section 1.1307(c) of our rules.[371]  Separate from the NEPA issues, we note, as discussed above, that we have reviewed SpaceX's orbital debris mitigation plan, and conclude that, as conditioned, SpaceX's debris

---

[362] *See* Viasat NEPA Reply at 30-32 (citing Constance Walker et al., Dark and Quiet Skies for Science and Society: Report and Recommendations 160-81 (2020)); Viasat February 8 Ex Parte at 34-35; Viasat February 12 Ex Parte at 34-35; Viasat April 16 Letter at 5-6.

[363] *See* The Balance Group Opposition at 20.

[364] *See* SpaceX Reply to The Balance Group at 4.

[365] *See id.*

[366] *See id.* (citing Press Statement 19-005, "Statement on NSF and SpaceX Radio Spectrum Coordination Agreement," NATIONAL SCIENCE FOUNDATION (June 4, 2019), https://www.nsf.gov/news/news_sum.jsp?cntn_id=298678.

[367] *See* Viasat NEPA Petition at III, 4, 9, 21-26; Viasat NEPA Reply at 35-39; Viasat February 8 Ex Parte at 6, 21, 36-37; Viasat February 12 Ex Parte at 6, 21, 36-37.

[368] *See* Viasat NEPA Petition at 21-24; Viasat February 8 Ex Parte at 36-37; Viasat February 12 Ex Parte at 36-37.

[369] *See* SpaceX Opposition to Viasat's NEPA Petition at 17-18.

[370] *See* Viasat NEPA Reply at 38-39; Viasat February 8 Ex Parte at 36-37; Viasat February 12 Ex Parte at 36-37.

[371] *See* 47 CFR § 1.1307(c); 42 U.S.C. § 4332(C).

mitigation plan is consistent with the public interest.

### 6. Radiofrequency Emissions

90.    Finally, The Balance Group argues that the SpaceX Third Modification application is missing information on peer-reviewed studies assessing radiofrequency exposure caused by the SpaceX constellation,[372] and asks what impact the radiofrequency exposure caused by SpaceX's constellation will have on humans, flora, and fauna as assessed by expert agencies.[373]  The Balance Group asks whether SpaceX has accounted for the differences in people, both in varying desire for additional connectivity and varying tolerances for light pollution and radiofrequency exposure.[374]  In response to these concerns, SpaceX points out that the Commission completed a review of its radiofrequency exposure rules in November 2019.[375]  SpaceX also states that it complies with the Commission's radiofrequency exposure rules.[376]  In its reply, The Balance Group suggests that the November 2019 radiofrequency exposure rules are under review and may not survive as they are currently structured,[377] and states that SpaceX has failed to provide a radiation hazard report for its modification application or authorizations.[378]

91.    A proposed project would require preparation of an EA if it "would cause human exposure to levels of radiofrequency radiation in excess of the limits" in the Commission's radiofrequency rules.[379]  The record in this matter fails to allege that the SpaceX modification would result in human exposure to radiofrequency emissions that would exceed the limits in the Commission's rules.  SpaceX further confirms its compliance with our radiofrequency exposure rules.  Therefore, no additional environmental consideration of radiofrequency exposure issues is required.

92.    In sum, with respect to NEPA, we conclude that the record before us does not support a need for further environmental review.  Accordingly, Viasat's Petition Pursuant to Section 1.1307 and the Opposition and Motions of the Balance Group are denied to the extent that they raise any NEPA related issues.

### F. Other Matters

93.    In addition to those matters addressed above, The Balance Group raises a number of additional concerns with respect to both the SpaceX Third Modification Application and the SpaceX system as a whole.[380]  These concerns are either already addressed in analysis of the application, are more appropriately addressed as part of rulemaking proceedings, or are otherwise beyond the scope of this modification proceeding.  For example, a number of The Balance Group arguments, to the extent that they do not overlap with issues addressed above, appear to raise general concerns about the Commission's process for evaluation of satellite applications, beyond the specific license modification request we address here.[381]  We note that the Regulatory Flexibility Act, cited by The Balance Group, does not apply

---

[372] *See* The Balance Group Opposition at 18.

[373] *See id.* at 18-19.  The Balance Group also expresses concerns about the lack of peer-reviewed studies from federal agencies assessing the effects of the radiofrequency exposure on food production.  *Id.*

[374] *See id.* at 21.

[375] *See* SpaceX Reply to The Balance Group at 4 (citing *Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, 34 FCC Rcd 11687 (2019)).

[376] *See id.*

[377] *See* The Balance Group June 16 Reply to SpaceX at 20.

[378] *See id.*

[379] 47 CFR § 1.1307(b).

[380] *See generally* The Balance Group Opposition.

[381] *See* The Balance Group Opposition at 13 (stating that "[t]he FCC holds requirements under the [APA], [NEPA], Radiation Hazard Report (RHR) obligations, Regulatory Flexibility Act (RFA), Secure 5G and Beyond Act, the

(continued....)

to this proceeding as we are not adopting regulations.[382] Other issues raised by the Balance Group, for example, such as those regarding insurance and indemnification, are addressed as part of our ongoing proceeding on orbital debris mitigation.[383] All of SpaceX's authorizations, including this grant of the SpaceX Third Modification Application, are conditioned on SpaceX complying with the outcome of future Commission rulemakings.

### G.    Petition for Reconsideration of Partial Grant

94.    On February 8, 2021, Viasat filed a petition for reconsideration of the Bureau Order authorizing SpaceX to deploy and operate ten additional satellites at a nominal altitude of 560 km, while otherwise deferring consideration of SpaceX's broader application.[384] The Bureau has referred this Petition to the Commission for consideration.[385] Despite these ten satellites having already been launched, Viasat reiterates four of its arguments regarding SpaceX's constellation as modified: the reliability of SpaceX's satellites; the medium and long-term effects of SpaceX's alleged space safety failures; the Bureau Order's improper assessment of the relationship between satellite altitude and safety; and failure of the Bureau Order to evaluate the effects of SpaceX's system on systems other than Kuiper's, either above or below 580 km.[386] Viasat suggests the Bureau acknowledge these errors and ensure that they are rectified going forward.[387] Viasat recognizes that the ten satellites covered by the partial grant have already been launched, but observes that the reasoning expressed in the Order, if not addressed, may become improperly invoked as Commission policy in the future.[388] Viasat argues that the Order not only grants authority for SpaceX to deploy ten satellites, but in fact grants SpaceX authority to deploy and operate its entire constellation consisting of 1,594 satellites at approximately 520-580 km, taking into account orbital tolerances, and an unlimited number of identical replacement satellites, and that the Order should have evaluated whether allowing all of those satellites to collectively operate in overlapping orbits will be in the public interest, taking into account SpaceX's experiential failure rate. Viasat further argues that this grant will encourage other operators to artificially segment their systems for purposes of application processing, and encourage them to seek "partial" grants of those segments without having the Commission ask the broader question of whether an authorized system as a whole creates significant risk that endangers the public interest.[389]

95.    As discussed above, SpaceX's operations at lower altitudes and significant maneuverability should result in lower collision risk and an improved orbital debris environment. The Bureau also considered other systems besides Kuiper in making its determination in the Ten-Satellite Partial Grant. The Bureau specifically addressed Kepler's concerns regarding overlap with its system,[390]

---

(Continued from previous page)

Constitution and Convention of the [ITU], and other similarly situated cross-agency and cross-government obligations, to conduct a detailed review of a modification request that is this massive in scope.")  In a letter filed on April 21, 2021, Professor Andrew Lawrence also raised some additional generalized concerns, including some regarding broader international space law and infrastructure policy.  *See generally* Andrew Lawrence Letter.  These concerns are similarly beyond the scope of this proceeding.

[382] *See* Regulatory Flexibility Act of 1980, as amended, 5 U.S.C. § 601 *et seq.*

[383] *See Orbital Debris R&O and FNPRM*, 35 FCC Rcd at 4237-4245, paras. 176 -192.

[384] Viasat Recon Petition.

[385] 47 CFR § 1.106(a)(1).

[386] See Viasat Recon Petition at 2-16; Viasat Recon Reply at 7-8, 10.

[387] *See* Viasat Recon Petition at 2.

[388] Viasat Recon Reply at 1-2.

[389] *Id.* at 3.

[390] *See Ten-Satellite Partial Grant* at para. 12.

and took all comments filed to date into consideration when analyzing orbital debris. Furthermore, even if Viasat is correct that the Bureau should have considered the ten satellites in conjunction with the 1,584 satellites already authorized, the safety and orbital debris characteristics of these satellites have already been thoroughly examined in SpaceX's original authorization, two modifications, and one order on reconsideration. As discussed above, we are not at this time concerned by the failure rates, given SpaceX's vast improvements and the lower altitude. We therefore find that the Bureau extensively considered the issues Viasat raises in its reconsideration petition above, and we deny Viasat's petition for reconsideration.

## IV.    CONCLUSION AND ORDERING CLAUSES

96.    Accordingly, IT IS ORDERED, that the Third Modification Application filed by Space Exploration Holdings, LLC (SpaceX), IS GRANTED, pursuant to section 309(a) of the Communications Act of 1934, as amended, 47 U.S.C. § 309(a).

97.    IT IS FURTHER ORDERED that this authorization is subject to the following requirements and conditions:[391]

a.    SpaceX must timely provide the Commission with the information required for Advance Publication, Coordination, and Notification of the frequency assignment(s) for this constellation, including due diligence information, pursuant to Articles 9 and 11 of the ITU Radio Regulations. This authorization may be modified, without prior notice, consistent with the coordination of the frequency assignment(s) with other Administrations. *See* 47 CFR § 25.111(b). SpaceX is responsible for all cost-recovery fees associated with the ITU filings. 47 CFR § 25.111(d).

b.    Operations in the 10.7-11.7 GHz (space-to-Earth) frequency band are authorized up to the applicable power flux-density limits in 47 CFR § 25.208(b), and up to the equivalent power flux-density requirements of Article 22 of the ITU Radio Regulations, as well as Resolution 76 (Rev. WRC-15) of the ITU Radio Regulations.

c.    In the 10.7-11.7 GHz band, operations must be coordinated with the radio astronomy observatories listed in 47 CFR § 2.106, n.US131, to achieve a mutually acceptable agreement regarding the protection of the radio telescope facilities operating in the 10.6-10.7 GHz band. For the purposes of coordination with these listed facilities or the National Radio Quiet Zone, correspondence should be directed to the National Science Foundation Spectrum Management Unit (Email: esm@nsf.gov).

d.    Operations in the 11.7-12.2 GHz (space-to-Earth) frequency band are authorized up to the power flux-density limits in Article 21 of the ITU Radio Regulations, and up to the equivalent power flux-density requirements of Article 22 of the ITU Radio Regulations, as well as Resolution 76 (Rev. WRC-15) of the ITU Radio Regulations.

e.    Operations in the 12.2-12.7 GHz (space-to-Earth) frequency band are authorized up to the power flux-density limits in 47 CFR § 25.208(o) and Article 21 of the ITU Radio Regulations, and up to the equivalent power flux-density requirements of Article 22 of the ITU Radio Regulations, as well as Resolution 76 (Rev. WRC-15) of the ITU Radio Regulations, and are subject to the condition that SpaceX not use more than one satellite beam from any of its satellites in the same frequency in the same or overlapping areas at a time.

f.    Operations in the 12.75-13.25 GHz (Earth-to-space) frequency band must be in accordance with footnote 5.441 to the U.S. Table of Frequency Allocations, 47 CFR § 2.106, n. 5.441, which states that operations in this band are subject to application of the provisions of No. 9.12 for coordination with other non-geostationary-satellite systems in the fixed-satellite service. Non-

---

[391] The conditions here replicate the full set of conditions applicable to SpaceX operations as specified in prior orders, except that conditions in paragraphs e and w have been modified, and new conditions have been specified at paragraphs j, o, r, s, t, and u. We also note that SpaceX has previously satisfied some of these conditions.

geostationary-satellite systems in the fixed-satellite service shall not claim protection from geostationary-satellite networks in the fixed-satellite service operating in accordance with the Radio Regulations.  Non-geostationary-satellite systems in the fixed-satellite service in the 12.75-13.25 GHz (Earth-to-space) frequency band shall be operated in such a way that any unacceptable interference that may occur during their operation shall be rapidly eliminated.

g.        Operations of non-geostationary-satellite systems in the 12.75-13.25 GHz (Earth-to-space) frequency band are restricted to individually licensed earth stations in accordance with footnote NG57 to the U.S. Table of Frequency Allocations, 47 CFR § 2.106, NG57.  In the 13.85-14.5 GHz (Earth-to-space) frequency band reception is permitted for levels up to the equivalent power flux-density requirements of Article 22 of the ITU Radio Regulations.

h.        In the 14.47-14.5 GHz band, operations are subject to footnote US342 to the U.S. Table of Frequency Allocations, 47 CFR § 2.106, US342, and all practicable steps must be taken to protect the radio astronomy service from harmful interference.

i.        Space-to-Earth operations in the 17.8-18.6 GHz, 18.8-19.3 GHz, and 19.7-20.2 GHz frequency bands must complete coordination with U.S. Federal systems, in accordance with footnote US334 to the United States Table of Frequency Allocations, 47 CFR § 2.106, prior to being used.  The use of space-to-Earth operations in the 17.8-18.6 GHz, 18.8-19.3 GHz, and 19.7-20.2 GHz bands must be in accordance with any signed coordination agreement between SpaceX and U.S. Federal operators.  Two weeks prior to the start of any operations in the 17.8-18.6 GHz, 18.8-19.3 GHz, and 19.7-20.2 GHz bands, SpaceX must provide contact information for a 24/7 point of contact for the resolution of any harmful interference to Jimmy Nguyen, Email: Jimmy.Nguyen@us.af.mil.

j.        Operations in the 19.7-20.2 GHz frequency band are subject to the condition that SpaceX may not use more than one satellite beam for satellite transmissions on the same frequency to the same or overlapping areas at a time.

k.        Operations in the 18.8-19.3 GHz (space-to-Earth) frequency band are authorized up to the power flux-density limits in Article 21 of the ITU Radio Regulations.

l.        In the 27.5-28.6 GHz and 29.5-30 GHz (Earth-to-space) frequency bands reception is permitted at levels up to the applicable equivalent power flux-density requirements of Article 22 of the ITU Radio Regulations.

m.        Operations in the 27.5-28.35 GHz (Earth-to-space) frequency band are secondary with respect to Upper Microwave Flexible Use Service (UMFUS) operations, except for FSS operations associated with earth stations authorized pursuant to 47 CFR § 25.136 and will comply with any determinations set forth in the Spectrum Frontiers proceeding (GN Docket 14-177).

n.        Operations in the 28.35-28.6 GHz and 29.5-30 GHz (Earth-to-space) frequency bands are on a secondary basis with respect to GSO FSS operations.

o.        For downlink operations in the Ku-band, SpaceX must ensure that the PFD, as measured on the surface of the Earth, satisfies the applicable limits set forth in the Commission's rules, 47 CFR § 25.208(o), and the ITU Radio Regulations, including for the lower satellite altitude and elevation angles authorized in this modification.  SpaceX must reduce the PFD for its Ka-band downlinks by 7 dB as compared to its current authorization.

p.        Under 47 CFR § 25.146(a), SpaceX must receive a favorable or "qualified favorable" finding in accordance with Resolution 85 (WRC-03) with respect to its compliance with applicable equivalent power flux-density limits in Article 22 of the ITU Radio Regulations.  In case of an unfavorable finding, SpaceX must adjust its operation to satisfy the ITU requirements.  SpaceX must cooperate with other NGSO FSS operators in order to ensure that all authorized operations jointly comport with the applicable limits for aggregate equivalent power flux-density in the space-to-Earth direction contained in Article 22 of the ITU Radio Regulations, as well as Resolution 76 (WRC-03) of the ITU Radio Regulations.

q.      SpaceX must make available to any requesting party the data used as input to the ITU-approved validation software to demonstrate compliance with applicable Equivalent Power Flux Density (EPFD) limits.

r.      SpaceX must accept any additional interference resulting from this modification compared to its current authorization, from licensees or market access grantees authorized in the Commission's NGSO 2016 Processing Round.  SpaceX must also accept any additional interference into its Ka-band uplink resulting from this modification compared to its current authorization, from the Kuiper Systems, LLC NGSO system as authorized in July 2020.  For this purpose, the allowable level of uplink interference from Kuiper into SpaceX shall be established by a showing submitted by Kuiper and accepted by the Commission that its operations would not have caused harmful interference to SpaceX's NGSO system at the altitudes where SpaceX would have operated prior to this modification.

s.      SpaceX must operate consistent with the technical specifications provided to the Commission, including any supplemental specifications, in connection with this Third Modification Application, including antenna beam patterns and other technical information.

t.      During launch and early orbit phase operations, payload testing, and deorbit of its satellites, SpaceX must operate on a non-harmful interference basis, *i.e.* SpaceX must not cause harmful interference and must accept any interference received.  In the event of any harmful interference under this grant, SpaceX must immediately cease operations upon notification of such interference and inform the Commission, in writing, of such an event.

u.      SpaceX must provide a semi-annual report, by January 1 and July 1 each year, covering the preceding six month period, respectively, from June 1 to November 30 and December 1 to May 31. The report should include the following information:

> i.      The number of conjunction events identified for Starlink satellites during the reporting period, and the number of events that resulted in an action (maneuver or coordination with another operator), as well as any difficulties encountered in connection with the collision avoidance process and any measures taken to address those difficulties.

> ii.      Satellites that, for purposes of disposal, were removed from operation or screened from further deployment at any time following initial deployment, and identifying whether this occurred less than five years after the satellite began regular operations or were available for use as an on-orbit replacement satellite,

> iii.      Satellites that re-entered the atmosphere,

> iv.      Satellites for which there was a disposal failure, as that term is defined in this Order, including a discussion of any assessed cause of the failure and remedial actions.

SpaceX must also provide a report if during any continuous one-year period that begins after April 2, 2021, there are three or more satellite disposal failures.  Such report shall be filed not later than 10 days following the third disposal failure and must either state the assessed cause of the failure and remedial actions for each of the disposal failures during the period, if available, or provide a schedule for completion of a process for doing so.

Based on the information reported, the license may be subject to additional terms and conditions, including additional reporting obligations, limitations on additional deployments, requirements for early removal of satellites from orbit, or any other appropriate conditions to limit collision risk.

v.      SpaceX must maintain satellite orbits so as to operate all of its satellites at or below 580 km.

w.      This authorization is subject to modification to bring it into conformance with any rules or policies adopted by the Commission in the future.  Accordingly, any investments made toward operations in the bands authorized in this order by SpaceX in the United States assume the risk that

operations may be subject to additional conditions or requirements as a result of any future Commission actions.  This includes, but is not limited to, any conditions or requirements resulting from any action in the proceedings associated with IB Docket 18-818[392] and WTB Docket 20-443[393].

x.      IT IS FURTHER ORDERED that SpaceX is subject to the rules regarding the sharing of ephemeris data in section 25.146(e) of the Commission's rules, 47 CFR § 25.146(e).

98.      IT IS FURTHER ORDERED that this authorization is also subject to the following requirements:

a.      SpaceX must post a surety bond in satisfaction of 47 CFR §§ 25.165(a)(1) & (b) no later than **April 30, 2018**,[394] and thereafter maintain on file a surety bond requiring payment in the event of a default in an amount, at minimum, determined according to the formula set forth in 47 CFR § 25.165(a)(1); and

b.      SpaceX must launch 50% of the maximum number of proposed space stations, place them in the assigned orbits, and operate them in accordance with the station authorization no later than **March 29, 2024**, and SpaceX must launch the remaining space stations necessary to complete its authorized service constellation, place them in their assigned orbits, and operate each of them in accordance with the authorization no later than **March 29, 2027**. 47 CFR § 25.164(b).[395]

99.      Failure to post and maintain a surety bond will render this grant null and void automatically, without further Commission action.  Failure to meet the milestone requirements of 47 CFR § 25.164(b) may result in SpaceX's authorization being reduced to the number of satellites in use on the milestone date.  Failure to comply with the milestone requirement of 47 CFR § 25.164(b) will also result in forfeiture of SpaceX's surety bond.  By April 15, 2024, SpaceX must either demonstrate compliance with its milestone requirement or notify the Commission in writing that the requirement was not met. 47 CFR § 25.164(f).

100.      IT IS FURTHER ORDERED that operations must comply with spectrum sharing procedures among NGSO FSS space stations specified in 47 CFR § 25.261 with respect to any NGSO system licensed or granted U.S. market access pursuant to the processing rounds initiated in Public Notice, DA 16-804 and Public Notice, DA 17-524.  Spectrum sharing between SpaceX's operations and operations of NGSO systems granted U.S. market access, where such operations do not include communications to or from the U.S. territory, are governed only by the ITU Radio Regulations and are not subject to section 25.261.

101.      IT IS FURTHER ORDERED that Viasat's Petition to Deny or Defer is DENIED.

102.      IT IS FURTHER ORDERED that SES/O3B's Petition to Deny or Defer is DENIED.

103.      IT IS FURTHER ORDERED that Kepler's Objection is DENIED.

104.      IT IS FURTHER ORDERED that Kuiper's Objection is DENIED.

---

[392] *See generally Orbital Debris R&O & FNPRM.*

[393] *See generally 12 GHz NPRM.*

[394] We note that SpaceX filed the required bond on April 23, 2018 and filed a rider to that bond on March 25, 2019 that increases the maximum penal sum of the original surety bond in compliance with the Commission's rules and the terms of SpaceX's authorization.

[395] We note that the *NGSO FSS Order* modified section 25.164(b) to offer additional flexibility and requires launch and operation of 50% of an authorized system within six years of grant and the remaining satellites within nine years of grant.

105.    IT IS FURTHER ORDERED that The Balance Group's Opposition and Motions for Consultation with Affected Agencies, for Disclosure, for Certification of Suitably Comprehensive Insurance Coverage, for Certification of Indemnity, and to Suspend or Revoke Licenses is DENIED.

106.    IT IS FURTHER ORDERED that Viasat's Petition Pursuant to Section 1.1307 is DENIED.

107.    IT IS FURTHER ORDERED that DISH's Request for Production of Evidence is DISMISSED as moot.

108.    IT IS FURTHER ORDERED that DISH's Request for a Protective Order is DENIED IN PART and otherwise DEFERRED as set forth in para. 51.

109.    IT IS FURTHER ORDERED THAT Viasat's Petition for Reconsideration of the Ten-Satellite Partial Grant, DA 21-34, is DENIED.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

# EXHIBIT B

# SPACEX NON-GEOSTATIONARY SATELLITE SYSTEM

## ATTACHMENT A
### TECHNICAL INFORMATION TO SUPPLEMENT SCHEDULE S

**A.1    SCOPE AND PURPOSE**

In 2018, the Commission authorized Space Exploration Holdings, LLC, a wholly owned subsidiary of Space Exploration Technologies Corp. (collectively, "SpaceX"), to construct, deploy, and operate a constellation of 4,425 non-geostationary orbit ("NGSO") satellites using Ku- and Ka-band spectrum.[1]  Since then, the Commission has authorized SpaceX to relocate 1,584 satellites to an altitude of 550 km, where they would be able to achieve better performance and orbital debris mitigation characteristics without increasing interference to any other licensed user of the relevant spectrum, and to respace those satellites to place coverage and capacity more evenly and rapidly across more of the United States.[2]  With this application, SpaceX proposes to build on the success of its earlier modifications in accelerating broadband deployment and increasing space safety by operating the remaining satellites in its Ku/Ka-band constellation at lower altitudes.

Specifically, SpaceX proposes to relocate the satellites that are currently authorized to operate at altitudes from 1,110 km to 1,325 km down to altitudes ranging from of 540 km to 570 km, and to make related changes to the operations of the satellites in these new lower shells of the constellation.  This modification to the SpaceX Authorization will slightly reduce the total number of spacecraft in the constellation (from 4,409 to 4,408), meet all required protection criteria for other systems operating in the same frequencies, and cause no material overall

---

[1]    *See Space Exploration Holdings, LLC*, 33 FCC Rcd. 148 (2018) ("*Initial Authorization*").

[2]    *See Space Exploration Holdings, LLC*, 34 FCC Rcd. 2526 (IB 2019) ("*First Modification*"); *Space Exploration Holdings, LLC*, 34 FCC Rcd. 12307 (IB 2019) ("*Second Modification*").

1

By using a lower operational altitude for its spacecraft, SpaceX will eliminate any risk from physical interaction with these SpaceX satellites for other systems operating in the 570 km to 1,325 km range – some of the most congested altitudes in low-Earth orbit.

### Post-Mission Disposal

As discussed above, SpaceX anticipates that its satellites in the proposed lower shells will reenter the Earth's atmosphere within approximately six months after completion of their mission – much sooner than the international standard of 25 years. The spacecraft's small mass and predominantly aluminum construction maximize the likelihood of atmospheric demise on re-entry. As SpaceX previously stated, all Starlink satellites launched after the first deployment will be fully demisable upon atmospheric re-entry, and no components will survive to reach the Earth's surface. Accordingly, the modification will have no effect on the risk of human casualty – which will remain zero for all launches from here on.

# EXHIBIT C

**SPACEX**

September 14, 2020

**BY ELECTRONIC FILING**

Marlene H. Dortch, Secretary
Federal Communications Commission
445 Twelfth Street, S.W.
Washington, DC 20554

    Re:   *Space Exploration Holdings, LLC, IBFS File No. SAT-MOD-20200417-00037*

Dear Ms. Dortch:

    This is to inform you that, on September 10, 2020, representatives of Space Exploration Holdings, LLC ("SpaceX") had a conference call with members of the Commission's International Bureau to discuss the above referenced application to modify SpaceX's existing authorization to deploy and operate a non-geostationary orbit ("NGSO") satellite system.[1] To facilitated the discussion, SpaceX shared the presentation attached hereto with the staff during the meeting.

    SpaceX began by providing an overview of its progress to date in deploying its Starlink constellation, including beta testing that confirms speeds above 100 Mbps of throughput and latency below 40 ms. SpaceX then addressed arguments related to radiofrequency interference and orbital debris mitigation raised in this proceeding, explaining that the modification would dramatically improve space safety while maintaining or improving the interference environment. SpaceX specifically refuted one commenter's novel contention that band splitting during in-line events occurs independently on the uplink and downlink frequencies, noting that such an approach is not practical, inconsistent with precedent, and had never even been suggested before now. SpaceX also updated the staff on the successful launch and operation of 233 additional satellites since before its last report.

Sincerely,

*/s/ David Goldman*

David Goldman
Director of Satellite Policy

SPACE EXPLORATION TECHNOLOGIES CORP.
1155 F Street, NW
Suite 475
Washington, DC 20004
Tel: 202-649-2641
Email: David.Goldman@spacex.com

---

[1]    Participants on the call are listed in Exhibit 1 hereto.

1155 F Street, NW   Suite 475   Washington, DC 20004
phone 202.649.2700   fax 202.649.2701
**spacex.com**

Marlene H. Dortch
September 14, 2019
Page 2 of 2

Attachments

cc:    International Bureau participants

**EXHIBIT 1**

**CALL PARTICIPANTS**

International Bureau

Karl Kensinger
Jameyanne Fuller
Joseph Hill
Jay Whaley

SpaceX

David Goldman
Mihai Albulet
Armor Harris
Jonathan Herman
Zahid Islam
Mary Shurtz
Ryan Wallace
Kevin Wu
Bill Wiltshire





## Starlink Deployment Status

- In the past two years, SpaceX has:

  - Built a U.S. world-leading manufacturing system, now building 120 satellites per month
  - Deployed over 700 satellites to date, now by far the largest satellite constellation in the world
  - Building gateway ground stations throughout the United States and internationally
  - On track to produce thousands of consumer user terminals per month, heading toward high-rate production
  - Begun beta service for users across multiple U.S. states
  - Tested at over 100 Mbps using standard user equipment
  - Latency <40-50ms round trip to internet
  - Rapid build-out of constellation – gearing to launch 120 satellites per month with SpaceX's reusable Falcon 9 launch system



A076

# MODIFICATION OF KU/KA-BAND LICENSE

Partial constellation modification
- Move remaining satellites to lower altitudes of 540 km to 570 km
- Align polar shells to speed deployment to Polar Regions, including Alaska

Further enhance space safety
- Updated orbital debris showing

Slightly reduce number of satellites
- Now 4,408 satellites
- Demonstrated EPFD, PFD compliance to protect space, terrestrial systems
- Demonstrated lack of significant impact on other licensed NGSO systems

| SPACEX PROPOSED MODIFICATION | | | | | |
|---|---|---|---|---|---|
| Orbital Planes | 72 | 72 | 36 | 6 | 4 |
| Satellites per plane | 22 | 22 | 20 | 58 | 43 |
| Altitude | 550 km | 540 km | 570 km | 560 km | 560 km |
| Inclination | 53º | 53.2º | 70º | 97.6º | 97.6º |

A077

# RF COMPLIANCE APPROACH: NO SIGNIFICANT INTERFERENCE

- altitude: ~ 1150km → ~550km
- min elevation: 40deg → 25deg for added system flexibility

- PFD is the same or reduced
- no FCC filings for ESs intended for operation with high altitude orbits

- G/T on satellite is reduced
- SpaceX agreed to accept Delta susceptibility increase

- Nco = 4 → Nco = 8, PFD is reduced by 3dB to account for this
- I/N does not change significantly
- no impact on geometric in-line events at a given location
- the number of gateway sites is cut in half



CDF of Number of Satellites in View (40.0°N,10.0°W)
SpaceX 4,409 sats, 550-1325km altitude, 40.0° min elev, 22.17 avg eligible sats
SpaceX 4,408 sats, 540-570km altitude, 25.0° min elev, 21.21 avg eligible sats

A078

# Improved Space Safety

- Reduced passive decay times for failed satellites and debris clouds
  - 1200 km => ~1000 year deorbit time
  - 550 km => ~5 year deorbit time
- Reduced large object collision risk
  - >100x reduction due to shorter decay
  - Further reduction from lower debris density on decay path
- Low small object densities due to atmospheric drag
- Reduced collision severity
- Despite inherently safer altitude we are still driving higher reliability
  - Since before its latest report to FCC in June, SpaceX has launched 233 satellites with no failures
- SpaceX will not fly all satellites in orbits overlapping with Amazon despite Amazon's repeated claims to the contrary
  - Nonetheless, SpaceX has not opposed others (eg, Swarm) with overlapping orbits; better addressed through coordination

A079



A080

# EXHIBIT D

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

|  |  |  |
|---|---|---|
| Application of | ) | |
| | ) | |
| SPACE EXPLORATION HOLDINGS, LLC | ) | Call Signs:  S2983 and S3018 |
| | ) | |
| For Modification of Authorization for the | ) | File No. SAT-MOD-20200417-00037 |
| SpaceX NGSO Satellite System | ) | |
| | ) | |

<u>**PETITION PURSUANT TO SECTION 1.1307(c) OF VIASAT, INC.**</u>

## SUMMARY

In July 2020, Viasat filed a petition to deny or defer an application by Space Exploration Holdings, LLC ("SpaceX") to relocate almost 3,000 of its Starlink satellites to lower orbital altitudes.  Viasat demonstrated that SpaceX's plan to crowd lower orbital altitudes and trajectories with thousands of satellites presents significant issues:  The combination of (1) a proposed significant densification of certain low-Earth orbits (LEOs), (2) SpaceX's experiential failure rate with its Starlink satellites, (3) the inability of its satellites to avoid collisions when they cannot be maneuvered effectively and reliably, and (4) the manner in which such collisions create significant additional orbital debris that further pollutes space, pose an unreasonable threat to the continued use of the shared orbital environment, and thereby compromise that environment.  This is the case not only for the altitudes and trajectories that SpaceX is authorized to use, but also for the altitudes hundreds of kilometers above and below, as well as for satellite missions that need to traverse the affected orbits.

After Viasat filed its petition, new research, studies, and filings raised serious environmental concerns relevant to SpaceX's proposed modification.  These materials include a study on the atmospheric impacts of satellite reentry, a report on the light pollution caused by Starlink satellites, and a new filing by NASA relating to the increase of space debris.  These studies bear on the environmental impacts of SpaceX's proposal, and thus on the Commission's obligations under the National Environmental Policy Act ("NEPA") and its public-interest inquiry.

As a satellite operator who shares the skies with SpaceX, Viasat values the tremendous potential for satellites to help close the digital divide, monitor global warming, detect and mitigate natural or man-made environmental disasters, and enhance myriad other aspects of modern life.  But it is our obligation as users of orbital space—and the Commission's responsibility as a regulator of its commercial use—to ensure that technologies are deployed responsibly and

i

efficiently, informed by an understanding of potential impacts to the Earth, its orbital environment, and its inhabitants.  NEPA was adopted to ensure that these environmental considerations enter the Commission's decisionmaking calculus.  SpaceX's proposal to deploy a massive fleet of satellites at a low orbital altitude implicates at least three broad categories of environmental impacts that warrant particular attention.

*First*, the Commission must carefully consider the environmental risks associated with thousands of satellites launching through the atmosphere and then reentering it in a short period of time, particularly when SpaceX is pursuing a strategy that emphasizes (1) disposability and replaceability over (2) reliability and safety, simply to advance its own commercial interests. Petition to Deny or Defer of Viasat, Inc. at 37, IBFS File No. SAT-MOD-20200417-00037 (July 13, 2020) ("Viasat Petition").  Instead of deploying a smaller fleet of environmentally friendly satellites, SpaceX treats its satellites as disposable commodities with little regard for the harmful environmental impacts they may have.  SpaceX maintains that modifying the orbital altitude of the nearly 3,000 operating satellites at issue here will greatly accelerate and compress the time period within which they burn up in the Earth's atmosphere, and will require launching at least 10,000 satellites (based on proposed satellite lifetimes, and possibly more depending on actual lifetimes) to maintain that fleet over 15 years, each of which is supposed to ultimately burn up in the atmosphere.  The launch and reentry of these satellites is likely to release harmful chemical compounds into the air that could contribute to ozone depletion and to global warming.  And given the satellite quantities at issue, there is also a risk that satellites that do *not* burn up on reentry could harm humans and the environment.

*Second*, lowering the orbital altitudes of such a vast number of non-geostationary satellites could significantly increase "light pollution" in the night sky, tarnishing its natural aesthetic beauty

and interfering with important scientific work by ground-based astronomers, among other effects. Lowering the altitude of the satellites can be expected to reflect sunlight with a brighter apparent magnitude, and SpaceX's recent efforts to reduce this light pollution have not eliminated scientific concerns.

*Third*, as Viasat has separately demonstrated, the densification of the orbital altitude range at issue with so many satellites will likely greatly increase the risk of collisions with other space objects. These collisions, in turn, would likely produce a significant amount of new orbital debris that remains in orbit for decades or even a century or more, threatening the viability of access to space for current and future generations.

These impacts are significant in their own right. And the manner in which the Commission addresses them also will have a significant effect on the environmental impacts to be expected from other large LEO constellations. Commission action on SpaceX's pending modification application will set the precedent for the design and deployment of large constellations by other operators—consisting of many tens (or hundreds) of thousands of additional LEO satellites.

Because SpaceX's application is likely to have significant impacts on the environment, and because the full scope of these effects remains unknown to and unexplored by the Commission (particularly in light of the new evidence cited herein), the Commission should prepare an environmental impact statement ("EIS") under NEPA before acting on SpaceX's proposed modification. At the very minimum, an environmental assessment ("EA") is required.

**TABLE OF CONTENTS**

SUMMARY ........................................................................................................ i

INTRODUCTION ............................................................................................ 2

DISCUSSION .................................................................................................. 5

   I.   NEPA Requires That Agencies Take a Hard Look at the Potential Environmental Consequences of Their Actions. ......................................................... 5

  II.  SpaceX's Modification Proposal Would Likely Have a Significant Impact on the Environment ................................................................................. 8

     A.  According to SpaceX, Its Modification Proposal Would Accelerate the Time Period Within Which Its Satellites Reenter the Atmosphere. ...................................... 9

     B.  SpaceX's Modification Proposal Would Likely Increase Light Pollution. ............... 16

     C.  SpaceX's Modification Would Likely Increase Space Debris. ................................. 21

CONCLUSION ................................................................................................ 27

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

_____

| | |
|---|---|
| Application of | ) |
| | ) |
| | ) |
| SPACE EXPLORATION HOLDINGS, LLC | )  Call Signs:  S2983 and S3018 |
| | ) |
| For Modification of Authorization for the | )  File No. SAT-MOD-20200417-00037 |
| SpaceX NGSO Satellite System | ) |
| _____ | ) |

 

**PETITION PURSUANT TO SECTION 1.1307(c) OF VIASAT, INC.[1]**

Viasat, Inc. respectfully requests that the Commission deny or defer consideration of the above-referenced modification application of SpaceX.  For the reasons explained below, the Commission should prepare an EIS fully evaluating the environmental impacts of SpaceX's proposed action pursuant to NEPA, before acting upon SpaceX's application.  In the alternative, the Commission should prepare an EA before acting upon SpaceX's application.  This request for relief is supplemental to the relief sought in Viasat's initial petition.

_____

[1]   Pursuant to Sections 1.1307(c) and 1.1313(a) of the Commission's rules, 47 C.F.R. §§ 1.1307(c), 1.1313(a), Viasat respectfully submits this petition as a supplement to the July 13, 2020 Petition to Deny or Defer of Viasat, Inc., IBFS File No. SAT-MOD-20200417-00037.  This petition brings to the Commission's attention recently released studies and expands on the issues raised in Viasat's initial petition.  It is timely because it raises authorities that had not yet been released at the time of Viasat's initial petition, which itself was timely filed under § 25.154(a)(2), 47 C.F.R. § 25.154(a)(2).  In the alternative, the Commission may deem this an informal objection under Sections 1.1313(b) and 25.154(b), _id._ §§ 1.1313(b), 25.154(b).

Regardless of how this petition is classified, the National Environmental Policy Act requires the Commission "'to consider every significant aspect of the environmental impact of a proposed action,'" _Balt. Gas & Elec. Co. v. NRDC_, 462 U.S. 87, 97 (1983), including the impacts set forth in this petition, _see_ 42 U.S.C. § 4332(2)(C).  The issues addressed herein also bear on whether the requested modification would "serve the public interest, convenience, and necessity."  47 C.F.R. § 25.117(d)(2)(ii).

## INTRODUCTION

Commercial use of space is at a crossroads.  Recent developments in satellite technology may deliver high-speed, low-latency Internet access to people in geographic areas that are otherwise difficult to serve.  Some applicants propose to provide this service primarily by launching unprecedented numbers of low-cost satellites into LEO.  But history has shown that rapidly deploying new technology in new ways, without pausing to carefully consider the environmental consequences, is a recipe for disaster.  Here, SpaceX seeks permission to lower the orbital altitude of its growing fleet of Starlink satellites—to be followed by tens of thousands of additional LEO satellites proposed in its other filings.  SpaceX views these satellites as disposable assets, which it predicts will reenter the atmosphere in a steady stream during the life of the program.  Yet new scientific evidence suggests that crowding large fleets of such satellites into lower orbits could cause serious environmental harms related to global warming, light pollution, and orbital debris.  Viasat accordingly supplements its earlier petition in this proceeding to bring these matters to the Commission's attention, and it respectfully urges the Commission to fully consider the environmental consequences of SpaceX's application in accordance with NEPA and considerations of the public interest.

By way of background, the Commission in March 2018 authorized SpaceX to "construct, deploy, and operate a proposed non-geostationary orbit (NGSO) satellite system comprising 4,425 satellites for the provision of fixed-satellite service (FSS) around the world."  *Space Expl. Holdings, LLC*, 33 FCC Rcd. 3391, 3391 (2018).  Later that year, the Commission authorized SpaceX to "add a very-low-Earth orbit (VLEO) NGSO constellation, consisting of 7,518 satellites," for a total of about 12,000 authorized satellites.  *Space Expl. Holdings, LLC*, 33 FCC Rcd. 11,434, 11,435 (2018).  SpaceX has since sought to modify the March 2018 authorization three times, including its most recent request to relocate 2,824 satellites that were previously authorized for operation at

2

altitudes ranging from 1,100 km to 1,330 km to new altitudes ranging from 540 km to 570 km. *See* Application for Modification of Authorization for SpaceX NGSO Satellite System at i, IBFS File No. SAT-MOD-20200417-00037 (Apr. 17, 2020) ("SpaceX Application").

Viasat opposed SpaceX's proposal in a July 2020 petition, citing concerns about space safety, collision risks, and the need to facilitate the "shared use of space." Viasat Petition at 48. Shortly after Viasat filed its petition, new evidence about the environmental effects of SpaceX's proposal came to light. For example, the Aerospace Corporation published a preliminary study analyzing the environmental impacts of satellite reentry on the Earth's atmosphere. Researchers presented that data at a conference just this month. *See* Debra Werner, *Aerospace Corp. Raises Questions About Pollutants Produced During Satellite and Rocket Reentry*, SpaceNews (Dec. 11, 2020), http://spacenews.com/aerospace-agu-reentry-pollution/. Members of the SATCON1 Scientific Organizing Committee published a thorough report in August 2020 analyzing the light-pollution effects of Starlink satellites. Constance Walker et al., *Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigation* (2020). And NASA recently wrote to the Commission about the ways in which certain LEO satellite constellation deployments could exacerbate the space-debris crisis. Letter from Samantha Fonder, NASA Representative to the Commercial Space Transp. Interagency Grp., to Marlene Dortch, Sec'y, FCC (Oct. 29, 2020). None of these materials was available when Viasat filed its petition, and further research has revealed a significant body of additional studies, reports, and articles addressing matters directly relevant to SpaceX's proposed modification.

These publications bear on the Commission's legal responsibilities in reviewing SpaceX's application. NEPA embodies a national policy against acting first and thinking later by imposing an affirmative, statutory obligation on federal agencies "to consider every significant aspect of the

environmental impact of a proposed action." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). The Commission also has an independent obligation to reject "[a]pplications for modifications of space station authorizations" that "would not serve the public interest, convenience, and necessity." 47 C.F.R. § 25.117(d)(2)(ii).

Here, numerous studies, articles, and papers indicate that SpaceX's proposal to dramatically increase its fleet of lower-altitude satellites could increase the generation of particles that contribute to global warming and significantly alter the chemistry of the atmosphere; harm humans and their environment if its satellites do not fully burn up on reentry; create excessive light pollution that interferes with the ability of astrophotographers, astronomers, and ordinary stargazers to study and enjoy space; and increase the risk of collisions due to excessive space junk and overcrowding in space. To be clear, these potentially significant environmental harms are specific to proposals (like SpaceX's) to deploy and maintain massive LEO satellite constellations; smaller-scale, more routine deployments may well avoid significant environmental impacts. But given the sheer quantity of satellites at issue here, as well as the unprecedented nature of SpaceX's treatment of them as effectively expendable, the potential environmental harms associated with SpaceX's proposed modification are significant. NEPA accordingly demands that the Commission prepare an EIS before acting on SpaceX's application—or, at a minimum, that it prepare an EA to further explore these issues before doing so. While SpaceX contends that some of these risks have been or will be reduced, experience teaches that SpaceX's claims do not always match reality, and in any event NEPA requires that the analysis be performed, even if the Commission ultimately concludes that some of the effects can be mitigated with appropriate conditions.

Inaction, however, is not a viable option. Relying on the Commission's decades-old categorical exemption to avoid even *inquiring* into the environmental consequences of SpaceX's modification proposal would not only violate NEPA, but also would needlessly jeopardize the environmental, aesthetic, health, safety, and economic interests that it seeks to protect, and harm the public interest. Commission action (or inaction) on SpaceX's pending modification application will set the precedent for the design and deployment of large LEO constellations by other operators— consisting of many tens (or hundreds) of thousands of additional satellites.

Now is the time for satellite operators and federal regulators to proactively analyze the consequences of recently emerging satellite technologies and practices, ensuring that the numerous benefits of innovative satellite technology can be enjoyed for years to come in a way that reflects responsible stewardship of the Earth and the skies.

## DISCUSSION

## I.     NEPA Requires That Agencies Take a Hard Look at the Potential Environmental Consequences of Their Actions.

NEPA establishes the "continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may," among other things, "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," and "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. § 4331(b). To that end, NEPA requires every agency, before taking a "major Federal actio[n] significantly affecting the quality of the human environment," to prepare an EIS that details the environmental impacts of the proposed action, their significance, and possible alternatives to the proposed action. *Id.* § 4332(2)(C). Agency approval of a project conducted by a private party—whether "approved by

permit or other regulatory decision"—may qualify as a major federal action.    40 C.F.R. § 1508.1(q)(3)(iv).

In implementing NEPA, the Council on Environmental Quality ("CEQ") has grouped federal actions into three overarching categories.  First, an agency may conclude that a certain type of action "[n]ormally does not have significant effects" on the environment.    40 C.F.R. § 1501.3(a)(1).  Such actions may be "categorically excluded" from further NEPA review, *id.*, unless "extraordinary circumstances" indicate that the action "may have a significant effect," *id.* § 1501.4(b).  Second, if an action "[i]s not likely to have significant effects or the significance of the effects is unknown," the agency must prepare an "environmental assessment" ("EA") before taking the action.  *Id.* § 1501.3(a)(2).  An EA briefly discusses the purpose and need for the proposed action, alternatives to the proposed action, the environmental impacts of the proposed action and alternatives, the agencies and persons consulted, and provides sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact.  *Id.* § 1501.5(c).  If the EA determines that no significant impact to the environment will occur, agencies typically issue a Finding of No Significant Impact ("FONSI") to document their decision. Finally, if an action is "likely to have significant effects" on the environment, the agency must prepare an EIS.  *Id.* § 1501.3(a)(3); *see also Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) ("If *any* 'significant' environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken.").

When determining the significance of environmental effects, agencies must consider, among other things, both the short-term and long-term effects of the action, both the beneficial and adverse effects of the action, and the effects of the action on public health and safety.  40 C.F.R.

§ 1501.3(b)(2).  Agencies must also consider the affected environmental area and its resources. *Id.* § 1501.3(b)(1).

The CEQ has directed agencies to adopt their own regulations identifying which types of actions typically are categorically exempt from NEPA review, which typically require an EA, and which typically require an EIS.  40 C.F.R. § 1507.3(e)(2).  The Commission's regulations, adopted in 1986, construe the categorical exemption broadly:  They extend the exemption to *all* Commission actions that do not fall within three narrow categories.  *See* 47 C.F.R. §§ 1.1306(b), 1.1307(a)–(b) (excepting only actions involving special locations, such as wildlife preserves and historic sites; actions involving high-intensity lighting; and actions resulting in human exposure to excessive radiofrequency levels).

Under § 1.1307(c), however, any interested person may submit a petition explaining that "a particular action, otherwise categorically excluded, will have a significant environmental effect."  47 C.F.R. § 1.1307(c).  The Bureau must review the petition and, if it determines that the action "*may* have a significant environmental effect," it must require the applicant to prepare an EA.  *Id.* (emphasis added).

Given the breadth of the Commission's categorical exemption, NEPA requires the Commission to seriously consider petitions asserting that an otherwise exempted action is likely to have a significant environmental impact.  *See Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1032–34 (D.C. Cir. 2008); *see also* 40 C.F.R. § 1501.4(b) (stating that categorical exclusions do not apply if "extraordinary circumstances" indicate that the action "may have a significant effect").  A lack of specific scientific evidence or consensus is not itself a sufficient reason to decline to prepare an EA.  Indeed, the existence of conflicting scientific studies "confirms, rather than refutes," that an action *may* have a significant impact and thus is ineligible for a categorical

exemption.  *Id.* at 1033–34.  And because "the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known," courts "reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'"  *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1091–92 (D.C. Cir. 1973).

NEPA plays a particularly important role in requiring federal agencies to seriously consider the environmental impacts of new forms of technology.  Indeed, "[o]ne of NEPA's main functions was to bolster [the] capacity to understand and control the effects of new technology."  *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 147 (D.C. Cir. 1985); *see* 42 U.S.C. § 4331(a) (expressing concern that the effects of "new and expanding technological advances" might threaten the environment).  NEPA thus requires the Commission to take a "hard look" at the environmental impact of allowing SpaceX to relocate its satellites—*before* approving the proposed modification.  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 303 (D.C. Cir. 2013); *see Sierra Club*, 717 F.2d at 1413.

## II.     SpaceX's Modification Proposal Would Likely Have a Significant Impact on the Environment.

SpaceX's proposal to lower the orbital altitude of nearly 3,000 satellites is likely to have a significant effect on the environment in at least three main ways.  First, SpaceX expects that the proposal will dramatically accelerate the time period within which its satellites will reenter and burn up in the atmosphere. As explained by SpaceX, this application is the first step in launching a massive amount of satellites in the future.  At least 10,000 satellites are expected to be launched within 15 years to maintain the fleet at issue (possibly many more when early failures are factored in).  These reentries and launches could affect the chemical composition of Earth's atmosphere,

and could also pose safety risks to aircraft and human populations. Second, the proposal threatens to create significant light pollution, as the apparent magnitude of the satellites would be brighter. And third, the proposal would densify the orbital altitude at issue, and, coupled with SpaceX's experiential failure rate, would unreasonably increase the risks of collisions and the creation of new space debris.

A. **According to SpaceX, Its Modification Proposal Would Accelerate the Time Period Within Which Its Satellites Reenter the Atmosphere.**

If SpaceX's modification proposal were granted, the 2,824 satellites at issue would join a fleet of 1,584 operating satellites that the Commission already permitted SpaceX to relocate from altitudes above 1,110 km to lower altitudes around 550 km, producing a total fleet of 4,408 operating satellites at altitudes ranging from about 540 km to about 570 km. *See Space Expl. Holdings, LLC*, 34 FCC Rcd. 2526 (Apr. 26, 2019). SpaceX explains that this reduction in orbital altitude would dramatically accelerate the time period within which many thousands of its satellites would burn up in the Earth's atmosphere. At the previously authorized altitudes, it would take centuries for the satellites to passively deorbit; at lower altitudes, SpaceX says that it "will take less than five years (even under worst-case assumptions)." SpaceX Application at 7. SpaceX touts this as beneficial to the environment, claiming that the hastened reentry of its satellites into the Earth's atmosphere will promote a cleaner orbital environment. SpaceX Application at ii, 7; SpaceX Ex Parte Filing at 9, IBFS File No. SAT-MOD-20200417-00037 (Sept. 14, 2020).

But the reduced time in orbit is not an unalloyed good. Maintaining this fleet of 4,408 operating satellites would require SpaceX to launch what it estimates as about 10,000 satellites over the course of 15 years (based on proposed satellite lifetimes). Letter from William M. Wiltshire, Counsel to SpaceX, to Jose P. Albuquerque, Chief, Satellite Div., Int'l Bureau, FCC at 5–6, IBFS File No. SAT-MOD-20200417-00037 (May 15, 2020). This number could be even

higher if SpaceX needs to replenish its fleet at a faster rate due to unanticipated failures or shorter-than-expected actual life, as has happened for many of the satellites that SpaceX has already launched. *See* Morgan McFall-Johnsen, *About 1 in 40 of SpaceX's Starlink Satellites may have Failed*, Business Insider (Oct. 16, 2020), http://www.businessinsider.com.au/spacex-starlink-internet-satellites-percent-failure-rate-space-debris-risk-2020-10. To put these numbers into perspective, humans have launched about 9,000 satellites *total* since space exploration first began. *Why in the Next Decade Companies Will Launch Thousands More Satellites than in All of History*, CNBC (Dec. 15, 2019), http://www.cnbc.com/2019/12/14/spacex-oneweb-and-amazon-to-launch-thousands-more-satellites-in-2020s.html. In effect, SpaceX anticipates treating its satellites as disposable, with little regard for the harmful environmental impacts they may have, rather than deploying a smaller, more efficient and environmentally friendly fleet of satellites.

Given the unprecedented nature of SpaceX's proposal, there is no base of experience on which the Commission can draw to determine that granting the proposed modification—and thus permitting the launch and decay of at least 10,000 low-Earth-orbit satellites within the span of less than two decades—will have "no significant effect on the quality of the human environment" and thus can be "categorically excluded from environmental processing." 47 C.F.R. § 1.1306(a). SpaceX's plan to dramatically accelerate the time period within which its satellites will reenter the atmosphere could create several potentially significant atmospheric and safety-related impacts—impacts that the Commission must consider.

## 1. Impacts on Atmosphere

SpaceX's modification proposal could affect Earth's atmosphere in several ways. First, each satellite launch contributes to ozone depletion because rockets emit ozone-destroying compounds. Martin Ross et al., *Limits on the Space Launch Market Related to Stratospheric Ozone Depletion*, 7 Astropolitics 50 (2009). Many rockets emit highly reactive compounds that

"accumulate in the stratosphere," where they "drive ozone destroying catalytic reactions." *Id.* at 52. Because these reactive compounds naturally comprise only about one-thousandth of the ozone layer, "relatively small absolute amounts of these reactive compounds can significantly modify ozone levels." *Id.* Rockets thus "have a significant potential to become a significant contributor to the problem of stratospheric ozone depletion." *Id.*

Ozone depletion significantly harms the human environment. Among other things, it increases the amount of ultraviolet radiation that reaches Earth, which leads to increased rates of skin cancer and cataracts. M. Norval et al., *The Effects on Human Health from Stratospheric Ozone Depletion and Its Interactions with Climate Change*, 6 Photochemical & Photobiological Scis. 232 (2007). Based on SpaceX's launches to date, each of which has carried about 60 satellites, *see* Jeff Foust, *SpaceX Reaches 100 Successful Launches with Starlink Mission*, SpaceNews (Oct. 24, 2020), http://spacenews.com/spacex-reaches-100-successful-launches-with-starlink-mission, more than 165 launches can be expected to launch at least 10,000 satellites over 15 years. NEPA requires the Commission to consider the impact on stratospheric ozone levels of authorizing the deployment of such a large number of satellites into low-altitude orbit.

Second, the dramatic acceleration of satellites burning up in the atmosphere during their reentry and demise could harm the stratosphere and global climate. When satellites built from aluminum burn up, they can produce aluminum oxide (also called "alumina"), a substance that may contribute to radiative forcing—a phenomenon partially responsible for climate change. *See* Martin N. Ross & Patti M. Sheaffer, *Radiation Forcing Caused by Rocket Engine Emissions*, 2 Earth's Future 177 (2014). This is so because alumina absorbs more radiation coming up from the Earth than it reflects coming from the sun, thus warming the stratosphere and likely the upper troposphere. *Id.* at 193. The Starlink satellites are of "predominantly aluminum construction."

11

SpaceX Application, Attachment A, at 24.  Just weeks ago, researchers predicted that the reentry of satellite constellations like SpaceX's could cause as much as 22,050,000 lbs of alumina to exist in the atmosphere at one time.  Lee Organski et al., Aerospace Corp., *Environmental Impacts of Satellites from Launch to Deorbit and the Green New Deal for the Space Enterprise* (presented Dec. 2020).  The Commission must evaluate what effects such a large increase in atmospheric alumina might have on our climate.

The high volume of reactive chemicals produced by 10,000 or more satellites burning in the atmosphere could also have significant impacts that would remain unknown without NEPA review.  Recent research suggests that "particles from reentering space junk will be a zoo of complex chemical types," that "[r]eentry is as much of an 'emission' as launch," and "[v]ery little is known about reentry dust production, the microphysics of the particles and how reentry dust could affect climate and ozone."  Martin N. Ross & Leonard David, *An Underappreciated Danger of the New Space Age: Global Air Pollution*, Sci. Am. (Nov. 6, 2020), http://www.scientificamerican.com/article/an-underappreciated-danger-of-the-new-space-age-global-air-pollution/.  Moreover, "[s]ome particles are very reactive, so small amounts of them could have a significant effect on atmospheric chemistry."  Leonard David, *How Much Air Pollution Is Produced by Rockets?*, Sci. Am. (Nov. 29, 2017), http://www.scientificamerican.com/article/how-much-air-pollution-is-produced-by-rockets/.

Moreover, this application cannot be considered in isolation; the Commission must account for the fact that SpaceX is building out, not reducing, the size of its low-Earth-orbit fleet.  SpaceX already has authorization for about 12,000 operating low-Earth-orbit satellites, and it has separately proposed launching 30,000 additional operating satellites, for a total of about 42,000 operating satellites.  *See* Application for Approval for Orbital Deployment and Operating

Authority for the SpaceX Gen2 NGSO Satellite System at ii, IBFS File No. SAT-LOA-20200526-00055 (May 26, 2020).  Maintaining that fleet will require launching *multiples* of that number over a 15-year license term, given the 5-year design life of the satellites, and an equal number will demise in the Earth's atmosphere.

Because "the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the action is taken and those effects fully known," *Scientists' Inst. for Pub. Info.*, 481 F.2d at 1091–92, NEPA obligates the Commission to conduct further research to understand the impacts of SpaceX's proposal on atmospheric chemistry.

### 2.        Impacts on Aircraft and Surface

As a general matter, it is estimated that about 60–90% percent of a satellite's mass burns up during reentry, leaving about 10–40% that reaches the surface. *Satellite Reentry: Manipulating the Plunge*, Aerospace Corp. (May 5, 2018), http://aerospace.org/article/satellite-reentry-manipulating-plunge.  This falling space debris ordinarily does not pose a grave threat because, as the National Environmental Satellite Data and Information Service notes, it's "largely a numbers game." *Does Space Junk Fall from the Sky?*, Nat'l Env't Satellite Data & Info. Serv. (Jan. 19, 2018), http://www.nesdis.noaa.gov/content/does-space-junk-fall-sky.  The fact that humans inhabit a relatively small percentage of the Earth's surface, combined with the currently small number of objects entering the atmosphere each year (between 200 and 400), makes it relatively unlikely that a human settlement will be harmed by space debris.  *Id.*

But SpaceX's plan to launch and operate over 10,000 satellites at lower altitudes (from one of its authorized constellations alone) could increase the risk of health-related harm to the human environment to an unacceptable level.  *See* 40 C.F.R. § 1508.1(g)(1) (effects on human environment include "health effects").  In particular, "[r]isks to aircraft posed by small debris surviving a reentry might be a major problem" if SpaceX's proposal is granted.  William H. Ailor,

Aerospace Corp., *Large Constellation Disposal Hazards* 14 (2020). By 2030, SpaceX's 4,425 operating low-orbit satellites could have a cumulative aircraft-related casualty expectation of as high as 0.13 per year, or about 1 casualty every 8 years, and SpaceX's 7,518 operating very-low-orbit satellites (between 340 and 370 km) could have a casualty expectation as high as 1 every 4 years. *Id.* at 12. The cumulative aircraft-related casualty expectation for *any* debris striking aircraft (not limited to SpaceX) could approach 1 per year. *Id.* at 13. Even if some of these precise figures are "likely overstated" to some extent, *id.* at 12, the risks of health-related environmental harms they identify are nevertheless significant and real.

Similarly, "[h]azards to people on the ground will also be a problem." Ailor, *supra*, at 15. By 2030, it is predicted that falling satellite debris could harm a person on the Earth's surface as often as every 4 years. *Id.* at 8. SpaceX's 4,425 operating low-orbit satellites could cause a casualty (again, based on their originally authorized altitude) on the surface as often as once every 18 years, whereas SpaceX's 7,518 operating very-low-orbit satellites could cause such a casualty once every 9 years. *Id.* This problem is not purely hypothetical; in the picture below, Lottie Williams is holding a piece of reentered debris that brushed her shoulder:



*Id.* at 5–6.

One way of mitigating these hazards to people on Earth's surface is to design satellites with longer lifetimes and "reduce the number reentering each year." Ailor, *supra*, at 14. SpaceX does

exactly the opposite: expecting tens of thousands of satellites to burn up in the atmosphere in a couple of decades. The Commission is required to consider the long-term effects of SpaceX's proposal on public health and safety. *See* 40 C.F.R. § 1501.3(b)(2).

And harm to humans is only one environmental concern associated with space debris. Any debris that survives re-entry will land *somewhere*, polluting the Earth's natural landscape and oceans. Burning debris, moreover, could cause a fire, resulting in potentially severe environmental consequences. In 2017, for example, parts of a rocket used for a Russian space launch fell to Earth and caused a fire on the steppes of Kazakhstan that spread almost 10 miles. *Kazakh Man Dies in Fire After Russian Rocket Launch: Govt.*, Phys.org (June 15, 2017), http://phys.org/news/2017-06-kazakh-dies-russian-rocket-govt.html. The Commission must consider these potential impacts on Earth's natural resources, especially if, as SpaceX claims, reentries will occur sooner.

SpaceX has said that it now expects its satellites to completely burn up in the atmosphere. *See* Letter from William M. Wiltshire, Counsel to SpaceX, to Jose P. Albuquerque, Chief, Satellite Div., Int'l Bureau, FCC at 3, IBFS File No. SAT-MOD-20181108-00083 (Mar. 13, 2019) (stating that "SpaceX has now developed a system architecture that will be completely demisable"). But the Commission cannot take that assertion at face value; NEPA obligates the Commission to take a "hard look" at whether satellite debris is likely to have environmental impacts on Earth's surface. *WildEarth Guardians*, 738 F.3d at 303. And in any event, even if SpaceX's satellites completely burn up in the atmosphere, this means *more* alumina accumulating in the stratosphere and contributing to radiative forcing—another factor the Commission must consider.

The environmental effects caused by satellite launches and reentries are likely to be significant, requiring the Commission to prepare an EIS. *See* 40 C.F.R. § 1501.3(a)(3). At the very least, the environmental effects of SpaceX's proposed modification are unknown, requiring

an EA to further study them.  *See id.* § 1501.3(a)(2).  There is no basis to conclude that SpaceX's proposal will have no significant environmental impacts.

**B.     SpaceX's Modification Proposal Would Likely Increase Light Pollution.**

New research also raises serious light-pollution concerns related to SpaceX's modification proposal.  Large satellite fleets can reflect sunlight towards the Earth's surface.  Often visible even to the naked eye, this light pollution "significantly affect[s] the quality of the human environment" by creating aesthetic, scientific, social, cultural, and health effects.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.1(g)(1).

**1.     Impacts of Light Pollution**

Aesthetic Effects.   Light pollution from Starlink mega-constellations can create an aesthetic distraction for any stargazer and can pose particular challenges for astrophotographers by leaving bright streaks of light across the exposures they capture.  *See* Luc H. Riesbeck et al., Aerospace Corp., *The Future of the Night Sky: Light Pollution from Satellites* 2–3 (2020).  Consider this photograph of Bryce Canyon, in Utah, "photobombed" by a Starlink constellation:



Walker et al., *supra*, at 4.  Or consider this photograph of the Comet NEOWISE (C/2020 F3), which reportedly was ruined by Starlink satellites:

16



Chris Young, *Starlink Satellites Ruin Comet NEOWISE Time-Lapse Image*, Interesting Eng'g (July 24, 2020), http://interestingengineering.com/starlink-satellites-ruin-comet-neowise-time-lapse-image.

Scientific Effects.  The aesthetic problems of Starlink mega-constellations are not limited to casual stargazers and photographers.  Light pollution poses a particular threat to professional astronomers' enjoyment and study of the night sky because "no currently apparent combination of known mitigations can completely avoid the impacts of the satellite trails on the science programs of the coming generation of optical astronomy facilities."  Walker et al., *Appendices to "Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigations"* 49 (2020) (emphasis omitted) ("*Appendices*").  This picture from an observatory illustrates the problem:

D.L. Cade, *Astronomers Warn Starlink Satellites Could Have a 'Fatal' Impact on Astrophotography*, PetaPixel (Aug. 28, 2020), http://petapixel.com/2020/08/28/astronomers-warn-starlink-satellites-may-have-a-fatal-impact-on-astrophotography/.

<u>Social & Cultural Effects.</u>  Beyond aesthetics, the night sky also has "cultural and social value that is difficult, if not impossible, to quantify in dollars." *Appendices*, *supra*, at 106.  Among those affected by light pollution visible to the naked eye are "casual stargazers and people whose cultural and religious practices involve use of the night sky." *Id.* at 107.  Hundreds of amateur astronomy organizations exist across the country, many of which host viewing nights and stargazing parties that could be affected by light pollution.  Go Astronomy, *Astronomy Club Directory* (last accessed Dec. 21, 2020), http://www.go-astronomy.com/astro-club-search.htm.

<u>Health Effects.</u>  Light pollution in general is known to have negative health consequences. *See* Fabio Falchi et al., *Limiting the Impact of Light Pollution on Human Health, Environment and Stellar Visibility*, 10 J. Env't Mgmt. 2714 (2011); Ron Chepesiuk, *Missing the Dark: Health Effects of Light Pollution*, 117 Env't Health Persps. 20 (2009).  More specifically here, though, light pollution from satellites may affect human health because of its impact on stargazing—an

18

A104

activity that can contribute to health and well-being. *See* Rebecca Bell et al., *Dark Nature: Exploring Potential Benefits of Nocturnal Nature-Based Interaction for Human and Environmental Health*, 5 Eur. J. Ecopsychology 1, 10 (2014) ("Stargazing might cultivate wellbeing through increased physical and social activity in addition to developing personal growth through sense of achievement. A range of transcendent and spiritual elements which are seen as an integrative component in health and wellbeing . . . were highlighted by participants.").

### 2.    The Proposed Modification's Effect on Light Pollution

Astronomical organizations have recently drawn attention to the light-pollution problems caused by launching large numbers of satellites. For example, the American Astronomical Society warned that mega-constellations create "the potential for substantial adverse impacts to ground- and space-based astronomy." Am. Astronomical Soc'y, *AAS Issues Position Statement on Satellite Constellations* (June 10, 2019), http://aas.org/press/aas-issues-position-statement-satellite-constellations. Other organizations have voiced significant scientific concerns about the Starlink program specifically and how it will affect astronomical research. *See*, *e.g.*, Royal Astronomical Soc'y, *RAS Statement on Starlink Satellite Constellation* (June 7, 2019), http://ras.ac.uk/news-and-press/news/ras-statement-starlink-satellite-constellation; *see also* Int'l Astronomical Union, *IAU Statement on Satellite Constellations* (June 3, 2019), http://www.iau.org/news/announcements/detail/ann19035/.

These concerns are well founded. New scientific research suggests that light pollution from satellite mega constellations orbiting at the altitude requested in SpaceX's proposed modification may have substantial adverse astronomical effects. In particular, visibility simulations indicate that astronomers should expect "significant negative impacts" from the Starlink program for satellites orbiting below 614 kilometers—even among SpaceX's proposed second-generation satellites. Walker et al., *supra*, at 3. At the altitude proposed in the

19

modification, "wide-field astrophotography would be severely impacted by the fully-deployed Starlink Generation 2 . . . constellation[]." *Id.* at 15.

Starlink's light-pollution problems are especially pronounced given (1) the sheer quantity of satellites in the overall proposal, and (2) the altitude at which they will orbit. Light pollution can be mitigated by reducing the number of satellites in orbit. *Id.* at 5. But, as noted, SpaceX is moving toward 42,000 operating satellites. *See* Application for Approval for Orbital Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System at ii, IBFS File No. SAT-LOA-20200526-00055 (May 26, 2020). In its application requesting approval for an additional 30,000 operating satellites, SpaceX goes so far as to "guarante[e]" that there will be "*multiple satellites in view* for every customer located at *any* point on the ground." *Id.* (emphases added).

Moreover, the proposal directly at issue here would bring nearly 3,000 operating satellites hundreds of kilometers *closer* to Earth than originally contemplated. Because the brightness of a satellite "is a function of the altitude of [that] satellite[,]" lowering the altitude of Starlink satellites generally risks making them brighter—the lower the satellite, the brighter the apparent magnitude. Riesbeck et al., *supra*, at 12. These concerns remain despite SpaceX's recent mitigation efforts and promises to darken its satellites; indeed, SpaceX has admitted that it is impossible to fully eliminate its satellites' light pollution. SpaceX, *Astronomy Discussion with National Academy of Sciences* (Apr. 28, 2020), http://www.spacex.com/updates/starlink-update-04-28-2020/.

The Commission cannot duck these concerns on the asserted ground that it "does not have jurisdiction over the visibility of satellites." SpaceX Application at 12. There is no doubt that light pollution is a relevant consideration for the Commission. *See* 47 C.F.R. § 1.1307(a)(8). And NEPA permits—indeed, *requires*—the Commission "to consider every significant aspect of the environmental impact of [the] proposed action." *Balt. Gas & Elec. Co.*, 462 U.S. at 97. Granting

20

SpaceX's proposed modification would bring the satellites closer to Earth, making those satellites appear brighter. The Commission's decision thus will directly affect the amount of light pollution in the environment, placing NEPA responsibilities squarely on the Commission's shoulders. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765–70 (2004).

At the very least, the effects of light pollution from large satellite constellations "remain underexamined." Riesbeck et al., *supra*, at 2. And NEPA review is especially important in cases involving "expanding technology" with unknown environmental impacts. Note, *The Fault in Our Stars: Challenging the FCC's Treatment of Commercial Satellites as Categorically Excluded from Review Under the National Environmental Policy Act*, 22 Vand. J. Ent. & Tech. L. 923, 943 (2020); *see also Found. on Econ. Trends*, 756 F.2d at 147. The Commission should prepare an EIS to study these effects; at a minimum, it must prepare an EA.

### C.    SpaceX's Modification Would Likely Increase Space Debris.

Finally, SpaceX's proposed modification is likely to worsen the space-debris crisis, foreclosing a finding that it will not cause a significant environmental impact.

### 1.    Space Debris Poses Serious Environmental Harms.

Space debris, or orbital debris, refers to any artificial material orbiting Earth other than functioning spacecraft, "ranging from flakes of paint from a spacecraft to an intact satellite that has stopped functioning." *The Fault in Our Stars*, *supra*, at 931; *see* Space Debris, NASA, http://www.nasa.gov/centers/hq/library/find/bibliographies/space_debris (last visited Dec. 21, 2020). Satellites can become space debris after failures—including the types of satellite failures that SpaceX has experienced to date at unexpected levels—render them unable to be maneuvered into lower orbits and disposed of as originally planned, causing them to remain in space longer than expected. *See* Viasat Ex Parte Filing at 3–5, IBFS File No. SAT-MOD-20200417-00037 (Dec. 21, 2020); Viasat Ex Parte Filing at 1–4, IBFS File No. SAT-MOD-20200417-00037 (Nov.

19, 2020).  Satellites also can become space debris due to collisions with other space objects that fragment them into many small pieces that spread into orbits many hundreds of kilometers away, with orbital lifetimes of up to 100 (or even more) years, polluting other orbits, endangering other satellites, and disrupting vital communications services, both near- and long-term.  Viasat Petition at iii, 3, 7, 17, 36.  Indeed, the "largest source of debris in the future is expected to be accidental collisions."  Marlon Sorge, Aerospace Corp., *Commercial Space Activity and Its Impact on U.S. Space Debris Regulatory Structure* 5 (2017).

Space debris is already pervasive above the Earth's atmosphere.  There are "millions of pieces of space junk flying in [low-Earth orbit]," which "can reach speeds of 18,000 miles per hour, almost seven times faster than a bullet."  *Space Debris*, *supra*.  As the following picture illustrates, low-Earth orbit has been described as "the world's largest garbage dump," and removing space debris is an expensive endeavor—if doing so is even possible for large amounts of small fragments.  *Id.*



*Id.*

The Commission has long acknowledged that such debris "poses a potential risk" to (1) "the continued reliable use of these orbital regimes for space-based services and operations" and

(2) "the continued safety of persons and property in space and on the surface of the Earth." *Mitigation of Orbital Debris*, 19 FCC Rcd. 11,567, 11,570 (2004). Collisions involving even very small debris moving at high speeds "are capable of producing significant damage." *Id.* And collisions further amplify the debris problem by "produc[ing] a large amount of additional debris, which can be disbursed over a wide orbital area." *Id.*

Because of those risks, space debris threatens to "significantly affect[t] the quality of the human environment" in multiple ways. 42 U.S.C. § 4332(2)(C).

*First*, space debris may cause severe "ecological" harm to the "functioning of [the] affected ecosyste[m]," *i.e.*, the near-Earth orbital environment. 40 C.F.R. § 1508.1(g)(1). "The main cost and risk of collisions with debris is the generation of further debris, which could ultimately lead to the so-called Kessler syndrome of cascading, self-generating collisions" and "render certain orbits unusable." Marit Undseth et al., *Space Sustainability: The Economics of Space Debris in Perspective* 7 (2020). Even short of that "ecological tipping point," *id.*, space debris interferes with human efforts to explore and develop near-Earth space.

*Second*, space debris may cause severe "economic" harm. 40 C.F.R. § 1508.1(g)(1). In 2016 alone, the space industry generated about $158 billion in the United States. Tina Highfill et al., *Measuring the Value of the U.S. Space Economy*, 99 J. U.S. Bureau Econ. Analysis 1, 4 (2019). Space debris "reduces the realized value of space activities by increasing the probability of damaging existing satellites or other space vehicles." Nodir Adilov et al., *Economic Dynamics of Orbital Debris: Theory and Application* 5 (2019). As the amount of space junk grows, the opportunity to use near-Earth space for scientific and economic purposes diminishes. That is not a hypothetical possibility. Just two months ago, NASA voiced concerns about how space debris could interfere with its assets and operations, thus threatening U.S. scientific interests, among

various other vital U.S. interests.  *See* Letter from Samantha Fonder, NASA Representative to the Commercial Space Transp. Interagency Grp., to Marlene Dortch, Sec'y, FCC (Oct. 29, 2020).

These harmful effects of generating additional space debris trigger NEPA obligations, even if debris originating from the proposed action may travel outside the space directly above the United States.  Federal agencies must analyze impacts that are caused by proposed federal actions, even if the impact will be felt in "the global commons outside the jurisdiction of any nation."  Exec. Order No. 12,114, § 2-3(a), 44 Fed. Reg. 1957 (Jan. 4, 1979).  Space is such a global commons, *see* Vito De Lucia & Viviana Lavicoli, *From Outer Space to Ocean Depths: The 'Spacecraft Cemetery' and the Protection of the Marine Environment in Areas Beyond National Jurisdiction*, 49 Cal. W. Int'l L.J. 345, 352 (2019), so the problems of space debris at issue here fall within the ambit of NEPA.

## 2.    The Proposed Modification Risks Worsening the Harms Associated with Space Debris.

SpaceX's proposed modification would crowd lower altitudes of near-Earth orbit with thousands more operational satellites.  That densification creates an increased risk of collision with other satellites at the same orbital altitude, with those in overlapping orbits, and with those traversing those orbits.  SpaceX, knowing that it can maintain that fleet simply by launching thousands more satellites, has not adequately ensured that its fleet will not collide with other space objects or otherwise clutter space with harmful debris.  SpaceX admits, as it must, that its modification involves greater collision risks than before, and Viasat has shown that SpaceX is substantially underestimating those risks.  Reply of Viasat Inc. in Support of its Petition to Deny or Defer at 4–8, IBFS File No. SAT-MOD-20200417-00037 (Aug. 7, 2020).

Recent experience with Starlink satellites illustrates how real these collision concerns are.  As recently as September 2019, "a satellite within the Starlink constellation nearly collided with

European Space Agency satellite Aeolus despite an earlier warning from the US military to the two operators that a collision was likely." *The Fault in Our Stars*, *supra*, at 943 n.171. If and when collisions occur, they will create more space debris—thus worsening an already serious problem. Even one collision can create hundreds to thousands of pieces of debris. *See*, *e.g.*, Brian Weeden, *2009 Iridium-Cosmos Collision Fact Sheet*, Secure World Found. (Nov. 10, 2010), http://swfound.org/media/6575/swf_iridium_cosmos_collision_fact_sheet_updated_2012.pdf.

Notably, NASA itself has weighed in on the issue, voicing concerns about mega-constellations and orbital debris. NASA explained to the Commission that SpaceX's originally proposed constellation raised a number of concerns:

> [T]he reliability of the design and fabrication of the [SpaceX] spacecraft and the reliability that the spacecraft can accomplish the post-mission disposal are of particular interest from the perspective of keeping the orbital environment safe. A design or fabrication flaw can potentially lead to malfunction or even explosion of many spacecraft during the deployment or mission operations of the constellation. Likewise, clearing an operational orbit of non-operating spacecraft becomes more important when applied to a large constellation.

Letter from Anne E. Sweet, NASA Representative to the Commercial Space Transp. Interagency Grp., to Marlene Dortch, Sec'y, FCC (June 26, 2017). The Commission acknowledged that these issues must be addressed, "agree[ing] with NASA that the unprecedented number of satellites proposed by SpaceX and the other NGSO FSS systems in this processing round will necessitate a further assessment of the appropriate reliability standards of these spacecraft, as well as the reliability of these systems' methods for deorbiting the spacecraft." *Space Expl. Holdings, LLC*, 33 FCC Rcd. at 3398.

The Commission cannot take SpaceX's word for it that the thousands of satellites it is seeking to pack into a lower orbit will not materially increase the risks of collisions and produce excessive space debris—especially because SpaceX knows that when its satellites do collide with

other space objects and fragment or fail, it can always launch more.  NEPA requires the Commission to evaluate the serious risks that SpaceX's proposed modification poses to the orbital environment.  The Commission should prepare an EIS to evaluate these risks; at a minimum, it must prepare an EA.

## CONCLUSION

For all of these reasons, Viasat respectfully requests that the Commission deny or defer consideration of SpaceX's proposed modification. More specifically, the Commission should prepare an EIS fully evaluating the environmental impacts of the proposed action pursuant to NEPA, before acting upon SpaceX's application. In the alternative, the Commission should prepare an EA before acting upon SpaceX's application. This request for relief is supplemental to the relief sought in Viasat's initial petition.

Date: December 22, 2020                                   Respectfully submitted,

                                                          /s/ Helgi C. Walker
                                                          _____

John P. Janka                                             Helgi C. Walker
Amy R. Mehlman                                            Michael K. Murphy
Jarrett S. Taubman                                        Joshua S. Lipshutz
VIASAT, INC.                                              Russell B. Balikian
901 K Street NW, Suite 400                                Philip W. Hammersley
Washington, DC 20001                                      Brian C. McCarty
                                                          GIBSON, DUNN & CRUTCHER LLP
                                                          1050 Connecticut Ave. NW
                                                          Washington, DC 20036
                                                          Telephone: (202) 955-8500
                                                          Email: hwalker@gibsondunn.com

                                                          *Counsel for Viasat*

## DECLARATION OF MARK A. STURZA

I, Mark A. Strurza, hereby make the following declarations under penalty of perjury:

1. I am President of 3C Systems Company, which has acted as consultant to Viasat, Inc. ("Viasat") regarding the matters addressed in the foregoing Petition Pursuant to Section 1.1307(c) ("NEPA Petition").

2. I am the technically qualified person responsible for preparation of engineering information contained in the NEPA Petition.  I have reviewed the NEPA Petition and certify that, to the best of my knowledge, information and belief, the factual assertions in the NEPA Petition are truthful and accurate.

/s/ Mark. A. Sturza
Mark A. Sturza
President
3C Systems Company

December 22, 2020

**CERTIFICATE OF SERVICE**

I, Helgi C. Walker, hereby certify that on this 22nd day of December, 2020, I caused to be served a true copy of the foregoing Petition Pursuant to Section 1.1307(c) of Viasat, Inc. and accompanying documents via first-class mail upon the following:

Patricia Cooper
David Goldman
SPACE EXPLORATION TECHNOLOGIES CORP.
1155 F Street, N.W
Suite 475
Washington, DC 20004

William Wiltshire
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W.
Suite 800
Washington, DC 20036

*Counsel for SpaceX*

/s/ Helgi C. Walker

Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. NW
Washington, DC 20036
Telephone: (202) 955-8500
Email: hwalker@gibsondunn.com

*Counsel for Viasat*

# EXHIBIT E

*Astropolitics*, 7:50–82, 2009
Copyright © Taylor & Francis Group, LLC
ISSN: 1477-7622 print
DOI: 10.1080/14777620902768867



# Limits on the Space Launch Market Related to Stratospheric Ozone Depletion

MARTIN ROSS

*The Aerospace Corporation, Los Angeles*

DARIN TOOHEY

*University of Colorado*

MANFRED PEINEMANN

*The Aerospace Corporation, Los Angeles*

PATRICK ROSS

*Embry-Riddle Aeronautical University*

Astropolitics 2009.7:50-82.

*Solid rocket motors (SRMs) and liquid rocket engines (LREs) deplete the global ozone layer in various capacities. We estimate global ozone depletion from rockets as a function of payload launch rate and relative mix of SRM and LRE rocket emissions. Currently, global rocket launches deplete the ozone layer ~0.03%, an insignificant fraction of the depletion caused by other ozone depletion substances (ODSs). As the space industry grows and ODSs fade from the stratosphere, ozone depletion from rockets could become significant. This raises the possibility of regulation of space launch systems in the name of ozone protection. Large uncertainties in our understanding of ozone loss caused by rocket engines leave open the possibility that launch systems might be limited to as little as several tens of kilotons per year, comparable to the launch requirements of proposed space systems such as spaceplanes, space solar power, and space reflectors to mitigate climate change. The potential for limitations on launch systems due to idiosyncratic regulation to protect the ozone layer present a risk to space industrial development. The risk is particularly acute with regard to the economic rationale to develop low-cost, high flight rate launch systems.*

Address correspondence to Martin Ross, The Aerospace Corporation, M1-132, PO Box 92957, Los Angeles, CA 90009. E-mail: Martin.N.Ross@aero.org

52                                    *M. Ross et al.*

aircraft which, in turn, is only a few percent from all $CO_2$ sources.[5] Space launch emissions, even for the large growth scenarios discussed here, will not likely be significant in future greenhouse gas regulatory schemes. As a cautionary tale, we point out that even though aircraft are responsible for a few percent of all $CO_2$ emissions, the airline industry must contend with considerable attention and likely regulation or carbon taxation.[6] The message to the space industry should be clear: policy and media attention on high visibility propulsion emissions are often framed in ways that overemphasize the relative contribution.[7]

If rockets are a minuscule contributor to the problem of climate change, they do have a significant potential to become a significant contributor to the problem of stratospheric ozone depletion. This follows from three unique characteristics of rocket emissions:

1. Rocket combustion products are the only human-produced source of ozone-destroying compounds injected directly into the middle and upper stratosphere. The stratosphere is relatively isolated from the troposphere so that emissions from individual launches accumulate in the stratosphere.[8] Ozone loss caused by rockets should be considered as the cumulative effect of several years of all launches, from all space organizations across the planet.

2. Stratospheric ozone levels are controlled by catalytic chemical reactions driven by only trace amounts of reactive gases and particles.[9] Stratospheric concentrations of these reactive compounds are typically about one-thousandth that of ozone. Deposition of relatively small absolute amounts of these reactive compounds can significantly modify ozone levels.

3. Rocket engines are known to emit many of the reactive gases and particles that drive ozone destroying catalytic reactions.[10] This is true for all propellant types. Even water vapor emissions, widely considered inert, contribute to ozone depletion. Rocket engines cause more or less ozone loss according to propellant type, but every type of rocket engine causes some loss; no rocket engine is perfectly "green" in this sense.

Since 1987, the ozone layer has been protected by international agreements[11] that limit the production and use of substances that have been determined to cause ozone depletion. The Montreal Protocol on Substances That Deplete the Ozone Layer (and subsequent amendments), regulates the worldwide production and use of ozone depleting substances (ODSs), including the well-known chlorofluorocarbons (CFCs) and other halogen gases. The Montreal Protocol is widely considered a significant success and the global phase out of ODSs mandated by the Protocol is expected to allow the ozone layer to recover to pre-ODS levels by about 2040. In support of the Montreal Protocol, the stratospheric science community issues a quadrennial summary,

Astropolitics 2009.7:50-82.

Astropolitics 2009.7:50-82.

54                                    *M. Ross et al.*

## STRATOSPHERIC OZONE AND REGULATORY PROTECTION

### Ozone Chemistry

A detailed account of stratospheric chemistry is beyond the scope of this paper however, a few critical concepts need to be explained in order to justify our parameterization of rocket ozone loss. The stratospheric ozone ($O_3$) layer generally resides between 20–30 km altitudes, absorbing harmful solar ultraviolet radiation before it reaches the Earth's surface. Chemical and dynamical processes that are well understood determine the vertical and horizontal distributions of stratospheric ozone. The ozone layer results from a long-term balance between the vertical profile of ozone production, the vertical profile of ozone destruction, and the global circulation of stratospheric air.

The ozone destruction side of the balance is dominated by reactive trace gases known as radicals. The highly reactive radicals—oxides of nitrogen, hydrogen, bromine, and chlorine referred to as NOx, HOx, BrOx, and ClOx—control global ozone levels by tilting the long-term balance between ozone production and destruction in favor of the latter. Moreover, because the radical reactions are catalytic, only trace amounts, a few parts per billion, are able to control much greater amounts of stratospheric ozone. A single radical molecule emitted into the stratosphere, for example, can destroy up to $\sim 10^5$ ozone molecules before being deactivated and transported out of the stratosphere. Radicals react with ozone on very short time scales, minutes to hours, so that direct injection into the stratosphere over a limited area (a rocket plume, for example) will cause a prompt, localized, ozone "hole." [16]

Particles also play an important role in ozone destruction. Chemical reactions particle surfaces activate radicals from their reservoirs, shifting the balance toward lower ozone levels. The strong potential for particles to reduce ozone is demonstrated in the springtime south polar stratosphere, where photochemical reactions on ice particles efficiently liberate $ClO_x$ from reservoirs[17] and so play a role in the formation of the infamous "Ozone Hole." Such reactions are known occur on the surface of alumina and, possibly, soot particles.[18] Particles with diameter less than about 1 micron (μm) remain suspended in the stratosphere for several years[19] and become mixed globally by the stratospheric circulation. This means that repeated injections of submicron particles into the stratosphere, as from global ($\sim$weekly) rocket launches for example, result in an accumulation of particles. The accumulated particle surfaces increase the rates that radicals "leak" from their reservoirs and so reduce ozone levels globally.

NOx, HOx, BrOx, and ClOx radicals are produced from source gases and reservoir gases. The sources and reservoirs can be thought of as a sort of chemical storage for the radicals, which leak photochemically from storage into the stratosphere, increasing the rate of ozone destruction. The

# EXHIBIT F





## Earth's Future

**RESEARCH ARTICLE**

10.1002/2013EF000160

**Key Points:**
- Rocket engine exhaust exerts positive atmospheric radiative forcing
- Black carbon and alumina particulate have most significant RF
- Carbon dioxide emission from rockets is not a significant RF source compared to particle emissions

**Corresponding author:**

M. N. Ross, mnross@ca.rr.com

**Citation:**

Ross, M. N., and P. M. Sheaffer (2014), Radiative forcing caused by rocket engine emissions, *Earth's Future*, 2, 177–196, doi:10.1002/2013EF000160.

Received 19 SEP 2013
Accepted 16 JAN 2014
Accepted article online 23 JAN 2014
Published online 28 APR 2014

# Radiative forcing caused by rocket engine emissions

**Martin N. Ross[1] and Patti M. Sheaffer[2]**

[1]Civil and Commercial Launch Projects, The Aerospace Corporation, Los Angeles, California, USA , [2]Remote Sensing Department, The Aerospace Corporation, Los Angeles, California, USA

**Abstract**  Space transportation plays an important and growing role in Earth's economic system. Rockets uniquely emit gases and particles directly into the middle and upper atmosphere where exhaust from hundreds of launches accumulates, changing atmospheric radiation patterns. The instantaneous radiative forcing (RF) caused by major rocket engine emissions $CO_2$, $H_2O$, black carbon (BC), and $Al_2O_3$ (alumina) is estimated. Rocket $CO_2$ and $H_2O$ emissions do not produce significant RF. BC and alumina emissions, under some scenarios, have the potential to produce significant RF. Absorption of solar flux by BC is likely the main RF source from rocket launches. In a new finding, alumina particles, previously thought to cool the Earth by scattering solar flux back to space, absorb outgoing terrestrial longwave radiation, resulting in net positive RF. With the caveat that BC and alumina microphysics are poorly constrained, we find that the present-day RF from rocket launches equals $16 \pm 8$ mW m$^{-2}$. The relative contributions from BC, alumina, and $H_2O$ are 70%, 28%, and 2%. respectively. The pace of rocket launches is predicted to grow and space transport RF could become comparable to global aviation RF in coming decades. Improved understanding of rocket emission RF requires more sophisticated modeling and improved data describing particle microphysics.

## 1. Introduction

The space industry is an essential part of Earth's economic, military, and scientific infrastructure. The space transportation sector of the space industry is growing. During 2012 there were 75 orbital launches and several dozen suborbital launches. Orbital launches have been increasing by about two launches per year over the last decade [*Sanderson*, 2010; J. McDowell, Jonathan's Space Report, 2013, http://planet4589.org/space/jsr/jsr.html]. As national space agencies and corporations develop new and more powerful rockets and the launch industry transitions to a more commercial and less governmental activity, launch rates are expected to continue to increase. Indeed, space transport could be poised for rapid growth in both the orbital and suborbital regimes, suggesting potentially rapid growth in rocket engine emissions [*Chandler*, 2007, *Carceres*, 2013].

Currently, rockets consume about 40 kilotons (kt) of propellant annually. Rockets use a variety of engine and propellant types. The most common emissions from all types are $CO_2$, $H_2O$, and alumina or carbon particles, accounting for about 80% of all rocket exhaust. The presence of these compounds in the atmosphere will cause radiative forcing (RF) to various degrees. The smaller portion of rocket exhaust (NO$_x$, N$_2$, HCl, and others) does not cause significant direct RF; however, some of these compounds play important roles in stratospheric chemical processes such as ozone chemistry and so may have significant indirect RF impacts that are beyond the scope of this work. They should be included in further studies using more sophisticated models.

Rockets have long presented a conundrum to the atmospheric science and associated policy communities; their emissions have generally been overlooked [e.g., *IPCC*, 2013] for a variety of reasons. As a segment of the global transport sector, rockets are considered small, annually burning about 0.01% of the fuel (or propellant) that global aviation burns. However, rockets uniquely emit exhaust directly into the atmosphere above the tropopause (Figure 1), where the lifetime of combustion products can be years. Modern jets during cruise introduce the greater part of their exhaust into the upper troposphere (and occasionally the lowermost regions of the stratosphere). However, the lifetime of jet exhaust is short, several months [*Wilcox et al.*, 2012], limiting their potential impact. Because the lifetime of rocket engine exhaust can be comparable to the age of air in the stratosphere, 3–5 years [*Waugh and Hall*, 2002], emissions from

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial-NoDerivs License, which permits use and distribution in any medium, provided the original work is properly cited, the use is non-commercial and no modifications or adaptations are made.

 **Earth's Future**

10.1002/2013EF000160

to minimize the problem, perhaps space debris would not be the problem it has become. In the same way, a decision to more fully understand rocket emissions today could have a large benefit in the future, reducing risk to unfettered development of space transportation and access to space.

Interestingly, NASA is considering the type of booster to be used on the very heavy-lift Space Launch System (SLS); SRMs and kerosene-fueled rockets are each being considered (NASA selects Space Launch System Advanced Booster Proposals, 2013, http://www.nasa.gov/exploration/systems/sls/advanced_booster.html). The relative climate impact of propellant type is unlikely to play a significant role in the booster decision. Still, given SLS's size (approximately several kilotons propellant each) and the expectation it will be the global heavy-lift workhorse for many decades, it would be useful to know how the predicted climate impact of the two competitors compare. The current level of understanding rocket emissions would not support an unambiguous comparison. The problem is complicated because, in addition to warming the lower stratosphere, SRM boosters would cause ozone depletion due to chlorine emissions, which we have not considered in this work. Alumina contributes to chemical ozone loss as well [*Jackman et al.*, 1996; *Danilin et al.*, 2001]. Against these SRM uncertainties, the BC RF of the kerosene-fueled booster version must be considered. Understanding the net effect of the two proposed boosters requires detailed work with a GCM. Because there are currently no guidelines with respect to the ozone or climate impacts of rocket emissions, SLS booster selection will be based on technical characteristics such as performance and cost. Still, it may be useful to understand the climate impact of each proposed rocket before acquisition, since SLS's climate impacts will be a part of space transport's total impact for decades.

## 9. Conclusions

We have performed an approximate analysis of the climate impact of the different components of the exhaust from rockets of the type currently used by the global space transportation industry. The metric we calculate is the instantaneous RF of the atmosphere due to addition of exhaust components—the net change in the SW plus LW flux balance at the top of the atmosphere, without relaxation and stratospheric adjustment. Our results do not account for the atmospheric response and feedbacks such as changes in cloudiness or global circulation due to the changes in SW or LW fluxes from the rocket exhaust. However, calculating the instantaneous RF allows us to (1) identity the relative importance of each emission, (2) the most important data uncertainties that prevent more accurate calculations, and (3) make plausible order of magnitude estimates of the climate impact of different launch systems.

We considered RF from $CO_2$ and $H_2O$ gases and BC and alumina particles. Except for $CO_2$ emissions, which become well mixed throughout the atmosphere, we assume exhaust emitted above the troposphere accumulates in a well-defined, zonally symmetric region in the lower stratosphere. We estimate the amount of $CO_2$ emitted globally by rockets since the start of the space age (ca. 1955) and find that the associated RF equals 3 $\mu W\,m^{-2}$, insignificant within the context of global climate change. A more detailed account of $CO_2$ emitted by past rocket emissions would not change our conclusion. RF from rocket $CO_2$ is unambiguously insignificant.

RF from the water component of rocket exhaust is estimated by assuming a 4 year lifetime and applying published results of detailed models of RF from lower SWV perturbations. Estimated RF from rocket water emissions exceeds $CO_2$ forcing but water vapor emissions also do not produce significant RF. $H_2O$ currently accounts for approximately 3% of the RF from rockets. One may reasonably infer that cryogenic rockets, with nearly 100% $H_2O$ emissions, would be preferred for future extensive space projects involving heavy lift rockets, launched often; space-based solar power, for example. Our calculations indicate that, other things being equal, a kerosene-fueled rocket generates RF at a level about 30 times that of a cryogenic rocket.

Importantly, we uncovered a new aspect to rocket exhaust climate impacts. Alumina particles, by absorbing a greater amount of upwelling terrestrial LW radiation than solar SW radiation scattered back into space, can have significant positive RF. Previous work assumed that alumina reflects solar SW, cooling the Earth. Our work shows that alumina warms the lower stratosphere and, presumably, the upper troposphere as well. This new result depends on a variety of assumptions and poorly known alumina data and so should be considered preliminary. Given the potential importance of this potentially important feature

© 2014 The Authors.

A122

# EXHIBIT G

# AEROSPACE

# Environmental Impacts of Satellites from Launch to Deorbit and the Green New Deal for the Space Enterprise

Lee Organski, Cayman Barber, Shawn Barkfelt, Madison Hobbs, Roy Nakagawa, Dr. Martin Ross, Dr. William Ailor

## Conclusion

There is substantial research and analysis focused on what may remain upon reentry and survive to reach the surface, but there is ostensibly no research into what happens to the remainder. Due to proposed mega constellations, we estimate the future annual mass flux of satellites to reenter the atmosphere to be 0.8 to 3.2 Gg, plus up to 1.0 Gg per year of launch vehicle mass needed to maintain these constellations, bringing a worst-case estimate to 4.2 Gg per year. It is concluded that the marked increase in these pollutants calls for the close tracking of mass flux, further research on the particulate distribution and radiative forcing, general research into reentry physics, and a study of possible solutions to mitigate the issue. With the potential for broad environmental policy to extend to regulate and quantify the environmental impacts of the space enterprise.

## Mass Flux from Deorbit



Historic mass flux from the beginning of human spaceflight (Jenkin 2015)

Steady-state annual mass that would enter the atmosphere in the upper limit case currently suggested by Ailor et al. (2019)

The max flux of future reentries is an order-of-magnitude issue, even when compared to peak reentry flux over the entire course of human spaceflight. An estimated 60% of rocket bodies and 60–90% of satellite mass is expected to burn up upon reentry, with aluminum likely making up much of the burnt-off mass (Ailor et al. 2019).

As upper stratospheric pressures range below 100 Pa, the boiling point of aluminum could be around 1330 deg C, well within range of reentry temperatures (Li et al. 2019) such that aluminum could be vaporized or ignited to form aluminum oxides during reentry.

## Radiative Forcing and Ozone



Estimated instantaneous RF of rockets compared to aircraft (Ross and Sheaffer 2014)

For a four-year residency time of reentry particulate, global residencies of alumina could reach up to 10 Gg at the steady state of mass satellite constellations. In this case, radiative forcing caused by reentering satellite particulate has the capability to warm Earth's atmosphere, but without precise modeling, the exact extent is unknown. Reentering space debris' ability to deplete ozone also poses a global threat because as it increases, so does ozone depletion from launch. The aircraft industry, despite having about the same relative impact on radiative forcing as rockets have on ozone depletion, is under policy pressure in the form of carbon taxes in an effort to reduce its impact (Ross et al. 2009).

## Satellite Reentry Distribution



Estimated reentry latitude superposition and pdf for near term pLEO constellations

With the substantial burden of sub-micron particles entering the atmosphere, it is also possibly of importance to understand the distribution of the reentries of satellites with respect to the latitude. While stratospheric circulation will likely redistribute particles in a difficult-to-predict manner, the initial loading latitudes may play a significant role in how heat is displaced. It is recommended to further investigate the impact of latitudinal distributions of reentries on a larger climate model.

## Top 10 Upcoming LEO Constellations

| Constellation | Boeing | ASTR&S | Kuiper | Mangata | o3b | Starlink | Telesat | Viasat | OneWeb | Theia |
|---|---|---|---|---|---|---|---|---|---|---|
| # of Satellites | 1,400–3,000 | 243 | 3,200 | 791 | 144 | 12,000–42,000 | 300–1,788 | 288–300 | 648–48,000 | 112–120 |
| Lifetime (years) | 10 | 10 | 7 | 10 | 15 | 5 | 10 | 15 | 10 | 12 |
| Estimated Mass (kg) | 200 | 200 | 200 | 500 | 700 | 260 | 168 | 200 | 150 | 4,000 |
| Annual Mass Flux (kg) | 28,000–60,000 | 4,900 | 91,400 | 39,500 | 6,700 | 624,000–2,184,000 | 5,000–30,000 | 3,800–4,000 | 9,700–720,000 | 37,300–40,000 |

Based on FCC Schedule S technical reports and press releases from individual organizations as of July 2020, only a few planned constellations dominate the total population. These dominate any future mass burden projections as well. It should also be mentioned that there is no predicting the advent of new technologies and private interests, nor the likelihood that any planned constellation project may succeed. Because of these uncertainties, it is justifiable and practical to use existing proposals to model satellite growth in coming years.

## References

Ailor, W.H., "Hazards of Reentry Disposal of Satellites from Large Constellations," The Journal of Space Safety Engineering, Vol. 6, No. 2, pp.113–121, Jun. 2019, doi: 10.1016/j.jsse.2019.06.005
Jenkin, A.B., M.E. Sorge, G.E. Peterson, J.P. McVey, "Recent Enhancements to GMRES and Resulting Sensitivity...
Li, L.Q., D. Osburn, L. Wang, J. Gong, S. Ming, "Numerical and experimental study on keyhole and melt flow dynamics during laser welding of aluminium alloys under subatmospheric pressures," International Journal of Heat and Mass Transfer, Vol.133, pp. 812–826, Apr. 2019, doi: 10.1016/j.ijheatmasstransfer.2018.12.165
Ross, M.N., D. Toohey, M. Peinemann, P. Ross, "Limits on the Space Launch Market Related to Stratospheric Ozone Depletion," Astropolitics, Vol. 7, No. 1, pp. 50–82, Mar. 2009, doi: 10.1080/14777620902768867
Ross, M.N., P.M. Sheaffer, "Radiative forcing caused by rocket engine emissions," Earth's Future, Vol. 2, pp. 177–196, Jun. 2014, doi: 10.1002/2013EF000160

A124

A125

# EXHIBIT H

**CENTER FOR SPACE
POLICY AND STRATEGY**

**MARCH 2020**

# THE FUTURE OF THE NIGHT SKY:
# LIGHT POLLUTION FROM SATELLITES

**LUC H. RIESBECK, ROGER C. THOMPSON, AND JOSEF S. KOLLER
THE AEROSPACE CORPORATION**

© 2020 The Aerospace Corporation. All trademarks, service marks, and trade names contained herein are the property of their respective owners. Approved for public release; distribution unlimited. OTR202000355



### LUC H. RIESBECK

Luc H. Riesbeck is a second-year master's degree candidate at the Space Policy Institute at George Washington University, researching space sustainability, orbital debris mitigation, and ethics in science and technology. A graduate of New York University Shanghai in 2018 with a bachelor's degree in social science with a minor in global China studies, Riesbeck recently served as a graduate intern at The Aerospace Corporation's Center for Space Policy and Strategy. They also have held research and internship positions at NASA Headquarters, Bryce Space and Technology, and Secure World Foundation. In 2018, they were selected as a fellow in the Brooke Owens Fellowship's second annual class.

### DR. ROGER C. THOMPSON

Dr. Roger C. Thompson a senior engineering specialist for The Aerospace Corporation's Mission Analysis and Operations Department. Thompson provides support for space situational awareness, collision avoidance, on-orbit breakup analysis and risk assessment, space debris issues, deorbit/reentry prediction, and orbital operations for many programs and space missions. He is one of the corporation's leading analysts in space traffic management and has represented Aerospace at high-level government and industry meetings where future space policy will be determined. Thompson has experience in uncertainty modeling, probability analysis, pointing and tracking systems, orbit and attitude dynamics, coverage analyses, optimal control systems, structural dynamics, and control of nonlinear systems. He also continues to support realtime launch and on-orbit collision risk assessment, orbit transfer and maneuver planning, orbital and trajectory modeling, and orbit determination. Thompson has a Ph.D. and a master's degree in engineering mechanics from Virginia Polytechnic Institute and State University as well as a bachelor's degree in engineering science and mechanics from North Carolina State University.

### DR. JOSEF S. KOLLER

Dr. Josef S. Koller is a senior systems director for The Aerospace Corporation's Center for Space Policy and Strategy, serving as an analyst and team leader on topics that cut across policy, technology, and economics. Prior to joining Aerospace, Koller served as a Senior Advisor to the Office of the Secretary of Defense for Space Policy, where he directly supported key national and international strategy efforts and provided technical advice and analysis on space-related U.S. government and DOD policy matters, including commercial remote sensing and space traffic management policy matters. Prior to that assignment, Koller managed and co-led over 40 scientists in the "Space Science and Applications Group" at Los Alamos National Laboratory. Koller also established and led the Los Alamos Space Weather Summer School to promote graduate student research. Koller has over 17 years of experience with global security and space physics programs. He has authored over 50 peer-reviewed scientific publications with 700+ citations. Koller has a Ph.D. in astrophysics from Rice University as well as master's degrees in physics and astronomy from the University of Innsbruck, Austria.

### ABOUT THE CENTER FOR SPACE POLICY AND STRATEGY

The Center for Space Policy and Strategy is dedicated to shaping the future by providing nonpartisan research and strategic analysis to decisionmakers. The center is part of The Aerospace Corporation, a nonprofit organization that advises the government on complex space enterprise and systems engineering problems.

The views expressed in this publication are solely those of the author(s), and do not necessarily reflect those of The Aerospace Corporation, its management, or its customers.

Contact us at www.aerospace.org/policy or policy@aero.org



A127

## Summary

The increase in pLEO (proliferated low Earth orbit) constellations set to launch over the next decade has fueled concern from the astronomy community, academia, and the general public over the light pollution visible in the night sky created by sunlight reflecting off these satellites. Like many aspects of large pLEO constellations, such as their effect on space traffic management efforts and potential increase in space debris, the overall impact of pLEO light pollution on astronomical observational equipment and research is still largely under-studied and merits objective analysis. Included in these "known unknowns" is the potential public impact of pLEO reflection of sunlight in addition to the larger light pollution problem from the ground, which has been shown to have adverse effects on astronomical research activities and stargazing. Although interference with astronomical observations from low Earth-orbiting satellites can, in principle, occur at the beginning and end of the night observation window during long winter nights, the effect is more pronounced and may last the whole night during short summer nights. Most telescopes are "overbooked," and any reduction in utility has an impact to operations. This paper presents an objective analysis of the increase of reflective satellites affecting astronomical observations and investments in astronomy and astronomical infrastructure worldwide.

---

### Introduction

Commercial space companies, such as SpaceX, Telesat, OneWeb, and Amazon, have announced plans to launch large constellations of small satellites into low Earth orbit (LEO). The logic behind the large constellation architecture is to take advantage of advancements in automation and miniaturization achieved in the past two decades to quickly build and operate several thousand satellites. These "smallsats" are comparatively inexpensive, faster to produce, and can be more readily replaced and upgraded. Should they all make it to orbit, the proposed commercial large constellation satellites launched could total well over 17,000, distributed primarily between low and very low Earth orbits by the end of the 2020s[1] and could surpass 50,000 in the following decade.[2] The scale of these planned constellations is significantly large in comparison to the current satellite population in orbit.[*]

It's not only commercial companies eyeing the shift to large proliferated LEO (pLEO) constellation architectures (sometimes referred to colloquially as *mega-constellations*). For some national security missions, a constellation of multiple smallsats may

---

[*] For comparison, fewer than 9,000 payloads have been put into orbit in the past 62 years.

1

be more elusive targets for an adversary to interfere with than traditional, exquisite satellites, which can sometimes reach the size of a school bus, take years (rather than weeks or months) to manufacture, and are orders of magnitude more expensive to produce. The Defense Advanced Research Projects Agency (DARPA) has been designing a LEO constellation program called Blackjack, which aims to develop and demonstrate the critical elements for a global high-speed network in LEO.[3] Blackjack will provide the Department of Defense (DOD) with "highly connected, resilient, and persistent coverage." DARPA and the DOD are also collaborating with the recently established Space Development Agency (SDA) to report to the House Armed Services Committee on the benefits of pLEO architectures, including how they could enhance overall system resilience, and making further recommendations for integrating such architectures into wider national security space strategy.

Despite the potential benefits from the proposed pLEO constellations and the recent public discussion, the aggregate effects of light pollution from such constellations remain underexamined in an objective way. If not carefully considered and mitigated at the design stage, optical reflective emissions of satellites may have a negative impact on astronomical research, undercutting investments made in astronomy by national governments, universities, and private foundations around the world. Astronomers can compensate for general light pollution by locating their telescopes in dark places, but they cannot site their telescopes to avoid satellites except for placing them in space themselves (like the future James-Webb Space Telescope). Stop-gap measures and temporary fixes already exist for when a single satellite passes through the field-of-view (FOV) of a telescope, but astronomers and telescope operators stress that a continued lack of high-level coordination on mitigation strategies will make satellite light pollution and radio frequency emissions an increasingly difficult problem to tackle as

architectures shift toward large constellation models. The present concerns of the astronomy community and others over the contribution of reflectivity of pLEO constellations to overall light pollution are part of this larger, under-studied set of concerns that merit further interdisciplinary and objective research.

## Satellites' Contribution to Light Pollution

The brightness of an object in space, such as a planet, a satellite, or a star as viewed in the night sky from Earth's surface is described as its *apparent* magnitude, with larger numbers indicating fainter objects. For astronomers with ground-based telescopes, brighter apparent magnitudes of satellites result in bright streaks of light across the exposures captured by their equipment (a satellite streak or track)—the same way a headlight from a car might appear as a streak of light across a long-exposure photograph taken by a camera at night. A similar effect is caused by airplane lights in the night sky. Depending on the apparent magnitude and the duration of the exposure, these satellite streaks in exposures are forcing astronomers to throw out some portions of their data at what they are warning could be an unsustainable rate.

Magnitudes were created by ancient Greeks, are based on the response of the human eye, and are captured in a logarithmic equation where smaller numbers represent brighter sources, with each magnitude being a multiple of 2.512 times brighter or fainter, depending on whether the magnitude is smaller or larger. Using this scale, a magnitude 1 star is about 2.5 times brighter than a magnitude 2 star, 6.31 times brighter than a magnitude 3 star, 15.85 times brighter than a magnitude 4 star, and so on. For reference, the sun's apparent magnitude is –26.74, and the International Space Station (ISS) can reach –6. The Hubble Ultra-Deep Field detected objects as faint as +30 magnitude.[4]

2

A129



*Figure 1: The period of illumination. Interference with an astronomical image is possible only when a satellite is illuminated by the sun (outside of Earth's shadow) and the observatory is located in the dark. The diagram displays (roughly to scale) a satellite orbit at 500 km.*

The apparent magnitude of a satellite in space varies based on multiple factors such as the observer's position on the Earth's surface, the altitude and specific orbit of the spacecraft, and the angle between the sun, satellite, and observer in addition to the satellite's reflectivity. When viewed from the ground, satellite brightness can also vary by time of year as regions experience shorter periods of night during the local summer. On the Earth's surface, the *terminator* defines a moving line that separates the side of the Earth illuminated by the sun and its dark side (see Figure 1). Shortly after sunset, there is a period of twilight where the sky is still illuminated by the sun. Astronomical twilight begins when the center of the sun is 18° below the local horizon, which usually indicates the time at which astronomical observations can begin. The observation window ends when the sun again is 18° below the horizon prior to sunrise. Satellites, because of their altitude, can still be sunlit and visible to a telescope even when the location of the telescope is in "astronomical night" conditions. As the observer location rotates deeper into the night,

satellites are in Earth's shadow and do not reflect sunlight. The interference period (satellites being illuminated) is longer for satellites at higher altitudes and, at geostationary Earth orbit (GEO), generally lasts the entire night—though, because they are so much farther away, they appear dimmer to the observer. Satellites at lower altitudes are brighter but have less impact because they move into Earth's shadow earlier than satellites at higher altitudes.

Orbiting spacecraft have generated optical interference for decades—most of them quite predictably. For example, the original Iridium constellation had predictable flares of specular reflection, visible to the naked eye, with a consistency that enabled them to be predicted down to the second. The timing of such flares has historically been tracked and published on the nonprofit Heavens Above website. Timing and observing them has become a hobby to some, and watching satellites with naked eye can be inspirational to children and the general public.

Other types of interference are continuously provided by airplane lights as well. Astronomers regularly find streaks of blinking lights in images throughout the night. Interference with star trackers on lower altitude satellites may be possible but is deemed unlikely due to the short exposure time and algorithms of these devices. Human navigators will also be able to quickly separate a LEO satellite from a star due to the fast movement across the night sky.

Streaks generated by large numbers of reflective satellites in LEO effectively create light pollution from space for astronomers attempting to observe dim stars in our own or distant galaxies. They make up a small and uncontrolled portion of the wider light pollution problem affecting astronomers. A 2016 American Association for the Advancement of Science (AAAS) study found that more than 80 percent of the world and more than 99 percent of U.S. and European populations live under light-polluted skies, and that the Milky Way is hidden from more than one-third of humanity.[5]

The low apparent magnitude (greater brightness) of satellite reflections in a telescope's FOV, which can be caused by both specular (direct, mirror-like reflections, which cause short flares or glints) and diffuse (indirect) reflection (which causes the longer streaks), degrades the quality of the exposures it captures. In extreme cases, they may even temporarily "blind" sensor pixels capturing the images. For astronomers, that interference can impede their ability to capture long-duration exposures of deep space. When interviewed, Johnathan McDowell, an astrophysicist at the Harvard-Smithsonian Center for Astrophysics and staff member at the Chandra X-ray Observatory, said, "On a technical level, when an image is ruined, we throw out one, with the understanding that the next will be fine."

Most satellites need some form of surface coating to protect them from exposure to extremes of the space environment, including harmful radiation.[6] A satellite body's surfaces are characterized by its visible reflectivity or albedo ($\alpha$) and its thermal infrared emissivity ($\epsilon$).

Satellites often produce the largest signals (both visible or near-infrared reflected and thermal emitted signatures) because of the large surface area of solar arrays relative to the cross-sectional area of the body of the satellite. While the solar arrays of very small satellites do not typically have large surface areas, many glints and thermal signatures are dominated by the effects of reflected or emitted light from their arrays.

Many coatings applied to satellite bodies have high reflectivity to preclude the absorption of heat from the sun in the visible and near-infrared range, from approximately 0.4 microns ($\mu$m) to 2 $\mu$m. These same coatings generally have a high emissivity (meaning they radiate well in the thermal IR, between approximately 4 $\mu$m and 20 $\mu$m), so that they can radiate excess heat into space to control the temperature of the electronics. By contrast, solar arrays are designed to absorb the visible and near infrared photons from the sun, which has its peak brightness near 0.5 $\mu$m. About one-fourth to one-third of that energy is converted into electricity, while the rest of the energy goes to heat the arrays. The arrays are heated to around 390° Kelvin (contributing to their infrared signatures), and the emissivity of both the cover glass on the front of the satellite and the black coating on the back are designed to help radiate that heat into space before it can be conducted to the body of the spacecraft. Most exterior finishes provide the correct emissivity for thermal considerations or to insulate the interior. Any bare metal surfaces are generally treated so that they do not corrode in an orbital environment and change their emissivity. Multi-layer insulation (MLI) is less reflective and can also be used for this purpose.

Ultimately, some coatings applied to satellite bodies protect them but, unfortunately, can also generate the side effect of reflectivity of sunlight toward Earth. Streaks of diffuse reflection and unpredicted flares of specular reflection can affect some of the data astronomers collect.

In the past decade, as the price per kilogram of mass to launch to LEO has decreased, some satellites have been launched for the express purpose of reflecting sunlight down to Earth's surface, such as the art project HumanityStar in 2018. Launched by small launch developer, RocketLab, HumanityStar was a spherical reflective ball intended to serve as a visual reminder of humanity's "fragile place in the universe." Though the art installation de-orbited naturally several months later, the ease with which RocketLab was able to launch a highly reflective mirrored-surface object into orbit raised eyebrows among the astronomical community,[7] pointing to a lack of public sense of urgency surrounding optical interference.

## Modeling and Simulation of Optical Interference

To model the effects of satellite reflection of sunlight, we used the mathematical description of the optical assembly[15] to determine the apparent magnitude of a satellite with respect to an observing ground site. The most influential parameters are the size, shape, and attitude of the spacecraft; the angle between the sun, satellite, and observer; and the reflection coefficients of the surfaces. All of these factors would need to be included in a detailed analysis to determine precise interference from a single object. Our purpose here is to define the periods when interference is possible without descending into the specifics of a particular satellite and orbit. To simplify the numerical results, we model hypothetical constellations at 500 km and 1,200 km to illustrate the tradeoff between altitude and illumination (see sidebar). Specific simulations of proposed constellations are available upon request.

| Table 1: Examples of Highly Reflective Spacecraft | |
|---|---|
| 1990s | Russia announces a plan to light up Siberia at night to a "dusk-like" state through the use of space-based mirrors. A failed test in 1999 marked the end of the project.[8] |
| 1990s to early 2000s | The original Iridium constellation generates regular, predictable flares, easily visible to the naked eye and tracked by the Heavens Above website.[9] |
| Mid-2010s | The completed ISS is visible, with predictable trajectory tracked via NASA's Spot the Station program and remains the third brightest object in the sky.[10] |
| 2018 | China announces a series of "artificial moon" reflective satellites to light the city of Chengdu after dark, to around one-fifth the brightness of streetlamps. If successful, it will be joined by three other "moons" by 2022.[11] |
| 2018 | New Zealand subsidiary of American startup company RocketLab launches the HumanityStar reflective "disco ball," raising light pollution concerns among the astronomy community. The object de-orbited[12] prematurely around two months after launch.[13] |
| 2019 | Russian startup company StartRocket proposes to investors an "orbital billboard" project to advertise in the night sky. PepsiCo's Russian arm becomes the company's first client but quickly backs out of the deal.[14] |

5



*Figure 2: Interference grid of an orbit at 500 km altitude. Satellites at that orbit will be visible to the ground site (here the LSST in Chile) if the satellites are illuminated by the sun.*

Basic assumptions for the analysis are that the object is a sphere with a 1-meter radius and a diffuse reflection coefficient of 0.2. Having assumed that the object is a sphere, the attitude, orbit plane, and direction of motion are now inconsequential; all that matters is the orbit altitude and geometric relationship between the sun, satellite, and observer. However, there are constraints that limit the periods when interference can occur. We deployed hypothetical constellations (500 km, 1,200 km) each with 1296 satellites evenly distributed at 50 degrees inclination with 36 orbital planes and 36 satellites per plane. As the observatory, we chose the Large Synoptic Survey Telescope (LSST)[16] currently under construction in Cerro Pachón, Chile. In order to count toward possible interference, the observatory must be in astronomical night conditions (after the end of evening astronomical twilight and before the beginning of next morning astronomical twilight). The satellite must be above the horizon of the observer and must be in direct sunlight, and the observed apparent magnitude must be greater than 27 to be observable with the LSST.

To determine all possible geometries where the assumptions and constraints combine to create optical interference, we create a spherical grid at a specific altitude above the observer as shown in Figure 2. The grid shown is at an altitude of 500 km and the observer location is Cerro Pachón, Chile. We performed two simulations (summer vs. winter) to illustrate seasonal effects and the length of astronomical night.

For satellites orbiting at 500 km (1,200 km in simulation 2) altitude and during long winter nights (Table 2), the results show that the observatory can have up to 4 hours (8 hours in simulation 2) of illuminated satellites in the night sky split almost evenly at each end of the night. The period of possible interference begins at the end of astronomical twilight (the first collection opportunity) with approximately 40 satellites (approximately 100 satellites) illuminated. About

63 percent (80 percent) of the sky can have illuminated satellites. At one hour into the night operations, approximately 28 percent (58 percent) of the sky can still receive solar reflections from passing satellites. Two hours (four hours) after astronomical twilight, the site has rotated into Earth's shadow enough that both altitudes are no longer illuminated (see Figure 3).

During the short summer night, the illumination of both the 500 km and the 1,200 km shell never completely ends although the number of illuminated satellites drops significantly. Table 3 shows the number of satellites illuminated and the percentage of sky with possible interference for a short summer night on the southern hemisphere on December 22.

The sky views of the observatory for a long winter night (June 21) at the beginning (left) and one hour into the astronomical night (right) are shown in Figure 4, where the red region indicates the orbital shell with possible interference. Crosses in the figures denote a satellite location at a single instant in time at 500 km (1,200 km in Figure 5). The specific satellite locations are dynamic and will vary over time, and each satellite in the interference region will produce a streak in the telescope's imagery if the telescope is pointed in that direction.

6

A133

| Table 2: Beginning (7:15:00 PM) and End (6:12:00 AM) of Astronomical Twilight on June 21 at Cerro Pachón | | | | |
|---|---|---|---|---|
| June 21 (long night) | 500 km | | 1,200 km | |
| Local Time | % FOV with Possible Interference | Number of Satellites Illuminated | % FOV with Possible Interference | Number of Satellites Illuminated |
| 7:15:00 PM | 63.4 | 40 | 79.6 | 95 |
| 8:15:00 PM | 28.1 | 12 | 57.9 | 75 |
| 9:15:00 PM | 0.52 | 0 | 34.1 | 40 |
| 10:15:00 PM | 0 | 0 | 11 | 16 |
| 11:15:00 PM | 0 | 0 | 0 | 0 |
| 12:15:00 AM | 0 | 0 | 0 | 0 |
| 1:15:00 AM | 0 | 0 | 0 | 0 |
| 2:15:00 AM | 0 | 0 | 0 | 0 |
| 3:15:00 AM | 0 | 0 | 12.1 | 12 |
| 4:15:00 AM | 1.18 | 0 | 35.2 | 44 |
| 5:15:00 AM | 29.8 | 17 | 59.1 | 67 |
| 6:12:00 AM | 63.5 | 38 | 79.4 | 96 |

| Table 3: Beginning (10:21:00 PM) and End (5:00:00 AM) of Astronomical Twilights on December 22 at Cerro Pachón | | | | |
|---|---|---|---|---|
| December 22 (short night) | 500 km | | 1,200 km | |
| Local Time | % FOV with Possible Interference | Number of Satellites Illuminated | % FOV with Possible Interference | Number of Satellites Illuminated |
| 10:21:00 PM | 63.3 | 45 | 79.4 | 107 |
| 11:21:00 PM | 38.6 | 38 | 64.9 | 91 |
| 12:21:00 AM | 21.3 | 24 | 53.5 | 81 |
| 1:21:00 AM | 13.4 | 17 | 47.7 | 74 |
| 2:21:00 AM | 15 | 22 | 48.9 | 76 |
| 3:21:00 AM | 26 | 25 | 56.8 | 84 |
| 4:21:00 AM | 46.2 | 39 | 69.5 | 97 |
| 5:00:00 AM | 63.3 | 45 | 79.4 | 108 |



*Figure 3: Summary of Tables 2 and 3 with number of satellites illuminated during a long winter night (June 21, left) and short summer night (December 22, right). Blue bars illustrate the number of satellites illuminated at 500 km, and orange bars show the number of satellites at 1,200 km altitude.*



*Figure 4: Sky view of illuminated satellites at 500 km altitude on June 21. The red area shows the part of the orbital shell with satellites still illuminated by the sun as the night progresses. Satellites (crosses) in that part of the sky will reflect the sun. Satellites in the black part of the sky will be dark. The small circle in the center shows the dimension of the FOV of 1.75 degrees half-cone angle (Large Synoptic Survey Telescope). The left figure is based on a simulation at the end of astronomical twilight and the right figure is one hour after astronomical twilight with significantly less of the orbital shell with illuminated satellites in the sky.*



*Figure 5: Same as previous figure, showing an orbital shell at 1,200 km altitude also on June 21. Due to the higher altitude, satellites are much longer illuminated by the sun.*

8

A135

This analysis shows regions of possible interference from satellite reflections and where orbital shells can have illuminated satellites based on hypothetical constellations at 500 km and 1,200 km. Astronomical telescopes generally have a very small FOV (small magenta circle in the center of Figures 4 and 5) and most are unable to point to all possible regions of their visible sky. This can be due to telescope mount limits or to avoid atmospheric turbulence when pointing close to the horizon. In practice, optical and infrared observations are generally taken at air masses[†] of less than 1.5 (elevation angle greater than 42°) and rarely at air masses greater than 2 (elevation angle less than 30°). Even though more illuminated satellites will appear close to the horizon, most telescopes will not make observations at that angle.

In summary, our simulations show that the number of illuminated satellite and the areas vary throughout the night, leaving varying portions of the sky free from interference. It is technically feasible to predict each position of illuminated satellites and implement the information into astronomical scheduling and optimization routines. However, doing so may lead to an overall reduction in time available to the observatory and may also become impractical at one point.

## Current Mitigation Efforts

Astronomers already employ methods to dampen the severity of *ground-based* light pollution in their observations. For example, most amateur telescopes can be fitted with light-pollution reduction (LPR) filters, which are able to block discrete wavelengths, such as those from sodium and mercury street lamps and from atmospheric "airglow," a faint emission of light generated in Earth's upper atmosphere. While these filters can be useful for amateur and hobbyist

stargazers, the filters also block the light emitted from stars at those wavelengths—resulting in no improvement in contrast when observing some stars, star clusters, and galaxies. Unfortunately, LPR filters are not effective against satellite flares or streaks; flares are reflected "broadband" light, following the solar spectrum, while the filters are designed for only a very narrow band.

Astronomers must therefore rely on other mitigation strategies to decrease optical interference from satellites. Many algorithms can stitch together multiple exposures taken over specific intervals and digitally combine them to "erase" current levels of satellite streaks. Particularly for short- and medium-duration exposures, though streaks can still compromise some data beyond the point of use, this "stitching" (sometimes called a "track-and-stack" approach) has proved useful as a stop-gap measure to retain as much raw data as possible from each night of measurements.

Mitigating the effects of satellite streaks gets tougher when applied to larger telescope systems, which are sensitive enough to see fainter satellite streaks. Researchers using these systems take multiple exposures of a section of the night sky and median-filter them, throwing out those with streaks and averaging the rest. But each exposure has an opportunity cost in the form of read noise. This is why five separate 10-minute exposures are not equal to one 50-minute exposure; in the first instance, you have five samples of read noises to account for instead of one. Also, reading out an image takes time, adding to the overhead and allocation of observation time requirement. When planning the logistics of operating large telescopes, it becomes a question of balancing this "cost" in read noises. This illustrates why satellite streaks during long-duration

---

[†] Air mass indicates the ratio of absolute air masses at oblique angles relative to that at zenith. By definition, the relative air mass at the zenith is 1. Air mass increases as the angle between the look-angle and the zenith increases being highest at the horizon.

exposures can have an impact on data collection efforts; while it may be possible, it could also become impractical to carefully time one hundred 1-minute exposures in between periods of interference. To add to the problem, bright satellites can cause saturation in some pixels, with charge spilling over and "blooming" into the rest of the image. However, using the "track-and-stack" approach on a pixel-by-pixel basis could be an alternative.

It is still unknown how such algorithms would retain their efficacy, as the number and frequency of satellite constellation flares and streaks increases. "From my perspective," McDowell disclosed, "much of the discussion from the commercial side gives me the impression they don't understand how precise astronomy is. It doesn't take much scattered light to ruin an exposure. . . . The point is, the uncertainty is high. And that's a problem."

As skies have grown more polluted with a variety of light sources, state and local governments, as well as grassroots organizations, have started to push back. The International Dark Sky Association (IDSA), for instance, is a nonprofit organization advocating for the preservation of the night sky and providing guidance and education to regulators on how to mitigate light pollution from terrestrial sources. For example, IDSA is working with the public, city planners, legislators, lighting manufacturers, parks, and protected areas to provide and implement smart lighting choices. Astronomers have voiced growing concern as early as the late 1990s, when the first satellite constellations were initially proposed. Proposals for large constellations have created even greater apprehension.

Many cities worldwide have heeded the concerns of groups like the IDSA, incorporating localized efforts to combat ground-based light pollution into their urban planning processes, such as new designs for street lamps that produce less light pollution and are more energy efficient.[4] Ground-based light pollution is especially prominent in densely populated cities, where nighttime lights contribute to the creation of "skyglow," or scattered light in the atmosphere at night. For astronomical equipment and to the human eye, skyglow greatly reduces the contrast between stars and galaxies and the sky itself, making it harder to see fainter objects such as galaxies and nebulae, even with powerful telescopes. Even before exposures are taken, astronomers rely on the periods just after sunset to calibrate their equipment's settings to accurately capture light from astronomical objects in space. For this reason, the locations of wide-field, multi-million-dollar telescope projects designed for long-exposure imaging of deep space are chosen with extreme care, usually at high-elevation and comparatively remote sites.

According to the National Conference of State Legislatures, at least 18 states have laws in place to reduce light pollution but are mostly limited to outdoor lighting fixtures installed on the grounds of a state building or public roadway.[17] In 2015, the Environmental Protection Agency (EPA) administrator, Gina McCarthy, said that light pollution is "in our portfolio" and that the agency is

| Table 4: Possible Mitigation Approaches | |
|---|---|
| Summary of Currently Known Mitigation Approaches with Varying Degrees of Feasibility | |
| Astronomers | Satellite Operators |
| ◆ Optimize observation schedules to avoid satellites | ◆ Apply special coating or paint to lower reflectivity |
| ◆ Apply "stitching" and median-filter algorithms | ◆ Modify orbit placement and satellite orientation |

10

"thinking about it." To date, EPA has no official regulation on light pollution.[18] A recent article highlighted that the EPA has provided the Federal Communications Commission (FCC) with a categorical exclusion since 1986, arguing that such activities do not impact the environment and thus do not require a review.[19] It can be argued, however, that the time has come to address light pollution at the national level.

Local approaches in areas with large astronomical infrastructure can also take the form of laws and regulations that mitigate the effects of ground-based light pollution and radio interference with certain telescopes. These local mitigation efforts have been particularly effective for protecting radio astronomy. West Virginia, for example, is home to the Green Bank Telescope, the world's largest fully steerable radio telescope, and has strictly enforced a "Radio Astronomy Zoning Act." The act prohibits the operation of weak and strong electrical equipment such as microwave ovens and even Wi-Fi routers within two- and ten-mile radii of any radio astronomy facility, respectively, "if such operation causes interference with reception by said radio astronomy."[20] Other radio quiet zone laws restricting radio transmissions within certain areas can be found internationally as well, such as the areas surrounding the Itapetinga Radio Observatory in Brazil and the Murchison Radio-astronomy Observatory in Australia.

Astronomers, however, have found that much of the diligence, investment, and preparation to shield equipment from ground-based light pollution is being undercut by a lack of regulatory coordination around mitigating satellite light pollution and reflections from above. This is of particular concern for wide-field telescopes taking long exposures. "A substantial increase in number of satellites in LEO will certainly change the operations of major ground-based telescopes," confirmed McDowell. Facilities, such as the Large Synoptic Survey Telescope (LSST)[21] currently under construction in

Cerro Pachón, Chile, and the Panoramic Survey Telescope and Rapid Response System (Pan-STARRS), located at the Haleakala Observatory in Hawaii, perform observations that will help scientists better understand deep space, the nature of dark matter, and how the Milky Way was formed. However, the telescopes also search for undiscovered near-Earth objects (NEOs). The LSST alone will be able to detect between 60 percent and 90 percent of all potentially hazardous asteroids (PHAs) larger than 140 meters in diameter, serving a key warning function for planetary defense against potential impact threats.

### A "Wake-Up Call"

In May 2019, the commercial space company, SpaceX, launched the first 60 satellites belonging to its Starlink LEO constellation, which will eventually have 1,584 satellites orbiting at a 550 km altitude. Since November 2019, SpaceX added an additional four launches with 60 satellites each (as of early March 2020). Directly following the launch, several videos of clearly visible "trains" of the spacecraft in preliminary orbits en route to their final orbital positions and orientations were uploaded to social media, and confused local citizens even filed numerous reports of UFOs in the areas where the satellite trains were visible.[22] Though the brightness of the reflection of the spacecraft at the time they were observed (within the few days following launch) are not representative of their brightness once in their final positions, the videos[23] nevertheless contributed to renewed discourse on the effect of space commercialization on astronomical research and society more generally.

The International Astronomical Union, the world's largest international association of local and regional chapters of professional astronomers, issued a statement following the launch,[24] depicting a photo of a telescope's FOV obstructed by light streaks from Starlink satellites. The picture was

taken early on as the satellites made their way into their final orbits, noting in the image caption that the density of satellites is significantly higher in the early days after launch and that the satellite brightness would diminish as they reach their final orbital altitude. The statement urged constellation "designers and deployers as well as policy-makers to work with the astronomical community in a concerted effort to analyze and understand the impact of satellite constellations."

The National Radio Astronomy Observatory (NRAO) issued its own statement following the launch,[25] remarking that SpaceX officials had been diligent in their consideration of interference with radio astronomy while planning how Starlink would operate—in accordance with domestic and international regulations regarding harmful satellite radio interference. NRAO noted that it had been working directly with SpaceX to "jointly analyze and minimize any potential impacts from its proposed Starlink system," and that their discussions had resulted in "valuable guidelines that could be considered by other such systems as well." In addition, SpaceX treated one satellite of the January 2020 batch with a special coating, lowering its brightness in response to reports from the public and the astronomical community.[26]

Overall, the brightness of any satellite (whether it is in a constellation or not) and the duration of its optical interference with astronomical observation is a function of the altitude of the satellite. The magnitude of the reflected signal (usually sunlight) will amount to 1 divided by the square of the distance of the satellite—so, as the altitude is raised, the brightness will become smaller. This underscores why LEO constellations at different altitudes pose risks of interference to astronomical observation: the amount of possible interference time is reduced at lower altitudes, but satellites are generally brighter.

## Looking Ahead

Despite the preparation and investments already made to mitigate ground-based light pollution for wide-field and long-exposure telescopes, the impact of light pollution of satellite constellations is currently not given consideration at the federal and international level.

Thanks to institutions like the International Telecommunications Union (ITU), radio astronomers are equipped with both policy protections in the form of regulation and a forum to challenge any harmful interference with their observations. For instance, many satellites broadcasting signals must redirect or cease such signals when passing over radio astronomy facilities. However, as of today, researchers in optical astronomy have no such recourse; unlike other risks and hazards associated with pLEO constellations, such as orbital debris concerns, no formal regulatory or licensing process currently exists for constellation operators to demonstrate their strategy for mitigation of the adverse impacts of reflectivity in their license applications.

An organized avenue for coordinated discussion on guidelines and mitigation strategies among stakeholders is needed to address the wider concerns of the astronomy community. Other aspects of managing the risks of pLEO constellations are already discussed at interagency, national, and international fora, such as the Inter-Agency Space Debris Coordination Committee (IADC), which has worked to negotiate and form mutually agreed-upon mitigation guidelines preventing the widespread proliferation of orbital debris for nearly three decades. The IADC is tasked with "consideration of space sustainability effects from deploying large constellations of satellites" at the federal level, but satellite light pollution is outside the scope of IADC.[27]

12

A139

Groups like the American Astronomical Society (AAS) and the International Astronomical Union (IAU) already act as representatives of the larger astronomy community working to express optical interference concerns to regulators. Other, more collaborative avenues may prove more appropriate; to ensure allied and multi-national coordination, for example, regulators could look to successful models that resulted in progress for other space sustainability issues, such as within the United Nations working group on the "Long-Term Sustainability of Space."

## Conclusion

From a U.S. policy perspective, pLEO constellations—both governmental and commercial—will provide novel services and benefits to their users. As more satellites are launched, and industry players continue to develop norms of operation in LEO, astronomers will want a larger role to play in wider constellation management and space safety coordination considerations. Operators of such constellations face an opportunity to get ahead of the issue by working with stakeholders to consider strategies for mitigation of optical reflectivity and albedo reduction. Regulators, astronomers, and industry should be in communication about their respective operational needs to explore options for building optical interference mitigation into existing constellation licensing application processes. Multiple stakeholders involved in this issue are increasing their communication among each other. Notably, at a recent AAS conference, LSST Chief Scientist Dr. Tony Tyson remarked, ". . . we find that SpaceX is committed to solving this problem." In the years to come, information-sharing and cooperation could help facilitate the creation of industry best practices and standards to ensure the long-term sustainability of both ground-based astronomy and LEO constellations.

13

## References

[1] "Eight Satellite Constellations Promising Internet Service from Space," Thierry Dubois. Aviation Week & Space Technology, December 2017. https://aviationweek.com/space/eight-satellite-constellations-promising-internet-service-space

[2] "SpaceX submits paperwork for 30,000 more Starlink satellites," Caleb Henry, SpaceNews. 15 October 2019. https://spacenews.com/spacex-submits-paperwork-for-30000-more-starlink-satellites/

[3] "Program Information: Blackjack." DARPA.mil. https://www.darpa.mil/program/blackjack

[4] Astronomical Magnitude Scale, Wikipedia. https://en.wikipedia.org/wiki/Magnitude_(astronomy)

[5] Falchi, et al. "The new world atlas of artificial night sky brightness," Science Advances, 10 Jun 2016 Vol. 2, no. 6.

[6] "Metal Plating on Satellites: The Benefits of Light Reflection." SPC Surface Treatments. https://www.sharrettsplating.com/blog/metal-plating-satellites-benefits-light-reflection/

[7] Humanity Star, Web. www.thehumanitystar.com

[8] "Russians to Test Space Mirror as Giant Night Light for Earth," NY Times, 12 January 1993. https://www.nytimes.com/1993/01/12/science/russians-to-test-space-mirror-as-giant-night-light-for-earth.html

[9] Heavens Above, "The End of Iridium Flares?" https://heavens-above.com/IridiumDemise.aspx

[10] "Spot the Station," NASA. https://spotthestation.nasa.gov/home.cfm

[11] "China Plans to Launch an 'Artificial Moon' to Light Up the Night Skies," Time magazine, 19 October 2018. https://time.com/5429288/china-chengdu-artificial-moon/

[12] "Decay Data: Humanity Star." Space-Track. 22 March 2018. https://www.space-track.org/basicspacedata/query/class/tip/NORAD_CAT_ID/43168/orderby/ID%20DESC/format/html/

[13] "Space Gets an Artificial Star. Astronomers Ask: Do We Need More?" NY Times, 28 January 2018. https://www.nytimes.com/2018/01/28/science/rocket-lab-humanity-star.html

[14] "PepsiCo scraps plans for 'orbital billboard,'" Marketing Dive, 17 April 2019.

https://www.marketingdive.com/news/pepsico-shoots-sky-high-with-planned-pilot-of-orbital-billboard/552776/

[15] Shell, James R., "Optimizing Orbital Debris Monitoring with Optical Telescopes," Proceedings of the Advanced Maui Optical and Space Surveillance Technologies Conference, Wailea, Maui, Hawaii, September 14-17, 2010.

[16] "About LSST," National Science Foundation. https://www.lsst.org/about

[17] https://www.ncsl.org/research/environment-and-natural-resources/states-shut-out-light-pollution.aspx

[18] https://www.washingtonexaminer.com/epa-chief-light-pollution-in-our-portfolio

[19] https://www.scientificamerican.com/article/the-fccs-approval-of-spacexs-starlink-mega-constellation-may-have-been-unlawful/

[20] "Enter the Quiet Zone: Where Cell Service, Wi-Fi Are Banned," NPR. https://www.npr.org/sections/alltechconsidered/2013/10/08/218976699/enter-the-quiet-zone-where-cell-service-wi-fi-are-banned

[21] "About LSST," National Science Foundation. https://www.lsst.org/about

[22] "UFO Reports surge after Elon Musk launches SpaceX Internet satellites," The Independent, 28 May 2019. https://www.independent.co.uk/life-style/gadgets-and-tech/news/ufo-sightings-elon-musk-spacex-internet-satellites-starlink-space-a8933411.html

[23] "SpaceX Starlink Objects train 24 May 2019," Marco Langbroek. Web. https://vimeo.com/338361997

[24] "IAU Statement on Satellite Constellations," 3 June 2019. Web. http://www.iau.org/news/announcements/detail/ann19035/

[25] "Statement on Starlink and 'Constellations' of Communication Satellites." 31 May 2019. https://public.nrao.edu/news/nrao-statement-commsats/

[26] https://www.space.com/spacex-starlink-satellites-astronomy-plans.html

[27] Email Correspondence, NASA Public Affairs Representative. Web. 22 August, 2019.

A141



# EXHIBIT I



# Impact of Satellite Constellations
## on Optical Astronomy and Recommendations Toward Mitigations

**Written by:** Walker, C. (NSF's NOIRLab), Hall, J. (Lowell Observatory), Allen, L. (NSF's NOIRLab), Green, R. (U. Arizona,), Seitzer, P. (U. Michigan), Tyson, A. (UC Davis/Rubin Observatory), Bauer, A. (Vera C. Rubin Observatory), Krafton, K. (AAS), Lowenthal, J. (Smith College), Parriott, J. (AAS), Puxley, P. (AURA), Abbott, T. (NSF's NOIRLab), Bakos, G. (Princeton University), Barentine, J. (IDA), Bassa, C. (ASTRON), Blakeslee, J. (Gemini Observatory/NSF's NOIRLab), Bradshaw, A. (SLAC), Cooke, J. (Swinburne University), Devost, D. (Canada–France–Hawai'i Telescope), Galadí, D. (Icosaedro working group of the Spanish Astronomical Society), Haase, F. (NSF's NOIRLab), Hainaut, O. (ESO), Heathcote, S. (NSF's NOIRLab), Jah, M. (University of Texas at Austin), Krantz, H. (U. Arizona), Kucharski, D. (University of Texas at Austin), McDowell, J. (CfA), Mróz, P. (Caltech), Otarola, A. (ESO, TMT), Pearce, E. (U. Arizona), Rawls, M. (U. Washington/Rubin Observatory), Saunders, C. (Princeton University), Seaman, R. (Catalina Sky Survey), Siminski, J. (ESA Space Debris Office), Snyder, A. (Stanford University), Storrie–Lombardi, L. (Las Cumbres Observatory), Tregloan–Reed, J. (U. Antofagasta), Wainscoat, R. (U. Hawai'i), Williams, A. (ESO) and Yoachim, P. (U. Washington/Rubin Observatory)

**Edited by:** Walker, C. (NSF's NOIRLab) and Hall, J. (Lowell Observatory)

**Print production:** NSF's NOIRLab (Communications, Education & Engagement division)

**Design:** Pete Marenfeld

**Copy–editing & Proofreading:** Peter Grimley

**Coordination:** Lars Lindberg Christensen

**Cover image:**  In May 2019 SpaceX launched its first batch of 60 Starlink communication satellites, which surprised astronomers and laypeople with their appearance in the night sky. Astronomers have only now, a little over a year later, accumulated enough observations of constellation satellites like those being launched by SpaceX and OneWeb (seen in this artist's impression, not to scale) and run computer simulations of their likely impact to begin to understand the magnitude and complexity of the problem.
Credit: NOIRLab/NSF/AURA/P. Marenfeld

2

# [ EXECUTIVE SUMMARY ]

Existing and planned large constellations of bright satellites in low-Earth orbit (LEOsats) will fundamentally change astronomical observing at optical and near-infrared (NIR) wavelengths. Nighttime images without the passage of a Sun-illuminated satellite will no longer be the norm. If the 100,000 or more LEOsats proposed by many companies and many governments are deployed, no combination of mitigations can fully avoid the impacts of the satellite trails on the science programs of current and planned ground-based optical-NIR astronomy facilities. Astronomers are just beginning to understand the full range of impacts on the discipline. Astrophotography, amateur astronomy, and the human experience of the stars and the Milky Way are already affected. This report is the outcome of the Satellite Constellations 1 (SATCON1) workshop held virtually on 29 June–2 July 2020. SATCON1, organized jointly by NSF's NOIRLab and AAS with funding from NSF, aimed to quantify better the impacts of LEOsat constellations at optical wavelengths and explore possible mitigations.

Recent technology developments for astronomical research — especially wide-field imaging on large optical telescopes — face significant challenges from the new ability in space and communication technologies to launch many thousands of LEOsats rapidly and economically. This troubling development went unnoticed by our community as recently as 2010, when *New Worlds, New Horizons* — the most recent National Academies' decadal survey of astronomy and astrophysics — was issued. In the last year, the sky has changed, with growing numbers of satellite trails contaminating astronomical images.

Many astronomical investigations collect data with the requirement of observing any part of the sky needed to achieve the research objective with uniform quality over the field of view. These include studies that are among the highest priorities in the discipline: stellar populations in the Milky Way and neighboring galaxies; searches for potentially hazardous near-Earth objects; identification of gravitational wave sources such as neutron star mergers; and wide-area searches for

transiting exoplanets. At a minimum, a fraction of the area being imaged is lost to the trails or significantly reduced in S/N (signal-to-noise ratio). However, many of these areas of research also include a time-critical aspect and/or a rare, scientifically critical target. Such a missed target, even with low probability, will significantly diminish the scientific impact of the project. For example, if a near-Earth object is not recovered, its orbital parameters are lost. If the transit of a promising super-Earth exoplanet candidate is missed, the orbital timing may not be recovered. If the optical counterpart of a gravitational wave source is lost in the few percent of pixels in satellite trails, its rapid fading may preclude subsequent identification. Detailed simulations beyond the scope of this workshop are required to better quantify the potential scientific cost of losing uniform full area coverage in these cases.

Even more challenging simulations are required to understand the impact on very large samples (e.g., from Vera C. Rubin Observatory) that are limited not by small number statistics but rather by systematic uncertainties. One measure of precision cosmology, for example, is the gravitational weak lensing shear that elongates faint galaxy images, and more complex modeling is needed to understand the major impact these satellites will have on this field.

Initial visibility simulations have shown the significant negative impacts expected from two communications-focused LEOsat constellations, Starlink (launched by Space Exploration holdings, LLC [SpaceX]), and OneWeb. For SATCON1, simulations were performed of the visibility of LEOsats with 30,000 second-generation Starlink satellites below 614 km and ~48,000 OneWeb satellites at 1200 km, in accord with the FCC filings for these projects. For all orbital heights, the visibility of sunlit satellites remains roughly constant between sunset and astronomical twilight (Sun 18 degrees below the horizon). The key difference between lower (~600 km) and higher (~1200 km) orbits is the visibility in the dark of night between astronomical twilights: higher altitude constellations can be visible all night long during

3



*Figure 1: Starlink trails over Bryce Canyon. The image is a stack of multiple, consecutive exposures acquired over a period of about 30 minutes, an example of the impact of satellite constellations on multi-image astrophotography. Image credit, Spencer Camera and Photo*

summer, with only a small reduction in the number visible compared to those in the twilight.

Mitigation of the most damaging impacts on scientific programs is now being actively explored by the professional astronomy community worldwide. These investigations have benefited from collaboration with SpaceX, the first operator to launch a substantial constellation of LEOsats (538 satellites over 9 launches as of July 2020). Changes are required at both ends: constellation operators and observatories. SpaceX has shown that operators can reduce reflected sunlight through satellite body orientation, Sun shielding, and surface darkening. A joint effort to obtain higher accuracy public data on predicted locations of individual satellites (or ephemerides) could enable some pointing avoidance and mid-exposure shuttering during satellite passage. Observatories will need to adopt more dynamic scheduling and observation management as the number of constellation satellites increases, though even these measures will be ineffective for many science programs.

SATCON1 was attended by over 250 astronomers and engineers from commercial operators (mainly from SpaceX since they are furthest along in their work on this issue), as well as other stakeholders, and reached a number of conclusions and recommendations for future work. The organizers hope that the collegiality and spirit of partnership between these two communities will expand to include other operators and observatories and continue to prove useful and productive. Our findings and recommendations should serve as guidelines for observatories and satellite operators alike to use going forward, even as we work toward a more detailed understanding of the impacts and mitigations.

Our findings and recommendations are listed below.

4

## A. Findings

**Finding 1**

The projected surface density of bright satellites in constellations is greatest near the horizon and during twilight. For this reason, LEO constellations disproportionately impact science programs that require twilight observations, such as searches for near-Earth objects (NEOs), distant Solar System objects and optical counterparts of fleeting gravitational wave sources. Depending on constellation design, LEO satellites can also be visible deep into the night, broadening the impact to encompass all astronomical programs. We find that the worst-case constellation designs prove extremely impactful to the most severely affected science programs. For the less affected programs, the impact ranges from negligible to significant, requiring novel software and hardware efforts in an attempt to avoid satellites and remove trails from images.



*Figure 2: A simulated all-sky plot of trails of 47,708 illuminated LEOsats over a 10-minute time period as seen from Rubin Observatory in Chile with the altitude of the Sun at –18.4 degrees. Zenith is at the center, north is up and east is left. The trails are bunched due to populating the orbital planes. The trail-free region is caused by the Earth's shadow. Credit: P. Yoachim (U. Washington/ Rubin Observatory), private communication*

We find two step-functions in impact based on the brightness of the satellites: naked-eye visibility and instrument sensor calibration range. If satellites are visible to the naked eye, the scope of impact expands to include non-professional, unaided-eye observers including amateur astronomers and astrophotographers, and possibly indigenous peoples and members of religions that observe the sky for calendar-keeping. Satellites whose apparent brightnesses are below unaided-eye visibility can have a much more severe impact on astronomical science if they are bright enough to cause non-correctable artifacts in the camera sensors. For fainter satellites, of course, the trail itself remains and must be dealt with. In the cases where it might be impossible to fully mask or remove trails, a bright enough satellite could induce systematic errors impacting some science investigations.

*Satellites below 600 km*

LEOsat constellations below 600 km are visible for a few hours per night around astronomical twilight from observatories at middle latitudes, but they are in Earth's shadow and invisible for several hours per night around local solar midnight, with some satellites visible during the transitions. This visibility pattern causes these constellations to most heavily impact twilight observers (see the examples mentioned above). Since these orbits are closer to Earth, satellites at these altitudes will be brighter than the same satellites would be at higher orbital altitudes. The reduced range makes them more likely to exceed the unaided-eye brightness threshold if operators fail to design with this criterion in mind.

*Satellites above 600 km*

Satellites above 600 km are an even greater concern to astronomers because they include all the impacts mentioned above, but can also be illuminated all night long. Full-night illumination causes these high-altitude constellations to impact a larger set of astronomical programs.

**Finding 2**

Approaches to mitigate LEOsat impacts on optical-NIR astronomy fall into six main categories.

1. Launch fewer or no LEOsat constellations. This is the only option identified that can achieve zero impact.
2. Deploy satellites at orbital altitudes no higher than ~600 km.

5

3. Darken satellites by lowering their albedo, shading reflected sunlight, or some combination thereof.
4. Control each satellite's attitude in orbit so that it reflects less sunlight to Earth.
5. Remove or mask satellite trails and their effects in images.
6. Avoid satellite trails with the use of accurate ephemerides.

# B. Recommendations

## 1. For Observatories

**Recommendation 1**
Support development of a software application available to the general astronomy community to identify, model, subtract, and mask satellite trails in images on the basis of user-supplied parameters.

**Recommendation 2**
Support development of a software application for observation planning available to the general astronomy community that predicts the time and projection of satellite transits through an image, given celestial position, time of night, exposure length, and field of view, based on the public database of ephemerides. Current simulation work provides a strong basis for the development of such an application.

**Recommendation 3**
Support selected detailed simulations of the effects on data analysis systematics and data reduction signal-to-noise impacts of masked trails on scientific programs affected by satellite constellations. Aggregation of results should identify any lower thresholds for the brightness or rate of occurrence of satellite trails that would significantly reduce their negative impact on the observations.

## 2. For Constellation Operators

**Recommendation 4**
LEOsat operators should perform adequate laboratory

Bi-directional Reflectance Distribution Function (BRDF) measurements as part of their satellite design and development phase. This would be particularly effective when paired with a reflectance simulation analysis.

**Recommendation 5**
Reflected sunlight ideally should be slowly varying with orbital phase as recorded by high etendue (effective area × field of view), large-aperture ground-based telescopes to be fainter than 7.0 $V_{mag}$ +2.5 × log($r_{orbit}$ / 550 km), equivalent to 44 × (550 km / $r_{orbit}$) watts/steradian.

**Recommendation 6**
Operators must make their best effor to avoid specular reflection (flares) in the direction of observatories. If such flares do occur, accurate timing information from ground-based observing will be required for avoidance.

**Recommendation 7**
Pointing avoidance by observatories is achieved most readily if the immediate post-launch satellite configuration is clumped as tightly as possible consistent with safety, affording rapid passage of the train through a given pointing area. Also, satellite attitudes should be adjusted to minimize reflected light on the ground track.

## 3. For Observatories and Operators in Collaboration

**Recommendation 8**
Support an immediate coordinated effort for optical observations of LEOsat constellation members, to characterize both slowly and rapidly varying reflectivity and the effectiveness of experimental mitigations. Such observations require facilities spread over latitude and longitude to capture Sun-angle-dependent effects. In the longer term, support a comprehensive satellite constellation observing network with uniform observing and data reduction protocols for feedback to operators and astronomical programs. Mature constellations will have the added complexity of deorbiting of the units and on-orbit aging, requiring ongoing monitoring.

**Recommendation 9**
Determine the cadence and quality of updated

6

positional information or processed telemetry, distribution, and predictive modeling required to achieve substantial improvement (by a factor of about 10) in publicly available cross-track positional determination.

**Recommendation 10**

Adopt a new standard format for publicly available ephemerides beyond two-line-elements (TLEs) in order to include covariances and other useful information. The application noted in Recommendation 2 should be compatible with this format and include the appropriate errors.



*Figure 3. A wide-field image (2.2 degrees across) from the Dark Energy Camera on the Victor M. Blanco 4-m telescope at the Cerro Tololo InterAmerican Observatory, taken on 18 November 2019. Several Starlink satellites crossed the field of view. Image credit: CTIO/NOIRLab/NSF/AURA/DECam DELVE Survey.*

7

# [ **I. INTRODUCTION** ]



*Figure 4: The Hubble Deep Field showed the value of observing the same patch of sky uninterrupted for days. Credit: Robert Williams and the Hubble Deep Field Team (STScI) and NASA/ESA*

In 1995, the Hubble Space Telescope used its valuable observing time to do something seemingly frivolous: stare over ten days at a blank patch of sky. The target area was minuscule — just twice the apparent size of Venus in its crescent phase — but the resulting image, the Hubble Deep Field, revealed thousands of galaxies from the earliest history of the Universe. Subsequent deep field images revealed tens of thousands more galaxies in equally tiny patches of sky. Dark skies hold many secrets, and the flagship ground-based facilities of today are steadily revealing them. Vera C. Rubin Observatory, Astro2010's top recommendation for ground-based optical astronomy, will be online in the next decade. In upcoming decades a set of thirty-meter facilities will come online, expanding substantially our view to our origins. For numerous reasons of expense, maintenance, and instrumentation, these facilities cannot be operated from space. Ground-based astronomy is, and will remain, vital and relevant.

Reflected light from large constellations of LEOsats threatens the scientific viability of these current and future facilities. Constellations at high altitudes, such as the OneWeb constellation at 1200 km, present particularly serious challenges; they will be visible all night during summer and significant fractions of the night during winter, fall, and spring, and will have negative impacts on nearly all observational programs. The recommendations and mitigation strategies in the next section are based on work by and collaboration between astronomers and SpaceX, and no other stakeholders. Nevertheless, they are intended for a broad audience, and especially the satellite constellation industry as a whole. We welcome broader engagement on these issues.

SATCON1 was held virtually from 29 June to 2 July 2020, with over 250 attendees. It focused on the technical aspects of the impact of satellite constellations on optical astronomy; topics of policy and regulation were deferred to SATCON2, tentatively planned for spring 2021. The first two days of SATCON1 consisted of presentations by members of four working groups on topics from papers they had drafted in the preceding month. The remaining days involved revision of these papers.

In Section II of this report, we present our conclusions about the impact of LEOsat constellations on optical astronomy in nine critical use cases. In Section III, we present our recommended metrics and mitigation strategies.

8

# II. IMPACT ASSESSMENT BY SELECTED OBSERVING GENRES AND SCIENCE CASES



*Figure 5: A LEOsat trail in a portion of a Subaru Telescope CCD image, as an example of a LEOsat trail in a wide-field image. This serendipitous observation of FUSE1 was done in morning twilight (4:33 am* local time on 28 May 2020). The low surface brightness fuzz extends to 15 arcseconds. Credit: R. Wainscoat (U. Hawai'i), private communication*

## A. Introduction

To build a more nuanced and detailed view of the likely impacts of large constellations of LEOsats, we identified nine representative science cases and genres of sky observations potentially vulnerable to those impacts:

1. Rare transients, e.g. gravitational wave events, gamma-ray bursts, fast radio bursts.
2. Deep, wide, extragalactic imaging for, e.g., cosmology (dark matter, dark energy) via large numbers of weak lensing, galaxy morphology, and ultra-faint low surface brightness measurements.
3. Near-Earth objects (NEOs).
4. Deep multi-object spectroscopic surveys.
5. Deep wide-field near-infrared (NIR) imaging.
6. Imaging of large extended low surface brightness targets.
7. Exoplanet transits in wide-field surveys.
8. Discovery of new phenomena.
9. Citizen science, amateur astronomers, and stargazers worldwide.

Science and community leaders from many major observatories responded to requests for information in the context of a summary of the Simulations Working Group's models of the appearance of a constellation of 33,000 satellites at 600 km or below (Starlink scenario) and 47,844 satellites at 1200 km (OneWeb scenario). To assist the working group in developing a qualitative impression of the impacts of these constellations, some respondents agreed to categorize the impact through definitions provided in a simple rubric:

· **Negligible**: the program will be realized as originally planned essentially unchanged.
· **Significant but tolerable**: science goals will be somewhat compromised, additional time or resources being required to offset losses.
· **Extreme**: science goals cannot be realized.

Some respondents provided general statements, along with descriptions of relevant observatory performance. The sections below are taken from these responses, with some editing for clarity, narrative, and style.

9

# B. Impacts on Scientific and Observational Programs

## 1. Rare Transients

**Fast Transients**
In the next decade, a "new sky" will open up: fast transients, an unexplored regime ripe for the discovery of the unexpected. Searches for optical or infrared counterparts to fast transients require a rapid response — often within a few minutes or less — to triggers from space- or ground-based gamma-ray, optical, or radio surveys. Follow-up observing networks can include dozens of ground-based telescopes. Major optical surveys include the Rubin Observatory Legacy Survey of Space and Time (LSST), the Zwicky Transient Facility (ZTF), and the Panoramic Survey Telescope and Rapid Response System (Pan-STARRS). Sky surveys themselves and spectroscopic follow-up observations are separately impacted by satellite trails.

This is a burgeoning research area with many unknown events and physical phenomena; satellites can ruin detections of these events as well as spectroscopic follow-up and, as the events fade very rapidly, the ability to re-acquire the data is lost.

**Optical Gravitational Wave Follow-Up**
Simultaneous data from optical/IR observatories and other detectors, such as neutrinos or gravitational waves (GW), represent a unique multi-messenger science opportunity in the next decade. As frequently as once a week, the network of GW detectors will detect events at very high S/N and within minutes will announce 90% likelihood areas on the sky. The first job is to detect any electromagnetic counterpart. This will be done by rapidly and repeatedly tiling this area with images from large telescopes such as Rubin Observatory in multiple filters, in order to distinguish the object from thousands of regular transients detected during this tiling. Once detected, the candidate must be passed on to spectroscopic follow-up. Owing to the time-critical nature, some of this search will occur during twilight. Satellite trails interfere with algorithms developed to distinguish real transient events from false detections.

**Rapid Contiguous Monitoring of Special Sky Areas**
Like the GW follow-up, several LSST science programs involve rapid contiguous monitoring of special fields. This precludes satellite avoidance strategies where one moves to an adjacent field. These special fields tend to be the same size as the field of view of the camera. One example is the LSST Deep Drilling fields, which will be rapidly imaged for about one hour every night in multiple filters to detect unusual events. Another example is the Large Magellanic Cloud, a nearby dwarf galaxy important both for new transients and for probing the physics of dark matter.

## 2. Deep, Wide, Extragalactic Imaging

Low surface brightness imaging surveys over wide areas enable unprecedented probes of cosmology and galaxy evolution. Much of the science from the LSST will involve statistical analysis of trillions of photometric measurements of 20 billion objects. Measuring the physics of dark matter and dark energy requires billions of extremely faint (26th magnitude) galaxies for which the shape must be accurately known to one part in 10,000. Science discoveries from these measurements will be more affected by systematics than by sample size. This is a new paradigm.

One example is cosmology. The masked long satellite trails present a low surface brightness systematic error at the edge of the mask, generating a line of correlated noise — potentially producing a cosmic shear bias. Simulations are needed to assess the degree of science impact. Each satellite trail will have its own low surface brightness

systematic error extending 30–60 arcseconds from the trail, depending on the satellite brightness. These residual errors and correlated linear noise features scale with trail brightness.

Virtually the entire astronomical community will rely on the released LSST data products (transient alerts and static deep sky catalogs) rather than processing the hundreds of petabytes of images. They therefore will also rely on the LSST data management to do the required pixel processing and artifact removal. This work is algorithmically feasible for satellite trails that are fainter than magnitude 7–8, but it represents additional work beyond the original scope of the project. A key issue is systematic errors that will ultimately land in the alerts and catalogs released by the LSST for the scientific community; for those programs most affected, the sheer task of tackling these new systematic errors in the released data products is likely beyond the capability of many.



*Figure 6: A histogram of 281 visual magnitude measurements of Starlink satellites imaged by the Pomenis Observatory in late May and early June 2020. The mean of all 281 measurements is $V_{mag}$ = 5.5 with a standard deviation of 1.0. This broad distribution of values demonstrates the varied brightness of Starlink satellites which depends on numerous geometric factors. Credit: H. Krantz (U. Arizona), private communication*

## 3. Near–Earth Objects (NEOs)

Since the 1980s, numerous projects worldwide have been devoted to scanning the skies for near–Earth asteroids and comets. These are interesting scientifically for the clues they give to the formation and evolution of the Solar System, but the most direct motivation for discovering and characterizing NEOs is their potential to collide with the Earth and cause catastrophic damage to ecosystems and human civilization. Asteroids and comets have frequently impacted Earth in the past and will do so in the future, over long intervals with dramatic consequences, if not discovered and mitigated. NEO detection and characterization has a US congressional mandate and is also supported by the United Nations Office for Outer Space Affairs. These surveys operate in the twilight hours when their targets are visible but also when satellite interference is worst. Pairs, triples, or quads of observations must be

made within a short time in order to form a moving object "tracklet," and the probability of a LEOsat trail interfering with this process is high.

LEOsats already cause loss of data to Pan-STARRS, the Catalina Sky Survey, and other NEO surveys, effectively wiping out a long trail in the focal plane. Trails also generate spurious artifacts that can confuse automated pipelines. Just after evening twilight and just before morning twilight are the only usable parts of the night for detecting NEOs at low solar elongation, a particularly rich area for NEO searches thanks to the line of sight along the orbit of Earth.

For the NEO community, the risks are perhaps best expressed as a tax — an unfunded mandate — imposed on NEO survey and follow-up operations. Per the rubric, the risks to our community will be generally "significant" in the future. For the Catalina Sky Survey, one way of characterizing the impact is the fractional loss of pixel area from satellite trails; a rough estimate is that a satellite trail in every image will cost a few tenths of a percent in detection efficiency. This can be qualified as "negligible," but bright trails from satellites not yet on-station or that are brightly illuminated without mitigations may have more impact.

As currently understood, either the Starlink Generation 2 or the OneWeb scenario (of order 40,000 satellites) will significantly degrade twilight near-Sun observations, especially for the LSST, as implied by several presentations at the SATCON1 workshop. The satellite trail masking developed for the LSST pipeline processing is very promising, but it may also unintentionally remove trails originating from NEOs. The NEO Surveyor Mission (NEOSM) will observe the near-Sun region from L-1 and will not be impacted by LEOsats; however, NEOSM will be sensitive to larger, more distant NEOs, not the myriad close-approachers that must be observed from the ground. It is vital to model and simulate twilight observations, near-Sun or for illuminated satellites high in the sky, for all surveys.

## 4. Deep Multi-object Spectroscopic Surveys

Spectroscopic observations generally cover smaller fields of view than imaging programs. However, exposure times can be much longer for spectroscopy, e.g., 1800 sec or more vs. typically 300 sec or less for imaging. A bright satellite crossing near a long spectrograph slit, series of slitlets in a slit mask, or integral field unit (IFU) could ruin the entire exposure, as it is not known *a priori* which observations are contaminated, forcing a repeat exposure or possible loss of science opportunity.

There are several large spectroscopic facilities nearing operation or in advanced planning that are all vulnerable to LEOsat trails. The Dark Energy Spectroscopic Instrument (DESI) is a wide-field spectrograph on the Nicholas U. Mayall 4-m telescope at Kitt Peak National Observatory. With an 8 square degree field of view and long exposures (10–20 minutes), it is not possible to "point between" satellite trails. DESI has completed its construction phase and will begin operations in 2021. LEOsats will impact DESI spectroscopy because of the large number of fibers in the focal plane (5000), the width of each satellite trail, and especially the long integration times. The far larger Maunakea Spectroscopic Explorer (MSE) project could transform the Canada-France-Hawai'i (CFHT) 3.6-m optical telescope into an 11-meter dedicated multi-object spectroscopic facility, with the ability to observe more than four thousand objects simultaneously using a suite of spectrographs with a variety of spectral resolutions. With its large aperture, MSE will generally always target very faint sources, and so the signal from LEOsats will dominate over the science target. Practically speaking, this means that the observation of those targets will be precluded.

LEOsats also leave a much wider trail than the effective size of low surface brightness objects, which will impact the necessarily long integration times for these faint objects. The largest contributor to this effective faint object

12

A155

size is the wide wings of the point-spread function (PSF) in typical turbulent air corresponding to good sky conditions (0.7 arcseconds FWHM seeing). Since the mean separation between fibers or slits in a 0.2–1.0-degree focal plane is comparable to LEOsat trail width, the probability of a LEOsat trail polluting one or more spectra is high with tens of thousands of LEOsats. Owing to the long exposure times, there is no mitigation for the next generation of large spectroscopic facilities where control of mid-exposure shuttering is not possible.

These levels of impacted spectrograph fibers are significant, and the science impact generally will not be discovered until after the observations. At low contaminating flux levels, on-the-fly data quality control will not identify the contamination (e.g., if the satellite is a few times fainter than the target). As a result, contaminated data will impact the science analysis and it may no longer be possible to re-acquire ruined data. To mitigate the impacts, it is important to be able to promptly flag (within ~24 hours after the observations) which fibers were affected by a satellite. This implies developing the ability to access the positions of the satellites with a precision comparable to a fiber diameter, and with a timing accuracy of ~1 second.

## 5. Deep Wide-field NIR Imaging

Wide-field large-aperture surveys are especially vulnerable to satellite trails; WFCAM, a wide-field near-IR camera at the 4-m United Kingdom Infra-Red Telescope (UKIRT) on Maunakea, is an appropriate example. It is almost impossible to determine if LEOsat trails can be handled in its images; the default pipeline stacking will remove short obvious satellite trails, but LEOsats generally leave longer and lower surface brightness tracks, and these are much harder to get rid of cleanly. Custom software would be required to attempt to use the characteristic LEOsat longer track signatures to locate more directly the pixels they influence.

## 6. Imaging of Large Extended Low Surface Brightness Targets

Galaxy surveys require very deep imaging consisting of long exposures and stacking those for the required depth. High-redshift galaxies are 2–100 million times fainter ($V_{mag}$ ~ 23–27) than a $V_{mag}$ = 7 satellite moving at 0.5 degrees/s, which has a surface brightness of $V_{mag}$ ~ 16 after correcting for exposure time. Satellites prevent the use for faint galaxy science of the region of the frames extending up to 60 or more pixels away from their trails (i.e., 120-pixel diameter, equivalent to ~30 arcseconds swath). Bright ($V_{mag}$ < 12) image artifacts can make it difficult or impossible to detect faint galaxies in large regions of the field. This argument is generally true for extended regions of low surface brightness, or for any imaging program with the expectation of uniform signal-to-noise ratio (S/N) over 100% of the areal coverage.



Full constellation, WNW elevation +25

$y = 5.882e{+}03 * x + 4.1359e{+}05 * x^2$

*Figure 7: Count of the number of satellite trails affecting a 10-second exposure for increasing field of view (FOV). The dots represent a series of direct simulations of observations, while the line shows a model fit. Credit: Galadi, private communications*

13

## 7. Exoplanet Transits in Wide-field Surveys

LEOsat constellations will impact exoplanet surveys. Stars that fall near satellite trails will suffer from skewed and less precise photometry, as well as added noise. Exoplanet detection will be impossible for stars that fall directly under a trail. Some of the most severely affected targets will be the M dwarfs, since cooler stars (at a fixed distance) will suffer larger relative effects. With the full constellations deployed, it will be impossible to detect super-Earth planets around M dwarf stars crossed by satellites.

An example of impacted facilities is the Hungarian-made Automated Telescope Network (HATNet) telescopes, which are sensitive, wide-field (10.4 degree x 10.4 degree) optical instruments, staring at selected fields and taking images every 3 minutes. They make high precision, low-noise relative photometry to detect the shallow transits of extrasolar planets in front of their host stars. The amplitudes of transits range from 2–3% for the largest planets to 0.1% for targets such as hot Saturns, Neptunes and super-Earths. All-sky variability has not been explored at the milli-magnitude level, at short timescales (~minutes), and at very long timescales (years, a decade), and satellite crossings will compromise variability studies for these low-amplitude and short-timescale phenomena.

## 8. Discovery of New Phenomena

Arguably the most exciting and important science to come out of current and planned astronomical facilities will be the discoveries of types of objects and phenomena not yet observed nor predicted by theorists. New technology has always led to such surprise discoveries (e.g., moons of Jupiter discovered with the new telescope by Galileo, pulsars discovered with radio telescope by Jocelyn Bell, stellar activity revolutionized with Kepler exoplanet space telescope), and almost certainly the coming decade of new facilities will likewise produce unpredicted and profound surprises. Those discoveries have the potential to revolutionize our understanding of every field from exobiology to cosmology.

# "Astronomy is still driven by discovery."

*(New Worlds, New Horizons — 2010 Decadal Survey of Astronomy and Astrophysics)*

For example, thanks to its unprecedented etendue (the product of a telescope's effective light-collecting area in square meters and its field of view in square degrees), Rubin Observatory opens the prospect of discovering the unexpected, especially in the time domain. It is precisely this discovery space that is most at risk from artifacts arising from tens of thousands of LEOsats.

It is impossible to calculate the risk or the impact of losing such opportunities to discover the unexpected without knowing what we're missing. But some phenomena will surely go undiscovered as a result of significant interference from LEOsats.

14

## 9. Citizen Science, Amateur Astronomers, and Stargazers Worldwide

This group of users of the night sky is impacted in numerous ways. In addition to the scientific value of the night sky, there is cultural and social value that is difficult, if not impossible, to quantify.

**Severe impact potential**
- Though we know of no plans to deploy a large unaided-eye-visible satellite constellation, there is no technical or legal barrier to building one. Such a constellation would have a very extreme impact on unaided-eye visual observers around the world.
- Given an average of two satellite trails per square degree per 60-second exposure near the horizon, as indicated by simulations, wide-field astrophotography would be severely impacted by the fully-deployed Starlink Generation 2 and OneWeb constellations.

**Moderate impact potential**
- Based on current deployment strategies, we expect there to be hundreds of satellites on their way up or down at any given time. These may be brighter than magnitude 7 even though they will be mostly noticeable during twilight. It depends somewhat on whether operator mitigations bring them *quickly* to maintain +7 mag after launch. Still, relative to the existing population of objects in LEO, Starlink alone may roughly double the number of space-based moving objects detectable by the unaided eye around twilight.
- The night sky has been a cultural resource since our earliest ancestors, with its significance ranging from practical benefits (e.g., tracking seasonal changes) to religious practices. With sufficient numbers of bright satellites, these stakeholders could be impacted as well and should be included in deliberations as LEOsat deployment continues.

**Minor impact potential**
- Casual observers using telescopes are already impacted by the presence of satellites and other orbital objects below the naked-eye visibility threshold. These distractions are brief, although bright, unexpected objects moving through telescope fields of view can be startling.
- A similar impact applies to mobile-phone astrophotographers, as these devices tend to have small and relatively noisy sensors unlikely to record trails from objects at magnitude +7 or fainter. These devices may be sensitive to bright objects near twilight, and to glints/flares later at night, but we expect the overall effect to be small.
- Narrow-field astrophotographers observe smaller fields of view than visual observers or mobile-phone/wide-field photographers. However, they do so for longer times. Assuming the availability of a reliable satellite pass prediction tool, these photographers are better able to avoid exposing while satellites are present.

## C. Summary

The impacts of large constellations of LEOsats on astronomical research programs and the human experience of the night sky are estimated to range from negligible to extreme, depending on factors including the scientific or other goals of the observation, the etendue of the facility, the observing strategy and ability to avoid satellites, and the ability to mask or remove satellite trails in data. The impact also depends strongly on the number of satellites, the orbital altitude of the satellites, the apparent brightness and attitude of the satellites, and the accuracy of their positional ephemerides. Most astronomical researchers and institutions are only now, a little over a year after the first tranche of 60 Starlink satellites were launched, coming to appreciate fully the magnitude and complexity of the problem.

15

# III. PERFORMANCE METRICS AND RECOMMENDATIONS FOR CHARACTERIZATION AND MITIGATION



*Figure 8. Simulation of a trail from a LEOsat at 550 km in Rubin Observatory's Legacy Survey of Space and Time (LSST). The most serious effect of bright LEOsats on the CCD sensors might be the electronic crosstalk (left) between the 16 segments of the CCDs, each of which has its own amplifiers and signal chains that are simultaneously sampled during readout. These crosstalk effects are nonlinear and may be removed in LSSTCAM down to near the background noise level with a pixel processing algorithm, providing the satellite is fainter than about 7th magnitude (right). Credit: T. Tyson UC Davis/Rubin Observatory, private communication*

## A. Visibility

Six groups performed simulations of representative LEOsat constellations, from which we draw preliminary conclusions about the impact on astronomical observations. For all orbital heights, the visibility of sunlit satellites remains roughly constant between sunset and astronomical twilight (Sun 18 degrees below the horizon). The key difference between lower (~600 km) and higher (~1200 km) orbits is the visibility in the dark of night between astronomical twilights.

16

A159

Higher altitude constellations can be visible all night long during summer, with only a small reduction in the number visible compared to those in twilight. The passage of a LEOsat through the field of view produces a bright trail; in that area the information from the night sky is lost. (The area must be identified and eliminated from analysis; that process is called masking.) Scientific investigations requiring imaging with uniform signal-to-noise (S/N) of complex regions over large fields of view will need multiple additional exposures to compensate for masked satellite trails, assuming such image combination is possible at all. With currently planned constellations at 1200 km, companion galaxies such as the Large Magellanic Clouds or the Andromeda Galaxy will have a trail superposed every 30 seconds. Figures demonstrating these effects are shown on the next two pages.

## 1. Finding

With state-of-the-art masking techniques for satellite trails and current understanding of systematics and losses induced by the requirement for such masking, the impact of higher altitude LEOsat constellations ranges from costly additional exposure time per area (at the 10–20% level or higher) to the complete loss of ability to study certain astrophysical problems. The impact grows with increasing altitude above ~600 km and increasing numbers of constellation satellites. Future simulations of impact on a range of scientific programs may allow the determination of a threshold for a reduced upper limit on effective reflectivity that provides a significant recovery of lost imaging area and/or lost total exposures.

## 2. Mitigation

**For satellite operators:**
Design constellations for operational orbits below 600 km with the minimum number of units needed for bandwidth and coverage requirements.




*Figure 9. These figures show the visibility of the proposed Starlink Generation 2 (left, 30,000 satellites mostly around 350 km altitude) and OneWeb Phase 2 (right, 50,000 satellites at 1200 km altitude), as seen from Vera C. Rubin Observatory (30 deg latitude S) at summer solstice. Within both figures, the top panels are for all satellites in sight, middle for satellites above 10 deg elevation, and bottom, above 30 deg of elevation (airmass = 2). The effect of altitude is striking: while all Starlink satellites drop in the shadow of the Earth soon after twilight, many OneWeb satellites remain illuminated during the whole night. Credit: O. Hainaut (ESO), private communication*

17

A160

 

*Figure 10. These are the same figures as on the previous page, except shown for winter solstice at Rubin Observatory. Again, note the much larger obscured period and much steeper curves for the lower-altitude Starlink satellites as compared to the OneWeb constellation. Credit: O. Hainaut (ESO), private communication*

# B. Reflected Sunlight

## 1. Post-launch Parking, Boosting, and De-Orbiting Stages

These mission stages can cause sunlight reflection much stronger than that in the operating orbit. Even with a build-out of tens of thousands of constellation units, the number of satellites in these mission phases is expected to be in the hundreds at any given time. However, the higher the orbit, the longer the deorbit phase (up to centuries from 1200 km).

## 2. On-station

The most common impact on astronomical observations will be the trails of reflected sunlight imposed onto the focal surfaces of telescopes and instruments by the passage of satellites through the field of view during an exposure. The most thoroughly studied instance of that effect is for the Rubin Observatory wide-field detector array. Through laboratory simulations, Rubin Observatory staff identified the surface brightness upper limit within a satellite track required to allow calibration and removal of low-level crosstalk, which would otherwise affect many lines of pixels parallel to the track. That limit is

well below detector charge saturation. Maintaining surface brightness within that upper limit confines the loss of usable pixels on the detector to the area of the primary track, requiring masking where the brightness of the trail exceeds a fraction of the sky background noise.

Rubin Observatory was motivated to undertake these measurements and simulations by the initial launches of the SpaceX Starlink constellation in mid-2019. They worked collaboratively with SpaceX to determine the apparent brightness of a Starlink unit corresponding to the calibratable surface brightness limit and to find mitigations for spacecraft illumination at the nominal orbital height of 550 km to bring the reflections within that limit. Satellites fainter than $V_{mag} = 7$ were found to be necessary, leading to the following metric:

*Reflected sunlight should be slowly varying with orbital phase as recorded by high etendue (effective area × field of view) and for large-aperture ground-based telescopes should be fainter than $7.0\ V_{mag} + 2.5 \times log(r_{orbit}\ /\ 550\ km)$, equivalent to 44 × (550 km / $r_{orbit}$) watts/steradian.*

The recorded image for Rubin Observatory and other large-aperture telescopes of similar focal length is resolved in angle because a satellite subtending ~0.33 arcsecond is well out of focus at a distance of 550 km

compared to infinity. For constellations at the higher ~1200 km altitude, the surface brightness is lower because the satellite is further away (proportional to 1 / distance$^2$), but the footprint of the more in-focus image is smaller (leading to a concentration of light proportional to distance$^2$). Meanwhile, the observed angular velocity across the sky scales as distance$^{-1.5}$. The recorded surface brightness therefore depends only on the dwell time from the orbital motion, proportional to distance, with a constant recorded limit requiring reduced effective reflection by 1/distance. Taken together, a full simulation of these effects leads to the conclusion that satellites at 1200 km must be fainter than $V_{mag} = 8$ to compare with the effects of $V_{mag} = 7$ satellites at 550 km. Unfortunately, satellites at 1200 km can be visible all night long. Addressing this issue for the telescope with the greatest etendue, that of Rubin Observatory, is likely to put most other facilities into a similar or better performance regime with respect to satellite trails.

SpaceX has conducted a series of development efforts exploring possible mitigation strategies. VisorSat is the latest experiment attempting to reach the minimum requirement, employing a combination of these mitigation approaches.

## 3. Flares and Glints

Flares are specular reflections off designed facets of the spacecraft. They can be many times brighter than the surface brightness limit above, leading to uncalibratable crosstalk or saturation. The illumination by a flare makes an astronomical image unusable. The expectation is that flares will be rare events.

Any fine texture on the reflecting surface of the satellite, such as multi-layer insulation, will provide rapidly varying reflectivity known as glints, possibly on millisecond timescales. The noise produced in a track by glints will greatly exceed the photon statistical noise, although the total reflected sunlight could still be below the recommended limit. Although it might be possible to recover some measurable area along the low-intensity skirts of the (out-of-focus) point-spread function under such a track, it would be more computationally expensive than a mask, essentially the equivalent of removing the background in a dispersed spectrum.

For all the issues including determining reflectance as a function of solar elongation, slowly varying body reflectance with orbital phase, glints and flares, a campaign of optical/IR ground-based measurements will provide the needed data. Confirmation of the efficacy of mitigation techniques is also essential through follow-up observations. Such observations would complement those of existing Space Situational Awareness (SSA) arrays, which tend to concentrate on positions for refining orbits rather than on the brightness of reflected sunlight.

## 4. Mitigation

**For satellite operators:**
- Surface darkening.
- Sun shielding.
- Avoiding the use of non-rigid specular materials on the nadir face of the satellites to reduce false transients.
- Potentially adjusting attitude to avoid flares projecting onto major ground-based observatory sites.
- Best efforts for attitude control of satellites within communications and power constraints to minimize effective reflectivity and ensure predictable nadir-facing specular surfaces in direction of ground-based observatories.

**For observatories, near-term:**
- Image post-processing to identify, model, subtract, and mask affected pixels associated with the satellite trail.
- With precise ephemerides of entire constellation suites, and for those facilities where it may be practical, close shutters for the seconds around predicted passage.
- Pointing avoidance when possible.

**For observatories, decadal-scale:**
- New instruments designed for mid-exposure shuttering.
- Exploration of CMOS detectors for pixel shuttering.

**Collaborative:**
- Sufficiently accurate ephemerides of the flares themselves for pointing avoidance.
- Publicly available ephemerides as accurate as possible.

19

A162



*Figure 11: As an example of operational mitigation, during orbit raise, Starlink satellites are rolled edge-on to the Sun to reduce the projected area illuminated by sunlight. On-station, a Sun-visor shades bright nadir-facing chassis components. Credit: SpaceX*

## C. Positional Accuracy

All impacted observational programs will rely on sufficiently high quality information for pointing avoidance and/or identification after the fact in the recorded image. Pre-scheduling of observations of critical fields that can be adjusted slightly in time can use the information for planning. Time-critical observations, including long exposures of transient phenomena like gravitational wave sources may have the option of closing the shutter during the passage of the satellite, provided the system doesn't lose target lock. The following expectations and recommendations are based on what is currently achievable. The need for significant improvement will require astronomers to develop more dynamic observation scheduling and operators to share their more frequently updated positions as input to improved predictions of orbital elements.

## 1. Post-launch Parking, Boosting, and De-Orbiting Stages

For a given position on the sky and given start and end times for an exposure, the ephemerides of all units of a constellation shall be specified in a public database to sufficient accuracy. In this case, we require that the transit of any unit across the field during the exposure interval can be predicted within 12 hours in advance of the observation, to an accuracy of 10 seconds in time. We must also know the position of the track to within 12 arcminutes in the cross-track direction and 12 arcminutes in position angle.

## 2. On-station

For a given position on the sky and given start and end times for an exposure, the ephemerides of all units of a constellation shall be specified in a public database to sufficient accuracy that the transit of any unit across the field during the exposure interval can be predicted within 12 hours in advance of the observation to an accuracy of 2 seconds in time and the position of the track to 6 arcminutes in the cross-track direction and 6 arcminutes in position angle.

## 3. Mitigation

**Collaborative:**
Determine the update cadence of publicly available positional information or processed telemetry, distribution, and predictive modeling required to achieve substantial improvement, which we require to be a minimum of a factor of 10, in cross-track positional determination.

## D. Recommendations

### 1. For Observatories

**Recommendation 1**
Support development of a software application available to the general astronomy community to identify, model, subtract, and mask satellite trails in images on the basis of user-supplied parameters.

**Recommendation 2**
Support development of a software application for observation planning available to the general astronomy community that predicts the time and projection of satellite transits through an image, given celestial position, time of night, exposure length, and field of view, based on the public database of ephemerides. Current simulation work provides a strong basis for the development of such an application.

**Recommendation 3**
Support selected detailed simulations of the effects on data analysis systematics and data reduction signal-to-noise impacts of masked trails on scientific programs affected by satellite constellations. Aggregation of results should identify any lower thresholds for the brightness or rate of occurrence of satellite trails that would significantly reduce their negative impact on the observations.

### 2. For Constellation Operators

**Recommendation 4**
LEOsat operators should perform adequate laboratory Bi-directional Reflectance Distribution Function (BRDF) measurements as part of their satellite design and development phase. This would be particularly effective when paired with a reflectance simulation analysis.

**Recommendation 5**
Reflected sunlight ideally should be slowly varying with orbital phase as recorded by high etendue (effective area × field of view), large-aperture ground-based telescopes to be fainter than 7.0 Vmag +2.5 × log(rorbit / 550 km), equivalent to 44 × (550 km / rorbit) watts/ steradian.

**Recommendation 6**
Operators must make their best effort to avoid specular reflection (flares) in the direction of observatories. If such flares do occur, accurate timing information from ground-based observing will be required for avoidance.

**Recommendation 7**
Pointing avoidance by observatories is achieved most readily if the immediate post-launch satellite configuration is clumped as tightly as possible consistent with safety, affording rapid passage of the train through a given pointing area. Also, satellite attitudes should be adjusted to minimize reflected light on the ground track.

## 3. For Observatories and Operators in Collaboration

**Recommendation 8**
Support an immediate coordinated effort for optical observations of LEOsat constellation members, to characterize both slowly and rapidly varying reflectivity and the effectiveness of experimental mitigations. Such observations require facilities spread over latitude and longitude to capture Sun-angle-dependent effects. In the longer term, support a comprehensive satellite constellation observing network with uniform observing and data reduction protocols for feedback to operators and astronomical programs. Mature constellations will have the added complexity of deorbiting of the units and on-orbit aging, requiring ongoing monitoring.

**Recommendation 9**
Determine the cadence and quality of updated positional information or processed telemetry, distribution, and predictive modeling required to achieve substantial improvement (by a factor of about 10) in publicly available cross-track positional determination.

**Recommendation 10**
Adopt a new standard format for publicly available ephemerides beyond two-line-elements (TLEs) in order to include covariances and other useful information. The application noted in Recommendation 2 should be compatible with this format and include the appropriate errors.

## Acknowledgments

This report was written by the members of the SATCON1 Scientific Organizing Committee (SOC). All members of the SOC had the opportunity to view, edit, and comment on the document. The views expressed in this paper represent the consensus of the SOC, and the views expressed are the opinions, findings, and conclusions or recommendations of the authors and do not necessarily reflect the views of the National Science Foundation, NOIRLab, AURA or the American Astronomical Society, or any other organizations affiliated with the authors.

SATCON1 co-chairs C. Walker and J. Hall thank the members of the SOC for their many contributions to making our online SATCON1 workshop a success and for their contributions to this report. We also thank the WG chairs (L. Allen, P. Seitzer, T. Tyson, and R. Green) and WG members for the substantial time and effort that went into writing their reports.

Walker and Hall also acknowledge the input and effort by SpaceX engineers who participated in the SATCON1 workshop and in the working groups. We look forward to further work with SpaceX and other operators.

The organizers thank the NSF's Division of Astronomical Sciences (award AST-2021148) for financial support of the workshop.

22

# EXHIBIT J

# Appendices to "Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigations"

  

https://www.noirlab.edu/public/products/techdocs/techdoc004/

# Appendix C. Technical Report on Mitigations of Impacts of Satellite Constellations

## A. Summary

We report on efforts to mitigate the effects of proposed low earth orbit satellite (LEOsat) constellations on optical astronomy research generally. Broadly speaking, mitigation options include fewer satellites, fainter satellites, lower-altitude satellites, smaller satellites, satellites visible in a smaller fraction of the nighttime, high-precision satellite attitude information, improved scheduling capabilities for observatories, improved image processing capabilities, and novel sensors for the future.

We list many of the optical observatories impacted, with estimates of the impact on their science programs and recommendations for further work. Large aperture facilities with large fields of view and broad science programs are the most impacted, in addition to telescope systems aiming for precision astrophysics (photometry, spectra, low S/N signal detection). The impact of bright LEOsat trails on telescope cameras and their sensors is an important issue because it can inform a target for satellite darkening efforts. We also discuss systematic effects due to LEOsat trails, time-critical observations, data analysis challenges, and plans for simulations of science impact under realistic LEOsat constellation scenarios.

## B. The main recommendations of the Mitigations WG

- Darken satellites in all phases of the orbit, including launch, parking orbit, final orbit and decay.
- Darken satellites to >7th mag. Incorporate a corresponding <44 W/sr radiance in the satellite design process.
- Fewer satellites.
- Satellites on orbits as low as possible. No satellites at >>600 km. Satellites at 1200 km are particularly damaging.
- Increased public availability of high-accuracy orbital and location data.
- App for LEOsat position-time prediction for observers.
- Advanced algorithms for avoidance of bright satellites.
- Predictive model for satellite brightness vs orbit relative to observatory.
- Support for end-end simulations of broad science impact by the research community.

With tens of thousands of proposed LEOsats, we find that generally **no currently apparent combination of known mitigations can completely avoid the impacts of the satellite trails** on the science programs of the coming generation of optical astronomy facilities. These facilities

49

are designed to probe the dark sky in new ways for dynamic events, very low amplitude and low S/N phenomena, and to reach unprecedented faintness. They were not designed and built to safeguard operations against the changes that constellations present to the observational space environment. A combination of efforts, including fewer and fainter LEOsats and other improved data and tools, will be required to realize their full scientific potential. For many programs of discovery opened by the next generation of astronomy facilities, this is far from guaranteed. Below we give several representative science cases where mitigation is particularly challenging.

## C. Representative science cases

**Fast transients with long exposure spectroscopic follow-up**
In the next decade, a "new sky" will open up: faint transients. While there are a wide range of transient object programs planned, this is an unexplored regime ripe for the discovery of the unexpected. These discoveries in wide-fast-deep LSST surveying will be selectively followed up spectroscopically with large telescopes with long integration time. The sky survey itself and the spectroscopic follow-up are separately impacted by satellite trails.

**Optical gravitational wave follow-up**
This is a unique multi-messenger science opportunity in the next decade. As frequently as once per week it is expected that the network of gravitational wave detectors will detect events at very high S/N and within minutes will announce 90% likelihood areas on the sky. The first job is to detect any electromagnetic counterpart. This will be done by rapidly and repeatedly tiling this area with Rubin Obs. in multiple filters, in order to distinguish the object from thousands of regular transients detected during this tiling. Once detected, the candidate must be passed on for spectroscopic follow-up. Due to the time-critical nature, some of this search will occur during twilight. Satellite trails interfere with the real-bogus classifier.

**Rapid contiguous monitoring of special sky areas**
Like GW follow-up, several LSST science programs involve rapid contiguous monitoring of special fields. This precludes satellite avoidance strategies where one moves to an adjacent field. These special fields tend to be the same size as the field of view of the camera. One example is the Deep Drilling fields. These will be rapidly imaged in multiple filters in order to detect unusual events. Another example is the Large Magellanic Cloud, a nearby dwarf galaxy which is important for new transients and for probing the physics of dark matter.

**Detection of potentially hazardous asteroids**
NEO searches must be done in evening or morning twilight pointed into the twilight. This is where the density of LEOsats is highest. Pairs, triples, or quads of observations must be made within a short time in order to form a tracklet. The probability of parts of a LEOsat trail interfering with this is quite high.

50

# EXHIBIT K

# Limiting the Impact of Light Pollution on Human Health, Environment and Stellar Visibility

https://doi.org/10.1016/j.jenvman.2011.06.029

## Authors and Affiliations

Fabio Falchi and Pierantonio Cinzano
*Istituto di Scienza e Tecnologia dell'Inquinamento Luminoso, Via Roma 13, I-36100 Thiene, Italy*

Christopher D. Elvidge
*NOAA National Geophysical Data Center, Boulder, Colorado USA*

David M. Keith
*Marshall Design Inc., Boulder, Colorado US*

Abraham Haim
*The Israeli Center for Interdisciplinary studies in Chronobiology, University of Haifa, Haifa 31905, Israel*

Corresponding author: F. Falchi; e-mail: falchi@lightpollution.it,

## *Abstract*

*Light pollution is one of the most rapidly increasing types of environmental degradation. Its levels have been growing exponentially over the natural nocturnal lighting levels provided by starlight and moonlight. To limit this pollution several effective practices have been defined: the use of shielding on lighting fixture to prevent direct upward light, particularly at low angles above the horizon; no over lighting, i.e. avoid using higher lighting levels than strictly needed for the task, constraining illumination to the area where it is needed and the time it will be used. Nevertheless, even after the best control of the light distribution is reached and when the proper quantity of light is used, some upward light emission remains, due to reflections from the lit surfaces and atmospheric scatter. The environmental impact of this "residual light pollution", cannot be neglected and should be limited too. Here we propose a new way to limit the effects of this residual light pollution on wildlife, human health and stellar visibility. We performed analysis of the spectra of common types of lamps for external use, including the new LEDs. We evaluated their emissions relative to the spectral response functions of human eye photoreceptors, in the photopic, scotopic and the 'meltopic' melatonin suppressing bands. We found that the amount of pollution is strongly dependent on the spectral characteristics of the lamps, with the more environmentally friendly lamps being low pressure sodium, followed by high pressure sodium. Most polluting are the lamps with a strong blue emission, like Metal Halide and white LEDs. Migration from the now widely*

1

*used sodium lamps to white lamps (MH and LEDs) would produce an increase of pollution in the scotopic and melatonin suppression bands of more than five times the present levels, supposing the same photopic installed flux. This increase will exacerbate known and possible unknown effects of light pollution on human health, environment and on visual perception of the Universe by humans. We present quantitative criteria to evaluate the lamps based on their spectral emissions and we suggest regulatory limits for future lighting.*

## Introduction

Light pollution is the alteration of natural light levels in the night environment produced by introduction of artificial light. Due to the continuous growth of nighttime artificial lighting, this problem is increasingly debated and many localities have developed regulations to constrain the wasteful loss of light into the sky and environment.

The expanding use of light at night is because humans are diurnal animals that are trying to extend activities into the usually dark hours. This increasing use is driven by what seems common sense, and by the lighting industry with justifications that at first may seem correct. With few exceptions, everything we build is lit at night. This includes streets, roads, bridges, airports, commercial and industrial buildings, parking lots, sport centers and homes. Outdoor lighting continues to expand as more infrastructure is built. Lighting levels are often set high with one or more secondary objectives in mind. For instance, building exteriors are often lit for a merely aesthetic effect. Shopping centers are typically heavily lit to attract shoppers and create a lively environment designed to stimulate spending. Lighting levels in public areas are often set high as a deterrent against crime, even though studies have not proven this to have any effect on crime rates [1-3]. Indeed the cores of our urban centers are bathed in light and the resulting light pollution can extend more than a hundred kilometers out from the city's edge.

There is reliable evidence that this artificial extension of the day produces serious adverse consequences to, human health and the environment.

The impact of light pollution on the night sky has been described in depth by Cinzano, Falchi and Elvidge [4]. In the First Atlas of Artificial Night Sky Brightness they showed that more than 60% of world population lives under light polluted skies (99% of the population of USA and Europe) and almost one-fifth of world terrain is under light polluted skies.

In regards to human, to date there are no doubts that exposure to light at night (LAN) decreases pineal melatonin (MLT) production and secretion and are not only a source for phase shift in daily rhythms. Apart of timing and exposure duration, the two light variables responsible for the suppression of MLT production are: 1) light intensity and 2) wave length. Therefore, it seems that the combination of both variables should be considered for the threshold of LAN. Light intensity levels found to suppress MLT production are decreasing as research progresses. During the eighties of last century, it was shown that bright light at an order of thousands of lux was requested for abolishing the secretion [5]. The discovery of a novel photoreceptor, the Non Image Forming Photoreceptors (NIFPs), and the photopygment melanopsin gave an opportunity for a better understanding of light perception by humans and showed the effects of spectrum in

the human high response to LAN exposure [6-11]. The results of a study [12], in which the impact of wave length on humans was assessed by measuring melatonin, alertness, thermoregulation and heart rate draw the attention to the significant role of wave length. It was shown that exposure of two hours to monochromatic light at 460nm in the late evening significantly suppressed melatonin secretion while under the same intensity, exposure timing and duration but at wavelength of 550nm such effects were not observed. Already Wright et al. [13] showed that even illuminance as low as 1.5 lux affect circadian rhythms. However, recently it as shown that bedroom illumination, typical of most homes in the evening, is sufficient to reduce and delay MLT production [14]. From the results of these studies it can be noted that MLT suppression by LAN is wavelength depended and intensities can be much lower than those used several decades ago.

Alteration of the circadian clock may cause performance, alertness, sleep and metabolic disorders. Exposure to light at night suppresses the production of the pineal hormone melatonin, and since melatonin is an oncostatic or anti-carcinogenic agent, lower levels in blood may encourage the growth of some type of cancers [15-20]. MLT seems to have an influence on coronary heart disease [21]. LAN acts directly on physiology, or indirectly by causing sleep disorders and deprivation, that may have negative effects on several disorders such as diabetes, obesity and others [22-23]. For a brief review of physiological, epidemiological and ecological consequences of LAN see Navara and Nelson [24].

Therefore, the increase in light intensity on the one hand and the wide use of "environmentally friendly bulbs" with a short wave length emission on the other, are probably having sever negative impact on health through the suppression of MLT production.

In the natural environment, animals and plants are exposed to light at night levels that vary from about $5 \times 10^{-5}$ lux of the overcast sky, to $1 \times 10^{-4}$ lux by the starry sky on a moonless night, to $2 \times 10^{-2}$ lux at the quarter moon, to 0.1-0.3 lux during the week around full moon. The artificial light of a typical shopping mall, 10-20 lux, is up to 200 thousand times brighter than the illuminance experienced in the natural environment around new moon. No wonder that it has become apparent that light at night has strong environmental effects in behavioral, population and community ecology (in foraging, mating, orientation, migration, communication, competition, and predation) and effects on ecosystems. For a review of ecological consequences of light pollution see [24-28]. This strong evidence of the adverse effects of artificial light at night on animals and on human health should be balanced against the supposed positive effects on safety and security. Fortunately it is possible (and also simple in theory, if those involved in lighting collaborate) to limit the light pollution effects and, at the same time, allow for the lighting that is usually perceived as a need by people. Practical ways to limit the effects of light pollution on the night sky and the night environment are well known and verified [29]:

a) **Full Cutoff Shielding:** Do not allow luminaires to send any light directly at and above the horizontal, with particular care to cut the light emitted at low elevations

3

(in the range gamma=90-135 degrees above the downward vertical, i.e. 0-45 degrees from the horizon plane). In practice, light in this range travels long distances through the atmosphere and enhances the additive property of light pollution [30-31], an effect that compounds the problem, especially in densely populated areas. An additional limitation on the light leaving the fixture downward (in the range gamma=80-90 degrees from the downward vertical, i.e. 0 to 10 degrees below the horizon plane) should also be enforced. This is because the nearly-specular reflection of asphalt at grazing incidence considerably increases the amount of light at low angles above the horizontal (although this reflected light is much more subject to screening by surrounding vegetation and buildings). This limitation will also improve the comfort and visual performance of road users by lowering the direct glare from fixtures.

b) **Limiting the Area of Lighting**: Carefully avoid wasting downward light flux outside the area to be lit. Such waste is not only a main cause of increase of installed flux per unit surface (and in turn a main cause of increase in energy expense), but some of this light is also reflected upward from these surfaces. Even if Lambertian diffusion from horizontal surfaces is less effective in sending light at low elevations than direct emission by luminaires, nevertheless when the direct emission is eliminated, the diffuse reflection remains as an appreciable source of pollution.

c) **Eliminate Overlighting:** Avoid luminances or illuminances greater than the minimum required for the task, and dim lights when the application allows it.

d) **Shut Off Lights When Not in Use[1]:** It makes sense to turn the lights off when you leave the room, or for the lights to turn off automatically, but in outdoor lighting these options are rarely available (in Italy, for example, almost all the parking lots of shopping malls are lit all night long, and likewise for the industrial/artisan/commercial areas, whether or not there are workers at night).

e) **Limit Growth in Installed Lighting**: Limits to the increase of the new installed flux should be implemented. A 1% yearly increase could be allowed at first for each administrative area, followed by a halt in the increase of total installed flux, and then by a decrease. This does not mean that no new installation will be allowed, but simply that if you want to install new lights you have to decrease the flux in the existing overlighted areas.

To these basic prescriptions, some others could substantially improve lighting quality (e.g. a requirement that the lighting installation be designed by a professional lighting designer, although this might not be feasible in poorer countries nor advisable for smaller installations, provided they respect the code) or to take account of specific kinds of installations (e.g. signs or historical buildings). Most of these prescriptions are already implemented in some of the most advanced anti-light-pollution laws such as Lombardia (Italy) Regional Law n.17 of March 27, 2000 with its subsequent additions and modifications. Twelve other similar regional laws followed in Italy, and most Italian territory and population are now protected by these laws. Slovenjia adopted a similar law in year 2007. Falchi [32] found that despite an almost doubling in the outdoor installed

---

[1] Even a great reduction (1/10th of the full values) of lighting levels could be advised, but safety norms don't allow for this.

flux, in two studied sites in Lombardia, the artificial sky brightness did not increase over the last twelve years. This is probably due to the adoption of laws against light pollution in the surroundings of the sites. A full enforcement of the prescriptions could probably make a substantial improvement in the quality of the night sky and environment. In fact, the same research shows that in six studied sites, on average, 75% of the artificial sky brightness is produced by light escaping directly from fixtures and only 25% from the reflections off lighted surfaces. This implies that, all the rest being equal, a complete substitution of the installed fixtures with fully shielded ones could lower the artificial sky brightness to 1/4 of present levels. In two of the studied sites, more than 90% of the artificial sky brightness derived by direct light. These sites would presumably have a 90% decrease in light pollution as a result of retrofitting fixtures to fully shielded in the surrounding territory that produce light pollution, i.e. a circle of at least 100 km radius.

Nevertheless, even when the best control of the light distribution is reached and when the proper quantity of light is used, some upward light emission remains, due to reflection from the properly lighted surface. This is an unavoidable by-product of the lighting operation, even when measures a), b) and c) have been achieved: lighting is installed just to produce reflections of light. However, after the light has performed its useful function, it is then dispersed into the environment. Due to its near-Lambertian behavior, this reflection is frequently less effective at low elevations than at large elevations, so the effect on the night sky tends to be confined largely to the vicinity of the source. In any case, the environmental impact of this residual light pollution cannot be neglected.

Limitation of this residual pollution requires limits not only on "how" nighttime lighting is arranged according to prescriptions a) and b), but also "how much" nighttime lighting is made. Typically it has been proposed to limit the growth rates of installed flux in each city, or to limit the average density of installed light flux (e.g. installed flux per hectare or acre). However, following the example of the radio portion of the electromagnetic spectrum, there is an additional way to limit this residual pollution: by preferential use of light sources with spectral characteristics that have the least impact on star visibility and human and wildlife health, while maintaining a given degree of visibility in areas that need artificial lighting. This would allow reduction of the negative astronomical and biological effects without impairing essential night lighting.

This solution has been applied for decades whenever Low Pressure Sodium (LPS) and High Pressure Sodium (HPS) lamps have been requested in place of Mercury Vapor (MV) or incandescent lamps. The arrival of new LED light sources for night-time outdoor lighting and widespread use of broad spectrum Metal Halide (MH) lamps even where they aren't the best option enhances the need to define a more quantitative prescription, applicable to any kind of lamp and capable of giving precise indications to the lighting industry on the way to proceed in light source development or improvement (e.g. how to filter or tailor the spectrum of the emitted light).

The prescription should:

(i)     be as effective as possible in protecting the night environment from the adverse effects of light pollution;

(ii)    take account of existing night time lighting habits in order to minimize the impact on human activities:

(iii)   allow easy identification of non-compliant light sources; and

(iv)    allow easy measurement in the field, when needed.

5

In this paper we discuss the problem, we recognize two different quantitative parameters, we devise a prescription and we investigate how it could be enforced.

## Methods

The possibility of limiting the residual light pollution, avoiding the need to limit night time outdoor lighting itself, is based on the different response with wavelength of the two main classes of eye receptors and the action spectrum of circadian rhythm disruption for rodents, monkeys and humans [33]. In a schematic way and for the purposes of this paper, we can distinguish the photopic response of cones and the scotopic response of rods. The eye response is fully photopic, i.e. cones fully determine it, for luminances over $3$ cd/m$^2$ whereas the eye response is fully scotopic, i.e. rods fully determine it, under about $0.01$ cd/m$^2$. In the range between these two limits, called mesopic, the eye response goes from scotopic to photopic, depending on the relative contributions of the two classes of receptors, which in turn depend on the luminances in view. (Figure 1).

Standard rules, e.g those on road safety lighting, usually require road luminance to be in the range from $0.3$ to $2$ cd/m$^2$ but, even where laws against light pollution prohibit exceeding values suggested by standard rules, in practice new installations rarely have an average maintained luminance under $0.75$ cd/m$^2$, the prescribed luminance of the ME4b class of the European Norm EN 13201. Eye response at these luminances is predominantly photopic[2] (see discussion below). In fact when we look at artificially-lit outdoor areas and recognize colors, which is a property of cones, it indicates that our cone vision is functioning. In some cases colors could be distorted by lamp spectra but in any case they are recognized. Otherwise, we could use monochromatic lamps like Low Pressure Sodium lamps everywhere and there would be no reasons to use white light. Moreover, the $0.3$ to $2$ cd/m$^2$ prescribed range is for the luminance of the road surface, usually dark asphalt, while the night scene in a city is also full of other lights and surfaces that usually have far higher luminances: the direct lights from fixtures, light colored objects, vehicle lights, billboardsand shop windows. So our eyes are not fully dark adapted in a typical city night scene (see Figure 2).

In observation of the starry sky, where the natural luminance of the sky is about $200$ µcd/m$^2$, the response is scotopic, except when looking at a few bright stars. This difference gives us a way of separating the primary polluting effects of the light from its lighting capabilities. Unfortunately the scotopic and photopic response curves overlap in part, as shown in Figure 3. This prevents us from fully separating these two effects. This means that we cannot use the spectra of lamps to limit light pollution in place of full–cutoff fixtures and the other prescriptions. Even monochromatic lamps emitting at the maximum of photopic response, e.g. LPS lamps, contribute consistently to the scotopic response pass band. So the a), b) and c) prescriptions listed in the introduction are still required in practice. However we can use this differential response to diminish pollution, subject to all the usual precautions to limit the amount of light pollution.

At luminances under $0.5$ cd/m$^2$ the contribution of monochromatic rods to eye response could be relatively larger, but we are aware that there are very few new installations with

---

[2] Even the Lighting Research Center recommends using the usual photopic lumen at luminance greater than $0.6$ cd/m$^2$ instead of their proposed Unified Luminance that take into account for the blue content of the lamps in the mesopic range [24].

average maintained luminance so low in Italy, even if standard rules allow 0.3 cd/m$^2$ for local roads. The Lighting Research Center recommends using the usual photopic values at luminance higher than 0.6 cd/m$^2$ [34]. Lewis [35] claimed that under a photopic luminance of 0.1 cd/m$^2$ some MH lamps emitting strongly in the scotopic passband can produce a reaction time only slightly worse than that obtained with some HPS lamps at 1 cd/m$^2$. In a study on mesopic visibility Orreveteläinen [36] investigated reaction times in seeing different colour targets in peripheral vision. He found no differences at 1 cd/m$^2$, very small differences at 0.1 cd/m$^2$ and evident differences only at 0.01 cd/m$^2$., where the blue and cyan targets were detected earlier than warmer colour targets. Lewis [35] showed that for a luminance of 1 cd/m$^2$ MH lamps emitting consistently in the scotopic band still produce a slightly greater contrast than HPS. However, better visibility in the peripheral field at the edge of streetlight obtained with bluer light should be evaluated along with the strong decrease in eye lens transparency of blue wavelengths with age. Brainard et al. [37] found that at 450 nm the transmittance of the lens of 60-69 year old is half that of 20-29 year old adults. At 425 nm it is one third. At 555 nm it is only a few per cent less while it is equal at 600 nm and above. Studies on vision should use a variety of subjects of different ages, to take into account the increasing population of elder drivers. A migration toward bluer lamps, such as MH and LEDs, will exacerbate the difference in vision performance between young drivers and old drivers, penalizing the latter even as they become a greater fraction of the driving population.

One additional observation should be made concerning high-blue-content lamps. Road surface materials, either asphalt and concrete, reflect less short-wavelength radiation compared to long-wavelength radiation, as seen in figures 4 and 5. This implies that lamps that emit more long-wavelength radiation, such as LPS or HPS, will have more light reflected by these roads. On the other hand, lamps that emit more in shorter-wavelengths are less effective in producing luminance from these road surfaces. We computed that at equal photopic output white LED lighting produces 6% to 11% less luminance from roads than HPS , depending on the type of surface. The spectra of these lamps are shown in figure 6. The spectral reflectivity of roads reduces the blue contribution of the lamps by one half or more, lowering the effects on the environment but also lowering the supposed visual benefits. Moreover, if fixtures are not suitably shielded, this lowering in the reflection of blue light is negligible, due to the dominant contribution of direct light to sky luminance outside of cities.

Replacement of HPS lamps with MH lamps and white LEDs - with an accompanying reduction of luminance to 0.1 cd/m$^2$ - does not seem immediately applicable because (a) existing rules do not allow such small luminances and typically require a very time-consuming process to be changed, (b) existing studies do not seem sufficiently complete and convincing to justify these practices.
As new studies on the negative effects of artificial light at night will be produced, a lowering of the external lighting levels would probably be advisable even in the case of a demonstrated decrease of visibility on roads. Accumulated evidence of the demonstrated negative effects of light at night may well outweigh the positive ones. Moreover, most of the positive effects used to justify the huge expenses to build, maintain and power external lighting are based on anecdotal indications or poor statistical analysis [1-3].

Even for the road safety effect there is a lack of studies using randomised controlled trials. A public registration of protocols and trials is suggested, lowering the problem of publication bias [38] by ensuring that 'against lighting' results remain as visible as 'for lighting' ones.

**The wavelengths that cause the worst light pollution**

For nearly a hundred years the specification and characterization of light has been based on the wavelength-dependent sensitivity of the two recognized types of photoreceptors (rods and cones) in the human eye. Rods are solely responsible for scotopic or night vision which is black and white. The cones are solely responsible for color vision. There is a wavelengthsensitivity to the vision provided by the rods or cones. The photopic band is a spectral representation of the sensitivity of the just the cones, and is centered in the green portion of the spectrum. When under dim lighting conditions there is insufficient light for activation of any cones, the rods are still able to provide black and white vision. This is scotopic vision, which has peak sensitivity in the blue-green (Figure 3). Early in this decade [6-10] a third photoreceptor in the human eye was recognized – a circadian photoreceptor with wavelength sensitivity centered in the blue [6,7]. As noted earlier, exposure to lighting with a high blue component disrupts the normal melatonin rhythms, commonly leading to insomnia, stress and increased risk for a wide range of medical maladies and even cancer. Preventing the blue component from reaching the eye by means of filters blocking wavelengths under 530 nm, preserves nocturnal melatonin production in humans [11]. This implies that the blue component of light has the severest consequences for the environment and human health.

A second reason that blue light contributes more to light pollution than green or red light is that blue light is more readily scattered in the atmosphere – as you can see from the blue sky of daylight hours. This "blue sky" effect arises from Rayleigh scattering which is inversely proportional to the fourth power of wavelength, meaning that shorter wavelength radiation - blue light - will scatter in the atmosphere more than longer wavelength radiation - green and red light [39]. The Sun at sunset and sunrise appears orange because the blue component of its light has been redirected by the atmosphere. But this style of scattering also applies to light emitted by cities and towns at night. Green and red light emitted upward are scattered less than blue light, so a higher portion of the long wavelength light tends to continue on towards space. More of the blue light is scattered in the atmosphere, contributing to the sky brightness that we call light pollution.

**Scotopic to Photopic Ratio**
The first way to minimize the impact of residual light pollution is to use lamps that, for a given amount of photopic light flux, produce a minimal amount of scotopic light flux. In fact, lighting installation design and standard rules are based on photopic luminance. At parity of photopic performance, we can sacrifice the small and usually unknown scotopic contribution, and in exchange we gain the chance of lowering the light pollution effects substantially.
The photopic luminous flux is defined as [40]:

$$\Phi_V = K_m \int_0^\infty \Phi_{e,\lambda} V(\lambda) d\lambda \qquad (1)$$

where $V(\lambda)$ is the photopic response [41], $\Phi_{e,\lambda}$ is the spectral radiant flux of the source and $K_m$=683 lm/W is the photometric efficacy, i.e. the standard lumen per watt conversion factor, for photopic response [42].

The scotopic luminous flux is defined as [40]:

$$\Phi_{V'} = K'_m \int_0^\infty \Phi_{e,\lambda} V'(\lambda) d\lambda \qquad (2)$$

where $V'(\lambda)$ is the scotopic response [43] and $K'_m$=1699 lm/W is the photometric efficacy, i.e. the standard lumen per watt conversion factor, for scotopic response [44].

Then the scotopic-to-photopic ratio $R_{sp}$, commonly used in lamp performance comparisons, is:

$$R_{sp} = \frac{\Phi_{V'}}{\Phi_V} = \frac{K'_m \int_0^\infty \Phi_{e,\lambda} V'(\lambda) d\lambda}{K_m \int_0^\infty \Phi_{e,\lambda} V(\lambda) d\lambda} \qquad (3)$$

It gives the scotopic light flux of a lamp for unit photopic light flux. The ratio of radiant fluxes in the scotopic and photopic spectral ranges will generally vary  and are of little value for the present purpose.

We used standard CIE responses, neglecting more recent and accurate photopic responses known as Judd [45] modified V($\lambda$), Judd-Vos modified $V_M(\lambda)$ [46] and Stockman and Sharpe [47] $V^*_2$ ($\lambda$) , because for now standardization of the ratio has priority over accuracy.

Setting an upper limit on the scotopic/photopic ratio could help to control or prevent the strong growth of artificial night sky scotopic luminance that would be produced by a migration from the current population of HPS lamps to MH or LED lamps promoted by the lighting industry because of their white output.

**Protected spectral band for visual astronomy**

Due to the above mentioned overlap of the photopic and scotopic luminosity curves, minimizing the scotopic to photopic ratio might not provide enough protection for the night sky in the short wavelength part of the visible spectrum. Hence a more specific wavelength-based restriction on the emissions from lighting is appropriate.

Let's consider a hypothetical lamp with a given ratio of scotopic to photopic light flux and a given radiant flux in each of the two bands. Now let's assume that we are able to move the spectral flux emitted in the wavelength range 440-540 nm to the blue side of the scotopic band, below 440 nm. Let's finally assume that we are able to tune this flux and the remaining photopic flux in order to maintain the same scotopic and photopic fluxes as before so that the eye will perceive the same quantity of light in scotopic and photopic

pass bands. The color of the lamp will change slightly, due to the shift. However now the range 440-540 nm is much darker. The artificial night background produced by the considered lamp will be negligible when observing the night sky with a filter that blocks any wavelength outside this range.

Given that stellar visibility in unpolluted conditions is limited by eye sensitivity, it is necessary that the "protected" wavelength range be centered on the maximum of the scotopic response curve and as large as possible (at least 100 nm) in order that the impact of the filter on limiting stellar magnitude be kept as small as possible. Otherwise the reduction in the eye's scotopic sensitivity with the filter will annul any advantage of filtering out the artificial part of skyglow.

We choose the scotopic protected interval, hereafter called P-band, in the range 440-540 nm in place of the range 450-550 nm in order to leave the mercury emission line at 546 nm unaffected. This range bounds 79 per cent of the area under the scotopic curve.

In practice, we cannot "move" light of a lamp toward redder or bluer wavelengths but we can make a good start by using lamps that have a relatively weak output in the P-range. We also need to devise a way to filter out the light in the 440-540 nm range of every lamp, e.g. using absorbing pigments on the lamp glass or on the fixture's cover glass. This could lead to design of a lamp (i) with whiter light than HPS thanks to emission lines in the blue that tend to balance the emissions over 540 nm; (ii) leaving the peak of the scotopic response unpolluted; and (iii) maintaining the same scotopic-to-photopic ratio as HPS lamps of today.

Lumen is not defined in bands different than scotopic and photopic, so we need to define a parameter in terms of energy flux.

The radiant flux in the photopic band $\Phi_{e,V}$ is:

$$\Phi_{e,V} = \int_0^\infty \Phi_{e,\lambda} V(\lambda) d\lambda \qquad (4)$$

where $V(\lambda)$ is the photopic response of CIE and $\Phi_{e,\lambda}$ is the spectral radiant flux of the source.

The radiant flux $\Phi_{e,P}$ in the protected band $\lambda_0$-$\lambda_1$ is:

$$\Phi_{e,P} = \int_{\lambda_0}^{\lambda_1} \Phi_{e,\lambda} d\lambda \qquad (5)$$

The P-band radiant flux to photopic luminous flux ratio $R_P$, hereafter called P-ratio, is:

$$R_P = \frac{\Phi_{e,P}}{\Phi_{e,V}} = \frac{\int_{\lambda_0}^{\lambda_1} \Phi_{e,\lambda} d\lambda}{\int_0^\infty \Phi_{e,\lambda} V(\lambda) d\lambda} \qquad (6)$$

It gives the energy emitted in the "protected" band by a lamp emitting unitary luminous flux in the photopic response pass band and, in practice, measures the lamp impact on the protected band.

An effective upper limit on the P-ratio is a practical way of protecting stellar visibility from harm caused by artificial radiant flux in the spectral range 440-540 nm. Following this approach could at least make the wavelength range near the maximum of scotopic sensitivity minimally polluted (figure 4).

## Measurements

Emission spectra were acquired using an ASD, Inc. FieldSpec 3 spectroradiometer equipped with an 8 degree field of view foreoptic. The instrument had been radiometrically calibrated and spectra were acquired in radiance (W/m$^2$/$\mu$m/sr) mode over the 350 to 2500 nm range. Each lamp was warmed up prior to measurement and the spectra were acquired from one lamp at a time in a dark room. The measured light sources included the following classes 1) liquid fuel lamps, 2) pressurized fuel lamps, 3) incandescent, 4) quartz halogen, 5) metal halide, 6) high pressure sodium, 7) low pressure sodium, and 8) light emitting diodes (LED).

Given the limited number of lamps and manufacturers in the market, the P-ratios should be provided by manufacturers for each lamp, calculated from the spectral power distribution, or measured. It would be futile to leave this to lighting installers to do. A quick check of installed lamps in the field by competent technicians will determine if the type of lamp installed satisfies the P-ratio limit discussed below.

The scotopic to photopic ratio can be obtained by dividing the illuminances measured using luxmeters with interchangeable filters available on the market. A scotopic luxmeter can also be purchased directly or obtained by replacing the photopic filter in a suitable luxmeter with a scotopic filter and calibrating it. An energy measurement of the P-ratio can be obtained with an irradiance-meter provided with an interference filter for the range 440-540 nm, and calibrated in irradiance with the filter in place. Such filters are commercially available, and some irradiance meters are already provided with photopic and scotopic filters. The calibration can be made using one of the many spectral calibration standards available on the market. There is no need for lighting installers to acquire such equipment provided that manufacturers' data are reliable, but it could be a good idea for environmental control organizations to acquire the equipment.

Table 1 shows actual ratios for some cases of interest in external lighting. Scotopic to photopic ratios have been measured at LPLAB by Cinzano [48], or calculated. Average scotopic to photopic ratios for HPS and MH lamps are taken from Knox & Keith [49]. P-ratios have been computed with synthetic photometry from spectra taken by Cinzano with WASBAM [50] and from spectra measured by Elvidge and Keith.

| Lamp | $R_{sp}$ | $R_P$ |
|---|---|---|
| LPS (*) | 0.20 | 0.0027 |
| HPS 70 W (*) | 0.55 | 0.13 |
| Average HPS(**) | 0.66 | - |
| HPL 80 W (Hg vapour) (*) | 1.18 | 0.27 |

| CIE Illuminant A (***) | 1.41 | 0.51 |
|---|---|---|
| QTH 3100 K (*) | 1.56 | 0.58 |
| Average MH (**) | 1.60 | 0.46 |
| Flat spectrum (***) | 1.86 | 0.93 |
| LED 'natural white' (***) | 3.5 | 0.87 |

Table 1. Ratios for some lamps and lamp classes.

(*) $R$sp measured

(**) $R$sp from Knox & Keith [45]

(***) $R$sp calculated

What upper limits should we set for the previous ratios? In principle, lamps with minimum ratios should be adopted. By far, the least polluting lamps in the P-band are the Low Pressure Sodium, with a $R$p ratio about 2% of the second best lamps, High Pressure Sodium. Unfortunately, LPS lamps have the disadvantages of long length and poor colour rendition, along with diminishing availability. In many applications colour rendition is unimportant or unnecessary, but LPS lamps have been abandoned by the lamp manufacturers in favor of other popular lamp types. An LPS lamp should be first choice, with others used only if strictly necessary. However, following the compromise position of individuals and organizations working against light pollution, we suggest that the upper limits be set equal to the actual maximum ratios of most common HPS lamps. Lamps with still larger ratios should be used only in those cases when strong reasons for "whiter" light are demonstrated. We are in a phase similar to when catalytic converters were introduced in the car market. They didn't stop pollutants totally (as in an ideal world), but started to do so in a way compatible with the technology of the time. Similarly, setting a limit compatible with HPS will start controlling the blue content, while not upseting the current habits of the market. Due to the overwhelming importance of our health over the "necessity" to use white or blue-rich light, even applications other than road lighting should follow our prescription. These top limits could be enforced by law as obligatory, because voluntary quality goals may not suffice.

Table 1 also shows that a migration from the current population of HPS lamps to MH or, worse, blue-rich white LED lamps could produce a growth of artificial night sky brightness by 2.5 to 5 times, as perceived by the dark adapted human eye. Such large increases, combined with the usual growth of installed flux, may produce a tenfold increase of the scotopic sky brightness in the next ten years or so. Figure 5 shows the spectral power distributions of a white LED and a HPS lamp with equal photopic lumen output. The far higher emission of blue by the LED is evident.

The same order of magnitude increase is expected on the melatonin suppression action spectrum. This action spectrum is shown in Figure 6. The peak sensitivity is from 440 nm to 500 nm. A tenfold decrease in sensitivity over the 460-470 nm peak is shown at the 410 nm and 540 nm wavelength. As seen in Table 2, given the same photopic lumen output, MH and LED lamps emit 3 to 7 times more energy in the 440 nm to 500 nm band compared to HPS. Considering the full range of the action spectrum, the results are similar. Given the uncertainties in the spectrum itself, we can summarize that MH is about three times more polluting in this band than HPS. Natural white LED has more than double the content of MH. A migration from HPS lamps to MH lamps and white

12

LEDs could produce far worse effects on human health than today's lighting does. This will impair and negate worldwide efforts towards better and less polluting lighting practices. . LEDs have anyway a great potential, they could be tuned and produced with very different spectra, so it is advisable that industry research be pushed toward the production of less polluting warm LEDs, with no blue emissions.

| Lamp type | Energy relative to HPS, 440 to 500 nm band | Melatonin suppression effect (relative to HPS) |
|---|---|---|
| HPS | 1 | 1 |
| LPS | 0.02 | 0.3 |
| Metal Halide | 2.7 | 3.4 |
| Natural White LED | 7.0 | 5.4 |
| Incandescent 65 W | 2.5 | 2.5 |

Table 2: 440 nm to 500 nm energy ratios (second column) and melatonin suppression efficiency (third column) for some common lamps.


## Proposed limits

Residual light pollution is that produced by reflected light, after direct upward emission has been accurately minimized, overlighting has been avoided, and the flux wasted illuminating outside surfaces has been minimized. It would remain to be dealt with after laws or regulations have required zero direct emission above the horizontal by lighting fixtures, limited the luminance or illuminance to the minimum required by security rules, minimized as much as possible the fraction of light wasted downward outside the surface to be lighted, and banned the use of mercury vapour[3] in every type of lamps.

The International Agency for Research on Cancer has recently added to the list of group 2A (probably carcinogenic to humans) shiftwork that involves circadian disruption [51]. As seen, circadian disruption is also induced by light exposure at night and light at night is becoming a public health issue [52, 53].

Light pollution has to be recognized as a hazard to our environment and our health and not, as commonly believed, as just a problem for astronomers. This view is supported by the recent resolution of the American Medical Association [54] where it is said that light pollution is a public health hazard.

**We recommend a total ban of the outdoor emission of light at wavelengths shorter than 540 nm to reduce the adverse health effects of decreased melatonin production and circadian rhythm disruption in humans and animals.** The relatively low emissions of HPS lamps in this spectral range could be set as the limit[4] on what is acceptable in terms of the balance between photopic and meltopic emission ratios. So, this rule should be use as standard:

---

[3] These lamps must be prohibited anyway due to their mercury content and low efficacy

[4] This limit is a compromise due to the available types of lamps on the market. It could be lowered in future, but it is anyway sufficient to stop the growth of the blue light content in the environment due to the LEDs and MH lamps.

*The wavelength range of the visible light spectrum under 540 nanometres, corresponding to high sensitivity of the melatonin suppression action spectrum, should be established as a protected range. Lamps that emit an energy flux in the protected range larger than that emitted by the standard HPS[5] lamp on a basis of equal photopic output should not be installed outdoors[6].*

The following prescription aims to limit residual light pollution in the scotopic band and should be used only in the limited number of cases where there is the absolute necessity to have accurate colour perception and the previous rule cannot be followed:

*The wavelength range of the visible light spectrum between 440 and 540 nanometres, corresponding to the maximum sensitivity of the scotopic vision of the human eye, should be established as a protected range. Lamps should not be installed outdoors if (a)[7] their emission in this wavelength range exceeds 15 per cent of the energy flux emitted in the photopic response pass band, measured in watts, and (b) [8] their emission in the scotopic response pass band exceeds two-thirds of that emitted in the photopic response pass band, measured in lumens.*

In the authors' opinion, lamp producers should follow these rules as a minimum precaution in order to minimize the impact of their products on human health and on the environment, even in the absence of laws or regulations.

Following the actual market trend towards more, brighter and whiter light may expose lamp producers and the lighting industry to extensive litigation for illness caused by toxic products, as has already happened with the tobacco and asbestos industries.

A regulation, to be studied, for lamps for interior use during night could be introduced too.

## Conclusions

In this paper we analysed the different energy and luminous fluxes in the melatonin suppression action spectrum and in the scotopic band for several types of lamps. We found that huge differences exist in the blue emissions of the lamps, for the same photopic luminous flux. Due to the fact that night vision and our health are impaired more by blue light, we proposed two limits to be followed in the adoption of lamps for external use. The first should be used everywhere, as a standard, in order to reduce emissions within the melatonin suppression band at night, as much as possible,. The second rule should be used only in a very limited number of situations where better colour rendition is indispensable for the task.

Therefore, an effective law to control light pollution should implement this set of rules:

-   do not allow luminaires to send any light directly at and above the horizontal;
-   do not waste downward light flux outside the area to be lit;

---

[5] HPS energy flux varies with the power of the lamp. So, for each lumen output of the lamp to be evaluated, it is to consider the immediate lower power HPS lamp. For example, in evaluating a 14000 lm lamp, it must be compared to a 100 W HPS lamp that typically produces 9500 lm instead of a 150 W HPS lamp that emits about 16000 lm.

[6] Regulamentation of indoor lighting lies outside the purposes of this paper

[7] i.e. Rp ratio lower than 0.15

[8] i.e. Rsp ratio lower than 0.66

- avoid over lighting;
- shut off lights when the area is not in use;
- aim for zero growth of the total installed flux;
- strongly limit the short wavelength 'blue' light.

Application of all these prescriptions would allow for proper lighting of our cities and, at the same time, protect ourselves and the environment from the more adverse effects of light pollution.

## Acknowledgments

We acknowledge Dr. Barry A.J. Clark and Dr. Jan Hollan for very interesting discussions and suggestions and consequent improvement of this work. We acknowledge also Dr. Steven W. Lockley and Dr. Paul Marchant for help given in their respective fields.

## References

1. Marchant PR (2004) A Demonstration that the Claim that Brighter Lighting Reduces Crime is Unfounded, The British Journal of Criminology 44, 441-447
http://bjc.oupjournals.org/cgi/content/abstract/44/3/441

2. Marchant PR (2005) What Works? A Critical Note on the Evaluation of Crime Reduction Initiatives, Crime Prevention and Community Safety 7 7-13

3. Marchant PR (2006) Shining a light on evidence based policy: street lighting and crime, Criminal Justice Matters No. 62 Uses of Research p18, The Centre for Criminal Justice Studies, Kings College, London
http://www.crimeandsociety.org.uk/opus33/Marchant final.pdf

4. Cinzano P., Falchi F., Elvidge C.D. (2001) The first world atlas of the artificial night sky brightness, Monthly Notices of the Royal Astronomical Society, 328, 689-707 (ISSN: 0035-8711

5. Lewy AJ, Wehr TA, Goodwin FK, Newsome DA, Markey SP. (1980). Light suppresses melatonin secretion in humans. Science 210:1267–1269.

6. Thapan K, Arendt J, Skene DJ, (2001) An action spectrum for melatonin suppression: evidence for a novel non-rod, non-cone photoreceptor system in humans, Journal of Physiology, 535, 261–267.

7. Brainard GC, Hanifin JP, Greeson JM, Byrne B, Glickman G, Gerner G., et al., (2001) Action spectrum for melatonin regulation in humans: evidence for a novel circadian photoreceptor, Journal of Neuroscience, 21(16), 6405-6412.

8. Hankins MW, Lucas RJ, (2002) The Primary Visual Pathway in Humans Is Regulated According to Long-Term Light Exposure through the Action of a Nonclassical Photopigment, Current Biology,12(3), 191–198

15

9. Shigang He, Wei Dong, Qiudong Deng, Shijun Weng, and Wenzhi Sun, (2003), Seeing More Clearly: Recent Advances in Understanding Retinal Circuitry, Science, v. 302, p. 408-411

10. Berman, S.M. and Clear R.D., (2008), Past visual studies can support a novel human photoreceptor. Light and Engineering, v. 16, no. 2, p. 88-94

11. Leonid, K., Casper R.F., Hawa R.J., Perelman P., Chung S.H., Sokalsky S., Shapiro C.M., (2005) Blocking Low-Wavelength Light Prevents Nocturnal Melatonin Suppression with No Adverse Effect on Performance during Simulated Shift Work, The Journal of Clinical Endocrinology & Metabolism 90(5):2755–2761

12. Cajochen, C, Munch, M, Kobialka, S, Krauchi, K, Steiner, R, Oelhafen, P, Orgul, S, Wirz-Justice, A. (2005).High sensitivity of human melatonin, alertness, thermoregulation, and heart rate to short wavelength light.*J. Clin. Endocrinol.Metab. 90:*1311-1316.

13. Wright, K., P.,Jr., Hughes, R., J., Kronauer, R.E., Dijk, D., J., Czeisler, C., A., (2001) Intrinsic near-24-h pacemaker period determines limits of circadian entrainment to a weak synchronizer in humans, Proceedings of the National Academy of Sciences USA, 98(24): 14027-32

14. Gooley JJ, Chamberlain K, Smith KA, Khalsa SB, Rajaratnam SM, Van Reen E, Zeitzer JM, Czeisler CA, Lockley SW. (2011). Exposure to room light before bedtime suppresses melatonin onset and shortens melatonin duration in humans. J. Clin. Endocrinol. Metab. 96:463–72.

15.  Glickman, G., Levin, R., Brainard, G. C., (2002) Ocular Input for Human Melatonin Regulation: Relevance to Breast Cancer, Neuroendocrinology Letters, 23 (suppl 2):17-22

16. Stevens, R.G., Blask, E. D., Brainard, C. G.,  Hansen, J., Lockley, S. W.,  et al., (2007) Meeting Report: The Role of Environmental Lighting and Circadian Disruption in Cancer and Other Diseases, Environmental Health Perspectives, vol. 115, n.9, p.1357-1362

17. Kloog, I., Haim, A., Stevens, R.G., Barchana, M., Portnov, B.A., (2008) Light at Night Co-distributes with Incident Breast but not Lung Cancer in the Female Population of Israel, Chronobiology International, 25(1), 65-81

18. Bullough JD, Rea MS, Figueiro MG. (2006) Of mice and women: light as a circadian stimulus in breast cancer research. Cancer Causes Control; 17:375–383

19. Kloog I, Haim A, Stevens RG, Portnov BA. Global co-distribution of light at night (LAN) and cancers of prostate, colon, and lung in men. Chronobiol Int. 2009;26(1):108-25.

16

20.  Haim, A., Yukler, A., Harel, O., Schwimmer, H., Fares, F., (2010). Effects of chronobiology on prostate cancer cells growth in vivo. *Sleep Science*, 3 (1): 32-35

21 Brugger P, Marktl W, Herold M. (1995) Impaired nocturnal secretion of melatonin in coronary heart disease. Lancet; 345:1408.

22. Haus E, Smolensky M. (2006) Biological clocks and shift work: circadian dysregulation and potential long-term effects. Cancer Causes Control; 17:489–500

23. Bass J, Turek FW. (2005) Sleepless in America: a pathway to obesity and the metabolic syndrome? Arch Intern Med; 165:15–16.

24. Navara, K., J., Nelson, R., J., (2007) The dark side of light at night: physiological, epidemiological, and ecological consequences. J. Pineal Res. 43:215-224

25. Rich, C and Longcore, T., (2004) Ecological Light Pollution, Front. Ecol. Environ.; 2(4): 191-198

26. Rich, C and Longcore, T., editors, (2006) Ecological Consequences of Artificial Night Lighting, Island Press

27. Longcore, T., (2010) Sensory Ecology: Night Lights Alter Reproductive Behavior of Blue Tits, Current Biology, Vol. 20, Issue 20, pp. R893-R895

28. Kempenaers, B., Borgström, P., Loës, P., Schlicht, E., Valcu, M., (2010),  Artificial Night Lighting Affects Dawn Song, Extra-Pair Siring Success, and Lay Date in Songbirds, Current Biology, Vol. 20, Issue 19, pp. 1735-1739

29. Cinzano P. (2002) in Light Pollution and the Protection of the Night Environment, ed. P. Cinzano, ISTIL, p. 193-205, www.lightpollution.it/istil/Venice/

30. Cinzano, P., Castro, J., D., (2000) Mem.SAIt-Journal of the Italian Astronomical Society, vol. 71 n.1 , pp.251-256

31. Luginbuhl, C., B., Walker, C.E., Wainscoat, R., J.,  2009, Physics Today, vol. 62, 12, p.35

32. Falchi, F., (2011), Campaign of sky brightness and extinction measurements using a portable CCD camera, Monthly Notices of the Royal Astronomical Society, 412**,** 33–48

33. Brainard, G. C., Hanifin, J.P. (2005) Photons, Clocks, and Consciousness, Journal of Biological Rhythms, 20, 314-325

34. Rea, M.S., Freyssinier, J. P., (2009) Outdoor Lighting: Visual Efficacy, ASSIST Recommends Vol. 2, issue 2, Jan 2009, Lighting Research Center and Rensselaer Polytechnic Institute

35. Lewis, A. (1999) Visual Performance as a Function of Spectral Power Distribution of Light Sources at Luminances Used for General Outdoor Lighting. Journal of the Illuminating Engineering Society of North America. Winter 1999, Vol. 28, no. 1.

36. Orreveteläinen P. 2005. Models for spectral luminous efficiency in peripheral vision at mesopic and low photopic luminance levels. Espoo. Helsinki University of Technology, Lighting Laboratory. Report 37, ISBN951227857X

37. Brainard, G. C., Rollag, M.D., Hanifin, J.P., (1997) Photic Regulation of Melatonin in Humans: Ocular and Neural Signal Transduction. *J Biol Rhythms.* 12: 537-546

38. Copas, J., (2005), The downside of publication, *Significance* Vol 2 Issue 4 p.154

39. Benenson, W., Harris, W., J, Stocker, H., Lutz, H., ed., (2002), Handbook of physics, Springer-Verlag, ISBN 0-387-95269-1, p.376

40. CIE (2001) The CIE System of Physical Photometry, Draft Standard 010.2/E

41. CIE (1926) Commission Internationale de l'Eclairage Proceedings 1924, Cambridge University Press, Cambridge

42. Bureau International des Poids et Mesures (2007), SI Brochure Appendix 2. Practical realization of the definition of the candela, http://www1.bipm.org/utils/en/pdf/SIApp2_cd_en.pdf

43. CIE (1951) Commission Internationale de l'Eclairage Proceedings, Vol. 1, Sec 4; Vol 3, p. 37, Bureau Central de la CIE, Paris

44. Wyszecki, G. and Stiles, W.S. (2000) Color science: concepts and methods, quantitative data and formulae. John Wiley and Sons, 2nd edition

45. Judd D.B. (1951) Proceedings of the Twelfth Session of the CIE, Bureau Central de la CIE, Paris, 11

46. Vos J.J. (1978) Colorimetric and photometric properties of a $2°$ fundamental observer, Color Research and Application, 3, 125-128

47. Stockman A., Sharpe L.T. (2000) The spectral sensitivities of the middle- and long-wavelength-sensitive cones derived from measurements in observers of known genotype, Vision Research, 40, 1711-1737

48. Cinzano P. (2003) A laboratory for the photometry and radiometry of light pollution, Memorie della Società Astronomica Italiana Supplement., 3, 414-318

49. Knox J.F., Keith D.M. (2003) Sources, surfaces and atmospheric scattering: the Rayleigh Scatter Index. presented at the 2003 meeting of the Int. Dark-Sky Assoc., Tucson, USA, Online at http://resodance.com/ali/scatter.pdf

50. Cinzano, P. (2004) A portable spectrophotometer for light pollution measurements, Memorie della Società Astronomica Italiana Supplement, v.5, p.395

51. Straif K, Baan R, Grosse Y, Secretan B, El Ghissassi F, Bouvard V, Altieri A, Benbrahim-Tallaa L, Cogliano V. (2007) Carcinogenicity of shift-work, painting, and fire-fighting. Lancet Oncol. 2007 Dec;8(12):1065-6.
PubMed PMID: 19271347.

52. Pauley, S.M. (2004) Lighting for the human circadian clock: recent research indicates that lighting has become a public health issue, Medical Hypotheses, 63, 588-596

53. Stevens, R.G. (2009) Light-at-night, circadian disruption and breast cancer: assessment of existing evidence, International Journal of Epidemiology, doi:10.1093/ije/dyp178

54. American Medical Association, House of Delegates, (2009) Resolution 516 – Advocating and Support for Light Pollution Control Efforts and Glare Reduction for both Public Safety and Energy Savings, online at: http://www.ama-assn.org/ama1/pub/upload/mm/475/a-09-ref-comm-e-annotated.pdf

55. Baldridge, A. M., Hook, S. J., Grove, C. I. and G. Rivera, 2008(9). The ASTER Spectral Library Version 2.0. In press Remote Sensing of Environment

56. Adrian W. and Jobanputra R., (2005) Influence of Pavement Reflectance on Lighting for Parking Lots, Portland Cement Association R&D Serial No. 2458

57. Hollan, J, (2004) Metabolism-influencing light: measurement by digital cameras,  Poster at Cancer and Rhythm, Oct 14 - 16, 2004, Graz, Austria

Figure Legends



Figure 1. Approximate luminance ranges of scotopic (rods), mesopic (rod/cone transition region) and photopic (cones) response of the human eye.



Figure 2. A typical town night scene. The lowest luminance is on the ground and on the street where it should be about 1 $cd/m^2$. Its luminance is even lower than the night sky in big cities. Most of the rest of the scene has a far higher luminance, completely in the photopic range of our eyes. (Photo by Bruce Kingsbury)

20



Figure 3. Photopic (dashed line) and scotopic (solid line) normalised responses for comparison with the spectral power distribution of a HPS lamp (dotted line).



Figure 4. Spectral reflectance of four asphalt surfaces. Data from NASA/Jet Propulsion Laboratory ASTER Library [55] and Portland Cement Association [56]



Figure 5. Spectral reflectance of five concrete surfaces. Data from NASA/Jet Propulsion Laboratory ASTER library [55]



Figure 4. The protected 440-540 nm range (solid line) compared with the scotopic response (short dashed line) and the spectral power distributions of a HPS lamp (solid line) and a Mercury Vapour lamp (dashed line).

23



Figure 5. Spectral power distributions of a white LED (solid line) and a HPS lamp (dotted line) with equal photopic lumen output.



Figure 6. Action spectrum of melatonin suppression by light [57]

# EXHIBIT L

Environews | Focus

# Missing the Dark
## Health Effects of Light Pollution





Mark A. Johnson/Alamy

I n 1879, Thomas Edison's incandescent light bulbs first illuminated a New York street, and the modern era of electric lighting began. Since then, the world has become awash in electric light. Powerful lamps light up streets, yards, parking lots, and billboards. Sports facilities blaze with light that is visible for tens of miles. Business and office building windows glow throughout the night. According to the Tucson, Arizona–based International Dark-Sky Association (IDA), the sky glow of Los Angeles is visible from an airplane 200 miles away. In most of the world's large urban centers, stargazing is something that happens at a planetarium. Indeed, when a 1994 earthquake knocked out the power in Los Angeles, many anxious residents called local emergency centers to report seeing a strange "giant, silvery cloud" in the dark sky. What they were really seeing—for the first time—was the Milky Way, long obliterated by the urban sky glow.

None of this is to say that electric lights are inherently bad. Artificial light has benefited society by, for instance, extending the length of the productive day, offering more time not just for working but also for recreational activities that require light. But when artificial outdoor lighting becomes inefficient, annoying, and unnecessary, it is known as light pollution. Many environmentalists, naturalists, and medical researchers consider light pollution to be one of the fastest growing and most pervasive forms of environmental pollution. And a growing body of scientific research suggests that light

**Aerial view of Los Angeles, California**

 

Glare, overillumination, and sky glow (which makes the sky over a city look orange, yellow, or pink) are all forms of light pollution. These photos were taken in Goodwood, Ontario, a small town about 45 minutes northeast of Toronto during and the night after the regionwide 14 August 2003 blackout. The lights inside the house in the blackout picture were created by candles and flashlights.

pollution can have lasting adverse effects on both human and wildlife health.

When does nuisance light become a health hazard? Richard Stevens, a professor and cancer epidemiologist at the University of Connecticut Health Center in Farmington, Connecticut, says light photons must hit the retina for biologic effects to occur. "However, in an environment where there is much artificial light at night—such as Manhattan or Las Vegas—there is much more opportunity for exposure of the retina to photons that might disrupt circadian rhythm," he says. "So I think it is not only 'night owls' who get those photons. Almost all of us awaken during the night for periods of time, and unless we have blackout shades there is some electric lighting coming in our windows. It is not clear how much is too much; that is an important part of the research now."

According to "The First World Atlas of the Artificial Night Sky Brightness," a report on global light pollution published in volume 328, issue 3 (2001) of the *Monthly Notices of the Royal Astronomical Society*, two-thirds of the U.S. population and more than one-half of the European population have already lost the ability to see the Milky Way with the naked eye. Moreover, 63% of the world population and 99% of the population of the European Union and the United States (excluding Alaska and Hawaii) live in areas where the night sky is brighter than the threshold for light-polluted status set by the International Astronomical Union—that is, the artificial sky brightness is greater than 10% of the natural sky brightness above 45° of elevation.

Light pollution comes in many forms, including sky glow, light trespass, glare, and overillumination. Sky glow is the bright halo that appears over urban areas at night, a product of light being scattered by water droplets or particles in the air. Light trespass occurs when unwanted artificial light from, for instance, a floodlight or streetlight spills onto an adjacent property, lighting an area that would otherwise be dark. Glare is created by light that shines horizontally. Overillumination refers to the use of artificial light well beyond what is required for a specific activity, such as keeping the lights on all night in an empty office building.

### Distracted by the Light

The ecologic effects of artificial light have been well documented. Light pollution has been shown to affect both flora and fauna. For instance, prolonged exposure to artificial light prevents many trees from adjusting to seasonal variations, according to Winslow Briggs's chapter on plant responses in the 2006 book *Ecological Consequences of Artificial Night Lighting*. This, in turn, has implications for the wildlife that depend on trees for their natural habitat. Research on insects, turtles, birds, fish, reptiles, and other wildlife species shows that light pollution can alter behaviors, foraging areas, and breeding cycles, and not just in urban centers but in rural areas as well.

Sea turtles provide one dramatic example of how artificial light on beaches can disrupt behavior. Many species of sea turtles lay their eggs on beaches, with females returning for decades to the beaches where they were born to nest. When these beaches are brightly lit at night, females may be discouraged from nesting in them; they can also be disoriented by lights and wander onto nearby roadways, where they risk being struck by vehicles.

Moreover, sea turtle hatchlings normally navigate toward the sea by orienting away from the elevated, dark silhouette of the landward horizon, according to a study published by Michael Salmon of Florida Atlantic University and colleagues in volume 122, number 1–2 (1992) of *Behaviour*. When there are artificial bright lights on the beach, newly hatched turtles become disoriented and navigate toward the artificial light source, never finding the sea.

Jean Higgins, an environmental specialist with the Florida Wildlife Conservation Commission Imperiled Species Management Section, says disorientation also contributes to dehydration and exhaustion in hatchlings. "It's hard to say if the ones that have made it into the water aren't more susceptible to predation at this later point," she says.

Bright electric lights can also disrupt the behavior of birds. About 200 species of birds fly their migration patterns at night over North America, and especially during inclement weather with low cloud cover, they routinely are confused during passage by brightly lit buildings, communication towers, and other structures. "Light attracts birds and disorients them," explains Michael Mesure, executive director of the Toronto-based Fatal Light Awareness Program (FLAP), which

Todd Carlson

## How Outdoor Lighting Translates into Light Pollution



**1**

**50**% Wasted Light

**10**% Glare

**40**% Productive Light



According to the National Park Service, 50% of the light from a typical unshielded light fixture is wasted, shining upward where it is not needed (figure 1). About 40% of the light shines downward to illuminate the intended target. Light emitted horizontally tends to create glare.

Globe lights typically distribute light poorly and contribute to glare (figure 2). Floodlights can fill a space with light, but they may be too bright for their intended task, and much of the light is wasted (figure 3).

Good lighting is shielded in a manner that directs all the light where it is needed and wanted. The International Dark-Sky Association (IDA) recommends that all lighting be installed such that no light is emitted above a horizontal plane running through the lowest part of the fixture (figure 4).

IDA further recommends the use of low-pressure sodium (LPS) lights wherever possible. LPS lights are the most energy-efficient lights currently available. They emit a yellow light at the wavelength where the human eye is most sensitive, but the monochromatic light makes it difficult to distinguish the colors of objects below. For outdoor lighting where color perception is important (to enhance security, for instance), IDA recommends high-pressure sodium lights.

Figure 1: U.S. National Park Service, Matthew Rayl/EHP; figures 2–4: International Dark-Sky Association

works to safeguard migratory birds in the urban environment. "It is a serious situation because many species that collide frequently are known to be in long-term decline and some are already designated officially as threatened."

Each year in New York City alone, about 10,000 migratory birds are injured or killed crashing into skyscrapers and high-rise buildings, says Glenn Phillips, executive director of the New York City Audubon Society. The estimates as to the number of birds dying from collisions across North America annually range from 98 million to close to a billion. The U.S. Fish and Wildlife Service estimates 5–50 million birds die each year from collisions with communication towers.

Turtles and birds are not the only wildlife affected by artificial nighttime lighting. Frogs have been found to inhibit their mating calls when they are exposed to excessive light at night, reducing their reproductive capacity. The feeding behavior of bats also is altered by artificial light. Researchers have blamed light pollution for declines in populations of North American moths, according to *Ecological Consequences of Artificial Night Lighting.* Almost all small rodents and carnivores, 80% of marsupials, and 20% of primates are nocturnal. "We are just now understanding the nocturnality of many creatures," says Chad Moore, Night Sky Program manager with the National Park Service. "Not protecting the night will destroy the habitat of many animals."

**Resetting the Circadian Clock**

The health effects of light pollution have not been as well defined for humans as for wildlife, although a compelling amount of epidemiologic evidence points to a consistent association between exposure to indoor artificial nighttime light and health problems such as breast cancer, says George Brainard, a professor of neurology at Jefferson Medical College, Thomas Jefferson University in Philadelphia. "That association does not prove that artificial light causes the problem. On the other hand, controlled laboratory studies do show that exposure to light during the night can disrupt circadian and neuroendocrine physiology, thereby accelerating tumor growth."

The 24-hour day/night cycle, known as the circadian clock, affects physiologic processes in almost all organisms. These processes include brain wave patterns, hormone production, cell regulation, and other biologic activities. Disruption of the circadian clock is linked to several medical disorders in humans, including depression, insomnia, cardiovascular disease, and cancer, says Paolo Sassone-Corsi, chairman of the Pharmacology Department at the University of California, Irvine, who has done extensive research on the circadian clock. "Studies show that the circadian cycle controls from ten to fifteen percent of our genes," he explains. "So the disruption of the circadian cycle can cause a lot of health problems."

On 14–15 September 2006 the National Institute of Environmental Health Sciences (NIEHS) sponsored a meeting that focused on how best to conduct research on possible connections between artificial lighting and human health. A report of that meeting in the September 2007 issue of *EHP* stated, "One of the defining characteristics of life in the modern world is the altered patterns of light and dark in the built environment made possible by use of electric power." The meeting report authors noted it may not be entirely coincidental that dramatic increases in the risk of breast and prostate cancers, obesity, and early-onset diabetes have mirrored the dramatic changes in the amount and pattern of artificial light generated during the night and day in modern societies over recent decades. "The science underlying these hypotheses has a solid base," they wrote, "and is currently moving forward rapidly."

The connection between artificial light and sleep disorders is a fairly intuitive one. Difficulties with adjusting the circadian clock can lead to a number of sleep disorders, including shift-work disorder, which affects people who rotate shifts or work at night, and delayed sleep–phase syndrome, in which people tend to fall asleep very late at night and have difficulty waking up in time for work, school, or social engagements.

The sleep pattern that was the norm before the invention of electric lights is no longer the norm in countries where artificial light extends the day. In the 2005 book *At Day's Close: Night in Times Past,* historian Roger Ekirch of Virginia Polytechnic Institute described how before the Industrial Age people slept in two 4-hour shifts ("first sleep" and "second sleep") separated by a late-night period of quiet wakefulness.

Thomas A. Wehr, a psychiatrist at the National Institute of Mental Health, has studied whether humans would revert back to the two-shift sleep pattern if they were not exposed to the longer photoperiod afforded by artificial lighting. In the June 1992 *Journal of Sleep Research,* Wehr reported his findings on eight healthy men, whose light/dark schedule was shifted from their customary 16 hours of light and 8 hours of dark to a schedule in which they were exposed to natural and electric light for 10 hours, then darkness for 14 hours to simulate natural durations of day and night in winter. The subjects did indeed revert to the two-shift pattern, sleeping in two sessions of about 4 hours each separated by 1–3 hours of quiet wakefulness.



Turtle hatchlings instinctively orient away from the dark silhouette of the nighttime shore. Here hatchlings have been temporarily distracted by a bright lamp. Hatchlings and mother turtles distracted by shorefront lights can wander onto nearby roadways.

Lynda Richardson/Corbis



Increase in Artificial Night Sky Brightness in North America

Late 1950s    Mid 1970s

1997    2025

<11% above the natural brightness level
11–33% above the natural brightness level
34–99% above the natural brightness level
100% above the natural brightness level
3–9 times the natural brightness level (the Milky Way is no longer visible)
9–27 times the natural brightness level (fewer than 100 stars are visible)
27–81 times the natural brightness level (the North Star is no longer visible)
81–243 times the natural brightness level (the Big Dipper is no longer visible)

Artificial night sky brightness at zenith, at sea level, for a standard clean atmosphere as a fraction of the average natural night sky brightness. These maps are based on upward light measured by the Defense Meteorological Satellite Program after accounting for propagation and scattering of that light in the atmosphere. The 2025 map assumes a constant population growth rate of 6% per year.

Source: http://www.lightpollution.it/  © 2001 P. Cinzano, F. Falchi, C.D. Elvidge

## Beyond Sleep Disorders

Alteration of the circadian clock can branch into other effects besides sleep disorders. A team of Vanderbilt University researchers considered the possibility that constant artificial light exposure in neonatal intensive care units could impair the developing circadian rhythm of premature babies. In a study published in the August 2006 issue of *Pediatric Research*, they exposed newborn mice (comparable in development to 13-week-old human fetuses) to constant artificial light for several weeks. The exposed mice were unable to maintain a coherent circadian cycle at age 3 weeks (comparable to a full-term human neonate). Mice exposed for an additional 4 weeks were unable to establish a regular activity cycle. The researchers concluded that excessive artificial light exposure early in life might contribute to an increased risk of depression and other mood disorders in humans. Lead researcher Douglas McMahon notes, "All this is speculative at this time, but certainly the data would indicate that human infants benefit from the synchronizing effect of a normal light/dark cycle."

Since 1995, studies in such journals as *Epidemiology, Cancer Causes and Control*, the *Journal of the National Cancer Institute*, and *Aviation Space Environmental Medicine*, among others, have examined female employees working a rotating night shift and found that an elevated breast cancer risk is associated with occupational exposure to artificial light at night. Mariana Figueiro, program director at the Lighting Research Center of Rensselaer Polytechnic Institute in Troy, New York, notes that permanent shift workers may be less likely to be disrupted by night work because their circadian rhythm can readjust to the night work as long as light/dark patterns are controlled.

In a study published in the 17 October 2001 *Journal of the National Cancer Institute*, Harvard University epidemiologist Eva S. Schernhammer and colleagues from Brigham and Women's Hospital in Boston used data from the 1988 Nurses' Health Study (NHS), which surveyed 121,701 registered female nurses on a range of health issues. Schernhammer and her colleagues found an association between breast cancer and shift work that was restricted to women who had worked 30 or more years on rotating night shifts (0.5% of the study population).

In another study of the NHS cohort, Schernhammer and colleagues also found elevated breast cancer risk associated with rotating night shift work. Discussing this finding in the January 2006 issue of *Epidemiology*, they wrote that shift work was associated with only a modest increased breast cancer risk among the women studied. The researchers further wrote, however, that their study's findings "in combination with the results of earlier work, reduce the likelihood that this association is due solely to chance."

Schernhammer and her colleagues have also used their NHS cohort to investigate the connection between artificial light, night work, and colorectal cancer. In the 4 June 2003 issue of the *Journal of the National Cancer Institute*, they reported that nurses who worked night shifts at least 3 times a month for 15 years or more had a 35%



The International Agency for Research on Cancer has classified shift work as a probable human carcinogen. A study in the December 2008 issue of *Sleep* found that use of light exposure therapy, sunglasses, and a strict sleep schedule may help night-shift workers achieve a better-balanced circadian rhythm.

increased risk of colorectal cancer. This is the first significant evidence so far linking night work and colorectal cancer, so it's too early to draw conclusions about a causal association. "There is even less evidence about colorectal cancer and the larger subject of light pollution," explains Stevens. "That does not mean there is no effect, but rather, there is not enough evidence to render a verdict at this time."

The research on the shift work/cancer relationship is not conclusive, but it was enough for the International Agency for Research on Cancer (IARC) to classify shift work as a probable human carcinogen in 2007. "The IARC didn't definitely call night shift work a carcinogen," Brainard says. "It's still too soon to go there, but there is enough evidence to raise the flag. That's why more research is still needed."

**The Role of Melatonin**

Brainard and a growing number of researchers believe that melatonin may be the key to understanding the shift work/breast cancer risk association. Melatonin, a hormone produced by the pineal gland, is secreted at night

and is known for helping to regulate the body's biologic clock. Melatonin triggers a host of biologic activities, possibly including a nocturnal reduction in the body's production of estrogen. The body produces melatonin at night, and melatonin levels drop precipitously in the presence of artificial or natural light. Numerous studies suggest that decreasing nocturnal melatonin production levels increases an individual's risk of developing cancer. [For more information on melatonin, see "Benefits of Sunlight: A Bright Spot for Human Health," *EHP* 116:A160–A167 (2008).]

One groundbreaking study published in the 1 December 2005 issue of *Cancer Research* implicated melatonin deficiency in what the report authors called a rational biologic explanation for the increased breast cancer risk in female night shift workers. The study involved female volunteers whose blood was collected under three different conditions: during daylight hours, during the night after 2 hours of complete darkness, and during the night after exposure to 90 minutes of artificial light. The blood was injected into human breast tumors that were transplanted into rats. The tumors infused with melatonin-deficient blood collected after exposure to light during the night were found to grow at the same speed as those infused with daytime blood. The blood collected after exposure to darkness slowed tumor growth.

"We now know that light suppresses melatonin, but we are not saying it is the only risk factor," says first author David Blask, a research scientist at the Bassett Healthcare Research Institute in Cooperstown, New York. "But light is a risk factor that may explain [previously unexplainable phenomena]. So we need to seriously consider it."

The National Cancer Institute estimates that 1 in 8 women will be diagnosed with breast cancer at some time during her life. We can attribute only about half of all breast cancer cases to known risk factors, says Brainard. Meanwhile, he says, the breast cancer rate keeps climbing—incidence increased by more than 40% between 1973 and 1998, according to the Breast Cancer Fund—and

Akira Suemori/AP Photo

"we need to understand what's going on as soon as possible."

### Linking Light Pollution to Human Health

The evidence that indoor artificial light at night influences human health is fairly strong, but how does this relate to light pollution? The work in this area has just begun, but two studies in Israel have yielded some intriguing findings. Stevens was part of a study team that used satellite photos to gauge the level of nighttime artificial light in 147 communities in Israel, then overlaid the photos with a map detailing the distribution of breast cancer cases. The results showed a statistically significant correlation between outdoor artificial light at night and breast cancer, even when controlling for population density, affluence, and air pollution. Women living in neighborhoods where it was bright enough to read a book outside at midnight had a 73% higher risk of developing breast cancer than those residing in areas with the least outdoor artificial lighting. However, lung cancer risk was not affected. The findings appeared in the January 2008 issue of *Chronobiology International.*

"It may turn out that artificial light exposure at night increases risk, but not entirely by the melatonin mechanism, so we need to do more studies of 'clock' genes—nine have so far been identified—and light exposure in rodent models and humans," Stevens says. Clock genes carry the genetic instructions to produce protein products that control circadian rhythm. Research needs to be done not just on the light pollution–cancer connection but also on several other diseases that may be influenced by light and dark.

Travis Longcore, co-editor of *Ecological Consequences of Artificial Night Lighting* and a research associate professor at the University of Southern California Center for Sustainable Cities, suggests two ways outdoor light pollution may contribute to artificial light–associated health effects in humans. "From a human health perspective, it seems that we are concerned with whatever increases artificial light exposure indoors at night," he says. "The effect of outdoor lighting on indoor exposure could be either direct or indirect. In the direct impact scenario, the artificial light from outside reaches people inside at night at levels that affect production of hormones. In an indirect impact it would disturb people inside, who then turn on lights and expose themselves to more light."

"The public needs to know about the factors causing [light pollution], but research is not going at the pace it should," Blask says. Susan Golden, distinguished professor at the Center for Research on Biological Clocks of Texas A&M University in College Station, Texas, agrees. She says, "Light pollution is still way down the list of important environmental issues needing study. That's why it's so hard to get funds to research the issue."

"The policy implications of unnecessary light at night are enormous," says Stevens in reference to the health and energy ramifications [for more on the energy impact of light pollution, see "Switch On the Night: Policies for Smarter Lighting," p. A28 this issue]. "It is fully as important an issue as global warming." Moreover, he says, artificial light is a ubiquitous environmental agent. "Almost everyone in modern society uses electric light to reduce the natural daily dark period by extending light into the evening or before sunrise in the morning," he says. "On that basis, we are all exposed to electric light at night, whereas before electricity, and still in much of the developing world, people get twelve hours of dark whether they are asleep or not."

Sources believe that the meeting at the NIEHS in September 2006 was a promising beginning for moving forward on the light pollution issue. "Ten years ago, scientists thought something was there, but couldn't put a finger on it," says Leslie Reinlib, a program director at the NIEHS who helped organize the meeting. "Now we are really just at the tip of the iceberg, but we do have something that's scientific and can be measured."

The 23 participants at the NIEHS-sponsored meeting identified a research agenda for further study that included the functioning of the circadian clock, epidemiologic studies to define the artificial light exposure/disease relationship, the role of melatonin in artificial light–induced disease, and development of interventions and treatments to reduce the impact of light pollution on disease. "It was a very significant meeting," Brainard says. "It's the first time the National Institutes of Health sponsored a broad multidisciplinary look at the light-environmental question with the intent of moving to the next step."

**Ron Chepesiuk**

# EXHIBIT M

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/305041212

# Dark Nature: Exploring potential benefits of nocturnal nature-based interaction for human and environmental health

**Article** · January 2014

CITATIONS
4

READS
327

**4 authors**, including:



Katherine N. Irvine
James Hutton Institute
**101** PUBLICATIONS **4,643** CITATIONS

SEE PROFILE

Caroline Wilson
Coventry University
**19** PUBLICATIONS **52** CITATIONS

SEE PROFILE

Sara L Warber
University of Michigan
**97** PUBLICATIONS **1,746** CITATIONS

SEE PROFILE

**Some of the authors of this publication are also working on these related projects:**

Pathways linking biodiversity to human health: A conceptual framework View project

Pharmacokinetic Study of High and Low doses of Tart Cherry in Humans View project

All content following this page was uploaded by Caroline Wilson on 08 July 2016.

The user has requested enhancement of the downloaded file.

# Dark Nature: Exploring potential benefits of nocturnal nature-based interaction for human and environmental health

**Bell, R. , Irvine, K.N. , Wilson, C. and Warber, S.L**

**Published PDF deposited in Curve February 2016**

**Original citation:**
Bell, R. , Irvine, K.N. , Wilson, C. and Warber, S.L. (2014) Dark Nature: Exploring potential benefits of nocturnal nature-based interaction for human and environmental health. European Journal of Ecopsychology, volume 5

http://eje.wyrdwise.com/ojs/index.php/EJE/article/view/60/0

This work is licensed under a Creative Commons Attribution 3.0 License.

**Copyright © and Moral Rights are retained by the author(s) and/ or other copyright owners. A copy can be downloaded for personal non-commercial research or study, without prior permission or charge. This item cannot be reproduced or quoted extensively from without first obtaining permission in writing from the copyright holder(s). The content must not be changed in any way or sold commercially in any format or medium without the formal permission of the copyright holders.**

**CURVE is the Institutional Repository for Coventry University**

http://curve.coventry.ac.uk/open

*European Journal of Ecopsychology 5: 1-15 (2014)*

# Dark Nature: Exploring potential benefits of nocturnal nature-based interaction for human and environmental health

Rebecca Bell[a], Katherine N. Irvine[b],
Caroline Wilson[c] & Sara C. Warber[d]

[a] *Institute for Energy and Sustainable Development, De Montfort University, UK*
[b] *Social, Economic and Geographical Sciences, The James Hutton Institute, UK*
[c] *Research Solutions, Coventry University, UK*
[d] *Department of Family Medicine, University of Michigan, USA*

## Abstract

This article considers 'Dark Nature', a term proposed to encompass both the nocturnal environment and the nature-interaction activities available therein. Current thoughts surrounding nature-interaction are briefly outlined and a more holistic view of nature-based interaction is suggested that includes the nocturnal environment. We report on a small pilot study focusing on stargazing as an example of a Dark Nature activity. The study utilized a short questionnaire incorporating open- and closed-ended questions coupled with the Connectedness to Nature Scale to explore to what extent stargazing could be considered a Dark Nature activity and what aspects of such an activity may benefit wellbeing. The results suggest that nature connectedness was higher for those with more years of stargazing experience and for those who indicated noticing wildlife while stargazing. Participants highlighted a range of benefits, including a sense of personal growth from developing skills to experiencing positive emotions and a variety of transcendent thoughts and experiences. Participants' responses suggest stargazing could be considered a Dark Nature activity in that it does not just take place in the dark but that those involved interact with the nocturnal environment. As such stargazing may offer benefits similar to those experienced by people taking part in daytime activities within natural environments. Using the study as a starting point for a wider discussion regarding Dark Nature activities and their potential benefits to both human quality of life and concern for nocturnal environments, we outline a range of beneficial features that the nocturnal environment may offer as a setting for nature-based activities.

**Keywords:** stargazing, Dark Nature, connectedness, wellbeing, nature-interaction

## Introduction

Interactions with nature are considered important contributors to human health and wellbeing (for reviews see e.g., Hartig et al, 2014; Keniger et al, 2013). Such interaction can increase positive emotions (e.g., Hinds & Sparks, 2011; Irvine et al, 2013) and reduce stress levels (e.g., Roe et al, 2013), whilst nature-based activities such as gardening and outdoor walking have been found to benefit multiple dimensions of human health/wellbeing (e.g., Hawkins et al, 2011; Marselle et al, 2013, 2014; Okvat & Zautra, 2011). Much of the research into the benefits of nature-based activities has, to date, focused on daylight pursuits primarily based in green surroundings, with sunlight cited as an additionally important aspect in enhancing wellbeing (Beute & Kort, 2013). Recent research has begun to focus on benefits from different types of environments (e.g., Marselle et al, 2013), the level of biodiversity (e.g., Fuller et al, 2007) and 'bluespace' (e.g., Wheeler et al, 2012). This article is an exploration of the potential wellbeing benefits from activities that take place in nocturnal environments.

There are a small but noteworthy number of activities in which individuals take part that occur outdoors during the hours of darkness: activities such as stargazing, night fishing, moon gardening, camping, and wildlife watching of nocturnal species. As with activities that take place during the day many of these pursuits involve interaction with nature on a number of levels, from passively viewing nature through to active participation and engagement with the natural environment itself (Irvine & Warber, 2002; Pretty, 2004). There seems to be an increasing awareness of the importance of interaction with nocturnal environments outside of academic research. For example, the Royal Society for the Protection of Birds (RSPB) in the UK recently promoted a national 'Big Wild Sleepout' event as part of their 'engaging with wildlife and nature' campaign. The project incorporated a range of activities that can be characterized by the term 'Dark Nature' and sought to increase awareness of and engagement in nocturnal nature activities. The campaign's description calls people to:

> Discover the secret world on your doorstep … sleep out in nature's home, hear night sounds, feel the night air on your face and marvel at the night sky (RSPB, 2013).

The RSPB project suggests that nocturnal activities may reveal a secret side to nature, one that may appeal to many senses and encourage feelings of wonder and awe in individuals. Despite such awareness campaigns and an increase in dark sky parks across Europe (International Dark Sky Association, 2013; Globe at Night 2014), there is limited academic research into how the features of the nocturnal (and

daytime) environment might promote psychosocial and particularly spiritual wellbeing (Irvine & Warber, 2002). The small number of existing studies instead come from a variety of disciplines: within medicine, the effects of light pollution on human physical health are examined (Chepesiuk, 2009), the biological sciences often focus on the effects of artificial lighting on biodiversity (Rich & Longcore, 2006), and astronomy itself has largely been investigated solely as a leisure pursuit (Ferris, 2002).

There has been little research examining the relationship between human interactions with the natural environment during night-time hours. As such, a notable proportion of activities that could facilitate nature-interaction may be overlooked. Such interactions could be labelled 'Dark Nature', which the authors define as an activity that promotes interaction with nature and takes place in the nocturnal environment. Identifying such Dark Nature activities could help to consolidate the ways in which the nocturnal environment may enhance wellbeing for individuals and benefit from increased protection and stewardship. This complementary relationship could be utilized and Dark Nature activities identified as environmentally sustainable leisure pursuits. The article develops the concept of Dark Nature and explores the extent to which stargazers interact with and are aware of the natural environment around them. The article examines findings from a pilot study of stargazing to explore the extent to which it could be considered a Dark Nature activity and discusses the wider implications that this study introduces in terms of individual and environmental wellbeing.

## Stargazing as a Dark Nature activity – A pilot study

A small scale pilot study was undertaken in April of 2013 to explore the idea of Dark Nature. Stargazing was selected as a leisure pursuit that took place in the nocturnal natural environment and as such may be an example of an intentional nature-interaction (Keniger et al, 2013). In some respects it may seem self-evident that stargazing is a nature-interaction activity as it is an activity based in nature which may offer a change in perception through "a mutual interaction between a subject and their environment" (Sewall, as cited in Totton, 2011). Yet stargazing appears to involve engaging with nature at a distance, with limited direct interaction i.e., it may not facilitate interaction with and awareness of the more 'nearby' natural environment. Thus, prior to this study, it was assumed that stargazers' focus would be away from ground level nature and as such may not necessarily be perceived as a nature-interaction activity. Consequently for this study we defined stargazing as an

activity that involved looking up at the night sky from an outdoor location only i.e., it did not include time spent in an observatory. To the authors' knowledge, this is the first study to conceptualise stargazing as a Dark Nature activity with a focus on exploring potential wellbeing benefits.

## Methods

### *Research design and participants*

The study was based around two central research questions. The first sought to understand to what extent stargazing could be considered a Dark Nature activity. The second focused on whether nature-based activities that take place during the night-time offered wellbeing benefits similar to those associated with nature-based activities that take place during daytime hours. The project took a cross-sectional study design and utilized a questionnaire with open- and closed-ended questions. This approach was taken in order to obtain participants' connection to nature through a quantitative measure and their personal experiences through qualitative data collection. Ethical approval was granted by the host university institution's Ethics Review Board. The questionnaire that was developed for the study was trialled with a small group of students from an astronomy society with subsequent minor revisions.

The study focused on astronomers who took part in stargazing as a leisure pursuit at both a novice and more experienced level. In total 29 participants were recruited by means of convenience sampling. These participants were drawn from a student astronomy group and individuals attending an astronomy outreach event. Three quarters of the participants were men (N=22); the majority (N=17) were over the age of 21.

### *Measures and data collection procedure*

In addition to two demographic questions (age, gender), the questionnaire incorporated open- and closed-ended questions structured around three areas of interest: (i) the stargazing experience; (ii) stargazers' interaction with and experience of nature; and (iii) the potential wellbeing benefits from time spent stargazing. These areas were considered useful in identifying the practicalities of the pursuit itself – such as frequency, locality etc. – and also any potential relationships between the pursuit of stargazing, interaction with nature, and resultant wellbeing.

Five questions were constructed to explore the stargazing experience: Participants

answered questions about their stargazing activity, specifically where their stargazing took place (open-ended response to 'Do you stargaze from your garden or somewhere else?') and what made them decide to end a stargazing session (open-ended response to 'What makes you decide to stop stargazing?'). Alongside this participants were asked how long they stargazed at any one period of time and on a weekly basis, and for how many years they had been stargazing. For the first of these questions ('On average how long to you spend stargazing at any one period of time?') response options were categorical in minutes (0-5, 5-10, 10-20, 20+). The other two time-related questions – 'On average how much time do you spend per week stargazing' and 'Approximately how long have you been stargazing? (in years, months or weeks)' – were open response. It was thought that these five questions would provide insight into the practical activity of stargazing and what it consists of in terms of commitment and engagement.

The stargazers' interaction with and experience of nature was addressed through use of two data collection tools, these were the Connectedness to Nature Scale (CNS) and an open-ended question constructed by the authors. The CNS, a validated scale, measures trait levels to identify the extent of an individual's feelings of being "emotionally connected to the natural world" (Mayer & Frantz, 2004: 1). The stem question asks individuals to consider fourteen statements (such as 'I often feel a sense of oneness with the natural world around me') and then rate to what extent they agree or disagree with each based on a scale of one ('strongly disagree') to five ('strongly agree'). Using the CNS was considered useful in helping to understand any potential relationship between feeling a connection to nature and time spent stargazing. The open-ended question asked participants 'Have you ever seen any wildlife whilst you were Stargazing? If so, what?'. This question sought to consider the extent to which stargazers were aware of the natural environment around them besides the skyscape, and whether being engaged in a deeply focused activity allowed for an awareness of the wider natural surroundings. Two open-ended questions were developed in order to consider stargazing and wellbeing. Participants were asked what they most enjoyed about stargazing ('What do you enjoy most about Stargazing?) and if (in their opinion') it enhanced their life ('Does Stargazing enhance your life? If so, how?'). These questions were developed to not only distinguish which aspects of stargazing they considered to be enjoyable, but also to encourage participants to think about the role it played in their lives. The questions also helped establish whether participants consciously identified interaction with nature as a benefit of stargazing and if so whether they considered this to be life enhancing.

The data collection procedure involved approaching attendees at a stargazing event with a brief verbal description of the project. Those who indicated interest were provided with an information sheet and consent form. The information sheet detailed the aims of the study and provided specifics on data storage and confidentiality. Individuals willing to take part in the study were asked to sign the consent form and were handed a questionnaire to self-complete. The questionnaire was completed immediately prior to a stargazing event.

## Analysis

The qualitative short answer data were analysed using open and axial coding (Saldana, 2013), to identify key themes and commonalities of experience. The biopsychosocial and spiritual dimensions of wellbeing (Irvine et al, 2013; Engel, 1977) were considered as an important template for understanding the themes present in the data and identifying potential wellbeing benefits that may be experienced through nocturnal nature-interaction. The quantitative data collected from the CNS were analysed using SPSS 22.0 and utilized Cronbach's alpha and independent samples t-tests. The CNS data showed moderate reliability (Cronbach's alpha = 0.75). Independent samples t-tests compared mean CNS scores of novice and experienced stargazers. These two groups were chosen to ascertain any difference in the effects of long term engagement in stargazing compared with those who had recently begun. CNS scores of individuals who did and did not notice wildlife while stargazing were also compared.

## Results

### The stargazing experience

Responses around the stargazing experience indicated that commitment to and engagement differed amongst participants. In terms of time spent per week this varied substantially with a small number of participants (N=2) taking part in the activity for the first time that evening. In contrast to this, one participant stated that they stargazed whenever they could, whilst the majority stargazed for between 10 minutes and 7 hours per week. Fourteen of the participants typically stargazed for less than 10 minutes, six stargazed for 10-20 minutes whilst nine stayed out for more than 20 minutes. The range of data in both of these questions suggests that even short periods a few times a week may also be considered 'stargazing' alongside more organized lengthy activity. Participants' reasons for ending a stargazing session

6

included, perhaps unsurprisingly, physical issues as a key factor such as a stiff neck or being cold/hungry. Additionally, some participants reported reasons such as feeling like they had met the evening's challenges or achieved their personal goals. When asked how many years they had been stargazing the responses were also widespread. Sixteen participants had been stargazing for 5 or fewer years with several of these individuals (N=5) having partaken in the activity for less than a year. Of the thirteen people who had been stargazing for more than 5 years, eight had been doing it for 25 years or more.

In terms of location, participants tended to stargaze either from their gardens (N=3) or another easily accessible and suitable location (N=10), with most utilizing numerous sites (N=16). It is interesting to note, however, that very few stargazed solely from their gardens suggesting that stargazing as an activity may encourage participants to venture out into the nocturnal environment to find appropriate locations.

### Stargazers' interaction with and experience of nature

The quantitative data collated from the CNS suggests that overall, stargazers demonstrated a relatively neutral level of connection to nature (M = 3.16, SD = 0.54). An independent samples t-test was conducted to compare nature connectedness between groups with more or less years spent stargazing. There was a significant difference for individuals who had stargazed for many years (>5 years; M = 3.46, SD = 0.43) and those who had stargazed for less (5 or fewer years; M = 2.92; SD = 0.53); t(27) = -2.920, p = 0.007. These results suggest that nature connectedness was higher for those with more years of stargazing experience. There was no significant difference in nature connectedness for those who were younger (under 21 years of age) and those who were older (21+ years); t(27) = -1.798, p = 0.083.

Whilst outside, stargazers reported seeing a wide range of nocturnal species such as bats or birds. Of those who reported wildlife sightings, over half (N=17) stated they had also seen some form of ground dwelling wildlife. Stargazers reported seeing animals such as foxes, badgers, and hedgehogs suggesting that whilst looking up they were also aware of the natural world around them at ground level. An independent samples t-test was conducted to compare nature connectedness between those who reported seeing wildlife while stargazing and those who did not. A significant difference was found whereby individuals who saw wildlife (M = 3.42; SD = 0.54) scored more highly on nature connectedness than those who reported seeing no

7

wildlife (M = 2.80, SD = 0.33); t(27) = 3.498, p = 0.002).

Based on the findings as discussed thus far, it would appear that stargazing could be conceptualized as a Dark Nature activity. This is apparent both directly through reports of wildlife sightings and indirectly with reported reasons for ending a stargazing session including the changing natural conditions around them. For example, many participants noticed changing aspects of their environment including the phases of the moon and shifting weather patterns such as the increase or decrease in cloud cover and changes in temperature whilst outside. Awareness of such features in the natural environment would suggest that stargazers often find that their focus is both broken by and drawn to the natural environment around them.

### *Stargazing and wellbeing*

The questionnaire included two questions developed to explore the wellbeing and life enhancing effects of a Dark Nature activity. A few participants considered these to be strange questions with some verbally commenting that they tended to think of stargazing as a science-based pursuit and as such had rarely considered it in terms of life enhancement and enjoyment.

On a physical level the qualitative data suggested that stargazing activity offered a possible link to wellbeing evident through an increase in a physical activity during a typically sedentary time period. As one individual stated, "It makes you go outside and stop watching TV" (Participant 4, male). Although stargazing may provide only minimal movements such as setting up equipment or walking to a suitable location, on a physical level, any increase in activity (particularly outdoors) is one of the factors which has been shown to improve wellbeing (Penedo & Dahn, 2005). Nevertheless, participants' comments tended to focus more on the non-physical elements of the biopsychosocial-spiritual model of health such as the social benefits and sense of personal growth through developing skills and acquiring knowledge. In addition, some individuals highlighted a range of spiritual and transcendent emotions that they enjoyed whilst stargazing.

In terms of the social benefits of stargazing, one participant stated that they "feel a communal spirit with the Astro society" (Participant 15, male). This sense of social integration and acceptance within a group through the activity of stargazing suggests that the social side is a significant feature. A sense of social contribution through sharing knowledge was also important "I enjoy being able to point out constellations to friends" (Participant 29, male). Another participant stated she enjoyed stargazing

as it was something she had "in common" with her dad. Another participant stated that they tend to stop stargazing when their friends go home, indicating that even though the activity may still be possible it is less enjoyable without company. A sense of connection with friends and family alongside feelings of social integration, acceptance and contribution are often considered to be important aspects in social wellbeing (Ryff, 1989; Keyes, 1998), which is one of the dimensions of overall wellbeing.

In terms of personal growth and sense of achievement stargazing offered individuals an ongoing activity that allowed them to build on their knowledge. As such being able to "learn my way around the night sky" (Participant 2, female), "testing my knowledge of the sky" (Participant 19, male), and "finding objects" (Participant 14, male) were often reported as things participants enjoyed most about stargazing. Whilst wanting to develop knowledge was considered an important reason for stargazing, achieving their personal goals was often cited as a reason for stopping a stargazing session. Working towards and achieving goals is considered to be an important aspect in wellbeing (Emmons, 1996).

In addition to the social nature and goal focused components of stargazing, some individuals reported that they enjoyed the more transcendent and spiritual elements. A number of participants gave comments that could be interpreted as reflecting the spiritual or transcendent aspect of stargazing often focusing on one's place in the universe. Two individuals reported particularly enjoying "The sense of crushing smallness compared to the universe one feels" (Participant 23, male) and "Realizing how small we are" (Participant 20, male), whilst others simply enjoyed "the peace and the intrigue" (Participant 17, male) and "the beauty" (Participant 8, male).

The study findings suggest that those who spend more time stargazing tended to be more likely to describe it as a life enhancing pursuit, often mentioning regular occurrence of positive and transcendent emotions such as awe and wonder whilst stargazing. One individual stated "I feel in awe of nature and the natural world… A sense of wonder at it all!" (Participant 14, male) whilst another reported "It relaxes me and reminds me of how precious life is…" (Participant 8, male).

Such positive emotions are important factors in quality of life as it has been demonstrated that the ratio of positive to negative emotions experienced by an individual has a direct effect on their subjective wellbeing (Pavot et al, 1991). Transcendent emotions which may be associated with peak experiences often incorporate feelings of awe and wonder. Such emotions are often related to feelings

of being "deeply happy" and feeling a "sense of unity and meaningfulness in life" (Boniwell, 2012: 35).

Fascination was also highlighted as a key feature of the activity, with participants reporting that they lost a "sense of time" when stargazing and often only came inside due to increased cloud cover. Comments regarding the interest and fascination that stargazing provided were some of the responses given by participants for taking part in the activity: "I find it fascinating" (Participant 5, female). Increase in fascination and a sense of loss of time are factors that define a state of 'flow' and regular engagement in flow-inducing activities are thought to also increase positive affect and happiness (Csikszentmihalyi, 1990).

Overall, the above pilot study seems to indicate that stargazing as a Dark Nature activity provides positive experiences often encountered in some daylight activities such as increased fascination and sense of flow. In addition, the study also highlights a link to and immersion in, an environment often neglected by daytime-based nature-interaction studies.

## Discussion

In this study of stargazing – an activity that takes place in nocturnal environments – we have quantified the range of experiences in terms of time spent and locations where stargazing occurs. We have seen that people who have engaged in stargazing for a longer number of years were found to have a greater connection to nature on a validated scale; this was also found for those who saw wildlife while stargazing. It also appears from our qualitative findings that stargazers are aware of the breadth of nature around them and that they are not solely noticing the stars during a night out stargazing. Stargazing might cultivate wellbeing through increased physical and social activity in addition to developing personal growth through sense of achievement. A range of transcendent and spiritual elements which are seen as an integrative component in health and wellbeing (Heintzman 1999) were highlighted by participants. Results suggest that stargazing may promote an increased sense of flow through fascination and loss of time. Reported positive emotions suggest that stargazing may be perceived as a life enhancement activity.

These findings lend some support to the idea that stargazing promotes multiple aspects of wellbeing, a feature discussed by others who have looked at other nature-based activities such as gardening (Hawkins, 2011; Unruh, 2011), the use of urban parks (Irvine et al, 2013) and outdoor walking (Marselle et al, 2013, 2014). Being in

10

parks has also been associated with a higher connection to nature than other indoor public locations (Arbuthnott et al, 2014) and participant reports suggest that stargazing may encourage engagement with such outdoor spaces. Leisure activities in general play an important role in wellbeing as free time is often spent partaking in pursuits that give life meaning for individuals (McDonald & Schreyer, 1991). The findings reported here also provide some additional insight into our understanding of human relationships with the nocturnal environment, moving beyond previous literature which focused primarily on the effect of light pollution and human health (Chepesiuk, 2009) and biodiversity (Rich & Longcore, 2006).

We appreciate there are limitations associated with a small scale pilot study in terms of sample size and the subsequent limited amount of data available for quantitative analysis. The results of the study did however identify some interesting aspects of stargazing as a Dark Nature activity: one that takes place in a nocturnal environment and provides opportunity for nature-interaction. The study also suggests a potential role in promoting human wellbeing. Future research would benefit from obtaining a larger sample size and conducting in-depth interviews which may provide richer data.

## Implications

The small scale pilot study reported raises some intriguing and interesting implications to consider for future study. Here we utilise elements of the stargazing study as a starting point for a deeper consideration of the aspects of Dark Nature activities that may enhance wellbeing for both the individual and for the environment.

### *Enriching the experience of nature-interaction*

An important potential benefit of Dark Nature activities is that they may offer a deeper engagement with the environment due to limited visual perception. As daily life becomes more urbanized (UN, 2013), the natural environment is often a place with which many individuals have little more than visual contact, and engagement of other senses such as smell and touch whilst in the outdoors is considered to be surprisingly rare (Stilgoe, 2001). Nocturnal activities provide only a limited range of vision, thus encouraging individuals to utilize additional senses such as hearing and smell. Thus participating in Dark Nature activities may enrich the nature-based experience by appealing to a multitude of senses which is considered beneficial in enabling individuals to engage with the natural environment in its entirety (Louv,

2012).

The limited vision available during nocturnal activities may also increase feelings of mystery and wonder due to the fact that the immediate landscape cannot be easily understood. Consequently what little can be seen receives our full sharpened focus, whilst aspects that cannot be explained or remain hidden may help to build positive emotions such as awe and wonder of the natural world. Such transcendent emotions alongside feelings of mystery may lead individuals to encounter 'peak experiences' which are characterized as moments when individuals feel intensely happy (Boniwell, 2012). The night sky, a primary feature of the nocturnal environment, also offers an opportunity to connect with feelings of "grandeur and overpowering elements of nature" and it is settings such as these that help to support beneficial spiritual experiences (McDonald & Schreyer, 1991: 188) The addition of nocturnal nature-interaction may allow for a more holistic individual experience of the natural environment and the benefits obtained therein.

## Potential role of dark nature activities

Dark Nature activities may offer additional benefits beyond those experienced during daylight nature-based activities. By being out in the garden or outdoors during unfamiliar hours, individuals may be able to 'recycle' their landscape, giving it a dual purpose and a new identity during the hours of darkness. This could allow people to cognitively increase the perceived amount of natural space available to them, which may be an important consideration in an era of decreasing natural environments. This change in perception may inspire individuals to experience everyday settings such as their garden in a novel way. This broadened perspective may in turn lead to a greater awareness of that environment (Fredrickson, 2001). Engaging individuals in Dark Nature activities may also challenge the sense of threat often felt in the nocturnal environment by providing opportunities to engage with and develop confidence in and knowledge of the nocturnal environment. Increased human activity in green spaces during nighttime hours may additionally help to reduce the sense of human threat and enable communities to reclaim areas considered to be unsafe.

Dark Nature activities could increase our engagement with natural spaces by lengthening the time-frame that is available to spend in nature. In terms of accessibility, almost half of our lives are spent in hours of darkness and to ignore this is to discount almost half of the natural environment that we are able to come into contact with. For those who work during the week, the weekend may be the

only time able to be set aside for engaging in nature-based activities. Dark Nature activities however provide an additional range of pursuits for those with limited time-frames: for example, those working during the day may engage with the activities in the evening.

### Dark nature and environmental wellbeing

Previous studies indicate that individuals who spend more time outdoors and report feelings of connection to nature tend to show pro-environmental behaviours (Mayer & Frantz, 2004; Nisbet, Zelenski & Murphy, 2009). These studies have focused on daytime activities in nature but this could also be the case for those involved in nocturnal nature-based activities. By spending time in nocturnal settings, individuals may also begin to value and subsequently engage in protective behavior. A familiarity with species not visible during daytime hours may encourage an increased consciousness of and concern for their conservation. For example, conservation projects addressing the impact of light pollution on biodiversity (IDA, 2013) are often being driven by participants taking part in Dark Nature activities. Dark Nature activities thus allow individuals to identify and interact with nocturnal flora and fauna which may be neglected in other studies.

## Summary

This article has highlighted the importance of considering nocturnal environments and the benefits these settings may offer and provided some preliminary data to illustrate these. In summary, it is proposed that Dark Nature activities need to be researched in greater depth to better understand not only the wide range of activities available, but also the motivations, experiences and perceived benefits of the individuals who engage in these pursuits. Such work could provide a basis on which to begin to establish the relevance of Dark Nature activities to the literature and conversation concerning human-nature interaction and human wellbeing.

## References

Arbuthnott, K.D, Sutter, G.C & Heidt, C.T. (2014). Natural history museums, parks, and connection with nature, *Museum Management and Curatorship,* 29, 102-121.

Beute, F. & Kort, A.W. (2013). Salutogenic effects of the environment: Review of health protective effects of nature and daylight. *Applied Psychology: Health and Wellbeing,* 6, 67-95.

Boniwell, I. (2012). *Positive psychology in a nutshell: The science of happiness.* Berkshire, UK: Open University Press.

Chepesiuk, R. (2009). Missing the dark: Health effects of light pollution. *Environmental Health Perspective,*

117, A20-A27.

Csikszentmihalyi, M., (1990). *Flow*. New York: Harper and Row.

Emmons, R.A. (1996). "Striving and feeling: Personal goals and subjective well-being", in P.M. Gollwitzer & J.A. Bargh (eds.), *The psychology of action: Linking cognition and motivation to behavior*. (pp. 313-337). New York, NY: Guildford Press.

Engel G.L. (1977). The need for a new medical model: A challenge for biomedicine. *Science,* 196, 129-136.

Ferris, T. (2002). *Seeing in the dark: How backyard stargazers are probing deep space and guarding Earth from interplanetary peril*. London: Simon & Schuster.

Fredrickson, B.L. (2001). The role of positive emotions in positive psychology: The broaden-and-build theory of positive emotions. *American Psychologist,* 56, 218-226.

Fuller, R.A., Irvine, K.N., Devine-Wright, P., Warren, P.H. & Gaston, K.J. (2007). Psychological benefits of greenspace increase with biodiversity. Biology letters, 3, 390-394.

Globe at Night (2014). *About Globe at Night*. Accessed July 2014 from http://www.globeatnight.org/

Hartig, T., Mitchell, R., de Vries, S. & Frumkim, H. (2014). Nature and health. *Annual Review of Public Health,* 35, 207-228.

Hawkins, J.L., Thirlaway, K.J., Backx, K. & Clayton, D.A. (2011). Allotment gardening and other leisure activities for stress reduction and healthy aging. *HortTechnology,* 21, 577-585.

Heintzman, P. (1999). Spiritual Wellness: Theoretical links with leisure. *Journal of Leisureability*, 26, 21-32.

Hinds, J. & Sparks, P. (2011). The affective quality of human-natural environment relationships. *Evolutionary* Psychology, 9, 451-469.

International Dark Sky Association. (2013). *IDSA website*. Accessed July 2014 from http://www.darksky.org/

Irvine, K.N., Warber, S.L., Devine-Wright, P. & Gaston, K.J. (2013). Understanding urban green space as a health resource: A qualitative comparison of visit motivation and derived effects among park users in Sheffield, UK. *International Journal of Environmental Research and Public Health*, 10, 417-442.

Irvine, K.N. & Warber, S.L. (2002). Greening healthcare: Practicing as if the natural environment really mattered. *Alternative Therapies in Health and Medicine,* 8, 76-83.

Kaplan, S. (1995). The restorative benefits of nature: Towards an integrative framework. *Journal of Environmental Psychology*, 15, 169-182.

Keniger, L.E., Gaston, K.J., Irvine, K.N. & Fuller, R.A. (2013). What are the benefits of interacting with nature? *International Journal of Environmental Research and Public Health*, 10, 913-935.

Keyes, C.L.M. (1998). Social well-being. *Social psychology quarterly*, 61, 121-140.

Louv, R. (2012). *The nature principle*. Chapel Hill, NC: Algonquin Books.

McDonald, B.L. & Schreyer, R. (1991). "Spiritual benefits of leisure participation and leisure settings". In B.L. Driver, P.J. Brown & G.L. Peterson (Eds.), *Benefits of leisure* (pp. 179-194). State College, PA: Venture.

Marselle, M.R., Irvine, K.N. & Warber, S.L. (2013). Walking for well-being: Are group walks in certain types of natural environments better for well-being than group walks in urban environments? *International Journal of Environmental Research and Public Health*, 10, 5603-5628.

Marselle, M.R., Irvine, K.N. & Warber, S.L. (2014). Examining group walks in nature and multiple aspects of well-being: A large-scale study. *Ecopsychology*, 6, 134-147.

Mayer, F.S. & Frantz, C.M. (2004). The connectedness to nature scale: A measure of individuals' feeling in community with nature. *Journal of Environmental Psychology*, 24, 503-515.

Nisbet, E.K.L, Zelenski, J.M. & Murphy S.A. (2009). The Nature Relatedness Scale: Linking individuals' connection with nature to environmental concern and behavior. *Environment and Behaviour*, 41, 715-740.

Okvat, H.A. & Zautra, A.J. (2011). Community gardening: A parsimonious path to individual, community and environmental resilience. *American Journal of Community Psychology*, 47, 374-387.

Pavot, W., Diener, E., Colvin,C.R., & Sandvik, E. (1991). Further validation of the satisfaction with life scale:

14

Evidence for the cross-method convergence of well-being measures. *Journal of Personality Assessment,* 57, 149-161.

Penedo, F.J. & Dahn, J.R. (2005). Exercise and well-being: A review of mental and physical health benefits associated with physical activity. *Current Opinion in Psychiatry: Behavioural Medicine,* 18, 189-193.

Pretty, J. (2004). How nature contributes to mental and physical health. *Spirituality and Health International,* 5, 68-78.

Rich, C. & Longcore, T. (Eds). (2006). *Ecological consequences of artificial night lighting.* Washington, USA : Island Press.

Roe, J.J., Thompson, C.W., Aspinall, P.A., Brewer, M.J., Duff, E.I., Miller, D. & Clow, A. (2013). Green space and stress: Evidence from cortisol measures in deprived urban communities. *International Journal of Environmental Research and Public Health,* 10, 4086-4103.

RSPB (2013). *The Big Wild Sleepout.* Accessed August 2013 from http://homes.rspb.org.uk/

Ryff, C. D. (1989). Happiness is everything, or is it? Explorations on the meaning of psychological well-being. *Journal of personality and social psychology,* 57, 1069-1081.

Saldana, J. (2013). *The coding manual for qualitative researchers (Second Edition).* London: SAGE publications.

Stilgoe, J.R. (2001). Gone barefoot lately? *American Journal of Preventative Medicine.* 20, 243-244.

Totton, N. (2011). *Wild Therapy: Undomesticating inner and outer worlds.* Ross-on-Wye: PCCS Books.

United Nations (2013). *World Urbanization Prospects, the 2012 Revision.* New York, United Nations, Department of Economic and Social Affairs, Population Division.

Unruh, A. & Hutchinson, S. (2011). Embedded spirituality: Gardening in daily life and stressful life experiences. *Scandinavian Journal of Caring Sciences,* 25, 567-574.

Wheeler, B.W., White, M., Stahl-Timmins, W. & Depledge, M.H. (2012). Does living by the coast improve health and wellbeing? *Health & place,* 18, 1198-1201.

## Acknowledgements

The authors would like to thank the participants for their time and the comments from two anonymous reviewers. Rebecca Bell was supported by a De Montfort University Ph.D. Studentship. Katherine Irvine was supported by the Scottish Government's Rural and Environment Science and Analytical Services Division (RESAS). Sara Warber was supported by a Fulbright Scholarship from the US-UK Fulbright Commission.

## Correspondence

Rebecca Bell

Institute for Energy and Sustainable Development

De Montfort University

Leicester, UK

*Email:* rebecca.bell4@email.dmu.ac.uk

View publication stats

# EXHIBIT N

# Concerns about ground based astronomical observations:
## A step to Safeguard the Astronomical Sky

Stefano Gallozzi[1], Marco Scardia[2], Michele Maris[3]

February 4, 2020

(1) stefano.gallozzi@inaf.it,
    INAF–Osservatorio Astronomico di Roma
(2) marco.scardia@inaf.it,
    INAF–Osservatorio Astronomico di Brera
(3) michele.maris@inaf.it,
    INAF–Osservatorio Astronomico di Trieste

arXiv:2001.10952v2 [astro-ph.IM] 3 Feb 2020

## Abstract

This article aims to highlight the impact for ground based astronomical observations in different windows of the electromagnetic spectrum coming from the deployment of fleets of telecommunications satellites.

A particular attention is given to the problem of crowding of circumterrestrial space by medium/small size orbiting objects. Depending on their altitude and surface reflectivity, their contribution to the sky brightness is not negligible for professional ground based observations. With the huge amount of about 50,000 new artificial satellites for telecommunications planned to be launched in Medium and Low Earth Orbit, the mean density of artificial objects will be of $>1$ satellite for square sky degree; this will inevitably harm professional astronomical images.

Only one of these project, Starlink@SpaceX's, was authorized by US Federal Communication Commission, F.C.C. and plans to deploy about 42,000 not geostationary satellites, which will shine from the 3rd to the 7th magnitude in sky after sunset and before sun dawn.

All satellites will leave several dangerous trails in astronomic images and will be particularly negative for scientific large area images used to search for Near Earth Objects, predicting and, eventually, avoiding possible impact events. Serious concerns are common also to other wavelengths eligible for ground based investigation, in particular for radio-astronomy, whose detectors are already saturated by the ubiquitous irradiation of satellites communication from Space stations as well as from the ground. Not to exclude the significant increase in the risk of hitting into the "Kessler syndrome" scenario with the deployment of all of these satellites.

Understanding the risk for astronomical community, a set of actions are proposed in this paper to mitigate and contain the most dangerous effects arising from such changes in the population of small satellites. A dedicate strategy for urgent intervention to safeguard and protect each astronomical band observable from the ground is outlined.

Keywords: Satellites constellations, ground based astronomical observations, ground based radio astronomy.

## 1   Introduction

The deployment of large fleets of small satellites planned or ongoing for the next generation of global telecommunication networks can severely harm ground based astronomical observations.

For centuries ground based astronomical observations have led to exceptional progresses in

1

our scientific understanding of the Laws of Nature. Currently, the capability of ground based astronomical instrumentation is endangered by the deployment of satellite fleets of unprecedented size.

Astronomers all over the world are concerned for the sky coverage and light/radio pollution produced by artificial satellites, which represent a dramatic degradation of the scientific content for a huge set of astronomical observations.

The same concerns have been expressed by the **International Astronomical Union, IAU** [1] and other institutions since the sky degradation is not only due to light pollution in the sky near cities and the most populated areas, but it is also due to large artificial satellite fleets crossing the sky producing bright parallel streaks/trails at all latitudes.

This paper is organized as follow: section 2 describes the substantial and complementary characteristic between ground based astronomical facilities and those in orbit; satellite constellations are introduced in section 3; section 4 illustrates how such constellations may affect ground based observations; section 5 is devoted to discuss possible mitigations; conclusions are in section 6.

# 2   Ground Based and Space Based Astronomy

The advent of space based astronomy (i.e. UVES, HST, Spitzer, Herschel, Planck to cite just some of well known space telescopes) did not dismiss ground based astronomy. On the contrary ground based astronomy and space based astronomy complement each other. Without ground based observations most of current space based astronomy would be useless or impossible. The reasons for this statement are shortly outlined below.

The effort of developing, deploying and operating a space based telescope is bigger, even of more than an order of magnitude, than the effort required for a ground based telescope of similar size (quantified by the diameter of its main mirror). As an example it took more than twenty years to develop the next large space telescope, the JWST planned for launch in 2021, with a 6.5 meters mirror at the cost of the order of ten billions euros. In the meantime the VLT, with four giant 8.2 m telescopes, two Magellan telescopes with 6.2 meters mirrors, and other telescopes of similar size entered in service. The next generation of new giant ground based telescopes as the GMT with a 25.5m mirror, the ESO/eELT with a 39m mirror is expected to be putted online in about half the time required for the JSWT and with a cost of about one billion euros per telescope.

As the ability of a telescope to reveal small, weak, far objects increases with the area of its mirror which collects light, the sensitivity of a telescope increases with the square of its diameter. So in ideal conditions, the eELT will be able to collect thirtysix times the amount of light collected by the JWST.

Compared to a ground based telescope, a space based telescope has the strong advantage of observing the sky outside the Earth atmosphere. In some bands, as an example the X rays, the Far UV or the far IR, the atmosphere blocks completely the incoming radiation. So that a ground based telescope in those bands would be completely blind or severely limited, but this is not true in other bands. As an example: in visible light our atmosphere is quite transparent, so that to observe in visible light from space is of little advantage with respect to the case of observing from ground, save for the disturbance introduced by atmospheric turbulence. However this last problem has been largely mitigated in the last decades through a careful selection of the sites where telescopes are installed, and by the adoption of technological innovations such as the adaptive optics.

A major limitation of space based telescopes is that they can not be maintained, refurbished or repaired after launch. In this respect HST has been a 'unicum' that hardly will be possible to repeat. The obvious consequence is that the operational lifetime of such telescopes is lim-

A224

ited by the amount of consumables which can be stored onboard (example coolant for the instruments) and by the resilience of the instruments to the degradation induced by ageing, radiations, micro meteoroids and so on. Compared to ground based observatories, the average life-time of space based telescopes is of the order of a couple of decades or less. On the contrary ground based observatories lasts for several decades, with telescopes installed at the beginning of the space era again working in a profitable manner. Being impossible to replace its components, space based telescopes suffer technological obsolescence when compared to ground based observatories. In general space based telescopes are too expensive to be used to validate new observing technologies, which usually are developed on ground based telescopes first.

There are strong limitations on the mass, the size, the technology which can be sent in space, putting severe constraints on designing and operating space telescopes. On the contrary, we are virtually allowed to plan as large a ground telescope as we want, provided it will not break under its own weight, it will be of practical use, and its cost will be sustainable.

Before to conclude it is important to stress that the arguments presented above have not to be misused or misinterpreted as arguments against space based astronomy. On the contrary in the modern professional practice both kinds of astronomy are equally important, so that astronomers involved in ground based astronomy are often involved in space based astronomy and vice-versa. Our aim is to disprove the quite common misunderstanding that ground based astronomy can be dismissed because of the advent of space based astronomy.

# 3    What are Satellites' Constellations

Over the past decades, considerable effort has gone into designing, building, and deploying

satellites for many important purposes. Recently networks, known as satellite constellations, have been deployed and are planned in ever greater numbers mainly in low-Earth orbits for a variety of purposes, including providing communication services to underserved remote areas. Until 2019, the number of such satellites was below 200, but that number is now increasing rapidly, with plans to deploy potentially tens of thousands of them. If no action will be put in place, several problems will soon arise in Astronomical observations.

## 3.1    The Iridium Satellite Constellation

The Iridium satellite constellation provides L-band voice and data information coverage to satellite phones, pagers and integrated transceivers over the entire Earth surface. The band used to provide communication services are proper of LTE-Advanced and UMTS/HSDPA services and operates from 1452 to 1492 MHz.[1]

The constellation consists of **66** active satellites in orbit, required for global coverage, and additional spare satellites to serve in case of failure. Satellites are in Low Earth Orbit, LEO at a height of approximately 781km and inclination of 86.4°. Orbital velocity of the satellites is approximately 27,000km/h. Satellites communicate with neighboring satellites via Ka band inter-satellite links. Each satellite can have four inter-satellite links: one each to neighbors foreground and afterground in the same orbital plane, and one each to satellites in neighboring planes to either side. These satel-

---

[1]In Europe, the Electronic Communications Committee (ECC) of the European Conference of Postal and Telecommunications Administrations (CEPT) has harmonized part of the L band (1452–1492 MHz), allowing individual countries to adopt this spectrum for terrestrial mobile/fixed communications networks supplemental down-link (MFCN SDL). By means of carrier aggregation, an LTE-Advanced or UMTS/HSDPA base station could use this spectrum to provide additional bandwidth for communications from the base station to the mobile device; i.e., in the downlink direction.

lites will cover an entire orbit around the Earth within roughly <u>100 minutes</u>.

## 3.2  The SpaceX Starlink Constellation

The US company SpaceX plans to put in orbit a very huge constellation of 42,000 satellites, called Starlink. This constellation is aimed to provide internet access. These satellites work in conjunction with ground trans-receiver stations. A small set of Starlink satellites is planned to be dedicated to military airforce [26] and/or research purposes. This satellites fleet will be displaced in three orbital shells:

1. about **10,000** satellites at <u>1150-kilometers-altitude</u> orbit shell using the <u>Ku band</u> (from 12 to 18 GHz) and <u>Ka bands</u> (from 26.5 to 40 GHz).

2. about **6,000** satellites in a <u>550-kilometer-altitude</u> orbit shell, using the same <u>Ku</u> and <u>Ka bands</u>.

3. about **26,000** satellites in a <u>340-kilometer-altitude</u> orbit shell using the <u>V-band</u> (from 40 to 75 GHz).[2]

The first phase of deployment will put in orbit first the 550km-altitude satellites, then those at 1150km-altitude. To the first phase a second phase will follow with the deployment in orbit of the remaining inner satellites at 340km-altitude.

Because the Starlink satellites can autonomously change their orbits, observations cannot be scheduled to avoid them.

---

[2]The 5th generation mobile networks (28, 38, and 60 GHz) will also partially overlap with Ka and V bands. The V band at 60 GHz was used by the world's first cross-link communication between satellites in a constellation between the U.S. Milstar 1 and Milstar 2 military satellites. The 60GHz frequency band is attractive to secure satellite crosslinks because it allows high data rates, narrow beams and, lying in a strong absorption band of oxygen, provides protection against intercept by ground-based adversaries.

## 3.3  The OneWeb Satellite Constellation

Is a UK project to provide global satellite Internet broadband services to people everywhere and it is composed of a constellation of about **5260 satellite** displaced in a circular LEO orbit shell of about <u>1,200km-altitude</u>. It will transmit and receive in the <u>Ku band</u>.

There are about 6 testing satellites in orbit; in February 2020 other 34 satellites are planned to be launched from the Baikonur Site. Other launches are scheduled in 2020.

## 3.4  Other Constellations

In the next years there could be <u>over 50,000 new satellites encircling the Earth</u> (at different altitudes) for various telecommunication purposes but mainly delivering broad band internet from Space and, considering the closeness to the Earth, internet signals will be provided fast and with very low-latency. Table 1 is a non-exhaustive list of principal satellite-constellation.

A so large number of new self-drivng satellites in different low-altitude orbiting shells could also impact on the capability to send in the outer space new science related missions, since it would be impossible to exactly predict the single positioning of each constellation satellite, so that impact risk will strongly increase during scientific mission launches.

## 4  The impact of large satellite constellations on ground based astronomy

The ground-based observatories with their large optical telescope currently working (Very Large Telescope, VLT [2], Large Binocular Telescope, LBT [3], ...) and those in construction (e.g. the Extremely Large Telescope, ELT [4], with a main 39-meter diameter mirror) are essential complements to astronom-

USCA Case #21-1123    Document #1901121    Filed: 06/02/2021    Page 232 of 508



Figure 1: First orbital planes of Starlink satellites after the 21 January 2020 launch of 60 satellites by the Falcon-X rocket to reach the total number of orbiting satellites of 240. Starlink@SpaceX systems will be turned on at 420 satellites, while the first broad band internet service will be provided once ~1000 satellites will be deployed. The red arrows indicates the Falcon9 orbiting bucket and the experimental Starlink DARKSAT, with an experimental coating to make it less reflective, and thus impact ground-based astronomical observations less.

ical satellites, which are not affected by reflections of the satellites. As introduced in the second section, for astronomical satellites, missions costs and limitations on size/weight preclude the launch of particularly large telescopes, thus the difficulty in repairing and maintaining telescopes in space means that the newest, most revolutionary technologies are implemented only on ground-based telescopes. Ground based telescopes are fundamental to astronomy and the international community and single states have invested for these ground based projects in past years several tens of billions of dollars/euro trillions of dollars, therefore they are requested to produce high rate of scientific results to repay the initial public investment received.

What is really damaging such scientific results is the sky degradation. This is not only due to sky-glow / light pollution in the sky near cities and the most populated areas (see Fig. 2), but it is also due to artificial satellite fleets crossing and scarring observations with bright parallel streaks/trails at all latitudes.

Astronomers are extremely concerned by the possibility that sky seen from Earth may be blanketed by tens of thousands of satellites, which will greatly outnumber the approximately 9,000 stars that are visible to the unaided human eye. This is not some distant threat: it is already happening. As seen in section 3, the US private company SpaceX has already put 240 of these small satellites, collectively called Starlink, in the sky and plans to constellate the whole sky with about 42,000 satellites. Thus, together with other telecommunication space projects in the near future (see §1.1), in a very short term there could be over 50,000 small satellites encircling the Earth (at different altitudes) each of them damaging

5

A227

| Constellation Name | n. Satellites | Altitude [km] | Bands | Serv.Start |
|---|---|---|---|---|
| SpaceX - Starlink (USA) | 42,000 | 1150, 550, 340 | Ku, Ka, V | 2020 |
| OneWeb (UK) | 5,260 | 1200 | Ku | 2020 |
| Telesat (CAN) | 512 | ~1000 | Ka | 2022 |
| Amazon - Kuiper (USA) | 3236 | 590, 630, 610 | ? | 2021 |
| Lynk (USA) | thousands | | ? | 2023 |
| Facebook (USA) | thousands | 500-550 | ? | 2021 |
| Roscosmos (RU) | 640 | 870 | ? | 2022-2026 |
| Aerospace Sci.Corp. (CHI) | 156 | ~1000 | ? | 2022 |

Table 1: Satellite-Constellation projects comparison.

astronomical observations.

The closeness of satellites in LEO makes them more visible, and brighter in the night sky especially when lighted by the Sun (e.g. satellites launched by SpaceX are brighter than 99 percent of the population of objects visible by the Earth orbit ).

As comparison, the current total number of cataloged objects in Earth orbit is less than 20,000 among spacecrafts, rocket bodies, fragmented mission and other related debrids, so with only the nominal Starlink fleet the total number of orbiting objects will increase of 300% (see Fig. 2 and 3).[3]

In the mid and long term, this will severely diminish our view of the Universe, create more space debris and deprive humanity of an unblemished view of the night sky.

It has been considered that most of these satellites will be visible to the naked eye (with a brightness between the 3rd and 7th magnitude) particularly in the time after sunset and before sunrise. Consequently they will reach

---

[3]It has been estimated that here are over 500,000 non-cataloged pieces of space debris from the size of one square cm (or larger) orbiting the Earth traveling up to 17,500 mph; millions of others are untraceable, in addition to the around 20,000 cataloged objects in Earth orbit. In 1978 this scenario was predicted by D.J Kessler, [30], warning governments about the devastating cascading effect of collision-induced debris creation (the so-called Kessler syndrome). The increase number of LEO satellites makes the creation of a dense debrids network belt around the Earth a possible scenario with devastating consequences for the future of space exploration and telecommunications too.

---

the brightness of the stars in the Ursa Minor constellation. There are only 172 stars in the whole sky exceeding the expected brightness of Starlink satellites (see Tab. 2). Higher altitude LEO satellites (e.g. over 1000km-altitude) will be visible all the night reaching approximately the 8th magnitude.

| Visible to typical human eye | Apparent magnitude | Brightness relative to Vega | Number of stars (other than Sun) brighter than apparent magnitude in the night sky |
|---|---|---|---|
| Yes | −1.0 | 251% | 1 (Sirius) |
| | 0.0 | 100% | 4 |
| | 1.0 | 40% | 15 |
| | 2.0 | 16% | 48 |
| | 3.0 | 6.3% | 171 |
| | 4.0 | 2.5% | 513 |
| | 5.0 | 1.0% | 1602 |
| | 6.0 | 0.4% | 4800 |
| | 6.5 | 0.25% | 9100[4] |
| No | 7.0 | 0.16% | 14 000 |
| | 8.0 | 0.063% | 42 000 |
| | 9.0 | 0.025% | 121 000 |
| | 10.0 | 0.010% | 340 000 |

Table 2: Stars Apparent Magnitudes comparisons.

The most important contribution on pollution of astronomical images comes from the satellites in the higher orbits since the light directly reflected by the Sun make them brighter during the night, instead lower altitude satellites



**E** 120°−180°  Critical area for skyglow experience from within urban and all areas but proportionally less impact to rural areas, distant from main light sources;

**D** 95°−120°  Significant contributor to skyglow, especially in rural areas. Less likely to be obstructed;

**C** 90°−95°  Critical zone for skyglow and obtrusion seen at tens of km (in rural areas) where it is strongly dependent on aerosol scattering;

**B** 85°−90°  Significant contributor to skyglow seen at a distance through reflection but reflected light more likely to be obstructed by buildings, trees and topography. Produces also glare in the roadway users;

**Bbis** 75°−85°  Produces glare in the roadway users;

**A** 0°−75°  Ideal light distribution.

Figure 2: Effect of Sky-glow and cut-off angle, showing the relative impact of a luminaire's output contribution to skyglow. Picture taken from "Starlight: a Common Heritage", Cipriano Marin, IAC - ESP



Figure 3: a) Number of object in the Earth's orbit and b) Number of artificial crossing bodies during an observing night.

are foreseen to contribute negatively only few hours after sunset and before sun dawn. It is possible to predict the range of variability of apparent magnitudes of the LEO satellites depending on the position and the altitude considering a mean density of about 1 satellite per square degree (see Fig. 4a and 4b and [12] for a whole sky simulation of 12,000 Starlink satellites at three different altitudes).

In Fig. 4b, illustrates how starlink orbital shells (shown in red) are illuminated by the Sun when it is at different altitudes below the horizon. We can see that the lower the sun is only the more distant satellites will be illuminated. At certain stages the lowest shells won't be visible at all, but the higher shells will be visible in the northern part of the sky. Also the swarm of the satellites near the horizon will be mostly invisible due to their distance and atmospheric effects. It should be noted that the "worst case" will be experienced during the summer, in northern half of the sky, in the northern hemisphere, where the satellites will be visible during the entire night, though their brightness will probably be lower than the bright overhead passes after the sunset and before the sunrise. The "best case" will be during the winter, at midnight, when the sky will be virtually free of any satellites, except for the horizon; for details see [28].

Thus with 50k satellites the "normality" will be a sky crowded with artificial objects: every

7



Figure 4: a) Apparent magnitude of satellites during an observing night depending on the altitude; b) Illumination factor depending on the Sun altitude of the three orbital shells for Starlink satellites. For OneWeb satellites the expected illumination fraction will be the same of highest starlink orbital shell, see [28].

square degree of the sky will have a satellite crawling in it along the whole observing night accessible and visible by astronomical cameras and not only by professional instrumentation.

It should also be noted that during nominal service operations SpaceX expects to dismiss and replace from 2,000 to 8,000 Starlink satellites every year, disintegrating them in the lower atmosphere, with all related issues, see [27] page 4-5 for details.

## 4.1  Impacts on ground based optical astronomy

Wide-field survey telescopes will be particularly damaged, by the presence of multiple saturated trails within camera images:

- LSST [5], capable to scan and perform a survey of the entire sky in three nights

- VST [6], with its 268MegaPixels camera and a FOV of 1 square degree

- Pan-STARRS [7], with its FOV of 7 square degrees and 1.4 Giga pixels camera

Also deep/long exposures with small-field facilities will be unavoidably impaired, see Fig. 5 and [12].

This have also a dramatic impact on our safety because large area astronomical observations and sky surveys are commonly used in search for Near Earth Objects, NEOs, asteroids monitoring and other related searches to guard the Earth from potential impact events: such satellite constellations could negatively impact on the ability to prevent and warn the whole humankind.

The light pollution is extremely damaging for astronomical observations at all wavelengths. To minimize the quantity of light reflected by LEO satellites, Starlink has put in orbit an experimental version of the Starlink satellites ( Starlink satellite n.1130 DARKSAT, see Fig. n.1) making use of a non-reflecting paint on the body. It is not clear how this coating will reduce the brightness of the satellite since it is not possible to cover solar panels, which represents 75% of the satellite reflecting surface.

If the satellite body will be inhibited to reflect the sun light, it will absorb radiation warming too much with possibile failures, thus will probably increase the risk management for the whole fleet and make the dark-coating solution ineffective or even counterproductive.

Moreover even if the brightness of the experimental satellite would be below the naked eye sensitivity, astronomical images will continue to see them (with resulting damage to their scientific content).

Thus degradation for scientific observations will remain high also with coating for three dif-



Figure 5: Few Starlink satellites visible in a mosaic of an astronomical image (courtesy of NSF's National Optical-Infrared Astronomy Research Laboratory/NSF/AURA/CTIO/DELVE)

ferent reasons:

1. Astronomical deep field camera images will continue to have trails in long exposures depending on the filter limiting magnitude.

2. Astronomical objects in the sky will be eclipsed, this will probably harm time-dependent (variability) studies.

3. The reflectivity of a surface depends on the observational wavelength, so what becomes dark in one part of the spectrum (e.g. visible), will remains bright in other parts of the spectrum (e.g. infrared or radio).

## 4.2 Impacts on ground based radio-astronomy

Even with best coating and mitigation procedures to decrease the impacto on visual astronomical observations, what it is often omitted or forgotten is that telecommunication constellations will shine in the radio wavelengths bands, observable from the ground.

The scientific needs of radio astronomers and other users of the passive services for the allocation of frequencies were first stated at the World Administrative Radio Conference held in 1959 (WARC-59). At that time, the general pattern of a frequency-allocation scheme was:

1. that the science of radio astronomy should be recognized as a service in the Ra-

9

A231

dio Regulations of the **International Telecommunication Union (ITU)**;

2. that **a series of bands of frequencies should be set aside** internationally for radio astronomy[4]

3. that special international protection should be afforded to the **hydrogen line** (1400-1427 MHz), the **hydroxyl (OH) lines** (1645-1675 MHz), and to the predicted **deuterium line** (322-329 MHz)...

Since 1959 a large number of spectral lines from a wide variety of atoms and molecules in space have been discovered, then the frequency range of radio astronomy now extends to at least 500 GHz. In particular frequencies of the CO molecule (at 115, 230, and 345 GHz), isotopes (at 110, 220, and 330 GHz) and the maser of $H_2O$ at 22,235GHz [29], are critical to many aspects of astronomy, see also [21].

Radio astronomers have been engaged for decades in the work of the United Nations Agency ITU to regulate the international use of the radio frequency spectrum. Their efforts ensured a limited number of narrow bands of the spectrum received protection to allow radio astronomy to develop and conduct essential and unique research.

Despite the special international protection for Radio-astronomy, some sources of radio frequency interference (RFI) are inescapable. While radio astronomers can minimize the effects of many terrestrial sources by placing their telescopes at remote sites, none can escape from RFI generated by satellite transmitters, such as those of the Iridium System, SpaceX, and others.

Whilst there is legislation in place where radio observatories are placed (e.g. at the two SKA sites in Australia and South Africa) to protect the telescopes from ground-based radio interference at those frequencies, the use of air and space-borne radio communications is regulated on a collaborative international basis.

What is not widely acknowledged is that the development of the latest generation telecommunication networks (both from space and from Earth) already has a profound impact on radio-astronomical observations (at all subbands): with LEO satellite fleets it is quite sure that the situation could become unbearable.

In particular, low Earth orbit satellite's spectral windows identified to communicate with earth stations in the Ku (12-18GHz), Ka (27-40GHz) and V (40-75GHz) bands will overlap with the nominal radio-astronomy bands and so will interfere with ground radio telescopes and radio interferometers, making the radio detectors enter in a non-linear regime in the K band (18-26.5GHz) and in Q band (33-50GHz). This fact will irreparably compromise the whole chain of analysis in those bands with repercussions on our understanding of the Universe, or even, making the astrophysics community blind to these spectral windows from the ground, see Fig 6.

There are different projects in development for ground based radio-astronomy that will significantly overlap with telecommunication signals coming from the satellites' constellations in orbit:

- The **Next Generation Very Large Array, ngVLA** and **ngVLA Long Baseline Array, LBA** [18]: located in New Mexico, west Texas, Arizona, and northern Mexico. The VLA will use 6 radiobands: 2,4GHz, 8GHz, 16GHz, 27GHz, 41GHz and 93GHz.

- The **Square Kilometer Array, SKA** [19], [23] will interfere with Ku satellites communication bands.

- The **Atacama Large Millimeter Array, ALMA** [22], the world-leading mm and sub-mm observatory built in Atacama, Chile, with enormous expenses spent by a broad international community, facility that has brought us many significant discoveries and played a crucial role

---

[4]These bands should lie at approximately every octave above 30 MHz and should have bandwidths of about 1 percent of the center frequency.



Figure 6: Spatial resolution versus frequency set by the maximum baseline of the ngVLA compared to other existing and planned facilities, see [18].

in the global system of EHT (first image of BH ever, published in April 2019), has its Bands 1, and 2+3 exactly in the potentially polluted part of the spectrum.

To aggravate the matter, with the current technological development, the planned density of radio frequency transmitters is impossible to envisage. In addition to millions of new commercial wireless hot spot base stations on Earth directly connected to the about 50,000 new satellites in space, will produce at least 200 billion of new transmitting objects, according to estimates, as part of the Internet of Things (IoT) by 2020-2022, and one trillion of objects a few years later.

Such a large number of radio-emitting objects could make radio astronomy from ground stations impossible without a real protection made by countries' safe zones where radio astronomy facilities are placed.

We wish to avoid that technological development without serious control turns radio astronomy practice into an ancient extinct science.

## 5 How to protect the Astronomical Sky?

To answer this question, we must remember some International Conventions and Treaties.

The Preamble of the **World Heritage Convention** holds that "the deterioration or disappearance of any item of the cultural or natural heritage constitutes a harmful impoverishment of the heritage of all the nations of the world" This protection appears again in the 1994 Universal Declaration of Human Rights for Future Generations:

> PERSONS BELONGING TO FUTURE GENERATIONS HAVE THE RIGHT TO AN UNCONTAMINATED AND UNDAMAGED EARTH, INCLUDING PURE SKIES; THEY ARE ENTITLED TO ITS ENJOYMENT AS THE GROUND OF HUMAN HISTORY OF CULTURE AND SOCIAL BONDS THAT MAKE EACH GENERATION AND INDIVIDUAL A MEMBER OF ONE HUMAN FAMILY.

The **UNESCO** has undertaken activities for the safeguarding of cultural heritage related to astronomy under the "Astronomy and World Heritage" project launched by the World Heritage Centre in 2003. This concept was taken

up again by UNESCO in 2005 as:

> The sky, our common and universal heritage, is an integral part of the environment perceived by humanity. Humankind has always observed the sky either to interpret it or to understand the physical laws that govern the universe. This interest in astronomy has had profound implications for science, philosophy, religion, culture and our general conception of the universe.

This in turn led to the following concepts:

> astronomical observations have profound implications for the development of science, philosophy, religion, culture and the general conception of the universe... discoveries of astronomers in the field of science have had an influence not only on our understanding of the universe but also on technology, mathematics, physics and social development in general... the cultural impact of astronomy has been marginalized and confined to a specialized public.

These protections for Starlight are necessary as the impact that Starlight has held on humanity has been expressed in works of religion, art, literature, science, philosophy, business, and travel.

Enforcement of the Right to Starlight:

> International law enforces international legal obligations, including property interests. Here, World Heritage is the property of all humankind, and while there may be protective laws, enforcing this is another matter, as only States can sue other States under this type of international treaty. **A State is responsible for the activities that occur within its jurisdiction — whether they are authorized or unauthorized**.

Thus:

> Within the framework of International Law and State based legal instruments, Protection of Starlight could then be implemented in the same manner:
> 1. Reaffirms the sovereign rights and responsibilities, towards the International Community, of each State for the protection of its own cultural and natural heritage;
> 2. Calls upon the International Community to provide all the possible assistance needed to protect and conserve the cultural and natural heritage of Starlight;
> 3. Invites the authorities of States to take appropriate measures in order to safeguard the cultural and natural heritage of Starlight;
> 4. Further invites the States to cooperate with UNESCO, the World Heritage Committee, the UNWTO, and the Starlight Initiative with a view to ensuring effective protection of its cultural and natural heritage in Starlight.

Having established these rights under international law, the conclusion is that there exist duties for both States and international organizations to protect the World Heritage Right to Starlight, as well as, their duties to foster the rights of travelers, hosts, and providers of travel to enjoy this Starlight "property interest" that belongs to all humanity. The existing legal instruments demonstrate the protection for the Right to Starlight, but it is the States that act as custodians of World Heritage that are charged with ensuring these rights are enforceable, and in turn made available to all of humanity.

## 5.1 On the legal side

SpaceX private company has received permission from many USA government agencies (e.g. Federal Communication Commission, FCC) to launch these satellites into orbit. So there

could be a legal claim, within the US legal system, to halt the progress of Starlink.

Also, as it turns out, according to the Outer Space Treaty and its progeny, there are no private companies operating in outer space, but only governments can operate in outer space. And the legal process is that the state government, this time the USA government, is legally responsible for all objects sent into outer space that launch from USA borders. That means, that it is the USA government that is responsible for the harm caused by its corporation, Starlink, sending objects into orbit that cause harm.

So under this international law, any country that suffers harm by Starlink can sue the United States government in the International Court of Justice in the Hague. The harm here is damage to our cultural heritage, the night sky, and monetary damages due to the loss of radio and other types of astronomy. For the scientists, the owners of the observatories have a legal argument that they have and will continue to lose money spent for their research based on Earth based observatories. Furthermore, Universities that own the observatories are state owned universities, so it is the government that owns the observatories that have lost financially because of their interruption of study of the night skies.

So it is essential that a government, like Chile, Italy or France, sues the USA in the International Court of Justice.

**If no national or international entity will stop this displacement the right of the private company SpaceX will become acquired at the beginning of March 2020**. How should the international astronomical community mobilize in order to stop further Starlink launches?

1. Sue in court for luminous pollution not taken into account by US FCC: The FCC's lack of review of these commercial satellite projects violates the National Environmental Policy Act, NEPA, which obligates all federal agencies to consider the environmental impacts of any projects they

approve. So in the most basic sense, SpaceX's satellites displacement authorization would be unlawful, see [31].

2. Sue in court for lack of jurisdiction and jurisprudence of US FCC to authorize private not geostationary satellites over other states and nations.

3. Sue in the International Court of Justice, ICJ the USA government to put on hold further Starlink launches to quantify the loss of public finances in damaging national and international astronomical projects.[5]

## 5.2    From the astronomers' side

An **international appeal/petition from astronomers** was launched in January 2020 and, at the time of writing, thousands of astronomers involved with astronomical observatories and facilities, have subscribed the appeal, see [25]. Another **open letter** has been prepared reguarding same concerns on the

---

[5]Though there are no international law that restrict mega constellations, to deploy and dispatch mega constellations an international agreement among states is needed, since satellites can not be located only over a single state (e.g. USA) but, being in LEO, they move around the globe passing over different states/nations/continents. This is a lack of jurisdiction of FCC authorization. In particular the International Court of Justice, ICJ, can be called into question whenever there is a dispute of international jurisdiction or between member states of the United Nations on the basis of international norms, treaties and / or their violations. In the beginning of chapter 5 it was explained how the World Heritage Convention regarding the "right of night sky / starlight" belongs to universal human rights and so no state can decide to contravene this convention if it interferes with the enjoyment of that right for other states. The pretext for appealing to the United Nations and the International Court of Justice (ICJ) is the loss of scientific value of the investments made for ground based projects by each state (damaged by SpaceX). Each damaged state, being damaged as consequence of a violation for an international treaty, the issue cannot be settled with a simple money compensation, but with an inhibition of the damage before the same occurs (and not after).

satellites constellations deployment for the further space missions and to raise awareness to US Senate, and US commisisons on the possibility that occurs the Kessler Syndrome, which is a realistic scenario with all these orbiting objects, see [32].

Requests from the astronomical community to governments, institutions, and agencies all around the world are:

1. to be committed to provide legal protection to ground astronomical facilities in all of the available observation electromagnetic windows.

2. to put on hold further Starlink launches (and other projects) and carry out an accurate moratorium on all technologies that can negatively impact astronomical space based and ground based observations, or impact on the scientific, technological and economic investments that each State engages in astrophysical projects.

3. to put in place a clear evaluation of risks and predictive impacts on astronomical observatories (i.e. loss of scientific and economic value), giving stringent guidelines to private individuals, societies and industries to plan satellite investments without clearly understanding all of the negative effects on outstanding astronomical facilities.

4. that the US Federal Communications Commission (FCC) and any other national agency be wary of granting permission to ship non-geostationary low-orbit satellites into orbit or alternatively to limit the authorization of only satellites being above the airspace of the "home country".

5. to demand a worldwide orchestration, where national and international astronomical agencies can impose the right of veto on all those projects that negatively interfere with astronomical outstanding facilities.

6. to limit and regulate the number of telecommunication satellite fleets to the "strictly necessary number" and to put them in orbit only when old-outdated technology satellites are deorbited, according to the Outer Space Treaty (1967) - the Art IX [8], and the United Nations Guidelines for the Long-term Sustainability of Outer Space Activities (2018) – guideline 2.2(c) [9], requiring the use of outer space be conducted "so as to avoid [its] harmful contamination and also adverse changes in the environment of the Earth" and [. . . omissis...] risks to people, property, public health and the environment associated with the launch, in-orbit operation and re-entry of space objects".

## 6   Conclusions

Avoiding damages in astronomical ground based observations arised from the displacement of satellite constellations is absolutely mandatory for safeguarding not only the economic and scientific investment, committed by international institutions and single nations, but also to continue efficiently to monitor possible impact events to guard and alert the humankind.

All of these requests come from the heartfelt concern of scientists arising from threatens to be barred from accessing the full knowledge of the Cosmos and the loss of an intangible asset of immeasurable value for humanity. In this context it is absolutely necessary to put in place all possible measures to protect the night sky right also on the legal side as stated by the Universal Declaration of Human Rights for Future Generations.

To ensure this safeguard action it would be desirable to adopt contingent and limiting resolutions to be ratified as shared international rules, which must be adopted by all space agencies to ensure protection for astronomical bands observable from the ground. All of this to continue to admire and study our Universe, for as long as possible.

14

In the meanwhile all private displacement of satellites constellation project must be put on hold; every "national" authorization to launch not geostationary LEO satellite fleets must be withdrawn and avoided as well.

"One person's freedom ends where another's begins". The public authorities (of every state) are entitled (and obliged) to enforce regulations, which take care that the above statement comes true. The right to see the sky in natural state belongs to our rights and freedoms alike the right to breath unpolluted air, drink clean water or sleep in a quiet environment during the night.

## References

[1] International Astronomical Union, IAU statements: www.iau.org/ann19035

[2] ESO Very Large Telescope: www.eso.org/paranal-observatory/vlt

[3] Large Binocular Telescope, LBT: http://www.lbto.org/

[4] ESO Extremely Large Telescope, E-ELT: www.eso.org/elt

[5] Large Syhoptic Survey Telescop, LSST: Vera_C._Rubin_Observatory

[6] ESO VLT Survey Telescope: surveytelescopes/vst

[7] Pan-STARRS Telescope: panstarrs.stsci.edu

[8] United Nations Office for Outer Space Affairs, "Treaty on Principles Governing the Activities of States in the Exploration and Use of Outer Space, including the Moon and Other Celestial Bodies": introouterspacetreaty.html

[9] Committee on the Peaceful Uses of Outer Space, "Guidelines for the Long-term Sustainability of Outer Space Activities ": https://www.unoosa.org

[10] Simulated prediction of "only" 12k Starlink satellites positions in the sky: www.youtu.be/LGBuk2BTvJE

[11] Simulated prediction of "only" 12k Starlink satellites naked eye view of the sky: www.youtube.com/9hQfKd9kfA

[12] Visualization tool to find, plot and search satellite orbits: https://celestrak.com/orbit-viz

[13] Phil Cameron, "The right to Starlight Under International Law"

[14] Starlight Initiative "Declaration in defense of the night sky and the right to starlight": starlightdeclaration

[15] Marian Cipriano, "Starlight: a common heritage", Published online by Cambridge University Press: 29 June 2011

[16] Marin, C., and Jafar, J. (eds) 2008,Starlight: A common Heritage(Tenerife: Instituto de As-trof´ısica de Canarias)

[17] Starlight Scientific Committee Report 2009,Starlight Reserve Concept: http://www.starlight2007.net

[18] A.J. Beasley, E. Murphy, R. Selina, M. McKinnon & the ngVLA Project Team, "The Next Generation Very Large Array (ngVLA)" NRAO

A citation: [?]

[19] Square Kilometer Array, SKA: https://www.skatelescope.org

[20] Avinash A. Deshpande and B. M. Lewis, ''Iridium Satellite Signals: A Case Study in Interference Characterization and Mitigation for Radio Astronomy Observations'', DOI: 10.1142/S225117171940009, arXiv:1904.00502 [astro-ph.IM]

[21] Committee on Radio Frequencies Board on Physics and Astronomy Commission on Physical Sciences, Mathematics, and Applications National Research Council ''VIEWS OF THE COMMITTEE ON RADIO FREQUENCIES CONCERNING FREQUENCY ALLOCATIONS FOR THE PASSIVE SERVICES AT THE 1992 WORLD ADMINISTRATIVE RADIO CONFERENCE ''

[22] Atacama Large Millimeter Array, ALMA: https://www.eso.org

[23] SKA statements on satellites contellations: ska-statement-on-satellite-constellations

[24] PATRICIA COOPER, ''SATELLITE GOVERNMENT AFFAIRS SPACE EXPLORATION TECHNOLOGIES CORP. (SPACEX)'': https://www.commerce.senate.gov

[25] APPEAL BY ASTRONOMERS: https://astronomersappeal.wordpress.com

[26] Starlink testing encrypted internet form military US Air Force purposes: https://www.reuters.com/article

[27] Starlink APPLICATION FOR APPROVAL FOR ORBITAL DEPLOYMENT AND OPERATING AUTHORITY FOR THE SPACEX NGSO SATELLITE SYSTEM: Legal-Narrative.pdf

[28] Starlink simulations from deepskywatch: http://www.deepskywatch.com

[29] Volvach et al 2019, "An Unusually Powerful Water-Maser Flare in the Galactic Source W49N", doi: 2019ARep...63..652V/doi:10.1134

[30] Donald J. Kessler, Burton G. Cour-Palais, "Collision frequency of artificial satellites: The creation of a debris belt", doi: https://doi.org/10.1029/JA083iA06p02637

[31] Ramon J. Ryan, Note, The Fault In Our Stars: Challenging the FCC's Treatment of Commercial Satellites as Categorically Excluded From Review Under the National Environmental Policy Act, 22 VAND. J. ENT. & TECH. L. (forthcoming May 2020)

[32] David Dubois, NASA "Open Letter to FCC, US Senate and Commissions and SpaceX", OpenLEtterforFCCandNASA

# EXHIBIT O



# SPACE SUSTAINABILITY

## THE ECONOMICS OF SPACE DEBRIS

## IN PERSPECTIVE

OECD SCIENCE, TECHNOLOGY AND INDUSTRY

**POLICY PAPERS**

April 2020  **No. 87**



# Summary and main findings

This paper explores selected long-term sustainability issues and the role of science, technology and innovation in the context of increasing activities in outer space, with a particular focus on the economics of space debris. Several international organisations and committees (e.g. United Nations' Committee on the Peaceful Uses of Outer Space, Inter-Agency Space Debris Coordination Committee), national administrations and space agencies have already carried out extensive work on some of these issues, mainly concentrating on the legal and technical aspects of space debris and the congestion of low-earth orbits. This paper brings in some original perspectives on space sustainability, by providing a fresh look at the economics of space debris, and by proposing some avenues for action, based on experiences in environmental pollution abatement from other policy domains.

***Economic and societal vulnerabilities to space hazards, in particular space debris, are growing.***

- The use of Earth's orbits, in particular the low-earth orbit, has significantly increased in the last ten years, following growing institutional uses and commercialisation of space activities. This evolution is expected to continue and accelerate with the deployment of mega-constellations for satellite broadband, some comprising several thousand satellites.

- One of the most pressing threats to the long-term sustainability of space operations is the accumulation of space debris in Earth's orbits, in particular in the low-earth orbit. Individual exceptional events (anti-satellite tests, collisions) can have disastrous consequences. The 2007 destruction of the FengYun-1C satellite doubled the amount of debris at 800 km altitude and led to a 30% increase in the total orbital debris population.

***Space debris protection and mitigation measures are already costly to satellite operators, but the main risks and costs lie in the future, if the generation of debris spins out of control and renders certain orbits unusable for human activities.***

- Space debris already generate associate costs, including satellite protection, mitigation and even replacement costs in some cases. To this must also be added the costs of debris surveillance and tracking. Operators in the geostationary orbit (GEO) have estimated protective and mitigation costs at some 5-10% of total mission costs. In the upper lower-earth orbits (LEO), these costs are much higher.

- However, the main cost and risk of collisions with debris is the generation of further debris, which could ultimately lead to the so-called Kessler syndrome of cascading, self-generating collisions. This ecological tipping point may render certain orbits unusable.

- Under this scenario, socio-economic impacts could be severe. Several important space applications could be affected or lost, in particular space-based observations for weather forecasting, climate monitoring, earth sciences, and potentially, satellite communications. Certain geographic areas and social groups would be disproportionally affected, in particular in rural areas with limited existing ground infrastructures and large reliance on space infrastructure.

***Comprehensive national and international mitigation measures exist, but compliance is insufficient to stabilise the orbital environment.***

# EXHIBIT P

Before the
# FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C.  20554

| | | |
|---|---|---|
| | ) | |
| Applications of | ) | |
| | ) | |
| SPACE EXPLORATION HOLDINGS, LLC | ) | Call Signs:  S2983 and S3018 |
| | ) | |
| For Modification of Authorization for the | ) | File No. SAT-MOD-20200417-00037 |
| SpaceX NGSO Satellite System | ) | |
| | ) | |
| VIASAT, INC. | ) | Call Sign: S2985 |
| | ) | |
| For Modification of the Viasat | ) | File No. SAT-MPL-20200526-00056 |
| Non-Geostationary Orbit Satellite System | ) | |
| Using Ka- and V-Band Frequencies | ) | |

## OPPOSITION OF SPACE EXPLORATION HOLDINGS, LLC TO PETITION PURSUANT TO SECTION 1.1307(c) OF VIASAT, INC.

William M. Wiltshire
Paul Caritj

HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W.
Suite 800
Washington, DC  20036
202-730-1300  tel
202-730-1301  fax

*Counsel to SpaceX*

January 6, 2021

David Goldman
Director, Satellite Policy

SPACE EXPLORATION TECHNOLOGIES CORP.
1155 F Street, N.W.
Suite 475
Washington, DC  20004
202-649-2700  tel
202-649-2701  fax

A243

# SUMMARY

The Commission has long concluded that satellite authorizations categorically do not have significant environmental effects warranting individualized environmental review, and has never found "extraordinary circumstances" sufficient to override that determination. There is no reason to depart from that precedent here.

➢ SpaceX's proposed modification either improves upon or maintains the environmental effects of its currently authorized system in every way. Viasat, in its desperation to mislead the Commission into harming competition, relies on warmed-over and debunked claims as well as material misrepresentations to support a belated Petition that, without irony, *asks the Commission to prevent SpaceX from implementing environment-friendly changes*.

➢ The very studies Viasat relies upon, as well as analytical software developed by NASA and real-world experience, confirm that SpaceX's modification would:

  o Decrease the effect of its satellites on astronomy and the night sky
  o Decrease the risk of satellite collisions
  o Decrease the time in orbit of its non-propulsive satellites
  o Cause no change in the number of satellite launches and reentries associated with its constellation.

➢ SpaceX—not Viasat—has worked extensively at the highest levels with the astronomy community to develop strategies to protect space exploration. SpaceX's ongoing efforts have set the standard for the industry and revealed important information about how to deploy an environmentally-friendly NGSO satellite system—including the fact that *operating below 600 km (as SpaceX proposes) significantly decreases the impact of reflected sunlight*.

➢ Accordingly, Viasat has failed to raise any reason—let alone the "extraordinary circumstances" required—to justify overturning decades of precedent in this case.

➢ In contrast to the extensive measures that SpaceX has implemented to minimize its environmental footprint, Viasat has filed its own modification that would make its proposed NGSO system *worse* for the environment on all of the metrics raised in its Petition. Thus, the only thing "extraordinary" about Viasat's Petition is its evident lack of self-awareness.

➢ SpaceX urges all would-be NGSO operators, including Viasat and Amazon, to follow SpaceX's lead in ensuring safe operations that minimize their environmental footprint, ensure the safety of life on the ground, and protect the night sky for exploration by future generations.

➢ Each effort Viasat has taken against SpaceX demonstrates its growing desperation about increased competition. Quickly dismissing these types of transparently anti-competitive filings would send a strong signal to Viasat to stop wasting Commission resources and trivializing important issues through anti-competitive gamesmanship.

\*                    \*                    \*

i

Viasat's Petition—filed at the eleventh hour just as the application is ripe for grant—asks the Commission to require its competitor, SpaceX, to be singled out to undergo a lengthy and unnecessary environmental review process.  This is a transparent and anti-competitive ploy, and nothing else.  Rather than stand for the proposition it claims to support, Viasat's Petition in fact serves to highlight the many massive benefits of SpaceX's modification, such as improving the debris profile of its system, reducing the time non-propulsive satellites remain in orbit, reducing the collision risk of its system, and reducing the effect on astronomers and the night sky.  And despite its trademark over-the-top rhetoric, Viasat presents no reason for the Commission to second guess its long-standing conclusion that satellite authorizations categorically do not have significant environmental effects warranting individualized environmental review. Yet, while SpaceX's modification demonstrates its own commitment to the space environment, Viasat's Petition does demonstrate how other NGSOs—particularly Viasat itself—fall short of the high standard set by SpaceX.  SpaceX looks forward to other operators such as Viasat and Amazon following SpaceX's lead in its commitment to environmental protection.

Unfortunately, Viasat's newfound environmentalism only extends to SpaceX. Viasat addressed none of these environmental issues in its own pending application to launch hundreds of additional satellites and operate them at an altitude that is far more likely to disrupt astronomical observations.  It also raised no environmental concerns with recent applications by Amazon and other operators to launch thousands of new satellites.  Instead, Viasat's concerns are focused on a single competitor, SpaceX, and its application to merely improve the debris profile of the satellites the Commission has already authorized by lowering them to orbits that are inherently safer and would have less impact on the environment.

ii

SpaceX's application is an odd target for a petition citing the National Environmental Protection Act ("NEPA") in good faith, even assuming the statute applies to activities in space (which it does not). Because the Commission has categorically determined that satellite licensing does not present significant environmental concerns, further NEPA review is justified only if "extraordinary circumstances" indicate that the action will have a "significant effect." Yet the application Viasat challenges would not result in the launch of a single additional satellite (in fact, it would reduce the number of satellites by one) and would, if anything, reduce each of the potential environmental effects that Viasat describes:

**Light Pollution** — Though high on rhetoric, Viasat's Petition provides no evidence that SpaceX's modification will have any adverse effect on light pollution, whether to professional astronomers or those simply seeking to enjoy the night sky. In fact, Viasat carefully avoids disclosing that the very studies it relies upon clearly demonstrate that the proposed modification would *reduce* light pollution, and explicitly credit SpaceX for working closely with the astronomy community to address its concerns. For example, Viasat relies upon a study whose primary finding is that satellites operating at altitudes below 600 km present less concern because, unlike satellites at higher altitudes, they are in Earth's shadow and invisible for many hours per night around local solar midnight. In fact, that report includes the recommendation that, to mitigate effects on astronomy, operators should "[d]eploy satellites at orbital altitudes no higher than ~600 km"— precisely the modification SpaceX proposes and Viasat seeks to prevent. SpaceX welcomes Viasat's recent commitment to astronomy and encourages it to reconsider its own application to deploy 14 times more satellites than currently authorized to an altitude that astronomers have found to be more harmful to their observations.

**Orbital Debris** — While the Commission has correctly concluded that SpaceX's previous modification to lower its initial deployment of satellites would "allow SpaceX to make efficient use of valuable spectrum resources more safely," Viasat continues efforts to resuscitate its tired claims that SpaceX's proposal to lower its remaining satellites will somehow increase the risk of orbital debris. This latest repackaging of arguments Viasat has made throughout this proceeding raises no substantive issues not already fully briefed for Commission consideration in addressing the merits of SpaceX's application. If anything, this latest maneuver is a tacit acknowledgment that Viasat's previous claims lacked merit.

In addition to reprising its false and debunked claims, Viasat adds two new misrepresentations. First, Viasat falsely asserts that SpaceX "admits" that lowering its satellites' altitude will result in an increased risk of collision. This assertion is simply false. In fact, SpaceX has demonstrated that the lower altitude will actually *decrease* the risk of collision (primarily by dramatically shortening the worst-case time on orbit). Indeed, the reduced risk of collision and orbital debris is the primary reason that SpaceX seeks to operate its satellites at a lower altitude. Second, Viasat makes the bizarre claim that SpaceX has no incentive to avoid collisions because it can simply launch additional satellites to replace those that have been destroyed. Viasat goes on to contradict its own claim by arguing that collisions on-orbit could generate sufficient debris to endanger other space operations, or even render orbits "unusable." Contrary to Viasat's many conflicting claims, SpaceX depends on a sustainable orbital environment for all of its operations, including launching astronauts to the International Space Station. Nobody has a greater incentive than SpaceX to ensure that low-Earth orbit remains free of debris.

**Pollution Caused by Launch and Reentry** — Viasat claims that SpaceX's modification would harm the environment by increasing the number of launches and satellite reentries, both of

which, Viasat asserts, might have environmental effects. But SpaceX's modification has no bearing whatsoever on the environmental concerns Viasat conjures up because the modification would not increase the number of deployed satellites launched or reentering the atmosphere. Viasat's claim to the contrary rests solely on the fact that the time for a satellite to *passively deorbit* would be shorter at the lower proposed altitudes. But this relates only to the worst-case time-to-demise of a satellite after the end of its mission, not the mission duration itself or the deorbit cadence planned for every SpaceX satellite. Thus, even if one were to assume that the launch and demise of satellites could have a significant environmental effect, SpaceX's application would not implicate these concerns.

Viasat also alleges that SpaceX's application will endanger aircraft and people on the ground by somehow increasing the amount of debris that survives atmospheric reentry. This also has nothing to do with the proposed modification which, as explained above, will not increase the number of reentering satellites. But even if it did, Viasat's argument would still be entirely off base given that SpaceX's satellites will fully demise upon reentry. Rather than grapple with this inconvenient fact, Viasat attempts to wish it away by mischaracterizing SpaceX's demisability analysis as a mere "assertion" at which the Commission has not taken a "hard look." However, SpaceX validated its conclusion with a Commission-mandated analysis using software purpose-built by NASA. Moreover, while SpaceX has repeatedly advocated for rules that require all systems to design for total atmospheric demise, Viasat has not supported such a requirement.

Notably, although SpaceX's pending application would improve—or at worst, maintain— the environmental metrics Viasat describes, the same cannot be said for Viasat's own pending application to modify its system. While SpaceX's modification will result in no change in the number of satellite launches or reentries, Viasat's modification would clearly increase both by

proposing to operate hundreds of additional satellites.  Likewise, while SpaceX seeks to lower its altitude to reduce the risk of orbital debris, Viasat's proposal would add hundreds of new satellites at an altitude where, if a satellite were to fail, it would continue to orbit uncontrolled for hundreds of years, posing a grave orbital debris risk.  These new satellites would also operate at 1,300 km meaning that, unlike satellites below 600 km, they would remain illuminated by the sun all night for most of the year, becoming a significant new source of light pollution according to the studies Viasat has submitted in support of its Petition.  Viasat has never presented any evidence it intends to take any of the measures that SpaceX is taking, and that astronomers have recommended, to mitigate the impact of Viasat's hundreds of new satellites on astronomy or casual enjoyment of the night sky.  Worse, Viasat has taken the extreme position of expressly reserving the right to make its system more risky if allowed under the Commission's rules.  SpaceX is filing this opposition, and the Petition to which it responds, for the record in Viasat's application.

Accordingly, because SpaceX's modification actually demonstrates SpaceX's commitment to the orbital environment, Viasat has presented no "extraordinary circumstances" that warrant the Commission overturning its long-standing conclusion that satellite authorizations categorically do not have significant environmental effects requiring individualized environmental review.

# TABLE OF CONTENTS

Page

SUMMARY ................................................................................. i

BACKGROUND ......................................................................... 3

I.  SpaceX is Already Licensed to Launch and Operate Over 4,400 Satellites; the Proposed Modification Would Just Lower the Orbital Altitude for 2,824 of Them, Improving the Impact on the Space Environment ........................ 3

II. Because the Commission Has Previously Determined that Space Station Authorizations Do Not Have a Significant Effect on the Environment, Viasat Must Show that "Extraordinary Circumstances" Require a Different Conclusion Here ................................................................. 6

DISCUSSION ............................................................................. 9

I.  None of the Issues Raised By Viasat Constitute "Extraordinary Circumstances" Requiring Commission Reconsideration Under NEPA .............. 9

  A.  In Considering Potential Environmental Effects of the Proposed Modification, SpaceX's Existing Authorization Establishes the Baseline ......................... 10

  B.  The Proposed Modification Will Actually Reduce the Impact of Light Reflected from SpaceX Satellites .................................................. 11

  C.  The Proposed Modification Will Enhance the Orbital Debris Mitigation Profile of SpaceX's NGSO Constellation ............................................ 15

  D.  The Proposed Modification Will Not Change the Number of Satellites Launched or Deorbited by SpaceX or Their Potential Environmental Effects ........ 18

    1.  The Proposed Modification Will Not Increase the Number of SpaceX Satellites ...... 18

    2.  SpaceX Satellites Will Fully Demise in the Atmosphere, Rendering Viasat's Musings About Potential Effects on Aircraft and the Earth's Surface Entirely Irrelevant .................................................................. 20

CONCLUSION ......................................................................... 21

**Before the**
# FEDERAL COMMUNICATIONS COMMISSION
**Washington, D.C.  20554**

| | |
|---|---|
| Applications of ) | |
| ) | |
| **SPACE EXPLORATION HOLDINGS, LLC** ) | Call Signs:  S2983 and S3018 |
| ) | |
| For Modification of Authorization for the ) | File No. SAT-MOD-20200417-00037 |
| SpaceX NGSO Satellite System ) | |
| ) | |
| **VIASAT, INC.** ) | Call Sign: S2985 |
| ) | |
| For Modification of the Viasat ) | File No. SAT-MPL-20200526-00056 |
| Non-Geostationary Orbit Satellite System ) | |
| Using Ka- and V-Band Frequencies ) | |
| ) | |

## OPPOSITION OF SPACE EXPLORATION HOLDINGS, LLC TO
## PETITION PURSUANT TO SECTION 1.1307(c) OF VIASAT, INC.

Space Exploration Holdings, LLC ("SpaceX") hereby opposes the unprecedented and belated request by Viasat, Inc. ("Viasat") that the Commission override its rules and ignore its prior precedent by denying or deferring SpaceX's above referenced modification application based on environmental concerns.[1]  In a tacit acknowledgment of the absence of merit of its previous attacks on SpaceX, Viasat's Petition now attempts to find a new legal theory for its recycled issues and inject it into the voluminous record of this proceeding many months after they should have been raised (if at all), seeking to invoke an onerous and time-consuming process just as the application is ripe for grant.  Yet as demonstrated below, SpaceX's modification actually would improve its environmental footprint and its impact on the orbital environment.  None of the issues raised now by Viasat require the Commission to undertake a further environmental evaluation of

---

[1]    *See* Petition Pursuant to Section 1.1307(c) of Viasat, Inc., IBFS File No. SAT-MOD-20200417-00037 (Dec. 22, 2020) ("Viasat Petition").

1

the proposed modification of SpaceX's non-geostationary orbit ("NGSO") Fixed-Satellite Service

("FSS") system, or to delay grant of the application that will enable SpaceX to continue to deploy

its high-capacity, low-latency broadband network.

Viasat's choice to use this modification application as the vehicle to propose a uniquely

onerous scope of review is particularly ironic, given that the modification actually improves

upon—or at worst, maintains—each of Viasat's purported concerns.  For example, as the

Commission has recognized, operating at the much lower altitudes proposed here has significant

public interest benefits in that orbital debris (including failed satellites) tends to deorbit in

relatively short order, significantly decreasing the risk posed to ongoing operations in space.[2]  In

fact, in granting SpaceX's previous modification to lower satellites to similar orbits, the

Commission specifically found that the modification would make operations safer.[3]  Operating at

lower altitude will also yield benefits in mitigating the potential impact on astronomical

observations—an area in which SpaceX is the undisputed industry leader.  In addition, nothing

about operating at lower altitude will change the number of satellites or the pace of deployment

and deorbiting, maintaining the status quo with respect to environmental impact.

Ironically, the concerns Viasat raises would apply more directly to its own pending

modification application, which proposes to increase the number of satellites by a factor of more

than fourteen and to operate them at an altitude where they will create more light pollution, or to

the recent application of Kuiper Systems, LLC ("Amazon") that proposed a completely new

---

[2]   *See, e.g.*, *Mitigation of Orbital Debris in the New Space Age*, 35 FCC Rcd. 4156, ¶ 43 (2020) ("*Orbital Debris Mitigation Update Order*") ("missions deploying above 650 km altitude may represent a greater risk from a long-term orbital debris perspective, since satellites that fail above that altitude will generally not re-enter Earth's atmosphere within 25 years, and depending on the deployment altitude, may be in orbit for centuries or longer").

[3]   *See Space Exploration Holdings, LLC*, 34 FCC Rcd. 2526, ¶ 1 (IB 2019) ("*Modification Order*") (finding that grant of the application "will allow SpaceX to make efficient use of valuable spectrum resources more safely, quickly, and cost-effectively"), *on reconsideration*, 35 FCC Rcd. 5649 (IB 2020).

system with more satellites (3,236) and at a slightly higher altitude (590-630 km) than SpaceX's modification.[4]  Yet Viasat failed to address these issues in its own application or to raise them in connection with Amazon's or any other NGSO application.  SpaceX therefore urges Viasat and Amazon—assuming Amazon files its required modification[5]—to follow SpaceX's lead in designing its system to address these issues.

This mismatch between the concerns Viasat raises and the public interest benefits of the modification that it opposes simply confirms the obvious:  the Petition is a blatantly anti-competitive eleventh-hour attack by a party that will stop at nothing to delay the only operational NGSO FSS system offering consumer service from continuing to deploy its high-capacity, low-latency broadband system and thereby increasing its advantage over less capable operators such as Viasat.  The Commission should reject such regulatory gamesmanship and approve SpaceX's modification application without delay.

## BACKGROUND

I.    **SPACEX IS ALREADY LICENSED TO LAUNCH AND OPERATE OVER 4,400 SATELLITES; THE PROPOSED MODIFICATION WOULD JUST LOWER THE ORBITAL ALTITUDE FOR 2,824 OF THEM, IMPROVING THE IMPACT ON THE SPACE ENVIRONMENT**

In March 2018, the Commission authorized SpaceX to deploy an NGSO constellation composed of 4,425 satellites operating in Ku- and Ka-band spectrum at altitudes from 1,110 km to 1,325 km.[6]  The Commission subsequently granted SpaceX's request to modify that authorization to relocate 1,584 satellites previously authorized to operate at an altitude of 1,150 km

---

[4]    *See* Description of Modification and Analysis Under Commission Framework, IBFS File No. SAT-MPL-20200526-00056 (May 26, 2020) ("Viasat Application"); Application for Authority to Launch and Operate a Non-Geostationary Satellite Orbit System in Ka-Band Frequencies, IBFS File No. SAT-LOA-20190704-00057 (July 4, 2019).

[5]    *See Kuiper Systems, LLC*, 35 FCC Rcd. 8324, ¶ 64 (2020) ("Prior to initiation of service, Kuiper must seek and obtain the Commission's approval of a modification containing an updated description of the orbital debris mitigation plans for its system").

[6]    *See Space Exploration Holdings, LLC*, 33 FCC Rcd. 3391 (2018).

to an altitude of 550 km.[7]  The Commission found that this modification would serve the public interest by improving broadband latency while decreasing the potential for orbital debris and would result in no material change in interference.[8]  SpaceX has proceeded rapidly with deployment of its NGSO system, launching over 880 satellites to date to the 550 km altitude.

In the application now under consideration, SpaceX proposes to further improve the potential orbital debris profile of its system with a slight decrease in its total number of satellites and relocation of 2,824 satellites to 540-570 km altitudes to achieve the same public interest benefits as the modification previously approved.  In its application, SpaceX demonstrated (among other things) that operating at a lower altitude offers several attractive features both during nominal operation and in unplanned scenarios, yields tangible benefits such as rapid, passive disposal in the unlikely event of a failed spacecraft, and provides a more favorable debris environment in general due to the effects of increased atmospheric drag.[9]  SpaceX demonstrated that it would satisfy the NASA safety standard for collision risk by several orders of magnitude and discussed the steps it has taken to avoid conjunctions with other NGSO systems.[10]  SpaceX also noted that it was the first NGSO licensee in its processing round to reach an agreement with radio astronomers to ensure its service does not interfere with radio observatories, and discussed its ongoing efforts to address concerns of optical astronomers as well.[11]

In response to the application, Viasat filed a petition to deny that focused primarily on orbital debris mitigation issues, and in particular the collision risk Viasat believed the modification

---

[7]   *See Modification Order, supra* note 3.

[8]   *See id.* ¶ 11.

[9]   *See* Application for Modification of Authorization for the SpaceX NGSO Satellite System, IBFS File No. SAT-MOD-20200417-00037, Narrative at 6-7, 10-11, Attachment A at 18-20 (Apr. 17, 2020) ("Modification Application").

[10]   *See id.* Attachment A at 20-24.

[11]   *See id.* Narrative at 12-14.

would create, including by using a collision metric never adopted by the Commission.[12] Throughout this proceeding, Viasat has continued to repackage the same issues, even after they had been questioned by the very scientists on whom Viasat relies to make its claims.[13] But on December 22, 2020—more than eight months after SpaceX filed its modification application— Viasat for the first time raised a concern about the potential impact of the modification on the environment. Specifically, Viasat claims that the modification will have a significant effect on the environment such that the Commission must consider three broad categories of environmental impact under the National Environmental Protection Act ("NEPA"):

1. sunlight reflecting off satellites;

2. collision risk; and

3. a variety of allegations concerning the effects of launching and deorbiting satellites.[14]

Viasat then makes the unprecedented claim that the Commission must therefore prepare an environment impact statement ("EIS") before acting on SpaceX's modification, or alternatively require preparation of an environmental assessment ("EA").[15] Notably, Viasat has never called for an EIS or EA for any other satellite system, including Amazon's constellation that would appear to present more cause for concern on many of the metrics raised now by Viasat.

---

[12] *See* Petition to Deny or Defer of Viasat, Inc., IBFS File No. SAT-MOD-20200417-00037 (July 13, 2020) ("Viasat PTD").

[13] *See* Letter from Jonathan McDowell to Marlene H. Dortch, IBFS File No. SAT-MOD-20200417-00037 (Sep. 21, 2020) (describing Viasat's arguments as "a misreading of my results" that "does not seem remotely justifiable to me").

[14] *See* Viasat Petition at ii-iii.

[15] *Id.* at iii. As a procedural matter, the Commission has made clear that its NEPA rules "do not delineate any circumstances in which an EIS is automatically triggered. Only proposals which, after evaluation of an Environmental Assessment (and an opportunity to amend) demonstrably have a significant environmental impact, will be subject to EISs." *Amendment of Environmental Rules in Response to New Regulations Issued by the Council on Environmental Quality*, 60 Rad. Reg. 2d (P&F) 13, ¶ 14 (1986) ("*NEPA Rules Order*").

## II. BECAUSE THE COMMISSION HAS PREVIOUSLY DETERMINED THAT SPACE STATION AUTHORIZATIONS DO NOT HAVE A SIGNIFICANT EFFECT ON THE ENVIRONMENT, VIASAT MUST SHOW THAT "EXTRAORDINARY CIRCUMSTANCES" REQUIRE A DIFFERENT CONCLUSION HERE

NEPA requires federal agencies to identify and evaluate the environmental effects of proposed "major Federal actions" and to prepare a "detailed statement" for such actions if they will "significantly affect[] the quality of the human environment."[16] However, in enacting NEPA, Congress "did not require agencies to elevate environmental concerns over other appropriate considerations."[17] Rather, the statute imposes certain procedural requirements, but "does not mandate particular consequences."[18]

Under Section 204 of NEPA, the Council on Environmental Quality ("CEQ") is entrusted with NEPA oversight responsibility.[19] The CEQ's regulations direct agencies to identify their Federal actions and place each within one of three categories: (1) actions that are likely to have significant environmental effects and are therefore appropriate for an EIS; (2) actions that are not likely to have significant effects or the significance of the effects is unknown and are therefore appropriate for an EA; and (3) actions that normally do not have significant effects and are therefore categorically excluded from further environmental processing.[20] Actions that require an EA or EIS face significant delays and paperwork burdens. The CEQ recently found that the average time for completion of an EIS was 4.5 years and that draft EISs averaged 575 pages.[21]

---

[16]  *See* 42 U.S.C. § 4332(2)(C).

[17]  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

[18]  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991).

[19]  *See* 42 U.S.C. § 4344.

[20]  *See* 40 C.F.R. § 1501.3(a).

[21]  *See* Council on Environmental Quality, *Environmental Impact Statement Timelines (2010–2018)*, EIS TIMELINES (June 12, 2020), https://ceq.doe.gov/nepa-practice/eis-timelines.html; Council on Environmental Quality, *Length of Environmental Impact Statements (2013–2018)*, EIS LENGTH (June 12, 2020), https://ceq.doe.gov/nepa-practice/eis-length.html.

The Commission has determined that none of its actions are likely to have significant environmental effects.[22] Section 1.1307 of the Commission's rules establishes the types of actions that require preparation of an EA because they may have a significant environmental impact.[23] Subsection (a) lists certain types of areas (such as officially designated wilderness areas, wildlife preserves, and Indian religious sites) that, if affected, would trigger an EA requirement. Subsection (b) requires preparation of an EA if a particular facility would cause human exposure to levels of radiofrequency radiation in excess of the limits in Sections 1.1310 of the Commission's rules. Viasat does not allege that any of these provisions apply here.

Section 1.1306 provides that "Commission actions not covered by § 1.1307(a) and (b) are deemed individually and cumulatively to have no significant effect on the quality of the human environment and are categorically excluded from environmental processing."[24] The Commission made this finding and adopted these categorical exclusions through a notice and comment rulemaking proceeding. The CEQ approved the exclusions as consistent with its regulations and NEPA.[25] This regime was "designed primarily to reduce paperwork and delays by eliminating unnecessary environmental processing and to improve the quality of agency decisions that affect the environment."[26] Viasat concedes that the effects cited in its Petition fall into this class of categorically excluded actions.

Consistent with CEQ requirements, the Commission also adopted a provision under which an interested person may file a petition setting forth in detail the circumstances necessitating environmental processing for a particular action that the person believes will have a significant

---

[22]  *See NEPA Rules Order* ¶ 4.

[23]  *See* 47 C.F.R. § 1.1307.

[24]  *Id.* § 1.1306(a).

[25]  *See NEPA Rules Order* ¶ 3; 40 C.F.R. § 1507.3(a).

[26]  *NEPA Rules Order* ¶ 2.

environmental effect but which would otherwise be categorically excluded.[27]  To prevail, such a petition must demonstrate "extraordinary circumstances" in which a normally excluded action may have a significant environmental effects.[28]  However, "[i]f an extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects."[29]

In the thirty-five years since the Commission adopted the current format of its NEPA rules it has never found a case in which "extraordinary circumstances" justify environmental processing of a categorically excluded action.  In addition, the CEQ regulations make clear that "major Federal action" does not include "[e]xtraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States."[30]  Like over 100 other countries, the United States is a signatory to the *Outer Space Treaty*, which provides that space "is not subject to national appropriation by claim of sovereignty."[31]  Accordingly, there is significant doubt that NEPA applies to activities in space at all.  However, the Commission need not reach that issue here because, as demonstrated below, there is no basis for conducting an environmental review of the proposed modification even assuming the statute applies.  A finding to the contrary could open the floodgates to environmental reviews for a wide array of space-based

---

[27]   47 C.F.R. § 1.1307(c).

[28]   40 C.F.R. § 1501.4(b).

[29]   *Id.* § 1501.4(b)(1).

[30]   *Id.* § 1508.1(q)(1)(i).

[31]   Treaty on Principles Governing Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies art. II, Jan. 27, 1967 ("*Outer Space Treaty*"), https://www.unoosa.org/oosa/en/ourwork/spacelaw/treaties/outerspacetreaty html.  Although the treaty does not establish the altitude at which space begins, the most commonly cited demarcation is 100 km – often referred to the Karman Line – though more recently an altitude of 80 km has been considered. *See, e.g.*, Federation Aeronautique Internationale, *Statement About the Karman Line,* NEWS (Nov. 30, 2018), https://www.fai.org/news/statement-about-karman-line.  In any event, the 540-570 km altitudes proposed by SpaceX are well above any such line.

proposals going forward, imposing a significant and unnecessary burden on applicants and Commission resources.

The Commission's rules direct that in contesting an application for modification of a station license, "objections based on environmental considerations shall be filed as petitions to deny."[32] Viasat instead waited over five months after such petitions were due before raising these NEPA issues.  Viasat seeks to excuse its tardiness by citing three documents "that had not yet been released at the time of Viasat's initial petition."[33]  Yet there can be no doubt that Viasat actually knew many months ago about each of the issues it has raised in this Petition.  Indeed, SpaceX addressed the issue of satellite reflectivity in its application,[34] and Viasat discussed its concerns about the risk of orbital debris in general and collision in particular in its original petition to deny.[35] The only thing that has truly changed in those intervening months is that Viasat apparently became concerned enough about the ineffectiveness of its arguments against the modification that it decided to make a yuletide submission in a desperate attempt to repackage old issues to delay grant of the application.

## DISCUSSION

## I.   NONE OF THE ISSUES RAISED BY VIASAT CONSTITUTE "EXTRAORDINARY CIRCUMSTANCES" REQUIRING COMMISSION RECONSIDERATION UNDER NEPA

As discussed above, the Commission has determined that space station licensing decisions are presumptively excluded from environmental processing, as they fall into the category of actions that can be expected to have no significant effect on the quality of the human environment. The Viasat Petition cites three broad categories of effects that it claims provide the "extraordinary

---

[32]  *See* 47 C.F.R. § 1.1313(a).

[33]  Viasat Petition at 1 n.1.

[34]  *See* Modification Application, Narrative at 12-14.

[35]  *See* Viasat PTD at 6-36.

circumstances" necessary to require the Commission to reconsider that determination: (1) effects from the sun reflecting off SpaceX satellites; (2) effects from the generation of orbital debris by SpaceX satellites; and (3) effects from launching and deorbiting SpaceX satellites. Below we demonstrate that there will be no such effects, much less "extraordinary circumstances" that would justify the time- and resource-intensive environmental processing Viasat demands. In fact, the modification would alleviate many of the supposed concerns that Viasat now raises.

### A. In Considering Potential Environmental Effects of the Proposed Modification, SpaceX's Existing Authorization Establishes the Baseline

NEPA requires the Commission to consider the environmental effects of "major Federal actions." In this case, the only "action" at issue is the potential grant of SpaceX's proposed modification. Several important conclusions follow from this fact. First, in assessing the environmental effects, SpaceX's existing authorization establishes the baseline for comparison. After all, that is both the current status quo and the authorization under which SpaceX would continue to proceed if the Commission were to deny the modification.[36] Second, the Commission need not consider SpaceX's existing V-band authorization—those satellites are already authorized, and the proposed modification would not affect them. Third, for similar reasons, the Commission need not consider SpaceX's unrelated application for a new NGSO constellation. That application has yet to be accepted for filing, and no action in this proceeding will change its status in any way.

Accordingly, the Commission can ignore Viasat's attempts to confuse the issue by invoking imagined perils arising from the combination of SpaceX's existing authorization, V-band authorization, and pending application.[37] The only action that SpaceX seeks here—and therefore

---

[36]    The CEQ regulations make clear that effects relevant for consideration "do not include those effects that . . . would occur regardless of the proposed action." 40 CFR § 1508.1(g)(2).

[37]    *See, e.g.*, Viasat Petition at 12. To the extent Viasat is attempting to describe a cumulative effect of these authorizations and applications, such effects were recently removed from NEPA consideration under the CEQ's

the only action at issue for purposes of NEPA—is the relocation of 2,824 already-authorized satellites from operating altitudes of 1,110-1,325 km to 540-570 km.

### B. The Proposed Modification Will Actually Reduce the Impact of Light Reflected from SpaceX Satellites

SpaceX is committed to promoting all forms of space exploration, which is why it was the first NGSO licensee in its processing round to reach an agreement with radio astronomers to ensure its service does not interfere with radio observatories.[38]  SpaceX has also taken a litany of proactive steps to ensure its operations do not materially impact optical astronomy.  For example, it has tested an experimental darkening treatment designed to reduce the visibility (albedo) on one in-orbit satellite and has for months been deploying satellites with visors to shield reflective surfaces from the sun's glare.  It is also devising operational procedures to ensure that satellites are oriented in a way that reduces potential reflections toward the Earth during all phases of operations.  Such efforts have enabled SpaceX to make its satellites all but invisible to the naked eye.[39]  In addition, SpaceX is making highly accurate satellite tracking data available so astronomers can better coordinate their observations with its satellites.  As a result of these efforts, it is no surprise that astronomers have concluded that SpaceX "has been very cooperative in working with researchers, devoting significant resources towards finding solutions to this crisis for astronomy.  We hope all

---

rules.  *See* 40 C.F.R. § 1508.1(g)(3) ("Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed.").  Moreover, the statutory period for seeking reconsideration of SpaceX's existing authorizations has long since passed.  *See* 47 U.S.C. § 405(a).

[38]  *See* Press Statement 19-005, *Statement on NSF and SpaceX Radio Spectrum Coordination Agreement*, NATIONAL SCIENCE FOUNDATION (June 4, 2019), https://www.nsf.gov/news/news_summ.jsp?cntn_id=298678.

[39]  *See* J. Tregloan-Reed et al., *First Observations and Magnitude Measurement of Starlink's Darksat*, Astronomy and Astrophysics (Apr. 23, 2020), https://arxiv.org/pdf/2003.07251.pdf.

satellite operators follow their example, for the benefit of everyone involved in research, amateur astronomy and other practices requiring dark skies."[40]

Nonetheless, Viasat makes the unsupportable assertion that the proposed modification would somehow increase "light pollution" in the form of sunlight reflecting off SpaceX satellites towards the Earth's surface.[41]  But the Commission need look no further than the studies cited in the Viasat Petition itself to conclude that relocating satellites from altitudes of 1,110-1,325 km to 540-570 km would have precisely the opposite effect.  Indeed, it is NGSO systems operating at altitudes near 1,200 km—such as the one proposed by Viasat—that present a much greater threat to astronomical observation.

For example, Viasat cites an August 2020 report by the SATCON1 Scientific Organizing Committee—one of the three "new" reports Viasat claims should justify its belated filing[42]—as supporting the contention that operating at altitudes below 614 km would have "significant negative impacts" on astronomy.[43]  Viasat's selective citation of this source is highly disingenuous. It ignores the critical conclusion highlighted in the report's executive summary:

> The key difference between lower (~600 km) and higher (~1200 km) orbits is the visibility in the dark of night between astronomical twilights: ***higher altitude constellations can be visible all night long during summer, with only a small reduction in the number visible compared to those in the twilight***.[44]

---

[40]  A. Venkatesan et al., *The impact of satellite constellations on space as an ancestral global commons*, NATURE ASTRONOMY (Nov. 2020), https://www.nature.com/articles/s41550-020-01238-3.  *See also* Shannon Hall, *SpaceX Plans Sunshades to Save Night Skies from Starlink Satellites*, N.Y. TIMES (May 6, 2020) (quoting Dr. Anthony Tyson, chief scientist of the Rubin Observatory: "[t]he fact that SpaceX has taken an attitude that they want to solve the problem sets a moral high ground for other operators to follow"), https://www.nytimes.com/2020/05/06/science/spacex-starlink-astronomy.html.

[41]  *See* Viasat Petition at 16.

[42]  *See id.* at 3.

[43]  *Id.* at 19-20.

[44]  Walker, C. et al., *Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigations* 3-4 (2020) ("Optical Astronomy Report") (emphasis added) (Exhibit 19 to Viasat Petition).

12

Indeed, Finding 1 of the report concludes that "[f]ull-night illumination causes these high-altitude constellations to impact a larger set of astronomical programs."[45]  Not surprisingly, one of the primary recommendations for mitigating the impact of LEO satellites on astronomical observations is simple: "*Deploy satellites at orbital altitudes no higher than ~600 km.*"[46]  SpaceX developed and has already implemented the other mitigation strategies suggested in the report.[47]  Those actions were within its control.  SpaceX now seeks authority from the Commission to implement the primary recommendation of the report.  Yet Viasat seeks to prevent this operational change in the name of reducing light pollution – *when its obstruction will patently result in exactly the opposite result*.

In yet another irony, Viasat's own currently pending modification application targets an operational altitude that is likely to have much worse light pollution effects.  Viasat proposes to increase its constellation by 14 times, and to relocate it to 1,300 km altitude.  Yet as the study it relies upon here concludes, NGSO constellations at such altitudes "present particularly serious challenges; they will be visible all night during summer and significant fractions of the night during winter, fall, and spring, and will have negative impacts on nearly all observational programs."[48]  For that reason, it recommends "[s]atellites on orbits as low as possible.  No satellites at >>600 km.  Satellites at 1200 km are particularly damaging."[49]  Viasat has not acknowledged this issue, much less addressed it, in its own modification proceeding.

---

[45]  *Id.* at 5.

[46]  *Id.* at 5-6 (emphasis added).

[47]  The study also recommends that NGSO operators "[d]arken satellites by lowering their albedo, shading reflected sunlight, or some combination thereof" and "[c]ontrol each satellite's attitude in orbit so that it reflects less sunlight to Earth."  *Id.* at 6.  It confirms that "SpaceX has shown that operators can reduce reflected sunlight through satellite body orientation, Sun shielding, and surface darkening."  *Id.* at 4.

[48]  Optical Astronomy Report at 8.

[49]  Walker, C. et al., *Appendices to "Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigations"* 49 (2020) (Exhibit 20 to Viasat Petition).

The other study Viasat primarily relies upon reached a similar conclusion.  To assess the potential impact of a large NGSO system on an astronomical observatory, it modeled hypothetical constellations at 500 km and 1,200 km to illustrate the tradeoff between altitude and illumination. The results definitively showed that at the 500 km altitude, fewer satellites were illuminated and they affected a much smaller portion of the night sky than did satellites at 1,200 km.[50]  In summary, the study concluded that "[s]atellites at lower altitudes are brighter but have less impact because they move into Earth's shadow earlier than satellites at higher altitudes."[51]  Here again, the very study upon which Viasat relies demonstrates that granting the proposed modification would *reduce* the potential impact of SpaceX's NGSO system on astronomers and others who look to the night sky.  If Viasat really cared about reducing the potential impact of NGSO systems on astronomy, it would support SpaceX's modification—and revise its own proposed operations.

Viasat also asserts that light pollution in space can have aesthetic effects, social and cultural effects, and health effects due to its impact on stargazers.[52]  Yet all of those effects presuppose that the light pollution at issue is "visible to the naked eye."[53]  Otherwise, the effects would not be discernable to the vast majority of people in their daily lives.  As discussed above, SpaceX has already adopted extensive technological and operational practices that significantly reduce the amount of sunlight reflected by its satellites and all but render them invisible to the naked eye, and is continuing to work with astronomers to achieve still more mitigation.  But for purposes of the Commission's assessment of Viasat's arguments, the more important fact is that granting the

---

[50]  Luc H. Riesbeck et al., *The Future of the Night Sky:  Light Pollution from Satellites* 5-8 (2020) (Exhibit 18 to Viasat Petition).

[51]  *Id.* at 3.

[52]  *See* Viasat Petition at 16-19.

[53]  *Id.* at 18.

14

modification so that SpaceX can operate all its satellites at lower altitude will only improve the situation.

### C. The Proposed Modification Will Enhance the Orbital Debris Mitigation Profile of SpaceX's NGSO Constellation

As SpaceX stated in its application, the prime motivating factor for both its previous modification that the Commission approved and the current proposal to relocate the remainder of its satellites to lower altitude was the attendant enhancements to space safety. Over the course of this proceeding, SpaceX has presented voluminous evidence that the modification would reduce the orbital debris risk profile of its NGSO system. For example, reproduced below as Table 1 is a previously submitted[54] summary of the risk of collision for a SpaceX satellite that has lost maneuver capability, as determined using the most recent version of NASA's Debris Assessment Software ("DAS" v.3.1.0) applied to the proposed modification.

| Altitude (km) | Current Satellite Design | | Satellite with Sun Shade Panels | |
|---|---|---|---|---|
| | **Maintained** | **Tumbling** | **Maintained** | **Tumbling** |
| 540 | 0.000069 | 0.000053 | 0.000071 | 0.000053 |
| 560 | 0.000139 | 0.000106 | 0.000142 | 0.000108 |
| 570 | 0.000138 | 0.000101 | 0.000141 | 0.000103 |

**Table 1.  Post-Modification Collision Risk Assuming No Maneuver Capability**

This collision risk profile is many times lower than the 0.001 standard recently adopted by the Commission.[55] As importantly, it represents a reduction of the collision risk compared to satellites

---

[54]  *See* Letter from William M. Wiltshire to Jose P. Albuquerque, IBFS File No. SAT-MOD-20200417-00037, at 2 (July 7, 2020).

[55]  *See Orbital Debris Mitigation Update Order* ¶¶ 33-34.

operating at the currently authorized higher altitudes by a factor of several hundred.[56] SpaceX has also demonstrated that its satellites will achieve 100% deorbit reliability at the lower altitudes proposed in the modification, exchanging the hundreds of years required for natural orbital decay of a satellite at 1,110-1,325 km for a period of less than five years for a satellite at the 540-570 km altitudes, even considering worst-case assumptions.[57]

Despite all this evidence, Viasat asserts—without supporting citation—that "SpaceX admits, as it must, that its modification involves greater collision risks than before."[58] This statement is patently false, and simply indefensible given the record SpaceX has established on orbital debris issues in this proceeding.

Indeed, both SpaceX and Viasat have submitted a great deal of material on orbital debris issues in this proceeding (although Viasat has submitted significantly less material about the risks presented by its own system). The Commission has adopted stringent requirements for U.S.-licensed systems designed to mitigate such debris, including recent updates that enhanced the regime still further based on the best available technical inputs from interested parties and other expert agencies, including NASA. These issues have been fully litigated in the record, and the Commission has all the information it needs to determine whether the proposed modification would comply with its rules. Perhaps recognizing that its arguments are failing, Viasat is now attempting to give them new life by repackaging the same stale claims within a thin veneer of environmental concern. Viasat even goes so far as to cite its prior submissions in this proceeding—

---

[56]  *See* Letter from William M. Wiltshire to Jose P. Albuquerque, IBFS File No. SAT-MOD-20200417-00037, at 2 (May 15, 2020) (a non-propulsive satellite operating at the currently authorized altitude of 1,110 km would have a 0.0392 collision risk with attitude maintained).

[57]  *See* Modification Application, Technical Attachment at 19-20.

[58]  Viasat Petition at 24.

again undercutting its claim that it could not have raised these NEPA arguments in a timely manner.[59]

But the Commission should not play Viasat's game. It already has a comprehensive and up-to-date regime for considering the implications of orbital debris, and Viasat presents no reason other than anti-competitive obstruction for a redundant analysis under NEPA. In this regard, the situation is similar to radiofrequency radiation in which the Commission determined that compliance with the human exposure limits in its rules would preclude the need for further environmental processing.[60] Here again, the Commission has already adopted a full suite of rules and policies on orbital debris mitigation, making further consideration under the umbrella of NEPA unnecessary and redundant.

Like Viasat, SpaceX recognizes that collisions between satellites and orbital debris could compromise the orbits involved.[61] As the only NGSO FSS operator currently offering commercial service to consumers—and as the nation's premier launch provider—SpaceX has more incentive than anyone to ensure that its satellites avoid such collisions and the debris they create. Yet after recognizing the debilitating effects collisions can have on operations in space, Viasat makes the bizarre argument that SpaceX will not be concerned "because SpaceX knows that when its satellites do collide with other space objects and fragment or fail, it can always launch more."[62] In other words, Viasat argues that SpaceX would spend billions of dollars to deploy a technologically advanced NGSO satellite system capable of generating tens of billions of dollars per year in revenue yet blithely ignore the existential risk to that mammoth investment posed by

---

[59]  *See id.* at 21, 24.

[60]  *See* 47 C.F.R. § 1.1307(b).

[61]  *See* Viasat Petition at 23.

[62]  *Id.* at 25-26.

orbital debris at its operational altitudes. Such an argument is completely untethered from reality and nonsensical on its face. Moreover, it ignores the fact that SpaceX seeks to relocate the rest of its satellites to lower altitudes precisely because doing so will dramatically improve the orbital debris environment in which it would operate. The Commission should reject Viasat's insinuations that SpaceX would not be motivated to prevent orbital debris.

In contrast, Viasat attempts to claim the mantle of "environmentally conscious" operator while simultaneously proposing to launch 14 times more satellites to a much riskier orbit yet presenting less information about the safety profile of its system—and explicitly asking to reserve its right to modify its system in the future to make it *less safe*.[63] And until a recent about face, it even argued that non-U.S. licensed systems such as its own should be exempt from Commission oversight. There should be little doubt as to which operator is more concerned about taking measures to reduce its orbital debris profile.

### D. The Proposed Modification Will Not Change the Number of Satellites Launched or Deorbited by SpaceX or Their Potential Environmental Effects

#### 1. The Proposed Modification Will Not Increase the Number of SpaceX Satellites

SpaceX is currently authorized to launch and operate 2,825 satellites at altitudes above 1,100 km. Under the modification, it would launch and operate 2,824 satellites at altitudes from 540-570 km. In both cases, the satellites have an expected useful lifetime of approximately five years, after which SpaceX will actively deorbit them by using propulsion to reduce perigee to approximately 300 km, from which point they will passively demise in the atmosphere in a matter of weeks or months. Thus, in either case, SpaceX would launch, operate, and deorbit essentially the same number of satellites over the term of its license (actually, one fewer under the

---

[63]    Viasat Application, Technical Annex at 6 (Viasat "reserves the right modify this orbital debris mitigation plan to incorporate any less-stringent requirements" adopted by the Commission).

modification).  Accordingly, contrary to Viasat's assertion, granting the proposed modification is not the same as "permitting the launch and decay of at least 10,000 low-Earth-orbit satellites within the span of less than two decades."[64]

A primary benefit of operating at the lower altitude is the fact that any satellites that SpaceX is unable to actively deorbit would *passively* deorbit in a few years from 540-570 km altitude as compared to the centuries it would take from altitudes above 1,100 km.  But Viasat attempts to conflate the active deorbit planned for the vast majority of SpaceX satellites with the passive de-orbit that would only apply to non-propulsive satellites to claim that "reduction in orbital altitude would dramatically accelerate the time period within which many thousands of its satellites would burn up in the Earth's atmosphere."[65]

This is a blatant mischaracterization of SpaceX's application.  SpaceX intends to launch and deorbit a slightly smaller number of satellites under the proposed modification than under its existing authorization—an orderly process during which SpaceX will control the ascent and descent of its satellites on a regularized timetable.  The fact that any small number of satellites that become non-propulsive will demise in the atmosphere faster from the proposed lower altitudes has no effect whatsoever on the pace at which SpaceX satellites will be actively deorbited.  The Commission should reject Viasat's cynical effort at misdirection.

Without this mischaracterization, Viasat's arguments about the effects of launching and deorbiting satellites on the environment disappear.  Granting the modification would not increase the number of launches compared to deployment of SpaceX's currently authorized system.  The same is true for deorbiting satellites, since the number will be essentially the same under both the

---

[64]    Viasat Petition at 10.

[65]    *Id.* at 9.

modification and the existing authorization.  Accordingly, grant of the modification would not change the status quo and therefore would not have any discernable effect on the atmosphere.

It is also worth noting that the Federal Aviation Administration ("FAA") licenses all U.S. launch vehicles and U.S. launch sites—and has its own rigorous NEPA evaluation associated with that process.[66]  Because SpaceX launches all of its satellites on U.S. rockets from U.S. soil, all launches associated with its constellation undergo NEPA analysis by the FAA.  Most foreign licensees—such as Viasat—deploy their satellites from launch sites outside the U.S. and therefore their launches and launch vehicles do not undergo the same evaluation of environmental effects.[67]  In these circumstances, it is ironic (though not surprising) that Viasat would raise an environmental concern that it managed to avoid for its own system by licensing and launching outside the U.S.

   2.   SpaceX Satellites Will Fully Demise in the Atmosphere, Rendering Viasat's Musings
         About Potential Effects on Aircraft and the Earth's Surface Entirely Irrelevant

Viasat devotes three pages of its Petition to a discussion of the potential risks for aircraft impacts, human casualty, and terrestrial pollution from pieces of SpaceX satellites that survive atmospheric reentry.[68]  It is not until the third page that Viasat bothers to acknowledge that SpaceX "expects its satellites to completely burn up in the atmosphere"[69]—a fact that renders the rest of its musings on this topic totally irrelevant.

Viasat tries to disregard this fact by arguing that "the Commission cannot take [SpaceX's] assertion at face value," and instead must take a "hard look" at whether satellite debris will have

---

[66]   *See* 14 C.F.R. § 413.3(a); FAA Order 1050.1F, Environmental Impacts: Policies and Procedures (July 16, 2015), https://www.faa.gov/documentLibrary/media/Order/FAA_Order_1050_1F.pdf.

[67]   For example, Viasat launched its first satellite from Kazakhstan on a Russian rocket and its second from French Guiana on a European rocket.  *See* Viasat, *Viasat's Growing Fleet of Satellites*, Viasat | Exede, https://www.exede.com/viasat-satellite-internet-service/.

[68]   *See* Viasat Petition at 13-16.

[69]   *Id.* at 15.

an environmental effect on the Earth's surface.[70]  That argument totally ignores the fact that the Commission has already taken a very hard look at satellite demise issues in promulgating its orbital debris mitigation rules.  Specifically, the Commission has endorsed the use of NASA's DAS to determine whether NGSO satellites will completely demise in the atmosphere and whether they present any risk of human casualty.[71]  SpaceX used DAS to determine that it had successfully designed its satellites for total atmospheric demise.  Although Viasat has raised many orbital debris challenges to SpaceX's modification, it has not challenged this demise determination.  The fact that Viasat has finally resorted to NEPA in an effort to have the Commission simply ignore its own orbital debris mitigation determinations strongly indicates that Viasat knows its orbital debris arguments to date are baseless and not likely to succeed.

The Commission is currently considering whether to require all NGSO systems to implement a design-for-demise approach under which no satellite remnants would survive atmospheric reentry.[72]  SpaceX heartily endorsed such a rule,[73] while Viasat did not.  Here again, there should be no doubt as to which operator is more committed to reducing potential environmental effects.

## CONCLUSION

Viasat presents absolutely no basis for deferring or denying SpaceX's modification application based on environmental considerations.  Operating at a lower altitude will actually shrink SpaceX's environmental footprint, ameliorating many of the concerns cited in Viasat's Petition—unlike Viasat's own pending application that instead proposes to launch hundreds more

---

[70]  *Id.*

[71]  *See Orbital Debris Mitigation Update Order* ¶¶ 118-121 and new Section 25.114(d)(14)(vii)(D)(2)(b).

[72]  *See id.* ¶¶ 173-74.

[73]  *See* Further Comments of Space Exploration Technologies Corp., IB Docket No. 18-313, at 14-15 (Oct. 9, 2020).

satellites at higher orbits where they will create increased risks of debris that would persist for generations to come and where reflectivity is a substantial issue. Accordingly, the Commission should deny the Petition and grant SpaceX's application so that SpaceX can proceed with its plans for expedited deployment of its NGSO constellation and provide improved high-throughput, low-latency broadband service to American users.

Respectfully submitted,

SPACE EXPLORATION HOLDINGS, LLC

By:  _/s/ David Goldman_____
    David Goldman, Director, Satellite
    Policy

William M. Wiltshire
Paul Caritj
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W.
Suite 800
Washington, DC  20036
202-730-1300   tel
202-730-1301   fax

SPACE EXPLORATION TECHNOLOGIES CORP.
1155 F Street, NW
Suite 475
Washington, DC  20004
202-649-2700   tel
202-649-2701   fax

*Counsel to SpaceX*

January 6, 2021

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 6th day of January, 2021, a copy of the foregoing pleading

was served by first class U.S. mail upon:

John P. Janka
Amy R. Mehlman
Jarrett S. Taubman
VIASAT, INC.
901 K Street, N.W., Suite 400
Washington, DC  20001

Helgi C. Walker
Michael K. Murphy
Joshua S. Lipshutz
Russell B. Balikian
Philip W. Hammersley
Brian C. McCarty
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036

/s/ *Hailey Stewart*
Hailey Stewart

# EXHIBIT Q



January 15, 2021

**BY ELECTRONIC FILING**

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC  20554

   Re: Viasat, Inc. *Ex Parte* Presentation, IB Docket No. 18-313 and IBFS File Nos.
     SAT-MOD-20200417-00037 and SAT-MPL-20200526-00056

Dear Ms. Dortch:

  Viasat, Inc. responds to the letter filed by Space Exploration Technologies Corp.
("SpaceX") on December 30, 2020.  In its letter, SpaceX expresses a desire to "update the
Commission's orbital debris rules to better account for the true cost of persistent debris"[1] and
purports to compare the relative environmental costs of different non-geostationary orbit
("NGSO") system designs.[2]

  Viasat agrees that the Commission's rules should account for the "true cost" associated
with NGSO operations, but the bespoke proposal SpaceX advances is deeply flawed.  Indeed,
SpaceX's "aggregate risk years" proposal suffers from the same issues identified by Viasat in its
letter of December 2, 2020—SpaceX fails to account for the factors that most directly affect the
collision risk and environmental impact associated with each NGSO system.[3]

  As summarized in Table 1 below and further detailed in Attachment 1, when all of the
relevant factors are considered, the inescapable conclusion is that *each successive SpaceX
modification of the Starlink constellation has increased collision risk*, not decreased it as SpaceX
claims.  And considering that each of the *existing and established* third-party metrics for

---

[1] Letter from SpaceX to FCC, IB Docket No. 18-313 and IBFS File No. SAT-MPL-20200526-
00056, at 1 (Dec. 30, 2020) ("SpaceX Dec. 30 Letter").

[2] *Id.* at 2-3.

[3] *See* Letter from Viasat to FCC, IB Docket No. 18-313 and IBFS File No. SAT-MOD-
20200417-00037 (Dec. 2, 2020) ("Viasat Dec. 2 Letter").

901 K Street NW, Suite 400, Washington, DC 20001, U.S.A. T: +1 202 383 5050
www.viasat.com

assessing collision risk illustrates the higher risks associated with Starlink, the Commission should be particularly skeptical about SpaceX's new proposed approach.

| Constellation | DAS[4] | | Kinetic Theory[5] | NEAT[6] |
|---|---|---|---|---|
| | Average Large Object Collision Probability | Expected Large Object Collisions Over Lifetime (MTBC) | Expected Intra-System Collisions Per Year (MTBC) | Expected Collisions Per Year Not Avoided (MTBC) |
| SpaceX 2016 | 2.22E-04 | 0.98 (5.1 years) | 11.5 (32 days) | 2.93 (0.52 years) |
| SpaceX 2018 | 2.67E-04 | 1.18 (4.3 years) | 12.6 (29 days) | 9.06 (0.11 years) |
| SpaceX 2020 (pending) | 3.07E-04 | 1.35 (3.7 years) | 14.5 (25 days) | 10.88 (0.09 years) |
| | | | | |
| Viasat LEO 288 (pending) | 1.37E-04 | 0.04 (190 years) | 0.077 (13 years) | 0.152 6.58 years) |

**Table 1 – Mean Time Between Collisions (MTBC) Shows SpaceX Constellation Mods Reduce Space Safety and Viasat Constellation is Safer**

The omissions and incorrect assumptions in SpaceX's assertions can be summarized as follows:

- SpaceX incorrectly assumes that NGSO operations at higher altitudes pose greater levels of persistent risk than operations at lower altitudes. This assumption is overly reductive and ignores significant complexities in the orbital environment—including the complex interplay between operations at different altitudes.

- SpaceX makes no effort to account for all, or even the most salient, factors impacting the "true cost of persistent debris." These are considerations with respect to Starlink that the Commission has not yet addressed, even though it has been over two years since the Commission first acknowledged the importance of reliability in the Starlink

---

[4]    NASA's Debris Assessment Software (DAS). *See* NASA Technical Standard, Process for Limiting Orbital Debris, NASA-STD-8719.14B, 2019-04-25.

[5]    The kinetic theory of gases has long been used to estimate satellite collision rates. *See* references collected in Attachement 1, Annex B.

[6]    The Number of Encounters Assessment Tool (NEAT) was developed by AGI and assesses collision risk by adjusting key constellation parameters to estimate conjunction warnings, maneuvers, and collisions. *See* https://www.agi.com/missions/space-situational-awareness/what-s-the-number-of-encounters-assessment-tool-it.

syatem, and started a rulemaking proceeding to address rule changes necessitated by the New Space Age.[7]

- SpaceX does not account for *intra*-system collision risk in a system consisting of many thousands of satellites—perhaps the *most* significant factor, and one not included in the DAS analysis. This is very significant risk in SpaceX's case, particularly when one considers the persistent collision risk created by Starlink satellites that cannot reliably and effectively maneuver to avoid collisions, or be actively deorbited. There have already been dozens of instances of Starlink satellites that have lacked such maneuverability and reliability—including satellites launched within the past 6 months, as discussed below.

- The unprecedented number of conjunction events associated with Starlink's massive system of many thousands of satellites materially increases the overall "true cost" of this system. These conjunctions can be avoided only as long as: (i) they can be predicted with sufficient warning (and the provision of timely and accurate ephemeris data); (ii) SpaceX can plan and command avoidance maneuvers; and (iii) each Starlink satellite maintains a reliable and effective maneuverability and TT&C capability.

- The residual risks associated with *maneuverable* satellites in SpaceX's massive system lead to material numbers of expected collisions even if one assumes that, accounting for the uncertainty in orbit predictions, the maneuver threshold for a conjunction alert is very small in any given instance. In other words, this consideration reflects the cumulative collision risk associated with low-collision-risk conjunction warnings that do not result in actual avoidance maneuvers.

- SpaceX does not account for the collision risks that persist from the time a Starlink satellite no longer can be reliably and effectively maneuvered until the satellite's orbit passively decays (which can be as much as six years).

- SpaceX does not account for the risks that persist for decades once a Starlink satellite does collide with another space object 10 cm or larger, fragments, and spreads a debris cloud into orbits many hundreds of kilometers away, which adversely affects the operation of other satellite systems operating in, or traversing, those orbits.

- In addition, the bespoke "aggregate risk years" metric through which SpaceX attempts to operationalize its assumption about collision risk is highly flawed and arbitrary. Tellingly, SpaceX: (i) does not provide any clear methodology for

---

[7]  *See Space Exploration Holdings, LLC*, 33 FCC Rcd 3391, at ¶ 15 (2018) (agreeing with NASA that the unprecedented number of satellites proposed by SpaceX and the other NGSO FSS systems in this processing round will necessitate a further assessment of the appropriate reliability standards of these spacecraft") ("*SpaceX Initial Authorization Order*"); *Mitigation of Orbital Debris in the New Space Age*, Notice of Proposed Rulemaking, 33 FCC Rcd 11352 (2018).

> calculating this proposed metric; (ii) inexplicably utilizes different methodologies/formulas to calculate the metric for different systems (in a manner more favorable to SpaceX's system than other systems); (iii) does not explain how or why it arrived at the different formulas it appears to employ; and (iv) when purporting to measure the risk posed by Starlink, uses inputs that do not reflect the typical operational parameters of its system (leading to an unduly rosy picture of the risk posed by its system).

In short, there is no basis for the "aggregate risk years" metric proposed by SpaceX, which is ill-conceived and incomplete.

That said, Viasat appreciates that SpaceX at least acknowledges the need to account for the "true cost" of each NGSO system. This is a significant departure from SpaceX's previous advocacy, in which it has essentially encouraged the Commission to prioritize SpaceX's commercial interests above the public's interest in orbital safety. Among other things, SpaceX has opposed proposals (*e.g.,* the Commission's proposal to apply a 0.001 collision probability limit on an aggregate basis) that would require operators to properly internalize negative externalities and bear the "true cost" associated with their NGSO system operations.[8] Viasat hopes that SpaceX's letter signals a willingness to align its interests with the broader public interest.

Viasat also hopes that SpaceX's letter signals a new willingness to provide the Commission with the information needed to assess the "true cost" associated with SpaceX's own system. As the Commission knows, SpaceX's Starlink satellites have failed at an extraordinarily high rate. Indeed, recent independently developed data supports the conclusion that there has been a total of 79 failures[9] out of 953 Starlink satellites launched, representing an 8.3% failure rate.[10] Considering that SpaceX continues to rely on the launch of *all of those satellites* in its public interest advocacy,[11] it is only appropriate to include the impact of all Starlink satellites

---

[8]   *See, e.g.,* Further Comments of Space Exploration Technologies Corp., IB Docket No. 18-313, at 3-7 (Oct. 9, 2020) (opposing Commission proposal to apply a 0.001 collision probability limit on an aggregate basis).

[9]   Defined to include satellites that were launched to provide service but never did.

[10]  *See* https://planet4589.org/space/stats/megacon/starbad.html (last visited Jan. 7, 2021). These failures have occurred over a mere fraction of the five-year design life of the Starlink satellites; the failure rate over that complete period is likely to be much higher. *See* Letter from Viasat to FCC, IBFS File No. SAT-MOD-20200417-0037, Att. at 4 (Jan. 7, 2020). Notably, Dr. McDowell's web site presents observed data for analysis and does not express a specific view on the failure rate of SpaceX satellites. *See* Letter from Viasat to FCC, IBFS File No. SAT-MOD-20200417-0037, at 1 (Sep. 24, 2020).

[11]  *See, e.g.,* Letter from SpaceX to FCC, IBFS File No. SAT-MOD-20200417-00037 and WT Docket RM-11768 (Dec. 28, 2020), Att. at 2 (claiming various benefits derived from the "955 Starlink satellites launched across 15 missions as of November 2020") ("SpaceX Dec. 28 Letter"). Particularly considering SpaceX's own advocacy, Viasat is not aware of any

4

when considering the public interest harms associated with Starlink.  Only SpaceX can explain the aberrant performance and orbital behavior of over 8% of its satellites launched to date.

Failed satellites that have no ability to maneuver or avoid collisions with orbital debris, active satellites, or each other pose significant risks to space safety.  Viasat has raised valid questions about the root cause(s) of these failures and what SpaceX is doing to address its flawed system design and/or construction,[12] but SpaceX has steadfastly refused to provide answers. Viasat can only hope that SpaceX's recent letter signals a newfound willingness to clarify the nature of its operations.

### A.    SpaceX incorrectly assumes that NGSO operations at higher altitudes pose greater levels of persistent risk than operations at lower altitude—ignoring significant complexities in the orbital environment

SpaceX asks the Commission to assume a direct correlation between the altitude at which an NGSO system operates and the risk of collision involving that system—*i.e.,* SpaceX advocates a metric at which operations at higher altitude would be assumed to pose greater risk. But SpaceX ignores significant complexities in the orbital environment, which render this approach deeply flawed, above and beyond its obvious self-serving nature.

As an initial matter, SpaceX's assertion that lower altitudes are less congested with space objects is simply incorrect.  Figure 1 shows the number of tracked debris objects and rocket bodies by 100-km altitude bin based on Space-Track data as of January 6, 2021.  These objects typically exceed 10 cm, and a satellite collision with any one of them would be catastrophic, fragmenting the satellite and creating more debris.  As reflected in Figure 1, there are more tracked non-maneuverable objects in the 500-km to 600-km bin in which SpaceX plans to operate (495) than in either of the bins around 1,300-km where Viasat plans to operate (374 and 237).

Moreover, Figure 1 reflects over 7,000 debris objects in the 600 to 1000-km bins that would deorbit through the 500-600 km range in which Starlink satellites would operate, creating significant collision risks.  Systems operating at higher altitudes do not face this risk to nearly the same extent.  For example, there are only around 1,000 LEO debris objects above Viasat's proposed 1,300 km altitude, and it will take well over 100 years before those deorbiting debris objects could pose a potential risk to Viasat's satellites.

---

valid basis for ignoring the v0.9 Starlink satellites (the first 60) when conducting a failure analysis, but even under such an approach, Starlink has suffered a 2.8% failure rate.

[12]    *See* Letter from Viasat to FCC, IBFS File No. SAT-MOD-20200417-00037 and IB Docket No. 18-313, Annex (Dec. 21, 2020); *see also* Petition to Deny or Defer of Viasat, Inc, IBFS File No. SAT-MOD-20200417-00037 (Jul. 13, 2020); Reply of Viasat, Inc. in Support of Its Petition to Deny or Defer, IBFS File No. SAT-MOD-20200417-00037 (Aug. 7, 2020) ("Viasat Reply").



**Figure 1 – LEO Tracked Debris Objects (including Rocket Bodies) by Altitude Bin**

Not only is SpaceX incorrect in saying that the lower altitudes are less congested with space debris, but SpaceX does not factor in the additional collision risk posed by the satellites in proposed LEO constellations. Figure 2 compares estimated collision rates by altitude based on actual orbital objects in October 2019 and the estimated altitude-based collision rates taking into account the proposed LEO constellations (including Starlink). Note that the scales are different—the estimated collision rate in the 400 to 600-km regions *increases by approximately a factor of 250* when these new satellite constellations are introduced. At bottom, the collision risk is lower at higher altitudes because the orbital objects at those altitudes are further dispersed and there are few satellites operating in those regions. Also note that "satellites flown by the same operator were eliminated from encounter rate estimates in anticipation that an operator will properly ensure that their own spacecraft will not collide with each other."[13] This risk is discussed further below.

---

[13] Salvatore Alfano, Daniel L. Oltrogge, and Ryan Shepperd, *LEO Constellation Encounter and Collision Rate Estimation: An Update*, 2nd IAA Conference on Space Situational Awareness (ICSSA), Washington D.C., USA, IAA-ICSSA-20-0021.

6



Fig. 2 Annual collision rates for October 29, 2019, 18 SPCS RSO catalogue



Annual collision rates (includes October 29, 2019 catalogue and proposed constellations)

**Figure 2 – Estimated Collision Rates Before and After Launch of Proposed LEO Constellations[14]**

Also incorrect is SpaceX's assertion that Starlink satellites operating at ~550 km decay in "just a few years" and thus do not pose significant risk.[15]  As Viasat noted in its December 2, 2020 submission, these objects pose significant collision risk for as long as they remain in orbit—*e.g.*, in the case of a failed Starlink satellite that is incapable of maneuvering and avoiding potential collisions—which could be as long as 6 years.[16]  And when they do collide and fragment, these failed satellites have the potential to create large debris fields that will remain in orbit *for decades or even a century of more* (as reflected in the following Table 2):

---

14    *Id.*

15    SpaceX Dec. 30 Letter at 2.

16    *See* Viasat Dec. 2 Letter at 2; *see also* Viasat Reply at 9-11.

7

| Apogee (km) | Decay Time |
|---|---|
| 550 | 13.7 years |
| 650 | 17.8 years |
| 750 | 28.6 years |
| 850 | 42.9 years |
| 950 | 59.9 years |
| 1050 | 79.7 years |
| 1150 | 96.5 years |
| 1250 | > 100 years |
| 1350 | > 100 years |

**Table 2: Passive Decay Times for Collision Fragments in
Various LEO Orbits with 550 km Perigee[17]**

In addition, SpaceX's approach ignores the complex interplay between operations at different altitudes, and how the operations of one system can impact the collision risks faced by other systems (at much higher or lower altitudes).  Notably, a fragmentation event in LEO can be expected to create a significant number of debris objects that will impact altitudes over hundreds of kilometers—not just those at the collision altitude.  For example, the entirely unexpected February 10, 2009 Iridium-33/Cosmos-2251 collision created 2,294 trackable debris objects, 1,396 of which remain in orbit 12 years later.[18]  These debris objects were spread to orbits over 800-km higher, as shown in Figure 3.

---

[17]   *See id.* at 9-15.  The decay times in this table are computed assuming a 550-km perigee and 0.01 m²/kg area-to-mass ratio for fragmentation debris created in 2020.  The lower area-to-mass ratio typical of fragmentation debris results in a much longer decay time compared to that of an intact Starlink satellite.

[18]   *See* https://fragmentation.esoc.esa.int/home/statistics (last visited Jan. 7, 2021).

8



**Figure 3 – Spread of Debris from Iridium-33/Cosmos-2251 Collision[19]**

The following Table 3 was prepared using DAS as detailed in Attachment 1, Annex A. It compares the average probability of per satellite large object collisions, the expected number of collisions per constellation over satellite lifetime, and the mean time between collisions for various SpaceX constellations, and for the Viasat LEO constellation. It is seen that SpaceX's system has become more dangerous after each constellation modification, from an average of one collision every 5.1 years to one every 3.7 years. Viasat's LEO is seen to be over 40 times safer, with an average of one collision every 190 years.

|  | Average Probability | Expected Collisions | Mean Time Between Collisions |
|---|---|---|---|
| SpaceX 2016 | 2.22E-04 | 0.98 | 5.1 years |
| SpaceX 2018 | 2.67E-04 | 1.18 | 4.3 years |
| SpaceX 2020 (pending) | 3.07E-04 | 1.35 | 3.7 years |
|  |  |  |  |
| Viasat LEO 288 | 1.37E-04 | 0.04 | 190 years |

**Table 3 – Average Probability of Per Satellite Large Object Collisions, Expected Number of Collisions Per Constellation over Satellite Lifetime, and Mean Time Between Collisions**

Notably, the issues discussed above, and in the following sections, include short- to medium-term effects on space and access to space by other satellite systems that operate outside the Starlink orbits. They go to the heart of the reason that the Commission made the policy

---

[19]  Plotted from 6 January 2021 Space-Track data.

decision to regulate orbital debris and collision risk almost 17 year ago.[20]  They are issues, however, that the Commission still has not addressed almost three years after issuing SpaceX its conditional license.[21]

**B.    SpaceX fails to account for the most salient factors impacting the "true cost of persistent debris"—including intra-system collision risk**

Any metric designed to account for the "true cost of persistent debris" should account for the most salient factors impacting that cost.  It is curious, then, that SpaceX does not account for *intra*-system collision risk in its advocacy.

Intra-system collision risk—*i.e.,* the risk that two or more satellites within a single system will collide—is not incorporated into the DAS model.  Yet, as the record reflects, this risk is a significant component of the total collision risk posed by an NGSO system consisting of many thousands of satellites.

Intra-system collision risk can be calculated by applying the kinetic theory of gases (see Attachment 1, Annex B for a more fulsome explanation).  Notably, there is significant literature supporting this approach (which is not the case with respect to the use of the "aggregate risk metric" proposed by SpaceX).  This methodology was used to estimate intra-system collision rates for the original, modified, and proposed SpaceX NGSO systems.  The results are shown in Table 4.

| Constellation | Expected Collisions Per Year | Mean Time Between Expected Collisions |
|---|---|---|
| SpaceX 2016 | 11.5 | 0.087 years (32 days) |
| SpaceX 2018 | 12.6 | 0.080 years (29 days) |
| SpaceX 2020 (pending) | 14.5 | 0.069 years (25 days) |
| Viasat LEO (pending) | 0.077 | 13.03 years |

**Table 4 – Estimated Number of Intra-System Collisions Per Year**

Significantly, it is seen that SpaceX's system has become more dangerous after each constellation modification, from an average of one collision every 32 days to one every 25 days.  Viasat's LEO is seen to be almost 200 times safer, with an average of one collision every 13

---

[20]   *See Mitigation of Orbital Debris*, 17 FCC Rcd 5586 (2004).

[21]   *Cf. Space Exploration Holdings, LLC*, IBFS File No. SAT-MOD-20200417-00037, DA 21-34, at ¶¶ 12 &40t (asserting that partial grant of authority to SpaceX "does not implicate" orbital debris concerns raised by commenting parties, and requiring SpaceX to obtain approval of an updated orbital debris mitigation plan before updating any other satellites) (Jan. 8, 2021); *SpaceX Initial Authorization Order* ¶¶ 40p & r.

years.  While this approach to estimating collision rates is known to be conservative, it is an established and empirically sound basis on which to compare the relative risk presented by the two systems, including the prior and current Starlink designs.  The key takeaways are that SpaceX is not improving safety with its modifications, and that SpaceX's systems with 4,408 satellites between 500- and 600-km altitudes has a two orders of magnitude higher intra-system collision rate than Viasat's 288 satellites at 1,300-km.

    **C.**    **SpaceX ignores the risks associated with unprecedented number of conjunction events associated with its proposed NGSO system**

As Viasat has previously demonstrated, the massive nature of the Starlink system leads to an enormous number of predicted conjunction events with space objects—potential collisions that must be monitored, evaluated, and, in many cases, avoided by effectively and reliably maneuvering the satellite (and not moving into the path of another space object and causing another collision in doing so).

Table 5 compares the estimated yearly warnings, avoidance maneuvers, and "collisions not avoided"[22] with mean-time-between-collisions (MTBC) for the original (SpaceX 2016), modified (SpaceX 2018), and modification pending (SpaceX 2020) SpaceX constellations and for Viasat's pending modified constellation.  As detailed in Attachment 1, Annex C, these estimates were computed using the current catalog of 19,697 resident space objects that are 10 cm or larger in size and can result in "catastrophic" collisions[23] that would fragment the Starlink satellites.  Notably, these estimates do not account for the significant growth in space objects in LEO that will be seen as proposed LEO constellations deploy.  When all relevant factors are considered, the inescapable conclusion is that the numbers of warnings, maneuvers, and "collisions not avoided" increase with each SpaceX constellation modification.  In all cases, they are significantly higher than those for the Viasat constellation.

---

[22]    The number of "collisions not avoided" is calculated taking into account that when a large number of conjunction alerts are not acted upon because they have a low probability of resulting in collisions, the cumulative collision risk can be significant.

[23]    *See, e.g.,* R. Thompson, *A Space Debris Primer*, Crosslink (Fall 2015), at 5 (explaining that the impact from an object 10 cm and larger in diameter is the equivalent of a bomb blowing up inside the spacecraft); *see also* Comments of Viasat, Inc., IB Docket No. 18-313, Section III (Oct. 9, 2020).

11

|  | Warnings | Maneuvers | Collisions Not Avoided | MTBC |
|---|---|---|---|---|
| SpaceX 2016 | 216,602 | 24,067 | 1.9/year | 0.52 years |
| SpaceX 2018 | 1,019,029 | 113,226 | 9.1/year | 0.11 years |
| SpaceX 2020 (pending) | 1,223,832 | 135,981 | 10.9/year | 0.09 years |
|  |  |  |  |  |
| Viasat LEO 288 (pending) | 7 | 1,900 | 0.15/year | 6.58 years |

**Table 5 – Number of Encounters Assessment Tool (NEAT) Yearly Estimates forSpaceX and Viasat LEO Constellations[24]**

Of course, both SpaceX and Viasat can be expected to initiate avoidance maneuvers as appropriate. With the pending modification, SpaceX could expect to receive over 3,350 warnings per day, over 370 of which might require planning and execution of avoidance maneuvers. In comparison, Viasat could expect to receive around 46 warnings per day, around 5 of which might require avoidance maneuvers.

Even if SpaceX could process 2.5 warnings per minute, and plan and actually execute an avoidance maneuver every four minutes, that leaves over 1 million warnings per year that would not be acted upon. The inherent uncertainty with orbit predictions means that some collisions still could occur even where avoidance maneuvers are not effectuated. Even using a very low maneuver threshold for a conjunction alert of a 0.00001 (1 in 100,000) probability of collision, with over 1 million alerts per year not acted upon, SpaceX would experience an average of 10.9 collisions per year, as detailed in Attachment 1, Annex C. That means 163 collisions could be expected over a 15-year license term, even if one assumes 100% reliability of the Starlink collision avoidance capability, which we know is not the case, given its experiential failure rate.

The ability to execute an avoidance maneuver requires that a Starlink satellite have reliable and effective maneuverability and TT&C during its entire orbital lifetime. Once a Starlink satellite loses reliable and effective maneuverability capability or TT&C, it is a collision risk until it passively deorbits. And as SpaceX's own calculations demonstrate, one of its failed satellites can remain in orbit for up to six years.[25] Furthermore, as is clear from the available evidence, a staggering number of Starlink satellites have failed, many of the failed satellites are or were not maneuverable, and a number of other Starlink satellites in orbit are exhibiting odd orbital behavior. Neither the Commission nor outside observers of the Starlink system know the reason that SpaceX has not been able to achieve the level of reliability it promised the Commission.[26]

---

[24]  *See supra* n.6.

[25]  *See* Reply of Viasat, Inc. in Support of its Petition to Deny or Defer, IBFS File No. SAT-MOD-20200417-00037, at 11 (Aug. 7, 2020).

[26]  *See, e.g.*, Letter from SpaceX to FCC, IBFS File No. SAT-LOA-20161115-00118, at 4 (filed April 20, 2017) (representing that "SpaceX will construct its spacecraft to specifications and tolerances to ensure that failure rates are nowhere near the [1, 5 or 10 percent] levels

12

There is no good reason to continue to speculate about the reliability or effectiveness of the maneuverability capability of *any* Starlink satellite.  SpaceX relies on of all of its 955 satellites lauched to date in asserting the public interest benefits of its system.[27]  The failures and unreliability experienced with each satellite within that 955 total correspondingly must be evaluated as part of the public interest analysis that the Commission is obligated to conduct.  Consistent with its responsibilities, the Commission must independently investigate the circumstances surrounding the failures and unreliability of the Starlink satellites.

Moreover, under these circumstances there would be no basis on which to assume that the risk of a Starlink satellite colliding with another space object 10 cm or larger is zero or near zero.

### D.    The specific "aggregate risk years" metric proposed by SpaceX is highly flawed and arbitrary

In addition to all of the foregoing issues, the newly proposed metric—"aggregate risk years"—on which SpaceX relies has no basis in the Commission's rules, NASA's standards, or readily available scientific literature.  Notably, SpaceX does not specify any methodology for calculating this bespoke metric, let alone justify any such methodology or the underlying components.  Instead, SpaceX employs an unsubstantiated approach that minimizes the calculated risk posed by its own NGSO system, while unfairly depicting the risk posed by Viasat's proposed NGSO system or any other NGSO system operating at about 1,000 km.

Tellingly, SpaceX does not even calculate its own baseless metric in a consistent manner.  In footnote 6 of its letter, SpaceX uses the following formula to calculate the "aggregate risk years" for Starlink:

(1 – reliability factor) x (DAS calculated risk) x (some number of years) x (number of satellites)

But SpaceX inexplicably adds a factor of 200 when computing "aggregate risk years" for the Viasat system—which of course has the effect of artificially inflating the value SpaceX presents for Viasat's case.  Specifically, footnote 7 of its letter uses the following formula to calculate "aggregate risk years" for Viasat:

(1 – reliability factor) x (**200 x** DAS calculated risk) x (some number of years) x (number of satellites).[28]

---

postulated in this question."); Letter from SpaceX to FCC, IBFS File No. SAT-LOA-20170301-00027, at 6-7 (Jul. 17, 2017) (assuming a failure rate of 1%, and explaining that a higher failure rate is "highly unlikely").

[27]  *See, e.g.,* SpaceX Dec. 28 Letter, Att. at 2 (claiming various benefits derived from the "955 Starlink satellites launched across 15 missions as of November 2020").

[28]  In footnote 7 of its letter, after stating that the "DAS-calculated Large Object Collision Risk" for Viasat's system is 3.11e-04, SpaceX uses a value of 6.22e-02 in its formula, 200 x 3.11e-

And SpaceX otherwise uses overly favorable parameters in calculating "aggregate risk years" for its own Starlink system.  For example, SpaceX uses a DAS-calculated large object collision risk of 9.34e-5, even though the actual constellation-average per-satellite value is 30.7e-5—a factor of 3.3 larger.[29]  SpaceX also assumes an average decay time of 1.72 years, when the actual value (averaging over solar cycles and orbit altitude) is around 3.5 years—a factor of 2 larger.  Furthermore, SpaceX assumes a 98% reliability factor (2% failures over lifetime), while the experiential failure rate is 8.3% (when the v0.9 satellites are included as they are for SpaceX's other public interest advocacy)[30] at less than one fifth of average design lifetime.  This is larger by a further factor of *4*.  If these corrected Starlink parameters are plugged into the formula used in footnote 7, the calculated "aggregate risk years" value is 74, compared to the 0.014 value calculated in footnote 6.  Put simply, SpaceX appears to have underrepresented the risk of its system by a factor of 5,200, even under its bespoke metric.

Although Viasat believes the "aggregate risk years" metric is of little value in any event, SpaceX's lack of integrity in applying its own flawed metric is very concerning.

<div align="center">*        *        *        *        *</div>

For the reasons set forth herein and in Viasat's letter of December 2, 2020, the Commission should reject the "aggregate risk years" proposal advanced by SpaceX.  Instead, the Commission should apply the 0.001 collision probability limit on an aggregate basis, as proposed by the Commission and supported by Viasat and other parties.  The Commission also should require SpaceX to address the many unanswered questions on the record about the design, manufacturing, and operation of its system.[31]

<div style="margin-left: 40%;">

Respectfully submitted,

_____/s/_____

Amy R. Mehlman
Vice President
US Government Affairs and Policy

Jarrett S. Taubman
Associate General Counsel
Government and Regulatory Affairs

</div>

---

04 = 6.22e-02.  SpaceX provides no explanation for the factor of 200 and does not use it in footnote 6 of its letter with respect to its own system.  As explained in Attachment A, Annex A, Viasat calculates a DAS value of only 1.37e-04 for its NGSO system.

[29]  *See* Attachment 1, Annex A.  These values are calculated using the latest, 16 December 2020, solar flux table and a January 2021 launch date for comparison purposes.

[30]  *See supra* n.11 and accompanying text.

[31]  *See* Letter from Viasat to FCC, IBFS File No. SAT-MOD-20200417-0037, Annex (Dec. 22, 2020).

<div align="center">14</div>

**Attachment**
**SpaceX Modifications Increase Collision Risk**

SpaceX claims that each of its modifications has increased space safety.[1] This is not the case; in fact, each of the SpaceX modifications has reduced space safety, increasing collision risk. SpaceX has also claimed that its constellation poses less risk than Viasat's. Again, this is not the case. The Viasat constellation is safer, and poses lower collision risk. Further, the Commission's recent decision to allow SpaceX to launch 10 satellites into sunsynchronous orbit has decreased space safety, and increased collision risk.

The original (SpaceX 2016), modified (SpaceX 2018), and modification pending (SpaceX 2020) SpaceX constellation orbits are shown in **Table 1**. Viasat's pending modified constellation consists of 288 satellites in planes at 1,300-km altitude and 45° inclination.

**Table 1 – SpaceX Constellation Configurations**

| Number of Satellites | Inclination | Altitude | SpaceX 2016 | SpaceX 2018 | SpaceX 2020 (pending) |
|---|---|---|---|---|---|
| 1600 | 53° | 1150 km | X | | |
| 1600 | 53.8° | 1110 km | X | X | |
| 400 | 74° | 1130 km | X | X | |
| 375 | 81° | 1275 km | X | X | |
| 450 | 70° | 1325 km | X | X | |
| 1584 | 53° | 550 km | | X | X |
| 1584 | 53.2° | 540 km | | | X |
| 720 | 70° | 570 km | | | X |
| 520 | 97.6° | 560 km | | | X |
| Total Number of Satellites | | | 4,425 | 4,409 | 4,408 |

This paper evaluates four metrics and compares them for the various constellations. The metrics are:

1. DAS calculated per satellite probability of large object (> 10 cm) collision, weighted average over the various shells of each constellation (see Annex A).
2. Expected number of collisions for each constellation, and the associated mean-time-between collisions (MTBC), based on DAS calculated probability of large object collisions (see Annex A).
3. Expected intra-system collision (self-collision) rate, and the associated MTBC, based on the kinetic theory of gases (see Annex B).

---

[1] *See. e.g.,* IBFS File No. SAT-MOD-20200417-00037, Narrative at ii (Apr. 17, 2020), (claiming that SpaceX's commitment to maintaining a clean orbital environment was a key driver behind its initial modification to lower its initial deployment and its decision to develop and deploy spacecraft with allegedly "no calculated casualty risk," and that the pending modification application seeks to "double down on the benefits of the lower altitude"). As detailed below, these assertions simply are not true.

4. Expected number of collisions, and MTBC, occurring considering low probability collision conjunction alerts that are not acted upon, based on NEAT calculations (see Annex C).

The metrics are compared in **Table 2**. For each metric it is seen that each SpaceX modification has increased, not decreased, collision risk. Also, it is seen that for each metric, the modified (pending) Viasat constellation poses significantly less collision risk than any of the SpaceX constellations.

**Table 2 – SpaceX Constellation Mods Reduce Space Safety and Viasat Constellation is Safer**

| | DAS | | Kinetic Theory | NEAT |
|---|---|---|---|---|
| Constellation | Average Large Object Collision Probability | Expected Large Object Collisions Over Lifetime (MTBC) | Expected Intra-System Collisions Per Year (MTBC) | Expected Collisions Per Year Not Avoided (MTBC) |
| SpaceX 2016 | 2.22E-04 | 0.98 (5.1 years) | 11.5 (32 days) | 2.93 (0.52 years) |
| SpaceX 2018 | 2.67E-04 | 1.18 (4.3 years) | 12.6 (29 days) | 9.06 (0.11 years) |
| SpaceX 2020 (pending) | 3.07E-04 | 1.35 (3.7 years) | 14.5 (25 days) | 10.88 (0.09 years) |
| | | | | |
| Viasat LEO 288 (pending) | 1.37E-04 | 0.04 (190 years) | 0.077 (13 years) | 0.152 (6.58 years) |

The impact on space safety of relocating 10 SpaceX satellites from their original orbits to the 560-km, 97.6° shell is shown in **Table 3**. Regardless of which of the four planes they were moved from, risk increased. Specifically, all depending on which planes they were moved from:

- The DAS calculated large object collision probability and expected number of large object collisions over lifetime increased by a factor of 2.2 to 4.4.
- The expected number of intra-system collisions increased by a factor of 1.1 to 1.3.
- The expected number of collisions per year not avoided increased by a factor of 1.9 to 5.8.

While the magnitudes of these impacts, in terms of collisions per year, are small,[2] they are all in the same direction, and confirm that relocating the 10 satellites increased overall collision risk.

---

[2] Of course, the reason the magnitude of the impact is small is because only 10 satellites are involved. If operators of proposed mega-constellations were to scale those constellations down in size by two to three orders of magnitude, the space safety risk would be mitigated.

Att-2

**Table 3 – Relocation of 10 SpaceX Satellites Decreased Space Safety Regardless of Which Shell They Were Moved From**

| | DAS | | Kinetic Theory | NEAT |
|---|---|---|---|---|
| Shell | Large Object Collision Probability | Expected Large Object Collisions Over Lifetime (MTBC) | Expected Intra-System Collisions Per Year (MTBC) | Expected Collisions Per Year Not Avoided (MTBC) |
| 1,110-km, 53.8° | 2.64e-4 | 0.0026 (1,893 years) | 0.00021 (4,839 years) | 0.0046 (218 years) |
| 1,130-km, 74° | 2.80e-4 | 0.0028 (1,787 years) | 0.00019 (5,129 years) | 0.0059 (169 years) |
| 1,275-km, 81° | 2.15e-4 | 0.0022 (2,323 years) | 0.00019 (5,391 years) | 0.0069 (145 years) |
| 1,325-km, 70° | 1.50e-4 | 0.0015 (3,338 years) | 0.00018 (5,451 years) | 0.0023 (432 years) |
| | | | | |
| 560-km, 97.6° (New shell) | 4.41e-4 | 0.0044 (1,133 years) | 0.00024 (4,219 years) | 0.0133 (75 years) |

Att-3

**Annex A**
**DAS Calculated Large Object Collisions**

An intact satellite represents a relatively small collision risk to other users of space. A satellite fragmented by catastrophic collision presents a risk that can be orders of magnitude larger. Because of the high typical collision velocities (around 10 km/s in LEO), LEO satellite collisions with large debris objects (diameter ≥10 cm) are likely to cause catastrophic collisions.[3]

By keeping the uniform probability of collision with other large objects less than 0.001, NASA attempts to achieve its goal that the average probability will be less than $10^{-6}$ of any individual operating satellite colliding with a fragment >1 mm from a prior collision.

NASA's Debris Assessment Software (DAS) [4] provides a means of calculating the probability of accidental collision between an individual satellite and known resident space objects (RSOs) during that satellite's orbital lifetime. DAS does not calculate the risk of intra-system collisions. It also does not forecast expected growth in debris flux from future intra- and inter-system collisions. In order to assess the risk presented by a multi-satellite constellation, the individual contributions must be combined.

The probability of an individual LEO satellite being hit by an intact structure or large debris object (> 10 cm) during its orbital lifetime is approximated by:

$$P = F \times A \times T$$

where

F is the weighted cross-sectional area orbital debris environment flux (number/m$^2$)

A is the average satellite cross-sectional area (m$^2$)

T is the orbital lifetime in years.

The weighted cross-sectional area flux is derived by evaluating the amount of time the satellite spends in different altitudes during its orbital lifetime. This value is determined by DAS given the initial orbit, area-to-mass ratio, and the launch date of the satellite. Station keeping, disposal orbits, and passive decay are modeled by summing the probability of collision evaluated separately for various altitudes.

The following table was prepared using DAS 3.1.1 with the latest, 16 December 2020, solar flux table and a January 2021 launch date. It compares the average probability of per satellite large object collisions, the expected number of collisions per constellation over satellite lifetime, and the mean time between collisions for various SpaceX constellations, and for the Viasat LEO constellation. It is seen that SpaceX's system has become more dangerous after

---

[3]    NASA Technical Standard, Process for Limiting Orbital Debris, NASA-STD-8719.14B, 2019-04-25.

[4]    https://software.nasa.gov/software/MSC-26690-1.

Att-4

each constellation modification, from an average of one collision every 5.1 years to one every 3.7 years. Viasat's LEO is seen to be over 40 times safer, with an average of one collision every 190 years.

**Table 4 – Average Probability of Per Satellite Large Object Collisions, Expected Number of Collisions Per Constellation over Satellite Lifetime, and Mean Time Between Collisions**

|  | Average Probability | Expected Collisions | Mean Time Between Collisions |
|---|---|---|---|
| SpaceX 2016 | 2.22E-04 | 0.98 | 5.1 years |
| SpaceX 2018 | 2.67E-04 | 1.18 | 4.3 years |
| SpaceX 2020 (pending) | 3.07E-04 | 1.35 | 3.7 years |
|  |  |  |  |
| Viasat LEO 288 | 1.37E-04 | 0.04 | 190 years |

The following tables show the expected number of large objects collisions for the SpaceX constellations as they have evolved over time, and for the Viasat LEO constellation. For all constellations, station keeping, 300-km post mission disposal orbit perigee, and January 2021 launch date are assumed.[5] The Starlink satellites are modeled as having 5-year mission life, 260-kg mass, and 0.0974 $m^2$/kg area-to-mass ratio. The Viasat satellites are modeled as having 7.5-years mission life, 300-kg mass, and 0.1-$m^2$/kg area-to-mass ratio. The DAS probabilities are per satellite.

**Table 5 – SpaceX 2016 Constellation: Expected Number of Large Object Collisions**

| Number of Satellites | Inclination | Altitude | DAS Probability | Collisions |
|---|---|---|---|---|
| 1600 | 53° | 1150 km | 1.89E-04 | 0.30 |
| 1600 | 53.8° | 1110 km | 2.64E-04 | 0.42 |
| 400 | 74° | 1130 km | 2.80E-04 | 0.11 |
| 375 | 81° | 1275 km | 2.15E-04 | 0.08 |
| 450 | 70° | 1325 km | 1.50E-04 | 0.07 |
|  |  |  | TOTAL | 0.98 |

**Table 6 – SpaceX 2018 Constellation: Expected Number of Large Object Collisions**

| Number of Satellites | Inclination | Altitude | DAS Probability | Collisions |
|---|---|---|---|---|
| 1584 | 53° | 550 km | 2.74E-04 | 0.43 |
| 1600 | 53.8° | 1110 km | 2.64E-04 | 0.42 |
| 400 | 74° | 1130 km | 3.88E-04 | 0.16 |
| 375 | 81° | 1275 km | 2.15E-04 | 0.08 |
| 450 | 70° | 1325 km | 1.89E-04 | 0.08 |
|  |  |  | TOTAL | 1.18 |

---

[5] Same start date is used for comparative purposes, to ensure consistency in results.

Att-5

**Table 7 – SpaceX 2020 (proposed) Constellation: Expected Number of Large Object Collisions**

| Number of Satellites | Inclination | Altitude | DAS Probability | Collisions |
|---|---|---|---|---|
| 1584 | 53° | 550 km | 2.74E-04 | 0.43 |
| 1584 | 53.2° | 540 km | 2.59E-04 | 0.41 |
| 720 | 70° | 570 km | 3.88E-04 | 0.28 |
| 520 | 97.6° | 560 km | 4.41E-04 | 0.23 |
| | | | TOTAL | 1.35 |

**Table 8 – Viasat LEO (proposed) Constellation: Expected Number of Large Object Collisions**

| Number of Satellites | Inclination | Altitude | DAS Probability | Collisions |
|---|---|---|---|---|
| 288 | 45° | 1270 km | 1.37E-04 | 0.04 |

Att-6

A294

## Annex B
## Application of Kinetic Theory of Gases to
## Estimating LEO Constellation Self Collision Rates

The kinetic theory of gases has long been used to estimate satellite collision rates, see references below. This technique can also be applied to estimating the intra-system (self) collision rate of a LEO mega constellation. The collision rate (collisions per year) is estimated by:

$$F = C \times N \times D \times v \times \sigma$$

where

C = 31,536,000 is the number of seconds in a year

N is the number of satellites in the shell

$D = N/V$ is the density of satellites in the shell (km$^{-3}$)
- $V = \pi/3 \times (R_2^3 - R_1^3) \times (4 - 2(2 + \sin i)(1 - \sin i)^2)$ is the shell volume (km$^3$)
  - $R_1$ and $R_2$ are the min and max orbit radii, respectively, (km)
  - $i$ is the orbit inclination

$v = \sqrt{2\mu/R}$ is the average relative velocity of the satellites (km/s)
- $\mu = 398,600$ (km$^3$/s$^2$) is the Earth's gravitational parameter
- $R = (R_1 + R_2)/2$ is the average orbital radius (km)

$\sigma = 4\pi r^2$ is the collision cross-section (km$^2$)
- r is the satellite's hard body radius (km)

The following tables show the results of applying this estimate to the various SpaceX constellations, and to the Viasat LEO constellation.

**Table 9 – SpaceX 2016 Constellation Estimated Intra-System Collision Rate**

| Number of Satellites | Inclination | Min Shell Altitude | Max Shell Altitude | Hard Body Radius | Collision Rate |
|---|---|---|---|---|---|
| 1600 | 53° | 1120 km | 1180 km | 4.5 m | 5.2/year |
| 1600 | 53.8° | 1080 km | 1140 km | 4.5 m | 5.3/year |
| 400 | 74° | 1100 km | 1160 km | 4.5 m | 0.3/year |
| 375 | 81° | 1245 km | 1305 km | 4.5 m | 0.3/year |
| 450 | 70° | 1295 km | 1355 km | 4.5 m | 0.4/year |
| | | | | TOTAL | 11.5/year |

Att-7

**Table 10 – SpaceX 2018 Constellation Estimated Intra-System Collision Rate**

| Number of Satellites | Inclination | Min Shell Altitude | Max Shell Altitude | Hard Body Radius | Collision Rate |
|---|---|---|---|---|---|
| 1584 | 53° | 520 km | 580 km | 4.5 m | 6.3/year |
| 1600 | 53.8° | 1080 km | 1140 km | 4.5 m | 5.3/year |
| 400 | 74° | 1100 km | 1160 km | 4.5 m | 0.3/year |
| 375 | 81° | 1245 km | 1305 km | 4.5 m | 0.3/year |
| 450 | 70° | 1295 km | 1355 km | 4.5 m | 0.4/year |
| | | | | TOTAL | 12.6/year |

**Table 11 – SpaceX 2020 (proposed) Constellation Estimated Intra-System Collision Rate**

| Number of Satellites | Inclination | Min Shell Altitude | Max Shell Altitude | Hard Body Radius | Collision Rate |
|---|---|---|---|---|---|
| 1584 | 53° | 520 km | 580 km | 4.5 m | 6.3/year |
| 1584 | 53.2° | 510 km | 570 km | 4.5 m | 6.3/year |
| 720 | 70° | 540 km | 600 km | 4.5 m | 1.2/year |
| 520 | 97.6° | 530 km | 590 km | 4.5 m | 0.6/year |
| | | | | TOTAL | 14.5/year |

**Table 12 – Viasat LEO (proposed) Constellation**

| Number of Satellites | Inclination | Min Shell Altitude | Max Shell Altitude | Hard Body Radius | Collision Rate |
|---|---|---|---|---|---|
| 288 | 45° | 1270 km | 1330 km | 3 m | 0.077/year |

References

1. Diserens, Samuel, Hugh G. Lewis, and Joerg Fliege. "Assessing collision algorithms for the newspace era." Journal of Space Safety Engineering 7.3 (2020): 274-281.

2. Frey, Stefan, and Camilla Colombo. "Transformation of satellite breakup distribution for probabilistic orbital collision hazard analysis." Journal of Guidance, Control, and Dynamics (2020): 1-18.

3. Liou, J-C. "Collision activities in the future orbital debris environment." Advances in Space Research 38.9 (2006): 2102-2106.

4. McCormick, Bernell. "Collision probabilities in geosynchronous orbit and techniques to control the environment." Orbital Debris from Upper Stage Breakup. Vol. 121. AIAA New York, 1989. 187-197.

5. McKnight, Darren Scott. "Examination of possible collisions in space." Acta Astronautica 26.7 (1992): 497-500.

6. McKnight, Darren S., and Phillip D. Anz-Meador. "Historical growth of quantities affecting on-orbit collision hazard." Journal of Spacecraft and Rockets 30.1 (1993): 120-124.

7. McKnight, Darren S., and Frank R. Di Pentino. "New insights on the orbital debris collision hazard at GEO." Acta Astronautica 85 (2013): 73-82.

8. Sehnal, L. "Probability of collisions of artificial bodies in the earth environment." Advances in Space Research 5.2 (1985): 21-24.

## Annex C
## Use of NEAT to Estimate Collisions Resulting from Low Probability Conjunction Alerts

The Number of Encounters Assessment Tool (NEAT) was developed by AGI and assesses collision risk by adjusting key constellation parameters to estimate conjunction warnings, maneuvers, and collisions.[6] **Table 13** compares the estimated yearly warnings, avoidance maneuvers, and collisions not avoided with mean-time-between-collisions (MTBC). It was computed using NEAT with the 19,697-current catalog of resident space objects and does not account for the significant growth that will be seen as proposed mega constellations deploy.

The warnings and maneuver thresholds were set to 3 km and 1 km, respectively. The number of "collisions not avoided" is calculated assuming that all avoidance maneuvers are successful, and that the probability of collision for the warnings that do not result in maneuvers is $10^{-5}$ (0.00001).

The numbers of warnings, maneuvers, and collisions-not-avoided increase with each modification. In all cases, they are significantly higher than those for the Viasat constellation.

**Table 13 – Comparison of Estimated Yearly Warnings, Avoidance Maneuvers, Collisions not Avoided, and MTBC**

|  | Warnings | Maneuvers | Collisions Not Avoided | MTBC |
|---|---|---|---|---|
| SpaceX 2016 | 216,602 | 24,067 | 1.9/year | 0.52 years |
| SpaceX 2018 | 1,019,029 | 113,226 | 9.1/year | 0.11 years |
| SpaceX 2020 (pending) | 1,223,832 | 135,981 | 10.9/year | 0.09 years |
|  |  |  |  |  |
| Viasat LEO 288 (pending) | 7 | 1,900 | 0.15/year | 6.58 years |

The following tables show the estimated yearly warnings and avoidance maneuvers for each of the constellations considered.

**Table 14 – SpaceX 2016 Estimated Yearly Warnings and Avoidance Maneuvers**

| Number of Satellites | Inclination | Altitude | Warnings | Maneuvers |
|---|---|---|---|---|
| 1600 | 53 | 1150 | 66,700 | 7,411 |
| 1600 | 53.8 | 1110 | 82,470 | 9,163 |
| 400 | 74 | 1130 | 26,655 | 2,962 |
| 375 | 81 | 1275 | 29,067 | 3,230 |
| 450 | 70 | 1325 | 11,710 | 1,301 |
|  |  | TOTAL | 216,602 | 24,067 |

---

[6]  *See* https://www.agi.com/missions/space-situational-awareness/what-s-the-number-of-encounters-assessment-tool-it.

**Table 15 – SpaceX 2018 Estimated Yearly Warnings and Avoidance Maneuvers**

| Number of Satellites | Inclination | Altitude | Warnings | Maneuvers |
|---|---|---|---|---|
| 1584 | 53 | 550 | 869,127 | 96,570 |
| 1600 | 53.8 | 1110 | 82,470 | 9,163 |
| 400 | 74 | 1130 | 26,655 | 2,962 |
| 375 | 81 | 1275 | 29,067 | 3,230 |
| 450 | 70 | 1325 | 11,710 | 1,301 |
| | | TOTAL | 1,019,029 | 113,226 |

**Table 16 – SpaceX 2020 Estimated Yearly Warnings and Avoidance Maneuvers**

| Number of Satellites | Inclination | Altitude | Warnings | Maneuvers |
|---|---|---|---|---|
| 1584 | 53 | 550 | 869,127 | 96,570 |
| 1584 | 53.2 | 540 | 169,616 | 18,846 |
| 720 | 70 | 570 | 107,070 | 11,897 |
| 520 | 97.6 | 560 | 78,019 | 8,668 |
| | | TOTAL | 1,223,832 | 135,981 |

**Table 17 – Viasat LEO (proposed) Estimated Yearly Warnings and Avoidance Maneuvers**

| Number of Satellites | Inclination | Altitude | Warnings | Maneuvers |
|---|---|---|---|---|
| 288 | 45 | 1300 | 17,100 | 1,900 |

Att-11

**DECLARATION OF MARK A. STURZA**

I, Mark A. Sturza, hereby make the following declarations under penalty of perjury:

1. I am President of 3C Systems Company, which has acted as consultant to Viasat, Inc. ("Viasat") regarding the matters addressed in the foregoing letter.

2. I prepared the engineering information submitted in the foregoing letter and otherwise have reviewed its substance, which is complete and accurate to the best of my knowledge, information and belief.


   /s/

Mark A. Sturza
President
3C Systems Company


January 15, 2021

# EXHIBIT R

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| Application of | ) | |
| | ) | |
| SPACE EXPLORATION HOLDINGS, LLC | ) | Call Signs:  S2983 and S3018 |
| | ) | |
| For Modification of Authorization for the | ) | File No. SAT-MOD-20200417-00037 |
| SpaceX NGSO Satellite System | ) | |
| | ) | |

<u>**REPLY OF VIASAT, INC. IN SUPPORT OF ITS**</u>
<u>**PETITION PURSUANT TO SECTION 1.1307(C)**</u>

## SUMMARY

The National Environmental Policy Act ("NEPA") directs the Commission to "consider every significant aspect of the environmental impact of a proposed action," including with respect to proposed satellite operations. The Council on Environmental Quality ("CEQ"), in implementing NEPA, has similarly required the Commission to consider all reasonably foreseeable effects of any such action. And the Commission's own regulations provide that NEPA review is required where a proposed action "may have a significant environmental impact."

SpaceX proposes to deploy 2,814 new satellites that it is not permitted to operate today at any orbital altitude. As the Commission just confirmed, SpaceX's ability to deploy and operate those satellites depends entirely on Commission action on SpaceX's pending modification application and associated orbital-debris-mitigation plan. Viasat's NEPA petition (which was prompted by studies prepared by independent third parties) establishes that a grant of SpaceX's pending modification application—and the deployment and operation of these new satellites—is likely to cause significant harm to the environment, including by:

- Depleting ozone, contributing to climate change, causing unpredictable changes in atmospheric chemistry, and potentially creating dangerous falling debris from satellites that do not fully burn up on reentry;

- Creating excessive light pollution that would interfere with the ability of astrophotographers, astronomers, and ordinary stargazers to study and enjoy space, and tarnish the beauty of the night sky; and

- Increasing the risk of collisions in orbit and generating excessive space debris that would pollute the orbital environment.

The Commission's obligation to fully evaluate these matters under NEPA, the CEQ's directives, an executive order regarding global commons (such as space), and the Commission's own regulations is clear.

Nevertheless, SpaceX asks the Commission to ignore that obligation and sidestep any NEPA inquiry by simply *assuming* that SpaceX operations at the altitude now proposed would cause less environmental harm than if SpaceX deployed these satellites at a higher altitude. But that is not the evaluation required by NEPA. Because SpaceX may not deploy the 2,814 satellites directly at issue in this proceeding at *any* altitude without further action by the Commission, the relevant question under NEPA is whether permitting SpaceX to deploy and operate those 2,814 new satellites (plus thousands of additional replacement satellites) would create environmental harms that do not exist in the environment today. The answer to that question is a resounding "yes."

Moreover, NEPA requires that the Commission consider the environmental impact of SpaceX's modification application as part of a broader plan to deploy an unprecedented constellation consisting of 42,000 operating satellites in low-Earth orbit. As SpaceX itself has recognized, these 2,814 satellites would be part of an initial phase of 4,408 operating satellites, which alone would require SpaceX to deploy about 10,000 satellites over a 15-year license term (taking into account planned replacements). Considering the full complement of 42,000 operating satellites and their 5-year design life, it is apparent that SpaceX's plans require the deployment and reentry into the atmosphere of *more than 100,000 satellites* in less than two decades. That is about ten times the number of objects mankind has launched into space in over 60 years. Considering the 5-year design life of these satellites, the replenishment of this constellation would require, on average, the deployment of about 9,000 additional SpaceX satellites per year (or 25 per day), and a similar number to be decommissioned by burning up in the atmosphere. Particularly at these levels of environmental activity, there is no basis for making the assumptions SpaceX makes about the absence of harm.

Further, significant record evidence establishes that the deployment and operation of many thousands of Starlink satellites, as proposed in SpaceX's modification application, would result in significant environmental harms. Among this evidence is a recent submission in which Viasat showed, using established third-party metrics and methodologies, that each of SpaceX's changes to the constellation conditionally authorized almost three years ago has increased the risks of certain of these environmental harms—and that the changes proposed in its pending modification application would do the same.

At a minimum, material questions exist on the record with respect to these matters that merit further investigation by the Commission. As such, NEPA requires the Commission to prepare an Environmental Impact Statement ("EIS")—or, at the very least, an Environmental Assessment ("EA")—that fully evaluates all potentially significant impacts of the project and relevant alternatives, including denial of the application and a reduction in the total number of satellites. The Commission should take these steps before it even *considers* granting SpaceX's application.

## TABLE OF CONTENTS

SUMMARY ........................................................................................................ i

INTRODUCTION ............................................................................................. 2

DISCUSSION .................................................................................................... 5

   I.   NEPA Review Is Required if SpaceX's Proposal to Deploy 2,814 Operating Satellites as Part of a Planned 42,000-Satellite System "May Have a Significant Environmental Impact." ..................................................................... 5

      A.  SpaceX Seeks Approval To Deploy Nearly 3,000 New Operating Satellites as Part of a Proposed 42,000-Satellite Fleet. ............................................. 5

         1.  SpaceX Cannot Deploy the Satellites at Issue—at Any Altitude—Unless the Commission Approves This Application and the Associated Orbital Debris Mitigation Plan. .......................................................................... 6

         2.  The Proposed Modification Must Be Analyzed in the Context of SpaceX's Plan To Deploy a 42,000-Satellite Fleet. ................................................. 10

      B.  The Question Before the Commission Is Whether the Proposed Modification "May Have a Significant Environmental Impact." ............................... 13

         1.  Section 1.1307(c) Requires an EA When a Proposed Action May Impact the Environment. .............................................................................. 13

         2.  SpaceX's Proposed Modification Falls Within the Scope of NEPA. .............. 17

  II.  SpaceX's Modification Proposal Would Likely Have a Significant Impact on the Environment. ..................................................................................... 19

      A.  The Increased Number of Satellite Deployments and Reentries Could Harm the Atmosphere, Aircraft, and Humans on Earth's Surface. ........................ 20

         1.  Satellite Deployments and Reentries Could Harm the Atmosphere. .............. 20

         2.  Satellite Reentries Could Impact Aircraft and Harm Humans on Earth's Surface. ................................................................................... 26

      B.  SpaceX's Modification Proposal Would Likely Increase Light Pollution and Astronomical Interference. .............................................................. 27

         1.  The Proposed Modification Would Generate More Light Pollution and Astronomical Interference by Increasing the Number of Satellites in Low-Earth Orbit. ..................................................................................... 28

         2.  The Proposed Modification Would Generate More Light Pollution by Making Starlink Satellites Shine Brighter During Twilight. ............................... 32

      C.  SpaceX's Modification Proposal Would Likely Increase Space Debris. ............ 35

         1.  The Proposed Modification Would Increase Collision Risks. ...................... 36

         2.  SpaceX's Remaining Efforts To Avoid Evaluation of Orbital-Debris Risks Are Meritless. .......................................................................... 38

CONCLUSION ................................................................................................ 40

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

_____

| | | |
|---|---|---|
| Application of | ) | |
| | ) | |
| SPACE EXPLORATION HOLDINGS, LLC | ) | Call Signs:  S2983 and S3018 |
| | ) | |
| For Modification of Authorization for the | ) | File No. SAT-MOD-20200417-00037 |
| SpaceX NGSO Satellite System | ) | |
| _____ | ) | |

**REPLY OF VIASAT, INC. IN SUPPORT OF ITS**
**PETITION PURSUANT TO SECTION 1.1307(C)**

Viasat, Inc. respectfully submits this Reply in Support of Its Petition Pursuant to Section 1.1307(c) ("Viasat NEPA Petition") and requests that the Commission deny or defer consideration of the above-referenced modification application of SpaceX.  SpaceX's opposition fails to rebut Viasat's showing that approving SpaceX's proposal to deploy nearly 3,000 new operating satellites into low-Earth orbit—part of a broader plan to build out a fleet of 42,000 operating satellites—is an action that "may have a significant environmental impact." 47 C.F.R. § 1.1307(c).  Accordingly, pursuant to NEPA, the Commission should require preparation of an EIS fully evaluating the environmental impacts of SpaceX's proposed action—or at a minimum require preparation of an EA—before acting upon SpaceX's application.

1

## INTRODUCTION

SpaceX urges the Commission to allow it to deploy many thousands of new satellites into low-Earth orbit without even pausing to *consider* the environmental effects of doing so. To support this position, SpaceX misleads as to the impact of granting its application, the requirements of NEPA, and the effects of its proposal. The Commission should reject SpaceX's invitation to shirk NEPA's obligations and instead should prepare an EIS or, at a minimum, an EA evaluating the proposal and potential alternatives.

NEPA requires federal agencies to "consider every significant aspect of the environmental impact of a proposed action." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (internal quotation marks omitted). Viasat's NEPA Petition cites recent studies by well-respected, independent third parties—including Aerospace Corp., NASA, and scientists and researchers at observatories and universities—demonstrating that the environmental effects of granting SpaceX's pending modification application are significant enough to warrant an EIS. At a minimum, these studies raise significant factual questions showing that granting SpaceX's application "may have" a significant impact, 47 C.F.R. § 1.1307(c), and that an EA is therefore required.

SpaceX seeks permission to deploy and operate 2,814 new, operational satellites (plus thousands of replacements) that it is not authorized to deploy and operate *at any orbital altitude* absent further authority from the Commission.[1] Per United Nations data, humans have launched a total of 10,293 *objects*—not limited to satellites—in the entire history of human space

---

[1] SpaceX's modification application seeks approval to deploy 2,824 satellites between 540 and 570 km. Application for Modification of Authorization for SpaceX NGSO Satellite System at 3, IBFS File No. SAT-MOD-20200417-00037 (Apr. 17, 2020). On January 8, 2021, after Viasat filed its NEPA Petition but before Viasat filed this reply, the Bureau granted the application in part to allow SpaceX to deploy 10 of these satellites at 560 km. Order and Authorization ¶ 18, DA 21-34, IBFS File No. SAT-MOD-20200417-00037 (Jan. 8, 2021). This modification application thus now relates to the remaining 2,814 satellites.

2

exploration. U.N. Office for Outer Space Affairs, *Online Index of Objects Launched into Outer Space*, http://www.unoosa.org/oosa/osoindex/search-ng.jspx (last accessed Jan. 19, 2021). Thus, the number of operational satellites covered by this modification application alone exceeds 25% of the total objects launched into space to date. And this application is merely one step toward deploying a fleet of SpaceX satellites of jaw-dropping magnitude: 42,000 operating satellites that, with replenishment, would likely require the deployment of 100,000 satellites. Dave Mosher, *SpaceX May Want to Launch 42,000 Internet Satellites—About 5 Times More Spacecraft than Humanity Has Ever Flown*, Bus. Insider (Oct. 17, 2019), http://www.businessinsider.com/spacex-starlink-internet-satellites-itc-filing-30000-additional-42000-total-2019-10.

SpaceX nevertheless seeks to avoid any inquiry into the environmental impact of introducing thousands of new satellites into orbit, primarily by asserting (incorrectly) that: (i) it is already fully authorized to deploy and operate these satellites; (ii) the pending modification application would merely change the altitude at which those satellites would operate; and (iii) this change, in and of itself, would not have any adverse environmental impact requiring review under NEPA. But none of these assertions is accurate. Contrary to SpaceX's suggestion, SpaceX is not currently permitted to deploy and operate *any* of the 2,814 operating satellites at issue at *any* orbital altitude. The pending application, if approved, would both satisfy an outstanding precondition to the deployment and operation of these satellites (along with thousands of replacements) *and* authorize SpaceX to deploy and operate those satellites at lower orbital altitudes than previously contemplated. When the nature of this application is properly understood, it is clear that NEPA requires the Commission to evaluate the environmental effects of the application and potential alternatives, including a "no-action" alternative in which these additional satellites are not deployed at all, as well as alternatives in which the number of satellites is significantly reduced.

3

A309

Viasat identified at least three broad categories of environmental harms that would result from granting SpaceX's application in full. Each harm is significant enough to independently warrant further environmental review, and SpaceX has not come close to rebutting Viasat's showing that they *may have* a significant environmental impact.

- *First*, granting SpaceX's application would dramatically increase the number of satellite deployments and reentries into the atmosphere, which SpaceX does not deny could negatively affect the atmosphere and increase casualty risks.

- *Second*, granting SpaceX's application would increase light pollution in the night sky and harm astronomical research.

- *Third*, Viasat showed that SpaceX's proposal would increase the risks of collisions and producing orbital debris.

SpaceX's primary response to these points is to misstate the scope of the application before the Commission, and even then SpaceX is unable to show that deploying and operating nearly 3,000 satellites (plus replacements) as proposed does not warrant NEPA review. And SpaceX offers little else of legal substance in its response, resorting to finger-pointing and deflection focusing on other proceedings involving other companies.

The only NEPA question before the Commission is whether approving SpaceX's application "may have a significant environmental impact" in any or all of the ways identified by Viasat. 47 C.F.R. § 1.1307(c). There can be little doubt that it would. Accordingly, NEPA requires the Commission to prepare an EIS—or, at a minimum, an EA—before acting on SpaceX's application.

## DISCUSSION

I.    **NEPA Review Is Required if SpaceX's Proposal to Deploy 2,814 Operating Satellites as Part of a Planned 42,000-Satellite System "May Have a Significant Environmental Impact."**

In its opposition, SpaceX repeatedly mischaracterizes how granting its pending modification application would impact the nature and scope of its planned operations—and thus the "action" that must be evaluated under NEPA.  SpaceX also misrepresents the nature of the inquiry that NEPA requires the Commission to undertake.  A proper NEPA inquiry in this case requires the Commission to consider whether permitting SpaceX to deploy 2,814 new satellites (plus replacements) into low-Earth orbit—as part of a broader plan to deploy an unprecedented fleet of 42,000 operating satellites "may have a significant environmental impact."  47 C.F.R. § 1.1307(c).  There can be no doubt that this deployment would have such an impact if permitted by the Commission.

A.    **SpaceX Seeks Approval To Deploy Nearly 3,000 New Operating Satellites as Part of a Proposed 42,000-Satellite Fleet.**

SpaceX argues that the scope of the Commission's NEPA analysis should be limited to the effects of deploying 2,814 satellites at a newly proposed altitude, instead of the altitudes previously contemplated.  Opposition of Space Exploration Holdings, LLC to Petition Pursuant to Section 1.1307(c) of Viasat, Inc., at 10–11, IBFS File No. SAT-MOD-20200417-00037 (Jan. 6, 2020) ("SpaceX Opposition").  But this argument ignores that SpaceX is not fully permitted at present to deploy *any* of the 2,814 operating satellites at issue here at *any* altitude.  Granting SpaceX's pending modification *would* permit it to deploy those satellites into low-Earth orbit.  Therefore, in evaluating SpaceX's application under NEPA, the Commission must consider the effects of adding these satellites into orbit *in addition to* the effects of deploying them at lower altitudes.  The Commission also must consider this application in the broader context of SpaceX's plans to deploy

5

a mega-constellation of 42,000 operating satellites, of which this tranche is an important component.

      **1.**      **SpaceX Cannot Deploy the Satellites at Issue—at Any Altitude—Unless the Commission Approves This Application and the Associated Orbital Debris Mitigation Plan.**

The SpaceX modification application currently before the Commission seeks approval to deploy and operate 2,824 new operating satellites (now, 2,814, *see supra* n.1) at an orbital altitude of 540–570 km, instead of 1,110–1,325 km, and contains a requisite orbital debris mitigation plan for these satellites.  As Viasat explained, the Commission is therefore required to consider the environmental impacts of permitting thousands of satellites to be deployed at the orbital altitudes at issue.  *E.g.*, Viasat NEPA Petition at ii.  There is little doubt that the introduction of nearly 3,000 new satellites (plus replacements) into low-Earth orbit could significantly impact the environment.

Remarkably, however, SpaceX denies the premise, asserting that approving its application "would not result in the launch of a single additional satellite."  *See* SpaceX Opposition at iii.  This assertion is highly misleading, if not outright false.  Contrary to SpaceX's claim, *see id.* at 10–11, SpaceX is *not* fully permitted to deploy and operate its full Ku/Ka-band constellation of 4,409 satellites.  Under a condition to SpaceX's existing authorization, the Commission must grant a separate modification application (*e.g.*, the pending one) before SpaceX can deploy the 2,814 satellites at issue here.  In short, granting SpaceX's pending modification application and resolving the outstanding condition in its existing authorization undeniably would increase the number of satellites that SpaceX is permitted to deploy, leading to the deployment and reentry into the atmosphere of many thousands of satellites over the course of 15 years.

In its initial grant of authority to SpaceX (which related to 4,425 satellites at an orbital range between 1,110 and 1,325 km), the Commission concluded that "it would be premature to grant SpaceX's application based on its current orbital debris mitigation plan."  *Space Expl.*

*Holdings, LLC*, 33 FCC Rcd. 3391, 3398 (2018).  The Commission therefore decided to "condition [the] grant of SpaceX's application on the Commission's approval of an updated description of the orbital debris mitigation plans for its system."  *Id.*  Specifically, the Commission imposed the following requirement: "Upon finalization of its space station design and prior to initiation of service, SpaceX must seek and obtain the Commission's approval of a modification containing an updated description of the orbital debris mitigation plans for its system, as discussed in paragraph 15 above."  *Id.* at 3407.

In November 2018, SpaceX filed its first modification application seeking approval to modify its NGSO system design to "relocate" 1,584 of its previously authorized satellites to 550 km.  In doing so, SpaceX included an updated orbital debris mitigation plan, cognizant of the need to satisfy the condition to its initial authorization.  *See* Attachment A: Technical Information to Supplement Schedule S at 38–48, IBFS File No. SAT-MOD-20181108-00083 (Nov. 8, 2018).  In granting the requested modification, the Bureau found that the updated "orbital debris mitigation plan" was sufficient *only* "with regard to the [1,584] space stations that SpaceX proposes to operate [at 550 km] under its modification."  *Space Expl. Holdings, LLC*, 34 FCC Rcd. 2526, 2536 (2019).  The Bureau was clear that this approval did *not* extend to the other satellites that would not be operated pursuant to that first modification: "SpaceX must seek and obtain the Commission's approval of a modification containing an updated description of the orbital debris mitigation plans for its system *for any satellites other than those that will be operated at an altitude of 550 km as proposed in this modification*."  *Id.* at 2539 (emphasis added).  The Bureau thus held that SpaceX still had not satisfied the original condition as to the 2,814 satellites now at issue in this proceeding.

The Bureau recently reaffirmed this holding.  In a January 8, 2021 order, the Bureau authorized SpaceX to deploy 10 of the 2,824 satellites it initially sought to operate at a lower

altitude through this pending modification application. Although Viasat disagrees with the Bureau's decision to grant such authorization, it should be noted that, in doing so, the Bureau explicitly found that SpaceX is *not* authorized to deploy the remaining 2,814 satellites until the Commission approves a further modification application with a suitable orbital debris mitigation plan. *See* Order and Authorization at 7–8 & n.48, ¶¶ 14–15, 11, ¶ 19(t), DA 21-34, IBFS File No. SAT-MOD-20200417-00037 (Jan. 8, 2021) ("SpaceX must seek and obtain the Commission's approval of a modification containing an updated description of the orbital debris mitigation plans for its system for any satellites other than those that will be operated at an altitude of 550 km, as addressed in a prior modification, or the satellites planned to operate at 560 km, addressed in this partial grant.").

Notably, SpaceX's pending modification application *does* include updated orbital debris mitigation information for the additional 2,814 satellites it is seeking to operate at 540–570 km. *See* Attachment A: Technical Information to Supplement Schedule S at 17–24, IBFS File No. SAT-MOD-20200417-00037 (Apr. 17, 2020). And SpaceX specifically noted that this information is intended to address the Commission's concerns with orbital debris, citing paragraph 15 of the Commission's initial authorization order, which stated that "it would be premature to grant SpaceX's application based on its current orbital debris mitigation plan." *Id.* at 18 & n.24; *see Space Expl. Holdings, LLC*, 33 FCC Rcd. 3391, 3398 (2018). This citation confirms that SpaceX itself knows the condition remains unsatisfied with respect to those satellites.

Thus, the Commission's decision with respect to this modification application will determine whether SpaceX can deploy and operate thousands of additional satellites at altitudes of 540–570 km. If SpaceX's application is denied, SpaceX will not be permitted to deploy *any* of the 2,814 satellites at issue at *any* altitude. If the modification and the updated orbital debris

mitigation plan are approved, however, SpaceX will be authorized to deploy 2,814 additional satellites—as well as a large number of replacements over a 15-year license term. SpaceX has estimated that it would need to deploy as many as 10,000 satellites within its 15-year license term to maintain its full 4,408-satellite Ku/Ka-band constellation—a lower-end number that does not factor in the number of satellites likely to fail before the end of their 5-year design life.  Letter from William M. Wiltshire, Counsel to SpaceX, to Jose P. Albuquerque, Chief, Satellite Div., Int'l Bureau, FCC at 5–6, IBFS File No. SAT-MOD-20200417-00037 (May 15, 2020) [hereinafter May 2020 Wiltshire Letter].  Prorating this figure for the 2,814 satellites at issue in this proceeding, as many as 6,383 *new* satellites could be expected to be deployed over the course of 15 years under the authority sought here.

Considering the full complement of 42,000 operating satellites discussed in the next section, and the satellites' 5-year design life, it is apparent that SpaceX's plans would require the deployment and reentry into the atmosphere of *over 100,000 satellites* in less than two decades. That is about ten times the number of objects mankind has launched into space in over 60 years. The replenishment of this constellation would require, on average, the deployment of about 9,000 additional SpaceX satellites per year (or 25 per day), and a similar number to be decommissioned by burning up in the atmosphere, given the 5-year design life of these satellites.

The Commission therefore must consider the impacts that the deployment, operation, and reentry of thousands of *new* satellites would have on the chemical composition of Earth's atmosphere, on aircraft and humans on Earth's surface, on astronomical research and the view of the night sky, and on the risk of collisions and creation of additional space debris in orbit. Particularly at these levels of environmental activity, there is no basis for making the assumptions SpaceX makes about the absence of harm.

9

## 2. The Proposed Modification Must Be Analyzed in the Context of SpaceX's Plan To Deploy a 42,000-Satellite Fleet.

This application must also be put into proper context and analyzed as a component of SpaceX's broader 42,000-satellite mega-constellation proposal. NEPA regulations contemplate that "connected actions" be considered together. 40 C.F.R. § 1501.9(e)(1). Actions are connected if they are "interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1501.9(e)(1)(iii). The Commission also must consider all effects from this application "that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action," including "effects that are later in time or farther removed in distance from the proposed action or alternatives." *Id.* § 1508.1(g). A "reasonably foreseeable" effect is one that is "sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision." *Id.* § 1508.1(aa).

Here, SpaceX contemplates that the 2,814 operational satellites immediately at issue here would comprise part of a mega-constellation consisting of 42,000 operating satellites. In addition to the 4,425 operating Ku/Ka-band low-Earth satellites conditionally authorized in March 2018 (of which these 2,814 are a part), SpaceX has sought and received conditional authorization to deploy 7,518 operating V-band satellites at altitudes of 335–346 km in what SpaceX describes as a "a single, coordinated system" consisting of about 12,000 satellites, *see* Application for Approval for Orbital Deployment and Operating Authority for the SpaceX NGSO Satellite System at 2, SAT-LOA-20170301-00027 (Mar. 1, 2017); *Space Expl. Holdings, LLC*, 33 FCC Rcd. 11,434, 11,435 (2018). SpaceX also filed an application seeking authorization to deploy 30,000 operating Gen2 satellites at altitudes of 328–614 km, Application for Approval for Orbital Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System at ii, 2, IBFS File No. SAT-LOA-20200526-00055 (May 26, 2020). SpaceX is thus planning to operate a total fleet of about

42,000 operating satellites (again, not including replacements).  Caleb Henry, *SpaceX Submits Paperwork for 30,000 More Starlink Satellites*, SpaceNews (Oct. 15, 2019), http://spacenews.com/spacex-submits-paperwork-for-30000-more-starlink-satellites/.

Under NEPA, the potential environmental impact of these 42,000 operating satellites must be evaluated together, as a whole, and declining to do so would amount to artificial, impermissible NEPA segmentation.  "An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).  Where, as here, multiple proposals that "will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe v. Sierra Club*, 427 U.S. 390, 409–10 (1976).  This requirement to consider the true scope of a proposed action flows directly from NEPA itself, and is not merely a product of the now-repealed regulatory definition of "cumulative . . . impact[s]" or of other CEQ regulations. *Id.*; *cf.* SpaceX Opposition at 10–11 & n.37.

The Commission therefore must acknowledge that this modification—significant in itself—is connected with other approved and pending applications by SpaceX, and is but one part of SpaceX's plan for an unprecedented 42,000-satellite mega-constellation.

Instead of contextualizing this application as part of *SpaceX's* broader plans, SpaceX's opposition attempts to distract the Commission from its NEPA duties in this proceeding by making (false) comparisons to other, unrelated applications that differ in important ways from SpaceX's application.  For example, in a transparent strategy of whataboutism, SpaceX cites Viasat's unrelated application to modify its existing NGSO system authorization to cover 288 low-Earth-

orbit satellites.  SpaceX Opposition at 2–3; *see* Exhibit A: Description of Modification and Analysis Under Commission Framework, IBFS File No. SAT-MPL-20200526-00056 (May 26, 2020).  But of course, *Viasat's* application has no bearing whatsoever on whether *SpaceX's* proposed operations would adversely impact the environment.  And in any event, SpaceX overlooks the obvious fact that there is a world of environmental difference between SpaceX deploying nearly 3,000 operational satellites and Viasat deploying roughly *one-tenth* of that amount, particularly where SpaceX's deployment is part of a broader effort to build out a fleet of 42,000 operational satellites.  Furthermore, Viasat's satellites are designed to have a much higher level of reliability with respect to maneuverability (99.5%) than SpaceX's satellites have demonstrated to date, and Viasat's satellites are designed for a 7.5-year life, meaning that they can be expected to be replaced far less frequently than SpaceX's satellites that have 5-year design lives.  *See* Consolidated Opposition to Petitions and Response to Comments of Viasat, Inc., at 44, 46, IBFS File No. SAT-MPL-20200526-00056 (Sept. 15, 2020).

Similarly irrelevant is the suggestion that Viasat could have raised NEPA concerns with respect to Kuiper Systems, LLC.  SpaceX Opposition at 2–3 (citing *Kuiper Systems, LLC*, 35 FCC Rcd. 8324 (2020)).  Kuiper does not have a modification application pending before the Commission, and, as Viasat noted in its NEPA Petition, its NEPA-related concerns were prompted by recent third-party studies and exacerbated by significant concerns about how *SpaceX* has chosen to design and deploy *its* system.  In any event, whether NEPA-related concerns were or could have been raised in connection with a *Kuiper* application has no bearing whatsoever on whether *SpaceX's* proposed operations would adversely impact the environment.  Thus, the only applications relevant to evaluating the environmental consequences of permitting SpaceX to increase its orbital fleet here are *SpaceX's* application to deploy and operate 2,814 operational

satellites, and other *SpaceX* applications that are relevant to the rest of its mega-constellation of 42,000 operational satellites.

### B.    The Question Before the Commission Is Whether the Proposed Modification "May Have a Significant Environmental Impact."

SpaceX also misrepresents the proper legal standard, falsely asserting that the Commission must find "extraordinary circumstances" before even inquiring into the environmental impacts of SpaceX's application. NEPA itself and its implementing regulations foreclose that view, making clear that environmental review is needed whenever a proposed action *may* have a significant environmental impact. In any event, SpaceX's unprecedented proposal clearly satisfies that bar.

SpaceX also suggests (but stops short of arguing) that NEPA is inapplicable because any environmental effects allegedly would be located entirely outside the jurisdiction of the United States. That suggestion is doubly wrong. Each of the harms that Viasat raised in its petition indisputably would produce ecological, aesthetic, cultural, economic, social, scientific, and/or health-related effects that would impact people in the United States. And SpaceX ignores an executive order discussed below that explicitly applies NEPA to actions that impact the global commons, such as space.

### 1.    Section 1.1307(c) Requires an EA When a Proposed Action May Impact the Environment.

NEPA affirmatively requires the Commission to "consider every significant aspect of the environmental impact of a proposed action." *Balt. Gas & Elec. Co.*, 462 U.S. at 97 (internal quotation marks omitted). Thus, when a proposed action "*may have* a significant environmental impact," the Commission's own rules require the applicant to prepare an EA evaluating the impacts of the proposal and potential alternatives and determining whether an EIS is warranted. 47 C.F.R. § 1.1307(c) (emphasis added); *see* 40 C.F.R. § 1501.5(c)(2) (requiring analysis of alternatives in an EA); *see also*, *e.g.*, *id.* § 1502.14 (same for EIS). The Bureau recently confirmed this fact,

acknowledging that the Commission's rules permit Viasat to "petition a reviewing bureau to consider the environmental concerns associated with an action that is otherwise categorically excluded" and that an EA would be required if the Bureau determines that SpaceX's proposal "'may have a significant environmental impact.'" Order and Authorization at 7, ¶ 14, DA 21-34, IBFS File No. SAT-MOD-20200417-00037 (Jan. 8, 2021) (quoting 47 C.F.R. § 1.1307(c)). SpaceX's attempt to reframe the inquiry and argue that environmental review is inappropriate absent "extraordinary circumstances," SpaceX Opposition at 8–10, gets NEPA review exactly backwards.

NEPA requires agencies to prepare a detailed environmental analysis for *all* "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This standard requires environmental analysis not only when a proposed action "[i]s likely to have significant effects," 40 C.F.R. § 1501.3(a)(3) (EIS required), but also when "the significance of the effects is unknown" and even when the agency concludes that a debatable action ultimately "[i]s *not* likely to have significant effects," *id.* § 1501.3(a)(2) (EA required) (emphasis added); *see also Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1033–34 (D.C. Cir. 2008) (directing the Commission to prepare an EA because the record showed that the proposed action may have had a significant environmental impact). The only time an agency may forgo environmental analysis is when a proposed action falls into a category of actions that, in the agency's experience, "normally do[es] not have a significant effect on the human environment." 40 C.F.R. § 1501.4(a); *see id.* § 1501.3(a)(1). Even as to these categorical exclusions, the agency must "evaluate the action" at issue to ensure that there are not "extraordinary circumstances in which a normally excluded action may have a significant effect." *Id.* § 1501.4(b).

Ripping the phrase "extraordinary circumstances" from its regulatory context, SpaceX seeks to tip the scales against environmental review by arguing that "NEPA review is justified *only* if 'extraordinary circumstances' indicate that the action will have a 'significant effect.'" SpaceX Opposition at iii (emphasis added). But § 1501.4(b)'s "extraordinary circumstances" standard applies only when the proposed action belongs to a class that *normally* does not have significant environmental effects, 40 C.F.R. § 1501.4(a)–(b); in that circumstance, it directs the agency to consider whether the *particular* action might be unusual and nonetheless result in a significant environmental impact, *id.* § 1501.4(b). SpaceX skips past that threshold question, simply assuming that the deployment of nearly 3,000 operational satellites as part of an unprecedented 42,000-satellite constellation can fairly be characterized as falling into a class of actions that "normally do[es] not have a significant effect on the human environment." 40 C.F.R. § 1501.4(a). That is plainly incorrect. There is no well of experience on which the Commission can draw to conclude that what SpaceX proposes normally would not have significant environmental effects and to categorically exempt this action from NEPA review. *See id.* § 1501.3(a)(1). Indeed, the Commission's categorical-exemption framework was initially adopted in 1986, long before it had occasion to consider whether the deployment of many thousands of satellites in a single constellation would significantly impact the environment, a question that has arisen only in the last few years with the rise of mega-constellations. *See* Jonathan O'Callaghan, *The Risky Rush for Mega Constellations*, Sci. Am. (Oct. 31, 2019), http://www.scientificamerican.com/article/the-risky-rush-for-mega-constellations/. And lawmakers have already raised the question whether the

Commission's regulations should be updated to make clear that environmental review of satellite constellations like Starlink is *always* required.[2]

Regardless, even if this application could properly be classified as falling within a class of categorically exempted satellite authorizations, SpaceX's attempt to raise the bar for environmental review contradicts the Commission's own regulations and fails to grapple with their unique structure. Whereas most agencies presume that NEPA requires environmental analysis of their actions and narrowly define specific exemptions from that presumption, the Commission has adopted the opposite default rule: It presumes that *all* of its actions are categorically exempted, and defines narrow categories of action that require the preparation of an EA. 47 C.F.R. §§ 1.1306(b), 1.1307(a)–(b). But in addition to these narrow exceptions, the Commission has also adopted a broad safety valve providing that it will review any otherwise-exempted action that "may have a significant environmental impact." 47 C.F.R. § 1.1307(c); *see Am. Bird Conservancy*, 516 F.3d at 1033–34 (requiring the Commission to follow its own NEPA regulations, which "require[] an EA when an action 'may' have a significant environmental effect); Order and Authorization at 7, ¶ 14, DA 21-34, IBFS File No. SAT-MOD-20200417-00037 (Jan. 8, 2021) (reaffirming this view). No additional showing of "extraordinary circumstances" is required to satisfy that standard—the potential for significant impacts to flow from a categorically exempted action *provides* the circumstances needed to justify environmental review.

In any event, extraordinary circumstances exist here, as this is no ordinary satellite deployment. While small, run-of-the-mill satellite authorizations may not ordinarily have

---

[2]     In particular, two U.S. senators have asked the Government Accountability Office to evaluate whether the Commission's categorical-exemption regulations should be updated to explicitly require NEPA review of large satellite authorizations like Starlink. Jeff Foust, *Senators Ask GAO To Review FCC Oversight of Satellite Constellations*, SpaceNews (Apr. 10, 2020), http://spacenews.com/senators-ask-gao-to-review-fcc-oversight-of-satellite-constellations/.

significant environmental effects, SpaceX's proposed modification involving nearly 3,000 operational satellites in a planned constellation of 42,000 satellites presents extraordinary circumstances demanding NEPA review.  Indeed, maintaining just the 2,814 satellites directly at issue here—to say nothing of the full 42,000-satellite fleet—would require deploying multiples of that number in less than two decades as satellites fail prematurely or reach the end of their 5-year design lives.  That is more than enough to justify removing this proposed modification from the Commission's categorical exemption.

**2.    SpaceX's Proposed Modification Falls Within the Scope of NEPA.**

SpaceX also suggests in passing that there is "significant doubt that NEPA applies to activities in space at all."  SpaceX Opposition at 8.  But it stops short of actually arguing that NEPA is inapplicable here, and for good reason:  The effects of approving SpaceX's proposal to deploy nearly 3,000 operational satellites into low-Earth orbit, along with replacements, obviously would not be "located entirely outside of the jurisdiction of the United States."  40 C.F.R. § 1508.1(q)(1)(i).

Each of the environmental impacts that Viasat's petition identified would affect the people and interests of the United States.  The atmospheric and climatological effects of burning up thousands of satellites in our atmosphere would affect everyone on Earth, including Americans.  Viasat Petition at 10–13.  Light reflected by these satellites would likewise affect wide swaths of people.  And increased orbital debris would make it more difficult and riskier for NASA, American scientists, and American companies to explore, study, and use space—and these types of debris could fall, and have already fallen, into the United States.  *Id.* at 14, 23.

SpaceX also ignores Executive Order No. 12,114, § 2-3(a), 44 Fed. Reg. 1957 (Jan. 4, 1979) (cited at Viasat NEPA Petition 24), which mandates environmental review of major federal actions that take place outside the United States in the "global commons outside the jurisdiction

of any nation," such as "the oceans or Antarctica."  *Id.*; *see* Howard A. Baker, *Space Debris: Law and Policy in the United States*, 60 U. Colo. L. Rev. 55, 70–71 (1989).  SpaceX does not (and cannot) dispute that the orbital altitudes at issue here are an area that the nations of the world share, but in which they retain no sovereign interests, and that these ranges thus fall within the Executive Order's definition of the global commons.  Treaty on Principles Governing Activities of States in the Exploration and Use of Outer Space, Including the Moon and Other Celestial Bodies art. II, Jan. 27, 1967 ("Outer Space Treaty"); *see* SpaceX Opposition at 8.  In fact, SpaceX itself cites the Outer Space Treaty, which supports NEPA review by recognizing that nations *do* share a "common interest" in outer space, despite the fact that it is "not subject to national appropriation by claim of sovereignty."  Outer Space Treaty, art. II.

In any event, the CEQ defines "human environment" to mean "comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment."  40 C.F.R. § 1508.1(m).  "Near-Earth space has always constituted a critical component of the human environment."  Comment from Charles Lee Mudd Jr. and Ruskin Hartley, Exec. Dir., Int'l Dark Sky Ass'n, to Mary B. Neumayr, Chairman, CEQ, at 6, Docket No. CEQ-2019-0003 (Mar. 9, 2020) [hereinafter Int'l Dark Sky Ass'n Comments].  And given the pace and importance of human activities in Earth's orbital space for present and future generations of Americans, there is no basis for ignoring how the Commission's decisions will affect this important aspect of Earth's environment.  Notably, NASA—another agency tasked with regulating certain activities in space—has interpreted NEPA to require evaluation of the environmental impact of actions in space.  *See* 14 C.F.R. § 1216.305(b)(1) (requiring an EA for "[s]pecific spacecraft development and space flight projects/programs"); NASA, *Environmental Assessment for Launch of NASA Routine Payloads* (Nov. 2011), http://www.nasa.gov/pdf/603832main

_FINAL%20NASA%20Routine%20Payload%20EA%20Resized.pdf (performing an environmental assessment of the effects of satellite launches, including actions that take place in the atmosphere); NASA, *Earth's Atmospheric Layers*, http://www.nasa.gov/mission_pages/ sunearth/science/atmosphere-layers2.html (last updated Aug. 7, 2017) (defining "the upper limit of our atmosphere" to encompass altitudes of "up to 10,000 km"); *see also* Note, *The Fault in Our Stars: Challenging the FCC's Treatment of Commercial Satellites as Categorically Excluded from Review Under the National Environmental Policy Act*, 22 Vand. J. Ent. & Tech. L. 923, 947 (2020). NEPA requires the Commission to evaluate activities in space that significantly affect the quality of the human environment.

## II.     SpaceX's Modification Proposal Would Likely Have a Significant Impact on the Environment.

If approved, SpaceX's modification and updated orbital debris mitigation plan would enable SpaceX to deploy nearly 3,000 additional operating satellites. This is likely to have a significant effect on the environment in at least three principal ways. First, the increased number of satellite deployments and reentries could cause ozone depletion, contribute to global warming, and have unpredictable effects on atmospheric chemistry. And any components that do not fully demise on reentry could cause human casualties if they strike aircraft or humans on Earth's surface. Second, the presence of almost 3,000 additional satellites in the night sky—plus an untold number of replacement satellites being raised into their intended operating orbits ("orbit-raising") and of failed or decommissioned satellites being deorbited—threatens to create significant light pollution and radio interference, making it more difficult for astronomers and photographers to study the night sky and tarnishing its natural beauty for casual stargazers. Placing the satellites at a lower altitude would also make them brighter during astronomical twilight. Third, adding almost 3,000 more operating satellites to the 540–570 km orbital range would densify it and, coupled with

SpaceX's experiential failure rate, would unreasonably increase the risks of collisions and the creation of additional space debris.

> **A.    The Increased Number of Satellite Deployments and Reentries Could Harm the Atmosphere, Aircraft, and Humans on Earth's Surface.**

As Viasat explained, the deployment and reentry of thousands of additional SpaceX satellites could harm the environment by depleting ozone, contributing to global warming, and causing unpredictable changes in atmospheric chemistry. Viasat NEPA Petition at 9–13. And any components of satellites that do not fully demise on reentry could cause human casualties if they strike aircraft or humans on Earth's surface. *Id.* at 13–16. Importantly, *SpaceX does not contest these points*, instead resting on its claim that the outcome of this proceeding will not increase the number of satellites that are ultimately deployed. As already explained, that claim is demonstrably incorrect, making the proposed modification indisputably significant. In any event, deploying the 2,814 satellites at issue at a lower altitude would itself significantly increase these risks. An EIS or, at a minimum, an EA is warranted for these reasons alone.

> **1.    Satellite Deployments and Reentries Could Harm the Atmosphere.**

SpaceX disputes almost none of the facts relevant to finding that the deployment and reentry of the satellites at issue here would significantly impact the environment. First, SpaceX does not deny that it would need to conduct many satellite launches to deploy and sustain the 2,814 satellites directly at issue in this proceeding over time, or that such launches would contribute to ozone depletion because rockets emit ozone-destroying compounds. Viasat NEPA Petition at 10–11; *see*, *e.g.*, Martin Ross et al., *Limits on the Space Launch Market Related to Stratospheric Ozone Depletion*, 7 Astropolitics 50 (2009). Nor does SpaceX dispute that ozone depletion significantly harms the human environment because it increases the amount of ultraviolet radiation that reaches Earth, leading to increased rates of skin cancer and cataracts, among other effects. Viasat NEPA

Petition at 11; *see* M. Norval et al., *The Effects on Human Health from Stratospheric Ozone Depletion and Its Interactions with Climate Change*, 6 Photochemical & Photobiological Scis. 232 (2007); *see also* EPA, *Health and Environmental Effects of Ozone Layer Depletion*, http://www.epa.gov/ozone-layer-protection/health-and-environmental-effects-ozone-layer-depletion (last visited January 15, 2021) (increased ultraviolet radiation can also harm plant development, reduce the survival and reproduction rates of marine organisms, and affect terrestrial and aquatic biogeochemical cycles). The Commission must consider the impact on atmospheric ozone levels of granting final authorization for the deployment and operation of such a large number of satellites in a relatively short time period.

SpaceX also does not dispute that a dramatic increase in the number of its satellites burning up in the atmosphere on reentry could harm the stratosphere and global climate. In particular, there is no dispute that reentry could produce alumina and thereby contribute to radiative forcing—the phenomenon responsible for climate change. Viasat NEPA Petition at 11–12; *see* Martin N. Ross & Patti M. Sheaffer, *Radiative Forcing Caused by Rocket Engine Emissions*, 2 Earth's Future 177 (2014). And SpaceX does not contest that the release of large amounts of highly reactive compounds into the atmosphere could significantly alter the chemistry of Earth's atmosphere in ways that remain unknown. Viasat NEPA Petition at 12; *see* Martin N. Ross & Leonard David, *An Underappreciated Danger of the New Space Age: Global Air Pollution*, Sci. Am. (Nov. 6, 2020), http://www.scientificamerican.com/article/an-underappreciated-danger-of-the-new-space-age-global-air-pollution/. The Commission must consider the undisputed possible effects on the atmosphere and global climate of permitting the deployment of many thousands of Starlink satellites that would burn up in the atmosphere within less than two decades.

21

SpaceX's only response is to claim that the same environmental effects would occur regardless of whether the Commission grants this modification because the number and pace of satellite deployments and reentries would be the same either way. SpaceX Opposition at 18–20. But as already explained, *see supra* Part I.A.1, that is simply not true. Unless the Commission approves SpaceX's pending modification application and updated orbital debris mitigation plan, SpaceX will not be able to deploy *any* of the 2,814 operating satellites at issue at *any* altitude. Approving the application, by contrast, could satisfy the Commission's condition in its initial authorization, resulting in the deployment and reentry of many more thousands of satellites in the span of 15 years to maintain that 2,814-satellite fleet. *See* May 2020 Wiltshire Letter at 5–6 (predicting that SpaceX would launch about 10,000 satellites during its 15-year license term to maintain its 4,408 Ku/Ka-band satellites). So the harms to the atmosphere will *not* be the same regardless of whether the Commission approves or denies this application for an additional 2,814 satellites. And as explained above, there is no dispute that these harms could be significant if the application is granted. This fact alone is independently sufficient to justify requiring an EIS.

Even focusing solely on the effects of changing the operational orbital altitude of the satellites—as if they could be deployed at any moment and the only question were whether to deploy them above 1,000 km or at 540–570 km, which is clearly not the case—the relocation of these satellites still warrants environmental review. Deploying the satellites at a lower orbit would decrease the time necessary for a Starlink satellite with failed or unreliable maneuverability to burn up in the atmosphere. Consequently, more such failed satellites would burn up in the atmosphere during any given time period. *See* Viasat NEPA Petition at 9–10. SpaceX resists this fact, assuming that the number of such failed Starlink satellites would be insignificant, and asserting that the vast majority of its satellites would be actively deorbited regardless of their orbital altitude.

SpaceX Opposition at 19–20 (falsely claiming that the number of deorbiting satellites "will be essentially the same under both the modification and the existing authorization"). This attempt to avoid NEPA review by assuming insignificant failure rates is contradicted by reality and should be rejected.

As an initial matter, SpaceX's assertion that the proposed modification would not result in an increased number of satellites reentering the atmosphere is in tension with its own representations in this proceeding. SpaceX has touted as a benefit of the modification the fact that it would increase the pace of satellite reentry, reducing the amount of orbital debris in the atmosphere. It did so in a September 2020 ex parte, *see* SpaceX Ex Parte Filing at 8, IBFS File No. SAT-MOD-20200417-00037 (Sept. 14, 2020) (noting that this proposed modification improves space safety by increasing the pace at which failed satellites and debris reenter the atmosphere), and it repeated that claim in its opposition to Viasat's NEPA petition, *see* SpaceX Opposition at 2 ("[O]perating at the much lower altitudes proposed here has significant public interest benefits in that orbital debris (including failed satellites) tends to deorbit in relatively short order, significantly decreasing the risk posed to ongoing operations in space."). SpaceX cannot simultaneously affirm and deny the same fact based on whether it hurts or helps SpaceX at a given moment.

In any event, NEPA certainly demands a hard look at the potential for significant environmental impacts in light of the extraordinarily high failure rate experienced by SpaceX to date, which continues to go unexplained. Recent independently developed data supports the conclusion that 79 out of 953 Starlink satellites launched to date to provide service will never do so, either because they deorbited before doing so, appear to be in the process of deorbiting, or do not appear to be under SpaceX's control, representing an 8.3% rate of failure. Letter from Amy

R. Mehlman, Vice President, U.S. Gov't Affairs & Policy, Viasat, Inc., & Jarrett S. Taubman, Assoc. Gen. Counsel, Gov't & Regulatory Affairs, Viasat, Inc., to Marlene H. Dortch, Sec'y, FCC, at 4 & n.10, IBFS File No. SAT-MOD-20200417-00037 (Jan. 15, 2021) [hereinafter Jan. 15, 2021 Viasat Ex Parte]; Dr. Jonathan McDowell, *Reentered and Bad Starlinks* (updated Nov. 25, 2020), http://planet4589.org.

These failures have occurred over a mere fraction of the five-year design life of the Starlink satellites launched as of the calculation date. Because additional failures of this same group of satellites will almost certainly occur as more time elapses, it is entirely reasonable to expect that the failure rate of the Starlink satellites considered in this analysis ultimately will be much higher than 8.3%. To illustrate this point: The relevant satellites were launched an average of 244 days before the above failure rate was calculated or they had failed—*i.e.*, on average, only around 13% of the design life of these satellites had elapsed. Assuming the average failure rate remains constant, 591 of those 953 Starlink satellites would be expected to fail before the end of their five-year design life—**a staggering 62% failure rate**. Conducting a similar analysis just for the so-called "v1.0" Starlink satellites suggests **a still-alarming 23% failure rate over that same time period**. *See* Jan. 15, 2021 Viasat Ex Parte at 4 n.11.

The Commission cannot assume that the Starlink failure rate would be lower, particularly given SpaceX's steadfast refusal to answer fundamental questions about the failures it has experienced to date—including with respect to the nature and root cause(s) of these failures, whether this extraordinary failure rate is the result of SpaceX instituting modifications in the original satellite or system designs on which its initial grant of authority was based (such as implementing its new "system-level" failure approach), and what SpaceX has done to address and correct these reliability issues. *See* Letter from Amy R. Mehlman, Vice President, U.S. Gov't

Affairs & Policy, Viasat, Inc., to Marlene H. Dortch, Sec'y, FCC, IBFS File No. SAT-MOD-20200417-00037 (Dec. 21, 2020).  Without this information, the Commission has no basis to conclude that failure rates for the satellites at issue here would be insignificant or that the aberrant satellite behavior observed to date should not be expected to continue.

SpaceX would need to launch at least 6,383 satellites over the course of 15 years to maintain 2,814 operational satellites.  Thus, regardless of whether the actual Starlink failure rate over five years is assumed to be 62%, 23%, or somewhat lower, the available data suggests that granting SpaceX's pending modification application could generate hundreds (or thousands) of failed satellites that otherwise would not exist.  Indeed, NEPA review would be required even using a purely hypothetical overall failure rate of 2% or 3%, as even those failure rates in such a large fleet would result in significant numbers of failed satellites.

SpaceX thus cannot avoid NEPA review simply by claiming that failed satellites would passively deorbit on an accelerated basis at lower altitude—that is, that the time required for a failed satellite to passively deorbit from 540–570 km is less than the time required for it to passively deorbit from 1,100–1,300 km, *see* SpaceX Ex Parte Filing at 8, IBFS File No. SAT-MOD-20200417-00037 (Sept. 14, 2020).  First, Viasat disputes SpaceX's suggestion that its failed satellites would not pose an orbital safety risk simply because they are operated at lower altitude, and Viasat has demonstrated that collision and orbital debris risk, in fact, would be *greater* if SpaceX's proposed modification were implemented.  *See* Jan. 15, 2021 Viasat Ex Parte at 4 n.11; *see also infra* Part II.C (demonstrating that SpaceX's satellites would pose a greater risk to orbital safety at the lower, proposed altitudes).  But second, even if SpaceX's incorrect claim about orbital safety were true, granting SpaceX's pending modification application still would result in failed Starlink satellites passively reentering the atmosphere much more quickly than would otherwise

be the case, with significant adverse implications for the Earth's atmosphere. NEPA demands that these potential effects be considered, and that the Commission evaluate critical outstanding questions about the failures that SpaceX has experienced to date and is likely to experience in the future.

In short, the increase by many thousands in the number of satellites being deployed and reentering the atmosphere, as well as the increased pace of failed satellites passively reentering the atmosphere, are potentially significant effects that would result from granting the modification and that must be considered together.

### 2. Satellite Reentries Could Impact Aircraft and Harm Humans on Earth's Surface.

The Commission also must consider the risk that satellite components that survive reentry pose to humans and aircraft. *See* William H. Ailor, *Large Constellation Disposal Hazards*, Aerospace Corp., at 14 (Jan. 23, 2020), http://aerospace.org/sites/default/files/2020-01/Ailor _LgConstDisposal_20200113.pdf. SpaceX does not dispute that increasing by nearly 3,000 (plus replacements) the number of satellites in low-Earth orbit would create a significant casualty risk if the satellites do not fully demise on reentry. *See* Viasat NEPA Petition at 13–16. And despite SpaceX's claims to the contrary, it has not shown that its satellites would do so.

Without any supporting citation, SpaceX baldly asserts that it "used DAS to determine that it had successfully designed its satellites for total atmospheric demise." SpaceX Opposition at 21. Similarly, its technical attachment to this proposed modification simply states, without citation or support, that "all Starlink satellites launched after the first deployment will be fully demisable upon atmospheric re-entry, and no components will survive to reach the Earth's surface." Attachment A: Technical Information to Supplement Schedule S at 24, IBFS File No. SAT-MOD-

20200417-00037 (Apr. 17, 2020). The proposed modification application contains no analysis at all showing that the satellites at issue would fully demise on reentry.

To be sure, SpaceX did conduct a stage-one DAS analysis regarding the demisability of an older design of its satellites as part of its first modification application. But that analysis indicated that the previous design was *not* fully demisable. *See* Attachment A: Technical Information to Supplement Schedule S at 45–48, IBFS File No. SAT-MOD-20181108-00083 (Nov. 8, 2018). The analysis revealed in particular that three components of the design could result in human casualties. *Id.* at 46. SpaceX stated that future designs would not include one of the components and that it would replace the others with parts "that will demise fully in the atmosphere." Letter from William M. Wiltshire, Counsel to SpaceX, to Jose P. Albuquerque, Chief, Satellite Div., Int'l Bureau, FCC at 5, IBFS File No. SAT-MOD-20181108-00083 (Mar. 13, 2019). But SpaceX has not pointed to any analysis on the record (DAS or otherwise) showing that its new design with different components would be fully demisable.

NEPA exists to ensure that federal agencies have their eyes open to these types of risks. The Commission must therefore take a hard look at the risk that components of SpaceX's satellites would survive reentry and harm aircraft, humans, and the environment on Earth's surface.

B.    **SpaceX's Modification Proposal Would Likely Increase Light Pollution and Astronomical Interference.**

As Viasat showed in its petition, satellite mega-constellations can cause harmful light pollution and interfere with astronomical observations in ways that have aesthetic, scientific, social, cultural, and health effects that must be considered under NEPA. Viasat NEPA Petition at 16–19. Lowering the orbital altitudes of satellites exacerbates the problem, as it makes satellites brighter during the time periods when they are visible. *Id.* at 20; *see also* SpaceX Opposition at 14 (admitting that lowering satellites makes them appear brighter); Luc H. Riesbeck et al., *The Future*

*of the Night Sky: Light Pollution from Satellites* 5–8 (Mar. 2020).  SpaceX never disputes these basic facts, and it has abandoned its previous position that light-pollution matters fall outside the Commission's jurisdiction.  *See* Application for Modification of Authorization for SpaceX NGSO Satellite System at 12, IBFS File No. SAT-MOD-20200417-00037 (Apr. 17, 2020); *see also* Application for Approval for Orbital Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System at 16, IBFS File No. SAT-LOA-20200526-00055 (May 26, 2020).

SpaceX's primary response is to claim that the Commission can simply ignore light-pollution and astronomical-interference issues in this proceeding because its proposal supposedly would *decrease* those issues rather than *increase* them.[3]  That claim is incorrect and highly disingenuous—approving SpaceX's modification would significantly increase the number of satellites in orbit, and thus undeniably generate more light pollution and astronomical interference. And even focusing only on the effects of relocating satellites, NEPA still requires the Commission to take a hard look at the environmental harms and trade-offs associated with SpaceX's modification proposal.

>   **1.    The Proposed Modification Would Generate More Light Pollution and Astronomical Interference by Increasing the Number of Satellites in Low-Earth Orbit.**

SpaceX's opposition grossly misstates the scope of the action pending before the Commission.  As explained, SpaceX does not simply seek to relocate satellites that have already

---

[3]    SpaceX also suggests that Viasat's satellites are a greater light-pollution threat, but that argument is legally irrelevant and factually incorrect.  The application at issue here is SpaceX's, not Viasat's.  And SpaceX's satellites would cause substantially more light pollution than Viasat's.  Viasat's constellation of 288 satellites would be about one-tenth the size of the tranche of 2,814 SpaceX satellites at issue here, and a fraction of the size of SpaceX's contemplated 42,000-satellite constellation.  *See* Description of Modification and Analysis Under Commission Framework, Exhibit A at 1, IBFS File No. SAT-MPL-20200526-00056 (May 26, 2020); Application for Approval for Orbital Deployment and Operating Authority for the SpaceX Gen2 NGSO Satellite System at 5, IBFS File No. SAT-LOA-20200526-00055 (May 26, 2020).

been deployed; it seeks permission to deploy thousands more satellites than it otherwise has final authority to operate. *See supra* Part I.A.1

Those additional satellites—along with an untold number of replacement satellites that would be in the orbit-raising process, and failed and decommissioned satellites that would be deorbiting at any given time[4]—undeniably would produce more light pollution than currently exists. *See* Constance Walker et al., *Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigation* 5 (2020) [hereinafter *Impact of Satellite Constellations*] (explaining that the "only option" to achieve "zero impact" on the night sky is to "[l]aunch fewer or no LEOsat constellations"). So, the question for the Commission is not *whether* granting the proposal would increase light pollution, but *how much* additional light pollution the proposal would generate—and whether the benefits of the project outweigh those costs and other negative effects. Given the wide-ranging environmental effects of light pollution, *see* Viasat NEPA Petition at 16–19, the Commission should perform an EIS, or at least an EA, to determine how disruptive the light from these new satellites would be and to inform the Commission's analysis of this modification application and alternatives.

The Commission bears that burden despite recent comments from the American Astronomical Society ("AAS") noting that "constellations at lower altitudes are less damaging to dark-sky astronomy." Comments of the American Astronomical Society On the Petition of Viasat,

---

[4]     Viasat has estimated that given SpaceX's recent pace of deployment and expected need to replace its satellites, SpaceX could have many hundreds (if not more than 1,000) additional satellites in transit to and from its operational orbits at any given time. Whatever the precise number, these additional numbers of satellites would also generate light pollution—indeed, ascending satellites are particularly problematic because "Starlink satellites are brightest soon after a launch." Stephen Clark, *SpaceX to Debut Satellite-Dimming Sunshade on Next Starlink Launch*, Astronomy Now (May 5, 2020), https://astronomynow.com/2020/05/05/spacex-to-debut-satellite-dimming-sunshade-on-next-starlink-launch/.

Inc., IBFS File No. SAT-MOD-20200417-00037 (Jan. 7, 2021) ("AAS Comments"). In a thoughtful letter, the AAS indicated that it "support[ed] consideration by the Commission of light pollution and impacts to optical astronomy"—*i.e.*, Viasat's ultimate request—but explained that, as between satellites at a higher altitude and satellites at a lower altitude, "lower altitude is a better option" for dark-sky astronomy. *Id.* That may be true, but it assumes that the proposal at issue merely involves picking the altitude at which a given number of satellites would be deployed. That assumption is misplaced here, where it is not a given that SpaceX will be finally authorized to deploy and operate the 2,814 satellites (plus replacements) covered by its modification application. For purposes of dark-sky astronomy, reducing the number of satellites deployed is likely preferable to introducing nearly 3,000 new satellites into operational orbit, even at lower altitudes. The vast fleet of 42,000 operating low-Earth orbit satellites that SpaceX proposes would be expected to have "significant negative impacts" on astronomy. *Impact of Satellite Constellations*, *supra*, at 3. Such fleets could "potentially affect every U.S. ground-based astronomy research facility, jeopardizing billions of dollars' worth of public investment." Int'l Dark Sky Ass'n Comments at 7.

In any event, SpaceX fails to grapple with the ways in which its additional satellites can harm astronomical research by interfering with radio-based astronomy. Certain signals from satellites into various frequencies used for radio astronomy "can cause interference to radio astronomy observations." *Space Expl. Holdings, LLC*, 33 FCC Rcd. at 3399. Like light pollution, radio interference threatens environmental harm by hampering scientific advances within the astronomical community. *See* Constance Walker et al., *Dark and Quiet Skies for Science and Society: Report and Recommendations* 160–81 (2020) [hereinafter *Dark and Quiet Skies*]; *see also* SKA, *SKAO Needs Corrective Measures From Satellite 'Mega-Constellation' Operators To*

*Minimise Impact on Its Telescopes* (Oct. 7, 2020), https://www.skatelescope.org/news/skao-satellite-impact-analysis/ (discussing radio interference from Starlink satellites). That interference already has "a profound impact on radio-astronomical observations," and it soon could "become unbearable." Stefano Gallozzi et al., *Concerns About Ground Based Astronomical Observations: A Step To Safeguard the Astronomical Sky* 10 (Feb. 4, 2020). Radio-based astronomy is particularly vulnerable to (1) unwanted radio emissions created outside of allocated frequency bands that indirectly interfere with observational efforts, and (2) increased occupation of radio spectrum that has not been allocated to radio astronomers, but which radio astronomers use for observational purposes. *Dark and Quiet Skies*, *supra*, at 166–67, 174–76. Because of these vulnerabilities, large low-Earth-orbit constellations pose grave problems for the continued viability of radio astronomy. *Id.* at 183.

Unsurprisingly, this form of astronomical interference has generated concern from interested organizations. *See*, *e.g.*, Int'l Astronomical Union, *IAU Statement on Satellite Constellations* (June 3, 2019), https://www.iau.org/news/announcements/detail/ann19035/. And SpaceX's mitigation efforts have not eliminated these concerns (and in any event cannot substitute for NEPA review) even though SpaceX has entered into an agreement with the National Science Foundation. National Science Foundation, Statement on NSF and SpaceX Radio Spectrum Coordination Agreement (June 4, 2019), https://www.nsf.gov/news/news_summ.jsp?cntn_id=298678. Indeed, concerns about radio-interference continue to be raised. *See* Daniel Clery, *Starlink Already Threatens Optical Astronomy. Now, Radio Astronomers are Worried*, Sci. Mag. (Oct. 9, 2020), https://www.sciencemag.org/news/2020/10/starlink-already-threatens-optical-astronomy-now-radio-astronomers-are-worried; *see also* Gallozzi, *supra*, at 10 ("Despite the special international protection for Radio-astronomy, some sources of radio frequency

interference (RFI) are inescapable. While radio astronomers can minimize the effects of many terrestrial sources by placing their telescopes at remote sites, none can escape from RFI generated by satellite transmitters . . . .").  In considering astronomical interference, then, both light pollution and radio interference warrant careful consideration by the Commission.

In sum, SpaceX's entire argument against NEPA review of light pollution and astronomical interference rests upon a false premise—that its proposal would not contribute to these harms because it is merely seeking to deploy and operate satellites at lower orbits than previously intended.  But SpaceX is not finally authorized to operate *any* satellites at *any* orbital altitude, beyond its initial tranche of 1,584.  It is seeking permission to deploy and operate nearly 3,000 additional satellites (plus replacements) that would cause environmental harms, even at lower altitudes.  Before acting on SpaceX's application, the Commission must discharge its statutory duty under NEPA to consider these environmental effects of the modification proposal.

##### 2.    The Proposed Modification Would Generate More Light Pollution by Making Starlink Satellites Shine Brighter During Twilight.

Lowering the orbital altitude of 2,814 satellites would independently require analysis of light-pollution effects under NEPA, even if those satellites were already operating above 1,000 km.

At lower altitudes, SpaceX satellites would appear brighter during a scientifically significant time:  astronomical twilight.  SpaceX does not dispute Viasat's showing that the closer satellites are, the brighter they appear when sunlight reflects off of them.  *See* SpaceX Opposition at 14 (quoting a study finding that "[s]atellites at lower altitudes are brighter").  And although SpaceX claims that lower-orbit satellites would reflect light for less of the night, *id.* at 12–14, even satellites at the lower orbits proposed by SpaceX would remain visible for several hours every morning and evening during and around astronomical twilight, *Impact of Satellite Constellations*,

*supra*, at 5.    Additional light pollution during "astronomical and nautical twilight" is harmful because that time is an "important time for key classes of astronomical observations, such as the detection and characterisation of comets, interstellar objects and near-earth objects." *Dark and Quiet Skies*, *supra*, at 147; *see also* Int'l Dark Sky Ass'n Comments at 7.

Moreover, even if lowering satellites would reduce the overall light-pollution impact for some people, such as dark-sky astronomers, *see*, *e.g.*, AAS Comment at 1, *other* interested parties like stargazers and photographers who rely on clear skies at twilight (for example, to capture star trails over landscapes) would likely be *more* harmed by SpaceX's proposal.    SpaceX cannot ignore that harm by asserting that its newer generation satellites would be "all but . . . invisible to the naked eye."    SpaceX Opposition at 14.    That assertion gives little comfort to photographers, and it implicitly concedes that *some degree* of light pollution would be visible to the naked eye as well. A recent study confirms this point, showing that, "relative to the existing population of objects in LEO, Starlink alone may roughly double the number of space-based moving objects detectable by the unaided eye around twilight." *Impact of Satellite Constellations*, *supra*, at 15.    NEPA requires the Commission to consider these tradeoffs.

Moreover, recent efforts at mitigating light pollution created by Starlink satellites have proven relatively unsuccessful.    For example, SpaceX in its response mentions its DarkSat program, SpaceX Opposition at 11 & n.39, but fails to disclose that it abandoned that program months ago, SpaceX, *Astronomy Discussion with National Academy of Sciences* (Apr. 28, 2020), http://www.spacex.com/updates/starlink-update-04-28-2020/ (explaining that SpaceX will be "moving forward with a sun visor solution instead").    And another SpaceX program—VisorSat, which equips satellites with a visor to block sunlight—has reportedly failed to achieve the brightness-reduction targets recommended by interested organizations. *See Dark and Quiet Skies*,

*supra*, at 30; *see also* Anthony Mallama, *The Brightness of VisorSat-Design Starlink Satellites* 10 (Jan. 2, 2021).  Even with visors equipped, these satellites would sometimes be visible to the naked eye.  *See Dark and Quiet Skies*, *supra*, at 43 n.1 (explaining that the faintest stars "discernable by a naked-eye observer are about magnitude 6"); Mallama, *supra*, at 10 (concluding that VisorSat satellites are sometimes brighter than a magnitude of 6).  VisorSat thus does not eliminate concerns relating to photography and astronomy.  Morgan McFall-Johnsen, *SpaceX Has Darkened Its Starlink Internet Satellites with Visors To Avoid Disrupting the Night Sky—But They Can Still Ruin Astronomers' Data*, Bus. Insider (Jan. 10, 2021), https://www.businessinsider.in /science/news/spacex-has-darkened-its-starlink-internet-satellites-with-visors-to-avoid-disrupting -the-night-sky-but-they-can-still-ruin-astronomers-data/articleshow/80200242.cms.

Photographic evidence collected from observatories confirms that VisorSat is no panacea. Despite SpaceX's efforts, VisorSat still shows up in astronomical imaging:



Figure 5.11. Starlink-1436 (Visorsat) as imaged by the Zeiss 1.23m telescope at Calar Alto, Spain on 20 September 2020. Visorsat (at 555 km orbital height) is the trail seen in the bottom left. A second trail from in the upper middle corresponds to Starlink-1348 (at 386 km orbital height).

*Dark and Quiet Skies*, *supra*, at 242.  Although VisorSat might be an improvement over earlier generations of Starlink satellites, it remains an unproven technology that threatens astronomical research to an unknown degree, particularly given that the 2,814 operating satellites at issue here

34

are intended to be part of a broader fleet of 42,000 operating satellites, helping to increase the frequency and intensity of the overall fleet's light pollution.  Notably, AAS "support[s] consideration by the Commission of light pollution and impacts to optical astronomy" at the same time that it supports certain mitigation strategies as well.  AAS Comments at 1.  The Commission should not rely on SpaceX's say-so (or merely one qualified factor noted by one stakeholder) to conclude that VisorSat renders NEPA analysis unnecessary as to the impact on light pollution.

In any event, even if SpaceX were correct that granting the modification proposal would reduce light pollution and astronomical interference, that *still* would not excuse the Commission from preparing an EA or an EIS.  Significant environmental effects may "include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial."  40 C.F.R. § 1508.1(g)(1).  Accordingly, the Commission still must engage in NEPA review to assess SpaceX's claims that its proposed modification would have beneficial effects.  Applying the categorical exclusion here based on an untested assumption that the modification would be beneficial would defeat NEPA's purpose of ensuring that agencies look before they leap.

### C.    SpaceX's Modification Proposal Would Likely Increase Space Debris.

Finally, Viasat showed that approving the proposed modification would increase space debris and collision risks.  Viasat NEPA Petition 21–26.  SpaceX does not develop any argument that space debris can be ignored under NEPA.  Instead, it asserts that its proposal would not worsen those environmental effects, claiming that lowering satellites reduces collision risks.  That assertion is baseless; granting the proposal would increase rather than decrease collision risks, and thus increase the risk of creating additional space debris.

35

### 1.    The Proposed Modification Would Increase Collision Risks.

Viasat's NEPA Petition demonstrates that granting SpaceX's pending modification application would increase the risk of collisions and of creating additional space debris.  Viasat NEPA Petition 21–26.  SpaceX does *not* assert that either of these areas can be ignored under NEPA.  Instead, SpaceX argues that its proposal would not worsen the environmental effects of its Ku/Ka-band NGSO constellation.

As an initial matter, SpaceX once again uses the wrong baseline in evaluating the potential effects of granting its pending application under NEPA.  As discussed above, the key question is not whether 2,814 satellites operating at lower altitude would create more space debris or pose greater collision risks than 2,814 satellites operating at higher altitude.  Rather, the key question is whether any deployment of those additional 2,814 satellites—which is not permitted under the status quo—could adversely impact the environment.  *See supra* Part II.A.1.  The answer to that question is a resounding "yes":  There can be no dispute that adding these satellites to the orbital environment would cause further crowding of that environment, increase the risk of collision, and create additional debris.  Orbital debris produced from collisions would cause untold ecological and economic harm, 40 C.F.R. § 1508.1(g)(1), particularly as that debris spreads into orbits hundreds of kilometers outside of the point of impact.

SpaceX misses the mark even as to the incorrect question of whether the operation of those satellites at lower altitudes would cause less harm than their operation at higher altitudes.  SpaceX Opposition at 15-16.  SpaceX rests entirely on its incorrect assumption that lowering the altitude at which its satellites operate would decrease associated space debris and collision risks.  But no such assumption is warranted.  Indeed, SpaceX's unduly reductive suggestion that "lower is better" ignores a host of relevant considerations, including that: (i) failed satellites at lower altitude pose a significant collision risk as long as they cannot avoid collisions while they remain in orbit, which

could be as long as six years in the case of Starlink satellites; (ii) lower altitudes are more congested than higher altitudes, increasing collision risks; (iii) the many proposed LEO constellations that would operate at lower altitudes will significantly increase estimated collision rates there; (iv) debris objects at higher altitudes must deorbit through lower altitudes, increasing the risk of collision with a failed satellite located there; (v) collisions at lower altitudes can be expected to create a significant number of debris objects that will impact altitudes over many hundreds of kilometers—not just those at the collision altitude—and can last for decades, if not centuries; and (vi) consequently, the potential risks associated with operations at lower altitudes cannot be avoided simply by maintaining some separation distance from other systems. *See generally* Jan. 15, 2021 Viasat Ex Parte; Letter from Amy R. Mehlman, Vice President, U.S. Gov't Affairs & Policy, Viasat, Inc., & Jarrett S. Taubman, Assoc. Gen. Counsel, Gov't & Regulatory Affairs, Viasat, Inc., to Marlene H. Dortch, Sec'y, FCC, at 4 & n.10, IBFS File No. SAT-MOD-20200417-00037 (Nov. 19, 2020) (explaining the increased collision risks posed by each of SpaceX's successive modifications).

When all relevant factors are considered, the inescapable conclusion is that allowing SpaceX to operate at lower altitudes as proposed would significantly increase the risk of collisions and creating additional space debris. Viasat recently demonstrated as much using a variety of existing and established third-party metrics and methodologies—including: (i) DAS single-satellite analysis (which corrects errors in the DAS analysis presented by SpaceX in its opposition, SpaceX Opposition at 15); (ii) analysis of intra-system risk—*i.e.*, the risk that two or more satellites within the Starlink system will collide; (iii) analysis of risk associated with conjunction warnings that do not result in actual avoidance maneuvers; and (iv) the additive impact of individual

collision risk calculated under DAS when considering multi-satellite constellations.  *See generally* Jan. 15, 2021 Viasat Ex Parte.

Particularly in light of the evidence on the record that undermines SpaceX's assertions, the Commission should perform further environmental analysis before acting on SpaceX's modification proposal and take a hard look under NEPA—especially given the undisputed effects that space debris has on the "reliability, continuity, and safety of satellite operations." *Mitigation of Orbital Debris*, 19 FCC Rcd. 11567, 11575 (2004).

### 2. SpaceX's Remaining Efforts To Avoid Evaluation of Orbital-Debris Risks Are Meritless.

SpaceX's last-ditch efforts to distract the Commission from its NEPA obligations are meritless.

First, SpaceX asserts that analyzing orbital debris under NEPA would be "redundant" with the Commission's regime for considering orbital debris.  But reviewing a party's orbital debris mitigation plan obviously does not discharge the Commission's NEPA obligations to fully consider the environmental impacts of a proposed action and its potential alternatives, whether as to orbital debris or otherwise.  NEPA requires the preparation of an EA or EIS that fully evaluates all potentially significant effects of the project and its alternatives, including a no-action alternative.  40 C.F.R. §§ 1501.5(c)(2), 1502.14; *see id.* §§ 1501.3(b)(2), 1508.1(g).  The Communications Act, by contrast, gives the Commission authority to encourage "the larger and more effective use of radio in the public interest," 47 U.S.C. § 303(g), which the Commission has understood as a grant of authority to regulate orbital debris and thus protect satellite radio transmissions, *Mitigation of Orbital Debris*, 19 FCC Rcd. at 11575; *see Mitigation of Orbital Debris in the New Space Age*, IB Docket No. 18-313, 2020 WL 2740796, at *6 (Apr. 24. 2020). Regulating orbital debris to promote the use of radio transmissions in the public interest is

consistent with, but distinct from, NEPA's requirement to fully evaluate the environmental impacts of a particular project and its potential alternatives. SpaceX does not and could not contend that the Commission's orbital-debris regulations impose identical environmental obligations on the Commission. *See* 47 C.F.R. § 25.114(d)(14). To the extent that orbital-debris documents produced pursuant to the Commission's regulations inform its NEPA obligations, the Commission may be able to consider them as part of the NEPA process. But it cannot categorically dismiss NEPA's obligations as "unnecessary and redundant," as SpaceX invites it to do. SpaceX Opposition at 17.

Second, SpaceX tries to distract the Commission from the need for NEPA analysis in this case by drawing attention to Viasat's proposed NGSO system modification. But in addition to being legally irrelevant to the question whether NEPA review is required, that comparison merely highlights the greater risks posed by SpaceX's proposal, as reflected in Viasat's recent submission in this proceeding. Jan. 15, 2021 Viasat Ex Parte at 5–6, 10–14. The greatest space-debris threat from satellites comes from mega-constellations involving thousands of satellites in orbit; smaller, more efficient operations like Viasat's involve fewer satellites at less congested orbits and present a significantly lower risk of harm. *Id.* at 2–3, 8, 10 (explaining how Viasat's proposed constellation is safer).

Finally, as already discussed, NEPA would require the Commission to perform environmental analysis even if SpaceX's proposal on the whole were deemed to generate net benefits. *See* 40 C.F.R. § 1508.1(g)(1). The modification proposal "may have a significant environmental impact" relating to orbital debris, 47 C.F.R. § 1.1307(c), and NEPA requires that the Commission take a hard look at it so that it can make a fully informed decision on SpaceX's application.

## CONCLUSION

For all of these reasons, Viasat respectfully requests that the Commission deny or defer consideration of SpaceX's pending modification application.  More specifically, the Commission should prepare an EIS fully evaluating the environmental impacts of the proposed action pursuant to NEPA, before acting upon SpaceX's application.  In the alternative, the Commission should prepare an EA before acting upon SpaceX's application.  This request for relief is supplemental to the relief sought in Viasat's initial petition.

Date: January 19, 2020

Respectfully submitted,

/s/ Helgi C. Walker

John P. Janka
Amy R. Mehlman
Jarrett S. Taubman
VIASAT, INC.
901 K Street NW, Suite 400
Washington, DC 20001

Helgi C. Walker
Michael K. Murphy
Joshua S. Lipshutz
Russell B. Balikian
Philip W. Hammersley
Brian C. McCarty
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. NW
Washington, DC 20036
Telephone: (202) 955-8500
Email: hwalker@gibsondunn.com

*Counsel for Viasat*

## DECLARATION OF MARK A. STURZA

I, Mark A. Strurza, hereby make the following declarations under penalty of perjury:

1. I am President of 3C Systems Company, which has acted as consultant to Viasat, Inc. ("Viasat") regarding the matters addressed in the foregoing Reply of Viasat, Inc. in Support of Its Petition Pursuant to Section 1.1307(c) ("NEPA Reply").

2. I am the technically qualified person responsible for preparation of engineering information contained in the NEPA Reply.  I have reviewed the NEPA Reply and certify that, to the best of my knowledge, information and belief, the factual assertions in the NEPA Reply are truthful and accurate.


/s/ Mark. A. Sturza
Mark A. Sturza
President
3C Systems Company


January 19, 2021

**CERTIFICATE OF SERVICE**

I, Helgi C. Walker, hereby certify that on this 19th day of January, 2021, I caused to be served a true copy of the foregoing Reply of Viasat, Inc. in Support of Its Petition Pursuant to Section 1.1307(c) of Viasat, Inc. and accompanying documents via first-class mail upon the following:

Patricia Cooper
David Goldman
SPACE EXPLORATION TECHNOLOGIES CORP.
1155 F Street, N.W
Suite 475
Washington, DC 20004

William Wiltshire
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W.
Suite 800
Washington, DC 20036
*Counsel for SpaceX*

/s/ Helgi C. Walker

Helgi C. Walker
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. NW
Washington, DC 20036
Telephone: (202) 955-8500
Email: hwalker@gibsondunn.com

*Counsel for Viasat*

# EXHIBIT S

# The Brightness of VisorSat-Design Starlink Satellites

Anthony Mallama

anthony.mallama@gmail.com

2021 January 2

Abstract

The mean of 430 visual magnitudes of VisorSats adjusted to a distance of 550-km (the operational altitude) is 5.92 +/-0.04. This is the characteristic brightness of these satellites when observed at zenith. VisorSats average 1.29 magnitudes fainter than the original-design Starlink satellites and, thus, they are 31% as bright.

## 1. Introduction

The rapidly growing population of bright satellites in low-earth-orbit is beginning to interfere with ground-based astronomy (Otarola et al., 2020, Walker et al., 2020, Tyson et al., 2020,  Gallozzi et al., 2020, Hainaut and Williams, 2020 and McDowell, 2020). The SpaceX company has launched hundreds of Starlink communication satellites during the past two years and plans to put thousands more into orbit in the near future. OneWeb is actively pursuing a similar project and other companies may follow.

SpaceX has engaged with the astronomical community to address this issue. As a result they have developed a VisorSat model of Starlink that includes a Sun shade to make the satellites appear dimmer. This paper characterizes the observed brightness of VisorSat-design spacecraft in visible light and compares it to that of the original Starlink design.

Section 2 of this paper defines the magnitudes used herein and discusses the illumination phase angle which can affect brightness. Then Section 3 describes the physical shape of Starlink satellites and discusses their orbits as these factors pertain to brightness. Section 4 describes the sources of satellite

1

magnitudes used in this study as well as the data processing techniques. Section 5 presents the findings which include the mean VisorSat magnitude, its uncertainty, the dispersion and the phase function. Section 6 compares the brightness of VisorSat with that of the original-design Starlink satellites and with the OneWeb satellite constellation. Section 7 discusses some limitations of this study. Section 8 briefly addresses VisorSats below the operational altitude as well as brightness surges. Section 9 gives the conclusions.

This study is part of the author's work with the Satellite Observations Working Group (Otarola et al., 2020). Most of the SOWG members record observations made through spectral filters. The visual magnitude results in this paper characterize satellite brightness across all visible wavelengths and complement the color-filtered photometry being carried out by other members of the SOWG.

## 2. Magnitudes and phase angles

*Visual* magnitudes represent satellite brightness in combined blue, green and red light with an effective wavelength in green. The band-pass sensitivity is centered near 0.6 micron and its width is about 0.4 micron. Visual magnitudes are a close match to the V-band of the Johnson-Cousins photometric system although the bandwidth of V is narrower.

The *apparent magnitude* is that recorded by a sensor after correction for atmospheric extinction. An analogy to the absolute magnitude of astronomers is the *1000-km magnitude* used by the satellite community. The 1000-km magnitude is an adjustment of apparent brightness to that standard distance which allows for comparisons between multiple satellite constellations at different altitudes.

Finally, there is a *standard magnitude* that is intended to account for the illumination phase angle which is measured at the satellite between the Sun and the observer. In principle the standard magnitude gives the brightness of a half-illuminated satellite at 1000 km distance. The adjustment between the 1000-km magnitude and the standard magnitude is given in Equation 1,

$$C = 2.5 * \log_{10} ( 0.5 + 0.5 \cos B ) + 0.753$$

Equation 1

2

where $C$ is the correction to be added. For an observer at phase angle $B$ the term inside the parentheses represents the fraction of a spherical object that is illuminated by the Sun. The value 0.753 sets the correction to zero for a satellite at $B = 90^{\circ}$. In practice the standard magnitude is of limited value for Starlink satellites because they are not shaped like spheres.

A potentially useful approach for Starlink is to derive an empirical phase function by determining a least-squares fit between the 1000-km magnitudes and their phase angles. An empirical fit for VisorSat magnitudes is presented later in this paper.

The SOWG generally employs the Minnaert (1941) bidirectional reflectance function to process observed magnitudes. Other formalisms can be used, too. Cole (2020) developed a physical model for VisorSats that includes its solar array.

3. Starlink satellites and their orbits

The orbital characteristics of Starlink satellites along with their physical size, shape, attitude (that is, their orientation in space) and reflective properties determine their brightness. Spacing between the observer and the satellite affects brightness according to the inverse square of the distance. SpaceX plans to distribute Starlink satellites into several orbital 'shells' of different altitudes and, thus, different distances. To date all satellites have been assigned to the 550 km altitude shell.

Starlink satellites are launched in batches of about 60 at a time on a single rocket. They are initially injected into lower altitude orbits where they reside until precession advances them to the desired celestial plane. Then they ascend to their final orbital altitude in groups of about 20 where they are spaced apart by 5 minutes of time and orbit the Earth in 95 minutes. These groups of 20 may be observed from one location on a single night.

The satellites themselves consist of a flat-panel shaped bus and a large attached solar array. The flat panel is nominally oriented perpendicular to the nadir direction and the solar panel is positioned to intercept sunlight. The bus appears to have both diffusive and specularly reflective surfaces.

3

A352

Starlink-1436 was the first VisorSat-design satellite to be launched. In this model a Sun shade was added to the bus in order to reduce the amount of sunlight reflected from the nadir side toward observers on the Earth's surface. That initial VisorSat was orbited on 2020 June 4 on the seventh operational Starlink launch designated L7. Beginning with the L9 launch of 2020 August 7 all Starlink satellites have been VisorSats.

4. Observation and data processing

The magnitudes analyzed in this paper are visual as defined in Section 2. That is, they represent the brightness of Starlink satellites in combined red, green and blue colors with an effective wavelength near 0.6 micron.

The data come from three sources. Two of them are experienced visual observers using binoculars. J. Respler records satellite magnitudes from coordinates $40^O$ north and $74^O$ west while the author observes from $39^O$ north and $77^O$ west. Satellite brightness is determined by comparison with nearby stars of known magnitudes using interpolation. The observers aim to achieve magnitudes that are accurate to about 0.2 magnitudes. Each apparent magnitude is converted to a 1000-km magnitude based on the satellite range at the time of observation. An associated phase angle is determined from the positions of the satellite, Sun and observer.

On 7 occasions out of 290 binocular observations the satellite was too faint to be seen. Since the limiting magnitude is usually about 8 and few satellites are close to that limit, the value 8.5 was assigned for those 7 observations. Figure 1 illustrates the distribution of apparent magnitudes.

The third source of data is the Mini-MegaTORTORA (MMT) automated observatory (Karpov et al. 2015) in Russia at $44^O$ north and $41^O$ east. Each of the 9 MMT channels consists of a 71 mm diameter f/1.2 lens and a 2160 x 2560 sCMOS detector. Unfiltered MMT magnitudes are within 0.1 magnitude of the Johnson-Cousins V band-pass for objects with small B-V color indices according to a color transformation formula kindly provided by S. Karpov (private communication). Mallama (2020a) found MMT magnitudes to be consistent with those of visual observers.

The online MMT database lists standard magnitudes which include the phase angle correction for a spherical body described in Section 2. Since Starlink satellites are not spherical the correction indicated

4

by Equation 1 is removed in order to give the 1000-km magnitude for the purpose of this study. When a satellite is recorded simultaneously by two separate MMT channels the magnitudes may differ by 0.1 - 0.2 magnitude which suggests that accuracy is of that order.



Figure 1. Histogram of apparent VisorSat magnitudes recorded by the visual observers. Also shown are the assigned magnitudes where the satellites were too faint to be seen, along with apparent magnitudes for original-design Starlink satellites.

Starlink satellites spend the great majority of their lifetime in orbit at the 550 km operational altitude. Furthermore, SpaceX (2020) indicates that they adjust the configuration of the solar panel differently during the ascent and the operational phases. Therefore, only observations of satellites at the operational altitude were selected for the analysis in the next section, while observations of satellites at lower altitudes are addressed later. Measurements taken when the satellite was in the Earth's penumbral shadow were not used. Each of the 430 observations used in Section 5 sampled a different satellite pass. The data are listed in the Appendix A.

5. Brightness characterization

The mean 1000-km magnitude for satellites at the 550 km operational altitude is 7.22 +/- 0.04 and the standard deviation of the individual magnitudes is 0.85. The median magnitude is somewhat fainter at 7.36 indicating that the mean is skewed by a few very bright observations. The mean adjusted to a range of 550 km gives magnitude 5.92 which is an indication of VisorSat brightness at zenith.

Figure 2 shows the magnitudes plotted as a function of phase angle. The linear and quadratic fits indicate that the satellites are brighter at small phase angles as expected. However, the standard deviation remains at 0.085 after the linear fit is applied and it only reduces to 0.084 for the quadratic fit. So phase functions are of little practical value in predicting satellite brightness. The best fitting equations are given in Table 1.



Figure 2. The phase function with linear and quadratic least-squares fits.

Observations of original-design Starlink satellites also evidenced large observed scatter with little reduction from modeling. Otarola et al. (2020) determined a standard deviations of 0.75 magnitude for POMENIS V-band photometry of satellites above 550 km before normalization techniques were applied and that only reduced to 0.69 afterward. Likewise, Mallama (2020a) derived 0.67 for 1000-km original-design Starlink magnitudes and 0.65 after a linear phase angle correction was applied.

Table 1. Phase Functions

```
Linear        M_V = 6.809 + 0.00495 * P
Quadratic     M_V = 5.732 + 0.03352 * P – 0.000177 * P²
M_V = visual magnitude
P = phase angle in degrees
```

The large dispersion values are expected. Visual observers have often noticed that Starlink satellites viewed in succession with nearly identical satellite-Sun-observer geometries can vary widely in brightness. For example, J. Respler wrote "there were 4 pairs [of satellites] with second following first by several seconds. In each case the first was mag 4-6. The second was 2-3 mags brighter" (http://www.satobs.org/seesat/Mar-2020/0126.html).

Additionally, MMT light curves demonstrate substantial and seemingly erratic magnitude changes as illustrated in Figure 3. The large brightness variations seen by visual observers and recorded by MMT are probably due to satellite attitudes. Thus, accurate prediction of the brightness of any given satellite at any given time may remain a difficult problem to solve.



Figure 3. MMT light curve of Starlink-1549 recorded on 2020 November 27. The large brightness surge is not explained by the phase angles of the observations.

Two other independent variables besides phase angle have been examined. Figure 4 shows magnitudes plotted versus calendar days. Meanwhile, Figure 5 shows magnitudes versus days elapsed since a satellite reached the 550 km operational altitude. Both of these functions seem to indicate dimming over time and these effects may be aliasing. The best fit to the calendar day plot indicates a fading of 0.52 magnitude between day 236 and 363 of calendar year 2020. The power law fitted to the magnitudes in Figure 5 suggests about half a magnitude of fading shortly after the satellites attain 550 km altitude.

8

A357



Figure 4. Brightness as a function of time.



Figure 5. Brightness versus time after reaching 550 km altitude fitted with a power law.

9

6. Comparison with original-design Starlink and with OneWeb

There are several hundred original-design Starlink satellites in orbit. The mean VisorSat magnitude reported in the previous section is 1.29 fainter than that of the original-design satellites as reported by Mallama (2020a). Thus, VisorSats average 31% as bright as their predecessors.

OneWeb satellites are another constellation being launched in great numbers. These spacecraft have large solar arrays on long support arms and dish-like antennas on shorter arms. Their operational altitude of 1,200 km is more than twice that of Starlink. Mallama (2020b) determined a mean 1000-km magnitude of 7.18 +/-0.03 for OneWeb based on MMT observations. An analysis of visual binocular observations which were reported at a later time (satobs.org/seesat/Dec-2020/0072.html) gave results that are consistent with those from MMT. The 1000-km value adjusted to the nominal 1,200 km altitude of a OneWeb satellite in orbit corresponds to magnitude 7.58. Thus, VisorSats satellites are approximately the same brightness as OneWeb at a common distance but they are much brighter than OneWeb at their respective operational altitudes. Table 2 summarizes these comparisons.

Table 2. Magnitude comparisons

| Satellite | 1000-km | Operational Altitude | Uncertainty |
|---|---|---|---|
| VisorSat | 7.22 | 5.92 | +/-0.04 |
| Original Starlink | 5.93 | 4.63 | +/-0.02 |
| OneWeb | 7.18 | 7.58 | +/-0.03 |

7. Limitations of this study

Several factors place limits on the accuracy and the general applicability of the results in this paper. First is the geographic distribution of the three data sources noted in Section 3. The MMT is located in Russia and the two visual observers are located in the eastern United States. If spacecraft attitude is being adjusted geographically for operational reasons then the results presented here may not be representative of other regions. Furthermore, the Sun's varying declination throughout the year may

10

A359

affect satellite brightness in a complicated way that depends on a combination of season and geographic location.

Another limiting factor is the short time span of the observations which begins in 2020 August and ends in December. Since spacecraft attitude can be actively controlled, the observed magnitudes during this period may not reflect those at later times.

Lastly, the MMT standard magnitudes and phase angles used in the analysis are averages of those for each satellite track. The magnitudes were copied from the MMT database while the phase angles were estimated by eye from track plots. The estimated phase angles are accurate to about 1 degree. A more rigorous (and time consuming) approach would be to associate every magnitude in every track with its corresponding phase angle.

## 8. Lower altitude observations and flaring

Besides the data already discussed the author measured 22 magnitudes of VisorSats that were below the operational altitude. The mean 1000-km magnitude was 7.54 +/-0.03 and the mean altitude was 417 km. Thus, the satellites were not especially bright in an absolute sense although their mean apparent brightness was rather high at magnitude 5.65. The observations are listed in Appendix B.

The original Starlink satellites were observed to flare in brightness by up to 10 magnitudes on several occasions in 2020 April (Mallama 2020a). These reports were posted on the SeeSat-L mailing list at http://www.satobs.org. However, there have been no further reports of extreme flaring events for original or VisorSat Starlink satellites since that time.

## 9. Conclusions

Magnitudes of VisorSat satellites at their 550 km altitude measured by the MMT automated observatory in Russia and by two visual observers in the United States are analyzed. The main conclusion is that the mean of 430 visual magnitudes adjusted to a 550 km range is 5.92 +/-0.04. This is their characteristic brightness when seen at zenith. VisorSats average 1.29 magnitudes fainter than the original-design Starlink satellites. Thus, VisorSats are 31% as bright as their predecessors.

The following findings are also discussed. There is some indication of a modest brightness decline after the first few days of a satellite at 550 km and there may have been a general dimming over time in year 2020. Satellites below the operational altitude are not especially bright in an absolute sense but their apparent brightness is high. No extremely bright flaring of VisorSats has been reported since 2020 April.

References

Cole, R.E. 2020. A sky brightness model for the Starlink "Visorsat" spacecraft. Research Note of the AAS. https://iopscience.iop.org/article/10.3847/2515-5172/abc0e9.

Gallozzi, S., Scardia, M., and Maris, M. 2020. Concerns about ground based astronomical observations: a step to safeguard the astronomical sky. https://arxiv.org/pdf/2001.10952.pdf.

Hainaut, O.R., and Williams, A.P. 2020. Impact of satellite constellations on astronomical observations with ESO telescopes in the visible and infrared domains. *Astron. Astrophys.* manuscript no. SatConst. https://arxiv.org/abs/2003.019pdf.

Karpov, S., Katkova, E., Beskin, G., Biryukov, A., Bondar, S., Davydov, E., Perkov, A. and Sasyuk, V. 2015. Massive photometry of low-altitude artificial satellites on minimegaTORTORA. Fourth Workshop on Robotic Autonomous Observatories. RevMexAA.

Mallama, A. 2020a. Starlink satellite brightness before VisorSat. https://arxiv.org/abs/2006.08422.

Mallama, A. 2020b. The brightness of OneWeb satellites. https://arxiv.org/abs/2012.05100.

Minnaert, M. 1941. The reciprocity principle in lunar photometry. The Astrophysical Journal, 93  403. 10.1086/144279.

McDowell, J. 2020. The low Earth orbit satellite population and impacts of the SpaceX Starlink constellation. *Ap  Let*, 892, L36 and   https://arxiv.org/abs/2003.07446.

Otarola, A. (chairman) and Allen, L., Pearce, E., Krantz, H.R., Storrie-Lombardi, L.,  Tregloan-Reed, J, Unda-Sanzana, E., Walker, C. and Zamora, O. 2020. Draft Report of the Satellite Observations Working Group commissioned by the United Nations, Spain and the International Astronomical Union as the Workshop on Dark and Quiet Skies for Science and Society. https://owncloud.iac.es/index.php/s/WcdR7Z8GeqfRWxG#pdfviewer.

SpaceX 2020. Starlink Discussion National Academy of Sciences April 28, 2020. https://www.spacex.com/updates/starlink-update-04-28-2020/

Tregloan-Reed, J, Otarola, A., Ortiz, E., Molina, V., Anais, J., Gonzalez, R., Colque, J.P. and Unda-Sanza, E. 2020. First observations and magnitude measurement of SpaceX's Darksat. *Astron. Astrophys.*, manuscript no. Darksat_Letter_arXiv_submission_V2. https://arxiv.org/pdf/2003.07251.pdf.

Tyson, J.A., Ivezić, Ž., Bradshaw, A., Rawls, M.L., Xin, B., Yoachim, P., Parejko, J., Greene, J., Sholl, M., Abbott, T.M.C., and Polin, D. (2020). Mitigation of LEO satellite brightness and trail effects on the Rubin Observatory LSST. arXiv e-prints, arXiv:2006.12417.

Walker, C., Hall, J., Allen, L., Green, R., Seitzer, P., Tyson, T., Bauer, A., Krafton, K., Lowenthal, J., Parriott, J., Puxley, P., Abbott, T., Bakos, G., Barentine, J., Bassa, C., Blakeslee, J., Bradshaw, A., Cooke, J., Devost, D., Galadí-Enríquez, D., Haase, F., Hainaut, O., Heathcote, S., Jah, M., Krantz, H., Kucharski, D., McDowell, J.loan-Reed, J., Wainscoat, R., Williams, A., and Yoachim, P. (2020). Impact of satellite constellations on optical astronomy and recommendations toward mitigations. Bulletin of the Astronomical Society, 52(2), 0206. 10.3847/25c2cfeb.346793b8.

Appendix A.

Summary of 550 km magnitudes
'Cal. Day' is the day number of year 2020.
'Ops. Days' is the time since attaining the 550km operational altitude.
Red entries indicate 'not seen' where apparent magnitude is assigned as 8.5

| Starlink Sat # | Cal. Day | Ops. Days | Phase Angle | 1000-km Magnitude | Source |
|---|---|---|---|---|---|
| 1436 | 238 | 10 | 71 | 7.02 | Mallama |
| 1436 | 240 | 12 | 86 | 7.96 | " |
| 1581 | 250 | 5 | 75 | 7.47 | " |
| 1526 | 250 | 6 | 75 | 7.52 | " |
| 1584 | 250 | 6 | 74 | 7.61 | " |
| 1523 | 250 | 6 | 73 | 7.01 | " |
| 1576 | 250 | 6 | 73 | 6.13 | " |
| 1580 | 250 | 6 | 72 | 7.45 | " |
| 1591 | 250 | 6 | 71 | 6.56 | " |
| 1534 | 250 | 6 | 69 | 6.79 | " |
| 1544 | 250 | 6 | 69 | 6.31 | " |
| 1565 | 250 | 6 | 68 | 4.93 | " |
| 1560 | 250 | 6 | 67 | 5.23 | " |
| 1556 | 250 | 6 | 94 | 6.95 | " |
| 1557 | 250 | 6 | 100 | 7.06 | " |
| 1567 | 250 | 6 | 94 | 7.31 | " |
| 1558 | 250 | 6 | 104 | 7.31 | " |
| 1569 | 250 | 6 | 106 | 7.42 | " |
| 1555 | 250 | 6 | 116 | 6.49 | " |
| 1582 | 250 | 6 | 120 | 6.01 | " |
| 1522 | 250 | 6 | 124 | 5.75 | " |
| 1581 | 250 | 5 | 123 | 6.69 | " |
| 1584 | 251 | 7 | 70 | 6.29 | " |

13

A362

| | | | | | |
|---|---|---|---|---|---|
| 1523 | 251 | 7 | 70 | 6.39 | " |
| 1576 | 251 | 7 | 70 | 7.02 | " |
| 1580 | 251 | 7 | 69 | 7.93 | " |
| 1591 | 251 | 7 | 68 | 6.45 | " |
| 1534 | 251 | 7 | 67 | 6.85 | " |
| 1544 | 251 | 7 | 67 | 7.26 | " |
| 1565 | 251 | 7 | 67 | 7.44 | " |
| 1560 | 251 | 7 | 68 | 6.78 | " |
| 1556 | 251 | 7 | 77 | 6.75 | " |
| 1557 | 251 | 7 | 91 | 7.27 | " |
| 1567 | 251 | 7 | 95 | 7.45 | " |
| 1522 | 252 | 8 | 69 | 7.59 | " |
| 1581 | 252 | 7 | 69 | 6.48 | " |
| 1526 | 252 | 8 | 68 | 6.55 | " |
| 1584 | 252 | 8 | 68 | 6.86 | " |
| 1523 | 252 | 8 | 68 | 7.17 | " |
| 1576 | 252 | 8 | 69 | 6.59 | " |
| 1580 | 252 | 8 | 69 | 8.07 | " |
| 1591 | 252 | 8 | 69 | 6.95 | " |
| 1534 | 252 | 8 | 70 | 7.09 | " |
| 1544 | 252 | 8 | 72 | 7.30 | " |
| 1565 | 252 | 8 | 73 | 7.17 | " |
| 1560 | 252 | 8 | 75 | 7.50 | " |
| 1556 | 252 | 8 | 102 | 6.78 | " |
| 1557 | 252 | 8 | 100 | 6.72 | " |
| 1567 | 252 | 8 | 109 | 7.21 | " |
| 1611 | 287 | 8 | 56 | 7.59 | " |
| 1641 | 287 | 8 | 56 | 6.53 | " |
| 1597 | 288 | 8 | 55 | 7.45 | " |
| 1615 | 288 | 8 | 55 | 7.18 | " |
| 1629 | 288 | 8 | 56 | 6.69 | " |
| 1608 | 288 | 8 | 57 | 7.40 | " |
| 1628 | 288 | 8 | 69 | 7.65 | " |
| 1592 | 288 | 8 | 81 | 7.40 | " |
| 1626 | 288 | 8 | 93 | 6.93 | " |
| 1601 | 288 | 8 | 96 | 7.43 | " |
| 1630 | 288 | 8 | 103 | 6.95 | " |
| 1595 | 288 | 9 | 56 | 7.16 | " |
| 1640 | 288 | 9 | 56 | 7.58 | " |
| 1611 | 288 | 9 | 57 | 6.91 | " |
| 1641 | 288 | 9 | 58 | 7.01 | " |
| 1597 | 288 | 9 | 59 | 6.90 | " |
| 1615 | 289 | 9 | 62 | 7.41 | " |
| 1629 | 289 | 9 | 102 | 7.16 | " |
| 1608 | 289 | 9 | 95 | 7.17 | " |

14

| 1628 | 289 | 9 | 100 | 6.93 | " |
|------|-----|---|-----|------|---|
| 1592 | 289 | 9 | 90 | 6.95 | " |
| 1626 | 289 | 9 | 92 | 6.99 | " |
| 1601 | 289 | 9 | 115 | 6.59 | " |
| 1630 | 289 | 9 | 118 | 6.23 | " |
| 1613 | 289 | 9 | 114 | 6.61 | " |
| 1567 | 304 | 60 | 92 | 8.32 | " |
| 1558 | 304 | 60 | 94 | 7.51 | " |
| 1569 | 304 | 60 | 96 | 7.61 | " |
| 1542 | 318 | 0 | 92 | 7.93 | " |
| 1551 | 318 | 0 | 108 | 6.88 | " |
| 1568 | 318 | 0 | 111 | 7.25 | " |
| 1559 | 318 | 0 | 114 | 7.09 | " |
| 1542 | 319 | 1 | 113 | 7.86 | " |
| 1578 | 319 | 0 | 116 | 7.32 | " |
| 1536 | 319 | 0 | 119 | 7.76 | " |
| 1530 | 318 | 49 | 72 | 7.05 | " |
| 1527 | 318 | 49 | 71 | 7.46 | " |
| 1624 | 318 | 49 | 48 | 7.28 | " |
| 1577 | 318 | 49 | 51 | 7.41 | " |
| 1574 | 318 | 49 | 53 | 7.80 | " |
| 1554 | 318 | 49 | 57 | 7.90 | " |
| 1541 | 318 | 49 | 79 | 7.69 | " |
| 1543 | 318 | 49 | 99 | 7.59 | " |
| 1535 | 318 | 49 | 102 | 7.66 | " |
| 1548 | 319 | 49 | 95 | 8.25 | " |
| 1540 | 319 | 46 | 103 | 7.95 | " |
| 1570 | 319 | 49 | 49 | 7.16 | " |
| 1514 | 319 | 50 | 50 | 7.31 | " |
| 1530 | 319 | 50 | 55 | 6.83 | " |
| 1527 | 319 | 50 | 58 | 7.33 | " |
| 1524 | 319 | 50 | 61 | 7.22 | " |
| 1577 | 319 | 50 | 45 | 6.83 | " |
| 1574 | 319 | 50 | 59 | 7.52 | " |
| 1554 | 319 | 50 | 57 | 7.39 | " |
| 1541 | 319 | 50 | 80 | 6.24 | " |
| 1543 | 319 | 50 | 106 | 7.38 | " |
| 1535 | 319 | 50 | 109 | 6.59 | " |
| 1548 | 319 | 50 | 94 | 7.41 | " |
| 1540 | 320 | 47 | 98 | 7.45 | " |
| 1561 | 320 | 49 | 101 | 7.19 | " |
| 1562 | 320 | 49 | 110 | 7.21 | " |
| 1573 | 321 | 52 | 45 | 7.91 | " |
| 1564 | 321 | 52 | 45 | 7.79 | " |
| 1572 | 321 | 52 | 50 | 7.36 | " |

15

| | | | | | |
|---|---|---|---|---|---|
| 1570 | 321 | 52 | 67 | 6.90 | " |
| 1514 | 321 | 53 | 65 | 6.99 | " |
| 1556 | 321 | 77 | 49 | 8.08 | " |
| 1530 | 321 | 53 | 104 | 7.69 | " |
| 1527 | 321 | 53 | 110 | 7.58 | " |
| 1524 | 321 | 53 | 101 | 7.97 | " |
| 1577 | 321 | 53 | 105 | 7.73 | " |
| 1574 | 321 | 53 | 109 | 7.99 | " |
| 1582 | 321 | 77 | 49 | 7.08 | " |
| 1522 | 321 | 77 | 65 | 7.02 | " |
| 1581 | 321 | 76 | 66 | 7.59 | " |
| 1526 | 321 | 77 | 105 | 7.11 | " |
| 1584 | 321 | 77 | 109 | 7.39 | " |
| 1523 | 321 | 77 | 95 | 7.43 | " |
| 1576 | 321 | 77 | 98 | 8.21 | " |
| 1580 | 322 | 77 | 108 | 7.59 | " |
| 1591 | 322 | 77 | 110 | 7.45 | " |
| 1565 | 323 | 79 | 47 | 6.63 | " |
| 1560 | 323 | 79 | 50 | 7.09 | " |
| 1556 | 323 | 79 | 65 | 7.01 | " |
| 1557 | 323 | 79 | 92 | 7.33 | " |
| 1567 | 323 | 79 | 105 | 7.67 | " |
| 1558 | 323 | 79 | 109 | 8.11 | " |
| 1569 | 323 | 79 | 99 | 7.11 | " |
| 1555 | 323 | 79 | 109 | 7.56 | " |
| 1582 | 323 | 79 | 112 | 7.72 | " |
| 1522 | 323 | 79 | 116 | 7.66 | " |
| 1581 | 323 | 78 | 119 | 7.87 | " |
| 1526 | 323 | 79 | 122 | 7.91 | " |
| 1663 | 333 | 2 | 93 | 7.23 | " |
| 1678 | 333 | 3 | 112 | 8.03 | " |
| 1696 | 333 | 3 | 104 | 7.03 | " |
| 1659 | 333 | 2 | 108 | 8.01 | " |
| 1676 | 333 | 2 | 113 | 7.95 | " |
| 1644 | 333 | 2 | 116 | 8.19 | " |
| 1698 | 333 | 2 | 119 | 7.05 | " |
| 1672 | 333 | 2 | 122 | 7.59 | " |
| 1633 | 333 | 7 | 36 | 6.73 | " |
| 1616 | 333 | 7 | 69 | 7.28 | " |
| 1636 | 333 | 8 | 52 | 7.93 | " |
| 1631 | 337 | 12 | 69 | 7.53 | " |
| 1593 | 337 | 57 | 52 | 7.29 | " |
| 1618 | 337 | 57 | 57 | 7.86 | " |
| 1590 | 337 | 57 | 35 | 7.06 | " |
| 1588 | 337 | 57 | 63 | 6.99 | " |

16

| 1595 | 337 | 57 | 33 | 5.92 | " |
| 1640 | 337 | 57 | 47 | 7.05 | " |
| 1611 | 337 | 57 | 78 | 7.54 | " |
| 1641 | 337 | 57 | 78 | 7.67 | " |
| 1597 | 337 | 57 | 56 | 7.86 | " |
| 1615 | 337 | 57 | 57 | 7.77 | " |
| 1629 | 337 | 57 | 99 | 7.01 | " |
| 1608 | 337 | 57 | 90 | 7.57 | " |
| 1628 | 337 | 57 | 96 | 7.41 | " |
| 1592 | 337 | 57 | 99 | 7.78 | " |
| 1771 | 347 | 52 | 62 | 5.93 | " |
| 1752 | 347 | 50 | 44 | 7.11 | " |
| 1617 | 347 | 48 | 72 | 7.30 | " |
| 1654 | 347 | 49 | 43 | 6.87 | " |
| 1690 | 347 | 48 | 88 | 6.99 | " |
| 1727 | 347 | 48 | 82 | 7.62 | " |
| 1689 | 347 | 48 | 108 | 7.49 | " |
| 1661 | 347 | 48 | 79 | 8.43 | " |
| 1719 | 347 | 48 | 105 | 6.41 | " |
| 1762 | 347 | 48 | 103 | 7.61 | " |
| 1723 | 349 | 52 | 34 | 6.63 | " |
| 1673 | 349 | 51 | 47 | 5.49 | " |
| 1656 | 349 | 52 | 84 | 7.26 | " |
| 1770 | 349 | 51 | 89 | 6.35 | " |
| 1771 | 349 | 54 | 62 | 6.06 | " |
| 1752 | 349 | 52 | 104 | 6.81 | " |
| 1617 | 349 | 50 | 107 | 6.91 | " |
| 1654 | 349 | 51 | 134 | 7.17 | " |
| 1690 | 349 | 50 | 133 | 7.37 | " |
| 1727 | 349 | 50 | 65 | 7.73 | " |
| 1586 | 352 | 25 | 66 | 7.99 | " |
| 1631 | 352 | 27 | 67 | 7.66 | " |
| 1625 | 352 | 26 | 43 | 7.18 | " |
| 1602 | 352 | 26 | 56 | 7.11 | " |
| 1633 | 352 | 26 | 61 | 7.92 | " |
| 1616 | 352 | 26 | 64 | 7.21 | " |
| 1636 | 352 | 27 | 81 | 7.17 | " |
| 1621 | 352 | 24 | 100 | 7.31 | " |
| 1635 | 352 | 26 | 107 | 6.39 | " |
| 1620 | 352 | 24 | 103 | 6.88 | " |
| 1607 | 352 | 23 | 98 | 6.78 | " |
| 1593 | 357 | 77 | 56 | 5.48 | " |
| 1618 | 357 | 77 | 58 | 5.79 | " |
| 1590 | 357 | 77 | 64 | 5.32 | " |
| 1588 | 357 | 77 | 66 | 5.40 | " |

17

| | | | | | |
|---|---|---|---|---|---|
| 1595 | 357 | 77 | 83 | 7.89 | " |
| 1640 | 357 | 77 | 86 | 8.15 | " |
| 1611 | 357 | 77 | 100 | 7.91 | " |
| 1641 | 357 | 77 | 103 | 7.66 | " |
| 1597 | 357 | 77 | 109 | 7.96 | " |
| 1615 | 357 | 77 | 110 | 7.58 | " |
| 1629 | 357 | 77 | 116 | 7.59 | " |
| 1538 | 363 | 45 | 70 | 7.95 | " |
| 1525 | 363 | 44 | 67 | 8.25 | " |
| 1529 | 363 | 42 | 77 | 7.81 | " |
| 1571 | 363 | 45 | 85 | 7.95 | " |
| 1552 | 363 | 45 | 88 | 7.53 | " |
| 1579 | 363 | 45 | 87 | 7.81 | " |
| 1532 | 363 | 45 | 89 | 7.69 | " |
| 1539 | 363 | 45 | 91 | 7.86 | " |
| 1551 | 364 | 46 | 46 | 8.01 | " |
| 1568 | 364 | 46 | 53 | 6.81 | " |
| 1559 | 364 | 46 | 71 | 7.93 | " |
| 1515 | 364 | 46 | 69 | 8.12 | " |
| 1538 | 364 | 46 | 89 | 8.11 | " |
| 1525 | 364 | 45 | 88 | 7.71 | " |
| 1529 | 364 | 43 | 90 | 7.65 | " |
| 1571 | 364 | 46 | 67 | 7.21 | " |
| 1514 | 323 | 54 | 119 | 9.13 | " |
| 1598 | 352 | 25 | 67 | 8.87 | " |
| 1552 | 364 | 46 | 112 | 8.87 | " |
| 1523 | 251 | 7 | 74 | 7.53 | Respler |
| 1580 | 251 | 7 | 66 | 7.81 | " |
| 1534 | 251 | 7 | 61 | 7.37 | " |
| 1560 | 251 | 7 | 84 | 6.75 | " |
| 1556 | 251 | 7 | 93 | 5.83 | " |
| 1591 | 252 | 8 | 80 | 6.24 | " |
| 1544 | 252 | 8 | 88 | 5.13 | " |
| 1581 | 253 | 8 | 79 | 5.69 | " |
| 1526 | 253 | 9 | 78 | 6.40 | " |
| 1584 | 253 | 9 | 87 | 7.05 | " |
| 1576 | 253 | 9 | 79 | 5.33 | " |
| 1554 | 275 | 6 | 109 | 6.03 | " |
| 1541 | 275 | 6 | 96 | 6.67 | " |
| 1540 | 275 | 3 | 59 | 2.72 | " |
| 1561 | 275 | 5 | 59 | 7.33 | " |
| 1564 | 275 | 5 | 54 | 7.26 | " |
| 1565 | 275 | 31 | 59 | 7.61 | " |
| 1514 | 275 | 6 | 57 | 7.05 | " |
| 1557 | 275 | 31 | 62 | 8.51 | " |

18

| | | | | | |
|---|---|---|---|---|---|
| 1436 | 280 | 52 | 68 | 7.48 | " |
| 1611 | 288 | 9 | 62 | 6.45 | " |
| 1641 | 288 | 9 | 68 | 6.49 | " |
| 1597 | 288 | 9 | 74 | 7.79 | " |
| 1615 | 289 | 9 | 77 | 8.07 | " |
| 1629 | 289 | 9 | 82 | 7.51 | " |
| 1608 | 289 | 9 | 87 | 8.22 | " |
| 1628 | 289 | 9 | 85 | 7.51 | " |
| 1592 | 289 | 9 | 90 | 7.68 | " |
| 1595 | 308 | 28 | 76 | 6.79 | " |
| 1601 | 309 | 29 | 107 | 6.66 | " |
| 1630 | 309 | 29 | 101 | 7.96 | " |
| 1619 | 309 | 29 | 80 | 8.39 | " |
| 1634 | 309 | 29 | 74 | 8.15 | " |
| 1593 | 309 | 29 | 68 | 8.39 | " |
| 1618 | 309 | 29 | 64 | 7.69 | " |
| 1524 | 318 | 49 | 63 | 8.64 | " |
| 1577 | 318 | 49 | 64 | 8.79 | " |
| 1582 | 318 | 75 | 89 | 8.41 | " |
| 1535 | 318 | 49 | 105 | 7.05 | " |
| 1548 | 319 | 49 | 110 | 7.36 | " |
| 1657 | 319 | 21 | 92 | 7.49 | " |
| 1752 | 319 | 20 | 59 | 8.80 | " |
| 1654 | 319 | 21 | 56 | 8.11 | " |
| 1690 | 319 | 20 | 56 | 7.51 | " |
| 1727 | 319 | 20 | 46 | 6.88 | " |
| 1661 | 319 | 20 | 50 | 6.76 | " |
| 1567 | 321 | 77 | 69 | 8.59 | " |
| 1558 | 321 | 77 | 75 | 7.59 | " |
| 1569 | 321 | 77 | 82 | 6.36 | " |
| 1555 | 321 | 77 | 84 | 7.62 | " |
| 1522 | 321 | 77 | 93 | 7.53 | " |
| 1538 | 350 | 32 | 80 | 7.95 | " |
| 1525 | 350 | 31 | 78 | 8.43 | " |
| 1552 | 350 | 32 | 73 | 7.59 | " |
| 1579 | 350 | 32 | 68 | 7.34 | " |
| 1532 | 350 | 32 | 70 | 7.66 | " |
| 1539 | 350 | 32 | 66 | 6.97 | " |
| 1565 | 252 | 8 | 79 | 9.43 | " |
| 1595 | 288 | 9 | 61 | 9.59 | " |
| 1601 | 289 | 9 | 100 | 9.09 | " |
| 1522 | 318 | 75 | 88 | 8.83 | " |
| 1436 | 236 | 8 | 76 | 7.64 | MMT |
| 1436 | 237 | 9 | 60 | 7.60 | " |
| 1436 | 265 | 37 | 88 | 7.75 | " |

19

| 1436 | 278 | 50 | 108 | 7.32 | " |
|------|-----|-----|-----|------|---|
| 1436 | 341 | 113 | 107 | 7.59 | " |
| 1556 | 245 | 1 | 84 | 7.56 | " |
| 1556 | 248 | 4 | 77 | 5.84 | " |
| 1557 | 247 | 3 | 81 | 7.65 | " |
| 1557 | 248 | 4 | 70 | 6.00 | " |
| 1558 | 247 | 3 | 90 | 6.89 | " |
| 1565 | 245 | 1 | 81 | 2.87 | " |
| 1567 | 247 | 3 | 85 | 7.43 | " |
| 1534 | 278 | 34 | 107 | 6.94 | " |
| 1544 | 278 | 34 | 98 | 7.17 | " |
| 1565 | 278 | 34 | 95 | 7.34 | " |
| 1771 | 298 | 3 | 45 | 5.59 | " |
| 1771 | 299 | 4 | 93 | 6.11 | " |
| 1656 | 298 | 1 | 45 | 3.09 | " |
| 1723 | 298 | 1 | 39 | 6.66 | " |
| 1723 | 299 | 2 | 54 | 7.48 | " |
| 1752 | 298 | 1 | 45 | 6.74 | " |
| 1752 | 299 | 2 | 94 | 7.51 | " |
| 1657 | 299 | 1 | 51 | 7.19 | " |
| 1673 | 298 | 0 | 39 | 5.72 | " |
| 1673 | 299 | 1 | 58 | 6.23 | " |
| 1617 | 299 | 0 | 99 | 7.59 | " |
| 1767 | 300 | 2 | 39 | 6.56 | " |
| 1523 | 304 | 60 | 89 | 7.36 | " |
| 1576 | 304 | 60 | 90 | 7.10 | " |
| 1591 | 304 | 60 | 104 | 6.97 | " |
| 1562 | 301 | 31 | 92 | 7.04 | " |
| 1583 | 300 | 30 | 95 | 7.20 | " |
| 1514 | 336 | 66 | 78 | 7.55 | " |
| 1570 | 336 | 65 | 82 | 7.53 | " |
| 1572 | 335 | 64 | 96 | 4.08 | " |
| 1573 | 335 | 64 | 103 | 7.67 | " |
| 1515 | 334 | 16 | 96 | 7.33 | " |
| 1525 | 335 | 16 | 96 | 7.27 | " |
| 1529 | 334 | 13 | 85 | 7.18 | " |
| 1529 | 335 | 14 | 94 | 7.45 | " |
| 1532 | 336 | 18 | 52 | 6.76 | " |
| 1533 | 317 | 2 | 58 | 6.99 | " |
| 1533 | 332 | 17 | 94 | 7.43 | " |
| 1533 | 334 | 19 | 76 | 7.68 | " |
| 1538 | 334 | 16 | 90 | 7.44 | " |
| 1538 | 335 | 17 | 100 | 7.25 | " |
| 1539 | 333 | 15 | 88 | 7.30 | " |
| 1549 | 332 | 13 | 102 | 7.10 | " |

20

| 1549 | 333 | 14 | 84 | 7.49 | " |
|------|-----|----|----|------|---|
| 1552 | 336 | 18 | 56 | 7.79 | " |
| 1563 | 334 | 15 | 80 | 3.31 | " |
| 1566 | 332 | 13 | 98 | 7.28 | " |
| 1566 | 334 | 15 | 80 | 2.90 | " |
| 1588 | 309 | 28 | 97 | 7.32 | " |
| 1608 | 323 | 42 | 92 | 7.68 | " |
| 1640 | 309 | 28 | 85 | 7.47 | " |
| 1656 | 335 | 38 | 98 | 7.21 | " |
| 1654 | 319 | 21 | 102 | 7.21 | " |
| 1654 | 335 | 37 | 92 | 7.57 | " |
| 1657 | 300 | 2 | 44 | 6.65 | " |
| 1673 | 300 | 2 | 50 | 5.82 | " |
| 1673 | 335 | 37 | 104 | 5.97 | " |
| 1617 | 319 | 20 | 104 | 7.39 | " |
| 1617 | 335 | 36 | 90 | 7.77 | " |
| 1661 | 319 | 20 | 93 | 7.48 | " |
| 1661 | 334 | 35 | 84 | 7.63 | " |
| 1665 | 319 | 20 | 95 | 7.45 | " |
| 1665 | 335 | 36 | 94 | 7.69 | " |
| 1689 | 319 | 20 | 95 | 7.25 | " |
| 1689 | 334 | 35 | 84 | 7.81 | " |
| 1690 | 319 | 20 | 99 | 6.97 | " |
| 1690 | 335 | 36 | 89 | 7.16 | " |
| 1771 | 300 | 5 | 102 | 6.82 | " |
| 1771 | 319 | 24 | 101 | 6.15 | " |
| 1771 | 335 | 40 | 95 | 5.81 | " |
| 1723 | 300 | 3 | 50 | 6.79 | " |
| 1752 | 300 | 2 | 104 | 7.47 | " |
| 1770 | 335 | 37 | 93 | 5.73 | " |
| 1719 | 318 | 19 | 97 | 7.10 | " |
| 1719 | 319 | 20 | 90 | 7.42 | " |
| 1721 | 319 | 20 | 91 | 7.45 | " |
| 1727 | 319 | 20 | 97 | 7.41 | " |
| 1727 | 320 | 21 | 79 | 7.76 | " |
| 1762 | 318 | 19 | 90 | 7.29 | " |
| 1762 | 335 | 36 | 95 | 7.49 | " |
| 1526 | 340 | 97 | 87 | 6.90 | " |
| 1526 | 341 | 98 | 90 | 7.37 | " |
| 1534 | 340 | 97 | 95 | 7.67 | " |
| 1544 | 340 | 97 | 94 | 7.88 | " |
| 1565 | 340 | 97 | 90 | 7.94 | " |
| 1582 | 340 | 97 | 104 | 6.34 | " |
| 1591 | 340 | 97 | 97 | 2.97 | " |
| 1581 | 340 | 96 | 93 | 6.45 | " |

21

| | | | | | |
|---|---|---|---|---|---|
| 1549 | 346 | 27 | 102 | 7.63 | " |
| 1588 | 340 | 60 | 88 | 7.73 | " |
| 1590 | 340 | 60 | 79 | 7.71 | " |
| 1595 | 340 | 60 | 85 | 7.49 | " |
| 1597 | 341 | 61 | 109 | 7.28 | " |
| 1640 | 340 | 60 | 85 | 7.74 | " |
| 1631 | 336 | 11 | 75 | 7.51 | " |
| 1602 | 336 | 10 | 78 | 5.91 | " |
| 1625 | 336 | 10 | 73 | 7.61 | " |
| 1696 | 346 | 16 | 107 | 7.71 | " |
| 1663 | 346 | 15 | 91 | 7.48 | " |
| 1556 | 353 | 109 | 98 | 7.21 | " |
| 1556 | 354 | 110 | 98 | 7.79 | " |
| 1558 | 355 | 111 | 80 | 7.36 | " |
| 1560 | 353 | 109 | 99 | 7.23 | " |
| 1560 | 354 | 110 | 100 | 7.60 | " |
| 1565 | 353 | 109 | 101 | 7.41 | " |
| 1565 | 354 | 110 | 96 | 7.46 | " |
| 1548 | 354 | 85 | 86 | 7.34 | " |
| 1562 | 353 | 83 | 94 | 7.90 | " |
| 1562 | 354 | 84 | 88 | 7.96 | " |
| 1564 | 353 | 83 | 96 | 7.80 | " |
| 1564 | 354 | 84 | 89 | 7.76 | " |
| 1540 | 354 | 82 | 85 | 7.59 | " |
| 1540 | 355 | 83 | 82 | 7.91 | " |
| 1515 | 350 | 32 | 103 | 6.98 | " |
| 1532 | 350 | 32 | 91 | 7.86 | " |
| 1538 | 350 | 32 | 110 | 5.39 | " |
| 1539 | 350 | 32 | 86 | 7.70 | " |
| 1552 | 350 | 32 | 94 | 7.68 | " |
| 1559 | 350 | 32 | 101 | 7.05 | " |
| 1571 | 350 | 32 | 98 | 7.70 | " |
| 1579 | 350 | 32 | 91 | 7.62 | " |
| 1525 | 350 | 31 | 98 | 6.96 | " |
| 1529 | 350 | 29 | 98 | 7.21 | " |
| 1608 | 353 | 73 | 96 | 7.70 | " |
| 1615 | 353 | 74 | 85 | 7.77 | " |
| 1631 | 353 | 28 | 69 | 6.74 | " |
| 1636 | 353 | 28 | 101 | 7.60 | " |
| 1602 | 353 | 27 | 77 | 6.90 | " |
| 1616 | 353 | 27 | 96 | 7.69 | " |
| 1625 | 353 | 27 | 70 | 6.56 | " |
| 1586 | 353 | 26 | 63 | 7.31 | " |
| 1598 | 353 | 26 | 59 | 7.45 | " |
| 1665 | 348 | 73 | 99 | 7.05 | " |

22

| 1663 | 363 | 32 | 101 | 7.43 | " |
| 1700 | 363 | 32 | 85 | 7.64 | " |

Appendix B.

Summary of magnitudes below 550 km
'Cal. Day' is the day number of year 2020.
'Ops. Days' (negative) is the time since attaining the 550km operational altitude.

| Starlink Sat # | Cal Day | Ops. Days | Phase Angle | 1000-km Magnitude | Source | Altitude km |
|---|---|---|---|---|---|---|
| 1569 | 231 | -13 | 193 | 7.60 | Mallama | 457 |
| 1555 | 231 | -13 | 193 | 7.69 | " | 458 |
| 1591 | 231 | -13 | 193 | 7.79 | " | 458 |
| 1534 | 231 | -13 | 193 | 8.37 | " | 458 |
| 1571 | 232 | -85 | 265 | 7.80 | " | 380 |
| 1577 | 232 | -36 | 216 | 7.40 | " | 380 |
| 1552 | 232 | -36 | 216 | 7.21 | " | 380 |
| 1574 | 232 | -36 | 216 | 7.42 | " | 380 |
| 1579 | 232 | -85 | 265 | 7.22 | " | 380 |
| 1554 | 232 | -36 | 216 | 7.02 | " | 380 |
| 1532 | 232 | -85 | 265 | 7.23 | " | 380 |
| 1541 | 232 | -36 | 216 | 7.03 | " | 380 |
| 1539 | 232 | -85 | 265 | 7.24 | " | 380 |
| 1543 | 232 | -36 | 216 | 7.04 | " | 380 |
| 1549 | 232 | -86 | 266 | 7.04 | " | 380 |
| 1535 | 232 | -36 | 216 | 7.45 | " | 380 |
| 1548 | 232 | -36 | 216 | 6.86 | " | 380 |
| 1533 | 232 | -1 | 181 | 7.07 | " | 380 |
| 1540 | 232 | -46 | 226 | 6.86 | " | 380 |
| 1563 | 318 | -1 | 181 | 9.36 | " | 549 |
| 1578 | 318 | -1 | 181 | 8.66 | " | 549 |
| 1536 | 318 | -1 | 181 | 8.56 | " | 549 |

23

# EXHIBIT T

*On-line Workshop*

# Dark and Quiet Skies
# for Science and Society

*Report and recommendations*

   



# 2. Executive summary

## 2.1. General executive summary

This report analyses all artificial interference that can have a negative impact on the visibility of the night sky. These interferences can be logically grouped into three categories according to type. The first category refers to the effect caused by the artificial emission of visible light during the night, also known as ALAN (Artificial Light At Night). The second category refers to the impact that the very large number of communication satellites in Low Earth Orbit will have on astronomical observations. The third category refers to the interference that radio broadcasting, both by terrestrial and satellite sources, have on observations by radio telescopes.

 The possibility of illuminating our houses and cities during the night time represents great technological progress and is currently an indefeasible asset to our society. However, excessive, ubiquitous and improperly directed illumination has very negative impact on three main aspects:

1. the ability of our citizens to view a pristine, starry sky,
2. the efficiency of scientific observations of cosmic phenomena by amateur and professional astronomers,
3. the bio-environment including human health.

These three aspects have been analysed in detail by three ad hoc Working Groups. Their findings and recommendations are summarized here.

In the case of the preservation of the pristine night sky, it is evident that it would be unrealistic to restore completely its visibility within the boundaries of a modern city, where the street illumination is mandatory for safety reasons. However, in order to safeguard the right of any citizen to enjoy the vision of the starred sky, we recommend that national and local governments establish a suitable number of "Dark Sky Oases" and protect them from excessive ALAN. When these are located nearby densely populated regions, urban illumination has to comply with a number of prescriptions that can mitigate the diffusion of light, including reducing the level of illumination to the minimum necessary and by directing the sources only where needed. Urban illumination that is not strictly needed for safety reasons should be discouraged. It is worthwhile noting that such measures result in substantial energy saving and serve to help promote societal conservation of natural resources.

In the case of the protection of existing or planned astronomical observatory sites, the mitigating measures are more stringent than those recommended for the Dark Sky Oases, not only because the level of light pollution from ALAN has to be kept considerably lower, but also because the control of the spectral distribution is an important factor. Modern astronomical optical observatories usually represent large financial investments by the relevant government institutions, therefore, it is in the interest of the same governmental authorities to protect a suitable area surrounding the observato- ries by adopting and enforcing specific regulations. However, in several cases, astronomical observatories that are financially supported by a given Government are located in a foreign country that offers better geographic and climate conditions for astronomical observations. In these cases, it is essential that clear assurance for enforced protection from ALAN is included in the international hosting agreement. This is one of the reasons why this matter is brought to the attention of the UN COPUOS, which offers the best international forum for proposing a uniform approach to the matter.



By analysing the impact of ALAN on astronomical observations, it was noted that the same polluting sources affect not only the sky, but also the environment in general and in particular biological life and human health. A specific Working Group on bio-environment has analysed these effects and is recommending a number of measures, some of which are germane to those recommended by the previous two cases. In addition, the Working Group is encouraging further study of the effect of ALAN on the bio-environment, in particular those produced by novel light sources, such as various types of outdoor LED lights.

One of the reasons why it is logical to present and discuss the three above cases as belonging to the same category, is the fact that the Working Groups recommendations, even if agreed internationally, can only be adopted and enforced by individual national and local governmental authorities, i.e., by the same authorities that regulate and finance, directly or indirectly, urban illumination.

Nonetheless, if a substantial number of UN Delegations would endorse the recommendations, their strength and value would greatly enhance the chances of their local implementation. It should be stressed, however, that the approach to regulate the ALAN effects differs substantially from those being considered for the remaining two interference sources that impact astronomy: stray light from satellite constellations and unregulated or wayward radio emissions.

The deployment of large numbers (tens of thousands) of communication satellites in LEO (Low Earth Orbit) is a very recent technological feat. Their main purpose is to provide earth-space-earth, low latency communication networking to any inhabited region of the globe. While this endeavor may be an advantage to society, the effect of the fully deployed constellations on the visibility of the night sky and on the professional astronomical observations has not been adequately considered. It turns out that, because of their low orbit, a considerable number of satellites will be visible to the naked eye, especially at low elevation above the horizon and at twilight and dawn.

More seriously, a much larger number of satellites will be detected during their flight paths by the highly sensitive astronomical detectors of modern telescopes during significant parts of the night. The impact is particular dramatic for wide-field telescopes and automated surveys aiming at the detection of moving objects, e.g., the COPUOS supported International Asteroid Warning Network (IAWN). It is estimated that up to 30-40% of the images taken by a wide field telescope, like Vera C. Rubin Observatory, could be made unusable. Differently from the previous category, the mitigation of the effects caused by satellite constellations calls for an internationally agreed regulation; i.e., it falls within the core business of the UN COPUOS. The situation is certainly complex, both from the technical point of view and from the possible regulatory aspects. Therefore, a larger section of the report has been devoted to the matter.

Radio astronomy has a long tradition of coping with interference caused by radio broadcasting and other artificial emissions. Indeed, a number of international agreements have been signed at the level of the International Telecommunication Union aiming at protecting wavelength bands that are of particular astronomical interest. However, the situation is continually evolving and the specific technology used to detect radio emission, substantially different from that used in the visual domain, makes the protection of radio astronomy a very complex matter. In addition, the recent increase of space-borne high-power radio emitters poses serious problems that must be addressed at the international level. In particular, non-GSO (GeoSynchronous Orbit) satellites should be required to avoid direct illumination of radio telescopes and radio quiet zones, especially when using radar and other high-power applications that are capable of burning out radio astronomy's receivers. Moreover, non-GSO satellites should be required to have sidelobe levels that are low enough that their indirect illuminations of radio telescopes and radio quiet zones do not interfere.



Executive Summary

The following 5 sections (from 2.2 to 2.6) are the thematic Executive Summaries prepared by the 5 Working Groups: Dark Sky Oases, Optical Astronomy, Bio-environment, Satellite Constellations and Radio Astronomy. The Summaries, as well as the corresponding full thematic reports, have been written independently by the 5 Working Groups and, although an effort has been made to homogenize their style and content, some repetitions were unavoidable.



## 2.2. Dark Sky Oases executive summary

The International Union on Conservation of Nature (IUCN) has classified Dark Sky Oases into six classes, based on the type of use to which they are put (such as astronomical research, astro-tourism, heritage values, wilderness areas used for public education and outreach etc.). The IUCN classification scheme has been adopted here. In May 2020 there were 223 Dark Sky Oases across the world. This chapter discusses the nature and causes of a bright night sky resulting from light pollution. This has adverse effect on professional astronomers, amateur astronomers, astro-tourists and on those who want to admire the beauty of a pristine and dark night sky.

Light pollution also has a number of additional adverse effects which are briefly discussed; they include reduced safety at night, wasted electric power, environmental harm and a probable adverse effect on human health. Sections 2.4 and 5. in this report cover some of these topics in more detail.

This Summary focuses on mitigating the effects of ALAN in "Dark Sky Oases," also known as "dark sky places." These are areas where the night sky has some form of policy protection from the effects of ALAN, through the means of lighting ordinances, local or national protocols or bye-laws, or the internal policies of land-management entities. Such protected areas have been granted accreditation by one of several internationally recognized accreditation organizations, notably the International Dark- Sky Association (based in Arizona) and the Starlight Foundation (based in the Canary Islands).

The work of the International Dark–Sky Association and of the Starlight Foundation is outlined, and the Dark Sky Oases they have accredited (or certified) are summarized in Section 3.7 and 3.8. The Aoraki Mackenzie International Dark Sky Reserve in New Zealand, with IDA accreditation, and the La Palma Starlight Reserve in the Canary Islands, with Starlight Foundation certification, are presented as typical case studies.

Light pollution has increased dramatically in many countries since the end of the Second World War as a result of the proliferation of outdoor street lighting and the use of lighting for commercial locations such as factory yards, ports and sports facilities and the floodlighting of buildings of heritage value.

Light pollution and bright night skies are a significant problem in eastern North America, Western Europe, India, Japan, and eastern China. Many people in these places are unable to see the Milky Way at all. In the most populated places only a few stars may be visible to the naked eye at night, compared to several thousand in Dark Sky Oases.

The effects of light pollution depend very much on the type of lamp and light source used. A short survey of different lamp types is given. The dominant rise of white light-emitting diode (LED) lamps in the last decade is noted. Many white LEDs have significant blue emission which is largely absent from sodium arc lamps. Here blue light is defined as emission with a wavelength less than 500 nm.

# EXHIBIT U




March 9, 2020

Ms. Mary B. Neumayr, Chairwoman
Mr. Stuart Levenbach, Senior Advisor to the Chairwoman
Mr. Ted Boling, Associate Director for NEPA
Mr. Michael Drummond, Deputy Associate Director for NEPA
Ms. Amy Coyle, Senior Counsel
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

**Re:       Comment in Response to**
**PRM: Update to the Regulations Implementing the Procedural Provisions of the**
**National Environmental Policy Act**

**Attn:      Docket No. CEQ-2019-0003**

Dear Ms. Neumayr and members of the Council on Environmental Quality:

On behalf of the undersigned individuals and organizations, we respectfully submit our comment
in *opposition* to the Council on Environmental Quality's ("CEQ") proposed amendments to the
CEQ regulations implementing the procedural provisions of the National Environmental Policy
Act[1] ("NEPA") ("Proposed Amendments").

**Executive Summary**
The undersigned primarily[2] object to the Proposed Amendments on the basis that the Proposed
Amendments do not include orbital space in the vicinity of the Earth (e.g. near-Earth space) and
its related concerns within the context and definition of the environment.  Given nearly forty
years elapsed since the regulations implementing the procedural provisions of NEPA were last
thoroughly reviewed ("Implementing Regulations"),[3] we agree with the limited proposition that
the Implementing Regulations need to be updated.  However, despite the articulated objective to
modernize the Implementing Regulations, we find the omission of near-Earth space and its

---

[1] 42 U.S.C. §§ 4321, et seq.
[2] At the public hearings on the Proposed Amendments, and no doubt in numerous written objections submitted
since, other individuals and organizations raised many objections to many of the proposed changes.  In this
Comment, we choose to focus on one omission from the Proposed Amendments to which little attention has been
directed.  We do not address other aspects of the Proposed Amendments to which others have raised objections.
That being said, the omission of these aspects in this Comment should not be attributed to the undersigned as either
an approval or disapproval.
[3] 40 CFR §§ 1500-1508, 1515-1518.

related concerns to be a significant oversight.  In an era of substantial growth within the commercial space sector and satellite megaconstellations,[4] near-Earth space must necessarily be *explicitly* included as an integral component of the environment under NEPA and the Implementing Regulations.  As the Proposed Amendments do not do so, we object to the present form of the Proposed Amendments and encourage the CEQ to include the proposed language below in any final amendments to the Implementing Regulations.

**Relevant Background**

*The Impetus*

There has long been the need to *expressly* include near-Earth space and its related concerns within the legal concept and definition of "human environment" under the Implementing Regulations.  However, the realization of this need became most pronounced following SpaceX's launch of its first set of sixty (60) Starlink[5] satellites on May 23, 2019 when many individuals observed the Starlink satellites cross the night sky:



Image used with permission of Marco Langbroek https://sattrackcam.blogspot.com/.[6]

---

[4] Although there is no universally recognized definition of a "satellite megaconstellation", the term is widely understood in the commercial space industry to mean groups of satellites numbering in the hundreds to thousands operated together, usually in similar orbits, for a common purpose such as relaying telecommunication signals at low latency over very large regions on Earth.

[5] A detailed description of the Starlink satellite mega constellation falls outside the scope of this Comment.  For such information, one should review the "SpaceX Non-Geostationary Satellite System - Attachment A - Technical Information to Supplement Schedule S" filed by SpaceX in conjunction with its Starlink applications.  *See* https://licensing.fcc.gov/myibfs/download.do?attachment_key=1158350.

[6] The specific source for the image can be found at: http://mlo.bz/Fljbf.

2

As images of the satellites circulated on the Internet, concerns about satellite megaconstellations grew. As additional details emerged, these concerns became more pronounced.

All told, more than 45,000 new communications satellites may be launched into near-Earth space[7] in the coming decade.[8] Other novel uses of near-Earth space in the future may include the launches of untold numbers of orbital advertisements,[9] reflectors,[10] and other objects whose presence in orbit entails potential effects as seen from the ground. Thus, real concerns have emerged about the effects large satellite constellation systems and other uses of near-Earth space would have on the night sky.

*The Regulatory Concern*

Given the attention to Starlink caused by its launch last May, questions arose as to how SpaceX obtained authorization for Starlink and the broader regulatory process.

As to the former question, SpaceX applied for and obtained authorization from the Federal Communications Commission ("FCC") to operate its Starlink satellites. It did so by filing applications with the FCC that became available for public comment. Following the public comment period, the FCC approved the SpaceX Starlink applications. Of course, the FCC has approved applications by other companies including, but not limited to, OneWeb,[11] Telesat Canada,[12] and Space Norway.[13] Some commentators suggest that either SpaceX (and by inference any similarly situated company) or the FCC failed to adequately address environmental concerns under NEPA with respect to Starlink.[14,15] In fact, some contend these failures warrant

---

[7] The orbital space in which commercial satellites operate range in mean height from ≤2,000 km, known as "Low Earth Orbit" or "LEO," up to ~42,000 km for satellites in geostationary orbits, or "GEO".

[8] We count a total of at least 45,886 satellites among the publicly stated plans of SpaceX, OneWeb, and Amazon alone. Henry, C., *SpaceX submits paperwork for 30,000 more Starlink satellites*, SpaceNews, 2019, https://spacenews.com/spacex-submits-paperwork-for-30000-more-starlink-satellites/ (last visited March 10, 2020); Pultarova, T. and Henry, C., *OneWeb weighing 2,000 more satellites*, SpaceNews, 2017, https://spacenews.com/oneweb-weighing-2000-more-satellites/ (last visited March 10, 2020); Shields, T., *Chasing SpaceX, Amazon Seeks to Launch 3,236 Internet Satellites*, Bloomberg, 2019, https://www.bloomberg.com/news/articles/2019-07-05/amazon-asks-to-join-broadband-space-race-with-elon-musk-s-spacex (last visited March 10, 2020).

[9] Christian, J., *This Startup Wants to Launch Giant Glowing Ads Into the Night Sky*, Futurism, 2019, https://futurism.com/startrocket-giant-ads-night-sky-cubesats (last visited March 10, 2020).

[10] Meixler, E., *China Plans to Launch an 'Artificial Moon' to Light Up the Night Skies*, TIME, 2018, https://time.com/5429288/china-chengdu-artificial-moon/ (last visited March 10, 2020).

[11] 33 FCC Rcd 5366 (6).

[12] 32 FCC Rcd 9663 (11).

[13] 32 FCC Rcd 9649 (11).

[14] O'Callaghan, J., *The FCC's Approval of SpaceX's Starlink Mega Constellation May Have Been Unlawful*, Scientific American, 2020, https://www.scientificamerican.com/article/the-fccs-approval-of-spacexs-starlink-mega-constellation-may-have-been-unlawful/ (last visited March 10, 2020).

[15] Ryan, R., *Torts in Space: Are Commercial Satellite Operators Liable for Their Actions?*, VANDERBILT J. OF ENTERTAINMENT & TECHNOLOGY LAW, 2020.

3

litigation.[16]  However, it has also been argued that, at this time, litigation would be misguided and efforts should be directed toward eliminating regulatory ambiguities.[17]

Regardless, a review of the applications and the related regulations reveals an explicit absence of near-Earth or orbital space from any environmental consideration.

Section 1.1307

The relevant FCC applications inquire whether there would be any "significant environmental impact" as defined by 47 CFR § 1.1307.[18] Section 1.1307 constitutes a part of the FCC regulations promulgated in response to the CEQ Implementing Regulations.[19]  At the time it promulgated § 1.1307, the FCC stated:[20]

> Based upon the Commission's experience, we have determined that the telecommunications industry does not generally raise environmental concerns. The comments filed in this proceeding support the Commission's determination. Thus, we have categorically excluded most Commission actions from environmental processing requirements.

It further stated that:[21]

> The Commission has reduced to three general areas the types of actions that may have a significant environmental impact to include cases in which facilities: (1) Will be located in sensitive areas (e.g. wildlife preserves); (2) will involve high intensity lighting in residential areas; and/or (3) will expose workers or the general public to levels of radiofrequency radiation which would exceed the applicable health and safety standards set forth in § 1.1307(b) of our rules.

Despite the FCC's oversight of satellites, § 1.1307 makes no reference to the orbital space surrounding Earth.[22] And, it has not been amended since.[23]

In their applications, most, if not all, megaconstellation operators respond "No" to the question whether there existed any significant environmental impacts under § 1.1307.[24]  Given the limited, terrestrial nature of the existing language in § 1.1307, it may come as no surprise that a respondent would not consider near-Earth space in answering the question as presented.

---

[16] *Id.*

[17] Mudd, C., *Starlink and Mega Constellations: Finding a Viable Legal Solution*, Illinois State Bar Association Intellectual Property Newsletter, 2020 (available from the author).

[18] Application for Satellite Space Station Authorizations, FCC 312 Main Form (November 15, 2016).

[19] 47 CFR § 1.1307.

[20] 51 Fed. Reg. 14999.

[21] *Id.*

[22] 47 CFR § 1.1307.

[23] *Id.*

[24] Apart from conveying this "understanding," the undersigned do not adopt a position on whether SpaceX accurately responded to the question or not.

4

<u>Assessing § 1.1307 Against the Implementing Regulations</u>

As § 1.1307 represents the FCC's implementation of the CEQ NEPA Implementing Regulations, it makes sense to assess whether or not the Implementing Regulations encompass near-Earth space and its related concerns within the concept and definition of environment or "human environment." They do not *expressly* do so, nor do they *expressly exclude* it. Specifically, the CEQ Implementing Regulations provide:[25]

### § 1508.14 Human environment.

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§ 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

The regulations further define "effects" as:[26]

### § 1508.8 Effects.

*Effects* include:

**(a)** Direct effects, which are caused by the action and occur at the same time and place.

**(b)** Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

Based on the foregoing, the express omission of near-Earth space from these definitions inevitably leads to an interpretation that could reasonably omit near-Earth space from the necessary scope of environment under NEPA and the Implementing Regulations.[27]   As such,

---

[25] 40 CFR § 1508.14.
[26] 40 CFR § 1508.8.
[27] *See id.* and 40 CFR § 1508.14.

5

although the FCC should update § 1.1307 given more than thirty (30) years have elapsed, it cannot be said that § 1.1307 *fails* to comply with the Implementing Regulations with respect to inclusion of Earth's orbital space. Rather, again, the focus should be on the failure of the Implementing Regulations to *expressly* include near-Earth space within the concept and definition of the applicable environment and environmental parameters.[28]

CEQ Implementing Regulations Appropriate Focus

As stated above, the FCC should update § 1.1307. However, the FCC represents but one of several federal agencies with jurisdictions related to Earth's orbital space.[29] The Federal Aviation Administration ("FAA") regulates the launch and reentry of vehicles into space.[30] The FAA also regulates launch and reentry sites (e.g. spaceports).[31] The National Oceanic and Atmospheric Administration ("NOAA") licenses and regulates commercial satellites directed toward and sensing aspects of Earth ("commercial remote sensing satellite systems").[32] The Department of Commerce and Department of State regulate the export of sensitive information and technology that, among other categories, relate to space. All of these (and other) federal agencies must assess the environmental impact of their operations and matters falling within their respective jurisdictions pursuant to the CEQ Implementing Regulations.[33] Consequently, the Implementing Regulations become the logical source for a universal amendment to ensure the inclusion of near-Earth space and related concerns within the concept and definition of "human environment."

**Inclusion of near-Earth Space in Human Environment and Effects**

Near-Earth space has always constituted a critical component of the human environment. Given the Earth's orbital space constitutes part of the human environment, it needs to be encompassed within the scope of the CEQ Implementing Regulations to ensure it – just as any other part of the environment – remains protected. Although there exist many concerns, this Comment focuses on four primary concerns related to protection of orbital space: human benefits of the dark night sky, optical and infrared astronomy, radio astronomy, and space debris.

---

[28] To be very clear, we contend that near-Earth space implicitly falls within the existing scope of "human environment" and "effects" under the CEQ Implementing Regulations. *See id.* Indeed, we also contend this interpretation remains consistent with NEPA and its stated policy. However, the *express* omission of near-Earth space and its related concerns in the stated definitions creates ambiguity resulting in near-Earth space and its related concerns being overlooked as evidenced by the example discussed *supra* involving the FCC and the parties submitting applications thereto.

[29] This Comment does not address the myriad of proposals seeking to consolidate space related regulatory activities.

[30] Commercial Space Launch Act, 98 Stat. 3005, Pub. L. No. 98-575 (Oct. 30, 1984) (re-codified as amended in 51 U.S.C. § 50901, et seq.); 14 C.F.R. §§ 400–450.

[31] *Id.,* particularly §§ 420 and 433; for the FAA guidance on the applicability of NEPA to these activities, *see* FAA Order 1050.1F.

[32] 51 U.S.C. § 60121(a); 15 CFR § 960.

[33] 40 CFR §§ 1500.2, 1500.3.

6

*Human Benefits of the Dark Night Sky*

The night sky has figured prominently in the human experience for countless generations. It enabled timekeeping and navigation, inspired great works of art, music and literature, and beckoned examination that has led to deep insights about the nature of the universe. The night sky holds clear value to humanity for both aesthetic and scientific purposes. It is also an integral part of the landscape, day and night, and therefore has both visual and cultural resource values.[34,35] And while satellites have appeared in the Earth's night skies since the launch of Sputnik 1 in 1957, to date the numbers of visible satellites number in the low few hundreds. The landscape of planned expansion in the next few years into this realm by private, commercial space operators could result in tens of thousands of new objects, routinely bright enough to be seen by the unaided eye, resulting in significant and distracting changes to the 'viewshed' of the night sky. Unlike conventional sources of light pollution, such as skyglow associated with cities, the view of satellites cannot be evaded simply by traveling to more remote locations. These objects will be visible from everywhere on Earth, except possibly in its extreme polar regions.

*Optical and Infrared Astronomy*

The presence of satellites and other orbital objects in the night sky potentially compromises astronomical observations by directing reflected sunlight toward telescopes where it competes with light from astronomical objects for detection. The impact of this effect scales according to the number of objects, the parameters of their orbits, time of night, and location on Earth. Satellites in Low-Earth Orbit are most visible during both evening and morning twilight. Visibility is greater in higher latitudes especially in summer, when satellites above the horizon remain illuminated by the Sun for longer. Telescopes with very large fields of view are most impacted, and those with small fields of view are impacted least. The degree of interference tends to scale with increasing exposure time, depending on the sensitivity of the imaging detectors. Predicted impacts range from as low as zero around midnight for some orbital parameters to as many as 40% of images taken by very wide-field telescopes during nautical twilight.[36,37] Evasive actions taken by observatories to avoid these impacts detract from operational efficiency. These satellites potentially affect every U.S. ground-based astronomy research facility, jeopardizing billions of dollars' worth of public investment.

---

[34] Turina, F., *Protecting Night Skies and Naturally Dark Conditions in National Parks*, in *VISUAL RESOURCE STEWARDSHIP CONFERENCE PROCEEDINGS: LANDSCAPE AND SEASCAPE MANAGEMENT IN A TIME OF CHANGE*, 186-200 (Gen. Tech. Rep. NRS-P-183, Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station) (Gobster, P.H., Smardon, R.C., eds., 2018).

[35] McCarty, J., et al., *New Directions and Common Challenges in Federal Stewardship of Visual Resources*, in *VISUAL RESOURCE STEWARDSHIP CONFERENCE PROCEEDINGS: LANDSCAPE AND SEASCAPE MANAGEMENT IN A TIME OF CHANGE*, 9-16 (Gen. Tech. Rep. NRS-P-183, Newtown Square, PA: U.S. Department of Agriculture, Forest Service, Northern Research Station) (Gobster, P.H., Smardon, R.C., eds., 2018).

[36] O. Hainaut and A. Williams, *Impact of satellite constellations on astronomical observations with ESO telescopes in the visible and infrared domains*, ASTRONOMY AND ASTROPHYSICS, 2020, in press. doi:10.1051/0004-6361/202037501.

[37] "Given possible saturation of sensors well past astronomical twilight, during summer months there could be a 40% impact on twilight observing time – less in winter. Rubin Observatory would have to point to a place in the sky where briefly there were no LEO satellites [LEOsats]. We estimate one LEO satellite trail per three exposures of the LSST camera for the full Starlink constellation. Extrapolating to a more crowded sky in the mid-2020s, we must multiply by about three for the other LEOsat corporate plans (from FCC filings). Nearly every exposure within two hours of sunset or sunrise, on average, would have a LEOsat streak, and a few of those will be sufficiently bright to far exceed saturation of the CCD sensor." Rubin Observatory Project Science Team, Impact on Optical Astronomy of LEO Satellite Constellation, Document-33805, 2020 (last revised March 3, 2020).

7

*Radio Astronomy*

Functional satellites orbiting the Earth and communicating with ground stations pose a specific threat to radio astronomy facilities, whose extremely sensitive receivers can be damaged or destroyed by intense radio frequency (RF) emissions. Certain RF bands are set aside and protected from terrestrial emissions for the benefit of astronomy, including the establishment of National Radio Quiet Zones near radio observatories.[38] However, uncontrolled and spurious broadband communications and radar signals from space can substantially interfere with astronomical observations. The expected proliferation of orbital satellites emitting RF in coming years are a serious challenge to ground-based radio astronomy requiring adequate coordination between satellite operators and the astronomy community.[39,40]

*Space Debris*

More than ten (10) years ago, Kessler identified large satellite constellations as "[s]ome of the most environmentally dangerous activities in space."[41] Today, the same concerns exist.[42,43] More broadly, these concerns relate to effective space traffic management, avoiding collisions with satellites and space debris, mitigating and remediating space debris, and, managing end-of-life ("EOL") and de-orbiting of space objects, to name but a few.

Objects in orbit around the Earth, other than functional satellites, are usually considered to be forms of debris. These include dead satellites, spent rocket stages, and literal debris either shed from other objects or generated as the result of collisions between objects. Debris objects impact both night sky visibility and professional astronomy observations. They reflect sunlight at optical wavelengths and emit thermally at infrared wavelengths. The objects range in size from many meters to less than a millimeter; objects larger than a few centimeters in size can be tracked from the ground, but the positions of the smallest objects are generally unknown. Small objects are of particular concern for this reason. Faint glints of sunlight reflected from them can be mistaken by ground-based telescopes for exotic, time-variable astrophysical phenomena, and their slow rates of motion can yield inappropriate detection triggers among sky surveys intended to find near-Earth objects that risk colliding with our planet.[44]

---

[38] Federal Communications Commission ("FCC") in Docket No. 11745 (November 19, 1958); Interdepartment Radio Advisory Committee ("IRAC") in Document 3867/2 (March 26, 1958).

[39] With respect to Starlink, the FCC specifically required SpaceX to work with the NRAO to avoid conflict with the observatories listed in 47 CFR § 2.106 n. US131. 33 FCC Rcd 3391 (4).

[40] The National Science Foundation ("NSF") has established a radio spectrum management group, and has begun to also consider optical spectrum management.

[41] Kessler, D., *The Kessler Syndrome* (2009) (Self-published).

[42] *See* the Inter-Agency Space Debris Coordination Committee ("IADC"), https://www.iadc-home.org/; the United Nations Committee on the Peaceful Uses of Outer Space Scientific ("COPUOS") and Technical Subcommittee, https://www.unoosa.org/oosa/en/ourwork/topics/space-debris/index.html; and the UN COPUOS Legal Subcommittee, https://www.unoosa.org/oosa/en/ourwork/topics/space-debris/index.html.

[43] United Nations Office for Outer Space Affairs ("UNOOSA") staff have teamed with the International Astronomical Union ("IAU") and the Instituto de Astrofisica de Canarias ("IAC") to produce a white paper to be presented to the UN General Assembly as recommendations toward new international regulations.

[44] An example of this situation is discussed by Micheli, M., et al., *The observing campaign on the deep-space debris WT1190F as a test case for short-warning NEO impacts*, Icarus, 304, 4–8, 2018, doi:10.1016/j.icarus.2017.10.006.

8

A386

Already over 22,300 debris objects exist with well-determined, regularly tracked orbits of which fewer than 10% are active satellites (statistical models estimate the existence of 34,000 debris objects larger than 10 cm, 900,000 debris objects between 1cm and 10cm, and 128,000,000 debris objects between 1mm and 1cm);[45] over time, we expect that the number and size distribution of objects will assume the form of a power law given that collisions generate large numbers of small pieces of debris, which then collide with other objects and increase the numbers of objects in a cascade effect.[46] Furthermore, space debris poses an existential threat to both public and private space assets, potentially including, e.g., meteorological satellites important to domestic weather forecasting and defense-related activities that impact U.S. national security.

**Proposed Amendment to Implementing Regulations**

Given the foregoing, the undersigned respectfully submit that the CEQ should amend its Implementing Regulations to include near-Earth space and its related concerns within the scope and definition of environment.  To that end, the undersigned specifically recommend that the Implementing Regulations be amended to include the following minimal additions:

*Existing Regulations*

[Amend]

§ 1508.8 Effects:

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, **astronomical (such as the effects on human enjoyment of the observable dark sky, optical astronomy, radio astronomy, and space debris),**

---

[45] European Space Agency, *Space Debris by the Numbers*, 2020 (data as of February 2020) https://www.esa.int/Safety_Security/Space_Debris/Space_debris_by_the_numbers; *see also* UNOOSA Index of Objects Launched into Outer Space, https://www.unoosa.org/oosa/osoindex/index.jspx?lf_id=.
[46] Kessler, D. J., & Cour-Palais, B. G., *Collision frequency of artificial satellites: The creation of a debris belt*, J. OF GEOPHYSICAL RESEARCH, 83(A6), 2637, 1978, doi:10.1029/ja083ia06p02637.

9

historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

[Amend]

§ 1508.14 Human environment.

*Human Environment*[47] means comprehensively to include the natural and physical environment, **including Earth's orbital space,** and the relationship of people with that environment. (See the definition of "effects" (§ 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

*Proposed Amendments*

Given the proposed amendment language to § 1500.3 in the proposed paragraph (a) that "[a]gency NEPA procedures to implement these regulations shall not impose additional procedures or requirements beyond those set forth in these regulations," it becomes imperative that CEQ Implementing Regulations be amended to include language encompassing orbital space and related concerns within any amendments adopted.  To that end, the following proposed changes assume the amendments proposed by CEQ become adopted as written:

---

[47] We note that the regulations' references (as opposed to other sources being quoted) to "man's environment" should be changed to "human environment" to be consistent with the applicable definitions (e.g. § 1502.16(a)(3), as proposed).

10

[Amend][48]

§ 1508.8

[* * * * *]

(g) Effects *or impacts* means effects of the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. Effects include reasonably foreseeable effects that occur at the same time and place and may include reasonably foreseeable effects that are later in time or farther removed in distance.include:

(1a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, **astronomical (such as the effects on human enjoyment of the observable dark sky, optical astronomy, radio astronomy, and space debris),** historic, cultural, economic (such as the effects on employment), social, or health effects, whether direct, indirect, or cumulative. Effects may also include those resulting from actions thatwhich may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

(2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should not be considered significant if they are remote in time, geographically remote **(except with respect to Earth's orbital space)**, or the product of a lengthy causal chain. Effects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action. Analysis of cumulative effects is not required.

[* * * * *]

---

[48] The CEQ proposed amendments use a maroon color and the amendments proposed by this Comment use a **red color in bold**.

(m) *Human Environment*[49] means ~~shall be interpreted~~ comprehensively ~~to include~~ the natural and physical environment, **including Earth's orbital space,** and the relationship of present and future generations of Americans~~people~~ with that environment. (See the definition of "effects." (§ 1508.8).) ~~This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.~~

In both cases, whether the existing regulations or those proposed by CEQ, the proposed amendments do not conflict with any existing portion of the regulations or NEPA.[50]  Rather, they clarify the scope of our Earth environment and the effects upon it.

Indeed, as the Implementing Regulations currently state:

> *Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment.

When one considers the "ordinary, contemporary, common meaning" of natural,[51] the "natural environment" includes the "external world in its entirety."[52]  Thus, "human environment" encompasses the external world and humankind's interaction with it.  In the context of space, this necessarily includes both the effects objects in space have on terrestrial Earth as well as the space such objects inhabit.

---

[49] We note that the regulations' references (as opposed to other sources being quoted) to "man's environment" should be changed to "human environment" to be consistent with the applicable definitions (eg § 1502.16(a)(3), as proposed).

[50] *See* 40 CFR §§ 1500-1508, 1515-1518; 42 U.S.C. §§ 4321, et seq.

[51] *Perrin v. United States,* 444 U.S. 37, 42, 100 S. Ct. 311 (1979). ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); *United States v. Bell,* 936 F.2d 337, 342 (7th Cir. 1991).

[52] https://www.merriam-webster.com/dictionary/nature.

**Conclusion**

For millennia, humankind enjoyed and used the dark night sky to navigate, for ceremonial and religious purposes, to explore the secrets of the Universe, and, quite simply, enjoy the astronomical environment in which Earth resides.  As the commercial space industry grows and our use of the orbital space around Earth increases, we must ensure – the CEQ must ensure – that federal agencies include Earth's astronomical and orbital space within the environment for purposes of complying with NEPA, the CEQ Implementing Regulations, and the agencies' regulations.  Consequently, the undersigned (a) agree the Implementing Regulations need to be modernized to effectuate this purpose but (b) must oppose the proposed amendments because they do not do so.  To that end, the undersigned propose specific amendments that will sufficiently satisfy the concerns raised herein at this time and under these circumstances.


Sincerely,


**Charles Lee Mudd Jr.** (principal author)[53]
Principal Attorney and Owner
Mudd Law Offices

**Ruskin Hartley**
Executive Director
International Dark Sky Association


Mudd Law represents domestic and international clients in diverse litigation and transactional matters with offices in Chicago, Houston, and Park City.  With nearly two decades of practice across the United States, it has become recognized as a leader in Internet and technology law.  Several years ago, the Firm expanded its practice into space law and policy.  More information about Mudd Law and its representation of clients in the commercial space industry and space policy initiatives can be found at http://www.muddlaw.com.

The International Dark Sky Association, a 501(c)(3) nonprofit organization based in Tucson, Arizona, advocates for the protection of the nighttime environment and dark night skies by educating policymakers and the public about night sky conservation and promoting environmentally responsible outdoor lighting. More information about IDA and its mission may be found at http://www.darksky.org.

---

[53] Special thanks to BJ Jordan (Baylor University, JD '20) for his assistance.

# EXHIBIT V

**SPACEX**

April 2, 2021

**BY ELECTRONIC FILING**

Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, N.E.
Washington, DC 20554

   Re: *IBFS File No. SAT-MOD-20200417-00037*

Dear Ms. Dortch:

   On March 31, 2021, representatives from Space Exploration Holdings, LLC ("SpaceX") had a conference call with Commission staff. A full list of participants is provided in Attachment A. SpaceX discussed its proposed modification to be able to launch the rest of its satellites to safer operating altitudes. SpaceX used the presentation included as Attachment B during this discussion.

   SpaceX reiterated its commitment to safe space for all operators and noted some of the measures it has taken to reduce the probability of collision with trackable objects. SpaceX explained how it determined that it is likely to use fewer than 10,000 satellites over the term of its license, qualifying that this is necessarily an estimate.

   SpaceX reiterated that it has chosen to go above and beyond the industry standard by initiating mitigating actions when the probability of collision ("Pc") is greater than 1 in 100,000, as opposed to the typical value of 1 in 10,000. This trigger is at least an order of magnitude more conservative than the industry standard maneuver trigger, resulting in a target post maneuver Pc of 1 in 1,000,000. SpaceX also currently uses a 10-meter hard body radius for its satellites, resulting in a 20-meter diameter sphere, as opposed to an actual SpaceX satellite that is an approximately 10-meter by 3-meter flat plane. Overall, the calculation results in a sphere at least an order of magnitude larger than the actual area of the satellite, and up to as much as two orders of magnitude depending on the attitude at the time of the closest approach. In addition, SpaceX satellites ingest a secondary object radius parsed from conjunction data messages provided to SpaceX by the 18th Space Control Squadron. Collision probabilities are calculated using a combined radius from both objects. This conservative calculation means SpaceX predicts more collisions and thus uses a more sensitive trigger to perform maneuvering events.

   SpaceX also discussed recent filings in this proceeding with respect to "Nco," the parameter used in equivalent power flux-density ("EPFD") data files to define the number of co-frequency simultaneously transmitting satellites serving a given point on the Earth. SpaceX confirmed that it has always operated its Ku-band downlinks to user terminals consistent with

Marlene H. Dortch
April 2, 2021
Page 5 of 7

time each satellite is in the night sky.[9]  While there is more work to do, SpaceX is aggressively pursuing improvements to the satellite design to reduce the impact of satellite brightness.

SpaceX also explained that the National Environmental Policy Act ("NEPA") does not apply to outer space generally or to SpaceX's safety upgrade specifically.  Among other things, this upgrade could not increase the amount of alumina in the atmosphere because SpaceX is not proposing to change the number of satellites it plans to operate, nor the amount of aluminum used in its satellites.  Furthermore, the allegations in the record that SpaceX's satellites would produce over 22 million pounds of alumina in the atmosphere[10] is more than an order of magnitude greater than all the alumina the SpaceX satellites could possibly create in an extreme unrealistic scenario.  Specifically, alumina is generated from the oxidation of aluminum, and SpaceX's satellites consist of approximately 230 pounds of aluminum.  But not all aluminum converts to alumina during reentry (alumina is $Al_2O_3$, 52% mass fraction aluminum).  Thus, even if SpaceX were to de-orbit all of its 4,408 satellites at once (which it will not) and all the aluminum in all of its satellites converted to alumina (which it would not), the satellites would still produce an order of magnitude less alumina than the overwrought estimates provided by Viasat.[11]  In fact, even under this totally unrealistic worst-case scenario, SpaceX would still create about 0.5% the amount of alumina as the metals generated by meteorites entering the Earth's atmosphere in a given year.[12]

Tellingly, Viasat has not disclosed how much aluminum it plans to include in its satellites if the Commission authorizes it to enlarge its system fourteen times its current authorization.  That lack of disclosure is likely because Viasat plans to argue that its satellites would, of course, be exempt from certain U.S. laws because Viasat is a non-U.S. licensee.

Viasat's accusations about SpaceX's launches are equally baseless.  The Federal Aviation Administration ("FAA") has found no significant impact for the SpaceX launch vehicle to the atmospheric environment.  The studies cited by Viasat in its effort to conjure false issues conclude that "global ozone loss caused by rocket emissions is dominated by SRM [solid rocket motor] emissions," not the liquid propellants that SpaceX uses on its Falcon launch vehicle.[13]  In fact, one of the very studies from which Viasat selectively and misleading quotes actually concluded "global rocket launches deplete the ozone layer ~0.03%, an insignificant fraction of the depletion caused by other ozone depletion substances (ODSs)."[14]

---

[9]   *See* SATCON1 Scientific Organizing Committee, *Impact of Satellite Constellations on Optical Astronomy and Recommendations Toward Mitigations*, AAS, 5-6 (Aug. 2020), https://aas.org/sites/default/files/2020-08/SATCON1-Report.pdf (Recommendation 5 and Finding 1).

[10]  *See* Petition Pursuant to Section 1.1307(c) of Viasat, Inc., IBFS File No. SAT-MOD-20200417-00037, at 12 (Dec. 22, 2020).

[11]  This simple and overly conservative calculation is 4,408*230/0.52 = 1,949,692 potential pounds of alumina.

[12]  Hughes, D.W., *Meteors, in Cosmic Dust*, J. A. M. McDonnell, Ed., Chap. 3 (John Wiley & Sons 1978).

[13]  Martin Ross et al., *Limits on the Space Launch Market Related to Stratospheric Ozone Depletion*, 7 Astropolitics 50, 80 (2009).

[14]  *Id.* at 50.

A394

Marlene H. Dortch
April 2, 2021
Page 7 of 7

Sincerely,

*s  David Goldman*

David Goldman
Director of Satellite Policy

SPACE EXPLORATION TECHNOLOGIES CORP.
1155 F Street, NW
Suite 475
Washington, DC  20004
Tel:  202-649-2691
Email:  David.Goldman@spacex.com

cc:      FCC Participants

Attachments



# EXHIBIT W



April 16, 2021

**BY ELECTRONIC FILING**

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC  20554

       Re:    Viasat, Inc. *Ex Parte* Presentation, IBFS File No. SAT-MOD-20200417-00037

Dear Ms. Dortch:

      Viasat, Inc. responds to the letter filed by Space Exploration Holdings, LLC ("SpaceX") on April 2, 2021.[1]  In that letter, SpaceX once again mischaracterizes the Commission's responsibilities under the National Environmental Policy Act ("NEPA"), particularly with respect to the need to evaluate the environmental impacts of SpaceX's proposed operations. At the same time:

    (i)      SpaceX's filing confirms that its proposed operations would create significant light pollution and increase the amount of alumina released into the atmosphere;

    (ii)     SpaceX's filing does not dispute that its proposed operations are likely to have other adverse environmental impacts raised on the record in this proceeding (*e.g.*, with respect to orbital debris and chemicals other than alumina); and

    (iii)    SpaceX's filing addresses only a narrow set of potential environmental impacts raised on the record in this proceeding—and does so in scattershot fashion by mischaracterizing the record and relevant third-party studies in obvious ways.

In short, SpaceX's filing succeeds only in *underscoring* the *many* open factual issues in this proceeding, and the consequent need for the Commission to carefully review how granting SpaceX's pending modification application could impact the environment.

      NEPA requires agencies to conduct environmental review anytime the requested action "*may*" have a significant environmental impact.  There can be no serious doubt that this standard is satisfied on this record.  Indeed, to comply with NEPA, agencies routinely review actions far less significant than the one at issue here, which would permit the deployment of thousands of

---

[1]   *See* Letter from SpaceX to FCC, IBFS File No. SAT-MOD-20200417-00037 (Apr. 2, 2021) ("SpaceX April 2 Letter").

month, new studies are published showing how SpaceX's proposed operations could seriously degrade the environment—including a new study, discussed below, that evaluates the effects satellites have on *background* light pollution.[11] It is not clear how the Commission could credibly conclude on this rapidly developing record that the environmental effects of SpaceX's proposals are both *known* and *so minimal* that they do not even warrant an environmental assessment.

## II.    SpaceX's Latest Filing Misrepresents the Record Evidence and Makes Important Concessions that Demonstrate the Need for Environmental Review

SpaceX's latest response to Viasat's analysis and the record evidence in this proceeding only underscores the need for the objective, hard look that NEPA requires. As the Commission will recall, Viasat has established that SpaceX's deployment of thousands of additional satellites at ~550 km may create significant: (i) light pollution; (ii) harm to the atmosphere; and (iii) orbital debris.

### Light Pollution

SpaceX makes the important concession that its satellites will produce light pollution for "both naked eye observers and astronomers"—an admission that highlights the need to inquire into the extent of this pollution.[12] In its letter, SpaceX explains that reducing light pollution from its satellites poses a "technical challenge."[13] And although SpaceX claims that it is "aggressively pursuing improvements," it candidly admits multiple times that "there is more work to do."[14] This acknowledgment aligns with the conclusions of the scientific community that the problem has not been solved.[15]

Even if SpaceX is eventually able to meet the "threshold of 7th apparent magnitude brightness" as it claims,[16] it would *still* cause significant light pollution. The satellites may still be visible to the naked eye, even if their visibility is reduced, and they would still be much brighter than many astronomically significant targets.[17] The fact that some astronomers are

---

[11]    *See* Sokol, *supra* n.10.

[12]    SpaceX April 2 Letter at 4.

[13]    *Id.*

[14]    *Id.* at 5, 13.

[15]    *See* Tarantola, *supra* n.10.

[16]    SpaceX April 2 Letter at 4.

[17]    *See, e.g.,* Ralph Crewe, *Astronomers Confirm that Darksat Is About Half as Bright as an Unpainted Starlink*, Universe Today (Jan. 19, 2021), https://www.universetoday.com/149700/astronomers-confirm-that-darksat-is-about-half-as-bright-as-an-unpainted-starlink/ (noting that an apparent magnitude of 7 "is just past the lower limit of brightness at which the naked eye can pick up an object in the night sky, but still far brighter than many astronomically significant targets").

4

working with SpaceX to address the light pollution created by SpaceX's operations reflects *their* recognition of the significant light-pollution concerns posed by a system as large as Starlink and the need to adopt mitigation strategies.

Notably, the solutions that SpaceX has pursued with respect to visible light pollution have tended to create *other* adverse environmental effects. For example, SpaceX initially pursued "DarkSat" technologies to make its satellites less reflective, but as a result its satellites absorbed that light and reradiated heat.[18] Those satellites therefore became much "brighter" in the infrared spectrum, which is also important for astronomical observation.[19] The technologies that SpaceX is now pursuing are unproven and may raise similar issues.

More broadly, SpaceX focuses entirely on *visible* light pollution but fails to examine other forms of astronomical interference. Substantial record evidence shows that SpaceX's satellites will create infrared and radiofrequency interference in addition to optical interference.[20] For example, the *Dark and Quiet Skies* report, which was published by a working group with dozens of leading scientific experts, exhaustively analyzed the astronomical interference concerns presented by satellites (including SpaceX satellites, specifically), and raised serious concerns about the effects those satellites will have on optical, radio, and infrared astronomy. SpaceX's acknowledgment that "there is more work to do"[21] is therefore an understatement.

Importantly, new evidence suggests that SpaceX's satellites can increase light pollution in a previously underappreciated way: by contributing to background skyglow visible to the naked eye.[22] Granting SpaceX's pending modification application and allowing it to deploy

---

[18]   Isobel Asher Hamilton, *SpaceX Is Launching 'Dark Satellites' to Stop Its Starlink Project from Wreaking Havoc with Astronomical Research. Astronomers Are Skeptical.*, Business Insider (Jan. 25, 2020), https://www.businessinsider.com/spacex-darkened-starlink-internet-satellites-astronomy-explainer-2020-1.

[19]   *See* Ralph Crewe, *Astronomers Confirm that DarkSat Is About Half as Bright as an Unpainted Starlink*, Universe Today (Jan. 19, 2021), https://www.universetoday.com/149700/astronomers-confirm-that-darksat-is-about-half-as-bright-as-an-unpainted-starlink/.

[20]   Constance Walker et al., Dark and Quiet Skies for Science and Society: Report and Recommendations (2020); Comment from Charles Lee Mudd Jr. and Ruskin Hartley, Exec. Dir., Int'l Dark Sky Ass'n, to Mary B. Neumayr, Chairman, CEQ, Docket No. CEQ-2019-0003 (Mar. 9, 2020).

[21]   SpaceX April 2 Letter at 5.

[22]   M. Kocifaj et al., The Proliferation of Space Objects Is a Rapidly Increasing Source of Artificial Night Sky Brightness 5 (2021) ("The cloud of artificial objects orbiting the Earth, composed of both operational and decommissioned satellites, parts of launch vehicles, fragments, and small particles, with characteristic sizes ranging from micrometers to tens of meters, reflect and scatter sunlight toward ground-based observers. When imaged with high angular resolution and high sensitivity detectors, many of these objects appear as individual streaks in science images. However, when observed with relatively low-sensitivity detectors

5

thousands of additional satellites would amplify that problem by crowding space with more satellites.[23]  Environmental review is needed *now*, before that risk becomes reality, to ensure that the Commission evaluates SpaceX's proposal with an accurate understanding of the effects that SpaceX's massive satellite constellation will have on the night sky.  SpaceX's assurance that it is diligently working to mitigate light pollution does not absolve the Commission of its duty to evaluate the environmental effects itself before taking action on the pending application.

### Atmospheric Pollution

Viasat's NEPA Petition establishes that SpaceX's proposed modification "could harm the environment by depleting ozone, contributing to global warming, and causing unpredictable changes in atmospheric chemistry."[24]  SpaceX's April 2 filing does not contest the general point that SpaceX's proposed Starlink operations could impact the environment in this manner.

In discussing the atmospheric effects of its post-launch satellite operations, SpaceX's filing focuses exclusively on the alumina that would be released into the atmosphere during satellite reentry.  But SpaceX does *not* address the atmospheric effects of releasing into the atmosphere a highly reactive "zoo of [other] complex chemical types,"[25] which researchers have predicted "could have a significant effect on atmospheric chemistry."[26]

And in discussing alumina specifically, SpaceX asserts that its proposed modification "could not increase the amount of alumina in the atmosphere" because SpaceX "is not proposing to change the number of satellites it plans to operate."  But SpaceX cannot deny and implicitly acknowledges that: (i) SpaceX's satellite operations *do* release alumina into the atmosphere; and (ii) increasing the number of satellites operated by SpaceX *would* increase the amount of alumina released in this fashion.  This is precisely what would happen if SpaceX's pending application is granted, as such grant would almost *triple* the number of satellites that SpaceX is permitted to deploy.

SpaceX also attempts to downplay the impact of its proposed operations with respect to atmospheric alumina by mischaracterizing Viasat's prior arguments and attacking the resulting

---

like the unaided human eye, or with low-angular-resolution photometers, their combined effect is that of a diffuse night sky brightness component, much like the unresolved integrated starlight background of the Milky Way.").

[23]  *See id.*

[24]  *See* Viasat NEPA Reply at 20; Viasat NEPA Petition at 9–13.

[25]  Martin N. Ross & Leonard David, *An Underappreciated Danger of the New Space Age: Global Air Pollution*, Sci. Am. (Nov. 6, 2020), https://www.scientificamerican.com/article/an-underappreciated-danger-of-the-new-space-ageglobal-air-pollution/.

[26]  Leonard David, *How Much Air Pollution Is Produced by Rockets* , Sci. Am. (Nov. 29, 2017), http://www.scientificamerican.com/article/how-much-air-pollution-is-produced-by-rockets/.

6

have significant environmental effects that warrant review.  The Commission should evaluate these effects before acting on SpaceX's modification application.

Respectfully submitted,

_____/s/_____

Amy R. Mehlman
Vice President
US Government Affairs and Policy

Jarrett S. Taubman
Associate General Counsel
Government and Regulatory Affairs

10

# EXHIBIT X



**INSTITUTE** *for* **ASTRONOMY**

School of Physics and Astronomy
The University of Edinburgh
Royal Observatory
Edinburgh EH9 3HJ

Telephone 0131 668 8477

Fax 0131 668 8416

email  al@roe.ac.uk

Website: http://www.roe.ac.uk

To : Ms Marlene H. Dortch, Secretary,
Federal Communications Commission
45 L Street N.E.
Washington D.C. 20554
*by web upload*

April 21st 2021


Re:  SpaceX/Starlink modification proposal
IBFS File No. SAT-MOD-20200417-00037


Dear Ms Dortch

I am writing to propose that the FCC deny or indefinitely defer this application, and any similar upcoming proposals by other companies, to allow a variety of stakeholders around the globe to complete a thorough review and study of the consequences, and debate a new and improved co-ordinated regulatory framework. I think history will not forgive us if we proceed with too much haste. This decision is not just about the Starlink project itself, or the US alone. Permission to proceed could open the international floodgates.

**My background**. I write both as a concerned citizen and as a professionally affected academic astronomer. I am not a member of the various technical working groups that some of my professional colleagues have set up, but I have published a book, called *Losing The Sky*, which provides a non-technical summary and analysis of the issues from a personal and societal perspective, intended for the general public. I am British, not American, but this is a US decision that will affect the world. Finally, I should stress that I write in a personal capacity, not formally as a representative of any working group, professional body, or of my institution.

**Context**. The population of active satellites has grown steadily for decades, to around 2000 in mid-2019, but has accelerated over the last two years, almost entirely due to the SpaceX Starlink project. In round numbers (the precise details keep changing) they have, as I understand it, firm permission for 1,600 satellites, provisional permission for another 2,800, and a proposal for 30,000 more. The current "modification" proposal for the +2,800 objects changes so much that it should be considered a new proposal. Meanwhile the pressure is building up behind the flood barrier. Many other companies and nations are planning Low Earth Orbit (LEO) constellations. In few years time, there could well be 100,000 or even more LEO satellites.

**Threat to astronomical science**. Starlink satellites are already regularly "photobombing" observations from both the ground and from space, and look likely to drown out a significant fraction of observations with the new generation of  radio telescopes such as the Square

Kilometre Array (SKA). SpaceX should be commended for engaging with the scientific community to experiment with mitigations such as darkening satellites and providing orbital predictions, but these make only a modest difference, and we cannot guarantee that other companies and countries will be as co-operative. Many individual astronomers and working groups have worked very hard at calculating the effects and proposing further mitigations, but of course the best mitigation is simply not to launch so many satellites. It all seems a classic example of the "displaced cost" problem that environmentalists are familiar with. Astronomical science will not be completely destroyed, but it will cost the taxpayer billions more dollars than it would otherwise have done.

**UN process**. As I write, the scientific and technical subcommittee of the UN Committee On Peaceful Uses of Outer Space (COPUOS) is considering the report written by the "Dark and Quiet Skies" working group, led by Dr Constance Walker, and the full committee will discuss the report in August. COPUOS is also actively debating the issue of space debris. The likely result on both questions is that COPUOS will require further work and debate. It makes sense to delay decisions on LEO licenses at least until the UN achieves an international consensus.

**Public right to the sky**. The sky is like nature, or the sea, or the air that we breathe, in that people around the world have a right to expect that it belongs to everybody. Private corporations or state actors should not damage or limit public enjoyment or access without permission or consequence. When you launch from California, within an hour you are polluting France and Morocco. SpaceX may be able to largely ameliorate the damage for casual naked-eye viewers, but not for the many millions of keen amateur stargazers with binoculars, telescopes and cameras. Furthermore, we cannot guarantee that other companies and nations will be so careful, or that they will not launch huge corporate sky-adverts.

**Sustainability of space industry**. Tracked debris outnumbers active satellites by an order of magnitude, and even then is only the tip of the iceberg, leading to fears of a "Kessler syndrome" runaway, making space industry increasingly non-viable. This isn't a question of some sudden catastrophe, but rather of the "boiling the frog" problem. As things get slowly but systematically worse, there is no clear threshold, but eventually you are dead. Once again, SpaceX and others have tried to take debris seriously, space agencies and academics are working on these issues, there are improved international guidelines, and some companies (e.g. Astroscale) are experimenting with debris clearance, but we are nowhere near having a proper understanding of the problem. It is reckless in the extreme to increase the satellite population by a factor of a hundred before we do.

**The latency question**. Widespread internet connection is solvable without large LEO constellations. Massive LEO infrastructure is driven by a perceived need for the shortest possible signal delay, i.e. latency. Very short latency is not necessary for most digital needs, but may be desirable for some applications, such as high frequency trading, real time gaming, surveillance, and driverless cars. However, just exactly how short is short enough, and over what distance, is not always clear, and needs better study before allowing "latency" as a shorthand buzzword to drive decisions with big consequences. If we consider various figures of merit such as bandwidth, ubiquity, reliability, and latency, the environmental damage we are worrying about comes almost entirely from the latency driver. Figures of merit should therefore not be bundled into a combined score, but each tensioned separately against their costs.

**The internet as an international infrastructure**. Most nations find a sensible balance between public infrastructure and private enterprise. When the state provides the roads, private enterprise can boom. Public infrastructure can of course be guaranteed by the state while being

outsourced to private enterprise. There is rightly much debate about what to leave to private enterprise and what to organise communally, and every nation finds its preferred solution. However the internet may be a special case, so important to humanity at large, and so much the bedrock of modern economic activity, that it should be globally organised or guaranteed even if privately contracted. For the software standards that underpin the internet, this is already the case, with huge success to the benefit of all humanity. ICANN, the IETF, and the W3C do not belong to any one nation or corporation; all collaborate fruitfully. There is a possible argument that this should also be the case for the physical infrastructure underpinning the internet. A number of models are possible mixing co-operation and competition in various ways. Again, I think the message is that we should slow down and think this through properly.

**Weakness of regulatory framework**. For historical reasons, regulation concerning space activity is dominated by radio communications concerns, but we are rapidly moving into a New Space Age where the issues are much wider, including public environmental damage, internet infrastructure, scientific and technological activity, military and intelligence issues, economic viability, and fair commercial competition. Meanwhile the existing international framework sets only very loose principles, with an optimistic assumption that each nation embodies those principles in their own laws. There is no real dispute resolution mechanism, but serious disputes are surely looming. There is a Liability Convention, but it is weak, and has only been used once. Regulations on ownership positively discourage debris clearance. In various ways, it seems clear that the regulatory framework is no longer fit for purpose. Things are bound to change. The FCC needs to carefully consider its role in that evolution, and to avoid taking actions that soon will seem badly inconsistent with the new international framework that will have emerged.

**Analogy with the Law of the Sea**. The evolution that I have suggested above is similar to the transition that occurred a few decades ago regarding the law of the sea. Historically, each nation tightly controlled a narrow strip of coastal waters, but the open seas were free for all to enjoy and exploit. This broke down during the twentieth century because of fishing rights and mineral rights, and the seas were becoming the scene of great commercial and international tension. After some years, the result was a greatly improved framework, and two new international bodies with real teeth.

You will I hope detect a consistent theme in this letter. We are heading rapidly towards a rather crazy situation, and should instead allow time for proper study and debate, to the eventual benefit of all.

Yours sincerely,


Andy Lawrence


Professor Andy Lawrence
Regius Professor of Astronomy,
Institute for Astronomy
University of Edinburgh

The Royal Observatory Edinburgh comprises the UK Astronomy Technology Centre (UKATC) of the
Science and Technology Facilities Council (STFC), the Institute for Astronomy (IfA) of
The University of Edinburgh and the ROE Visitor Centre
The University of Edinburgh is a charitable body, registered in Scotland, with registration number SC005336

# EXHIBIT Y

# SPACEX NON-GEOSTATIONARY SATELLITE SYSTEM

## ATTACHMENT A
### TECHNICAL INFORMATION TO SUPPLEMENT SCHEDULE S

## A.1   SCOPE AND PURPOSE

On March 29, 2018, the Commission authorized Space Exploration Holdings, LLC, a wholly owned subsidiary of Space Exploration Technologies Corp. (collectively, "SpaceX"), to construct, deploy, and operate a constellation of 4,425 non-geostationary orbit ("NGSO") satellites using Ku- and Ka-band spectrum.[1]  With this application, SpaceX seeks to modify its license to reflect constellation design changes resulting from a rigorous, integrated, and iterative process that will accelerate the deployment of its satellites and services.  Specifically, SpaceX proposes to relocate 1,584 satellites previously authorized to operate at an altitude of 1,150 km to an altitude of 550 km, and to make related changes to the operations of the satellites in this new lower shell of the constellation.  This modest modification to the SpaceX Authorization will slightly reduce the total number of spacecraft in the constellation, meet all required protection criteria for other systems operating in the same frequencies, and cause no overall increase in radiofrequency interference.  The modification will meet or exceed all space safety requirements, and will reduce the potential for orbital debris through operation of part of the constellation at a lower altitude.  SpaceX requests no other technical changes to its authorization at this time, and certifies that all other technical information provided in its original Ku/Ka-band applications remains unchanged.[2]

---

[1]   *See Space Exploration Holdings, LLC*, 33 FCC Rcd. 148 (2018) ("SpaceX Authorization").

[2]   *See* 47 C.F.R. § 25.117(c).  *See also* Application for Approval for Orbital Deployment and Operating Authority for the SpaceX NGSO Satellite System, IBFS File No. SAT-LOA-20161115-00118 (Nov. 15, 2016); Application for Approval for Orbital Deployment and Operating Authority for the SpaceX NGSO Satellite System Supplement, IBFS File No. SAT-LOA-20170726-00110 (July 26, 2017).  These materials are collectively referred to herein as the "Original Applications."

*Atmospheric Demise*

The spacecraft's small mass and predominantly aluminum construction maximize the likelihood of atmospheric demise on re-entry.  To verify this, SpaceX utilized NASA's Debris Assessment Software ("DAS").  As demonstrated below, the SpaceX design remains below the necessary demise threshold, even using worst-case satellite configurations.

To perform the DAS analysis, the satellite was broken down into 50 major components, each defined with its own shape, material, mass and dimensions.  Components were modeled in a nested fashion; a child component would not be exposed to aerodynamic heating until its nesting parent component completely burned up.  This enabled conservative re-entry survivability analysis of common problematic components.  DAS models the release of all root components 79 km above the surface; the demise altitudes of all modeled components are shown in the following figure:



Several objects were identified as components of interest.  These were objects with distinct mass, quantity, or shape factors that made them of particular concern during re-entry analysis.  Those components and their corresponding demise altitudes are given in the table below:

| Component | Demise (km) |
|---|---|
| Phased Arrays | 68.9 |
| Propellant Tank | 68.2 |
| Structural Panel | 66.4 |
| Batteries | 66.0 |
| Regulator | 53.9 |

Although SpaceX made efforts to avoid the use of components resistant to disintegration, some scenarios were unavoidable at this time. DAS analysis indicates that three unique components may have a chance of reaching the Earth's surface with sufficient energy to result in human casualty.[33] These components are listed in the table below.

| Component | Qty. | Material | Mass (kg) | Total DCA (m^2) |
|---|---|---|---|---|
| Thruster Internals | 1 | Iron | 1.66 | 0.47 |
| Reaction Wheels | 4 | Stainless Steel | 1.18 | 2.37 |
| Comms. Components | 4 | Silicon Carbide | 1.43 | 2.34 |

Comparing these results against those from the Original Applications yields the following observations. First, the total DCA of the communications components has decreased slightly, from 2.79 m$^2$ to 2.34 m$^2$. Second, by far the biggest change is the addition of steel reaction wheels, which were not a potential source of human casualty risk in the prior analysis. SpaceX plans to deploy two versions of its initial satellites with slightly different configurations and each will only carry a subset of the components identified above.[34] Each of these configurations yields

---

[33] The Debris Casualty Area is a function of the dimensions of an average person and of the specific debris fragment. The model does not consider more complicated aspects, such as sheltering within structures. The total casualty area is the sum of the casualty areas of all surviving debris fragments that reach the ground with kinetic energy greater than 15 joules.

[34] The first version includes the iron thruster and steel reaction wheels, whereas later iterations will add a silicon carbide component, while replacing the wheels with a fully demisable alternative. Even a worst-case configuration that includes all three components (a configuration that SpaceX does not intend to deploy) yields a risk of 1:10,700, which still meets the NASA requirement.

46

a Risk of Human Casualty rate of 1:19,800,[35] satisfying the requirement of 1:10,000 established by NASA in NASA-STD-8719.14.

The tables provided above summarize the results of a first-order DAS re-entry analysis. As a first-order tool, at times DAS has been known to provide conservative results. For example, DAS does not model partial ablation, which would have favorably affected the outcome of the model. This, and similar factors, are more accurately accounted for by analysis using NASA's proprietary Object Reentry Survival Analysis tool ("ORSAT"), a common step superseding DAS analysis. SpaceX currently has an open contract with NASA's Orbital Debris Program Office for carrying out higher fidelity satellite ORSAT analysis, though those results are not yet available. Moreover, the DAS analysis does not take into consideration the degree to which people would be located within structures that would provide shelter from potential impact. According to NASA, even lightly-sheltered structures provide protection against falling debris with up to a few kilojoules of kinetic energy.[36] Given that the DAS analysis assumes that debris with as little as 15 joules will result in human casualty, any level of shelter would significantly reduce the likelihood of injury.

*DAS Accordance*

As shown in the screen shot below, the DAS assessment concludes that SpaceX's anticipated de-orbit plan for the orbital shell proposed at 550 km satisfies all applicable requirements under NASA-STD-8719.14.[37]

---

[35]    DAS is sig-fig limited. While the DCA of each configuration varies slightly, DAS reports a risk of 1:19,800 for both scenarios.

[36]    *See* NASA Standard 8719.14A at § 4.7.3(d).

[37]    Requirement 4.8-1, related to Collision Hazards of Space Tethers, does not apply to SpaceX's satellites.



A411

**ENGINEERING CERTIFICATION**

I hereby certify that I am the technically qualified person responsible for preparation of the engineering information contained in this application, that I am familiar with Part 25 of the Commission's rules, that I have either prepared or reviewed the engineering information submitted in this application, and that it is complete and accurate to the best of my knowledge and belief.

/s/ *Mihai Albulet*
Mihai Albulet, PhD
Principal RF Engineer
SPACE EXPLORATION TECHNOLOGIES CORP.

November 8, 2018
Date

# EXHIBIT Z

(/)

Home(/) | About IAU (/about) | Member Directory (/administration/membership) | Site Map(/sitemap/) | Contact Us(/administration/secretariat/) | Login(/auth/login/)

News     Science(/science/scientific_bodies/)Publications(/publications)Administration     Training in Astronomy(/training/)     Astronomy for Education(/education/)     Astronomy for the Public(/public/)     Astronomy for Development(/deve

Home(/)  /  News  /  Announcements(/news/announcements/)  /  IAU Statement on Satellite Constellations(/news/announcements/detail/ann19035/)

## ann19035 — Announcement

Subscribe to the IAU e-Newsletter.(http://eepurl.com/UNZljj)



(/static/archives/images/screen/ann19035a.jpg)

Click to Enlarge (/static/archives/images/screen/ann19035a.jpg)

Over the past decades, considerable effort has gone into designing, building, and deploying satellites for many important purposes. Recently networks, known as satellite constellations, have been deployed and are planned in ever greater numbers in mainly low-Earth orbits for a variety of purposes, including providing communication services to underserved or remote areas [1]. Until this year, the number of such satellites was below 200, but that number is now increasing rapidly, with plans to deploy potentially tens of thousands of them. In that event, satellite constellations will soon outnumber all previously launched satellites.

The International Astronomical Union (IAU) is concerned about these satellite constellations. The organisation, in general, embraces the principle of a dark(https://www.iau.org/public/themes/light_pollution/) and radio-quiet sky as not only essential to advancing our understanding of the Universe(https://www.iau.org/static/resolutions/IAU2009_English.pdf) of which we are a part, but also as a resource for all humanity and for the protection of nocturnal wildlife. We do not yet understand the impact of thousands of these visible satellites scattered across the night sky and despite their good intentions, these satellite constellations may threaten both.

The scientific concerns are twofold. Firstly, the surfaces of these satellites are often made of highly reflective metal, and reflections from the Sun in the hours after sunset and before sunrise make them appear as slow-moving dots in the night sky. Although most of these reflections may be so faint that they are hard to pick out with the naked eye, they can be detrimental to the sensitive capabilities of large ground-based astronomical telescopes [2], including the extreme wide-angle survey telescopes currently under construction [3]. Secondly, despite notable efforts to avoid interfering with radio astronomy frequencies, aggregate radio signals emitted from the satellite constellations can still threaten astronomical observations at radio wavelengths. Recent advances in radio astronomy, such as producing the first image of a black hole(https://iopscience.iop.org/article/10.3847/2041-8213/ab0e85/pdf) or understanding more about the formation of planetary systems, were only possible through concerted efforts in safeguarding the radio sky from interference.

The IAU is a science and technology organisation, stimulating and safeguarding advances in those areas. Although significant effort has been put into mitigating the problems with the different satellite constellations, we strongly recommend that all stakeholders in this new and largely unregulated frontier of space utilisation work collaboratively to their mutual advantage. Satellite constellations can pose a significant or debilitating threat to important existing and future astronomical infrastructures, and we urge their designers and deployers as well as policy-makers to work with the astronomical community in a concerted effort to analyse and understand the impact of satellite constellations. We also urge appropriate agencies to devise a regulatory framework to mitigate or eliminate the detrimental impacts on scientific exploration as soon as practical.

A414

The IAU's Commission B7(https://www.iau.org/science/scientific_bodies/commissions/B7/) Protection of Existing and Potential Observatory Sites welcomes the opportunity to work proactively with everyone involved in these efforts.

## Notes

[1] Examples of these include the Iridium satellite constellation(https://en.wikipedia.org/wiki/Iridium_satellite_constellation), SpaceX's Starlink (https://en.wikipedia.org/wiki/Starlink_(satellite_constellation)), OneWeb(https://en.wikipedia.org/wiki/OneWeb_satellite_constellation), Globalstar(https://en.wikipedia.org/wiki/Globalstar), Amazon's Project Kuiper(https://en.wikipedia.org/wiki/Amazon_(company)#Project_Kuiper), and Facebook Athena.

[2] The largest optical telescope currently under construction (the Extremely Large Telescope, ELT(http://eso.org/elt)) has a main mirror 39 metres in diameter. Such ground-based observatories are essential complements to astronomical satellites, which are not affected by the reflections. Costs and limitations on size and weight preclude the launch of particularly large telescopes, and the difficulty in repairing and maintaining telescopes in space means that the newest, most revolutionary technologies are implemented on ground-based telescopes decades before it is prudent to attempt them in space. Both types are fundamental to astronomy.

[3] The Large Synoptic Survey Telescope (LSST(https://www.lsst.org/)) will have the ability to survey the entire sky in only three nights.

## More information

The IAU (https://iau.org/)is the international astronomical organisation that brings together more than 13 500 professional astronomers from more than 100 countries worldwide. Its mission is to promote and safeguard astronomy in all its aspects, including research, communication, education and development, through international cooperation. The IAU also serves as the internationally recognised authority for assigning designations to celestial bodies and the surface features on them. Founded in 1919, the IAU is the world's largest professional body for astronomers.

### Links

- International Dark Sky Association's statement on Starlink (http://darksky.org/starlink-response/)
- NRAO statement on Starlink(https://public.nrao.edu/news/nrao-statement-commsats/)

### Contacts

Connie Walker
President Commission B7
Email: cwalker@noao.edu(mailto:cwalker@noao.edu)

Lars Lindberg Christensen
IAU Press Officer
Garching bei München, Germany
Tel: +49 89 320 06 761
Cell: +49 173 38 72 621
Email: lars@eso.org(mailto:lars@eso.org)

| Search www.iau.org |
|---|

| Search... |
|---|

Tweet(https://twitter.com/share)

### Follow the IAU on social media

(https://www.facebook.com/InternationalAstronomicalUnion)          (https://twitter.com/IAU_org)

(https://www.youtube.com/channel/UCc3I9q-N0NA05vIYeNMmtTw)

---

**About the Announcement**

**Id:**
 ann19035

---

**Images**



(/public/images/detail/ann19035a/)

PR Image ann19035a(/public/images/detail/ann19035a/)
Trails made by Starlink satellites



(/public/images/detail/ann19035b/)

PR Image ann19035b(/public/images/detail/ann19035b/)
Satellite tracks over Germany 2018

Copyright(/copyright/) | Credit(/credit/) | Technology(/technology/)

# EXHIBIT AA



# RAS statement on Starlink satellite constellation



The night sky above the European Southern Observatory site at La Silla, Chile.

**Credit:**  ESO / B. Tafreshi

The Royal Astronomical Society notes with concern the launch of the new  SpaceX (https://www.spacex.com/)  Starlink constellation of satellites into low-Earth orbit, and the potential impact of this and other programmes on views of the night sky and on astronomical research.

Starlink, and other similar networks planned by  OneWeb (https://www.oneweb.world/),  Amazon (https://spacenews.com/amazon-planning-3236-satellite-constellation-for-internet-connectivity/)  and  Telesat (https://www.telesat.com/), aim to provide global commercial internet coverage. Each network consists of

thousands of satellites in low-Earth orbit – less than 2,000 kilometres altitude – that when fully deployed will be visible over a significant proportion of the sky from most of the inhabited world.

In their final orbits, the satellites will be relatively faint most of the time. Initial images of the constellation though suggest that they will exhibit frequent reflective flaring, where transient alignment with sunlight leads to temporary surges in brightness.

Increasing the number of satellites so significantly presents a challenge to ground-based astronomy. The deployed networks could make it much harder to obtain images of the sky without the streaks associated with satellites, and thus compromise astronomical research.

Given the scale of these projects, there is also the prospect of a significant and lasting change to the views of the night sky until now enjoyed throughout human history and pre-history. The night sky is part of the cultural heritage of humanity, and the Society believes that it deserves protection.

There appears to have been no consultation between SpaceX and the scientific community in advance of the Starlink launch, though since initial press reports we note that Elon Musk has responded indicating he wishes to minimise the impact on astronomy.

The Society welcomes this offer. We urge SpaceX, and other satellite providers, to work with scientists, engineers and others to mitigate the effects of the new constellations. We also ask that the provider companies consider the impact on human heritage too – an issue that goes far beyond the concerns of the astronomical community.

**Media contacts**

Dr Robert Massey
Royal Astronomical Society
Tel: +44 (0)20 7292 3979
Mob: +44 (0)7802 877699
 press@ras.ac.uk (mailto:press@ras.ac.uk)

A419

Dr Morgan Hollis

Royal Astronomical Society

Mob: +44 (0)7802 877700

press@ras.ac.uk (mailto:press@ras.ac.uk)

**Notes for editors**

The Royal Astronomical Society (RAS), founded in 1820, encourages and promotes the study of astronomy, solar-system science, geophysics and closely related branches of science. The RAS organises scientific meetings, publishes international research and review journals, recognises outstanding achievements by the award of medals and prizes, maintains an extensive library, supports education through grants and outreach activities and represents UK astronomy nationally and internationally. Its more than 4,000 members (Fellows), a third based overseas, include scientific researchers in universities, observatories and laboratories as well as historians of astronomy and others.

Follow the RAS on Twitter (https://twitter.com/royalastrosoc), Facebook (https://facebook.com/royalastrosoc), Instagram (https://instagram.com/royalastrosoc) and YouTube (https://www.youtube.com/user/RoyalAstroSoc)

*Submitted by Robert Massey (/user/18) on Fri, 07/06/2019 - 11:47*

## Latest News

Prof. Catherine Heymans becomes Astronomer Royal for Scotland (/news-and-press/news/prof-catherine-heymans-becomes-astronomer-royal-scotland)

5 days 6 hours ago

A420

Royal Astronomical Society signs Climate Neutral Now pledge (/news-and-press/news/royal-astronomical-society-signs-climate-neutral-now-pledge)

2 weeks ago

---

RAS Quilt Project - an update (/news-and-press/news/ras-quilt-project-update-1)

2 weeks 6 days ago

---

Election results 2021: new RAS Council (/news-and-press/news/election-results-2021-new-ras-council)

2 weeks 6 days ago

---

Call for nominations - Awards and Prizes 2022 (/news-and-press/news/call-nominations-awards-and-prizes-2022)

4 weeks ago

---

Registered Charity No: 226545

Registered Company
No: RC000446

Copyright Royal Astronomical Society 1996-2021

# EXHIBIT BB

M    E    N    U

10 JUNE 2019

# AAS Issues Position Statement on Satellite Constellations

** Contact details appear below. **

On May 23rd entrepreneur Elon Musk's company **SpaceX** launched 60 Starlink communication satellites aboard a single rocket. Within days skywatchers worldwide spotted them flying in formation as they orbited Earth and reflected sunlight from their shiny metal surfaces. Some people, unaware that artificial satellites can be seen moving against the starry background every clear night, reported UFO sightings. Astronomers, on the other hand, knew exactly what they were seeing — and immediately began to worry.



*Starlink satellite trails ruin an astrophoto. Courtesy Victoria Girgis/Lowell Observatory.*

SpaceX had suggested that the satellites would be visible just barely, if at all. But for a few days after launch the Starlink constellation shone as brightly as many astronomical constellations, and SpaceX intends to launch thousands more such spacecraft as part of an effort to provide internet service to everyone in the world. "I think it's commendable and very impressive engineering to spread the information and opportunities made possible by internet access," says Megan Donahue (Michigan State University), President of the American Astronomical Society (AAS), "but I, like many astronomers, am very worried about the future of these new bright satellites." The Starlink satellites and similar swarms being developed by other companies could eventually outnumber the stars visible in our night sky.

On June 8th, at the **234th AAS meeting** in St. Louis, Missouri, the **AAS Board of Trustees** adopted the following position statement on satellite constellations:

The American Astronomical Society notes with concern the impending deployment of very large constellations of satellites into Earth orbit. The number of such satellites is projected to grow into the tens of thousands over the next several years, creating the

A423

potential for substantial adverse impacts to ground- and space-based astronomy. These impacts could include significant disruption of optical and near-infrared observations by direct detection of satellites in reflected and emitted light; contamination of radio astronomical observations by electromagnetic radiation in satellite communication bands; and collision with space-based observatories.

The AAS recognizes that outer space is an increasingly available resource with many possible uses. However, the potential for multiple large satellite constellations to adversely affect both each other and the study of the cosmos is becoming increasingly apparent, both in low Earth orbit and beyond.

The AAS is actively working to assess the impacts on astronomy of large satellite constellations before their numbers rise further. Only with thorough and quantitative understanding can we properly assess the risks and identify appropriate mitigating actions. The AAS desires that this be a collaborative effort among its members, other scientific societies, and other space stakeholders including private companies. The AAS will support and facilitate the work by relevant parties to understand fully and minimize the impact of large satellite constellations on ground- and space-based astronomy.

"The natural night sky is a resource not just for astronomers but for all who look upward to understand and enjoy the splendor of the universe, and its degradation has many negative impacts beyond the astronomical," says Jeffrey C. Hall (Lowell Observatory), Chair of the **AAS Committee on Light Pollution, Radio Interference, and Space Debris**. "I appreciate the initial conversation we have already had with SpaceX, and I look forward to working with my AAS colleagues and with all stakeholders to understand and mitigate the effects of the rapidly increasing numbers of satellites in near-Earth orbit."

AAS President Donahue adds, "I'm looking forward to productive conversations between astronomers and SpaceX. I fully expect that we will come up with creative solutions that can serve as models for other companies to follow."

Contacts:
**Rick Fienberg**
AAS Press Officer
+1 202-328-2010 x116

**Kevin B. Marvel**
AAS Executive Officer
+1 202-328-2010 x114

A **press kit (PDF)** for the Starlink mission is available from SpaceX.

A high-resolution version of the image that appears above is available, with a detailed caption, from the **International Astronomical Union**.

The American Astronomical Society (AAS), established in 1899, is the major organization of professional astronomers in North America. Its membership of approximately 7,500 also includes physicists, mathematicians, geologists, engineers, and others whose research interests lie within the broad spectrum of subjects now comprising the astronomical sciences. The mission of the AAS is to enhance and share humanity's scientific understanding of the universe, which it achieves through publishing, meeting organization, education and outreach, and training and professional development.

    

ORGANIZATIONAL ETHICS AND POLICIES

CONTACT US

OBITUARIES

HONORS, GRANTS & PRIZES

PHOTO GALLERY

PRESS OFFICE

**Updating content on the site?**

Log in      Posting Guidelines

COPYRIGHT 2019–PRESENT,
AMERICAN ASTRONOMICAL SOCIETY.

Privacy Policy      Terms of Use



Back to top

# EXHIBIT CC



# Final Environmental Assessment and Finding of No Significant Impact for SpaceX Falcon Launches at Kennedy Space Center and Cape Canaveral Air Force Station

## July 2020



# DEPARTMENT OF TRANSPORTATION

# Federal Aviation Administration
# Office of Commercial Space Transportation

# Finding of No Significant Impact
# for
# Issuing Licenses to SpaceX for Falcon Launches at Kennedy Space Center and Cape Canaveral Air Force Station

## Summary

The Federal Aviation Administration (FAA) prepared the attached Final Environmental Assessment (EA) to analyze the potential environmental impacts of issuing launch licenses to Space Exploration Technologies Corp. (SpaceX) to conduct Falcon 9 and Falcon Heavy launches from Kennedy Space Center's (KSC) Launch Complex 39A (LC-39A) and Cape Canaveral Air Force Station's (CCAFS) Launch Complex 40 (LC-40). The EA also analyzed the potential environmental impacts of issuing reentry licenses to SpaceX for Dragon reentry operations. The EA was prepared in accordance with the National Environmental Policy Act of 1969, as amended (NEPA; 42 United States Code [U.S.C.] § 4321 et seq.); Council on Environmental Quality NEPA implementing regulations (40 Code of Federal Regulations [CFR] parts 1500 to 1508); and FAA Order 1050.1F, *Environmental Impacts: Policies and Procedures*.

After reviewing and analyzing available data and information on existing conditions and potential impacts, the FAA has determined the Proposed Action would not significantly affect the quality of the human environment. Therefore, the preparation of an Environmental Impact Statement (EIS) is not required, and the FAA is issuing this Finding of No Significant Impact (FONSI). The FAA has made this determination in accordance with applicable environmental laws and FAA regulations. The Final EA is incorporated by reference into this FONSI.

For any questions or to request a copy of the EA, contact the following FAA Environmental Specialist. A copy of the EA may also be obtained from the FAA's website:

https://www.faa.gov/space/environmental/nepa_docs/

Daniel Czelusniak
Environmental Specialist

Federal Aviation Administration
800 Independence Ave., SW, Suite 325
Washington DC 20591
Daniel.Czelusniak@faa.gov
(202) 267-5924

## Purpose and Need

The purpose of FAA's Proposed Action is to fulfill the FAA's responsibilities as authorized by the Commercial Space Launch Act (51 U.S.C. Subtitle V, ch. 509, §§ 50901-50923) for oversight of commercial space launch activities, including licensing launch activities. The need for FAA's Proposed Action results from the statutory direction from Congress under the Commercial Space Launch Act, 51 U.S.C 50901(b) to, in part, "protect the public health and safety, safety of property, and national security and foreign policy interests of the United States" while "strengthening and [expanding] the United States space transportation infrastructure, including the enhancement of United States launch sites and launch-site support facilities, and development of reentry sites, with Government, State, and private sector involvement, to support the full range of United States space-related activities."

## Proposed Action

The FAA is proposing to modify existing SpaceX launch licenses or issue new launch licenses to SpaceX to continue conducting Falcon launch operations at KSC and CCAFS and to issue new reentry licenses to SpaceX for Dragon reentry operations. SpaceX is also proposing to construct a mobile service tower (MST) at LC-39A to support commercial launches and the U.S. Air Force's National Security Space Launch program. NASA is responsible for approving the construction of the MST at LC-39A. The FAA has no federal action related to the construction of the MST. Therefore, construction of the MST is not addressed in this FONSI.

## Alternatives

Alternatives analyzed in detail in the EA include (1) the Proposed Action and (2) the No Action Alternative. Under the No Action Alternative, the FAA would not modify existing SpaceX licenses or issue new licenses to SpaceX for Falcon launch and Dragon reentry operations as discussed in Section 2.1 of the EA. SpaceX would continue Falcon 9 and Falcon Heavy launch operations at KSC and CCAFS, as well as Dragon reentry operations, as analyzed in previous NEPA and environmental reviews and in accordance with existing FAA licenses until the licenses expire.

## Public Involvement

On February 27, 2020, the FAA published a Notice of Availability of the Draft EA in the *Federal Register*. The public comment period ended on March 20, 2020. The FAA received six comment submissions (see Appendix D of the Final EA). The FAA considered all public comments when preparing the Final EA.

## Environmental Impacts

The potential environmental impacts from the Proposed Action and No Action Alternative were evaluated in the attached Final EA for each environmental impact category identified in FAA Order 1050.1F. Chapter 3 of the Final EA describes the affected environment and regulatory setting. In addition, Chapter 3 identifies those environmental impact categories that are not analyzed in detail, explaining why the Proposed Action would have no potential effect on those impact categories. Those impact categories include farmlands, floodplains and wetlands, environmental justice and children's environmental health and safety risks, and wild and scenic rivers.

Chapter 4 of the Final EA provides evaluations of the potential environmental consequences of each alternative for each of the environmental impact categories analyzed in detail and documents the finding that no significant environmental impacts would result from the Proposed Action. In addition, Chapter 4 addresses the requirements of special purpose laws, regulations, and executive orders.

A summary of the documented findings for each impact category, including requisite findings with respect to relevant special purpose laws, regulations, and executive orders, is presented below.

- **Air Quality**, Final EA Section 4.3. Air pollutant emissions below 3,000 feet would be of short duration (a matter of seconds) during launches, including landings. Air pollutant emissions would not result in violations of any air quality standards, including the National Ambient Air Quality Standards. Therefore, the Proposed Action would not result in significant impacts on air quality.

- **Biological Resources (including Fish, Wildlife, and Plants)**, Final EA Section 4.8. Temporary and infrequent impacts (e.g., startle response) on wildlife species would occur due to launch noise. In accordance with Section 7 of the Endangered Species Act (ESA), the FAA conducted consultation with the U.S. Fish and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS). USFWS and NMFS concluded that the Proposed Action would not jeopardize the continued existence of a federally listed threatened or endangered species, and would not

result in the destruction or adverse modification of federally designated critical habitat. Therefore, the Proposed Action would not result in significant impacts on biological resources.

- **Climate**, Final EA Section 4.4. The maximum total annual greenhouse gas (GHG) emissions under the Proposed Action is estimated to be 68,877 metric tons of carbon dioxide equivalent ($CO_2e$). Though emissions from launch operations would increase the yearly levels of GHGs, the emissions would represent a negligible fraction of GHG emissions from the United States and the world. Therefore, the Proposed Action would not result in significant climate impacts.

- **Coastal Resources**, Final EA Section 4.9. Launch operations would take place in the coastal zone but not within intertidal areas, salt marshes, estuaries, or coral reefs. The Proposed Action does not include any coastal construction or seafloor-disturbing activities. Dragon reentry and recovery operations would occur in deeper waters at least five nautical miles off the Atlantic or the Pacific coasts. The Florida State Clearinghouse review resulted in no objections. Therefore, the Proposed Action would not result significant impacts on coastal resources.

- **Department of Transportation Act, Section 4(f)**, Final EA Section 4.7. The Proposed Action would not result in a physical use of any Section 4(f) property. Section 4(f) properties could be exposed to a sonic boom during booster returns to CCAFS and during a Falcon 9 polar launch. The FAA has determined that Falcon launches, including landings, would not result in substantial impairment of the 4(f) properties because sonic booms would occur infrequently and would be similar to or less than the noise experienced during a clap of thunder in the majority of the sonic boom footprints. Thus, the Proposed Action would not result in a constructive use of any 4(f) property. On launch days, there is a possibility of temporary restricted access due to visitor volume on sections of KSC managed by USFWS and National Park Service (NPS), as have occurred for other space programs. These temporary closures of Section 4(f) properties are typically related to crowd control and access for emergency services. They are related to the volume of visitor traffic in an area and are not related to a public safety hazard from a launch. Any potential closures due to visitor volume would be coordinated between KSC security, USFWS, and NPS by monitoring to ensure parking lot thresholds are not exceeded, and that roadways allow for emergency egress for any form of emergency associated with large crowds. Such closures would not be expected to cause more than a minimal disturbance to the enjoyment of the resources of MINWR and CNS and would be determined by the land managing agencies. In summary, the Proposed Action would not constitute a physical or constructive use

# EXHIBIT DD

Jonathan's Space Report
No. 785                                          2020 Nov 5    Somerville, MA
--------------------------------------------------------------------------------

International Space Station
---------------------------

Expedition 63 concluded on Oct 21 with the undocking of Soyuz MS-16.
Expedition 64 is now underway under the command of Sergey Ryzhikov.

Soyuz MS-17 was launched on Oct 14 at 0545 UTC with Sergey Ryzhikov, Sergey Kud'-Sverchkov and Kate Rubins.
It docked with the Rassvet module at 0848 UTC. The 3 hr 3min 49s flight from Earth to ISS is
a record for the ISS program.

Soyuz MS-16 undocked from the Poisk module at 2332 UTC Oct 21 and landed
in Kazakhstan at 0254 UTC Oct 22, returning Anatoliy Ivanishin, Ivan
Vagner and Chris Cassidy to Earth.

The Nanoracks NRCSD-19 payloads, delivered to the ISS on Cygnus NG-14, are being prepared for
deployment from the Kibo airlock. The payloads are:
   Bobcat-1, 3U cubesat from Ohio U with a technology payload
   NEUTRON, 3U cubesat from U of Hawaii with a space physics experiment
   SPOC, 3U cubesat from U of Georgia with an ocean color imager
   Lemur-2-v4.7 and Lemur-2-v4.8, 3U cubesats from Spire Global with comms and GNSS-RO weather payloads
   DESCENT Mother and DESCENT Daughter, two 1U cubesats joined by a 100-metre tether from York University
(Canada).
   SATTLA-1, 1U student and amateur radio payload from Ariel University in the West Bank

Starlink
----------

The Falcon 9 stage 2 from the Oct 6 launch failed to perform its deorbit
burn and was left in a 262 x 277 km orbit. It reentered on Oct 30.

Another 60 Starlinks (launch 14, V1.0-L13) were launched on Oct 18 from
KSC. The first stage, B1051, made its sixth flight and landed on OCISLY.
The second stage made a two-burn insertion; it was not cataloged and may
have been deorbited.

One of this batch, Starlink 1819, failed at deployment and reentered over Chad on Oct 25.

60 more Starlinks (launch 15, V1.0-L14) went up on Oct 24 from Cape
Canaveral using booster B1060 on its third flight, landing on JRTI. The
two-burn insertion profile was used again and this time the second stage was
again cataloged in orbit with no deorbit burn performed. Starlinks 1915 and 1950
are in decaying orbits and may have failed.

Glonass-K
---------

The third Glonass-K navigation satellite, No. 15L, was launched on Oct 25. The Glonass-K series
is expected to replace the current Glonass-M type, but with only 3 launches in 9 years
the system's deployment rate is not impressive.

The Glonass site confirms that the satellite has been given the cover name Kosmos-2547.

Yaogan 30 Group 7
-----------------

On Oct 26 China's CALT launched a CZ-2C from Xichang with three
Yaogan 30 hao 07 zu  (YG-30 Group 7) satellites. A small Tianqi Xingzuo 06
secondary payload was also carried.

Electron Launch 15
------------------

On Oct 28 RocketLab launched its 15th Electron flight, In Focus, carrying the CESAT-IIB satellite
for Canon Electronics and nine Flock 4e-Prime satellites for Planet to 0942 LTDN sun-sync orbit.
The nine Planet sats are Doves 225a, 2279, 2251, 227e, 2276, 2280, 2262, 2264, and 2441.


ION-SVC
-------

Deployment of the 12 Flock 4v cubesats from the ION-SVC carrier was completed on Oct 28.


OSIRIS-REX
----------

NASA's OSIRIS-REx probe performed a touch-and-go sample retrieval from the surface of minor
planet (101955) Bennu on Oct 20. It left the 1 km parking orbit at 1730 UTC, began a steep
descent from 125m at 2133 UTC (Checkpoint Burn), matched horizontal speed with Bennu's rotation
(Matchpoint Burn) at around 2143 UTC at 50m altitude, and landed at 2153 UTC.

After activation of the TAGSAM sampler, the probe took off again after
about 9 seconds on the surface. It departed from Bennu at 0.4 m/s, which
exceeds escape velocity, and left the 48-km-radius Sun-Bennu Hill sphere
at about 0700 UTC Oct 22. Sample stow was expected on Oct 26, with the TAGSAM observed
to be overflowing with material.


Table of Recent Orbital Launches
 ----------------------------------

| Date UT Apogee Incl | Name Notes | Launch Vehicle | Site | Mission | INTL. | Catalog | Perigee |
|---|---|---|---|---|---|---|---|
| Oct  2? x 521 x 97.5 | Flock 4v-17) | | | ION-SVC, LEO | Imaging | 61BF S46529 | 516 |
| x 527 x 97.5 | Flock 4v-18) | | | Imaging | 61BG S46597 | 514 |
| Oct  3 0116 x 238 x 51.6 | S.S. Kalpana Chawla | Antares 230+ | MARS Pad 0A | Cargo | 69A S46530 | 185 |
| Oct  6 1129 | Starlink 1531    ) | | | | | | |
| x 277 x 53.0 | Starlink 1644    ) | Falcon 9 | Kennedy LC39A | Comms | 70A S46532 | 262 |
| | Starlink 1648-1650 ) | | | | | to S46591 | |
| | Starlink 1659-1660 ) | | | | | | |
| | Starlink 1663-1664 ) | | | | | | |
| | Starlink 1668    ) | | | | | | |
| | Starlink 1671-1672 ) | | | | | | |
| | Starlink 1674-1685 ) | | | | | | |
| | Starlink 1687    ) | | | | | | |
| | Starlink 1692-1694 ) | | | | | | |
| | Starlink 1696-1702 ) | | | | | | |
| | Starlink 1705-1706 ) | | | | | | |
| | Starlink 1708-1709 ) | | | | | | |
| | Starlink 1712    ) | | | | | | |
| | Starlink 1714    ) | | | | | | |
| | Starlink 1728-1730 ) | | | | | | |
| | Starlink 1732-1733 ) | | | | | | |
| | Starlink 1735-1737 ) | | | | | | |
| | Starlink 1740-1741 ) | | | | | | |
| | Starlink 1743-1744 ) | | | | | | |
| | Starlink 1746-1749 ) | | | | | | |
| | Starlink 1753-1755 ) | | | | | | |
| Oct  9? x 521 x 97.5 | Flock 4v-19) | | | ION-SVC, LEO | Imaging | 61BH S46529 | 516 |
| x 527 x 97.5 | Flock 4v-20) | | | Imaging | 61BJ S46597 | 514 |
| Oct 11 1657 x35836 x 28.5 | Gao Fen 13 | Chang Zheng 3B | Xichang | Imaging | 71A S46610 | 182 |
| Oct 14? x 521 x 97.5 | Flock 4v-21) | | | ION-SVC, LEO | Imaging | 61BK S46596 | 515 |
| x 526 x 97.5 | Flock 4v-22) | | | Imaging | 61BL S46735 | 515 |

A435

```
Oct 14 0545  Soyuz MS-17              Soyuz-2-1A        Baykonur LC31 Spaceship 72A  S46613   417
x  420 x51.6
Oct 18 1226  Starlink 1715-1718)
             Starlink 1720     )      Falcon 9          Kennedy LC39A Comms     73A  S46670   263
x 277 x 53.0
             Starlink 1731     )                                                    to S46729
             Starlink 1766     )
             Starlink 1772-1776)
             Starlink 1778     )
             Starlink 1780-1781)
             Starlink 1783     )
             Starlink 1784     )
             Starlink 1786     )
             Starlink 1788-1797)
             Starlink 1799-1805)
             Starlink 1807-1811)
             Starlink 1813-1831)
             Starlink 1841     )
Oct 20?      Flock 4v-23)             ION-SVC, LEO      Imaging   61BM S46737   515
x 521 x 97.5
             Flock 4v-24)                               Imaging   61BN S46738   515
x 526 x 97.5
Oct 24 1531  Starlink 1798     )      Falcon 9          Canaveral LC40 Comms    74A  S46739   263
x 277 x 53.0
             Starlink 1832-1835)                                               to S46798
             Starlink 1847-1848)
             Starlink 1851     )
             Starlink 1865     )
             Starlink 1872     )
             Starlink 1882-1883)
             Starlink 1892-1894)
             Starlink 1896-1899)
             Starlink 1901-1903)
             Starlink 1905-1906)
             Starlink 1908     )
             Starlink 1910-1911)
             Starlink 1915-1926)
             Starlink 1928-1937)
             Starlink 1939     )
             Starlink 1941-1950)
Oct 25 1908  Glonass-K No. 15L        Soyuz-2-1B/Fregat Plesetsk LC43/4 Navigation 75A S46805
19125 x 19150 x 64.8
Oct 26 1519  Yaogan 30 hao 07 zu 01 xing)  Chang Zheng 2C  Xichang      Sigint   76A S46807
589 x    604 x 35.0
             Yaogan 30 hao 07 zu 01 xing)                  Sigint   76B S46808
589 x    604 x 35.0
             Yaogan 30 hao 07 zu 01 xing)                  Sigint   76C S46809
589 x    604 x 35.0
             Tianqi Xingzuo 06          )                  Comms    76D S46810
589 x    604 x 35.0
Oct 28 2121  CE-SAT-IIB       )        Electron          Mahia LC1    Imaging  77K S46822?
511 x    528 x 97.5
             Flock 4e'-1      )                            Imaging  77A S46813?
511 x    528 x 97.5
             Flock 4e'-2      )                            Imaging  77H S46820?
511 x    528 x 97.5
             Flock 4e'-3      )                            Imaging  77G S46819?
511 x    528 x 97.5
             Flock 4e'-4      )                            Imaging  77J S46821?
511 x    528 x 97.5
             Flock 4e'-5      )                            Imaging  77E S46817?
511 x    528 x 97.5
             Flock 4e'-6      )                            Imaging  77F S46818?
508 x    528 x 97.5
             Flock 4e'-7      )                            Imaging  77B S46814?
505 x    528 x 97.5
             Flock 4e'-8      )                            Imaging  77D S46816?
507 x    524 x 97.5
             Flock 4e'-9      )                            Imaging  77C S46815?
```

```
505 x   525 x 97.5

Table of Recent Suborbital Launches
-----------------------------------

Date UT         Payload/Flt Name Launch Vehicle    Site            Mission     Apogee/km   Target

Oct  1          Black Dagger     Boosted Zombie    Fort Wingate?   Target         100?     White
Sands
Oct 13 1336     NS-13            New Shepard       W Texas         Test           106      W Texas
Oct 29 0727     GT236GM          Minuteman 3       Vandenberg LF09 Op. Test       1300?    Kwajalein

 .----------------------------------------------------------------------.
 |  Jonathan McDowell              |                                    |
 |  Somerville MA 02143            |   inter : planet4589 at gmail      |
 |  USA                            |   twitter: @planet4589             |
 |                                 |                                    |
 | JSR: https://www.planet4589.org/jsr.html                            |
 | Back issues:  https://www.planet4589.org/space/jsr/back             |
 | Subscribe/unsub: https://www.planet4589.org/mailman/listinfo/jsr    |
 '----------------------------------------------------------------------'
```

A437

# EXHIBIT EE



**OXIDIZING SOOT** makes the plume of this Russian Soyuz-FG rocket glow during a 2015 launch from Kazakhstan.

SPACEFLIGHT

# SPACE POLLUTION

The new private launch industry can learn a lot
from aviation about sustainability

*By Martin N. Ross and Leonard David*



T HE SPACE INDUSTRY IS GROWING AND
innovating at a pace not seen since
the days of the moon landings. Fifty years ago nearly everything related to space
was a government-sponsored project. In 21st-century space, rockets and satellites
are most often corporate investments or public-private partnerships.

Untethered from government leashes, the global space industry looks and operates increasingly like global
aviation. Reusability. Regular flight cadence. Mass production of spacecraft and launch vehicles. Analysts pre-
dict that the space industry's contribution to global GDP could cross the 1 percent threshold by 2040. We can
reasonably construct future scenarios where the space and aviation industries have comparable economic clout.

A great deal of aviation's remarkable airframe and propulsion developments since World War II have been
guided by sustainability concerns, mainly focused on jet engine emissions. Modern jet engines emit much
less soot and gas pollutants than engines emitted 50 years ago. The pressure to reduce jet emissions has been
good for aviation because honing turbine combustion to near theoretical maximum efficiency has had the

NASA VIA GETTY

February 2021, ScientificAmerican.com **57**

benefit of reducing fuel consumption. Good for corporate bottom lines and good for planet Earth.

Sustainability has not been much of a concern for space systems development. Just like their jet engine cousins, rocket engines emit a variety of gases and particles into the atmosphere that can have regional and even global consequences. Even so, the environmental impacts of launch vehicles are typically disregarded by comparing jet and rocket fuel consumption in an overly simplified way.

The argument goes like this: Rockets burn only 0.1 percent of the fuel that aircraft burn every year and are therefore only 0.1 percent of the emissions problem that aviation presents. But this is a case of false equivalence. Careful understanding of every phase of space flight shows that space emissions can change the atmosphere in ways that are wholly different from, and in some cases worse than, aviation emissions.

Unlike with aviation, emissions produced by the space industry affect every layer of the atmosphere. Whereas jet emissions into the troposphere are quickly washed to the surface by precipitation, rocket emissions into the stratosphere are cleared away only slowly. Stratospheric emissions accumulate year over year, adding up exhaust from all of Earth's launches and reentries over the past four or five years. In fact, the fragile ozone layer resides in the stratosphere, near where rocket emissions accumulate.

Prospects for space travel have never been more thrilling. Advances in the space industry, including high-performance smallsats, low-Earth-orbit (LEO) mega constellations, new rocket propellants and lunar resource extraction, are driving the 21st-century "New Space" growth. These developments could realize the long-held ambition to make space travel as commonplace as air travel. But are these new space technologies on a sustainable path?

### GAS EXHAUST

ROCKET ENGINE EXHAUST, like jet exhaust, is mostly carbon dioxide and water vapor, and the global impacts of these emissions are well understood. Carbon dioxide emitted at any altitude is a "long-lived" greenhouse gas (GHG), adding to the atmospheric GHG burden. Water vapor is a "short-lived" GHG. These components of rocket exhaust are a small fraction of 1 percent of aviation's $CO_2$ and $H_2O$ outputs. Even though their current consequences are small, some minor rocket exhaust components require closer inspection.

Solid-rocket motor (SRM) oxidizer, ammonium perchlorate, contains chlorine, the most serious threat to stratospheric ozone. Direct plume sampling 20 years ago by NASA aircraft showed that SRM plumes create dramatic ozone "mini holes" that persist for several days after a launch. The mini holes disappear, however, as the chlorine-laden plumes mix into the global stratosphere, and all the chlorine emitted by SRMs every year is small and short-lived compared with the chlorine released by the notorious chlorofluorocarbons. Chlorine from SRMs is most likely not a serious threat to the ozone layer.

Scientists well understand how the $CO_2$, $H_2O$ and Cl gas emissions from rockets affect climate and ozone. And all this research indicates that these impacts are insignificant compared with other pollution sources and are buried in the noise of the global atmosphere. Even if these launch emissions increased by an order of magnitude, their consequences would be small. Still, there is another component to rocket exhaust that could be significant: particles of black carbon (BC) soot and alumina.

### PARTICLE EMISSIONS

ROCKETS FAMOUSLY DISPLAY BRILLIANT EXHAUST PLUMES. The "flame" of a hydrocarbon-fueled rocket engine is mostly the incandescent glow of soot particles oxidizing in the hot plume. Soot production in rocket engines is complicated and not very well understood. Soot forms in fuel-rich combustion chambers, fuel-cooling nozzle walls and turbopump gas generators and is partly consumed in the hot plumes. Jet engines have none of these complexities and burn very clean compared with rocket engines. Some types of hydrocarbon-fueled rocket engines emit hundreds of times more soot for each kilogram of fuel burned than do their jet engine cousins. And jets only occasionally fly in the stratosphere; rockets fly there every launch.

What is the concern about soot in the stratosphere? Black carbon soot very efficiently absorbs sunlight. The absorbed energy is transferred to the surrounding air, so that BC soot acts as a heat source, warming the stratosphere, which can in turn slightly change the circulation of the global atmosphere. And because ozone concentration is inversely proportional to temperature, a warmer stratosphere equates to depletion of the ozone layer. Is the BC soot emitted by the current fleet of rockets great enough to have a significant effect on the atmosphere? We do not yet know. The required climate models are only now being assembled.

Solid-rocket motor plumes are even more brilliant than hydrocarbon-fueled plumes. White-hot alumina droplets leaving the nozzle are the source for the SRM flame. As with the chlorine gas emission, SRM plumes diffuse and eventually mix into the global atmosphere so that rocket alumina particles are found in random stratospheric air samples from equator to poles. In the 1990s researchers discovered how ozone-destroying chemical reactions occur on the surface of SRM alumina particles, but alumina's significance as a source of ozone depletion is not known. SRMs emit ozone-destroying chlorine gas, too, of course, and the double-sided nature of SRM ozone depletion is poorly described. The 2018 World Meteorological Organization ozone assessment acknowledged the large gaps in our understanding and noted that further research is "warranted."

The space shuttle SRMs were the largest ever flown, and it is often mistakenly assumed that the use of large solid rockets ended when the space shuttle retired. In fact, SRMs are finding increasing launch applications around the planet. The Space Launch System's 144-inch-diameter SRMs will be the most massive ever flown when the next-generation NASA heavy-lift vehicle lifts



**Martin N. Ross** is a scientist with Aerospace Corporation, who leads research on how aerospace propulsion systems impact Earth's atmosphere. He served as a co-author of the 2018 World Meteorological Organization's Scientific Assessment of Ozone Depletion.



**Leonard David** is a veteran space journalist and author of *Moon Rush: The New Space Race*, published by National Geographic in May 2019.

off for the first time in November 2021. Even that rocket will be eclipsed by a Chinese 156-inch SRM planned for a 2025 debut. SRMs present a growing and poorly known hazard to stratospheric ozone.

### WHAT GOES UP COMES DOWN

SPACE POLLUTION DOESN'T STOP when a rocket leaves the atmosphere. Contrary to many media stories about the latest spectacular space junk reentry, orbital debris returning to Earth does not "disappear" or "burn up" on reentry. Some parts of derelict spacecraft will survive reentry and reach the surface. Most of the reentering mass vaporizes into a hot gas that quickly condenses into a spray of small particles, however. Thus, as with launch, bright plumes mean particle production. Unlike the chemically simple particles from launch, particles from reentering space junk will be a zoo of complex chemical types. Particles from vaporizing propellant tanks, computers, solar panels and other exotic materials will form around an 85-kilometer altitude, then drift downward, accumulating in the stratosphere along with the launch's soot and alumina. Reentry is as much of an "emission" as a launch.

The growing low-Earth orbit mega constellations, with thousands of satellites in each constellation, use reentry vaporization as the satellite end-of-life disposal mechanism. Once these constellations are deployed, hundreds of tons of nonfunctioning satellites will be "brought in" for disposal every year. Most of this mass will become particles in the middle atmosphere. Very little is known about reentry dust production, the microphysics of the particles, and how reentry dust could affect climate and ozone.

Space has entered a growth phase reminiscent of aviation's early days. Once a technology becomes a normal part of the market economy, there is no limit to potential new applications. And like its aviation industry big brother, the space industry emits gases and particles into the atmosphere from propulsion systems. But a comparison between aviation emissions and space emissions must account for the vastly different ways that the two industries affect Earth's atmosphere.

Carbon dioxide emissions from jet engines will be much larger than $CO_2$ emissions from rocket engines for any foreseeable future. This is reflected in well-meaning but misguided calculations of a conventional "carbon footprint" for space. But $CO_2$ is not where the action is for space pollution. The particles emitted by rocket launches and space debris reentries cause much larger changes in atmospheric chemistry, dynamics and radiation than rocket $CO_2$ emissions. For the space industry, the carbon footprint is a complicated story that is yet to be appropriately defined.

The recent controversy over the brightness of LEO satellites highlights how sustainability needs to become a fundamental aspect of space system development. It will be easier to guarantee unimpeded use of space systems if the environmental impacts of every stage in a system's life cycle are evaluated ahead of time. This is



ASTRONAUTS launch toward the International Space Station onboard a SpaceX Crew Dragon craft propelled by a Falcon 9 rocket in November 2020.

how aviation contemplates sustainability. Environmental concerns that appear after deployment encourage regulation. Full and complete analysis before deployment inoculates against regulation.

Ironically, only space can provide the perspective required to manage humanity's stewardship of our planet. *Apollo 8*'s view of Earthrise is often associated with the beginning of global environmentalism. And yet space industry emissions themselves are too poorly known to answer fundamental questions about space's environmental impact and sustainability. As we look to aviation, an appropriate scientific program would include measurements of launch and reentry plumes, detailed modeling of plumes from fresh emissions to steady state global mixing, and laboratory measurements of the microphysics of all the different particle types generated from launch to reentry. The effort should be a government and commercial partnership.

The space industry is poised to become a more significant part of the global economy just at a time when sustainability is becoming a common goal across the world. What would a sustainable space industry look like? What are the future regulatory threats to space development? We will not know the answers to these questions until we carry out a sustained, globally coordinated scientific research program on space industry emissions. ◼

**FROM OUR ARCHIVES**

Birth of a Rocket. David H. Freedman; June 2015.

scientificamerican.com/magazine/sa

RED HUBER Getty Images

A442

# EXHIBIT FF

www.nature.com/scientificreports

# scientific reports



**OPEN**

# Satellite mega-constellations create risks in Low Earth Orbit, the atmosphere and on Earth

Aaron C. Boley[1]✉ & Michael Byers[2]

The rapid development of mega-constellations risks multiple tragedies of the commons, including tragedies to ground-based astronomy, Earth orbit, and Earth's upper atmosphere. Moreover, the connections between the Earth and space environments are inadequately taken into account by the adoption of a consumer electronic model applied to space assets. For example, we point out that satellite re-entries from the Starlink mega-constellation alone could deposit more aluminum into Earth's upper atmosphere than what is done through meteoroids; they could thus become the dominant source of high-altitude alumina. Using simple models, we also show that untracked debris will lead to potentially dangerous on-orbit collisions on a regular basis due to the large number of satellites within mega-constellation orbital shells. The total cross-section of satellites in these constellations also greatly increases the risk of impacts due to meteoroids. De facto orbit occupation by single actors, inadequate regulatory frameworks, and the possibility of free-riding exacerbate these risks. International cooperation is urgently needed, along with a regulatory system that takes into account the effects of tens of thousands of satellites.

Companies are placing satellites into orbit at an unprecedented frequency to build 'mega-constellations' of communications satellites in Low Earth Orbit (LEO). In two years, the number of active and defunct satellites in LEO has increased by over 50%, to about 5000 (as of 30 March 2021). SpaceX alone is on track to add 11,000 more as it builds its Starlink mega-constellation and has already filed for permission for another 30,000 satellites with the Federal Communications Commission (FCC)[1]. Others have similar plans, including OneWeb, Amazon, Telesat, and GW, which is a Chinese state-owned company[2]. The current governance system for LEO, while slowly changing, is ill-equipped to handle large satellite systems. Here, we outline how applying the consumer electronic model to satellites could lead to multiple tragedies of the commons. Some of these are well known, such as impediments to astronomy and an increased risk of space debris, while others have received insufficient attention, including changes to the chemistry of Earth's upper atmosphere and increased dangers on Earth's surface from re-entered debris. The heavy use of certain orbital regions might also result in a de facto exclusion of other actors from them, violating the 1967 Outer Space Treaty. All of these challenges could be addressed in a coordinated manner through multilateral law-making, whether in the United Nations, the Inter-Agency Debris Committee (IADC), or an ad hoc process, rather than in an uncoordinated manner through different national laws. Regardless of the law-making forum, mega-constellations require a shift in perspectives and policies: from looking at single satellites, to evaluating systems of thousands of satellites, and doing so within an understanding of the limitations of Earth's environment, including its orbits.

Thousands of satellites and 1500 rocket bodies provide considerable mass in LEO, which can break into debris upon collisions, explosions, or degradation in the harsh space environment. Fragmentations increase the cross-section of orbiting material, and with it, the collision probability per time. Eventually, collisions could dominate on-orbit evolution, a situation called the Kessler Syndrome[3]. There are already over 12,000 trackable debris pieces in LEO, with these being typically 10 cm in diameter or larger. Including sizes down to 1 cm, there are about a million inferred debris pieces, all of which threaten satellites, spacecraft and astronauts due to their orbits crisscrossing at high relative speeds. Simulations of the long-term evolution of debris suggest that LEO is already in the protracted initial stages of the Kessler Syndrome, but that this could be managed through active debris removal[4]. The addition of satellite mega-constellations and the general proliferation of low-cost satellites in LEO stresses the environment further[5–8].

[1]Department of Physics and Astronomy, The University of British Columbia, Vancouver, Canada. [2]Department of Political Science, The University of British Columbia, Vancouver, Canada. ✉email: aaron.boley@ubc.ca

www.nature.com/scientificreports/



**Figure 1.** Cumulative on-orbit distribution functions (all orbits). Deorbited objects are not included. The 2007 and 2009 spikes are a Chinese anti-satellite test and the Iridium 33-Kosmos 2251 collision, respectively. The recent, rapid rise of the orange curve represents NewSpace (see "Methods").



**Figure 2.** Orbital distribution and density information for objects in Low Earth Orbit (LEO). (Left) Distribution of payloads (active and defunct satellites), binned to the nearest 1 km in altitude and 1° in orbital inclination. The centre of each circle represents the position on the diagram, and the size of the circle is proportional to the number of satellites within the given parameter space. (Right) Number density of different space resident objects (SROs) based on 1 km radial bins, averaged over the entire sky. Because SRO objects are on elliptical orbits, the contribution of a given object to an orbital shell is weighted by the time that object spends in the shell. Despite significant parameter space, satellites are clustered in their orbits due to mission requirements. The emerging Starlink cluster at 550 km and 55° inclination is already evident in both plots (Left and Right).

## Results

**The overall setting.** The rapid development of the space environment through mega-constellations, predominately by the ongoing construction of Starlink, is shown by the cumulative payload distribution function (Fig. 1). From an environmental perspective, the slope change in the distribution function defines NewSpace, an era of dominance by commercial actors. Before 2015, changes in the total on-orbit objects came principally from fragmentations, with effects of the 2007 Chinese anti-satellite test and the 2009 Kosmos-2251/Iridium-33 collisions being evident on the graph.

Although the volume of space is large, individual satellites and satellite systems have specific functions, with associated altitudes and inclinations (Fig. 2). This increases congestion and requires active management for station keeping and collision avoidance[9], with automatic collision-avoidance technology still under development. Improved space situational awareness is required, with data from operators as well as ground- and space-based

www.nature.com/scientificreports/



**Figure 3.** Satellite density distribution in LEO with the Starlink and OneWeb mega-constellations as filed (and amended) with the FCC. Provided that the orbits are nearly circular, the number densities in those shells will exceed $10^{-6}$ km$^{-3}$. Because the collisional cross-section in those shells is also high, they represent regions that have a high collision risk whenever debris is too small to be tracked or collision avoidance manoeuvres are impossible for other reasons.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

sensors being widely and freely shared[10]. Improved communications between satellite operators are also necessary: in 2019, the European Space Agency moved an Earth observation satellite to avoid colliding with a Starlink satellite, after failing to reach SpaceX by e-mail. Internationally adopted 'right of way' rules are needed[10] to prevent games of 'chicken', as companies seek to preserve thruster fuel and avoid service interruptions. SpaceX and NASA recently announced[11] a cooperative agreement to help reduce the risk of collisions, but this is only one operator and one agency.

When completed, Starlink will include about as many satellites as there are trackable debris pieces today, while its total mass will equal all the mass currently in LEO—over 3000 tonnes. The satellites will be placed in narrow orbital shells, creating unprecedented congestion, with 1258 already in orbit (as of 30 March 2021). OneWeb has already placed an initial 146 satellites, and Amazon, Telesat, GW and other companies, operating under different national regulatory regimes, are soon likely to follow.

**Enhanced collision risk.** Mega-constellations are composed of mass-produced satellites with few backup systems. This consumer electronic model allows for short upgrade cycles and rapid expansions of capabilities, but also considerable discarded equipment. SpaceX will actively de-orbit its satellites at the end of their 5–6-year operational lives. However, this process takes 6 months, so roughly 10% will be de-orbiting at any time. If other companies do likewise, thousands of de-orbiting satellites will be slowly passing through the same congested space, posing collision risks. Failures will increase numbers, although the long-term failure rate is difficult to project. Figure 3 is similar to the righthand portion of Fig. 2 but includes the Starlink and OneWeb mega-constellations as filed (and amended) with the FCC (see "Methods"). The large density spikes show that some shells will have satellite number densities in excess of $n = 10^{-6}$ km$^{-3}$.

Deorbiting satellites will be tracked and operational satellites can manoeuvre to avoid close conjunctions. However, this depends on ongoing communication and cooperation between operators, which at present is ad hoc and voluntary. A recent letter[12] to the FCC from SpaceX suggests that some companies might be less-than-fully transparent about events[13] in LEO.

Despite the congestion and traffic management challenges, FCC filings by SpaceX suggest that collision avoidance manoeuvres can in fact maintain collision-free operations in orbital shells and that the probability of a collision between a non-responsive satellite and tracked debris is negligible. However, the filings do not account for *untracked* debris[6], including untracked debris decaying through the shells used by Starlink. Using simple estimates (see "Methods"), the probability that a single piece of untracked debris will hit any satellite in

the Starlink 550 km shell is about 0.003 after one year. Thus, if at any time there are 230 pieces of untracked debris decaying through the 550 km orbital shell, there is a 50% chance that there will be one or more collisions between satellites in the shell and the debris. As discussed further in "Methods", such a situation is plausible. Depending on the balance between the de-orbit and the collision rates, if subsequent fragmentation events lead to similar amounts of debris within that orbital shell, a runaway cascade of collisions could occur.

Fragmentation events are not confined to their local orbits, either. The India 2019 ASAT test was conducted at an altitude below 300 km in an effort to minimize long-lived debris. Nevertheless, debris was placed on orbits with apogees in excess of 1000 km. As of 30 March 2021, three tracked debris pieces remain in orbit[14]. Such long-lived debris has high eccentricities, and thus can cross multiple orbital shells twice per orbit. A major fragmentation event from a single satellite could affect all operators in LEO.

Even if debris collisions were avoidable, meteoroids are always a threat. The cumulative meteoroid flux[15] for masses m > $10^{-2}$ g is about $1.2 \times 10^{-4}$ meteoroids m$^{-2}$ year$^{-1}$ (see "Methods"). Such masses could cause non-negligible damage to satellites[16]. Assuming a Starlink constellation of 12,000 satellites (i.e. the initial phase), there is about a 50% chance of 15 or more meteoroid impacts per year at m > $10^{-2}$ g. Satellites will have shielding, but events that might be rare to a single satellite could become common across the constellation.

One partial response to these congestion and collision concerns is for operators to construct mega-constellations out of a smaller number of satellites. But this does not, individually or collectively, eliminate the need for an all-of-LEO approach to evaluating the effects of the construction and maintenance of any one constellation.

## Surface impacts and atmospheric effects.

Although failures do occur, first stages of SpaceX rockets are usually landed and re-used, while second stages are usually controlled through re-entry and deposited in remote areas of ocean. This best practice might not be followed by others. For example, the first stages of the Soyuz rockets employed by OneWeb are not reusable, nor are the second stage re-entries controllable. The Long March rockets that will likely be employed by GW are similar. Uncontrolled re-entries do not always meet safety standards[17], a situation that may be exacerbated by mega-constellations. Moreover, the cumulative impact of thousands of rocket stages on the ocean environment could be significant should those stages contain hazardous materials, such as unspent hydrazine fuels[17–19]. In the 1990s, Pacific island countries opposed the Sea Launch project because of environmental concerns, including from discarded rocket stages[20]. In 2016, Inuit in the Canadian Arctic protested the Russian practice of disposing rocket stages in the North Water Polynya, a biologically rich area of year-round open water[21].

The first Starlink satellites contained some components that survive re-entry, with the highest human casualty risk for a single satellite calculated to be 1:17,400[22], below NASA's recommended 1:10,000 threshold. However, the initial approval process did not account for the cumulative casualty risk, and if all the then-planned 12,000 satellites had contained the same components, a continuous 5-year replacement cycle would have seen a 45% probability of one or more casualties per cycle. When the subsequent FCC petition process identified the problem, SpaceX reportedly replaced some materials with a view to having all of the satellite components now demise in the atmosphere[23]. Other companies, based in other countries, might not follow this best practice or be required to do so.

The demise of satellite components during re-entry introduces a different problem, since none of that material actually disappears. Starlink satellites have a dry mass of about 260 kg; 12,000 satellites will total 3100 tonnes. A 5-year cycle would see on average almost 2 tonnes re-entering Earth's atmosphere daily. While small compared to the 54 daily tonnes of meteoroid mass[24], the satellites are mostly aluminum; most meteoroids, in contrast, contain less than 1% Al by mass[25]. Thus, depending on the atmospheric residence time of material from re-entered satellites, each mega-constellation will produce fine particulates that could greatly exceed natural forms of high-altitude atmospheric aluminum deposition, particularly if the full numbers of envisaged satellites are launched. Anthropogenic deposition of aluminum in the atmosphere has long been proposed in the context of geoengineering as a way to alter Earth's albedo[26]. These proposals have been scientifically controversial and controlled experiments encountered substantial opposition[27]. Mega-constellations will begin this process as an uncontrolled experiment[28].

Rocket launches themselves affect the atmosphere. While cumulative $CO_2$ emissions are small compared to other sources, $CO_2$ is not the relevant metric. Black carbon produced by kerosene-fueled rockets such as SpaceX's Falcon 9 and alumina particles produced by solid-fueled rockets lead to instantaneous radiative forcing. Modelling of the cumulative effect of emissions from 1000 annual launches of hydrocarbon-fuelled rockets found that, after one decade, the black carbon would result in radiative forcing comparable to that resulting from sub-sonic aviation[29]. Although 1000 launches annually is 10 times the current rate, the construction and renewal of multiple mega-constellations will require dramatic increases in launches. Current launches likely cause non-negligible radiative forcing already[30].

Rockets fueled with liquid hydrogen do not produce black carbon but require larger tanks and therefore larger rockets, with solid-fueled boosters often being used to increase payload capacity. SpaceX's new Starship, which the company plans to use to launch 400 Starlink satellites at a time, will be fueled by methane, the combustion of which produces soot that may, like black carbon, contribute to radiative forcing. All liquid fuels will affect mesospheric cloud formation[31], with potential climate consequences. Rockets even threaten the ozone layer by depositing radicals directly into the stratosphere[29], with solid-fueled rockets causing the most damage because of the hydrogen chloride and alumina they contain[29].

A447

www.nature.com/scientificreports/

## Discussion

National regulators such as the FCC are assigning orbital shells to mega-constellations on a first come, first served basis, without assessing the effects on other countries. These could include making any addition of further satellites to those shells too dangerous to contemplate. This de facto occupation of orbital shells likely violates Article I of the 1967 Outer Space Treaty, which designates the exploration and use of space as "the province of all mankind" and open to all countries "without discrimination of any kind." There is also Article II: "Outer space … is not subject to national appropriation by claim of sovereignty, by means of use or occupation, or by any other means." Although regulators are not claiming sovereignty over orbital shells, allowing national companies to saturate them with satellites could constitute appropriation by "other means." Lastly, Article IX requires that space activities be conducted "with due regard to the corresponding interests of other States".

Mega-constellation operators and their regulators could respond that they are exercising the right to explore and use space without discrimination, the use of an orbital shell is time-limited as a result of the license, and the satellites will be actively de-orbited[32]. They could also reference that countries have been using slots in geostationary orbit for decades, resulting in the de facto exclusion of others from any given slot without this being considered appropriation. However, the use of slots in geostationary orbit is mediated by the International Telecommunications Union (ITU), which does not play the same role in LEO.

Another 'land rush' is occurring over radio spectrum. The ITU is involved in the allocation of frequencies to communications satellites. Under its binding instruments, countries must treat frequencies as limited resources to which others have equitable access, and therefore limit their own use. But companies are not party to those instruments and do not deal directly with the ITU. They apply for and obtain licenses from their national regulator, which early in the planning process files a general description of the mega-constellation with the ITU, including the frequencies it will use[33]. A company is required to coordinate with any satellite system that might be affected by its planned mega-constellation, provided the other system was filed before its filing, but there is no requirement to coordinate with those whose filings are made after its own. The ITU recently adopted a tiered management approach, whereby listing a mega-constellation in its 'Master Register' depends on certain milestones being met. This deters companies from filing and effectively claiming orbital shells years before they are ready to launch, but thereby disadvantages smaller companies and exacerbates long-term equity concerns for those developing countries that are not yet active in space.

No binding international rules exist on other aspects of mega-constellations. In 2007, the Inter-Agency Space Debris Coordination Committee (IADC), currently representing 13 space agencies, indicated that direct re-entry at the end of a satellite's operational life was preferred but nevertheless only recommended that deorbiting conclude within 25 years. This widely accepted guideline is poorly suited for mega-constellations made up of thousands of satellites with short operational lives. It also overlooks placement, with satellites at higher altitudes producing relatively high collision probabilities when de-orbiting timescales are long[34].

The IADC also recommended collision avoidance and end-of-life deorbiting technologies. These add costs, and in 2017 the IADC reported that adherence to its guidelines was "insufficient and no apparent trend towards a better implementation is observed"[35]. More recent analyses indicate that compliance with the end-of-life guidelines is now improving by some metrics[36]. However, these improvements appear to be driven, at least in part, by SpaceX's own practices, which may not be followed by other mega-constellation operators. Guidelines allow for 'free riding', whereby individual actors can save costs through non-compliance while benefitting from the compliance of others. In the context of any shared resource, free riding can lead to a 'tragedy of the commons,' which is exactly what needs to be avoided in LEO.

Finally, we would be remiss not to mention the threats posed by mega-constellations to astronomy, although for a detailed discussion we refer to other recent work[37–41]. Briefly, astronomers pushed for reductions in the number and brightness of Starlink satellites after an image from a telescope in Chile was ruined. SpaceX responded by adding visors to the satellites, which has reduced their naked-eye visibility while still leaving them bright to telescopes[39]. Next generation sky surveys and observations close to the horizon, especially near sunrise and sunset, are especially vulnerable—and critical for near-Earth object observations for planetary defence. Occultations are another issue: even a satellite that is unilluminated (i.e. passing through the shadow of the Earth) can interfere with rapid time domain astronomy when it passes in front of a star. Radio astronomy is also threatened[39], since mega-constellations will require frequencies additional to those traditionally used by land stations. These could encroach on protected spectrum through out-of-band overtone emission. The large number of fast-moving transmitting stations (i.e. satellites) will cause further interference. New analysis methods could mitigate some of these effects, but data loss is inevitable, increasing the time needed for each study and limiting the overall amount of science done.

There are reasons for hope. SpaceX is showing some leadership with rapid end-of-life deorbiting,  automatic collision avoidance, and visors to reduce light pollution, even if these are not yet sufficient. Spacefaring countries, moreover, recognize that debris threatens all satellites, including military satellites. Some are strengthening their national regulations, including by incorporating non-binding international guidelines into binding national laws. However, there is little recognition that Earth's orbit is a finite resource, the space and Earth environments are connected, and the actions of one actor can affect everyone. Until that changes, we risk multiple tragedies of the commons in space.

## Methods

Figure 1 is produced using data obtained from the USSPACECOM satellite catalogue [14] and cross-referencing with on-orbit fragmentation records[42]. All orbits are included. Sudden rises in the CPDF are typically due to fragmentation events, while decreases are driven by orbital decay.

A448

www.nature.com/scientificreports/

Figure 2, right panel and Fig. 3 are constructed by using apogee-perigee information from the satellite catalogue, which is then used to determine osculating Keplerian orbits. Those orbits are used, in turn, for assigning a given object's contribution to each orbital shell's object density. All shells are averaged over the entire sky ($4\pi$), so inclination information is not used. A satellite's contribution to the number density within a specific shell is computed by the fraction of time per orbit the satellite spends traversing that shell. For example, if the satellite spends half of its time in a shell, then it only contributes 0.5 satellites to the total satellite count in that shell. The satellite number density in a shell is just the weighted satellite count divided by the shell volume. We use 1 km radial widths for all shells. It should be recognized that orbital inclinations for satellites will lead to local variations in the actual satellite volume density for any given point in space. In some cases, this will be much higher than the all-sky average, and in some cases, much lower.

In setting the mega-constellation number densities for Fig. 3, we assume that the constellation satellites have an eccentricity of $2 \times 10^{-4}$, which is based on the typical apogee-perigee altitudes for Starlink satellites above 500 km, as given in the satellite catalogue. The Starlink contributions are given according to FCC filed and approved altitudes (335.9, 340.8, 345.6, 550, 1110, 1130, 1275, and 1325 km) and corresponding numbers (2493, 2478, 2547, 1584, 1600, 400, 375, 450). The OneWeb constellation is assumed to consist of 6372 satellites at 1200 km (as filed). It should be recognized that this is an ongoing process, and further changes to satellite orbits and numbers may be filed. As noted in the main text, SpaceX has already filed for an additional 30,000 satellites. It is also seeking to lower the 1000 km shells to the 500–600 km region[13].

We construct a simple collision estimate between Starlink satellites and untracked debris in the 550 km shell as follows: We take the typical relative speed between any two random objects in a shell to be $v \approx 10$ km/s, which assumes randomly oriented circular orbits. We let the cross-sectional area $A = 10$ m$^2$, which is a rough estimate that includes the body and solar panels. Specifying that the debris is untracked means that collision avoidance is not possible, at least with full knowledge of the debris. In this case, the collision rate between a single debris particle and any satellite in the shell is $R = n v A$. The probability that one or more collisions will occur during some time $t$ is $P = 1 - exp(-\tau)$, where $\tau$ is the total effective optical depth given by $R t$ over all relevant debris particles. For the above values and satellite $n \approx 10^{-6}$ km$^{-3}$, we find $\tau_i = 0.003$ for the i-th debris particle. If all debris particles are independent, then $P > 1/2$ after 1 year for about 230 pieces of debris (i.e., $\tau \approx 0.7$). Given the large number of debris pieces in orbit above 550 km due to the 2007 Chinese ASAT test and the 2009 Kosmos 2251–Iridium 33 collision, significant debris should be expected to be decaying through the mega-constellation shells at any given time.

Another estimate for the collision risk with untracked debris can be made by looking at the actual debris distribution, which has an all-sky averaged density of about $n_{deb}(> 10) \approx 7 \times 10^{-9}$ km$^{-3}$ at 550 km (see Fig. 2). This is only the catalogued and tracked debris, which is again approximately representative of objects with diameters $D \gtrsim 10$ cm. The total amount of debris in LEO of that size scale is 12,400 (excluding rocket bodies and payloads). Statistical estimates for size $D \gtrsim 1$ cm suggest a population of $9 \times 10^5$ objects[44]. While the smaller size scales need not correspond directly to the catalogued debris population, we can, for the moment, assume that they do.

Under these approximations, the number density of untracked debris in the 550 km shell is $70 \times$ the catalogued density, i.e., $n_{deb}(> 1) \approx 5 \times 10^{-7}$ km$^{-3}$. In this situation, the collision rate between satellites and untracked debris is $R_{deb} = n_{deb}(> 1) A N_{sat} v$, where $N_{sat} = 1584$, the number of satellites in the 550 km shell. Using the same values for $A$ and $v$, we find $R_{deb} t \approx 2.5$ for $t = 1$ year, which means that there is a 92% chance of having one or more debris collisions during that time.

The reported meteoroid flux estimate using the Grün model includes an extra factor of 4 to account for gravitational focusing and no tumbling. A total satellite cross-section of $A = 10$ m$^2$ is again assumed.

Received: 20 March 2021; Accepted: 4 May 2021

Published online: 20 May 2021

## References

1. Henry, C. SpaceX submits paperwork for 30,000 more Starlink satellites. *Space News*. https://spacenews.com/spacex-submits-paperwork-for-30000-more-starlink-satellites. (Accessed 15 October 2019).(2019).
2. Press, L. A New Chinese Broadband Satellite Constellation. *CircleID*. http://www.circleid.com/posts/20201002-a-new-chinese-broadband-satellite-constellation. (Accessed 2 October 2020) (2020).
3. Kessler, D. & Cour-Palais, B. Collision frequency of artificial satellites: The creation of a debris belt. *J. Geophys. Res.* **83**, 2637 (1978).
4. Liou, J.-C. & Johnson, N. L. Risks in space from orbiting debris. *Science* **311**, 5759 (2006).
5. Rossi, A., Petit, A. & McKnight, D. Short-term space safety analysis of LEO constellations and clusters. *Acta Astronaut.* **175**, 476–483 (2020).
6. Le May, S., Gehly, S., Carter, B. A. & Flegel, S. Space debris collision probability analysis for proposed global broadband constellations. *Acta Astronaut.* **151**, 445–455 (2018).
7. Liou, J.-C., Matney, M., Vavrin, A., Manis, A. & Gates, D. NASA ODPO's large constellation STUDY. *Orbit. Debris Quart. News.* **22–3**, 4–7 (2018).
8. Vavrin, A. & Manis, A. CubeSat study project review. *Orbit. Debris Quart. News.* **22–1**, 6–8 (2018).
9. Reiland, N., Rosengren, A., Malhotra, R., & Bombardelli, C. Assessing and minimizing collisions in satellite mega-constellations. *Advances in Space Research* **37**, 3755–3744 (2021).
10. U.S. Senate. Committee on Commerce, Science, and Transportation. *Space Missions of Global Importance: Planetary Defense, Space Weather Protection, and Space Situational Awareness* Hearing, 12 February 2020 (Testimony by Jah, M.). At https://www.commerce.senate.gov/services/files/F15B56A1-9134-43D8-B072-65F6CD2ADCEA. (2020).
11. National Aeronautics and Space Administration. NASA, SpaceX Sign Joint Spaceflight Safety Agreement.*Press Release* at https://www.nasa.gov/press-release/nasaspacex-sign-joint-spaceflight-safety-agreement. (Accessed 18 March 2021) (2021).
12. Federal Communications Commission. D. Goldman Letter to the Marlene H. Dortch, Secretary, FCC (Dated 20 April 2021). IBS File No. SAT-MOD-20200417-00037(2021).
13. Roulette, J. OneWeb, SpaceX satellites dodged a potential collision in orbit. *The Verge.* https://www.theverge.com/2021/4/9/22374262/oneweb-spacex-satellites-dodgedpotential-collision-orbit-space-force. (Accessed 9 April 2021) (2021).

A449

www.nature.com/scientificreports/

14. United States Space Command. Satellite Catalogue. https://www.space-track.org. (Accessed 30 March 2021) (2021).
15. Grün, E., Zook, H. A., Fechtig, H. & Giese, R. H. Collisional balance of the meteoritic complex. *Icarus* **62**, 244 (1985).
16. Moorhead, A., Kingery, A. & Ehlert, S. NASA's Meteoroid engineering model 3 and its ability to replicate spacecraft impact rates. *J. Spacecraft Rockets.* **57**, 160 (2020).
17. Carmen, P. & Luciano, A. Uncontrolled re-entries of spacecraft and rocket bodies: A statistical overview over the last decade. *J. Space Safety Eng.* **6**, 30–47 (2019).
18. Byers, M. & Byers, C. Toxic splash: Russian rocket stages dropped in Arctic waters raise health, environmental and legal concerns. *Polar Rec.* **53**, 580 (2017).
19. De Lucia, V. & Iavicoli, V. From outer space to ocean depths: The 'Spacecraft Cemetery' and the protection of the marine environment in Areas Beyond National Jurisdiction. *Cal. W. Int'l I.J.* **49**, 345 (2018).
20. Woodward, C. Inuit launch worries islanders.*Christian Science Monitor.* https://www.csmonitor.com/1999/0922/p5s1.html. (Accessed 22 September 1999) (1999).
21. Weber, B. Inuit angered by Russian rocket splashdown in the Arctic. *Canadian Press* . http://www.theglobeandmail.com/news/national/inuit-angered-by-russian-rocketsplashdown-in-the-arctic/article30273826. (Accessed 3 June 2016) (2016).
22. Federal Communications Commission. IBFS File No. SAT-LOA-20170301-00042.https://fcc.report/IBFS/SAT-LOA-20170301-00027. (2020).
23. Federal Communications Commission. IBFS File No. SAT-MOD-20200417-00037. https://fcc.report/IBFS/SAT-MOD-20200417-00037. (2021).
24. Drolshagen, G., Koschny, D., Drolshagen, S., Kretschmer, J. & Poppe, B. Mass accumulation of earth from interplanetary dust, meteoroids, asteroids, and comets. *Planet. Space Sci.* **143**, 21 (2017).
25. Lodders, K. Solar system abundances of the elements. In *Principles and Perspectives in Cosmochemistry* (eds Goswami, A. & Reddy, B.) (Springer, 2010).
26. Keith, D. Geoengineering the climate: History and perspective. *AREE* **25**, 245 (2000).
27. Parson, E. & Keith, D. End the deadlock on governance of geoengineering research. *Science* **339**, 1278 (2013).
28. Werner, D. Aerospace Corp. Raises questions about pollutants produced during satellite and rocket re-entry. *SpaceNews* https://spacenews.com/aerospace-agu-reentrypollution(2020). Accessed 11 December 2020.
29. Ross, M., Mills, M. & Toohey, D. Potential climate impact of black carbon emitted by rockets. *Geophys. Res. Let.* **37**, 24 (2010).
30. Ross, M. & Sheaffer, P. Radiative forcing caused by rocket engine emissions. *Earth's Future* **2**, 4 (2014).
31. Dallas, J., Raval, S., Gaitan, J. P. A., Saydam, S. & Dempster, A. G. The environmental impact of emissions from space launches: A comprehensive review. *J. Cleaner Product.* **255**, 120209 (2020).
32. Johnson, C. The legal status of MegaLEO constellations and concerns about appropriate of large swaths of earth orbit. In *Handbook of Small Satellites* (eds Pelton, J. & Madry, S.) (Springer, 2020).
33. Azzarelli, T. Obtaining landing licenses and permission to operate LEO constellations on a global basis. In *Handbook of Small Satellites* (eds Pelton, J. & Madry, S.) (Springer, 2020).
34. Lewis, H. Understanding long-term orbital debris population dynamics. In *Proceedings of the First International Orbital Debris Conference* Contrib. 6097. Preprint at https://www.hou.usra.edu/meetings/orbitaldebris2019/orbital2019paper/pdf/6097.pdf (2019).
35. Inter-Agency Debris Coordination Committee. An Overview of the IADC Annual Activities. At https://www.iadc-online.org/Documents/IADC-17-02%20UN%20COPUOS%20STSC%20Presentation%20-%2021.12.2016.pdf (2017).
36. European Space Agency. ESA's Annual Space Environment Report. Ref GEN-DB-LOG-00288-OPS-SD. At https://www.sdo.esoc.esa.int/environment_report/Space_Environment_Report_latest.pdf. (2020).
37. Massey, R., Lucatello, S. & Benvenuti, P. The challenge of satellite megaconstellations. *Nat. Astron.* **4**, 1022 (2020).
38. Venkatesan, A., Lowenthal, J., Prem, P. & Vidaurri, M. The impact of satellite constellations on space as an acenstral global commons. *Nat. Astron.* **4**, 1043 (2020).
39. Walker, C. et al. Impact of Satellite Constellations on Optical Astronomy and Recommendations Towards Mitigations (eds. Walker, C. & Hall, J.). NSF's NOIRLab, AURA and AAS https://aas.org/sites/default/files/2020-08/SATCON1-Report.pdf. (2020).
40. Kocifaj, M., Kundracik, F., Barentine J., & Bará S. The proliferation of space object is a rapidly increasing source of artificial night sky brightness. MNRAS Lett. 504, L40-L44 (2021).
41. United Nations Office for Outer Space Affairs. Dark and Quiet Skies for Science and Society (eds. Walker, C. & Di Pippo, S.). International Astronomical Union, United Nations Office for Outer Space Affairs, Astrofisica Canarias, NSF's NOIRLab https://www.iau.org/static/publications/dqskies-book-29-12-20.pdf. (2021).
42. Anz-Meador, P., Opiela, J., Shoots, D., & Liou, J.-C. History of On-Orbit Satellite Fragmentations, 15th edn. National Aeronautics and Space Adminstration, Houston(2018).
43. Federal Communications Commission. IBFS File No. SAT-MOD-20200417-00037, DA 21-34. At https://docs.fcc.gov/public/attachments/DA-21-34A1.pdf. (2021).
44. European Space Agency. Space Debris by the Numbers. https://www.esa.int/Safety_Security/Space_Debris/Space_debris_by_the_numbers. (2021) (Accessed 1 March 2021).

### Acknowledgements

This work was supported in part by The University of British Columbia, the Canada Research Chairs program, the National Science and Engineering Research Council (DG: 2020-04635), the Social Sciences and Humanities Research Council (NFRFE: 2019-00691), and the Department of National Defence Mobilizing Insights in Defence and Security program.

### Author contributions

A.B. and M.B. wrote the manuscript text and identified and addressed the main issues raised in the article. A.B. prepared the figures and calculations. M.B. completed the legal analyses.

### Competing interests

The authors declare no competing interests.

### Additional information

**Correspondence** and requests for materials should be addressed to A.C.B.

**Reprints and permissions information** is available at www.nature.com/reprints.

**Publisher's note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

A450

www.nature.com/scientificreports/

**Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

© The Author(s) 2021

A451

# EXHIBIT GG

USCA Case #21-1123    Document #1901121    Filed: 06/02/2021    Page 458 of 508

MNRAS **000**, 1–6 (2015)    Preprint 24 March 2021    Compiled using MNRAS LaTeX style file v3.0

# The proliferation of space objects is a rapidly increasing source of artificial night sky brightness

M. Kocifaj,[1,2]* F. Kundracik,[2] J. C. Barentine,[3,4] S. Bará,[5]

[1] ICA, Slovak Academy of Sciences, Dúbravská cesta 9, 845 03 Bratislava, Slovakia
[2] Department of Experimental Physics, FMPI, Comenius University, Mlynská dolina, 842 48 Bratislava, Slovakia
[3] International Dark-Sky Association, 3223 N. 1st Ave, Tucson, AZ 85710 USA
[4] Consortium for Dark Sky Studies, University of Utah, 375 S 1530 E, RM 235 ARCH, Salt Lake City, Utah 84112-0730 USA
[5] Departamento de Física Aplicada, Universidade de Santiago de Compostela, E-15782 Santiago de Compostela, Galicia, Spain

Accepted XXX. Received YYY; in original form ZZZ

**ABSTRACT**
The population of artificial satellites and space debris orbiting the Earth imposes non-negligible constraints on both space operations and ground-based optical and radio astronomy. The ongoing deployment of several satellite 'mega-constellations' in the 2020s represents an additional threat that raises significant concerns. The expected severity of its unwanted consequences is still under study, including radio interference and information loss by satellite streaks appearing in science images. In this Letter, we report a new skyglow effect produced by space objects: increased night sky brightness caused by sunlight reflected and scattered by that large set of orbiting bodies whose direct radiance is a diffuse component when observed with the naked eye or with low angular resolution photometric instruments. According to our preliminary estimates, the zenith luminance of this additional light pollution source may have already reached ∼20 $\mu$cd m$^{-2}$, which amounts to an approximately 10 percent increase over the brightness of the night sky determined by natural sources of light. This is the critical limit adopted in 1979 by the International Astronomical Union for the light pollution level not to be exceeded at the sites of astronomical observatories.

**Key words:** light pollution – methods: statistical – methods: data analysis

## 1 INTRODUCTION

Artificial satellites orbiting the Earth have been a concern of astronomers since the launch of the first such object, Sputnik 1, in 1957. As of 1 January 2021, some 3,372 satellites are in orbit (UCS 2021) along with many tens of thousands of pieces of space debris; we refer to both satellites and space debris here as "space objects."

The orbital altitudes of space objects range from a few hundred kilometres in the case of objects in Low-Earth Orbit (LEO) to beyond the 35,786-km height defining geosynchronous orbits. At such altitudes, space objects remain directly illuminated by sunlight as seen from the night side of the Earth; consequently, they appear in images obtained with ground-based telescopes as streaks of various lengths and apparent brightness depending on the orbital parameters of the objects. Because the streaks are often comparable to or brighter than objects of astrophysical interest, their presence tends to compromise astronomical data and poses the threat of irretrievable loss of information.

* E-mail: kocifaj@savba.sk

The number of space objects orbiting Earth is expected to increase by more than an order of magnitude in the next decade due to the launches of fleets of new, large 'constellations' of communications satellites. While astronomers can often plan observations around the presence of bright space objects in their telescopes' fields of view by predicting their apparent positions on the night sky using databases of orbital elements, the expected increase in the space object population significantly increases the probability that any particular observation will be affected by streaks. Hainaut at al. (2020) and Tyson et al. (2020) recently explored the expected impacts of large satellite constellations on both optical and near-infrared astronomical observations, finding that ultra-wide imaging exposures made with large survey telescopes will be most affected, with up to 40% of science exposures affected by streaks assuming the largest expected numbers of new satellites and an overall loss of ∼1% of science pixels.

To date there is little information in the literature as to the contribution of space objects to the diffuse brightness of the night sky, as opposed to the effect of discrete streaks that add systematic errors to astronomical data. While the

© 2015 The Authors

2    *M. Kocifaj et al.*



**Figure 1.** A simplified illustrative view of space debris orbiting the Earth and directly illuminated by sunlight. Planes I and II are for the Sun and the Earth, respectively, while the parameters used are described in the main text. The drawing is not to any particular scale.

night sky luminance signal due to sunlight reflected from space objects and propagating in the Earth's atmosphere is expected to be small, it is otherwise unknown how its contribution to diffuse night sky brightness (NSB) compares to natural sources of light in the night sky that ultimately determine the sky luminance over 'pristine' locations nearly devoid of anthropogenic skyglow, such as the sites of astronomical research observatories.

We decided to estimate the present-day diffuse NSB contribution from space objects, before the ongoing deployment of large communication satellite constellations increase in order to benchmark future NSB observations in these pristine places. In the current work, we describe the geometry of the situation and model the diffuse NSB specifically attributable to sunlight reflected from space objects, establishing lower limits for the space object contribution based on expectations for coming launches and the potential for orbital crowding to generate new sources of space debris.

This paper is organised as follows. We develop the requisite theory, establish the expected spectral radiance of space objects in the observer's zenith, and compute the zenith night sky luminance contribution from space objects in Section 2. We present the results of our calculations and discuss their implications in Section 3. Finally, we draw conclusions from this work and speculate on future prospects in Section 4.

## 2   SKY BRIGHTNESS DUE TO SPACE OBJECTS

Due to their high altitudes, objects in orbit around the Earth can be visible after the onset of astronomical night; i.e., for solar depression angles $\geq 18°$. For instance, objects at altitudes between 1000–2000 kilometres can be directly illuminated by sunlight and observed in the zenith even when the depression angle of the solar disc is 30-40°. The lower the minimum altitude of light rays, the more such rays diverge due to atmospheric refraction; see the quantity $h_0$ in Fig. 1. Depending on beam trajectory, the angle of refrac-

tion is $1'$ at an altitude of 30 km, $10'$ at $h_0 \approx 15$ km, and approaches $1°$ for rays entering the lower troposphere (Link 1969). Satellites illuminated by such low rays are normally dark or even invisible because of exceptional atmospheric extinction of sunlight.

Since the deflection of the light beam is extremely low, most space objects orbiting the Earth are either directly illuminated by sunlight or disappear once they cross into the geometrical shadow of the Earth.[1] A few objects moving in a 'transition zone' between positions unaffected by the Earth's atmosphere and those obstructed by the Earth contribute negligibly to the diffuse brightness of the night sky, and thus are not considered in the following analysis. The transition zone is defined by the angle of refraction, which normally does not exceed 1°. The objects traversing the sky from the twilight region into the Earth's shadow are constantly illuminated by sunlight and seen in the visual field of 90° or more; thus, the number of objects in the transition zone is about 1% of all objects we can see in the night sky.

### 2.1   Spectral radiance

The spectral irradiance (W m$^{-2}$ nm$^{-1}$) at a point $N$ located at an altitude $h$ above the Earth's surface is

$$E_\lambda(\gamma) = 2b_{0,\lambda} \int_{\gamma - R_S}^{\gamma + R_S} T_\lambda^{Ext}(\rho) \, \epsilon_0(\rho) \, d\rho , \qquad (1)$$

where $b_{0,\lambda}$ is the average radiance of the Sun (W m$^{-2}$ nm$^{-1}$ sr$^{-1}$), $\lambda$ is the wavelength of radiation, $\gamma$ is the angular distance measured from the centre of the Earth between the position of an illuminated object (in point $N$) and the centre of the Earth's shadow (in point $M$), $R_S$ is the angular radius of the solar disc, $\rho$ is the angular distance ranging from $\gamma - R_S$ to $\gamma + R_S$, and $\epsilon_0$ is the maximum opening angle at an angular distance of $\rho$, i.e., the angle between centre of solar disc and the limb (consult Fig. 1). The transmission coefficient $T_\lambda^{Ext}$ characterizes attenuation of sunlight in the atmosphere due to extinction (see, e.g., Kocifaj and Horvath 2005). In the absence of the terrestrial atmosphere, or for high-altitude beams with $h_0 \gtrsim 60$ km (Link 1969), Eq. (1) reduces to

$$E_{0,\lambda} = 2b_{0,\lambda} \int_{\gamma - R_S}^{\gamma + R_S} \epsilon_0(\rho) \, d\rho = b_{0,\lambda} \pi R_S^2 , \qquad (2)$$

with $\pi R_S^2$ being the solid angle subtended by the solar disc in steradians.

Of all photons entering the point $N$, a small fraction is intercepted by space objects and redirected toward the Earth. The redirection is dominated by scattering in the case of debris objects smaller than or comparable to the wavelengths of visible light. For larger macroscopic objects to which the principles of geometric optics are applicable, direct reflection of light dominates the redirection. The amount of redirection is proportional to $E_{0,\lambda} \frac{P_\lambda(\theta)}{4\pi} k_\lambda(h)$, where $P_\lambda(\theta)$ is scattering phase function normalized to $4\pi$, and $\theta$ is the scattering angle, i.e., the angle between the incident beam and the scattered beam. Conservation of energy requires that

---

[1] The geometrical shadow of the Earth neglects refraction effects from the terrestrial atmosphere.

USCA Case #21-1123      Document #1901121      Filed: 06/02/2021      Page 460 of 508



**Figure 2.** Spatial density of space objects larger than 1 mm as a function of altitude. Dots are data published by Bendisch et al. (2004), while the solid line represents our fitted model.

$\int \frac{P_\lambda(\theta)}{4\pi} d\omega = 1$, where $d\omega = 2\pi \sin(\theta) d\theta$ is the elementary solid angle.

Artificial satellites and pieces of space debris have diverse shapes and are oriented randomly in the line of sight, scattering and reflecting light in a complex manner. However, the number of orbital objects is large, and statistical averaging over a large sample size yields results similar to those for equally sized spherical objects. Since most space objects are very large compared to the wavelengths of visible light, they scatter light strictly in the geometrical optics regime. The resulting optical signal therefore depends much more strongly on an object's geometric cross section rather than on its morphology.

The volume scattering coefficient $k_\lambda(h)$ can be computed from Mie theory (see, e.g., Hergert and Wriedt 2012) by treating a given object as a sphere of radius of $r$:

$$k_\lambda(h) = \pi \int_0^\infty r^2 n(r,h) \, Q_{\lambda,sca}(r) \, dr, \qquad (3)$$

where $Q_{\lambda,sca}(r)$ is the scattering efficiency factor for an object of radius $r$ illuminated by monochromatic light of wavelength $\lambda$. The function $n(r,h)dr$ is the number of objects of radius $r \to r + dr$ per cubic meter such that $n(r,h)$ is expressed in units of $m^{-4}$. For objects larger than the typical observational wavelengths, geometric optics dictate that $Q_{\lambda,sca} \approx 2$.

The spectral radiance due to the reflection of sunlight in all space objects in Earth orbit along the line of sight $z$, detected by an observer at ground level is

$$L_\lambda(z) = \frac{e^{-\tau_\lambda / \cos z}}{\cos z} E_{0,\lambda} \int_{h_1}^\infty \frac{P_\lambda(\theta)}{4\pi} k_\lambda(h) \, dh, \qquad (4)$$

where $\tau_\lambda$ is the optical thickness of Earth's atmosphere, $z$ is the zenith angle of observation, and $h_1$ is the minimum orbital altitude of space objects. The latter parameter is normally a few hundred kilometers (see Fig. 2), but the lower integration limit can also be asymptotically extended to $h_1 = 0$ km assuming that both the number density of space objects and $k_\lambda(h)$ approach zero near the Earth's surface. Space objects with arbitrary shapes reflect sunlight more or less isotropically, resulting in $P_\lambda(\theta)/4\pi \approx 1/4\pi$ (Shendeleva 2017). Substituting the approximate expressions into Eq. (4), we found for the theoretical spectral radiance in the zenith ($z = 0°$)

$$L_\lambda(z) = \frac{E_{0,\lambda} e^{-\tau_\lambda}}{2} \int_{h=h_1}^\infty \int_{r=0}^\infty r^2 \, n(r,h) \, dr \, dh. \qquad (5)$$



**Figure 3.** Logarithmic relationship between cumulative number and sizes of LEO objects. Dots are data published by National Research Council (1995) while the solid line is the analytic fit. The data shown are for objects within 1600 kilometres of the Earth's surface.

## 2.2 Zenith sky luminance: An estimate

It follows from Eq. (5) that the number distribution of space objects is the only otherwise unknown quantity required to calculate these objects' contribution to total diffuse night sky brightness. We combined a number of works to estimate this function, assuming $n(r,h) = R(r)H(h)$. The function $R(r)$ models the size distribution $(m^{-1})$, while $H(h)$ is the number concentration of space objects (number $m^{-3}$). The cumulative number of LEO objects larger than a given size has been known for decades (National Research Council 1995). The rate at which the cumulative number of objects, $N(r)$, declines with increasing size is roughly constant on a log scale, which allows for the simple logarithmic approximation $\log N(r) = a \log(2r) + b$ (Fig. 3), where $2r$ is the characteristic diameter of objects in meters, and $a = -1.98$ and $b = 2.32$ are dimensionless scaling constants.

In Fig. 3, $N(r) = n_0 \int_r^{5m} R(r)dr$, where $n_0 = 1.64 \times 10^{14}$ is the dimensionless coefficient of proportionality satisfying the normalization condition $\int_{5 \times 10^{-7}m}^{5m} R(r)dr = 1$. The function $H(h)$ is scaled to satisfy the following equation

$$\int_{200km}^{1600km} 4\pi h^2 H(h) \, dh = n_0. \qquad (6)$$

The integral form for $N(r)$ can be easily transformed into differential form $R(r) = -\frac{1}{n_0} \frac{dN(r)}{dr} = -\frac{a}{r n_0} 10^{a \log(2r) + b}$. The vertical stratification of objects in Earth orbit was modeled in accordance with Bendisch et al. (2004). We have developed an analytical formula that models the experimental data reasonably well for altitudes $h < 40000$ km (Fig. 2). Assuming $h$ is given in metres, we found

$$H(h) = \beta \, 10^{A(\log h - D)/[B + (\log h - F)^m] - C} \qquad (7)$$

with $A=4.02$, $B=0.60$, $C=7.3$, $D=5.35$, $F=5.3$, and $m=5.32$. The coefficient of proportionality, $\beta=0.10$, was derived from the normalization condition (Eq. 6).

To estimate the contribution of space objects to the diffuse brightness of the night sky at the zenith we take $E_{0,vis} e^{-\tau_\lambda}$ to be about $E_{0,vis} \approx 120,000$ lm m$^{-2}$ (Al-Obaidi et al. 2014; Taleb and Antony 2020), a standard value for ground-level direct solar illuminance that is consistent with the top-of-the-atmosphere illuminance of 133,600 lm m$^{-2}$ deduced from the 1985 Wehrli Standard Extraterrestrial Solar Irradiance Spectrum (NREL 2010; Wehrli 1985; Neckel and Labs 1981). The average scattering cross section of a



**Figure 4.** Trend of the absolute number of all counted space objects. Vertical lines with dots represent data provided by ESA (2020). The solid line is an analytical model.

spherical object is $C_{sca} = \pi r^2 Q_{sca}(r) \approx 2\pi r^2$, so the total cross section for all objects is

$$\sigma = 2\pi \int_{5\times10^{-7}\text{ m}}^{5\text{ m}} r^2 R(r)dr \qquad (8)$$

and the contribution from the space objects to the zenith luminance is

$$
\begin{aligned}
L &= \sigma\alpha \frac{E_{0,vis}}{4\pi} \int_{2\times10^5\text{ m}}^{4\times10^7\text{ m}} H(h)dh \\
&= \frac{E_{0,vis}\alpha}{2} \int_{5\times10^{-7}\text{ m}}^{5\text{ m}} r^2 R(r)dr \int_{2\times10^5\text{ m}}^{4\times10^7\text{ m}} H(h)dh \\
&\approx \alpha \; 7.2 \; \mu\text{cd m}^{-2},
\end{aligned}
\qquad (9)
$$

where $\alpha$ is the average albedo of space objects.

Due to their different shapes and orientations, the reflectivity of space objects can vary substantially. Many spacecraft are made of composite materials, much of them highly reflective for the benefit of thermal management, but other objects can appear dark because of efficient absorption. We use the average value of $\alpha \approx 0.5$ in accordance with Krutz et al. (2011).

Note that the estimate in Eq. (9) is specifically applicable to conditions during the middle to late 1990s. Based on the trend published by ESA (2020) (Fig. 4) we found that the number of known space objects has increased by a factor of 4.5 since the late 1990s. Therefore, we expect that today's contribution from space objects to zenith luminance is at least $(7.2\alpha) \times 4.5 = 16.2$ $\mu$cd m$^{-2}$. Assuming the above increase rate remains conserved in next few years, the luminance may quickly approach 25 $\mu$cd m$^{-2}$ in 2030.

## 3 DISCUSSION

Any piece of matter in Earth orbit illuminated by the Sun reflects or scatters light, and can in principle be detected and tracked as an individual moving object if it can be distinguished from neighboring ones and its radiance is above the sensitivity threshold of one's detector. If its angular size is smaller than the instrument point-spread function (PSF), what is recorded in the image is essentially the PSF with an average irradiance directly proportional to the object radiance and inversely proportional to the PSF area. The irradiance detection threshold can be reached either by increasing the telescope numerical aperture, yielding larger irradiances,

and/or by increasing the responsivity of the detector. Most present-day instruments used for narrow-field imaging or for large astronomical surveys have enough performance as to record the individual streaks produced by many of the objects orbiting Earth, excepting those of very small sizes.

The situation is different when observing the night sky with the unaided eye. The human eye has a PSF with perceptual angular resolution of order 1′, but it has a relatively small light sensitivity in comparison with long exposure images, even under scotopic adaptation. Except for the brighter ones, most Earth-orbiting objects cannot be visually detected and tracked individually, since their individual irradiances fall below the visual detection threshold. However, if several such objects are present within the receptive field of a retinal ganglion cell, their combined irradiance may well reach the threshold, and may be perceived as a diffuse skyglow component.

A similar diffuse skyglow effect arises when measuring the night sky brightness with highly sensitive but very low angular resolution detectors. Examples of these devices are the widely used Sky Quality Meter (SQM; Cinzano 2007) and Telescope Encoder and Sky Sensor-WiFi (TESS-W; Zamorano 2017), whose PSFs have full widths at half-maximum of ∼20°. In that case the radiance of even very dim space objects may be enough to be individually detected, but the low angular resolution of the instrument unavoidably integrates the light of the many such objects present within its field of view without resolving each individual source. This results in an increased value of the diffuse night sky brightness, similar to the one that would be produced by light pollution from atmospheric scattering of the radiance emitted by anthropogenic light sources on the ground.

The estimated strength of this effect, as per direct application of Eq. (9), is currently of order 16.2 $\mu$cd m$^{-2}$. Note that this value was obtained from Eq. (9) by integrating the contributions of the objects located toward the observer's local zenith with a lower integration limit of 200 km, consistent with the object altitude distribution in Fig. 2 and assuming that only one half of the cross-section of the object is illuminated by sunlight as seen from the observer's position. This corresponds to the objects' phase angle at sunset or sunrise.

At the beginning or the end of the astronomical night, when the Sun is at –18° with respect to the horizon, the Earth shadow reaches 328 km above the observer. Up to this orbital altitude the space objects are entirely in darkness at these moments. However, since such low-altitude orbits are relatively little populated (Fig. 2) the total radiance of the space object column is still 99.98 per cent of the maximum. Furthermore, at that time of the night the phase angle of the objects located above the observer is ±72°, so that the fraction of their illuminated surface is 0.65, instead of 0.5. The skyglow contribution of the space object cloud at the beginning and end of the astronomical night is then proportionally increased, reaching an estimated value of 21.1 $\mu$cd m$^{-2}$.

These luminances amount to ∼10 per cent of the natural night sky brightness, a critical level mentioned in the 1979 resolution of the International Astronomical Union (IAU) as the limiting acceptable value of light pollution at astronomical observatory sites. According to this criterion, "…the

increase in sky brightness at 45° elevation due to artificial light scattered from clear sky should not exceed 10 per cent of the lowest natural level in any part of the spectrum between wavelengths 300 and 1000 nm except for the spectral line emission from low pressure sodium lamps..." (Cayrel 1979). Although the original criterion refers to the brightness at 45° elevation, it is reasonable to apply it also to zenith observations.

The concept of a 'natural level' of brightness is in itself debatable, since the natural night sky brightness in any observation band, including the visual one, is widely variable depending on the region of the sky, the location of the observer, the state of the atmosphere and the highly fluctuating strength of the airglow, as described in, e.g., Masana et al. (2021) and references therein. According to the Gaia-Hipparcos map, zenith luminance values of 200 $\mu$cd m$^{-2}$ could be taken as a reasonable 'dark sky' luminance benchmark. A reference level of 22.0 mag arcsec$^{-2}$ in the Johnson $V$ band is often quoted in the literature, subject to the same variability factors as the luminance value.

Note that the true visual luminance of a Johnson $V$ = 22.0 mag arcsec$^{-2}$ sky is contingent on the arbitrarily chosen definition of the $V$ magnitude scale (AB or Vega zero-points, Vega magnitude, etc.), and also on the spectrum of the incoming light. The same Johnson $V$ magnitude may correspond to very different sky luminances depending on the correlated colour temperature (CCT) of the sky spectrum, as reported in Bará et al. (2020). Notwithstanding that, 22.0 Johnson $V$ mag arcsec$^{-2}$ corresponds to $\sim$200 $\mu$cd m$^{-2}$ for typical sky CCTs recorded in observatories across the world (Bará et al. 2020), so both quantities can be taken as sensible and practical reference values for the brightness of the natural sky.

These results imply that diffuse night sky brightness produced by artificial space objects directly illuminated by the Sun may well have reached nowadays, and perhaps exceeded, what is considered a sustainability 'red line' for ground based astronomical observatory sites. Note that the data used in Figs. (3-4) are for detected objects only. This means the real number of objects should be even higher because, in principle, not all objects have been identified. Therefore, the above estimate is a lower limit. This effect will certainly be aggravated by the planned deployment of huge satellite 'mega-constellations' that will add a substantial number of reflecting objects in large-inclination orbits at altitudes above $\sim$ 500 km. The effect of these space objects on the diffuse brightness of the night sky is to be considered in addition to the streaks of individual objects that tend to compromise the quality of astronomical images. This is in our opinion an issue that should be taken into account by the astrophysical community in its efforts to preserve science-grade quality night skies.

The approach in this work is a first approximation to the problem, made with some simplifying assumptions. However, the results in Section 2 were derived from robust first principles and we believe they capture the basic physics of this effect. Our estimates refer only to the human visual band; estimates in other bands of the optical region, including the near-infrared, would be also informative but were not addressed in this work.

Observational campaigns to evaluate the strength of this effect should be planned and carried out. They pose

an interesting methodological problem, since this new skyglow component corresponds to a diffuse contribution slowly varying across the night sky, so no sharp borders between an affected and an unaffected area of the sky are to be expected. If these borders between adjacent patches of the sky were present, visual inspection could have been enough to detect this phenomenon: the luminance contrast of a 20 $\mu$cd m$^{-2}$ brighter patch over a 200 $\mu$cd m$^{-2}$ background is 0.1, well above the human detection contrast threshold for a 6° zone surrounded by a 200 $\mu$cd m$^{-2}$ adaptation luminance field, which is 0.07 (Blackwell 1946). The lack of such sharp borders should prompt the community to make absolute measurements and compare them with models of the natural night sky and/or to monitor changes in night sky brightness on timescales of order of a few years. Comprehensive datasets of the present levels of skyglow in dark sites could provide an instrumental baseline to assess the additional contribution of the new satellite mega-constellations, and also to monitor its evolution in forthcoming years.

## 4   PROSPECTS AND CONCLUSIONS

The cloud of artificial objects orbiting the Earth, composed of both operational and decommissioned satellites, parts of launch vehicles, fragments, and small particles, with characteristic sizes ranging from micrometers to tens of meters, reflect and scatter sunlight toward ground-based observers. When imaged with high angular resolution and high sensitivity detectors, many of these objects appear as individual streaks in science images. However, when observed with relatively low-sensitivity detectors like the unaided human eye, or with low-angular-resolution photometers, their combined effect is that of a diffuse night sky brightness component, much like the unresolved integrated starlight background of the Milky Way.

According to our preliminary estimations, this newly recognised skyglow component could have reached already a zenith visual luminance of about 20 $\mu$cd m$^{-2}$, which corresponds to 10 per cent of the luminance of a typical natural night sky, exceeding in that way the IAU's limiting light pollution 'red line' for astronomical observatory sites. Future satellite mega-constellations are expected to increase significantly this light pollution source.

## ACKNOWLEDGEMENTS

This work was supported by the Slovak Research and Development Agency under contract No: APVV-18-0014. Computational work was supported by the Slovak National Grant Agency VEGA (grant No. 2/0010/20). SB acknowledges support by Xunta de Galicia (grant ED431B 2020/29).

## DATA AVAILABILITY STATEMENT

Digitized data shown in Fig. 2-4 and the numerical solvers used to model zenith NSB are publicly available on http://davinci.fmph.uniba.sk/~kundracik1/debris. We did not use any new data.

A457

# REFERENCES

Al-Obaidi K. M. et al., 2014, Front. Archit. Res. 3, 178.

Alshaibani K., 2016, Lighting Res. Technol. 48, 742.

Bará et al., 2020, MNRAS 493, 2429

Bendisch et al., 2004, Adv. Space Res. 34, 959

Blackwell H. R., 1946, J. Opt. Soc. Am. 36, 624

Cayrel R., 1979, Trans. Int. Astron. Union, 17, 215

Cinzano, P., 2007, Report on Sky Quality Meter, version L; Technical Report; ISTIL

ESA, 2020, ESA's Annual Space Environment Report, GEN-DB-LOG-00288-OPS-SD, Darmstadt, Germany

Hainaut O. R. et al., 2020, Astron. Astrophys. 636, A121.

Hergert W., Wriedt T., 2012, The Mie theory: Basics and Applications. Springer Ser. Opt. Sci. 169.

Kocifaj M., Horvath H., 2005, Appl. Opt. 44, 7378

Krutz et al., 2011, Acta Astronaut. 69, 297

Link F., 1969, Eclipse Phenomena in Astronomy. Springer.

Masana et al., 2021, MNRAS 501, 5443

National Research Council, 1995, Orbital Debris: A Technical Assessment. Washington, DC: The National Academies Press.

Neckel H., Labs D., 2011, Sol. Phys. 74, 231

NREL, 2021, 1985 Wehrli Standard Extraterrestrial Solar Irradiance Spectrum, www.nrel.gov/grid/solar-resource/spectra-wehrli.html

Shendeleva M. L., 2005, J. Eur. Opt. Soc. 13:10.

Taleb H. M., Antony A. G., 2020, J. Build. Eng. 28, 101034.

Tyson J. A. et al. 2020, Astron. J. 160, 226.

UCS 2021, Union of Concerned Scientists Satellite Database, www.ucsusa.org/resources/satellite-database

Wehrli, C. Extraterrestrial Solar Spectrum, Publication no. 615, Physikalisch-Meteorologisches Observatorium + World Radiation Center, Davos Dorf, Switzerland, July 1985.

Zamorano J. et al. 2017, Int. J. Sust. Lighting 18, 49–54.

This paper has been typeset from a TeX/LaTeX file prepared by the author.

A458

# EXHIBIT HH

**Trending:**     AMD Radeon RX 680

**NEWS**

# Elon Musk reveals when Starlink



Downloads     More

**By Trevor Mogg**
April 16, 2021



SpaceX launched its Starlink internet service in beta in October 2020.

Currently available to a limited number of customers, the broadband service is powered by more than 1,000 small

satellites deployed by SpaceX in multiple rocket launches since 2019. Thousands more satellites will be deployed in the coming years as the service continues to expand.

So far more than 10,000 people in several countries around the world have been allowed to sign up for the beta service. More will be allowed to join once Starlink exits its test phase, a move that SpaceX Elon Musk revealed in a tweet this week will "probably" take place "this summer." Exiting beta will be a major step forward for the service, paving the way for what could be a major expansion of its customer base.

*This is accurate. Service uptime, bandwidth &amp; latency are improving rapidly. Probably out of beta this summer. &mdash; Elon Musk (@elonmusk) April 15, 2021*

## Mobile Starlink

In another Twitter post, the SpaceX chief said that Starlink should be in a position to offer a "fully mobile" service later this year, "so you can move it anywhere or use it on an RV or truck in motion," adding that "a few more satellite launches [and] some key software upgrades" will be needed to make it happen.

The plan to make Starlink mobile came to light last month following the publication of a SpaceX filing with the Federal Communications Commission requesting permission to install its internet terminals in moving vehicles — not just people's homes. At the current time cars are not included as the Starlink terminal is currently too large.

Recent reports suggested current Starlink customers are receiving speeds of around 100 megabits per second (Mbps), though this should increase to 300 Mbps later this year. Musk also said on Thursday that service uptime, bandwidth, and latency are "improving rapidly."

Customers signing up to the beta service are required to make a one-off payment of $549 ($499 for the hardware and $50 for shipping and handling), plus $99 a month for the broadband service.

## Customer response

A CNBC article this week surveyed more than 50 Starlink customers across the U.S. to learn more about their Starlink experience so far.

Most customers appear happy with things like pricing, equipment, and speed, though a few had difficulties installing the equipment, for various reasons. Others raised concerns that the company might introduce data caps in the future, something which they said could cause them to ditch the service.

Overall, though, the customers in CNBC's report speak favorably of their own Starlink experiences so far, giving Musk

# EXHIBIT II

US MARKETS OPEN    In the news

|  **Dow Jones** |  **Nasdaq** | **S&P 500** | **TSLA** | **FB** | **BABA** |
| +0.02% | +0.04% | +0.12% | -3.18% | +0.27% | -0.33% |



HOME  >  TECH

## Here are the 7 big space companies in the race to build a global satellite-internet network

**Kate Duffy**  Apr 17, 2021, 4:30 AM



**Jeff Bezos, Elon Musk, and Dan Goldberg.**  Getty Images

**Satellite broadband is becoming an increasingly popular way to connect to the internet.**

**Major space companies are offering super-fast internet, which beams down from satellites in orbit.**

**They have one thing in common — they're racing to become the biggest name in satellite broadband.**

< HOMEPAGE                                                                Subscribe

A467

**SpaceX's Starlink**



**SpaceX CEO Elon Musk.** Hannibal Hanschke-Pool/Getty Images

 HOMEPAGE

Subscribe

Elon Musk's space venture currently has more than 1,350 satellites in orbit, with plans to launch up to 42,000 by mid-2027.

Eventually, Starlink — a subdivision of SpaceX — wants to wrap thousands of satellites around the Earth to build a global network.

Starlink's "Better Than Nothing Beta" test went live in October and has since gained over 10,000 users across six different countries.

Starlink's business model directly connects customers to the satellites — there are no telecommunications companies involved in between.

Users sign up to Starlink via its website. When the service is up and running in the area, subscribers receive an email to buy the kit. Starlink may even offer users $99 preorders, like it did in Australia, Mexico and parts of the US, where the network isn't live yet.

Once the order has been accepted, Starlink sends the kit, including a tripod, WiFi router and terminal to customers. Overall, this costs users $499 for the kit and $99 for the monthly Starlink subscription for up to 210 Megabits per second. Customers then set up the kit themselves.

Starlink is rapidly expanding — it plans on attaching antennas to moving vehicles to connect them to the satellite network.

Not everyone is fully on board with Starlink's dominance. Local internet service providers in the US say Starlink is using "unproven" technology with its satellite constellation. They have asked the Federal Communications Commission (FCC) to look into its application for the Rural Digital Opportunity Fund, for which Starlink was awarded $885 million.

**Amazon's Project Kuiper**





**Amazon and Blue Origin founder Jeff Bezos.** MANDEL NGAN/AFP via Getty Images

Project Kuiper, a subsidiary of Amazon, came to light in 2018 when government filings revealed the tech giant was going ahead with building a global space-based internet service.

The project aims to blast 3,236 satellites to 630 kilometers in orbit, very close to Starlink's satellites at 550 kilometres.

In January, the FCC gave Project Kuiper regulatory approval to launch its satellite fleet into space by July 2029 and connect with antennas on the Earth to provide internet service.

50% of its satellites should be operational by July 30, 2026.

It's not yet clear what Project Kuiper's satellites will look like or which rocket they will be launched on, but Amazon founder Jeff Bezos' space company Blue Origin could send them into orbit via its New Glenn rocket.

Sources told Insider in 2019 that Project Kuiper's headquarters are a few miles from Microsoft's headquarters in Redmond, Washington.



**The ViaSat logo is displayed on a smartphone.**  Rafael Henrique/SOPA Images/LightRocket via Getty Images

Californian-based ViaSat operates five GEO satellites around 22,000 miles above the surface of the Earth.

It's adding to this constellation at the start of 2022 by putting three "ultra-high capacity GEO satellites" into orbit, which will give global coverage by 2023, a ViaSat spokesperson told Insider.

ViaSat is also planning on putting 288 satellites into low-Earth orbit (LEO) by 2026.

Mark Dankberg, ViaSat's executive chairman and co-founder, told Insider on Thursday that having both GEO and LEO satellites complement each other.

He said ViaSat are trying to create a "multiorbital constellation where you use GEO satellites and LEO satellites in a way that look seamless to users."

Dankberg gave an example of the benefits of using different orbital satellites for videos online: The LEO satellites can offer the latency — the delay between a user's actions and the internet's response — and the lower cost bandwidth from GEO satellites.

In December, Viasat asked the FCC to study the potential environmental impacts of Starlink. In response, Musk tweeted: "Starlink 'poses a hazard' to Viasat's profits, more like it."

Dankberg said it's common for companies to become "frenemies" in the space industry. Despite having a launch contract with

‹ HOMEPAGE

Launching more satellites leads to a higher chance of collision, resulting in more space debris which could be a "doomsday

scenario for space," according to Dankberg.

SPONSOR CONTENT

**Why robots could soon be at the center of our relationship with money, according to a consumer finance survey**

Read the story



## Hughes Net



**Hughes Jupiter 2 satellite team.**  Hughes Net

Hughes Net, the biggest satellite internet provider in the US, relies on satellites positioned 22,500 miles away in geostationary orbit to beam internet back down to Earth.

The main difference between the low-Earth orbit satellites and the bigger geostationary (GEO) satellites is that the latter are much further away in orbit and as a result can cause second-long delays in video calls and other technology.

Subscribe

But GEO satellites are in a fixed position, so unlike LEO satellites, they don't move around in orbit and target their internet service

A472

in one specific area.

Hughes, with more than 1.5 million subscribers, has six satellites in orbit, which cover various parts of North and South America and Canada, including Mexico, Brazil, and Chile.

Hughes Net spokesperson Sharyn Nerenberg told Insider the company is purely focused on providing internet to the Americas.

The last satellite Hughes launched was in June 2018 and it's aiming to send another one into orbit, named Jupiter 3, in the second half of 2022. Nerenberg said Jupiter 3 is going to be the largest commercial satellite ever launched.

Those who sign up for Hughes Net receive a kit through the post and get it installed by an outsourced company.

Costs for Hughes satellite service range from $59.99 to $149.99 per month for 25 Mbps download speeds. The kit is priced at $249.99 with a $199 installation charge, taking the total purchase price to $449.98 — $50 cheaper than SpaceX's Starlink.

Nerenberg also said Hughes offers community WiFi hotspots via its satellite network to small rural areas in Latin America for those who can't afford a subscription.

---

**The UK's OneWeb**



‹ HOMEPAGE                                                                    Subscribe



**A rocket with 36 OneWeb satellites onboard blasts off from a launch pad of Vostochny Cosmodrome in Russia.**  Yuri Smityuk\TASS via Getty Images

OneWeb is a British-owned satellite broadband provider that currently has 146 satellites at 1,200 km in orbit and plans to have 648 satellites in total to offer a global network.

The firm was rescued from bankruptcy by the UK government and India's Bharti Group in November and now pledges to invest $1 billion in the company.

OneWeb wants to provide internet to the whole of the UK by June. Its most recent launch on March 25 will deliver internet coverage to the top of the globe down to the 50th degree latitude, covering countries such as Alaska, Canada, Greenland, Russia, the Nordic countries, and northern Europe.

The UK firm offers a business-to-business model, whereby it provides satellite internet to telecommunications companies, which then distribute the service to customers.

Chris McLaughlin, chief of government, regulation and engagement at OneWeb told Insider the company has had discussions with the government about becoming part of the UK's $6.9 billion Project Gigabit — just like Starlink.

OneWeb and Starlink satellites almost collided into each other in orbit on April 3 that could have sent thousands of debris pieces flying around space, adding to the space junk crisis.

McLaughlin told Insider on Monday it was "no one's fault but a big challenge" to avoid this from happening.

---

SPONSOR CONTENT

**How Aon is redefining the value of intellectual property**

Read the story



---

< HOMEPAGE                                                                 Subscribe

**Eutelsat**



**Konnect satellite launch team.** Eutelsat

Eutelsat is a European satellite operator that has 39 GEO satellites positioned at 36,000 kilometres away in orbit.

The company currently provides internet to parts of Europe and Africa, and plans to launch another satellite called Konnect VHTS, which will cover the rest of Europe.

Michel Azibert, Eutelsat's deputy CEO, told Insider on Friday: "Konnect VHTS will be a game-changer, enabling Eutelsat to provide powerful connectivity seamlessly to the end user at a price comparable to those of terrestrial operators."

Prices for Eutelsat's satellite company range between €30 and €70 per month for speeds between 30 and 100 Mbps, with an upfront fee between €49 to €149 depending on the market, Azibert said.

He said the pricing was "well below Starlink's and very well adapted to the rural markets that we are targeting in EMEA."

Eutelsat's satellites "are a reliable solution to cost-effectively address areas and regions where fiber will remain too costly to deploy," he added.

Eutelsat, founded in 1977, sends its satellites into space from various locations across the world. The first satellite it launched was

 

**Canada's Telesat**



**Satellite services operator Telesat CEO and president Daniel Goldberg listens during a session at the World Summit For Satellite Financing.**  ERIC PIERMONT/AFP

Telesat, headed by Dan Goldberg, already has 15 GEO satellites more than 35,000 km (22,200 miles) above Earth.

The Canadian company is also planning a LEO constellation called "Lightspeed" — the first batch of 298 satellites, built by Thales Alenia Space, are expected to be launched by early 2023. The goal is to provide full global service by 2024.

Manik Vinnakota, director, commercial and product development at Telesat, told Insider the satellites weigh around 700 kilos and have a 10-12 year design life.

‹ HOMEPAGE

Subscribe

The company provides its satellite internet to government, aviation, maritime and terrestial markets, Vinnakota said.

Goldberg confirmed during the Satellite 2021 LEO Digital Forum on April 6, per Space News, that Lightspeed would cost $5 billion. This much cheaper than SpaceX's and Amazon's projects which exceed the $10 billion mark.

He told Reuters on Sunday that Telesat is "in the sweet spot" with pricing.

In 2019, Telesat signed a launch deal with Jeff Bezos' Blue Origin to use its rockets, such as the proposed New Glenn, to blast its LEO satellites into orbit.

David Wendling, Telesat's chief technical officer, told Reuters the company is in talks with three different launch providers but that they haven't made a final decision just yet.

# INSIDER

Subscribe

**NEWSLETTER**

**Sign up for the 10 Things in Tech newsletter for the latest trends & developments in tech.**

Email address

SIGN UP

By clicking 'Sign up', you agree to receive marketing emails from Insider as well as other partner offers and accept our Terms of Service and Privacy Policy.

More:   SpaceX   Amazon   Project Kuiper   Starlink ⌄

* Copyright © 2021 Insider Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of Service, Privacy Policy and Cookies Policy.

Sitemap | Disclaimer | Accessibility | Commerce Policy | CA Privacy Rights | Coupons | Made in NYC | Jobs

Stock quotes by finanzen.net | Reprints & Permissions

International Editions:

INTL | AT | AUS | DE | ES | FR | IN | JP | MX | NL | SE | PL | ZA

CA Do Not Sell My Info

Nos. 21-1123, -1125

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

VIASAT, INC.,

*Appellant,*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee,*

SPACE EXPLORATION HOLDINGS, LLC,

*Movant-Intervenor.*

On Appeal from the Federal Communications Commission
IBFS File No. SAT-MOD-20200417-00037

## DECLARATION OF MARK DANKBERG

I, Mark Dankberg, hereby declare as follows:

1.      I am the Chairman of the Board and Executive Chairman of Viasat, Inc. I co-founded the company in 1986, and served as its CEO from 1986 until assuming my current role in November 2020.  As Executive Chairman, I focus on advancing Viasat's strategic technology and business direction, as well as shaping the national and international space and broadband regulatory environments that are critical to Viasat's execution of its global strategy.

2.      I earned a Bachelor of Science in Electrical Engineering and a Master of Electrical Engineering from Rice University, and am a member of the Rice University Electrical and Computer Engineering Hall of Fame.  In 2017, I was elected to the National Academy of Engineering for my contributions to broadband internet communications via satellite.  Membership in the National Academy of Engineering is one of the highest professional honors that can be accorded an engineer.

3.      I have co-authored several military standards on satellite networking, and am a named inventor on over one hundred patents concerning communications and satellite networking technologies.  I have participated in Department of Defense advisory panels and was invited to testify before Congress on the promises of next-generation commercial satellite technology, national broadband expansion plans, and high technology growth companies and IPOs.

4.      I have received a number of other awards in recognition of my industry and business leadership, including:

- 2000 San Diego Entrepreneur of the Year
- 2003 Satellite Industry Executive of the Year
- 2008 American Institute of Aeronautics and Astronautics (AIAA) Aerospace International Communications Award
- 2012 Visionary Executive of the Year, Satellite Markets and Research
- 2013 Arthur C. Clarke Foundation Industry Innovator
- 2013 San Diego Business Journal Most Admired CEO Founders Award

2

- 2015 Society of Satellite Professionals Hall of Fame

5.      Viasat has a long history and extensive expertise in developing and providing satellite communications technologies for both military and commercial uses.  It is a leading provider of satellite-based broadband services to consumers, businesses, and government users throughout the United States and the world, including to over 1,400 aircraft and more than 14 airlines (American Airlines, Delta Airlines, JetBlue, KLM, Qantas, and United Airlines, among others).  Viasat also develops state-of-the-art technologies for other satellite operators and for government entities.  Viasat has been a leading provider of satellite payload and ground technologies for satellite operators and government entities across narrowband low-earth orbit ("LEO"), broadband LEO, earth sensing non-geosynchronous orbit ("NGSO"), broadband medium-earth orbit ("MEO"), and broadband geosynchronous orbit ("GSO").

6.      Viasat's broadband service has received various accolades.  For example:

- Last year, *U.S. News & World Report* named Viasat to its list of top internet service providers (ISPs) in the United States.[1]
- In 2019, *Fortune* included one of Viasat's satellite broadband solutions on its "Change the World" list, which identifies commercial initiatives

---

[1] Sarah Shelton, *Best Internet Service Providers of 2021*, U.S. News & World Report (Apr. 28, 2021), https://www.usnews.com/360-reviews/internet-providers.

that are having measurable social impact around the world.[2]

- In April, CNET named Viasat as the best satellite provider of 2021 for rural connectivity in the United States.[3]

- *Fast Company* included Viasat in its 2020 World Changing Ideas list.[4]

7.      Viasat's existing fleet of satellites has set records over the years. ViaSat-1, for example, became the highest capacity satellite in the world upon its launch in 2011, at the time providing greater capacity than all other communications satellites over North America combined.[5]

8.      In addition to its consumer and business services, Viasat has been a leading provider of satellite broadband connectivity to allied governments and a number of U.S. Department of Defense organizations, serving a broad range of airborne platforms and missions, including providing satellite-based internet

---

[2] *Change the World*, FORTUNE, https://fortune.com/change-the-world/2019/ (last visited June 1, 2021).

[3] David Anders, *The Best Rural Internet Providers of 2021*, CNET (Apr. 7, 2021), https://www.cnet.com/home/internet/best-rural-internet/.

[4] Kristin Toussaint, *Here's how one company is delivering the internet to remote villages*, Fast Company (Apr. 28, 2020), https://www.fastcompany.com/90490840/heres-how-one-company-is-delivering-the-internet-to-remote-villages; *see also World Changing Ideas Awards 2020: Developing-World Technology Finalists and Honorable Mentions* (Apr. 28, 2020), https://www.fastcompany.com/90492106/world-changing-ideas-awards-2020-developing-world-technology-finalists-and-honorable-mentions.

[5] Veronica Magan, *ViaSat-1 Sets Guinness World Record*, VIA SATELLITE (Mar. 6, 2013), https://www.satellitetoday.com/telecom/2013/03/06/viasat-1-sets-guinness-world-record/.

4

connectivity for Air Force One and other high-value government aircraft.[6]  Viasat is currently operating a satellite for a U.S. Government customer in LEO at an orbit of 575 km (within the 510-580 km orbital altitude range of SpaceX's Starlink satellites).

9.    Viasat has active plans to expand its fleet with additional satellites and satellite constellations.  On April 23, 2020, the FCC authorized Viasat to serve the United States market with a NGSO satellite system consisting of 20 satellites operating in MEO (at ~8,200 km).[7]  On May 26, 2020, Viasat requested a modification of that authorization to expand the number of active satellites from 20 to 288 and to lower the orbital altitude to LEO (at ~1,300 km).  In addition, Viasat is under contract with the Department of Defense to launch a high value LEO satellite into an orbit that also is within the altitude range of SpaceX's Starlink satellites, and intends to do so within the next six to twelve months.  That satellite will demonstrate Tactical Data Links from space in support of the Department of Defense and Space Force.  The satellite will be jointly operated by Viasat and the Department of Defense.  Many more such satellites are contemplated.

---

[6] Mike Gruss, *ViaSat Wins $73 Million for Air Force One Satellite Communications Contract*, SPACE NEWS (June 3, 2016), https://spacenews.com/viasat-wins-73-million-for-air-force-one-satellite-communications-contract/.

[7] *In the Matter of Viasat, Inc. Petition for Declaratory Ruling Granting Access for a Non-U.S. Licensed Non-Geostationary Orbit Satellite Network*, Order and Declaratory Ruling, 35 FCC Rcd. 4224 (Apr. 23, 2020).

10.    In addition, Viasat has spent years and over one billion dollars researching, designing, and building its latest generation of broadband satellites, dubbed ViaSat-3.  Each of the three ViaSat-3 satellites under construction will cover one-third of the earth's surface, and each will have a communications capacity of over 1 terabit of data per second.[8]  Upon deployment, each ViaSat-3 satellite will be the highest-capacity communications satellite ever launched, with more than twice the per-satellite capacity of its nearest competitor.

11.    The first ViaSat-3 is expected to be launched through LEO into geosynchronous orbit (which is at a higher altitude than LEO or MEO) within the next twelve months, followed shortly thereafter by the next two ViaSat-3 satellites.

12.    I am familiar with (*a*) SpaceX's plans to deploy a LEO satellite constellation (dubbed "Starlink") consisting of: (i) two initial groups of satellites that would be operated together as a single network—including a group of approximately 4,408 operating satellites, and another group of approximately 7,518 operating satellites (with the two groups operating in different frequency combinations and altitudes), and (ii) a follow-on network with approximately 30,000 additional operating satellites;   (*b*) SpaceX's FCC licenses and license applications that underlie the foregoing; (*c*) SpaceX's "Third Modification Application," in which it

---

[8] *ViaSat-3 Satellite Constellation*, ViaSat, Inc., https://www.viasat.com/space-innovation/satellite-fleet/viasat-3/ (last accessed June 1, 2021).

6

sought final authorization from the FCC to deploy 2,824 operating satellites into LEO; (*d*) the FCC's Order approving the Third Modification Application; and (*e*) Viasat's efforts to secure environmental review by the FCC of the Third Modification Application (including through this appeal).  I also am familiar with the scientific research that has been conducted, and is ongoing, regarding both the threats to the orbital environment and the safety thereof posed by the growing amount of orbital debris, as well as the threats to the continued use of shared orbital resources in space as a consequence of the deployment of unprecedentedly large numbers of satellites in LEO, like the Starlink constellation.

13.    I submit this declaration in support of Viasat's motion to stay the FCC's Order because both Viasat individually, and the public more generally, will suffer irreparable harm as a result of the SpaceX satellite deployments and operations authorized by the Order.

14.    Indeed, a large number of academics and other researchers have expressed concern about the potential environmental impacts of launching large numbers of satellites into LEO.  By way of example:

> a. Dr. Jonathan McDowell of the Harvard-Smithsonian Center for Astrophysics has warned that SpaceX will operate so many satellites that even a low failure rate would mean a relatively high threat to orbital safety because of the potential for collisions, and that it is "not

7

clear that [SpaceX] will be able to manage the final constellation."[9] Dr. McDowell has recommended that satellite companies pause launches once there are 1,000 satellites in orbit to monitor for design flaws or other issues.[10]

b. Dr. Moriba K. Jah, a leading expert on managing the risks of debris at the Aerospace Engineering and Engineering Mechanics Department at the University of Texas at Austin, testified to Congress that "[t]here are no standard 'rules of the road' for space operations and activities, and we should avoid creating these in a vacuum, absent informed science and technology." He testified further: "I have personally found an absence of space operations expertise amongst the workforce driving some of these 'New Space' ventures, causing me further concern regarding orbital safety and long-term sustainability of space activities. There is a mentality of 'take risks and fail often.' While this worked well for software companies in Silicon Valley, we can't afford to have this exact mentality in space."[11]

c. Dr. William Ailor, Technical Fellow for the Center for Orbital and Reentry Debris Studies at the Aerospace Corporation, a federally

---

[9] Bojan Pancevski, *Elon Musk's Satellite Internet Project Is Too Risky, Rivals Say*, THE WALL STREET JOURNAL (Apr. 19, 2021), https://www.wsj.com/articles/elon-musks-satellite-internet-project-is-too-risky-rivals-say-11618827368. Dr. McDowell has similarly noted that the "impacts [of Starlink] will be significant for certain types of [astronomical] observation, certain observatories and at certain times of year." A. Tarantola, *We're Entombing the Earth in an Impenetrable Shell of Dead Satellites*, ENGADGET (Apr. 8, 2021), https://www.engadget.com/were-entombing-the-earth-in-an-impenetrable-shell-of-dead-satellites-163002560.html

[10] Kate Duffy, *SpaceX is dominating orbit with its Starlink satellites, making the risk of space-traffic collision a serious hazard, industry experts say*, BUSINESS INSIDER (Mar. 28, 2021), https://www.businessinsider.com/elon-musk-spacex-starlink-satellites-dominate-orbit-industry-experts-2021-3

[11] *Reopening the American Frontier: Promoting Partnerships Between Commercial Space and the U.S. Government to Advance Exploration and Settlement: Hearing Before the Subcomm. on Space, Science, and Competitiveness of the S. Comm. on Commerce, Science & Transportation*, 115th Cong. 38 (2017) (Statement of Moriba K. Jah), https://www.govinfo.gov/content/pkg/CHRG-115shrg30770/pdf/CHRG-115shrg30770.pdf.

8

funded research and development center committed exclusively to the space enterprise, has written that the "environmental impacts of rocket emissions, space debris and re-entry plumes warrant attention given the significant increase in space activity in recent years."  Moreover, "[m]ore analysis is warranted to appropriately quantify and account for environmental impacts along the entire space supply chain to ensure both terrestrial and space sustainability."[12]

15.    The FCC has identified and acknowledged two critical aspects of the problem that is created by the rush to fill space with mega-constellations like SpaceX's:

    a.  LEO resources are limited, such that an unlimited number of satellites cannot coexist in LEO.

    b.  Economic incentives for individual commercial actors may not be sufficient to encourage them to adopt responsible and socially optimal practices designed to ensure that the shared orbital environment remains available for all to use safely.  Instead, individual commercial actors may be incented to adopt practices that force other space users to bear significant negative externalities, raising their economic costs and ultimately jeopardizing the viability of certain parts of space—*i.e.*, the Tragedy of the Commons.[13]

16.    SpaceX's authorizations from the FCC allow it to deploy an unlimited number of technically identical replacement satellites over the applicable 15-year license term.  Given the stated 5-year design life of its satellites, and the expectation

---

[12] Debra Werner, *Aerospace Corp. raises questions about pollutants produced during satellite and rocket reentry*, SPACE NEWS (Dec. 11, 2020), https://spacenews.com/aerospace-agu-reentry-pollution/

[13] *See Mitigation of Orbital Debris in the New Space Age,* Notice of Proposed Rulemaking and Order on Reconsideration, 33 FCC Rcd 11352, at ¶¶ 88-89 (2018);  *Mitigation of Orbital Debris in the New Space Age*, Report and Order and Further Notice of Proposed Rulemaking, 35 FCC Rcd 4156, at ¶ 25 (2020).

9

(based on experience to date) that many of its satellites will fail or be deorbited before the end of their design lives (as over 100 of its first ~1,700 already have), it is reasonable to expect that over 15 years, SpaceX will launch at least two-to-three times more Starlink satellites than it is permitted to operate at any one time. In other words, SpaceX can be expected to launch anywhere from 5,648 to 8,472 satellites under the authority provided by the FCC's Order alone. Indeed, the number of satellites might be even higher if the operational lifetime of additional Starlink satellites is shorter than 5 years.

17.    SpaceX's planned deployment of many thousands of satellites into LEO—including those covered by the FCC's grant of the Third Modification Application—will significantly increase the risk of in-orbit collisions, including (*a*) collisions between two SpaceX satellites, (*b*) collisions between a SpaceX satellite and a satellite operated by a third party, such as Viasat, and (*c*) collisions between a SpaceX satellite and orbital debris. Viasat and other parties presented extensive technical analysis of this increased collision risk, which is included in the FCC's administrative record.[14]

18.    With respect to a given satellite constellation, there are two particularly significant sources of overall collision risk: (i) risks related to satellites that fail and

---

[14] *See, e.g.*, Letter from Viasat to FCC, IBFS File No. SAT-MOD-20200417-00037, Attachment (Jan. 15, 2021).

lose the ability to maneuver—and thus avoid potential collisions, and (ii) "residual risks" that exist because:

    a. most orbital debris objects cannot be effectively tracked, making it difficult to predict collisions with such objects or initiate appropriate avoidance maneuvers to avoid such collisions;

    b. maneuvering to avoid one collision risks creating a different collision; and

    c. avoidance maneuvers are *not* initiated in every instance where a collision is possible (*e.g.,* because the predicted collision probability is deemed too low to warrant a maneuver).

The impact of each of these factors scales with constellation size, with constellations containing many thousands of satellites presenting exponentially greater collision risk than the much smaller satellite constellations that previously have been deployed. And, as discussed below, any such collisions will have long-lasting repercussions in space, for the operator involved in the collision, for other operators in nearby orbits, and for those hundreds of kilometers away.

19. Two basic principles are very important in understanding the growing problem of pollution in space: (i) satellites that cannot maneuver cannot avoid collisions, and (ii) not all potential collisions can be predicted, and even where a satellite is maneuverable, not all potential collisions can be avoided.

20. A satellite that cannot maneuver is unable to avoid a potential collision regardless of whether that collision is with another non-maneuverable satellite in the same constellation, a third party's satellite that is non-maneuverable, or with orbital debris of any shape or size. Even where a satellite is designed to be maneuverable,

that maneuverability can be lost in whole or in part if any one of several sub-systems fails or is damaged by a collision with even a tiny piece of orbital debris. Thus, the loss of satellite maneuverability has a direct bearing on collision risk. So does the number of total satellites in the constellation, as discussed below.

21.    Collisions can occur when one of the over 100 million pieces of uncontrolled orbital debris currently in orbit strikes a satellite and disables it or renders it non-maneuverable, or entirely destroys the satellite, fragmenting it into thousands of pieces of new orbital debris. Collisions also can occur when two satellites are on a collision path and the collision is not successfully avoided.

22.    NASA explains that orbital debris in LEO travels at speeds up to 17,500 mph,[15] fast enough for even a very small piece of orbital debris to damage a satellite. Indeed, every piece of orbital debris larger than 1-2 cm has the potential to either cause a catastrophic collision in space or render a satellite non-maneuverable.[16] The following table helps demonstrate the magnitude of the threat posed by even very small pieces of orbital debris:[17]

---

[15] Mark Garcia, *Space Debris and Human Spacecraft*, NASA, https://www.nasa.gov/mission_pages/station/news/orbital_debris.html (last updated May 27, 2021).

[16] Roger Thompson, *A Space Debris Primer,* CROSSLINK 5 (Fall 2015), https://aerospace.org/sites/default/files/2019-04/Crosslink%20Fall%202015%20V16N1%20.pdf.

[17] *Id.* at 5-6.

12

| Debris size | Mass (g) aluminum sphere | Kinetic Energy (J) | Equivalent TNT (kg) | Energy similar to |
|---|---|---|---|---|
| 1 mm | 0.0014 | 71 | 0.0003 | Baseball |
| 3 mm | 0.038 | 1910 | 0.008 | Bullets |
| 1 cm | 1.41 | 70,700 | 0.3 | Falling anvil |
| 5 cm | 176.7 | 8,840,000 | 37 | Hit by bus |
| 10 cm | 1413.7 | 70,700,000 | 300 | Large bomb |

23.    NASA estimates that there are approximately (i) 23,000 pieces of uncontrolled orbital debris larger than a softball (*i.e.*, 10 cm) orbiting the Earth, (ii) half a million pieces of debris the size of a marble (up to 1 cm) and larger, and (iii) approximately 100 million pieces of debris about 1 mm and larger.[18]

24.    NASA also explains that certain techniques can be effective in avoiding the larger pieces of orbital debris that can be tracked by the Department of Defense's Space Surveillance Network.  These techniques include conjunction assessments (*i.e.*, predicting expected "close calls" when the orbital paths of the debris and an active satellite approach each other) and collision avoidance maneuvers (*i.e.*, activating the propulsion sub-system on the satellite to try to get out of the way of

---

[18] Mark Garcia, *Space Debris and Human Spacecraft*, *supra* n. 14.

13

the oncoming debris or satellite). NASA further explains that orbital debris smaller than 10 cm usually is too small to track with current technology for conjunction assessments and collision avoidance. In other words, techniques exist to try to avoid collisions with only a very small fraction of the over 100 million pieces of existing debris.[19]

25. As to the potential collisions with large orbital debris (or other satellites) that theoretically can be avoided, experts calculate that a constellation of thousands of satellites (like SpaceX's) should expect to receive millions of conjunction warnings each year (*i.e.*, warnings about possible close calls with uncontrollable debris or with other satellites).[20] Satellite operators typically maneuver to avoid such close calls only when the probability of a collision is expected to exceed a certain threshold (*e.g.*, 1 in 10,000, or 1 in 100,000).

26. Every time an operator does not maneuver a satellite in response to a low-probability conjunction warning, there is a non-zero collision risk. Additionally, every time an operator does maneuver, there is another non-zero probability that the maneuver will result in a collision. In both cases, with millions

---

[19] *Id.*

[20] Salvatore Alfano, Daniel L. Oltrogge, & Ryan Shepperd, *LEO Constellation Encounter and Collision Rate Estimation: An Update*, 2ND IAA CONFERENCE ON SPACE SITUATIONAL AWARENESS, Washington D.C. (Jan. 2020), https://bit.ly/3tk9VCc.

of conjunction warnings each year, even events that are individually very *un*likely

to occur can quickly become *likely* when individual risks are aggregated.

27.    A collision in space also has the potential to create a large debris field

that can spread to surrounding orbits—including to altitudes hundreds of kilometers

away from the collision.  By way of illustration, the 2009 collision between the

active Iridium 33 satellite and the passive Cosmos 2251 satellite just below 800 km

fragmented these two satellites into an estimated 200,000 pieces, and spread

dangerous debris widely into numerous orbits[21]—including where the International

Space Station operates.[22]   This collision and the intentional destruction of just one

other satellite (a Chinese weather satellite named FY-1C satellite that fragmented

into an estimated 300,000 objects 1 cm or larger) resulted in step-increases in the

amount of trackable objects (including debris objects) in LEO, as depicted in

---

[21] Felix Hoots, *Keeping Track: Space Surveillance for Operational Support*, CROSSLINK 26 (Fall 2015), https://aerospace.org/sites/default/files/2019-04/Crosslink%20Fall%202015%20V16N1%20.pdf.

[22] Debris poses a particular danger to the International Space Station (ISS), and recently required the conduct of emergency maneuvers when there was a particularly close approach of orbital debris.  *See* Adam Smith, *International Space Station Forced to Carry Out Emergency Manoeuvre to Dodge Debris*, INDEPENDENT (Sep. 23, 2020), https://www.independent.co.uk/life-style/gadgets-and-tech/international-space-station-space-debris-nasa-iss-b549114.html. Notably, this is not the first time astronauts from the ISS have needed to evacuate to an emergency capsule because debris threatened to impact the ISS—such incidents have occurred at least seventeen times between 2009 and 2017.  *See* Organisation for Economic Co-operation and Development, *Space Sustainability: The Economics of Space Debris in Perspective* 24 (Apr. 2020).

Figure 1.



(a) Evolution of absolute number of objects.

Figure 1 – Step Increases in Absolute Number of Objects in the Low Earth Orbit (LEO) Region, Including Objects in Geostationary Transfer Orbit (GTO), Low and Medium Earth Crossing Orbits (LMO), and Highly Eccentric Earth Orbit (HEO).[23]

28.     As can be seen in the below graphic, the debris from the Iridium-Cosmos collision spread to orbits many hundreds of kilometers above and below the point of impact.

---

[23] *See ESA's Annual Space Environment Report*, EUROPEAN SPACE AGENCY, § 2.2 (May 27, 2021) (arrows added), https://www.sdo.esoc.esa.int/environment_report/Space_Environment_Report_latest.pdf.

16



Figure 2 – Iridium-33–Cosmos 2251 Debris Cloud, 12 Years Later (2021-04-28)[24]

29.    This debris persists as an ongoing threat more than a decade later. Indeed, when such a collision occurs and debris spreads to other orbital altitudes, that debris can remain in space for a very long period of time.

30.    In fact, just last week scientists from the Canadian Space Agency and NASA noticed that Canadarm2—the Canadian robotic arm on the International Space Station—had been hit by a piece of debris.  As the statement from the Canadian Space Agency noted, "[w]hile the utmost precautions are taken to reduce the potential for collisions with the" International Space Station, collisions can still

---

[24] This graph was plotted from the April 28, 2021 data available through Space-Track.org, which "promotes space flight safety [and] protection of the space environment."  *See* https://www.space-track.org/#catalog.

17

occur.[25]



Figure 3 – Damage from space debris colliding with Canadarm2[26]

31.     The orbital debris created from a collision of a SpaceX satellite at 550 km could similarly spread across a wide range of orbits and would remain an ongoing threat in those orbits.  As depicted below, such debris would not be expected to passively decay and renter the Earth's atmosphere for anywhere from over a decade to more than 100 years.

---

[25] *Lucky Strike:  Canadarm2 stays the course after an orbital debris hit*, Canadian Space Agency (May 28, 2021), https://www.asc-csa.gc.ca/eng/iss/news.asp#20210528.

[26]  *Id.*

| Apogee (km) | Decay Time |
|---|---|
| 550 | 13.7 years |
| 650 | 17.8 years |
| 750 | 28.6 years |
| 850 | 42.9 years |
| 950 | 59.9 years |
| 1050 | 79.7 years |
| 1150 | 96.5 years |
| 1250 | > 100 years |
| 1350 | > 100 years |

Table 1 – Passive Decay Times for Collision Fragments in Various LEO Orbits with 550 km Perigee[27]

Moreover, recent research indicates that these calculations—which undergird most debris models, including those used by the Commission—may actually understate the amount of time that debris will remain in orbit because increasing levels of carbon dioxide in the atmosphere may materially reduce the rate of passive decay of debris.[28]

32.   For these reasons, a catastrophic collision in space can create a considerable number of additional debris objects, which immediately make the orbital environment more dangerous and make access to space more costly and risky

---

[27] The decay times in this table were computed using the Orbit Lifetime/Dwell Time utility in NASA's Debris Assessment Software (DAS).  *See* https://software.nasa.gov/software/MSC-26690-1.  Values were computed assuming a 550-km perigee and 0.01 $m^2$/kg area-to-mass ratio for fragmentation debris created in 2020.  Debris with smaller area-to-mass ratios take longer to decay than the passive decay time for an intact spacecraft.

[28] Jonathan O'Callaghan, *What if Space Junk and Climate Change Become the Same Problem?*, NY TIMES (May 12, 2021), https://www.nytimes.com/2021/05/12/science/space-junk-climate-change.html.

19

as well.[29]  Furthermore, the considerable debris created by an in-orbit collision can lead to further collisions, with each one exponentially increasing the pre-existing level of in-orbit collision risk, including the expected number of conjunctions.

33.    Parties commenting at the FCC, along with leading academics,[30] have expressed concern that SpaceX's demonstrated approach to space is inherently risky. Specifically, SpaceX intends to launch large numbers of economically-expendable and replaceable satellites (i.e., achieving system-wide redundancy through large numbers of satellites) instead of deploying smaller numbers of more capable, reliable, and safer satellites.[31]  Indeed, SpaceX itself has noted that "[l]aunching more satellites is our core competency, so we generally use that kind of fault

---

[29] Zachary Grzelka and Jeffrey Wagner, *Managing Satellite Debris in Low-Earth Orbit: Incentivizing Ex Ante Satellite Quality and Ex Post Take-Back Programs*, 74 ENV'T & RES. ECONS. 321-22 (2019).

[30] *See* Aaron C. Boley and Michael Byers, *Satellite mega-constellations create risks in Low Earth Orbit, the atmosphere and on Earth*, SCIENTIFIC REPORTS (May 20, 2021), https://www.nature.com/articles/s41598-021-89909-7 (noting that the "consumer electronic model [adopted by SpaceX] allows for short upgrade cycles and rapid expansion of capabilities, but also considerable discarded equipment").

[31] Instead, the likely goal should be the deployment of maximally efficient satellite constellations across all domains that impact or otherwise create risks for the environment, including (a) the total numbers of satellites in each constellation, (b) the total mass of each constellation in space, (c) the total cross-sectional area of each constellation in space, (d) the total conjunction risk of each constellation in space, and (e) the composition of a constellation's satellites (e.g., whether made of aluminum or other materials).

tolerance wherever we can[.]"[32]

34.    As Viasat has previously argued to the Commission, one of the results of this commercial decision is increased cost and risk to other space users resulting from the satellite failures, collisions, creation of additional debris, and risks and delays associated with launching satellites into a more crowded and dangerous space environment, as discussed above.

35.    In SpaceX's case, the risk of an in-orbit collision is elevated because SpaceX's satellites have failed at a high rate.  In its Order, the FCC acknowledged that SpaceX's experiential failure rate suggests that *hundreds* of SpaceX satellites could fail over its 15-year license term.[33]  As discussed above, failed satellites that cannot maneuver cannot avoid collisions, thereby significantly increasing the risk of an in-orbit collision and consequent fragmentation.  Moreover, failed satellites remain a collision risk until they passively decay into the Earth's atmosphere, which

---

[32] *See We are the SpaceX software team, ask us anything!*, REDDIT (June 6, 2020), https://www.reddit.com/r/spacex/comments/gxb7j1/we_are_the_spacex_software_team_ask_us_anything/ ("On Starlink, we've designed the system so that satellites will quickly passively deorbit due to atmospheric drag in the case of failure (though we fight hard to actively deorbit them if possible). We still have some redundancy inside the vehicle, where it is easy and makes sense, but we primarily trust in having system-level fault tolerance: multiple satellites in view that can serve a user. Launching more satellites is our core competency, so we generally use that kind of fault tolerance wherever we can . . .").

[33] *See Space Exploration Holdings, LLC*, Order and Authorization and Order on Reconsideration, IBFS File No. SAT-MOD-20200417-00037, FCC 21-48, at ¶ 63 (rel. Apr. 27, 2021).

Viasat's analysis before the Commission demonstrated would take anywhere from 3.2 to 6.1 years (based on a failure occurring in 2020, and depending on the precise orbit at which the failure occurs and whether the failure causes the satellite to tumble). Recent research indicates that these calculations may actually understate the problem, as discussed in paragraph 31 above.

36.     Leading experts have expressed concern about the development of a devastating "positive feedback loop" within existing fields of orbital debris that leads to an exponential and self-sustaining growth in the density of debris. Within this loop, debris density increases after each collision, causing additional collisions to occur, which further increases debris density—and so on under until the collision rate becomes so high that all satellites are consumed. This is the so-called Kessler syndrome first posited by noted NASA researcher Dr. Donald Kessler.

37.     The Organisation for Economic Co-operation and Development explains that the socio-economic impacts of such an event could be "severe" and that "[s]everal important space applications could be affected or lost, in particular space-based observations for weather forecasting, climate monitoring, earth sciences, and potentially, satellite communications. Certain geographic areas and social groups would be disproportionally affected, in particular in rural areas with

22

limited existing ground infrastructures and large reliance on space infrastructure."[34]

38.    At a minimum, orbital debris and non-maneuverable satellites pollute orbits and impede the ability of others to traverse and operate in those orbits. SpaceX satellites are likely to fail and lose maneuverability on an ongoing basis, and will pose immediate risks to other operators—including Viasat—when they do.  For example, the debris created by a collision involving a SpaceX satellite could damage, disable, or destroy Viasat satellites traversing or operating in LEO.  Indeed, as I discussed above, Viasat is currently operating a satellite in LEO at 575 km (within the 510-580 km orbital altitude range of SpaceX's satellites), is under contract with the Department of Defense to launch a high-value LEO satellite into that same range, and plans to do so within the next six to twelve months.  Viasat also plans to deploy additional LEO satellites at altitudes within hundreds of kilometers of SpaceX's satellites.  Moreover, an intact SpaceX satellite that has failed and is no longer maneuverable will pose risks to all Viasat satellites that are being launched *through* the orbits in which SpaceX operates.

39.    The orbital debris created by the fragmentation of a SpaceX satellite after a collision, and failed SpaceX satellites that are not maneuverable, would both frustrate Viasat's efforts to deploy its own constellation in LEO—and, at a

---

[34] *See Space Sustainability: The Economics of Space Debris in Perspective*, Organisation for Economic Co-operation and Development 7 (Apr. 2020), https://www.oecd.org/environment/space-sustainability-a339de43-en.htm.

minimum, significantly increase the costs and complexity of doing so. Indeed, the Organisation for Economic Co-operation and Development and leading academics have studied and commented on the increased economic costs borne by operators like Viasat from an increase in both debris and collision risk, noting that debris "reduces the realized value of space activities by increasing the probability of damaging existing satellites or other space vehicles."[35]

40.    Moreover, SpaceX's deployment of thousands of additional satellites into LEO pursuant to the FCC's Order would in and of itself create a more crowded orbital environment—and in and of itself harm Viasat's operations. As crowding increases, Viasat will need to expend time and resources ensuring that its own satellites—including LEO satellites currently in orbit—avoid collisions or physical interference caused by SpaceX.[36]

41.    For example, viable launch windows are inherently limited, and will become even more scarce as SpaceX deploys thousands of additional satellites into LEO. And the debris created by a collision involving a SpaceX satellite, or even the mere presence in orbit of failed SpaceX satellites that are no longer maneuverable,

---

[35] *See, e.g.*, Nodir Adilov et al., *An Economic Analysis of Earth Orbit Pollution*, 60 ENV'T & RES. ECONS., 95 (2015).

[36] It is even conceivable that the rapid launch of new Starlink satellites could require other operators to pause their own launches into LEO until the safety risk of co-existing in LEO decreases to responsible levels.

will further impede the ability of Viasat and other operators to launch their own satellites into orbit.  At a minimum, the increased scarcity caused by SpaceX's planned deployment and operations, collisions involving SpaceX satellites and the resulting orbital debris, and the presence of additional failed SpaceX satellites will increase the costs, risks, and delay associated with launching satellites into space, as recently observed by the CEO of satellite launch provider RocketLab.[37]  Put simply, SpaceX's planned deployment would reduce the number of viable launch windows available to Viasat and other operators, and thus increase the costs and delay associated with launch activities, including launches Viasat has planned in the next six to twelve months.

42.    SpaceX intends to use its constellation to compete directly with Viasat in the market for satellite broadband services, and benefits commercially from the Commission's having skipped a legally required environmental review.  Viasat must now internalize costs that the Commission's Order shifts onto other operators.  The negative externalities created by the Commission's having authorized SpaceX to deploy thousands of satellites into LEO without proper environmental review

---

[37] Jackie Wattles, *Space is becoming too crowded, Rocket Lab CEO Warns*, CNN (Oct. 8, 2020), https://www.cnn.com/2020/10/07/business/rocket-lab-debris-launch-traffic-scn/index.html ("Satellite constellations can be particularly problematic, he said, because the satellites can fly fairly close together, forming a sort of blockade that can prevent rockets from squeezing through.").

25

directly harms Viasat, including inflicting unwarranted competitive injury.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2021

Mark Dankberg

26