Nos. 21-1123, -1125

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

VIASAT, INC.,

*Appellant,*

v.

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee,*

SPACE EXPLORATION HOLDINGS, LLC,

*Movant-Intervenor.*

On Appeal from the Federal Communications Commission
IBFS File No. SAT-MOD-20200417-00037

**VIASAT'S REPLY IN SUPPORT OF ITS
MOTION TO STAY PENDING JUDICIAL REVIEW**

OF COUNSEL:

John P. Janka
Jarrett S. Taubman
VIASAT, INC.
901 K Street NW, Suite 400
Washington, DC 20001

Colin L. Ward
VIASAT, INC.
6155 El Camino Real
Carlsbad, CA 92009

June 21, 2021

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000

David J. Zimmer
Gerard J. Cedrone
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000

*Counsel for Viasat, Inc.*

## TABLE OF CONTENTS

                                                                        **Page**

INTRODUCTION ..................................................................................................1

ARGUMENT .........................................................................................................3

      I.      The Commission needed to prepare an environmental assessment. ...............................................................................................3

            A.     An assessment was required if the Order "may" significantly impact the environment. .........................................3

            B.     The harms from launching and deorbiting satellites are undisputed. ..............................................................................4

            C.     Mitigation does not justify ignoring light pollution. .................6

            D.     The Commission's orbital-debris analysis does not satisfy NEPA. .......................................................................8

      II.     Viasat has standing and is within NEPA's zone of interests. ..............9

      III.    Viasat faces irreparable injury ............................................................11

      IV.    The balance of harms and public interest support a stay. ..................13

CONCLUSION ....................................................................................................14

CERTIFICATE OF COMPLIANCE ...................................................................15

CERTIFICATE OF SERVICE ............................................................................16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Bird Conservancy v. FCC*,
    516 F.3d 1027 (D.C. Cir. 2008)..................................................................3, 5

*Cabinet Mountain Wilderness v. Peterson*,
    685 F.2d 678 (D.C. Cir. 1982)........................................................................7

*Environmental Defense Fund v. EPA*,
    489 F.2d 1247 (D.C. Cir. 1973).....................................................................8

*J.D. v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019)...................................................................11

*La. Energy & Power Auth. v. FERC*,
    141 F.3d 364 (D.C. Cir. 1998).......................................................................9

*Lexmark Int'l v. Static Control Components*,
    572 U.S. 118 (2014).....................................................................................10

*N.Y. v. NRC*,
    681 F.3d 471 (D.C. Cir. 2012)...................................................................5, 9

*Nat'l Ass'n of Farmworkers Organizations v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980).....................................................................11

*Nevada v. DOE*,
    457 F.3d 78 (D.C. Cir. 2006).........................................................................8

*Realty Income Trust v. Eckerd*,
    564 F.2d 447 (D.C. Cir. 1977).................................................................10, 12

*Sierra Club v. Marsh*,
    769 F.2d 868 (1st Cir. 1985)..........................................................................7

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985).....................................................................12

**Regulations**

40 C.F.R. § 1508.1 ................................................................................................10

40 C.F.R. § 1508.4 ..................................................................................................3

47 C.F.R. § 1.1307(c).........................................................................................1, 3

**Other Authorities**

*Matter of Mitigation of Orbital Debris in the New Space Age*, FCC
    20-54, 2020 WL 2740796 (Apr. 24, 2020)...........................................................9

Satellite 2021 Conference:  The New World Order (Apr. 6, 2021),
    https://vimeo.com/540441944/5bdb02c6bf......................................................13

Delbert, *All the Satellites in Space Could Crack Open the Ozone
    Layer*, Popular Mechanics (2021),
    https://www.popularmechanics.com/space/satellites/a36651845/sat
    ellite-pollution-starlink-ozone/ ...........................................................................2

SpaceX, *Astronomy Discussion with National Academy of Sciences*
    (Apr. 28, 2020), *available at*
    https://www.spacex.com/updates/starlink-update-04-28-2020/ .........................7

Starlink Statistics, https://planet4589.org/space/stats/star/starstats.html
    (visited June 21, 2021).....................................................................................13

# INTRODUCTION

Viasat provided extensive evidence that SpaceX's deployment of nearly 3,000 satellites—approximately 30% of all satellites *ever* launched—will significantly impact the environment, polluting the atmosphere, altering the night sky, and materially increasing the risk of catastrophic collisions in low-Earth orbit (LEO). The Commission and SpaceX invoke deference to defend the Order's back-of-the-hand dismissal of these harms, but their oppositions depend on factual assertions found nowhere in the Order. Moreover, neither opposition disputes the *possibility* the Order will have significant environmental impacts—like the Order, they merely dispute the likelihood of such harm. But because significant harms "may" result, 47 C.F.R. § 1.1307(c), the Commission must evaluate likelihood through an environmental assessment (EA). This Court should not allow the Commission to blindly authorize conduct with presumably significant environmental consequences.

