**No. 21-1123 (and consolidated cases 21-1125, 21-1127, 21-1128)**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

VIASAT, INC.,
*Appellant,*

v.

FEDERAL COMMUNICATIONS COMMISSION,
*Appellee/Respondent,*

THE UNITED STATES OF AMERICA,
*Respondent,*

SPACE EXPLORATION HOLDINGS, LLC,
*Intervenor.*

On Notices of Appeal and Petition for Review of an Order of
the Federal Communications Commission

### STATUTORY ADDENDUM

Richard A. Powers
*Acting Assistant Attorney
General,
Antitrust Division*

Todd Kim
*Assistant Attorney General,
Environment and Natural
Resources Division*

Robert B. Nicholson
Robert B. Wiggers
Justin Heminger
Allen Brabender
*Attorneys*

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

P. Michele Ellison
*Acting General Counsel*

Jacob M. Lewis
*Associate General Counsel*

James M. Carr
Rachel Proctor May
*Counsel*

FEDERAL COMMUNICATIONS
COMMISSION
45 L Street NE
Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

# Contents

42 U.S.C. § 4321 ................................................................ 1

42 U.S.C. § 4331(a) ........................................................... 1

47 U.S.C. § 301 ................................................................ 2

47 U.S.C. § 307(a) ........................................................... 3

47 U.S.C. § 308(a) ........................................................... 3

47 U.S.C. § 309(a) ........................................................... 4

47 U.S.C. § 312(a) ........................................................... 4

47 U.S.C. § 316(a)(1) ....................................................... 5

47 U.S.C. § 402(a), (b)(6), (c) ........................................ 5

47 U.S.C. § 405(a) ........................................................... 7

47 U.S.C. § 503(b)(1) ...................................................... 8

40 C.F.R. § 1501.3 ......................................................... 10

40 C.F.R. § 1501.4 ......................................................... 11

40 C.F.R. § 1502.16(b) ................................................... 11

40 C.F.R. § 1507.3(a), (d)(6), (e)(2)(ii) ......................... 12

40 C.F.R. § 1508.1(g) ..................................................... 13

47 C.F.R. § 1.3 ............................................................... 14

47 C.F.R. § 1.17(a)(1), (b)(1) ........................................ 14

47 C.F.R. § 1.1306 ......................................................... 15

47 C.F.R. § 1.1307(a), (c) .............................................. 17

47 C.F.R. § 1.1311(e) ..................................................... 19

47 C.F.R. § 2.1(c) ........................................................... 20

47 C.F.R. § 25.103 ......................................................... 20

47 C.F.R. § 25.114(d)(14)(iii)-(iv) ................................. 22

47 C.F.R. § 25.117(d)(2)(ii) ........................................... 23

47 C.F.R. § 25.146(a)(1)(iii) (2017) ............................... 24

47 C.F.R. § 25.146(a), (c), (d)(2)............................................................25

47 C.F.R. § 25.289 .................................................................................26

## 42 U.S.C. § 4321
## § 4321. Congressional declaration of purpose

The purposes of this chapter are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

## 42 U.S.C. § 4331(a)
## § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

## 47 U.S.C. § 301

## § 301. License for radio communication or transmission of energy

It is the purpose of this chapter, among other things, to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license. No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District; or (b) from any State, Territory, or possession of the United States, or from the District of Columbia to any other State, Territory, or possession of the United States; or (c) from any place in any State, Territory, or possession of the United States, or in the District of Columbia, to any place in any foreign country or to any vessel; or (d) within any State when the effects of such use extend beyond the borders of said State, or when interference is caused by such use or operation with the transmission of such energy, communications, or signals from within said State to any place beyond its borders, or from any place beyond its borders to any place within said State, or with the transmission or reception of such energy, communications, or signals from and/or to places beyond the borders of said State; or (e) upon any vessel or aircraft of the United States (except as provided in section 303(t) of this title); or (f) upon any other mobile stations within the jurisdiction of the United States, except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

## 47 U.S.C. § 307(a)
## § 307. Licenses

(a) Grant

The Commission, if public convenience, interest, or necessity will be served thereby, subject to the limitations of this chapter, shall grant to any applicant therefor a station license provided for by this chapter.

