No. 21-1123 (and consolidated cases)

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

VIASAT, et al.,

*Appellants,*

v.

FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,

*Appellees,*

SPACE EXPLORATION HOLDINGS, LLC,

*Intervenor.*

―――――――――

On Appeal of an Order of the
Federal Communications Commission

―――――――――

## PETITION FOR PANEL REHEARING OR FOR REHEARING EN BANC

―――――――――

Jeffrey H. Blum
Alison Minea
Hadass Kogan
**DISH NETWORK CORPORATION**
1110 Vermont Avenue NW
Suite 450
Washington, D.C.  20005

Pantelis Michalopoulos
Andrew M. Golodny
Mark C. Savignac
William Travis West
**Steptoe & Johnson LLP**
1330 Connecticut Avenue NW
Washington, D.C.  20036
(202) 429-6494
PMichalo@steptoe.com

*Counsel for DISH Network Corp.*

October 11, 2022

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iii

GLOSSARY ............................................................................. v

PETITION FOR PANEL REHEARING .................................... 1

OR FOR REHEARING EN BANC ........................................... 1

STATEMENT OF THE CASE ................................................. 3

ARGUMENT ............................................................................ 6

I.     The Panel Decision Conflicts with This Court's Precedents
       Allowing Challenges to Pre-Existing Agency Rules ...................... 6

II.    The Panel Decision Also Conflicts with the Supreme Court's
       *Chenery* Decision ................................................................ 12

III.   The Panel Decision Was Premised on a Misconstruction of the
       Commission's Rule ................................................................ 14

IV.    The Panel Further Erred by Allowing the Commission to Apply Its
       Flawed Rule to DISH While Simultaneously Waiving the
       Application of the Rule to SpaceX ............................................ 16

V.     SpaceX Has Subsequently Disclosed Its Own Skepticism for
       Certain ITU Interference Evaluation Methods ............................ 17

CONCLUSION ....................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*\* Functional Music, Inc. v. FCC,*
274 F.2d 543 (D.C. Cir. 1958) ......................................................... 9, 10

*\* Graceba Total Communications, Inc. v. FCC,*
115 F.3d 1038 (D.C. Cir. 1977) .................................................. 8, 9, 10

*Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Rsrv. Sys.,*
195 F.3d 28 (D.C. Cir. 1999) ............................................................. 10

*Kisor v. Wilkie,*
139 S. Ct. 2400 (2019) ....................................................................... 15

*NLRB v. Bell Aerospace Co.,*
416 U.S. 267 (1974) ............................................................................ 13

*\* SEC v. Chenery Corp.,*
332 U.S. 194 (1947) ............................................................................ 12

*Tribune Co. v. FCC,*
133 F.3d 61 (D.C. Cir. 1998) ............................................................... 7

## Regulations and Orders

47 C.F.R. § 25.146(a) ............................................................................... 14

47 C.F.R. § 25.146(c) ............................................................................... 16

*Space Exploration Holdings, LLC Request for Modification of the Authorization for the SpaceX NGSO Satellite System,* 36 FCC Rcd. 7995 (2021) ............................................................................................. 3

## Other Authorities

Elon Musk (@elonmusk), Twitter (Mar. 28, 2022 6:05 EST), twitter.com/elonmusk/status/1508565936449622018 ........................... 2

Letter from David Goldman, SpaceX, to Marlene Dortch, FCC, IBFS
    File Nos. SAT-LOA-20200526-00055 and SAT-AMD-20210818-00105
    (Aug. 19, 2022) .................................................................................. 18

*\* Cases and other authorities principally relied upon are marked with
    asterisks.*

# GLOSSARY

| | |
|---|---|
| 12 GHz band | The portion of the electromagnetic spectrum ranging from 12.2-12.7 GHz |
| Communications Act | Communications Act of 1934, as amended, 47 U.S.C. §§ 151, *et seq.* |
| FCC or Commission | Federal Communications Commission |
| GHz | Gigahertz |
| ITU | International Telecommunication Union |
| Order | *Space Exploration Holdings, LLC Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, 36 FCC Rcd. 7995 (2021) |

## PETITION FOR PANEL REHEARING
## OR FOR REHEARING EN BANC

The panel decision conflicts with decisions of this Court and at least one decision of the Supreme Court.  The panel held that the Commission was duty-bound to refuse to consider DISH's evidence of interference from SpaceX's satellite system to DISH's satellite television customers because agencies have to follow their own rules.  But, in making this determination, the panel did not consider either of DISH's two key arguments: that the rule invoked by the agency for its refusal to evaluate DISH's evidence did not foreclose that evaluation as applied to this case; and that the agency here actually waived in part the very rule that supposedly tied its hands.

The panel's failure to consider these arguments has implications that sweep broadly beyond this case.  Absent rehearing by the panel, consideration by the full Court is necessary to secure and maintain the uniformity of this Court's decisions and consistency with the precedents of the Supreme Court.

This proceeding involves one or more questions of exceptional importance, including because the panel decision conflicts with

authoritative precedents of this Court and the Supreme Court on the

following issues:

1.  Whether a party may challenge an existing agency rule in a
    proceeding in which the agency applies that rule to the
    party's detriment.

2.  Whether an agency has authority to implement policy
    through adjudication as well as by rulemaking and, thus, to
    reconsider an existing rule in the context of a licensing
    proceeding or other adjudication to which that rule would
    otherwise apply.

Additionally, the panel appeared to rely on factual premises that

have since been contradicted by SpaceX itself or proven false.

Finally, this proceeding has exceptional practical importance

considering the unprecedented scope of SpaceX's system and its threat

of interference harming millions of American households.  SpaceX's

Elon Musk expects "over 4200 Starlink satellites in operation within 18

months, which is ~2/3 of all active satellites of Earth." Elon Musk

(@elonmusk), Twitter (Mar. 28, 2022 6:05 PM EST), twitter.com/elon

musk/status/1508565936449622018.  The Commission decision to

greenlight this enormous project, and the precedent of lax and vicarious

oversight set by that decision, merit the scrutiny of the full Court.