The irreparable harms to Viasat and the public far outweigh any harm to SpaceX. Neither the Commission nor SpaceX disputes that market entry by an environmentally reckless operator causes Viasat irreparable competitive harm. Viasat also faces increased risks and unrecoverable costs. The public interest, too, supports a stay. NEPA's core command is to weigh potential benefits against environmental harm. And though SpaceX asserts harm itself, as of mid-April

SpaceX did not even know if or when its application would be approved; it cannot plausibly claim that it would now suffer hardship from NEPA review that outweighs the harm to Viasat and the public from forgoing it.

SpaceX retreats to baseless attacks on Viasat and professed indignation that a competitor invoked NEPA. But Starlink's environmental threat is widely recognized. The Balance Group—whose interest is solely environmental—appealed the Order and supports a stay. And the environmental and scientific communities have sounded widespread alarm about Starlink.[1] Moreover, NEPA is not just for environmental non-profits. Viasat depends on space as a resource. It has a legitimate environmental interest in regulatory oversight to protect that resource from spoliation.[2]

---

[1] *See, e.g.*, A126-A142; A413-426; A444-451; Delbert, *All the Satellites in Space Could Crack Open the Ozone Layer*, Popular Mechanics (2021), https://www.popularmechanics.com/space/satellites/a36651845/satellite-pollution-starlink-ozone/

[2] This Court should at a minimum expedite the appeal. A motion to expedite will be filed next week, which will reflect the parties' positions on a proposed schedule. But expedition is insufficient relief: SpaceX will still launch hundreds of satellites before even an expedited appeal is resolved.

2

# ARGUMENT

I. **The Commission needed to prepare an environmental assessment.**

   A. **An assessment was required if the Order "may" significantly impact the environment.**

The Commission agrees (at 3) that an EA was necessary if the Order "may have a significant environmental impact." 47 C.F.R. § 1.1307(c). The question is not whether a significant impact is *probable*, but whether it is *possible*; if so, likelihood must be resolved through an EA. *See American Bird Conservancy v. FCC*, 516 F.3d 1027, 1033 (D.C. Cir. 2008).

SpaceX insists—without Commission support—that Viasat further show "extraordinary circumstances." Not so. The regulations SpaceX cites instruct agencies to develop procedures for identifying "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. The Commission's response was 47 C.F.R. § 1.1307(c), which requires an EA *whenever* a decision "may have a significant environmental impact." No additional extraordinary-circumstances inquiry is necessary.[3] A320-322.

---

[3] SpaceX argues (at 10-11)—again without Commission support—that Viasat challenged only the environmental effect of 42,000 satellites. That is wrong. *E.g.*, A094 (deploying "nearly 3,000 satellites is likely to have a significant effect on the environment"); A312 (same). Viasat is challenging the Order on the same basis on which the Commission ruled.

3

### B.  The harms from launching and deorbiting satellites are undisputed.

Viasat demonstrated, based on studies from third-party experts, that launching and deorbiting Starlink satellites may lead to: (1) damage to the atmosphere and ozone layer; and (2) human casualties from non-disintegrated satellite pieces.

1.  The Commission and SpaceX do not dispute that alumina warms the atmosphere and depletes the ozone layer.  A122.  Satellites could produce over twenty-two million pounds of alumina when they reenter the atmosphere, with Starlink being the biggest contributor.  A124, A442.  SpaceX contends, however, that Starlink will create "only" two million pounds of alumina—equivalent, it says, to 0.5% of all metals produced annually by meteorites.  FCC Opp. 22-23; SpaceX Opp. 13-14; A394.

Despite being the lynchpin of both oppositions, this 0.5% figure appears *nowhere* in the Order.  Indeed, SpaceX appears to have invented it.  The only source SpaceX cites is a chapter from a forty-year-old textbook, which says *nothing* about alumina.  A394; Supplemental Appendix ("SA") 152-217.  It certainly provides no basis for comparing alumina from Starlink to alumina from meteorites.  Viasat's evidence debunks SpaceX's comparison:  Meteorites contain insignificant quantities of aluminum, so aluminum from satellites would "*greatly*

4

*exceed* natural forms of high-altitude atmospheric aluminum deposition." A447 (emphasis added).