## 47 U.S.C. § 308(a)
## § 308. Requirements for license

(a) Writing; exceptions

The Commission may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor received by it: *Provided*, That (1) in cases of emergency found by the Commission involving danger to life or property or due to damage to equipment, or (2) during a national emergency proclaimed by the President or declared by the Congress and during the continuance of any war in which the United States is engaged and when such action is necessary for the national defense or security or otherwise in furtherance of the war effort, or (3) in cases of emergency where the Commission finds, in the nonbroadcast services, that it would not be feasible to secure renewal applications from existing licensees or otherwise to follow normal licensing procedure, the Commission may grant construction permits and station licenses, or modifications or renewals thereof, during the emergency so found by the Commission or during the continuance of any such national emergency or war, in such manner and upon such terms and conditions as the Commission shall by regulation prescribe, and without the filing of a formal application, but no authorization so granted shall continue in effect beyond the period of the emergency or war requiring it: *Provided further*, That the Commission may issue by cable, telegraph, or radio a permit for the operation of a station on a vessel of the United States at sea, effective in lieu of a license until said vessel shall return to a port of the continental United States.

Stat. Add. 3

## 47 U.S.C. § 309(a)
## § 309. Application for license

(a) Considerations in granting application

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

## 47 U.S.C. § 312(a)
## § 312. Administrative sanctions

(a) Revocation of station license or construction permit

The Commission may revoke any station license or construction permit--

(1) for false statements knowingly made either in the application or in any statement of fact which may be required pursuant to section 308 of this title;

(2) because of conditions coming to the attention of the Commission which would warrant it in refusing to grant a license or permit on an original application;

(3) for willful or repeated failure to operate substantially as set forth in the license;

(4) for willful or repeated violation of, or willful or repeated failure to observe any provision of this chapter or any rule or regulation of the Commission authorized by this chapter or by a treaty ratified by the United States;

(5) for violation of or failure to observe any final cease and desist order issued by the Commission under this section;

Stat. Add. 4

(6) for violation of section 1304, 1343, or 1464 of Title 18; or

(7) for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station, other than a non-commercial educational broadcast station, by a legally qualified candidate for Federal elective office on behalf of his candidacy.

## 47 U.S.C. § 316(a)(1)
## § 316. Modification by Commission of station licenses or construction permits; burden of proof

(a)(1) Any station license or construction permit may be modified by the Commission either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity, or the provisions of this chapter or of any treaty ratified by the United States will be more fully complied with. No such order of modification shall become final until the holder of the license or permit shall have been notified in writing of the proposed action and the grounds and reasons therefor, and shall be given reasonable opportunity, of at least thirty days, to protest such proposed order of modification; except that, where safety of life or property is involved, the Commission may by order provide, for a shorter period of notice.

## 47 U.S.C. § 402(a), (b)(6), (c)
## § 402. Judicial review of Commission's orders and decisions

(a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

(b) Right to appeal

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

* * *

(6) By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

(c) Filing notice of appeal; contents; jurisdiction; temporary orders

Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of. Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission. Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper. Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

## 47 U.S.C. § 405(a)

## § 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order

(a) After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: *Provided,* That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition.

Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

## 47 U.S.C. § 503(b)(1)
## § 503. Forfeitures

**\* \* \***

(b) Activities constituting violations authorizing imposition of forfeiture penalty; amount of penalty; procedures applicable; persons subject to penalty; liability exemption period

> (1) Any person who is determined by the Commission, in accordance with paragraph (3) or (4) of this subsection, to have--

>> (A) willfully or repeatedly failed to comply substantially with the terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission;

>> (B) willfully or repeatedly failed to comply with any of the provisions of this chapter or of any rule, regulation, or order issued by the Commission under this chapter or under any treaty, convention, or other agreement to which the United States is a party and which is binding upon the United States;

>> (C) violated any provision of section 317(c) or 509(a) of this title; or

(D) violated any provision of section 1304, 1343, 1464, or 2252 of Title 18;

shall be liable to the United States for a forfeiture penalty. A forfeiture penalty under this subsection shall be in addition to any other penalty provided for by this chapter; except that this subsection shall not apply to any conduct which is subject to forfeiture under subchapter II of this chapter, part II or III of subchapter III of this chapter, or section 507 of this title.