## STATEMENT OF THE CASE

This appeal concerns Appellant DISH's challenge to the unlawful authorization by Appellee Federal Communications Commission ("FCC") of Intervenor SpaceX's use of the 12 GHz band of radio frequency spectrum.  *See* Order, *Space Exploration Holdings, LLC Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, 36 FCC Rcd. 7995 (2021) ("Order").  The full factual and legal background relevant to this appeal is set forth in detail in DISH's opening brief on appeal.  *See* DISH Br. 1-24.  In short, without a rehearing, SpaceX will continue to operate its enormous non-geostationary satellite system at power levels that risk causing interference into many millions of households receiving satellite television service.

About 22 million families in the United States receive satellite-television service transmitted to their homes from the nation's two Direct Broadcast Satellite providers who use geostationary satellites transmitting in the 12 GHz band.  The Communications Act mandates that the FCC prevent signal interference to this service, which the FCC has purportedly done by imposing "power limits" on non-geostationary

3

satellite systems that also transmit in the 12 GHz band.  In the Order on review, however, the FCC abdicated that statutory duty and approved SpaceX's use of non-geostationary satellites in the 12 GHz band despite DISH's clear showing—in response to which the FCC performed *no* technical analysis—that SpaceX's system would exceed the power limits.  The Order threatens millions of American families with loss of television service, in contravention of the FCC's statutory obligation to prevent harmful interference.  DISH accordingly sought review in this Court, explaining that the FCC had violated the Administrative Procedure Act ("APA"), the Communications Act, and the Constitution.

On August 26, 2022, the panel issued its decision and judgment affirming the Order.  As relevant here, the panel first held that the FCC properly refused to consider expert reports submitted by DISH showing that SpaceX's system would cause interference because "the reports use a different method for assessing interference than what binding regulations require."  Panel Op. 7.  Second, the panel upheld the FCC's waiver of its own requirement that SpaceX receive a favorable finding from the International Telecommunication Union ("ITU") before it is

allowed to put its system into operation. *See id.* at 8-10. Third, the panel held that, for the same reasons it concluded that the FCC did not violate the APA, it also did not violate the Communications Act. *See id.* at 10.

ARGUMENT

The panel's decision was erroneous, and rehearing—either by the panel or, if necessary, by the full Court sitting en banc—is justified.

*First*, the panel of this Court that issued the original decision in this case should grant panel rehearing because the original decision (1) was premised on misconceptions of law and fact and (2) conflicts with binding precedents.

*Second*, in the alternative, the full Court should grant rehearing en banc because (1) the panel decision conflicts with authoritative precedents of this Court and the Supreme Court on important issues of administrative law, and (2) rehearing is necessary to secure and maintain the uniformity of this Court's decisions.

In either event, this Court should vacate both the panel's original opinion and the Commission's Order with respect to SpaceX's authorization to use the 12 GHz band.

## I.  The Panel Decision Conflicts with This Court's Precedents Allowing Challenges to Pre-Existing Agency Rules

The panel held that the FCC was permitted, and indeed required, to ignore DISH's undisputed evidence about the flaws in the ITU method that the Commission used to evaluate the risk of impermissible

6

interference.  *See* Panel Op. 7.  The panel's decision was premised on the proposition that, while an agency is *required* to consider evidence undermining its regulation when that evidence is submitted in the course of the agency's promulgation of a regulation itself, the agency is *prohibited* from considering such evidence when it is submitted in the course of a licensing proceeding in which the agency's application of the regulation harms the party submitting the evidence.

The panel pointed to *Tribune Co. v. FCC*, 133 F.3d 61, 68 (D.C. Cir. 1998) for the assertion that "an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding."  Panel Op. 7; *see also id.* (purportedly distinguishing DISH's citations to *American Radio Relay League*, 524 F.3d 227, 241 (D.C. Cir. 2008), and *Environmental Health Trust v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021), on the ground that the Court there was "reviewing the regulation [or refusal to initiate a rulemaking] itself, not its application in a later licensing proceeding"); *but see Tribune*, 133 F.3d at 68 (acknowledging that this Court has elsewhere suggested that "where an agency is confronted with an undisputable indication that its rule is illegal, either

7

because of the reasoning of a Supreme Court decision or intervening legislation, *it may be entitled, indeed obliged, to decline to apply it"*) (emphasis added).

In holding that the Commission was required to apply its flawed rule while ignoring evidence that undermined that rule, the panel failed to consider DISH's key points—that the rule did not actually foreclose consideration of the evidence as applied to this case, and that the rule was actually waived by the agency to relieve the obligation of SpaceX to obtain the ITU finding on which the Commission relied before initiating service. In doing so, the panel created a direct conflict with two authoritative precedents of this Court that DISH cited in its brief without addressing or even acknowledging them.

In *Graceba Total Communications, Inc. v. FCC*, 115 F.3d 1038 (D.C. Cir. 1977), this Court permitted a company (Graceba) to challenge, in the context of a radio licensing decision, the constitutionality of an underlying agency order establishing a radio auction. *See id.* at 1041. The Commission had rejected Graceba's challenge in part because Graceba did not file a petition for reconsideration of the order establishing the auction rule within the

8

statutory 30-day window.  *See id.* at 1040.  But this Court reversed,

explaining: "Because 'administrative rules and regulations are capable

of continuing application,' limiting review of a rule to the period

immediately following rulemaking 'would effectively deny many parties

ultimately affected by a rule an opportunity to question its validity.'"

*Id.* (quoting *Functional Music, Inc. v. FCC*, 274 F.2d 543, 546 (D.C. Cir.

1958)).

Likewise, in *Functional Music*, this Court vacated a Commission

order finding that a certain type of subscription broadcast violated the

Communications Act.  *See* 274 F.2d at 548-49.  The Commission had

issued a rule banning the service at issue in 1955, but had repeatedly

postponed its effective date.  The time for judicial review of that rule

passed.  But, before the expiration of the final postponement,

Functional Music filed a petition with the Commission asking it to

repeal or further postpone the rule.  *See id.* at 545.  The Commission

denied the petition and, when Functional Music appealed to this Court,

the Commission argued that the window for judicial review had closed.

This Court disagreed: "As applied to rules and regulations, the

statutory time limit restricting judicial review of Commission action is

applicable *only to cut off review directly from the order promulgating a rule. It does not foreclose subsequent examination of a rule where properly brought before this court for review of further Commission action applying it.* For unlike ordinary adjudicatory orders, administrative rules and regulations are capable of continuing application; limiting the right of review of the underlying rule would effectively deny many parties ultimately affected by a rule an opportunity to question its validity." *Id.* at 546 (emphasis added). This Court went on to find that the Commission lacked the statutory authority under the Communications Act to issue the challenged rule. *See id.* at 548.