The actual alumina-related evidence thus shows a *likely* substantial environmental impact. This scenario—which, being generous to SpaceX, involves "'conflicting studies' and 'sharply divergent views'"—is precisely when an EA is required. *American Bird Conservancy*, 516 F.3d at 1034; *N.Y. v. NRC*, 681 F.3d 471, 482 (D.C. Cir. 2012) (agency may curtail assessment "[o]nly if the harm in question is so 'remote and speculative' as to reduce the effective probability of its occurrence to zero").

As to launches, the Commission suggests (at 21-22) that the FAA's assessment is sufficient. But the FAA reviewed effects "at or below 3,000 feet." SA071. It recognized that "emissions from operations at or above 3,000 feet … *would occur*"—they just "would not result in appreciable ground-level concentrations." *Id.* (emphasis added). The Commission cannot ignore upper atmospheric effects because the FAA considered *ground-level* impact.

SpaceX's response (at 14)—that the Commission found that SpaceX launches do not emit alumina—is simply false. SpaceX quotes the Commission's summary of SpaceX's argument—not the Commission's conclusion. *See* A055-056 (¶ 81). Moreover, *other* compounds released during SpaceX launches *also* deplete ozone. A439-442.

5

2. The Order contains two fatal flaws as to casualty risk: (1) SpaceX did not show that its current satellite design fully disintegrates; and (2) the technical analysis of SpaceX's prior satellites, on which the Order relied, actually states those satellites will *not* fully disintegrate. A057 (¶ 85); Mot. 12-13.

The Commission's response (at 20-21) contradicts itself. It first says that SpaceX validated that its older satellites are fully demisable. That is incorrect—SpaceX's "analysis using software purpose-built by NASA" proved its satellites are not fully demisable. A409. So the Commission tries to assert SpaceX's latest design is somehow different. But that contradicts the Order, which *ignored* the new satellites because it saw "no material difference" between the current satellites and those previously analyzed. A057 (¶¶ 84-85).

SpaceX relies (at 15) on the Order's reasoning—which the Commission seems to abandon—and argues that the new satellites are materially identical to the old. But SpaceX's own technical analysis conceded the prior satellites are *not* fully demisable, A409, so the Order's reasoning is indefensible.

C. **Mitigation does not justify ignoring light pollution.**

In response to evidence from third-party experts about Starlink's causing light pollution, the Commission and SpaceX shrug: It could be worse. Both suggest that because SpaceX has taken *some* steps to mitigate light pollution, there is no need for an EA. That is wrong.

6

Mitigation avoids the need for environmental assessment *only if* the mitigation obviates the environmental effect. As the Commission explains (at 26)—quoting *Cabinet Mountain Wilderness v. Peterson*, 685 F.2d 678, 682 (D.C. Cir. 1982)—mitigation does not "eliminate any need for additional review" unless the post-mitigation impact "is not significant." *See, e.g.*, *Sierra Club v. Marsh*, 769 F.2d 868, 877 (1st Cir. 1985) (potential mitigation "does not obviate the need" for review).

The Commission now says that Starlink won't have a significant post-mitigation impact, but the Order includes no such finding. The Commission "note[d] … SpaceX's representation" that it dimmed its satellites "from a 4.99 apparent magnitude to a 6.48 apparent magnitude" (lower magnitudes are brighter),[4] but never identified record support for this claim. In fact, SpaceX's website states: "Starlink satellites have an average apparent magnitude of 5.5 when on-station and brighter during orbit raise."[5] Moreover, SpaceX concedes that even magnitude 6.48 objects remain "visible to the naked eye."[6] The Commission (wisely) committed to monitor the situation—tacitly acknowledging significant

---

[4] A058 n.351; A059.

[5] *See* SpaceX, *Astronomy Discussion with National Academy of Sciences* (Apr. 28, 2020), *available at* https://www.spacex.com/updates/starlink-update-04-28-2020/.

[6] *Id.*; *see also* SA007-008; A398-400.

7

risk. Indisputably Starlink will change the sky when, even post-mitigation, its satellites are plainly visible:



Figure 5.11. Starlink-1436 (Visorsat) as imaged by the Zeiss 1.23m telescope at Calar Alto, Spain on 20 September 2020. Visorsat (at 555 km orbital height) is the trail seen in the bottom left. A second trail from in the upper middle corresponds to Starlink-1348 (at 386 km orbital height).