# 40 C.F.R. § 1501.3
## § 1501.3 Determine the appropriate level of NEPA review.

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:

> (1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

> (2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

> (3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions consistent with § 1501.9(e)(1).

> (1) In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

> (2) In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

> > (i) Both short- and long-term effects.

> > (ii) Both beneficial and adverse effects.

> > (iii) Effects on public health and safety.

> > (iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

## 40 C.F.R. § 1501.4
## § 1501.4 Categorical exclusions.

(a) For efficiency, agencies shall identify in their agency NEPA procedures (§ 1507.3(e)(2)(ii) of this chapter) categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

(1) If an extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects.

(2) If the agency cannot categorically exclude the proposed action, the agency shall prepare an environmental assessment or environmental impact statement, as appropriate.

## 40 C.F.R. § 1502.16(b)
## § 1502.16 Environmental consequences.

* * *

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

## 40 C.F.R. § 1507.3(a), (d)(6), (e)(2)(ii)
## § 1507.3 Agency NEPA procedures.

(a) Where existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply, consistent with § 1506.13 of this chapter, unless there is a clear and fundamental conflict with the requirements of another statute. The Council has determined that the categorical exclusions contained in agency NEPA procedures as of September 14, 2020 are consistent with this subchapter.

\* \* \*

(d) Agency procedures should identify those activities or decisions that are not subject to NEPA, including:

\* \* \*

(6) Actions where the agency has determined that another statute's requirements serve the function of agency compliance with the Act.

(e) Agency procedures shall comply with the regulations in this subchapter except where compliance would be inconsistent with statutory requirements and shall include:

\* \* \*

(2) Specific criteria for and identification of those typical classes of action:

\* \* \*

(ii) Which normally do not require either an environmental impact statement or an environmental assessment and do not have a significant effect on the human environment (categorical exclusions (§ 1501.4 of this chapter)). Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect. Agency NEPA procedures

shall identify when documentation of a categorical exclusion determination is required.

## 40 C.F.R. § 1508.1(g)
## § 1508.1 Definitions.

\* \* \*

(g) Effects or impacts means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

(2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action.

(3) An agency's analysis of effects shall be consistent with this paragraph (g). Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed.

## 47 C.F.R. § 1.3
## § 1.3 Suspension, amendment, or waiver of rules.

The provisions of this chapter may be suspended, revoked, amended, or waived for good cause shown, in whole or in part, at any time by the Commission, subject to the provisions of the Administrative Procedure Act and the provisions of this chapter. Any provision of the rules may be waived by the Commission on its own motion or on petition if good cause therefor is shown.

## 47 C.F.R. § 1.17(a)(1), (b)(1)
## § 1.17 Truthful and accurate statements to the Commission.

(a) In any investigatory or adjudicatory matter within the Commission's jurisdiction (including, but not limited to, any informal adjudication or informal investigation but excluding any declaratory ruling proceeding) and in any proceeding to amend the FM or Television Table of Allotments (with respect to expressions of interest) or any tariff proceeding, no person subject to this rule shall;

(1) In any written or oral statement of fact, intentionally provide material factual information that is incorrect or intentionally omit material information that is necessary to prevent any material factual statement that is made from being incorrect or misleading;

* * *

(b) For purpose of paragraph (a) of this section, "persons subject to this rule" shall mean the following:

(1) Any applicant for any Commission authorization;

**47 C.F.R. § 1.1306**
## § 1.1306 Actions which are categorically excluded from environmental processing.

(a) Except as provided in § 1.1307 (c) and (d), Commission actions not covered by § 1.1307 (a) and (b) are deemed individually and cumulatively to have no significant effect on the quality of the human environment and are categorically excluded from environmental processing.