This Court's authoritative decisions in *Graceba* and *Functional Music* thus establish a longstanding rule that a party may challenge an existing agency rule in the context of a later adjudication or licensing proceeding in which the agency proposes to apply that rule to the party's detriment. As the Court explained in *Graceba*, "we permit both constitutional and statutory challenges to an agency's application or reconsideration of a previously promulgated rule, even if the period for review of the initial rulemaking has expired." 115 F.3d at 1040 (citing

cases); *see, e.g.*, *Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Rsrv. Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999) ("We have frequently said that a party against whom a rule is applied may, at the time of application, pursue substantive objections to the rule, including claims that an agency lacked the statutory authority to adopt the rule, even where the petitioner had notice and opportunity to bring a direct challenge within statutory time limits.").  And, where a party shows that the previously promulgated rule is contrary to law, the agency is legally obligated *not* to follow it.

Under the precedent promulgated in *Graceba* and *Functional Music*, DISH was entitled to challenge the Commission's existing regulation establishing the method for determining interference because the Commission was applying that regulation to evaluate and approve SpaceX's application.  And, the Commission was obliged to consider DISH's undisputed evidence that SpaceX's system would indeed cause impermissible interference.

The panel decision here directly contravened *Graceba* and *Functional Music*.  Notably, the panel never addressed or distinguished those cases, even though DISH relied on them for this very point in its

11

reply brief. *See* DISH Reply 11. The panel should grant rehearing to correct its failure to consider the binding precedent that DISH submitted to it. In the alternative, the full Court should grant en banc review to maintain the uniformity of its decisions by vacating the panel's decision disregarding *Graceba* and *Functional Music* and applying those decisions to vacate the Commission's Order in light of the agency's failure to consider DISH's unrebutted evidence and its dereliction of its statutory duty to avoid harmful interference.

## II.    The Panel Decision Also Conflicts with the Supreme Court's *Chenery* Decision

In *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court held that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Id.* at 203. *Chenery* also holds that, where the agency chooses to proceed through adjudication, it can apply its decision retroactively. *See id.* at 203-04.

The panel decision conflicts with the Supreme Court's decision in *Chenery* for much the same reasons as it conflicts with this Court's precedents in *Graceba* and *Functional Music*. Under *Chenery*, an agency is entitled to supplement or modify its rules with interpretations

12

applied retroactively through licensing proceedings and other adjudications. *See also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (holding that an agency "is not precluded from announcing new principles in an adjudicative proceeding and … the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion"). The Commission had authority to use its adjudicatory power to interpret and apply the Communications Act's non-interference requirement—including by evaluating its rules to better satisfy that requirement—and it was required to consider the relevant and undisputed evidence that DISH submitted.

Rehearing is thus appropriate to confirm that an agency *does* have the power (and, thus, responsibility) to follow its statutory commands in the context of an adjudication, including where doing so would require it to make policy in the course of an adjudication that adjusts policy previously established by way of rulemaking. In short, "the choice between rulemaking and adjudication lies in the first instance within the [agency's] discretion." *Bell Aerospace*, 416 U.S. at 294. The panel's erroneous decision to the contrary should not stand.

13

### III.  The Panel Decision Was Premised on a Misconstruction of the Commission's Rule

The panel appears to have wrongly assumed, following the Commission's own apparent interpretation in its brief, that the Commission's rules require interference calculations to be made according to a particular *method*. *See* Panel Op. 7 (holding that the Commission could ignore DISH's undisputed expert reports because they "use a different method for assessing interference than what binding regulations require").  In fact, however, the regulation in question (47 C.F.R. § 25.146(a)) says nothing at all about the ITU software, much less any specific method, and while the Commission's 2017 NGSO Order requires use of ITU validation software, it also says nothing about what particular methods are acceptable.  Moreover, DISH's expert studies *did* use the ITU validation software, and therefore complied with the plain text of both the regulation and the NGSO Order.  *See, e.g.*, DISH Reply 7 ("[T]he record is clear that the Second Study of DISH's expert Mr. Dupuis *in fact used the ITU software*, only substituting 'real-world parameters' for theoretical locations.").

14

The panel erroneously concluded that "the governing rules require interference between [geostationary] and [non-geostationary] systems to be assessed through *the method used in* the ITU-approved validation software." Panel Op. 7 (emphasis added). To the extent that the panel believed that it was adopting an interpretation advanced in the Commission's brief on appeal, that interpretation was inconsistent with the plain text of § 25.146(a) and the NGSO Order and was not entitled to deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 n.6 (2019) ("The general rule, then, is not to give deference to agency interpretations advanced for the first time in legal briefs."). DISH explained this in its reply brief; DISH Reply 7. Yet the panel failed to engage with DISH's point at all.

Here, again, rehearing to correct the panel's manifest error is necessary and appropriate. Notably, although the panel's erroneous interpretation of the Commission's rule does not itself create a direct conflict, vacating that erroneous interpretation would avoid the conflicts described above with the precedents of both this Court and the Supreme Court, because that interpretation was the necessary premise for the panel's belief that DISH was asking the Commission to reconsider its

15

existing rule.  Thus, the en banc Court should consider this error as a potential vehicle to cure the conflicts discussed above and maintain consistency in the law of this Circuit by vacating the panel decision.

## IV. The Panel Further Erred by Allowing the Commission to Apply Its Flawed Rule to DISH While Simultaneously Waiving the Application of the Rule to SpaceX

As the panel acknowledged, the Commission's rules clearly required SpaceX to obtain a "favorable" or "qualified favorable" finding from the ITU before beginning to operate its system.  Panel Op. 4; 47 C.F.R. § 25.146(c).  But, the Commission waived that requirement for SpaceX's benefit.  *See* Panel Op. 5.  And the panel affirmed that waiver, rejecting DISH's challenge to the waiver as both unreasonable and insufficiently explained.  *See id.* at 8-10.