A340.

### D.  The Commission's orbital-debris analysis does not satisfy NEPA.

Viasat provided extensive evidence that Starlink will increase space pollution. The Commission does not dispute that it had to conduct *some* review of space pollution, but appears to suggest that analysis through its orbital-debris regime should suffice.[7] A044 (¶ 56). That analysis, however, is incomplete. The Commission acknowledged that SpaceX's satellites pose a collision risk as large as

---

[7] The Commission's cases do not suggest such informal review is sufficient. *See Nevada v. DOE*, 457 F.3d 78, 90 (D.C. Cir. 2006) (agency already *prepared an EIS*); *Environmental Defense Fund v. EPA*, 489 F.2d 1247, 1257 (D.C. Cir. 1973)

8

1-in-44.5. A048 (¶ 63). But the Commission never resolved the precise level of risk, "a matter of significant contention in the record," nor did it identify what level of risk would be acceptable. *See* A044-048 (¶¶ 58, 61, 63-64). The Commission cannot hide behind the orbital-debris regulation to suggest it satisfied NEPA—particularly when the Commission acknowledges its existing regulations are out-of-date. *See Matter of Mitigation of Orbital Debris in the New Space Age*, FCC 20-54, 2020 WL 2740796, at *57-62 (Apr. 24, 2020). Moreover, while the Commission elsewhere warned of the dangers of orbital debris, the Order does not grapple with the results of a collision. *See N.Y.*, 681 F.3d at 482 (agency "must examine both the probability of a given harm occurring *and* the consequences of that harm if it does occur").

## II. Viasat has standing and is within NEPA's zone of interests.

Viasat has Article III standing. Contrary to the Commission (at 16-18), Viasat's harm is not "speculative": the failure to conduct proper environmental review results in a material risk to Viasat's satellites. Mot. 18-19. Viasat also has an Article III injury because the Commission "lift[ed] regulatory restrictions on [Viasat's] competitors or otherwise allow[ed] increased competition." *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998).

---

(agency was *already* "engaged primarily in an examination of environmental questions").

9

So the Commission pivots to a non-jurisdictional question: whether Viasat is within NEPA's zone of interests. The zone-of-interests inquiry is "not especially demanding": A plaintiff fails only if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that" Congress could not have meant to authorize the suit. *Lexmark Int'l v. Static Control Components*, 572 U.S. 118, 130 (2014) (citation omitted). NEPA's zone of interests is "very broad[]." *Realty Income Trust v. Eckerd*, 564 F.2d 447, 453 n.11 (D.C. Cir. 1977). The statute's reach extends to a wide range of "effects"—including "economic" ones. 40 C.F.R. § 1508.1.

Viasat's petition fits well within NEPA's capacious zone. Viasat has an interest in preserving the shared orbital environment and ensuring that environmentally reckless uses undergo appropriate scrutiny. Mot. 18-20. Contrary to both oppositions, "a party is not disqualified from asserting a legal claim under NEPA [just] because the impetus behind the NEPA claim may be economic." *Eckerd*, 564 F.2d at 452 (citation and brackets omitted). A suit is barred only if the challenger—unlike Viasat—has *no arguable environmental interest*. *See id.*; *Lexmark*, 572 U.S. at 130. Challenging environmental shortcuts by a competitor is entirely proper under NEPA.

**III.   Viasat faces irreparable injury.**

SpaceX concedes (at 19) that it will launch nearly 1,500 satellites in the next year absent a stay. These satellites—approximately 15% of those *ever* launched—create a likelihood of substantial and irreparable injury to Viasat.

By massively increasing the satellites in LEO, SpaceX puts key Viasat operations at risk, especially in LEO. Mot. 17-19. Viasat already operates one satellite for the U.S. government at common altitude with SpaceX, and will launch another for the Defense Department during this appeal. A481-482. *Any* collision in LEO risks generating debris fields that would irreparably damage Viasat satellites and impacts Viasat's ability to traverse LEO. Mot. 18-19. SpaceX and the Commission brush off Viasat's LEO operations as involving just a few satellites. But unlike Starlink, Viasat's satellites are not expendable—especially those serving the DoD—and damage to them would irreparably harm Viasat.