(b) Specifically, any Commission action with respect to any new application, or minor or major modifications of existing or authorized facilities or equipment, will be categorically excluded, provided such proposals do not:

> (1) Involve a site location specified under § 1.1307(a) (1)–(7), or

> (2) Involve high intensity lighting under § 1.1307(a)(8).

> (3) Result in human exposure to radiofrequency radiation in excess of the applicable safety standards specified in § 1.1307(b).

(c)(1) Unless § 1.1307(a)(4) is applicable, the provisions of § 1.1307(a) requiring the preparation of EAs do not encompass the construction of wireless facilities, including deployments on new or replacement poles, if:

> (i) The facilities will be located in a right-of-way that is designated by a Federal, State, local, or Tribal government for communications towers, above-ground utility transmission or distribution lines, or any associated structures and equipment;

> (ii) The right-of-way is in active use for such designated purposes; and

> (iii) The facilities would not

>> (A) Increase the height of the tower or non-tower structure by more than 10% or twenty feet, whichever is greater, over existing support structures that are

located in the right-of-way within the vicinity of the proposed construction;

(B) Involve the installation of more than four new equipment cabinets or more than one new equipment shelter;

(C) Add an appurtenance to the body of the structure that would protrude from the edge of the structure more than twenty feet, or more than the width of the structure at the level of the appurtenance, whichever is greater (except that the deployment may exceed this size limit if necessary to shelter the antenna from inclement weather or to connect the antenna to the tower via cable); or

(D) Involve excavation outside the current site, defined as the area that is within the boundaries of the leased or owned property surrounding the deployment or that is in proximity to the structure and within the boundaries of the utility easement on which the facility is to be deployed, whichever is more restrictive.

(2) Such wireless facilities are subject to § 1.1307(b) and require EAs if their construction would result in human exposure to radiofrequency radiation in excess of the applicable health and safety guidelines cited in § 1.1307(b).

Note 1: The provisions of § 1.1307(a) requiring the preparation of EAs do not encompass the mounting of antenna(s) and associated equipment (such as wiring, cabling, cabinets, or backup-power), on or in an existing building, or on an antenna tower or other man-made structure, unless § 1.1307(a)(4) is applicable. Such antennas are subject to § 1.1307(b) of this part and require EAs if their construction would result in human exposure to radiofrequency radiation in excess of the applicable health and safety guidelines cited in § 1.1307(b) of this part. The provisions of § 1.1307 (a) and (b) of this part do not encompass the installation of aerial wire or cable over existing aerial corridors of prior or permitted

use or the underground installation of wire or cable along existing underground corridors of prior or permitted use, established by the applicant or others. The use of existing buildings, towers or corridors is an environmentally desirable alternative to the construction of new facilities and is encouraged. The provisions of § 1.1307(a) and (b) of this part do not encompass the construction of new submarine cable systems.

Note 2: The specific height of an antenna tower or supporting structure, as well as the specific diameter of a satellite earth station, in and of itself, will not be deemed sufficient to warrant environmental processing, see § 1.1307 and § 1.1308, except as required by the Bureau pursuant to the Note to § 1.1307(d).

Note 3: The construction of an antenna tower or supporting structure in an established "antenna farm": (i.e., an area in which similar antenna towers are clustered, whether or not such area has been officially designated as an antenna farm), will be categorically excluded unless one or more of the antennas to be mounted on the tower or structure are subject to the provisions of § 1.1307(b) and the additional radiofrequency radiation from the antenna(s) on the new tower or structure would cause human exposure in excess of the applicable health and safety guidelines cited in § 1.1307(b).


## 47 C.F.R. § 1.1307(a), (c)
## § 1.1307 Actions that may have a significant environmental effect, for which Environmental Assessments (EAs) must be prepared.

(a) Commission actions with respect to the following types of facilities may significantly affect the environment and thus require the preparation of EAs by the applicant (see §§ 1.1308 and 1.1311) and may require further Commission environmental processing (see §§ 1.1314, 1.1315 and 1.1317):

> (1) Facilities that are to be located in an officially designated wilderness area.