The panel's ruling on the waiver highlights the inconsistency with its ruling that the Commission was entitled—indeed, *required*—to ignore DISH's unrebutted expert evidence on the ground that an agency "abuses its discretion when it arbitrarily violates its own rules, not when it follows them."  *Id.* at 7 (quoting *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1184 (D.C. Cir. 2003)).  DISH did not ask the Commission to "arbitrarily violate[] its own rules," but, rather, to reasonably consider

the relevant evidence and acknowledge flaws in its chosen methodology.
What is arbitrary about this situation is that the panel simultaneously
reasoned that the Commission was *required* to ignore DISH's evidence
because it must follow its own rules and that the Commission was
*entitled* to waive—that is, to decide *not* to follow—its own rules when it
suited SpaceX to receive a waiver. The Kafkaesque circularity of the
Commission's actions—claiming to be bound by a rule that it decided to
waive—is yet another reason why this Court should grant rehearing
and vacate the panel decision.

## V. SpaceX Has Subsequently Disclosed Its Own Skepticism for Certain ITU Interference Evaluation Methods

In deciding that the Commission's rules "require interference
between [geostationary] and [non-geostationary] systems to be assessed
through the method used in the ITU-approved validation software," the
panel ignored the flaws identified by DISH, and acknowledged by the
ITU itself, in the ITU's interference analysis method. Panel Op. 7. In
doing so, the panel operated under a misconception as to SpaceX's own
assessment of the ITU method.

According to SpaceX, the ITU apparently could do no wrong when
evaluating interference risk from the operation of non-geostationary

17

satellite systems.  At argument, for example, SpaceX's counsel represented to this Court that the model used by the ITU is "the best one."  Oral Arg. Tr. 77:15-16.  Likewise, SpaceX referred in its briefing to "*purported* shortcomings in ITU's software modeling."  SpaceX Br. 17 (emphasis added).

Yet in a recent letter to the Commission, SpaceX itself claimed that the ITU method for evaluating interference in a different frequency band *is* seriously flawed.  Specifically, SpaceX pointed to "*a well-recognized flaw* in the ITU methodology for determining compliance with downlink PFD limits in portions of the Ka-band."  Letter from David Goldman, SpaceX, to Marlene Dortch, FCC, IBFS File Nos. SAT-LOA-20200526-00055 and SAT-AMD-20210818-00105, at 6 (Aug. 19, 2022) (emphasis added).[1]  To be sure, SpaceX had never before acknowledged the existence of any flaws in the ITU methods—much less "well-recognized" ones.  Had the panel been aware of the parties' consensus that the ITU's methods suffer from well-recognized flaws, it

---

[1] This letter was submitted in the context of SpaceX's proposed second-generation system that is currently under consideration by the FCC.

likely would not have upheld the Commission's unquestioned adherence to the ITU process.[2]

Neither the ITU itself, nor, it turns out, SpaceX views the ITU's method as sacrosanct; and the idea the ITU could swiftly conclude its evaluation has been totally debunked. A rehearing is necessary to correct a decision relying on inaccurate or misleading assertions.

---

[2] At the oral argument held on December 3, 2021, SpaceX's counsel also assured the panel that the ITU's finding was right around the corner: "[W]e're not talking about years ahead for the ITU approval … we could have an ITU validation with[in] a couple of months." Oral Arg. Tr. 78:1-15. Yet the ITU has yet to release a finding even now.

## CONCLUSION

For the foregoing reasons, this Court should grant the petition for panel rehearing or, in the alternative, for rehearing en banc.

Dated:  October 11, 2022                    Respectfully submitted,

Jeffrey H. Blum                           /s/ *Pantelis Michalopoulos*
Alison Minea                              Pantelis Michalopoulos
Hadass Kogan                              Andrew M. Golodny
**DISH NETWORK CORPORATION**              Mark C. Savignac
1110 Vermont Avenue NW                    William Travis West
Suite 450                                 **STEPTOE & JOHNSON LLP**
Washington, D.C. 20005                    1330 Connecticut Avenue NW
                                          Washington, D.C.  20036
                                          (202) 429-6494

                                          *Counsel for DISH Network Corp.*

## CERTIFICATE OF COMPLIANCE

I, Pantelis Michalopoulos, counsel for Appellant DISH Network Corporation, hereby certify pursuant to Fed. R. App. P. 32(g) that this petition complies with the type-volume limitations of Fed. R. App. P. 35(b)(2)(A) & 40(b)(1). This petition was prepared in a proportionally space typeface using 14-point Century font, and contains 3,395 words, excluding the parts of the document exempted by Fed. F. App. P. 32(f).

Dated: October 11, 2022                 /s/ *Pantelis Michalopoulos*
                                        Pantelis Michalopoulos
                                        STEPTOE & JOHNSON LLP
                                        1330 Connecticut Ave. NW
                                        Washington, D.C. 20036
                                        (202) 429-6494

# CIRCUIT RULE 35(c) ADDENDUM

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 3, 2021          Decided August 26, 2022

No. 21-1123

VIASAT, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

SPACE EXPLORATION HOLDINGS, LLC,
INTERVENOR

———

Consolidated with 21-1125, 21-1127, 21-1128

———

On Notices of Appeal and Petition for Review of an
Order of the Federal Communications Commission

———

*William M. Jay* argued the cause for appellants Viasat,
Inc. and The Balance Group.  With him on the briefs were
*Colin L. Ward*, *David J. Zimmer*, *Gerard J. Cedrone*, *Jordan
Bock*, *Michael F. Smith*, and *Stephen L. Goodman*.

2

*Pantelis Michalopoulos* argued the cause for appellant DISH Network Corporation.  With him on the briefs were *Mark C. Savignac* and *William Travis West.*

*Ivan L. London*, *Jean-Claude Andre*, and *Philip E. Karmel* were on the brief for *amicus curiae* Professor Andy Lawrence in support of appellants.

*James M. Carr* and *Rachel Proctor May*, Counsel, Federal Communications Commission, argued the causes for appellee.  With them on the brief were *Todd Kim*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson*, *Robert J. Wiggers*, *Justin Heminger*, and *Allen Brabender*, Attorneys, and *Jacob M. Lewis*, Associate General Counsel, Federal Communications Commission.

*Pratik A. Shah* argued the cause for intervenor Space Exploration Holdings, LLC in support of appellee.  With him on the brief was *Z. W. Julius Chen*.

*Corbin K. Barthold* and *James E. Dunstan* were on the brief for *amicus curiae* TechFreedom in support of appellee.