The Commission and SpaceX argue that a significant *risk* of irreparable harm is insufficient. But this Court has consistently found irreparable injury from risk of harm that could not later be remedied. *E.g.*, *J.D. v. Azar*, 925 F.3d 1291, 1337 (D.C. Cir. 2019) ("increased health risks" and "perhaps" the inability to obtain abortion); *Nat'l Ass'n of Farmworkers Organizations v. Marshall*, 628 F.2d 604, 613 (D.C. Cir. 1980) ("risk of harm" from "exposure" to a pesticide). Even the cases the Commission and SpaceX cite recognize that a "likelihood" of harm is

11

sufficient, especially when the harm "has occurred in the past." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Collisions *have* occurred in the past; the International Space Station experienced one recently. A492-495.

Collision risk aside, SpaceX's crowding of LEO over the next year will increase the costs and complexities of Viasat's upcoming launches, irrecoverably. Mot. 19; A501-502. Contrary to the Commission (at 27-28), this is not speculative: Viasat provided uncontroverted testimony, consistent with statements from others. A501-502.

The Order will also lead to unlawful competition from a system built to foist environmental externalities onto others. Mot. 20. No party disputes that competitive injury *will* occur. SpaceX's claim (at 17) that competitive injuries are categorically not irreparable is only true when damages are later recoverable. Viasat cannot recover from the Commission or SpaceX, and competitive injuries like lost goodwill or market opportunities are *always* irreparable. Mot. 20-21. The Commission claims (at 28) that Viasat's "competitive position could be restored" if Viasat wins this appeal. But Viasat cannot recover opportunities already lost. And letting SpaceX keep launching may affect the Commission's willingness to consider meaningful relief on remand if Viasat prevails. *Eckerd*, 564 F.2d at 456-457.

## IV. The balance of harms and public interest support a stay.

The public will suffer irreparable harm absent a stay: expert third-party evidence shows that SpaceX's launch of nearly 1,500 satellites will cause precisely the "irreversible effects on the environment" that NEPA abhors, and could render NEPA review an "empty gesture." *Id.* While a stay would pause Starlink's deployment, NEPA's premise is that even beneficial agency action should first have its environmental ramifications assessed. Nothing about the Order justifies forsaking this vital analysis.

Until recently, SpaceX did not know if or when its application might be approved; the idea that briefly staying that approval would cause significant commercial disruption is implausible. Moreover, the Commission warned SpaceX that investments made under the Order "assume[d] the risk" of additional conditions and limitations. Mot. 22 & n.3 (quoting A065-066 (¶ 97(w)). Finally, Starlink is currently operating far below capacity. According to SpaceX, each Starlink satellite can serve many thousands of people.[8] But SpaceX's existing fleet of 1,600-plus satellites[9] serves only 10,000 customers (A461)—or six per satellite.

---

[8] *See* Satellite 2021 Conference: The New World Order (Apr. 6, 2021), 47:47, https://vimeo.com/540441944/5bdb02c6bf (asserting SpaceX's full constellation could serve approximately 60 million customers).

[9] *See* Starlink Statistics, https://planet4589.org/space/stats/star/starstats.html (visited June 21, 2021).

13

SpaceX can add millions of customers even if further deployment pauses during the appeal.

## CONCLUSION

The Court should grant the stay.

Dated: June 21, 2021

OF COUNSEL:

John P. Janka
Jarrett S. Taubman
VIASAT, INC.
901 K Street NW, Suite 400
Washington, DC 20001

Colin L. Ward
VIASAT, INC.
6155 El Camino Real
Carlsbad, CA 92009

Respectfully submitted,

/s/ *William M. Jay*
William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000
wjay@goodwinlaw.com

David J. Zimmer
Gerard J. Cedrone
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
dzimmer@goodwinlaw.com
gcedrone@goodwinlaw.com

*Counsel for Viasat, Inc.*

## CERTIFICATE OF COMPLIANCE

I, William M. Jay, counsel for Appellant, hereby certify pursuant to Fed. R. App. P. 32(g) that the Motion for a Stay complies with the type-volume limitations of Fed. R. App. P. 27(d)(2). This motion was prepared in a proportionally spaced typeface using 14 point, Times New Roman font, and according to the word count of Microsoft Word, the word-processing system used to prepare the motion, the motion contains 2,600 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

Dated:  June 21, 2021                               */s/ William M. Jay*
                                                                    William M. Jay

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2021 I electronically filed the foregoing document with the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. I certify that the counsel of record for Appellee and Movant-Intervenor are registered as ECF Filers and that they will be served by the CM/ECF system.

*/s/ William M. Jay*
William M. Jay