(2) Facilities that are to be located in an officially designated wildlife preserve.

(3) Facilities that:

> (i) May affect listed threatened or endangered species or designated critical habitats; or

> (ii) are likely to jeopardize the continued existence of any proposed endangered or threatened species or likely to result in the destruction or adverse modification of proposed critical habitats, as determined by the Secretary of the Interior pursuant to the Endangered Species Act of 1973.

Note: The list of endangered and threatened species is contained in 50 CFR 17.11, 17.22, 222.23(a) and 227.4. The list of designated critical habitats is contained in 50 CFR 17.95, 17.96 and part 226. To ascertain the status of proposed species and habitats, inquiries may be directed to the Regional Director of the Fish and Wildlife Service, Department of the Interior.

(4) Facilities that may affect districts, sites, buildings, structures or objects, significant in American history, architecture, archeology, engineering or culture, that are listed, or are eligible for listing, in the National Register of Historic Places (see 54 U.S.C. 300308; 36 CFR parts 60 and 800), and that are subject to review pursuant to section 1.1320 and have been determined through that review process to have adverse effects on identified historic properties.

(5) Facilities that may affect Indian religious sites.

(6) Facilities to be located in floodplains, if the facilities will not be placed at least one foot above the base flood elevation of the floodplain.

(7) Facilities whose construction will involve significant change in surface features (e.g., wetland fill, deforestation or water diversion). (In the case of wetlands on Federal property, see Executive Order 11990.)

(8) Antenna towers and/or supporting structures that are to be equipped with high intensity white lights which are to be located in residential neighborhoods, as defined by the applicable zoning law.

(c) If an interested person alleges that a particular action, otherwise categorically excluded, will have a significant environmental effect, the person shall electronically submit to the Bureau responsible for processing that action a written petition setting forth in detail the reasons justifying or circumstances necessitating environmental consideration in the decision-making process. If an interested person is unable to submit electronically or if filing electronically would be unreasonably burdensome, such person may submit the petition by mail, with a request for waiver under § 1.1304(b). (See § 1.1313). The Bureau shall review the petition and consider the environmental concerns that have been raised. If the Bureau determines that the action may have a significant environmental impact, the Bureau will require the applicant to prepare an EA (see §§ 1.1308 and 1.1311), which will serve as the basis for the determination to proceed with or terminate environmental processing.

## 47 C.F.R. § 1.1311(e)
## § 1.1311 Environmental information to be included in the environmental assessment (EA).

\* \* \*

(e) An EA need not be submitted to the Commission if another agency of the Federal Government has assumed responsibility for determining whether of the facilities in question will have a significant effect on the quality of the human environment and, if it will, for invoking the environmental impact statement process.

## 47 C.F.R. § 2.1(c)
## § 2.1 Terms and definitions.

* * *

(c) The following terms and definitions are issued:

* * *

Harmful Interference. Interference which endangers the functioning of a radionavigation service or of other safety services or seriously degrades, obstructs, or repeatedly interrupts a radiocommunication service operating in accordance with [the ITU] Radio Regulations. (CS)

## 47 C.F.R. § 25.103
## § 25.103 Definitions.

Terms with definitions including the "(RR)" designation are defined in the same way in § 2.1 of this chapter and in the Radio Regulations of the International Telecommunication Union.

* * *

Equivalent Power Flux Density (EPFD). The sum of the power flux densities produced at a geostationary-orbit receive earth or space station on the Earth's surface or in the geostationary orbit, as appropriate, by all the transmit stations within a non-geostationary-orbit Fixed–Satellite Service system, taking into account the off-axis discrimination of a reference receiving antenna assumed to be pointing in its nominal direction. The equivalent power flux density, in $dB(W/m^2)$ in the reference bandwidth, is calculated using the following formula:

Where:

$N_a$ is the number of transmit stations in the non-geostationary orbit system that are visible from the GSO receive station considered on the Earth's surface or in the geostationary orbit, as appropriate;

i is the index of the transmit station considered in the non-geostationary orbit system;