Before: WILKINS, KATSAS, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*:    The Federal Communications Commission approved a request by Space Exploration Holdings, LLC to fly its satellites at a lower altitude.  One competitor contends that the FCC did not adequately consider the risk of signal interference, a claim we reject on the merits.  Another competitor, joined by an environmental group, raises a claim under the National Environmental Policy Act.  We decline to consider it because the environmental group lacks

3

Article III standing, and the competitor's asserted injury does not fall within the zone of interests protected by NEPA.

I

A

The Communications Act of 1934 authorizes the FCC to grant radio station licenses, including for the operation of communications satellites. 47 U.S.C. § 307(a). The Commission may modify licenses if it finds that the modification would serve the public interest, convenience, and necessity. *Id.* § 316(a)(1). The Telecommunications Act of 1996 requires the agency to facilitate the provision of broadband internet service to unserved areas. *Id.* § 1302.

To further that goal, the FCC granted Space Exploration Holdings, LLC (which goes by SpaceX) a license to provide internet service by satellite. *In re Space Exploration Holdings, LLC*, 33 FCC Rcd. 3391 (2018). Once operational, this service will reach currently unserved areas.

SpaceX uses new technology to expand its coverage area. Traditional communications satellites move in geostationary orbit, or GSO. GSO satellites orbit at the same speed as the Earth's rotation, so they appear fixed in the sky. A single GSO satellite has a continuous sight line to users within its coverage area—and thus can provide continuous service to them. SpaceX's satellites, by contrast, move at lower altitudes in a non-geostationary orbit, or NGSO. The lower altitude reduces transmission latency, making NGSO satellites better suited to provide high-speed internet service. But these satellites do not synchronize with the Earth's spin, so a single satellite cannot maintain a sight line with any given user. SpaceX solved this problem by deploying multiple satellites that move and communicate as a constellation: When one

4

satellite moves out of view of a user's ground antenna, it transfers the signal to the next satellite in line.

B

After receiving authorization for its satellites and launching about half of them, SpaceX requested permission to operate the constellation at a lower altitude.  Given the complexity of satellite system design, the FCC seeks where possible to allow licensees "to modify the technical design of their satellites as they are being built." *Teledesic LLC, Order and Authorization*, 14 FCC Rcd. 2261, 2264 (Int'l Bureau 1999).  But technical changes can interfere with signals from other satellites, so the Commission must find that "the proposed modification does not present any significant interference problems." *Id.*  Various FCC rules govern this interference determination.

First, regulations prioritize GSO systems over NGSO systems.  An NGSO system "must not cause unacceptable interference to" a GSO system.  47 C.F.R. § 25.289.  More specifically, NGSO systems must operate within power limits set by the International Telecommunications Union (ITU), a United Nations agency responsible for addressing signal interference internationally.  *See id.*  The licensee must use ITU-approved software to show compliance with the power limits.  Initially, the licensee enters its satellite data into the software and certifies the results to the FCC.  47 C.F.R. § 25.146(a); *see Update to Parts 2 and 25 Concerning Non-Geostationary, Fixed-Satellite Service Systems and Related Matters*, 32 FCC Rcd. 7809 ¶ 41 (2017) (NGSO Order).  The licensee then submits the data to the ITU, which must make a "favorable" or "qualified favorable" finding before the licensee may provide service.  47 C.F.R. § 25.146(c).

5

The rules also address interference among NGSO systems. Priority is based on the order in which the competing systems were licensed; systems licensed later must not unduly interfere with those licensed earlier. NGSO Order, 32 FCC Rcd. 7809 ¶ 61. An NGSO licensee can modify its license without losing its priority only if the changes will not cause "significant interference" to existing services. *Teledesic*, 14 FCC Rcd. 2261 ¶ 5.

C

In 2019, the FCC's International Bureau approved SpaceX's request to lower roughly half the satellites in its constellation, after finding that the changes would impose no undue interference and would serve the public interest. *In re Space Exploration Holdings, LLC*, 34 FCC Rcd. 2526 (Int'l Bureau Apr. 26, 2019) (First Modification Order). Because of a backlog at the ITU, the Bureau waived the ITU-finding requirement in part: It allowed the satellites to fly at the lower altitude after SpaceX certified compliance with ITU power limits using ITU-approved software. *Id.* ¶ 28. But the Bureau still required SpaceX to submit its data to the ITU and cautioned that SpaceX would have to adjust its operations if the ITU were to make an unfavorable finding. *Id.*

In the order under review, the full Commission authorized SpaceX to lower the remainder of its constellation. *In re Space Exploration Holdings, LLC*, 36 FCC Rcd. 7995 (2021) (Second Modification Order). Again, the FCC permitted SpaceX to act upon a successful software certification. *See id.* ¶ 41. But it reiterated that SpaceX would have to bring its system into compliance if the ITU were to make an adverse finding. *Id.* ¶ 97(p).

DISH Network Corporation, one of SpaceX's competitors, objected to the modification. DISH argued that

6

the proposed changes would interfere with its GSO satellite television service. Another competitor, Viasat, Inc., jointly objected with an environmental organization calling itself The Balance Group. They argued that NEPA required the FCC to prepare an environmental assessment before granting the modification. The FCC rejected both contentions. Second Modification Order, 36 FCC Rcd. 7995 ¶¶ 47, 92.

DISH, Viasat, and The Balance Group appeal the FCC's order. SpaceX has intervened to support the Commission. We have statutory jurisdiction under 47 U.S.C. § 402(b)(6).[1]

II

We first consider interference issues. DISH argues that the FCC's interference determination violated the Administrative Procedure Act and the Communications Act. DISH also challenges the regulatory procedure for showing compliance with ITU power limits.

A

The APA requires us to set aside agency action that is arbitrary or capricious. 5 U.S.C. § 706(2)(A). An action is arbitrary if the agency relied on inappropriate factors, failed to consider important aspects of the problem, or ignored relevant evidence. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Conversely, agency action is not arbitrary if it is "reasonable and reasonably

---

[1] Because we have jurisdiction over the appeals under section 402(b), we dismiss Viasat's petition for review under section 402(a). *See Sprint Nextel Corp. v. FCC*, 524 F.3d 253, 256 n.4 (D.C. Cir. 2008) (sections 402(a) and 402(b) are "mutually exclusive").