Stat. Add. 20

$P_i$ is the RF power at the input of the antenna of the transmit station, considered in the non-geostationary orbit system in dBW in the reference bandwidth;

$\theta i$ is the off-axis angle between the boresight of the transmit station considered in the non-geostationary orbit system and the direction of the GSO receive station;

$G_t(\theta_i)$ is the transmit antenna gain (as a ratio) of the station considered in the non-geostationary orbit system in the direction of the GSO receive station;

$d_i$ is the distance in meters between the transmit station considered in the non-geostationary orbit system and the GSO receive station;

$\varphi_i$ is the off-axis angle between the boresight of the antenna of the GSO receive station and the direction of the ith transmit station considered in the non-geostationary orbit system;

$G_r(\theta_i)$ is the receive antenna gain (as a ratio) of the GSO receive station in the direction of the ith transmit station considered in the non-geostationary orbit system;

$G_{r,max}$ is the maximum gain (as a ratio) of the antenna of the GSO receive station.

* * *

Power flux density (PFD). The amount of power flow through a unit area within a unit bandwidth. The units of power flux density are those of power spectral density per unit area, namely watts per hertz per square meter. These units are generally expressed in decibel form as $dB(W/Hz/m^2)$, $dB(W/m^2)$ in a 4 kHz band, or $dB(W/m^2)$ in a 1 MHz band.

## 47 C.F.R. § 25.114(d)(14)(iii)-(iv)
## § 25.114 Applications for space station authorizations.

* * *

(d) The following information in narrative form shall be contained in each application, except space station applications filed pursuant to § 25.122 or § 25.123:

* * *

(14) A description of the design and operational strategies that will be used to mitigate orbital debris, including the following information:

* * *

(iii) A statement that the space station operator has assessed and limited the probability of the space station becoming a source of debris by collisions with large debris or other operational space stations. Where a space station will be launched into a low–Earth orbit that is identical, or very similar, to an orbit used by other space stations, the statement must include an analysis of the potential risk of collision and a description of what measures the space station operator plans to take to avoid in-orbit collisions. If the space station operator is relying on coordination with another system, the statement must indicate what steps have been taken to contact, and ascertain the likelihood of successful coordination of physical operations with, the other system. The statement must disclose the accuracy—if any—with which orbital parameters of non-geostationary satellite orbit space stations will be maintained, including apogee, perigee, inclination, and the right ascension of the ascending node(s). In the event that a system is not able to maintain orbital tolerances, i.e., it lacks a propulsion system for orbital maintenance, that fact should be included in the debris mitigation disclosure. Such systems must also indicate the anticipated evolution over time of the orbit of

Stat. Add. 22

the proposed satellite or satellites. Where a space station requests the assignment of a geostationary–Earth orbit location, it must assess whether there are any known satellites located at, or reasonably expected to be located at, the requested orbital location, or assigned in the vicinity of that location, such that the station keeping volumes of the respective satellites might overlap. If so, the statement must include a statement as to the identities of those parties and the measures that will be taken to prevent collisions;

(iv) A statement detailing the post-mission disposal plans for the space station at end of life, including the quantity of fuel—if any—that will be reserved for post-mission disposal maneuvers. For geostationary–Earth orbit space stations, the statement must disclose the altitude selected for a post-mission disposal orbit and the calculations that are used in deriving the disposal altitude. The statement must also include a casualty risk assessment if planned post-mission disposal involves atmospheric re-entry of the space station. In general, an assessment should include an estimate as to whether portions of the spacecraft will survive re-entry and reach the surface of the Earth, as well as an estimate of the resulting probability of human casualty. Applicants for space stations to be used only for commercial remote sensing may, in lieu of submitting detailed post-mission disposal plans to the Commission, certify that they have submitted such plans to the National Oceanic and Atmospheric Administration for review.

## 47 C.F.R. § 25.117(d)(2)(ii)
## § 25.117 Modification of station license.

* * *

(d)(2) Applications for modifications of space station authorizations will be granted except under the following circumstances:

* * *

(ii) Granting the modification request would not serve the public interest, convenience, and necessity.