7

explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). DISH contends that the interference determination was arbitrary for three reasons.

1

DISH first argues that the FCC unreasonably refused to consider expert reports claiming that SpaceX's proposed changes would interfere with DISH's GSO satellites. But the reports use a different method for assessing interference than what binding regulations require.

The FCC must "adhere to its own rules and regulations." *AT&T Corp. v. FCC*, 448 F.3d 426, 434 (D.C. Cir. 2006). Here, the governing rules require interference between GSO and NGSO systems to be assessed through the method used in the ITU-approved validation software. 47 C.F.R. § 25.146(a), (c)(2). DISH acknowledges that SpaceX's desired changes pass muster under that approach. Nevertheless, DISH argues that its experts have a better method for calculating interference. DISH thus faults the FCC for following its own interference rules. But an agency "abuses its discretion when it arbitrarily violates its own rules, not when it follows them." *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1184 (D.C. Cir. 2003).

DISH cites *American Radio Relay League v. FCC*, 524 F.3d 227 (D.C. Cir. 2008), to support its argument. There, we faulted the FCC for failing to consider data that undermined a regulation. *Id.* at 240–41. But we did so in reviewing the regulation itself, not its application in a later licensing proceeding. *See id.* at 236; *see also Env't Health Trust v. FCC*, 9 F.4th 893, 903 (D.C. Cir. 2021) (same for agency decision not to initiate a rulemaking). As we have explained, "an agency need not—indeed should not—entertain a challenge to a regulation, adopted pursuant to notice and comment, in an adjudication or licensing proceeding." *Trib.*

8

*Co. v. FCC*, 133 F.3d 61, 68 (D.C. Cir. 1998). The FCC did not err by following that "hornbook" rule of administrative law. *Id.*[2]

2

DISH argues that the FCC misapplied *Teledesic* in refusing to lower the priority of SpaceX's NGSO license. Under *Teledesic*, the FCC generally permits NGSO licensees to modify licenses without losing priority if the changes do not cause "significant interference" to other systems and are "otherwise consistent with Commission policies." 14 FCC Rcd. 2261 ¶ 5. DISH argues that the FCC failed to consider interference to GSO systems. But the agency expressly found that lowering SpaceX's constellation "will not increase interference to GSO satellite systems." Second Modification Order, 36 FCC Rcd. 7995 ¶ 47. And as explained above, it applied the correct legal standard in making that finding based on a certified compliance with ITU power limits. *Id.* ¶ 40; *see* 47 C.F.R. § 25.289.

3

Finally, DISH argues that the FCC unreasonably waived the requirement of a favorable ITU finding, thus allowing SpaceX to proceed based on software validation alone. The FCC may waive its rules "for good cause shown." 47 C.F.R. § 1.3. Good cause exists "when particular facts would make strict compliance inconsistent with the public interest." *AT&T Wireless Servs. v. FCC*, 270 F.3d 959, 965 (D.C. Cir. 2001). To satisfy the APA, the FCC must "clearly state in the

---

[2]  As explained below, the regulations themselves permit waivers "for good cause shown." 47 C.F.R. § 1.3. DISH does not contend that its expert reports compelled the FCC to formally waive the validation method required by section 25.146(c)(2).

9

record its reasons for granting the waiver." *Keller Commc'ns v. FCC*, 130 F.3d 1073, 1076 (D.C. Cir. 1997).

The FCC met these requirements. When the International Bureau first granted the waiver, it determined that an ITU backlog would significantly delay the start of operations even though SpaceX had already certified compliance with ITU power limits using ITU-approved software. First Modification Order, 34 FCC Rcd. 2526 ¶ 28. We have held that "harm resulting from delay" can be good cause for a waiver. *Omnipoint v. FCC*, 78 F.3d 620, 631 (D.C. Cir. 1996). Here, the Bureau reasonably granted a waiver to avoid long delays in the provision of internet service to Americans who remain "totally unserved by other broadband solutions." First Modification Order, 34 FCC Rcd. 2526 ¶ 1. And it reasonably concluded that the certification of compliance would provide some assurance of no harmful interference.

DISH faults the FCC for not justifying the waiver anew in the Second Modification Order. But, in that order, the Commission explained that allowing SpaceX to lower the remainder of its constellation "will facilitate deployment" of broadband internet and "improve service to remote and underserved areas." 36 FCC Rcd. 7995 ¶ 13. Seeing "no reason to revoke" the previously granted waiver, *id.*, the agency extended it to the rest of SpaceX's constellation. That decision was reasonable and reasonably explained.

DISH also challenges the waiver as discriminatory and illogical. It cites *WorldVu Satellites Ltd.*, 32 FCC Rcd. 5366 (2017), to show that the FCC has not waived the ITU-finding requirement for other licensees. But the licensee there *received* a waiver of a *different* rule. *Id.* ¶ 19. DISH cannot show improper discrimination by offering only an "apples-and-oranges comparison." *Barbour v. Browner*, 181 F.3d

10

1342, 1347 (D.C. Cir. 1999). As for logic, DISH questions the utility of requiring SpaceX to receive a favorable ITU finding in the future, despite the possibility of harmful interference in the present. Although DISH is right that future ITU review will neither prevent nor undo any current interference, it still serves a purpose: If the ITU should make an unfavorable finding, SpaceX will have to eliminate interference going forward. Second Modification Order, 36 FCC Rcd. 7995 ¶ 97(p). In the meantime, other licensees may report any present interference through established regulatory channels. *See id.* ¶ 97(i).

B

As a fallback to its arguments about arbitrariness, DISH argues that the FCC's interference determination violated sections 303 and 316 of the Communications Act. Section 303 requires the FCC to promulgate regulations "to prevent interference between stations." 47 U.S.C. § 303. As detailed above, the Commission has done so. Section 316 permits license modifications to promote the "public interest," which is undermined by harmful interference. *See id.* § 316(a)(1). DISH's argument rests on the premise that the FCC failed to adequately address the question of harmful interference, so it fails for reasons explained above.

C

Finally, DISH raises a structural challenge to 47 C.F.R. § 25.146(c), which requires licensees to obtain a favorable ITU finding. According to DISH, this requirement violates constitutional and statutory rights to judicial review, because courts cannot review the ITU finding. Moreover, DISH continues, the regulation impermissibly delegates FCC authority to the ITU.