### 47 C.F.R. § 25.146(a)(1)(iii) (2017)
### § 25.146 Licensing and operating rules for the NGSO FSS in the 10.7–14.5 GHz bands.

(a) A comprehensive technical showing shall be submitted for the proposed non-geostationary satellite orbit Fixed–Satellite Service (NGSO FSS) system in the 10.7–14.5 GHz bands. The technical information shall demonstrate that the proposed NGSO FSS system would not exceed the validation equivalent power flux-density (EPFD) limits as specified in § 25.208(g), (k), and (l) for $EPFD_{down}$, and $EPFD_{up}$. If the technical demonstration exceeds the validation EPFD limits at any test points within the U.S. for domestic service and at any points outside of the U.S. for international service or at any points in the geostationary satellite orbit, as appropriate, the application would be unacceptable for filing and will be returned to the applicant with a brief statement identifying the non-compliance technical demonstration. The technical showing consists of the following:

(1) Single-entry validation equivalent power flux-density, in the space-to-Earth direction, ($EPFD_{down}$) limits.

* * *

(iii) If a computer program that has been approved by the ITU for determining compliance with the single-entry $EPFD_{down}$ validation limits is not yet available, the applicant shall provide a computer program for the single-entry $EPFD_{down}$ validation computation, including both the source code and the executable file. This computer program shall be developed in accordance with the specification stipulated in the most recent version of Recommendation ITU–R S.1503. If the applicant uses the ITU approved software, the

applicant shall indicate the program name and the version used.

### 47 C.F.R. § 25.146(a), (c), (d)(2)
### § 25.146 Licensing and operating provisions for NGSO FSS space stations.

(a) An NGSO FSS applicant proposing to operate in the 10.7–30 GHz frequency range must certify that it will comply with:

(1) Any applicable power flux-density levels in Article 21, Section V, Table 21–4 of the ITU Radio Regulations (incorporated by reference, § 25.108), except that in the 19.3–19.4 GHz and 19.6–19.7 GHz bands applicants must certify that they will comply with the ITU PFD limits governing NGSO FSS systems in the 17.7–19.3 GHz band; and

(2) Any applicable equivalent power flux-density levels in Article 22, Section II, and Resolution 76 of the ITU Radio Regulations (both incorporated by reference, § 25.108).

* * *

(c) Prior to the initiation of service, an NGSO FSS operator licensed or holding a market access authorization to operate in the 10.7–30 GHz frequency range must receive a "favorable" or "qualified favorable" finding by the ITU Radiocommunication Bureau, in accordance with Resolution 85 of the ITU Radio Regulations (incorporated by reference, § 25.108), regarding its compliance with applicable ITU EPFD limits. In addition, a market access holder in these bands must:

(1) Communicate the ITU finding to the Commission; and

(2) Submit the input data files used for the ITU validation software.

(d) Coordination will be required between NGSO FSS systems and GSO FSS earth stations in the 10.7–12.75 GHz band when:

Stat. Add. 25

* * *

(2) The $EPFD_{down}$ radiated by the NGSO satellite system into the GSO specific receive earth station, either within the U.S. for domestic service or any points outside the U.S. for international service, as calculated using the ITU software for examining compliance with EPFD limits exceeds—174.5 dB(W/(m²/40kHz)) for any percentage of time for NGSO systems with all satellites only operating at or below 2500 km altitude, or—202 dB(W/(m²/40kHz)) for any percentage of time for NGSO systems with any satellites operating above 2500 km altitude.

## 47 C.F.R. § 25.289
## § 25.289 Protection of GSO networks by NGSO systems.

Unless otherwise provided in this chapter, an NGSO system licensee must not cause unacceptable interference to, or claim protection from, a GSO FSS or GSO BSS network. An NGSO FSS licensee operating in compliance with the applicable equivalent power flux-density limits in Article 22, Section II of the ITU Radio Regulations (incorporated by reference, § 25.108) will be considered as having fulfilled this obligation with respect to any GSO network.