11

We lack jurisdiction to consider these arguments, which DISH failed to press before the FCC. The Communications Act bars judicial review of "questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass." 47 U.S.C. § 405(a). Quoting a phrase from one of our cases, DISH contends that the Act's exhaustion requirement applies only to "technical defects" in an FCC decision. *See Time Warner Entm't v. FCC*, 144 F.3d 75, 79–81 (D.C. Cir. 1998). DISH is mistaken. In *Time Warner*, we held that section 405(a) applies with special rigor to "technical or procedural" errors; in that context, a party must "raise the precise claim before the Commission" so that the agency has an opportunity to correct any mistake. *Id.* at 81. But we did not suggest that section 405(a) applies only to technical or procedural errors. To the contrary, we explained at length that section 405(a) requires all claims to be "flagged" or "teed up" before the Commission, whether by the appellant or by some other party, before they may be pursued in court. *See id.* at 79–81; *see also Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 509 (D.C. Cir. 2020) ("we will not review arguments that have not first been presented to the Commission"). Here, no party teed up—with precision or otherwise—the judicial-review and delegation claims that DISH now seeks to raise.

III

We now turn to the environmental claim. Viasat and The Balance Group contend that the FCC violated NEPA by allowing SpaceX to proceed without first preparing an environmental assessment.

Before reaching the merits of this claim, we must ask whether any party has standing to raise it. For constitutional standing under Article III, a party must show it has suffered

12

an injury that is actual, imminent, or certainly impending. *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).  On the other hand, a "speculative" possibility of future injury does not suffice.  *See*, *e.g.*, *id.*; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 583–84 (1992); *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).  In addition, to pursue NEPA claims under the APA, the party must show that its injury "is to interests of the sort protected by NEPA."  *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc); *see Bennett v. Spear*, 520 U.S. 154, 162–63 (1997) (explaining the "zone of interests" rule for APA review).  The "injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'"  *Mount. States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

Because neither Viasat nor The Balance Group has met both requirements, we do not reach the merits of their claim.

A

Viasat competes against SpaceX as a provider of satellite-communications services.  It asserts three distinct injuries from the approval of SpaceX's constellation.

1

Viasat worries that SpaceX's satellites may cause debris to collide with its own satellites.  Viasat operates only a single satellite that flies close to SpaceX's constellation, and it does not seriously contend that the probability of a direct collision is high enough to support Article III standing.  Instead, Viasat posits that SpaceX's satellites may collide with other orbiting bodies, which may cause more space debris, which may in turn collide with a Viasat satellite.

13

This theory of injury is much too speculative. To ground standing on the risk of future harm, a party must show both that the risk is substantial and that the challenged action substantially increases it. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015). Viasat posits too many unlikely contingencies to clear those hurdles. First, one of SpaceX's satellites would have to suffer a collision. The FCC estimated this risk to be a chance between 1-in-44 and 1-in-200 over the next century, depending on the number of satellites launched and the disposal failure rate. Second Modification Order, 36 FCC Rcd. 7995 ¶ 63. Second, the collision would have to generate a debris field of its own, with particles large enough to damage another satellite. According to Viasat, only 0.5 percent of debris particles currently in orbit are large enough to cause such damage. Finally, a debris particle large enough and traceable to an impact with a SpaceX satellite would have to happen upon a collision course with Viasat's satellite, remain undetected, and thwart satellite protocols to avoid collisions. Viasat's standing affidavit is long on the general problem of space debris, but short on the probability that any SpaceX impact might imminently harm a Viasat satellite. Viasat's theory of space-debris collision does not cross the line from speculative to certainly impending.

2

Alternatively, Viasat asserts that SpaceX's constellation increases its own operating costs—for example, by making it more technically complex and more expensive for Viasat to launch its own satellites. Those harms are economic—and thus fall outside the zone of interests protected by NEPA. *See*, *e.g.*, *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) ("The zone of interests protected by the NEPA is, as its name implies, environmental; economic

14

interests simply do not fall within that zone."); *Mount. States*, 92 F.3d at 1235–36 ("NEPA's rather sweeping list of interests … do not include purely monetary interests, such as the competitive effect that a construction project may have on plaintiff's commercial enterprise.").

Viasat responds that predominating economic injuries, although themselves unprotected by NEPA, do not disqualify a party from asserting other, "environmental" injuries, *Nat'l Ass'n of Home Builders v. Army Corps of Eng'rs*, 417 F.3d 1272, 1287 (D.C. Cir. 2005), or injuries with "an environmental as well as an economic component," *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 155 (2010). Viasat reasons that its economic injury flows from "orbital crowding"—in other words, congestion in outer space— which Viasat says is a "classic environmental concern." Viasat Reply Br. at 22–23.

We reject this argument. To be sure, we have suggested that congestion such as "vehicular and pedestrian traffic" is an environmental harm against which NEPA is directed. *Realty Income Trust v. Eckerd*, 564 F.2d 447, 452 n.10 (D.C. Cir. 1977) (quoting *Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972)). Individuals subjected to these nuisances may therefore sue to prevent NEPA violations. An apartment owner "in Manhattan" may object to the building of a jail "across the street." *Hanly*, 460 F.2d at 642. And the owner of buildings "in downtown Jackson, Mississippi" may object to "the construction of a new federal office building in downtown Jackson." *Realty Income Trust*, 564 F.2d at 452. But Article III standing is not geographically unbounded. Individuals wishing to look at elephants in the Bronx Zoo cannot complain about the treatment of elephants in Sri Lanka. *See Defs. of Wildlife*, 504 U.S. at 566. Likewise, commuters in New York City cannot complain about actions

15

that worsen traffic in Washington, D.C.  To press a NEPA claim, an individual must be close to the wildlife that he wants to experience or the congestion that he wants to avoid. This follows from the bedrock standing principle that "the 'injury in fact' test requires more than an injury to a cognizable interest.  It requires the party seeking review to be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972); *see also Match-E. Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 227 (2012) (a "neighboring landowner" may challenge federal land acquisition over aesthetic and environmental concerns).  We do not question that space congestion attributable to SpaceX may impose economic costs on Viasat itself.  But we do not think that Viasat (or its shareholders, officers, employees, customers, suppliers, or other stakeholders) can fairly be described as having personally suffered a nuisance, aesthetic, or other environmental injury from congestion in outer space.

3

Finally, Viasat claims injury because the FCC licensed one of its competitors.  That is a pure economic harm well beyond the purview of NEPA.  *ANR Pipeline Co. v. FERC*, 205 F.3d 405, 408 (D.C. Cir. 2000) ("suppressing competition … is not within the zone of interests protected by NEPA").

B

The second party seeking to raise a NEPA claim is The Balance Group.  According to its "operating officer" Joseph Sandri, the Group "exists to provide a balanced approach to solving large, systemic issues" about technology's "impact on the human condition and the environment at large."  Sandri Decl. ¶ 3.  The Group asserts standing as an organization and as an association acting on behalf of its members.

16

1

To determine organizational standing, we "conduct the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). Thus, the Group must show that it has suffered a concrete, imminent injury from the FCC's licensing decision. *See Defs. of Wildlife*, 504 U.S. at 560. A mere "setback to the organization's abstract social interests" is not enough. *Havens Realty*, 455 U.S. at 378. The Group must prove that its "discrete programmatic concerns are being directly and adversely affected." *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)).

A party seeking to challenge agency action in court bears the same burden to prove standing "as that of a plaintiff moving for summary judgment." *Ams. for Safe Access v. DEA*, 706 F.3d 438, 443 (D.C. Cir. 2013). Thus, unless standing is clear from the administrative record, the party must submit evidence to prove it. *See* D.C. Cir. R. 28(a)(7); *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). In this context as elsewhere, "barebones" statements do not suffice. *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607, 613–14 (D.C. Cir. 2019).

The Group's affidavit is too conclusory to establish organizational standing. The Group says that the FCC's licensing decision has forced it to "redeploy personnel and divert other resources" from research projects about terrestrial networks. Sandri Decl. ¶¶ 5–6. But which personnel and resources, and to where were they redeployed? Sandri does not say, beyond a threadbare claim that "equipment and personnel" were needed to "measure the impacts of the SpaceX system." *Id.* ¶ 5. Sandri estimates that the Group

17

spent "at least $10,000" on "activities related to" SpaceX's constellation, but he gives no concrete sense of what the funds were spent on. *Id.* ¶ 7. These unadorned assertions do not enable us to fairly assess whether the Group has satisfied the requirements for organizational standing under *Havens Realty* and *PETA*. *See Conservation Force v. Jewell*, 733 F.3d 1200, 1207 (D.C. Cir. 2013) ("We do not insist on record evidence and affidavits to establish standing because we are misguided nitpickers, but rather because we must respect the limits of our jurisdiction.").

2

Associations sometimes may assert standing on behalf of their individual members, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), but the Group has not shown that it qualifies as a membership association.

To assert associational standing, an organization must have the "indicia of a traditional membership association." *Sorenson Commc'ns v. FCC*, 897 F.3d 214, 225 (D.C. Cir. 2018) (quoting *Am. Legal Found.*, 808 F.2d at 90). This turns on considerations such as whether members finance the organization, guide its activities, or select its leadership. *See id.*; *Gettman v. DEA*, 290 F.3d 430, 435 (D.C. Cir. 2002). On the other hand, it is not enough for putative members simply to read a group's publications, subscribe to its e-mail list, or follow its Facebook page. *See Sorenson Commc'ns*, 897 F.3d at 225; *Gettman*, 290 F.3d at 435. In *Gettman* and *American Legal Foundation*, we applied these criteria to deny associational standing to groups that fell on the wrong side of this line. *See* 290 F.3d at 435; 808 F.2d at 89–90. And in *Sorenson Communications*, we denied standing to a group whose affidavit left it "unclear" whether the group satisfied these criteria. 897 F.3d at 225.

18

Here, the Group has given us no insight into how it relates with its members.  Two purported members submitted affidavits, but neither describes involvement in the Group beyond a bare assertion of membership.  *See* Baddiley Decl. ¶ 2; Malina Decl. ¶ 2.   And the Group's own affidavit, submitted by its operating officer, makes no reference to membership.  Again, we are left with no basis to determine whether the requisite elements of standing have been met—an issue on which the Group bore the burden of proof.

IV

The FCC adequately explained its conclusion that the modification of SpaceX's license would not interfere with DISH's satellites, and there is no proper party to pursue the NEPA claim.

*Affirmed in part and dismissed in part.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Appellant DISH Network Corp. certifies as follows:

### A. Parties

<u>Appellants</u>

The Appellants in this matter are (1) DISH Network Corporation (Case No. 21-1127), (2) Viasat, Inc. (Case Nos. 21-1123 and 21-1125), and (3) The Balance Group (Case No. 21-1128).

<u>Appellees</u>

The Appellees in the consolidated case are the Federal Communications Commission and the United States of America.

<u>Intervenor</u>

Space Exploration Holdings, LLC ("SpaceX") is an intervenor in the consolidated case.

### B. Amici Curiae

Professor Andy Lawrence appeared as amicus curiae on behalf of the Appellants. TechFreedom appeared as amicus curiae on behalf of the Appellee.

## C. Rulings Under Review

DISH, Viasat, and the Balance Group sought judicial review of the final Commission order captioned *Space Exploration Holdings, LLC; Request for Modification of the Authorization for the SpaceX NGSO Satellite System*, 36 FCC Rcd. 7995 (2021).

## D. Related Cases

1. Viasat, Inc. v. FCC, Case Nos. 21-1123, 21-1125
2. DISH Network Corp. v. FCC, Case No. 21-1127
3. The Balance Group v. FCC, Case No. 21-1128

## CORPORATE DISCLOSURE STATEMENT

DISH Network Corporation is a publicly traded corporation on the NASDAQ Global Select Market under the symbol "DISH."  It has no publicly held subsidiaries.  Its subsidiaries operate pay-TV and wireless businesses.  No publicly held corporation owns 10% or more of its stock except for Dodge & Cox.

## CERTIFICATE OF SERVICE

I hereby certify that, on October 11, 2022, I electronically filed the foregoing document with the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. I certify that the counsel of record for all parties are registered as ECF Filers and that they will be served by the CM/ECF system.

/s/ *Pantelis Michalopoulos*
Pantelis Michalopoulos
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, D.C. 20036
(202) 429-6494